# BIENERT, MILLER & KATZMAN
*A Professional Law Corporation*

February 12, 2018

**VIA ECF**

The Honorable P. Kevin Castel
United States District Court
Southern District of New York
500 Pearl Street
New York, NY, 10007-1312

  Re: *United States v. Bergstein et al*, Case No. 16-cr-746-PKC-1

Dear Judge Castel:

  As ordered by the Court on February 8, 2018, the defense writes in response to the government's letter motion filed February 9, 2018 (the "Gov. Ltr."). See Dkt. 268.

## I. PRELIMINARY STATEMENT

  The government continues is exploiting the Court's December 5, 2017 ruling, which granted the government's request to impose a Rule 16 production deadline on the defendant 5 weeks before trial. This exploitation is exacerbated because the Court also rejected the defendant's requests that the Court set a reciprocal deadline for the government to complete its Rule 16 production. The result of these rulings is that the government, which has the burden of proof in this case and initial discovery obligations to provide defendant of notice of what he must defend, has no limit on when it may produce new discovery; while the defendant, who has no burden and is reacting to the government's case, has a deadline to produce discovery. While the government seeks an order precluding the defense from introducing approximately 2,200 pages of supplemental discovery[1] produced within five weeks of trial, during that same period the government has produced *3,500* pages of additional discovery to the defense.[2] Defendant does not believe the Court intended its orders to create a "sword/shield" scenario for the government; doing so is unfairly prejudicial to defendant and results in an improper burden shifting regarding evidence in this criminal case.

  If the government's position were accurate, defendant would be improperly precluded from offering evidence related to material that the defense in good faith, determines within five weeks of trial and during trial that it will use in its case-in-chief. A defendant would rarely, if ever, be able to meet this standard. This is particularly true in this case because the deadline imposed on

---

[1] The government has often argued to the Court—and the Court has agreed—that page numbers can be misleading in evaluating the volume of discovery. *See* Dkt. 194 (in denying the defense's continuance request in light of voluminous discovery produced by the government late in the game, the Court observed that "[p]age numbers are notoriously unreliable indicators of the significance and/or difficulty of documentary materials.")

[2] The government likewise has continued to supplement its exhibit list after the deadline set by the Court for the government to provide its exhibit list. Of course, the defense presumes that the government is doing so in good faith—which both the government and the defense should be permitted to do.

To: Honorable P. Kevin Castel  
Re: *USA v. Bergstein et al*  
February 12, 2018  
P a g e | **2**

BIENERT, MILLER & KATZMAN  
A Professional Law Corporation

the defense to produce Rule 16 material was prior to the defense receiving the government's witness list, marked exhibits, Section 3500 material, or even its completed discovery, making full determinations of "trial evidence" for defendant impossible.  Moreover, the deadline was nearly a month before the Court ruled on the government's motion to admit certain 404(b) evidence, which greatly expanded the scope of the case beyond the indicted crimes.

By setting a Rule 16 deadline for the defense but not the government—if that ruling is applied in the manner advocated by the government—the burden has essentially been shifted to the defense, which will be handcuffed from responding to the government's supplemental discovery, exhibits, or evidence at trial with any evidence not provided earlier than 5 weeks before trial.  This certainly cannot be the outcome intended by the Court when it entered its December 5, 2017 order.  Additionally, Rule 16 by its terms obligates a defendant to produce only that material he intends to use in his case-in-chief.  To the extent that decision, in good faith, has not been made at the time of the deadline set by the Court, the defense cannot be precluded from supplementing its disclosures once a decision is made to use material at trial.  The defense in this case has at all times attempted to comply with this Court's orders, even those it disagrees with, fully and in good faith.

Additionally, the government's letter sets forth an inaccurate narrative, because in fact many of the documents about which it now complains it was unaware were actually identified for the government more than a year ago (prior to the return of the Indictment), and have been available for several years in publicly filed pleadings—including in an action that the government itself intervened.  In fact, while the government claims that the documents were not provided to the government in response to grand jury subpoenas, over 16 months ago—shortly after receiving several grand jury subpoenas—Bergstein's counsel identified a number of the documents to the government and offered to provide them.  The government never took the defense up on this offer.  In light of this, the government's letter appears to be an attempt to preview the defense's evidence and witnesses before the government completes its case.  The government had plenty of time to investigate these documents, instead of waiting until mid-trial to raise these issues.

At bottom, the government does not like the so-called "Questioned Documents" because they are evidence inconsistent with the government's theory of the case.  However, the appropriate course of action is not to seek an *in limine* judicial finding that the evidence must be fabricated, but rather to address admissibility if and when the defense seeks to introduce the evidence,[3] to cross-examine any witnesses with respect to the evidence, and to permit the jury to determine the weight of the evidence it deserves.  *See Appendi v. New Jersey*, 530 U.S. 466, 477 (2000) (6th and 4th Amendments entitle a criminal defendant to a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt).  For the reasons set forth below, the government's knee-jerk reaction claims that evidence inconsistent with its theory of the case must be fabricated should be disregarded as a basis to interrupt or alter the normal order of trial.

---

[3] Notably, the defense has not yet attempted to introduce any of the Questioned Documents into evidence, and when making the February 7 production to the government, the defense indicated that it had not yet determined whether it intended to use the produced materials in his case in chief, but was producing them out of an abundance of caution.

To: Honorable P. Kevin Castel                                    BIENERT, MILLER & KATZMAN
Re: *USA v. Bergstein et al*                                      A Professional Law Corporation
February 12, 2018
P a g e | **3**

## II. THE GOVERNMENT CONTINUES TO PRESENT A FALSE NARRATIVE TO THE COURT BY RELYING ON A DISCREDITED TRUSTEE'S REPORT

At the outset, the defense is compelled to respond to the government's continued reliance on a "report" issued by the trustee in the involuntary bankruptcy cases of five of Bergstein's former film industry-based companies in an attempt to bolster the credibility of its accusations.[4] While the government characterizes the trustee's "report" as "findings," in truth—as the government well knows—the document consists of nothing but unsubstantiated accusations that the trustee himself ultimately had to admit were never proven, despite 5 years of contentious litigation spanning more than 150 lawsuits (all dismissed at the pleadings stage) and massive amounts of discovery. *See* Ex. 1 (December 2015 Settlement) at §§ 2.5, 2.6, 2.8, 2.13, 2.14, 2.15, & 2.28.

The trustee accused Bergstein of "backdating" certain documents. However, the court never agreed, and denied multiple attempts by the trustee to use that accusation to obtain relief. In fact, affirmative evidence was presented establishing the falsity of the trustee's allegations. *See* Ex. 2 (Steffan Declaration) (without exhibits). The trustee eventually acknowledged that Bergstein presented evidence disputing the accusations in the report. *See* Ex. 1 at § 2.6 (trustee recital acknowledging that Bergstein "provided information that is not reflected or referred to in the ["report"], and that contradicts the ["report's"] allegations concerning Mr. Bergstein . . . .")

Moreover, the trustee and his counsel—the authors of the "report" on which the government now relies for support—were harshly criticized by the court for inappropriate and abusive tactics. After years of advancing frivolous arguments, the court issued lengthy findings of fact and conclusions of law granting Bergstein's motion to dismiss the bankruptcy cases, finding that the trustee and his counsel engaged in, among other things, the following:

(i) "gross mismanagement";

(ii) "blatant abuse of the legal system";

(iii) "neglect of [their] duty to properly administer the estates";

(iv) "blatant forum shopping";

(v) "unwillingness to accept responsibility for their lack of due diligence in attending to the administration of [bankruptcy cases]";

(vi) making "blatantly false statement[s]";

(vii) persistence in continuing to make a "false argument, which seriously put[] into question both the credibility and judgment of both [the trustee and his counsel]"; and

(viii) taking "action in blatant disregard of their duties, as officers of the court . . . ."

*See* Ex. 3 (Findings of Fact & Conclusions of Law).[5]

---

[4] Indeed, it appears that this same report formed the basis for the government's proposed 404(b) evidence related to an alleged "advance fee media scheme," to which Bergstein continues to object.

[5] It should also be noted that Bergstein has been involved in hundreds of deals involving thousands of documents during his approximately 30 years working in distressed asset deals. He

Case 1:16-cr-00746-PKC   Document 271   Filed 02/12/18   Page 4 of 12

To: Honorable P. Kevin Castel
Re: *USA v. Bergstein et al*
February 12, 2018
P a g e | **4**

BIENERT, MILLER & KATZMAN
A Professional Law Corporation

The government's attempt to reach back to the bankruptcy cases to try to impugn Bergstein in this case, while inappropriate, is not surprising. It was in connection with those bankruptcy cases that government informant and cooperator Paul Parmar first began using his FBI connections to coordinate and push a criminal investigation of Bergstein. Parmar warned Bergstein as early as 2010 of the threat of a criminal investigation. *See* Ex. 4 (Parmar Declaration).

The trustee—a former FBI agent himself—worked covertly with Parmar and David Molner (the former manager of Aramid Entertainment Fund, one of the hedge fund assets at issue in this case) to try to have the bankruptcy judge recused after he began to rule in Bergstein's favor. *See* Ex. 5 (Declaration of Mitchell Greene), at ¶ 11. The plan employed to accomplish this was to leak one of the recordings Parmar made of Bergstein to the press, and use that as a basis for recusal. Around this same time, when Bergstein realized Parmar had illegally recorded their phone calls, Parmar became concerned and reached out to SA Shannon Bieniek—the case agent in this case—trying to push a criminal investigation against Bergstein while at the same time stave off any investigation regarding him or Molner. *See* Ex. 6 (August 20, 2013 Email from Parmar to SA Bieniek). Less than a month after the correspondence between Parmar and SA Bieniek the motion to recuse the bankruptcy judge was filed. The bankruptcy judge recognized the recusal motion for what it was—"an engineered attempt" by the parties adverse to Bergstein who were "just unhappy with the rulings." *See* Ex. 7 (excerpt of transcript).

### III. THE GOVERNMENT'S FABRICATION ACCUSATIONS ARE MERITLESS

#### A. The Government's Contentions Regarding Prior Process Are Misleading And/Or Irrelevant.

Regarding the subpoena issued to Bergstein by the SEC, the government acknowledges that while Bergstein produced documents in response to the subpoena, he made clear through counsel that he had not produced all documents called for by the subpoena. *See* Gov. Ltr., Ex. B. Bergstein himself also advised SEC staff of this during his testimony. *See* Dkt. 267-1 at 5. Notably, for the reasons set forth above in the discussion of the involuntary bankruptcy cases, at the time Bergstein responded to the SEC subpoena he was: (i) involved in over 100 litigations; (ii) thinly staffed; (iii) turned certain servers over to the bankruptcy trustee; and (iv) as a result had large volumes of documents in hard copy stored in boxes. Bergstein was advised to and did focus his production on communications with Weston/Hallac/Wellner. Notably, the government presents no evidence that the SEC took any steps to seek additional information or material from Bergstein.

With respect to the grand jury subpoenas the government asserts were issued to Bergstein and entities he purportedly controlled, the government issued those subpoenas on September 28, 2016. *See* Gov. Letter, Ex. C. Upon receipt of those subpoenas, Bergstein's counsel began dialoguing with the government regarding a response to the subpoenas and discussing a proffer session. *See* Ex. 8 (Oct. 19, 2016 email). Shortly thereafter the government Indicted Bergstein

---

has also been involved in hundreds of litigations. Out of those, the only allegations of backdating the government can point to are the long discredited (and admittedly unproven) allegations by the bankruptcy trustee 7 years ago.

Case 1:16-cr-00746-PKC   Document 271   Filed 02/12/18   Page 5 of 12

To:  Honorable P. Kevin Castel                                BIENERT, MILLER & KATZMAN
Re:  *USA v. Bergstein et al*                                  A Professional Law Corporation
February 12, 2018
P a g e | 5

without engaging in a proffer.  Because of the Indictment, the defense shifted focus to defending the case against Bergstein.  The government never sought to enforce the pre-indictment grand jury subpoenas.  Indeed, the defense does not believe the government ever raised the issue of the pre-indictment grand jury subpoenas again until its February 9, 2018 letter—a week into trial.

Additionally, the government continues to incorrectly claim that Bergstein "controlled" Arius Libra.  This is not true.  The defense believes the evidence will show that, in fact, Weston—primarily through Hallac and Wellner—controlled Arius Libra at all times.  Specifically: (i) Weston (through government cooperating witnesses Keith Wellner and Albert Hallac, as well as Jeffrey Hallac) controlled 3 of Arius Libra's 5 board seats; (ii) Wellner was Arius Libra's President; (iii) Weston (through two funds it managed and controlled, Wimbledon Financing Master Fund and Wimbledon Real Estate Master Fund) owned 65.88% of Arius Libra's stock; and (iv) Weston controlled Arius Libra's bank account (Albert Hallac appears to have been the only signature on the account at all times).[6]

Regarding the pre-indictment grand jury subpoenas issued by the government to third parties—i.e., Kia Jam ("Jam"), K-Jam Media, or Zarrinkelk Kashefipour & Co. ("ZKCO")—Bergstein does not control those third parties, who are separately represented, and cannot speak to the responses provided.

The government suggests something nefarious by complaining that Bergstein produced documents "without any metadata that could identify when the documents were last created or modified" and that "[n]one of the documents, moreover, were produced in emails or other forms that would indicate when they were created or transmitted to other individuals."  Gov. Ltr. at 6.  However, the government has produced thousands of pages, if not tens of thousands, of discovery that fits the same description.  There is nothing improper about this, and questions about authenticity (to the extent they exist) can be addressed through cross-examination of witnesses.

The government likewise inaccurately characterizes the source and timing of the defense's receipt of the KJM Invoices and the DM Invoice.  While it is accurate that defense counsel received these invoices from Bergstein, Bergstein obtained them from Evan Warshawsky—who the defense has disclosed to the government as a defense witness—shortly before Bergstein provided the invoices to counsel, and only a few days before trial commenced.  The government will have a full and fair opportunity to cross-examine Mr. Warshawsky on any testimony he offers at trial, including testimony regarding these invoices.

### B.     The Integrated Administration Invoices

As an initial matter,[7] the government's arguments regarding the IA Invoices are fatally flawed and demonstrate the impropriety and waste of judicial resources in proceeding as the

---

[6] Based on this evidence, it appears that the testimony of government cooperator Wellner that Arius Libra was "functionally controlled" by Bergstein (Tr. 142:12-16) was false or, at a minimum, misleading.

[7] The government presents a general background purporting to describe what Integrated Administration is and was to do, and the nature of the invoices.  Gov. Ltr. at 7-8.  This is all information that would need to be elicited as evidence be subject to challenge through cross examination. Similarly the government's argument that the IA Invoices were not produced by

Case 1:16-cr-00746-PKC   Document 271   Filed 02/12/18   Page 6 of 12

To:  Honorable P. Kevin Castel                                BIENERT, MILLER & KATZMAN
Re:  *USA v. Bergstein et al*                                 A Professional Law Corporation
February 12, 2018
P a g e | **6**

government proposes. The government's entire argument rests on its incorrect assumption that Bergstein intends on introducing the IA Invoices to substantiate a reimbursement claim. This is incorrect. The IA Invoices were produced out of an abundance of caution, in the event they became relevant at trial. The defense did not want to be precluded from using the IA Invoices at trial in light of the Court's oral directive to the defense on February 6, 2018.

Second, Bergstein does not dispute that the IA Invoices were prepared in 2013—and has never represented otherwise to the government. Additionally, despite the government's characterization otherwise, the evidence does not show that Bergstein created these invoices—rather, the evidence cited by the government itself (the metadata for the excel spreadsheets referenced at page 8 of the Gov. Ltr.) shows that the invoices were, in fact, created by an individual named Harry Simonian in June 2013. It is the defense's understanding that Mr. Simonian was hired by Integrated Administration in February 2013 to assist Integrated Administration with getting its books and records in order. *See* Declaration of Harry Simonian, at ¶ 2. In connection with that work, Mr. Simonian began working on reconciling Integrated Administrations books, prepared and revised invoices for work performed, and submitted them for review and comment. *Id.*

Third, with respect to the alleged change in the "bill to" designation on the IA Invoices, the government has its timing wrong. The government accuses Bergstein of altering the IA Invoices to change the "bill to" designation from "Cyrano Group, Inc. – Bidz matter" to simply "Bidz matter" prior to trial. In fact, it appears that the original designation on the invoices was "Bidz matter," and Mr. Simonian subsequently changed the designation to "Cryano Group, Inc. – Bidz matter." *See* Simonian Decl. at ¶¶ 3 & 4.

As the government correctly points out in its letter, Cyrano Group did not exist until November 2011. *See* Gov. Ltr. at Ex. O. However, by the time Mr. Simonian began his work in 2013, Cyrano Group was active. When preparing and revising the IA Invoices, Mr. Simonian mistakenly assumed that Cyrano Group was the appropriate entity to which the Bidz matter was to be billed. Simonian Decl., at ¶¶ 3 & 4. That was incorrect because, as the government acknowledges, Cyrano Group has no relationship to this case.

In any event, these changes are irrelevant, because as noted above, the government's attempts to foresee the defense's use (if any) of the IA Invoices misses the mark.

### 1.    The Formatting of the IA Invoices Is A Red Herring

Finally, the government points to the different formatting of various invoices issued by Integrated Administration as some sort of proof that the IA Invoices at issue are fabricated. *See* Gov. Ltr. at 11-12. This argument is baseless for several reasons. First, the government has identified contemporaneous emails with draft invoices in the form of the IA Invoices, which shows the template in the IA Invoices was being used at the time. *See* Gov. Ltr. at 8. Second and more importantly, the fact that different templates for invoices were used is not evidence that any invoice

---

Bergstein in response to the SEC's November 2012 subpoena (Gov. Ltr. at 8) is irrelevant and certainly does not lead to conclusion that the IA Invoices were fabricated; as explained above, Bergstein informed the SEC that he had not produced all responsive documents and the SEC took no further action.

Case 1:16-cr-00746-PKC   Document 271   Filed 02/12/18   Page 7 of 12

To:  Honorable P. Kevin Castel            BIENERT, MILLER & KATZMAN
Re:  *USA v. Bergstein et al*              A Professional Law Corporation
February 12, 2018
P a g e | 7

is fabricated.  Rather, it is reflective of what in fact is the case—around the relevant time frame, invoices were being generated by at different individuals—Mr. Simonian and Mr. Warshawsky—each of whom used their own preferred templates and each of whom is a likely defense witness that the government may question about their templates.

At bottom, the appropriate person for the government to question regarding which invoice is the proper invoice is the principal of Integrated Administration, Kia Jam.  However, the government has effectively precluded the defense from calling Jam as a witness by threatening him with indictment.  The government should therefore be compelled to immunize Jam to testify on these matters to the extent he Court proceeds with a 104 hearing (which it should decline to do for the reasons set forth herein).

      C.      **The KJM Invoices and the Definity Media Invoices**

As with the IA Invoices, the government claims that the KJM Invoices were not produced previously.  Assuming that is true, for the reasons set forth above, the government's conclusion that the invoices are fabricated does not follow.  Rather, Mr. Warshawsky confirms that he prepared the KJM and the DM Invoice in the regular course of business, found them in his physical files a few days before trial, and provided them to the defendant.  *See* Declaration of Evan Warshawsky at ¶¶ 3-4.

Moreover, the government points to its purported conversations with civil counsel for the TT Fund and WFF, whom the government represents have indicated that the KJM Invoices have not been produced in civil discovery.[8]  Of course this ignores the simple fact that Bergstein has resisted discovery in those civil cases due to his Fifth Amendment concerns in light of Indictment in this case, and those cases have been stayed (including document discovery) pending the conclusion of trial here.

Again, the government's focus on the template of the invoices used is misplaced.  The KJM Invoices and the DM Invoice were prepared by the same individual—Mr. Warshawsky—using his standard template form.  *See* Warshawsky Decl. at ¶ 6.  It is neither surprising nor unusual for an individual like Mr. Warshawsky to have a stock template to use for certain documents, such as invoices.

To the extent the government believes the work reflected in the invoices is "extremely suspect" (Gov. Ltr. at 14), that is a matter it can attempt to bring out through cross-examination—not exclusion of otherwise admissible evidence.  It is then up to the jury to determine what weight, if any, to give to the invoices.  To be sure, the defense's position is that much of the government's evidence is "extremely suspect"—including the testimony of its star witness, Wellner—but that concern is being addressed through cross-examination and introduction of competing evidence, which is the appropriate method to address these matters. The same is true regarding government's argument regarding the way the KJM Invoices and the DM Invoice match up with associated money transfers. Gov. Ltr. at 15-16.

---

[8]  Notably, the government has not made a similar claim with respect to the IA Invoices or any other documents at issue in the government's letter.

Case 1:16-cr-00746-PKC   Document 271   Filed 02/12/18   Page 8 of 12

To: Honorable P. Kevin Castel  
Re: *USA v. Bergstein et al*  
February 12, 2018  
P a g e | **8**

BIENERT, MILLER & KATZMAN  
A Professional Law Corporation

### D.   The Related Party Contracts

With respect to the "Related Party Contracts" (Gov. Ltr. at 16), the government argues they are "facially suspicious" because they are executed by Jam, who the government repeatedly characterizes as a co-conspirator. That is not a basis to exclude the evidence. Indeed, the government's position ignores the fact that Weston—through Hallac and/or Wellner—repeatedly sought Jam's signature on numerous documents forming the basis of the deal at issue in the Indictment, which have already been entered into evidence. *See, e.g.*, GX 106 (Jam's signature on the Conditional Assignment Assumption Agreement, Pledge Agreement, Contribution Agreement, and Borrowing Certificate).

#### 1.   The SIP SPA, Graybox FSA, and Pineboard-SIP Note

With respect to the SIP SPA, the Graybox FSA, and the Pineboard-SIP Note, the government claims that it was unaware of these documents until the defense produced them on February 7, 2018. This is not true. In fact, on October 11, 2016—roughly a month *prior* to the return of the Indictment—Bergstein's counsel sent the government several documents, including a brief in the matter of *The Wimbledon Fund, SPC (Class TT) v. Graybox LLC, et al*, Case No. 2:15-cv-6633-CAS-AJW, pending before the United States District Court for the Central District of California. *See* Ex. 9 (October 11, 2016 email). That brief specifically identified as exhibits: (i) the SIP SPA; (ii) the Graybox FSA; and (iii) the Pineboard-SIP Note, among other documents. *See* Ex. 9 at 4-6. These documents were each filed in the civil litigation more than a year earlier—September 25, 2015. Furthermore, the defense offered to send all exhibits to the government on its request. *See id.* The government never asked the defense to serve the exhibits. However, the government subsequently moved to intervene the same lawsuit and had access to all pleadings and exhibits filed in the case.

Any other issues raised by the government with respect to these documents in its letter are appropriately dealt with through cross-examination.

#### 2.   The Pineboard MOI


REDACTED

Third, the defense has consistently taken the position that that Parmar *did* not deliver the medical billing assets as he was required to do under the relevant Purchase Agreement—

Case 1:16-cr-00746-PKC   Document 271   Filed 02/12/18   Page 9 of 12

To: Honorable P. Kevin Castel                          BIENERT, MILLER & KATZMAN
Re: *USA v. Bergstein et al*                           A Professional Law Corporation
February 12, 2018
P a g e | **9**

accordingly the government's contention that 'Bergstein contributed assets purchased from Parmar to Sovrin" is inaccurate.

The defense only recently received the Pineboard MOI, which was provided by Mr. Silverman. As far as the defense is aware, neither Sovrin nor Messrs. Silverman and DeFrank received prior process. Because Messrs. Silverman and/or DeFrank are slated as defense witnesses, the government will be free to cross-examine them regarding the Pineboard MOI.

### 3. The Arius Libra-SIP Loan


REDACTED

### E. The Graybox Invoices

The government does not dispute that the defense provided the Graybox Invoices to the government previously (the Graybox Invoices were also identified in the defense's October 2016 email to the government). Instead, the government simply claims "there is no reason to think they are real." Gov. Ltr. at 17. However, the government is not the finder of fact—that is a job left to the jury. And whether a proper foundation has been laid for the invoices will depend on what occurs at trial.

## IV. THE DEFENDANT HAS COMPLIED WITH HIS RULE 16 OBLIGATIONS IN GOOD FAITH, AND CONTINUES TO DO SO

Rule 16's reciprocal discovery framework is not triggered until (1) the defense requests discovery and the government complies, Fed. R. Crim. P. 16(b)(1). With respect to documents the defense intends to use in its case in chief, the obligation to disclose the material to the prosecution is subject to two further conditions: (1) that the document is within the defendant's possession, custody or control, and (2) the defendant intends to use the item in the defendant's case-in-chief at trial. Fed. R. Crim. P. 16(b)(1)(A)(i), (ii). Of course, a defendant cannot make an informed decision about what documents it intends to use in his case in chief until it knows what the government intends to present in its case in chief. Therefore, a defendant's obligation to produce

Case 1:16-cr-00746-PKC   Document 271   Filed 02/12/18   Page 10 of 12

To:  Honorable P. Kevin Castel  BIENERT, MILLER & KATZMAN
Re:  *USA v. Bergstein et al*  A Professional Law Corporation
February 12, 2018
P a g e | **10**

documents depends on the timing and the extent of the government's pretrial disclosures about its case in chief.

Here, the government disclosed very little information about its case in chief. What it has disclosed, it has disclosed only recently. The government's witness list was produced on January 15, 2018. Its exhibit list was produced on a week later, but has been regularly updated since then, including throughout trial. The defense responded in good faith by producing approximately 10,000 documents on January 2, 2018. In that letter, the defense made clear to the government that the production consisted only of documents that the defense had identified as of that date, and that the defense was continuing to review and assess documents in its possession and would make supplemental disclosures based, in part on the governments' case in chief. See Ex. 10 (January 2, 2018 Letter re: Rule 16 production). It was inevitable, given the timing of the government's disclosures, that the defense would be forced to produce documents on a rolling basis. The government has also supplemented its discovery production on a rolling basis. In fact, although the government claimed that it had produced substantially all of the discovery to the defense more than one year ago, it has since supplemented its production at least times, with over 300,000 documents. *See* Dkt. No. 184. In the same period the government now complains of—since January 2, 2018—the government has produced more discovery to the defense than the defense has produced to the government.

The government raised its objection to the timing of the defense disclosures of documents relied on by its summary witness on February 6, 2018. On that day the government was given an opportunity to be heard both on whether the defense had violated the discovery rules and what sanction should follow. After that hearing the government asked that the Court order the defense to produce any documents it intended to present through its summary witness. The defense complied with that order the next day and produced documents to the government with the caveat that not all materials produced may be used in the defense's case in chief.

The fact that the government first raised the issues set forth in its February 9 letter the day after receiving the defense's supplemental production shows that it had no trouble reviewing those documents (and the metadata associated with them), identifying their relevance, and forming arguments about their authenticity. In its letter, the government even suggests that it may wish to use the documents to argue Bergstein's "consciousness of guilt." This makes it clear that the government has not been "sandbagged" by the production nor has it suffered prejudice.

Rule 16(d) gives the Court broad discretion to regulate discovery, including ordering that certain items be produced on a date certain, as the Court has done in this case. As set forth above, the defense complied with the Court's Rule 16 order and produced documents relied on by its summary witness well in advance of the date they will be presented (if they are offered at all). But even if the Court were to find a Rule 16 violation, the Court should not order preclusive sanctions unless it concludes that a less drastic remedy (such as a continuance) would not be sufficient mitigate any prejudice. *See United States v. Gray-Burriss*, 791 F.3d 50, 56 (D.C. Cir. 2015). The government has clearly had enough time to prepare for the use of all of the documents produced on February 7 and cannot credibly allege that it suffered any prejudice. But to the extent that the government needs additional time, Bergstein would not object to a continuance.

None of the government's cases support a preclusive sanction.

Case 1:16-cr-00746-PKC   Document 271   Filed 02/12/18   Page 11 of 12

To: Honorable P. Kevin Castel                                                                BIENERT, MILLER & KATZMAN
Re: *USA v. Bergstein et al*                                                                     A Professional Law Corporation
February 12, 2018
P a g e | **11**

*United States v. Ryan*, 448 F. Supp. 810 (S.D.N.Y. 1978) stands for the unremarkable proposition that a defendant must comply with a Court's order compelling him to produce documents. In *Ryan*, the Court ordered the defendant to produce documents by the following morning at 9:30 a.m. *Id.* at 811. Likewise here, the Court ordered Bergstein to produce documents to be relied on by his summary witness, and Bergstein complied with that order. *Ryan* does not support preclusion of defense exhibits following a defendant's compliance with a court order. Moreover, *Ryan* says nothing about precluding supplemental productions made in good faith.

*United States v. Weiss* is also inapposite. In that case, the defense was ordered to produce documents it intended to use in its case in chief "immediately." 930 F.2d 185, 199 (2d Cir. 1991). The defense did not comply with the district court's order, and it did not produce the document until after the government rested its case, and after the government witnesses who could have provided information about the documents were out of state. *Id.* at 199. Here, the defense complied with the court's discovery order and produced the documents early in the government's case, giving the government potentially weeks (based on the government's estimate of its case) to review them before the defense case is presented. Moreover, as the government's 25-page letter to the Court shows, it has carefully scrutinized each of the documents produced and has not been prejudiced by the timing of the production at all.

The government is free to challenge the authenticity of the documents and seek to exclude them on that ground. But it would be an abuse of discretion to exclude them pursuant to Rule 16(d).

## V.   THE GOVERNMENT'S REQUEST FOR A 104 HEARING IS BASELESS

The Government's request for a hearing regarding the authenticity of challenged documents should be rejected. With respect to the question of authenticity, the Court's power is "limited to a determination whether sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *Rickets v. City of Hartford*, 74 F.3d 1397, 1411 (2d Cir 1996) (internal quotations omitted); *see United State v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991). Accordingly, in *Rickets*, the Second Circuit held that the trial judge erred in excluding a recording "on authentication grounds without making a finding that no rational juror could have concluded that [the defendant] made the statement at issue." 74 F.3d at 1411; *see United States v. Sliker* 751 F.2d 477 (2d Cir 1984 (holding that recording was properly admitted because there was sufficient evidence to allow a rational juror to conclude that the defendant's voice was on recording).

Further, questions of witness credibility are for the jury, not the Court. *See*, *e.g.*, *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001). Accordingly, a court may intrude on the jury's role in assessing witness credibility only in "exceptional circumstances" such as when it "defied physical realities." *Id.* at 134 (quoting *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir.1992)). Accordingly, the trial court should leave the question of whether a document was fabricated to the jury. *See United States v. Rittweger*, 2003 WL 22290228, at *9 (S.D.N.Y. Oct. 6, 2003) ("Brandon had every opportunity to cross-examine Blech before the jury to show that the document was fabricated, and he argued at length to the jury that the document was fabricated. . . . It was for the jury to assess Blech's credibility with respect to the document and the Court cannot

Case 1:16-cr-00746-PKC   Document 271   Filed 02/12/18   Page 12 of 12

To:  Honorable P. Kevin Castel                                    BIENERT, MILLER & KATZMAN
Re: *USA v. Bergstein et al*                                       A Professional Law Corporation
February 12, 2018
P a g e | **12**

conclude on the basis of the testimony and the record that admissibility of the document was in any way erroneous.").

The Government's requested hearing is particularly improper, because, to the extent the defendant could provide the foundation for the challenged documents, the defendant would be forced to decide whether to testify before the close of the Government's case. Such a requirement is unconstitutional. *See Brooks v. Tennessee*, 406 U.S. 605, 610-11 (1972) (holding that Tennessee rule that a defendant must testify first in the defense case violated the defendant's Fifth Amendment and due process rights). Because "the accused and his counsel may not be restricted in deciding whether, and when in the course of presenting his defense, the accused should take the stand," the Government's requested hearing would violate Mr. Bergstein's Fifth Amendment and due process rights. *Id.* at 613

## VI. THE GOVERNMENT'S REQUEST FOR ALTERNATIVE RELIEF IN THE EVENT THE DOCUMENTS AT ISSUE ARE ADMITTED IS PREMATURE

For the reasons set forth in this letter, the government has jumped the gun in seeking the relief it is requesting. One point the defense and government appear to agree on is that the appropriate relief available to the government or the defense with respect to particular evidence will depend on the ultimate state of the factual record at the appropriate time. Here, it is premature to make determinations regarding the government's proposed "consciousness of guilt evidence," a supplemental jury instruction, or other relief. *See* Gov. Ltr. at 24-25.

## VII. CONCLUSION

Accordingly, for the foregoing reasons, the Court should decline the government's request for a Rule 104 hearing and instead address the evidence in the appropriate course if and when the defense seeks to introduce it.

Respectfully Submitted,

/s/ Thomas H. Bienert, Jr                         /s/ Andrew L. Fish
Thomas H. Bienert, Jr.                            Andrew L. Fish
BIENERT, MILLER & KATZMAN, PLC                    SATERLEE STEPHENS LLP


*Counsel to David Bergstein*                      *Counsel to David Bergstein*



425771-1