I2F5ber1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               16 Cr. 0746(PKC)

DAVID BERGSTEIN,

                Defendant.

------------------------------x
                                      February 15, 2018
                                      10:10 a.m.
Before:

                  HON. P. KEVIN CASTEL,

                                      District Judge

                      APPEARANCES

GEOFFREY S. BERMAN
      Interim United States Attorney for the
      Southern District of New York
BY:   EDWARD IMPERATORE
      ROBERT ALLEN
      ELISHA KOBRE
          Assistant United States Attorneys

BIENERT, MILLER & KATZMAN, PLC
      Attorneys for Defendant
BY:   THOMAS H. BIENERT, JR.
      ANTHONY R. BISCONTI

SATTERLEE STEPHENS LLP
      Attorneys for Defendant
BY:   ANDREW L. FISH

          – also present –

Ellie Sheinwald, U.S. Paralegal Specialist
Sarah Emmerick, U.S. Paralegal Specialist
Caroline Howland, Defense Paralegal Specialist

SA Shannon Bieniek, FBI

I2F5ber1

1              (Trial resumed; jury not present)

2              THE COURT:  Please remain standing for the jury.

3              I am going to take up the issue of the subpoena on a

4      break.  Marked as Court Exhibit 7 are the introductory charges

5      through page 27, which I am going to ask you to review because

6      I propose to deliver them during the course of the trial.

7              You may take the witness stand.

8              Bring our jury in.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I2F5ber1                         Martin - cross

1          (Jury present)

2          THE COURT:  Please, be seated.

3          Good morning, ladies and gentlemen.  It's somewhat

4    bittersweet.  Yesterday we had some fun about it being

5    Valentine's Day and it was also Ash Wednesday and we found out

6    about the tragedy in Florida.  And I know our thoughts and our

7    prayers are with the good people whose families have been

8    affected by that tragedy.

9          We are back in action and, Mr. Martin, the Court

10   reminds you that you are still under oath.

11         THE WITNESS:  Yes, sir.

12    DOUGLAS MARTIN, resumed.

13         THE COURT:  You may inquire, Mr. Bienert.

14   CROSS EXAMINATION

15   BY MR. BIENERT:

16   Q.  Thank you, your Honor.

17         Mr. Martin, good morning.  I represent David

18   Bergstein, my name is Tom Bienert.

19         First of all, the facts of your business deals with

20   Mr. Bergstein that you testified with the government primarily

21   about, those span from 2006 mostly into 2010; is that the about

22   the right time frame?

23   A.  I think the actual business deals went from 2007 to -- on

24   into 2010 and 2011.

25   Q.  Okay.

I2F5ber1                    Martin - cross

1          And, just to be clear, is it accurate, sir, that you

2    and Stephens never had any involvement with a business deal

3    involving a company named Arius Libra, Pineboard, Sovrin, or

4    any of those companies in 2011 or 2012?

5    A.  That's correct.  I'm not familiar with those companies.

6    Q.  No dealings with them at all?

7    A.  Right.

8    Q.  Now, let's go back.  You testified about several loans that

9    you noted were made, in essence, between your company or the

10   company you look out for, Stephens, and Mr. Bergstein or one of

11   his companies, right?

12   A.  Yes, sir.

13   Q.  But, sir, there were many more deals or contracts that were

14   part of what we will call the Sheridan/DB Zwirn/BT Music

15   episode, and just the loans you went over with us, right?

16   A.  When you say other contracts, that Stephens was a party to?

17   Q.  Yes, sir.

18   A.  I would have to be refreshed, my memory on that.

19   Q.  Okay.

20   A.  It was a long time ago and so many deals I don't know what

21   was happening.

22   Q.  So, first and foremost, you are sitting here today in 2018

23   talking about fairly complex business deals that happened in

24   2007 and 2008, right?

25   A.  Yes, sir.

I2F5ber1                         Martin - cross

Q.  And even for somebody who is diligent and works hard and is
highly educated like yourself, is it accurate it is very
difficult to remember a lot of what happened?

A.  Sometimes it is; yes, sir.

Q.  So, what I am going to do is let's talk about how you and
Stephens became involved with this music library company
Sheridan to begin with in 2006.  Am I right that basically
Stephens made an $8 million equity, in essence, purchase to own
part of Sheridan sometime in around 2006?

A.  That's my recollection; yes, sir.

Q.  And, at the time that happened, Mr. Bergstein wasn't on the
horizon and he had nothing to do with any of that, right?

A.  Not to my knowledge.

Q.  And, because you bought equity, what you guys were doing,
am I correct, was buying an ownership in the company, hoping
that over time the company could make money, and then your
equity position for Stephens would let you make money, or if
the company sold you would make money that way?

A.  Yes, sir.

Q.  Was that the plan?

A.  Yes, sir.

Q.  In that time frame, in that 2006 to 2007 time frame when
you were doing these types of deals for Sheridan -- strike
that -- for Stephens, did you have sort of a rule of thumb time
frame that you wanted to see a distressed company turn around

I2F5ber1                         Martin - cross

1    and make money for your company's investment?

2    A.   Two answers to that.  One, it was not my impression that

3    Sheridan was distressed at the time that we made the

4    investment.  That was not what was represented to us.  As far

5    as a time frame, Stephens is a private equity firm and we --

6    it's a family private equity effort, it's not a fund, so we

7    don't have any particular time frame that we are beholden to,

8    so we have held investments anywhere from a couple years to 20

9    years.

10              So, there is no specific time frame.

11   Q.   But it is certainly within the realm of reasonable, from

12   your perspective at Stephens, that the time frame would be a

13   matter of years, frequently, before Stephens sees the return on

14   its investment that it wanted?

15   A.   Yes.  That's conceivable.

16   Q.   Now, you mentioned what was represented to you, in I guess

17   2006, about whether Sheridan was or wasn't doing well

18   economically?

19   A.   Yes.

20   Q.   Who would have made representations to you about how

21   Sheridan was or wasn't doing?

22   A.   That would have been the existing principals of Sheridan

23   Square that were running the company at the time that we made

24   the investment.

25   Q.   It didn't involve Mr. Bergstein?

I2F5ber1                         Martin - cross

1   A.   No.

2   Q.   Now, shortly after getting involved in Sheridan, after

3   paying $8 million to that company, was it only a matter of

4   months before you realized or learned that the company was

5   behind in making payments it owed to a bank or a financier that

6   had lent it money?

7   A.   It was a matter of six or so months when we learned from

8   the principals of Sheridan Square that they were having trouble

9   meeting their obligations.

10  Q.   And when you learned about this, first of all, were the

11  obligations to this financial institution you have referenced

12  yesterday, DB Zwirn?

13  A.   It wasn't necessarily just DB Zwirn.  They had other trade

14  creditors as well.

15  Q.   Did you find out in, let's say, late 2006, how much money

16  DB -- strike that -- how much money Sheridan owed to, for

17  example, DB Zwirn?

18  A.   I don't recall exactly what the amount was that Sheridan

19  owed.

20  Q.   Was it significant?

21  A.   Yes, I think it was significant.

22  Q.   Was it multiple times greater than the $8 million that you

23  invested in Sheridan?

24  A.   I believe it was; yes, sir.

25  Q.   Do you recall, sir, that in the fall of 2006 you were

1    corresponding with Mr. Bianco, who is one of the principals of

2    Sheridan -- is that the right name at least?

3    A.  Yes.

4    Q.  And you told him that the Sheridan investment was a total

5    disaster and you didn't see any viable plan to not lose

6    millions of dollars by having invested, for Stephens, in

7    Sheridan?

8    A.  I don't recall that specific conversation.

9    Q.  I am going to place in front of you Exhibit Z94 for

10   identification and ask you to take a look at that and just tell

11   me, sir, once you have had a chance to see it.

12   A.  I'm sorry.  Did you want me to read the whole thing or

13   identify it?

14   Q.  Yes; look at it, sir, and the question is going to be does

15   that refresh your memory on the topic I asked you about.

16   A.  Yes.  This is an e-mail exchange between me and Joe Bianco

17   talking about Sheridan Square's financial performance.

18   Q.  And what were you expressing to him?

19   A.  I was expressing disappointment to him that the results of

20   the company had not been as he projected.

21   Q.  And what were the words you used?

22             MR. KOBRE:  Objection.  The document is not in

23   evidence.

24             THE COURT:  Sustained.

25   BY MR. BIENERT:

I2F5ber1                          Martin - cross

1    Q.  Did you express to him, in strong words, that you felt like

2    the company was dramatically worse off than he had represented

3    to you?

4    A.  Yes.

5    Q.  So, and by the way, does it refresh your memory if you look

6    at the date on that, it is the timing of when you were

7    realizing how bad off Stephens was?

8    A.  Yes, sir.

9    Q.  Was that happening in the fall of 2006?

10   A.  Yes.  This is dated late November '06.

11   Q.  So, is it true that after the situation you found yourself

12   in, Mr. Bianco was trying to suggest to you things that you

13   might be able to do or all of you guys might be able to do to

14   try to do restructuring or resolve things so the company could

15   keep going forward?

16   A.  Yes.  His e-mail back to me offers some promise of

17   potential resolution to the financial problems.

18            MR. KOBRE:  Objection, your Honor.

19            THE COURT:  Basis?

20            MR. KOBRE:  The witness is reading from the document.

21            THE COURT:  You can't read from the document, sir.

22            THE WITNESS:  Okay.

23            THE COURT:  It is not in evidence.

24            THE WITNESS:  Okay.

25            THE COURT:  Okay?  Thank you.

I2F5ber1                         Martin - cross

1  BY MR. BIENERT:

2  Q.  Let me try this.  If you look at the document in front of

3  you -- first of all, with e-mails back and forth with you, did

4  you tend to write them yourself, type them out yourself?

5  A.  Yes.

6  Q.  And at the time that you would write your e-mails, would

7  you accurately type what your thoughts and understandings were

8  at the time about what you were writing?

9  A.  As far as I know, yes.

10  Q.  Do you believe that an e-mail like the one in front of you

11  would accurately reflect what you had, the knowledge that you

12  had as of the time of that e-mail?

13  A.  Yes, sir.

14         MR. BIENERT:  Your Honor, I would move into

15  evidence -- I don't have the number in front of me -- Z94.

16         THE COURT:  Put it up on the screen.

17         MR. BIENERT:  Your Honor, technology has failed us, we

18  only have an ELMO today.

19         THE COURT:  And you are offering the top part or --

20  which part are you offering?

21         MR. BIENERT:  The middle part and the top part as a

22  past recollection recorded.

23         THE COURT:  The top part appears to be Mr. Bianco's

24  statement.

25         MR. BIENERT:  Correct.

I2F5ber1                          Martin - cross

1              THE COURT:  Am I wrong about that?

2              MR. BIENERT:  Well, I will be honest, your Honor.  I

3     don't have the document in front of me, but that sounds right,

4     so with that then I can limit it to the middle part.

5              THE COURT:  Okay.  All right.

6              Any objection?

7              MR. KOBRE:  Your Honor, not to its being a present

8     recollection recorded but if that was the case then the

9     defendant can read it into the record but not -- the document

10    doesn't come into evidence.

11             THE COURT:  All right.  I will allow the witness to

12    read it into the record, then, the middle part, Doug Martin

13    wrote.

14             Go ahead.  You may read it, sir.

15             THE WITNESS:  I am traveling today and tomorrow and

16    hard to talk to.  Not thinking much other than this is a total

17    disaster.  In reality, what is there to talk about?  Is there

18    any viable plan?  The "restructuring plan" showed millions of

19    losses.  Please e-mail me if I am missing something.

20             THE COURT:  Thank you.  You may hold on to it.

21    BY MR. BIENERT:

22    Q.  And then, sir, is it true that Mr. -- strike that.

23             Is it true that following this e-mail you got e-mails

24    suggesting thoughts on how there could be a restructuring that

25    could give Sheridan a chance at going forward?

I2F5ber1                          Martin - cross

```
 1   A.  Ask the question again, please?
 2   Q.  Yes.
 3           Is it true, sir, that following this e-mail exchange
 4   with Mr. Bianco when you expressed what a disaster Sheridan
 5   was, that there were plans put together for possible ways to
 6   restructure things so Sheridan could attempt to go forward?
 7   A.  Yes.
 8   Q.  Let me ask a prefatory question to that.  If you go back to
 9   where your head was at in November when you sent that e-mail
10   that you just read to Mr. Bianco; if the company had failed, in
11   other words if it couldn't keep paying its bank notes and other
12   things, did you have an understanding at the time of what would
13   have happened to your $8 million investment?
14   A.  Yes.
15           As I testified yesterday, when a company is not
16   meeting its obligations there are several different things that
17   can happen.  You can enter into negotiations with the lenders
18   for forbearance, you can enter into negotiations with the
19   lenders for a discount, you can put more capital into the
20   company, or you can attempt to attract outside investment into
21   the company.
22   Q.  And is one of the options if the lenders didn't agree to
23   any of that, they could basically force a sale of the assets of
24   the company and pay itself what the lender was owed?
25   A.  Correct.  Yes.
```

I2F5ber1                    Martin - cross

1   Q.  Is it true, sir, that given how much was owed by Sheridan
2   to the lender, DB Zwirn and others, if they had done that
3   option, in all likelihood Stephens would have lost the entire
4   $8 million?
5   A.  I don't know.  That's one possibility.  It just depends on
6   what the assets were sold for.
7   Q.  So, is it true, then, that Mr. Bianco told you, among other
8   options, about Mr. Bergstein who might be able to come in and
9   work with Sheridan and DB Zwirn, the bank, to try to do a
10  restructuring to see if the bank would agree to allow more time
11  for the company Sheridan to continue on and try to succeed?
12  A.  That's correct.  He had told us that there was an outside
13  investor that had an interest in the business that might be
14  willing to contribute capital.
15  Q.  And then you guys -- you guys meaning yourself, Mr. Bianco,
16  people with Sheridan -- y'all followed up on that and at some
17  point you wound up in touch with, among others, Mr. Bergstein?
18  A.  That's correct.
19  Q.  Now, is what was going on at this time, was that the bank,
20  DB Zwirn, which was owed a lot of money by Sheridan, was
21  putting conditions on whether or not it would agree to allow
22  Sheridan to push out the date of the loans owed before it would
23  agree to allow that to happen?
24  A.  I don't recall the details of the restructuring
25  negotiations or whether it was just DB Zwirn or, as I mentioned

I2F5ber1                    Martin - cross

1    earlier, other creditors as well.

2    Q.  I will approach with Exhibit Z95 for identification and ask

3    you to look at that, sir and tell me if, after you have read

4    it, tell me if it refreshes your memory.

5    A.  Yes.  This gives additional information on the subject of

6    the restructuring -- potential restructuring.

7    Q.  Well, looking at that document -- have you read it, sir?

8    A.  No.  Let me read it.

9                MR. BIENERT:  Your Honor, can I ask just a procedural

10   problem?  Because we are using the ELMO today, I don't know if

11   the ELMO allows us to do an identification where only your

12   Honor and the lawyers see it or if it is all published.

13               THE COURT:  Let's see.

14               Flo, do you know the answer?

15               MR. BIENERT:  Here it is.  I need a manicure.  I am

16   assuming right now that the jurors cannot see this.

17               A JUROR:  The government's --

18               THE COURT:  Ah, great.  Thank you.

19               MR. BIENERT:  So if I am understanding this, your

20   Honor, I can put things up for identification on the ELMO

21   without having to walk up to the witness each time?

22               THE COURT:  That should be the case.

23               Put your hand down there?  Can you broadcast it to the

24   witness?

25               MS. HOWLAND:  We have lost the feed, unfortunately.

1           THE COURT:  All right.  You have lost the feed.

2           We might have to do this the old fashioned way with

3   paper.  We will give it a chance to see whether we can get the

4   AV person up here to make it right for you, Mr. Bienert.

5           Flo, if you can see whether we can get an assist on

6   that?

7           THE DEPUTY CLERK:  I texted him.  He will come up, I

8   texted him.

9           THE COURT:  Mr. Bienert, do you want a recess for a

10  moment?  What's your pleasure.

11          MR. BIENERT:  I think we move on, your Honor.

12          THE COURT:  Thank you.

13          MR. BIENERT:  Obviously with the caveat that I can

14  talk about exhibits but the jury won't be seeing them, might

15  make it easier on me.

16          THE COURT:  Very good.

17  BY MR. BIENERT:

18  Q.  All right, sir.

19  A.  I have read the e-mail.

20  Q.  I believe if I have my exhibits right, that is Exhibit Z95

21  on the bottom right?

22  A.  Yes, sir.

23  Q.  Sir, is your memory refreshed that in late 2009 there was a

24  proposal by Mr. Bergstein to try to do a restructuring of the

25  Sheridan debt and satisfying DB Zwirn on the loan owed to it so

1    DB Zwirn would allow Sheridan to continue on payment terms.

2    A.  All I recall from this is that this represents a proposal

3    by Mr. Bergstein to invest capital along with us and the other

4    principals of Sheridan Square in the business.

5    Q.  Is what ultimately happened that Mr. Bergstein did invest

6    capital into Sheridan, along with Stephens?

7    A.  All I know is that Stephens invested additional capital;

8    not these amounts, but different amounts.  I think the proposal

9    was changed from this particular incident.

10   Q.  Well, is it true that Mr. Bergstein and his companies

11   invested over $4 million into Stephens in late 2006 or early

12   2007?

13   A.  Did you mean Sheridan?

14   Q.  Thank you.  I am sorry, the S's are getting me.  Let me try

15   that again.

16          Is it true that in late 2006 or early 2007,

17   Mr. Bergstein and his companies invested over $4 million into

18   Sheridan as part of doing a restructuring with Sheridan and

19   DB Zwirn to go forward?

20   A.  It's my recollection, and it's very fuzzy because this was

21   the first transaction that predated the ones we talked about

22   yesterday, that sometime in early '07 there was capital put up

23   in the form of some sort of reserve that would be available to

24   Sheridan under certain circumstances.  And I know Stephens put

25   up a million dollars and I do not know what, if anything,

I2F5ber1                          Martin - cross

1    Mr. Bergstein put up.

2    Q.  I just direct you to read the highlighted paragraph in the

3    middle of the page and tell me if that refreshes your

4    recollection as to the amounts of money put up by each party.

5    A.  Well, this is an e-mail from once of the principals.

6              MR. KOBRE:  Objection.  The witness is reading from

7    the document.

8              THE COURT:  Yes.  It is not in evidence.

9    BY MR. BIENERT:

10   Q.  The question, sir, is if you look at that and then sit back

11   and look at me, does looking at that refresh your recollection

12   as to what amounts each party put up?

13   A.  Not directly, because I think this was just one of the

14   several proposals that was made and may not have represented

15   the final transaction.

16   Q.  The part you remember is that Stephens put up $1 million;

17   is that right?

18   A.  Yes, sir.  That's my recollection.

19   Q.  And is your recollection that Mr. Bergstein and his

20   entities also put up money and you just can't remember how much

21   it was?  Or, do you not have a recollection of them putting up

22   money at all?

23   A.  Well, I don't have any direct or specific evidence or

24   recollection of how they put up money but as best I can recall

25   there was $1 million from us and $4 million from Bergstein

I2F5ber1                    Martin - cross

1    entities that went into -- did not come in in cash but came in

2    in the form of some sort of collateral base for the company

3    that the creditors could rely on.

4            That's my recollection.  I can't be positive about

5    that.

6    Q.  Okay.  Now, going forward, after -- strike that.

7            Regardless of what the specific numbers are and the

8    vagaries of your recollection, is it accurate that some

9    restructuring deal was accomplished with Mr. Bergstein coming

10   in so that DB Zwirn allowed Sheridan to continue doing business

11   and extend the terms of the loan?

12   A.  I think it is accurate that something transpired to cause

13   DB Zwirn to forebear upon its note.

14   Q.  And that something that transpired was Mr. Bergstein coming

15   in and negotiating with DB Zwirn, right?

16   A.  Well, it was us -- it was Stephens putting up money, it was

17   negotiations among Mr. Bergstein, Mr. Bianco, Mr. Narang, and

18   DB Zwirn that I was not party to but, yes, something happened

19   among that group and the capital provided from that group that

20   caused DB Zwirn to forebear.

21   Q.  Now, as we get into 2007 and Sheridan is continuing, you

22   mentioned yesterday with Mr. Kobre that the person running

23   Sheridan was a guy by the name of Mike Olsen; is that right?

24   A.  Not at the time.  At the time, in '07 as I recall,

25   Mr. Bianco and Mr. Narang were still running Sheridan and

I2F5ber1                          Martin - cross

1   Mr. Olsen worked for them at the time.  He subsequently became

2   CEO.

3   Q.  Would Mr. Olsen periodically give updates to you and others

4   who were part of the Sheridan deal as to, for example, cash

5   flow?

6   A.  I don't recall specifically but that would have been

7   typical for Mr. Olsen, as either financial or operating person,

8   to do that.

9   Q.  And, is it true that the cash flow information was very

10  bad?  I place for identification Z97 but don't look at it yet.

11  A.  I don't recall specifically that it was bad and there is

12  two forms of bad -- bad results and bad information, the

13  quality of the financial reporting and I don't necessarily

14  recall that the financial reporting was bad but I do recall

15  that it was not commensurate with our usual standards.

16  Q.  Or, frankly, what you had been told the year before when

17  you were -- when you guys entered the deal with Sheridan,

18  right?

19  A.  That goes to the other form of bad, the actual bad results

20  and, yes, that Sheridan continued to have cash flow problems.

21  Q.  And I direct your attention to Exhibit Z97 in front of you

22  and ask you to look at it, and when you are done I'm going to

23  ask you whether it refreshes your recollection as to cash flow

24  issues.

25              THE COURT:  The concept of refreshing a recollection,

I2F5ber1                    Martin - cross

1   Mr. Martin, is not whether you think the information in a

2   document is accurate or not.  That's not the question.  The

3   question is you look at the document and then you ask yourself

4   the following question:  Having read this document, do I now

5   have a new and refreshed recollection on the subject?  If you

6   do, you do.  If you don't, you don't.

7             Do you understand?

8             THE WITNESS:  Yes, sir.  Thank you.

9             THE COURT:  Take your time.

10            THE WITNESS:  Okay.  I have read it.

11  BY MR. BIENERT:

12  Q.  So, do you now, having looked at that, have a recollection

13  on the subject of the general status of cash flow of Sheridan

14  in May of 2007?

15  A.  Yes, sir.

16  Q.  And, what was the general condition of the cash flow?

17  A.  It is no different than I stated before; that Sheridan was

18  having difficulties with its cash flows meeting its

19  obligations.

20  Q.  In other words, this company that you had invested $8

21  million in to begin with, and now with the restructuring with

22  Mr. Bergstein had put at least another $1 million into, it

23  wasn't even making enough money every month to pay its bills;

24  right?

25  A.  That's correct.

I2F5ber1                         Martin - cross

1  Q.  So, what he is telling you here is we need another several

2  hundred thousand dollars from somewhere just to pay the bills

3  for the next month or two; right?

4  A.  Yes, sir.

5  Q.  And, when this is happening, the bank, the lenders

6  DB Zwirn, they would learn of this and would indicate to you

7  and the others invested in Sheridan that they wanted money;

8  right?

9  A.  At this point in time I was not having conversations

10 directly with DB Zwirn, to my recollection.  When Stephens

11 makes an investment in a company, we are relatively passive in

12 terms of the operations and the financial aspects of it.  We

13 will get information such as this e-mail from the principals

14 that describe what is going on but our actual involvement is

15 fairly limited.

16 Q.  Well, isn't it accurate, sir, that after reading financials

17 like this, within a day of that you were affirmatively

18 contacting Mr. Bergstein and saying to him is there any way we

19 can get out of Sheridan and take its assets and roll it into a

20 new company where we use Mike Olsen but go forward?

21 A.  I don't recall specifically doing that.  I may have.

22 Q.  I place in front of you Exhibit Z98 and ask you to look at

23 that.  When you are done, tell us if it refreshes your

24 recollection.

25 A.  Yes, it does.

I2F5ber1                    Martin - cross

1    Q.  And what was your view and position in May of 2007 of what

2    was the best course of action looking out for Stephens?

3    A.  At that point in time I was greatly disappointed with the

4    performance by the principals of Sheridan Square, Bianco, and

5    Narang, and obviously the performance of the business, and I

6    had been introduced to Mr. Bergstein as somebody who had an

7    interest and capability in restructuring and being involved and

8    bringing synergies to the business.  At that point in time he

9    was somebody that I thought could be helpful to the business.

10   So, I would say to him that, basically, let's try to go forward

11   with just Bergstein and Stephens as investors in this and have

12   the company actually run by Mike Olsen as opposed to Narang and

13   Bianco.

14   Q.  Right.  So, at this point you wanted to get rid of the old

15   guard, the guys who had frankly misled you into investing in

16   their company, and as of the time -- the entire time up to then

17   when you had $9 million of your company's money into Sheridan,

18   they couldn't even turn a profit so you wanted a change of

19   direction, right?

20   A.  That's it.  Yes, sir.

21   Q.  And you went to Mr. Bergstein for that change of direction,

22   right?

23   A.  Yes, sir.

24   Q.  And then, over the course of the next couple of weeks,

25   Mr. Bergstein got you back a proposal for how to set up a new

1    structure that would take the good of Sheridan, namely the

2    assets, and put it into a new company to go forward with to

3    hope that Sheridan could be resurrected and make money.

4           Is that what happened?

5    A.  That's my recollection.  Yes, sir.

6    Q.  By the way, at the time when you were expressing your

7    disappointment in Sheridan, is it true that Stephens owned the

8    majority of the equity of Sheridan?

9    A.  I believe that's the case, yes.

10   Q.  So, y'all are the biggest stakeholder in the company at

11   this time when it was doing really poor and you turned to

12   Mr. Bergstein?

13   A.  The biggest equity stake holder.

14   Q.  You said equity, sir?

15   A.  Biggest equity stakeholder, yes.  As you pointed out,

16   DB Zwirn had a larger financial interest.

17   Q.  So, is it true by the middle of May or so of 2007, the idea

18   that Mr. Bergstein and you had formulated was let's set up some

19   new companies that will take assets of Stephens, among other

20   things, and try to move forward?

21   A.  Sheridan.

22   Q.  Sheridan and move forward; is that right?

23   A.  Yes.

24   Q.  And that's where this idea of this company BTM came about;

25   is that right?

I2F5ber1                          Martin - cross

1   A.  Yes, sir.

2   Q.  So what y'all did was y'all set up a new company called BTM

3   and it was going to set up and acquire various assets and it

4   would include the Sheridan library of music, right?

5   A.  That's my recollection.  It would be called BT Music that

6   would hold Sheridan and, potentially, other assets as well.

7   Q.  And when you say other assets, was one of the thought

8   processes that y'all recognized that Sheridan itself wasn't

9   making enough capital to make the kind of money you needed for

10  the business to succeed so the plan was to use the Sheridan

11  library of music but also try to acquire other libraries that

12  would be video or music that could complement that to try to

13  make more money?

14  A.  I would say it was a three-fold plan as described to me by

15  Mr. Bergstein.  One would be to, as you say, acquire additional

16  assets; two, would be for him to contribute assets to BT Music

17  that he already controlled that were in the music or music

18  rights business -- he told us several times he could push value

19  into Sheridan Square -- and the third, would be that he could

20  take some of the assets, the music rights of Sheridan and

21  enhance the distribution of those assets because of his

22  involvement in the industry so he could increase the cash flow.

23  Q.  And so that was, in a general sense, your understanding of

24  the plan going forward?

25  A.  That was, in fact, my general sense.  I obviously was not

1   an expert on the business but that was my general sense of what

2   might be possible by continuing to do another transaction with

3   Mr. Bergstein.

4   Q.  And is it fair to say that in the next month or two,

5   following May of 2007, is when this plan started formulating

6   into paperwork and agreements and when the business of BTM was

7   actually set up?

8   A.  I believe that's the case; yes, sir.

9   Q.  Even as you guys were trying to move to the new business,

10  is it accurate that you continually got hit with even more

11  expenses and things that Sheridan was obligated to pay, like

12  legal issues?

13  A.  I don't recall what the actual obligations of Sheridan were

14  but they obviously had too much debt, they had trade creditors,

15  and so the cash flow of the business was not generating

16  sufficient funds to meet all of its obligations.  That

17  continued to be the case; yes, sir.

18  Q.  So, as an example, one of the well known bands that

19  Sheridan had as part of its catalogue was the band The White

20  Stripes, correct?

21  A.  I do recall that they had not full rights but some rights

22  that they had for them.

23  Q.  And Sheridan was involved in a legal issue because The

24  White Stripes said they owed them $700,000 in royalty payments

25  and hadn't been paid, right?

I2F5ber1                          Martin - cross

1    A.  I don't recall that specifically, no.

2    Q.  Do you recall also how much -- strike that.

3         Do you recall there being a summary judgment granted

4    against Sheridan for $1.4 million in or around May of 2007?

5    A.  I don't recall that.

6    Q.  Just take a look at Exhibit Z13 for identification and

7    after you have looked at it, just let me know if it refreshes

8    your recollection or not.

9         MR. KOBRE:  Your Honor, I believe --

10   A.  Yes, sir.

11        MR. KOBRE:  Your Honor, I believe this is Z 103.

12        MR. BIENERT:  Did I misspeak?  If I did --

13        THE COURT:  Z103.  Isn't that a radio station or

14   something?  Okay.  Go ahead.

15   BY MR. BIENERT:

16   Q.  Does this refresh your recollection, sir?

17   A.  Yes.

18   Q.  And what does it refresh your recollection as to what, if

19   any, additional expense Sheridan would have to shoulder?

20   A.  As I reviewed e-mails, getting ready to testify I saw a

21   reference to something called Hirsch and was unclear what that

22   was.  And I'm not sure exactly who Hirsch is but it appears

23   here that they've got a summary judgment --

24        MR. KOBRE:  Objection, your Honor.  The witness is

25   reading from the document.

I2F5ber1                     Martin - cross

 1              THE WITNESS:  Okay.

 2       BY MR. BIENERT:

 3       Q.  It is real simple, yes or no.  Do you remember -- does this

 4       jog your memory as to anything owed and if yes, say yes; if no,

 5       say no.

 6       A.  Yes.

 7       Q.  And what does it jog your memory was owed by Sheridan, as

 8       of the time?

 9       A.  As I said, in the course of their business, call them trade

10       creditors or whatever, they had obligations, when they earned

11       royalties, to turn around and pay their vendors if you want to

12       call them that, or artists, or providers, or whatever.  So,

13       they were not able to meet all of those obligations either.

14       Q.  So, in addition to all the other financial woes and issues

15       you were aware of, now in addition to that Sheridan had to pay

16       a significant amount of money as part of a lawsuit; right?

17       A.  That's correct.

18       Q.  So there is another debt that was holding Sheridan back,

19       right?

20       A.  It was a trade obligation that became a legal judgment.

21       Q.  So it's against this backdrop that in June of 2007 you and

22       Stephens and Mr. Bergstein are putting together this new

23       proposal that you talked about that would turn into BT Music,

24       right?

25       A.  Correct.

1    Q.  Did you tell Mr. Bergstein in that time frame that you and

2    Stephens were well aware that he did not create Sheridan and

3    that in order to resuscitate that business he didn't really

4    need you guys, Stephens, to do it?

5    A.  That sounds like something I might have said, yes.

6    Q.  And, did you also tell him that you recognize that because

7    he was trying to come in and resuscitate his business that he

8    certainly had no obligation to make Stephens whole for the $9

9    million or so that it had already invested in Sheridan?

10   A.  That would be something that Stephens would represent, yes.

11   Q.  So, going forward you had a lot of exchanges of information

12   with Mr. Bergstein about the new business that they would

13   start, right?

14   A.  Yes, sir.

15   Q.  He even came out to, Arkansas and met with you and all of

16   your folks, right?

17   A.  He came out to Arkansas at some point in time.  I don't

18   recall specifically when it was, whether it was in this time

19   frame or not.

20   Q.  But, do you remember him coming to Arkansas to meet with

21   y'all and talk about the potential business, learn more about

22   you guys and vice versa?

23   A.  At some point; yes, sir.

24   Q.  Isn't it true that even though y'all were on the path to

25   doing the new business, the bank -- DB Zwirn -- it continued to

I2F5ber1                        Martin - cross

1    periodically tell you guys we need more money on the big debt

2    that Sheridan has to us?

3    A.   Are you talking before or after the transaction in June of

4    '07?

5    Q.   Well, how about July of 2007; is it true that the bank

6    indicated that it needed another $6.5 million?

7    A.   I don't recall that specifically.   It could well have been.

8    Q.   I place in front of you Exhibit Z143.

9    A.   Okay.

10   Q.   Does looking at that document refresh your recollection as

11   to whether, in July 2007, the bank needed more money from

12   Stephens?

13   A.   Well, I think you said that the bank needed $6.5 million.

14   Q.   I don't want you to -- just say yes or no and I will ask a

15   follow up.

16   A.   What is the question?

17   Q.   I don't want you reading from the document.

18   A.   Okay.  I won't.

19   Q.   Let me try it this way first of all.  Is the document in

20   front of you an e-mail that you wrote?

21   A.   Yes.

22   Q.   Do you recognize the e-mail addresses, the from and to and

23   the date and the general topic of it?

24   A.   Yes, I do.

25   Q.   At the time that you would have written this e-mail, would

I2F5ber1                          Martin - cross

1    it have accurately stated your knowledge and understanding of

2    the status as it related to the finances and needs of Stephens?

3    A.   Yes.  It would have reflected my understanding of the

4    needs.

5            MR. BIENERT:  Your Honor, I ask that we move into

6    evidence Exhibit Z143.

7            THE COURT:  One second, please.  (pause)

8            Any objection to the witness reading the e-mail text

9    as a past recollection recorded?

10           MR. KOBRE:  Your Honor, no objection if it is not --

11   that statement is not for its truth.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. BIENERT:  Well, I believe that is an exception,

2    your Honor, to the rules; so it could be.  Although, I think it

3    was more that it was just conveyed.

4          THE COURT:  Yes, if it's for the fact that it was what

5    transpired, not the underlying truth of the factual statements,

6    but it reflects what we discussed yesterday and what they

7    agreed, it seems to me that that's past recollection recorded

8    and that's permissible.

9          In lieu of, did you ever agree, did you ever say, and

10   the witness says, yes, I did agree; yes, I did say, and past

11   recollection recorded substitutes for the witness' present

12   recollection.  That's all.

13         MR. KOBRE:  Yes, your Honor.  So the government has no

14   objection to the witness reading it.

15         THE COURT:  All right.  You can read the highlighted

16   text.

17   A.  As we discussed yesterday, there appears to be a

18   six-and-a-half million dollar requirement at SSE for operations

19   to handle all creditors and pay DBZ interest.  As two million

20   remains from our mutual investment a few weeks ago, the net

21   required is four million.  You and I agreed that we should ask

22   DBZ to do half that.

23         As for the remaining two million, it seems to be

24   fungible with an investment in Image, as Image will either

25   repay that money or deliver a preferred security for you.  If

1   you would like us to do one million, it would probably be

2   easier for us to do it via an investment in Image.  Is my

3   summary/thinking correct on all this?  I'll look forward to

4   getting the pro forma information on Image.

5   BY MR. BIENERT:

6   Q.  All right.  And, sir, first of all, that was an e-mail from

7   Mr. Bergstein to you, right?

8   A.  Yes.

9   Q.  And when you wrote that, was that accurate from your

10  viewpoint at that time?

11  A.  It was a description of a potential solution to the ongoing

12  capital needs of Sheridan Square.

13  Q.  And, again, that's because even though it's now been, I

14  would assume, over a year since Stephens invested in Sheridan,

15  Sheridan just continues to have ongoing capital needs and not

16  be able to pay its own bills by itself, right?

17  A.  Sheridan continued to have financial difficulties and not

18  be able to meet its obligations, particularly the debt that it

19  was under.

20  Q.  So you turned to Mr. Bergstein and basically said, I think

21  we need to get some more money in, and you had ideas on how

22  Stephens could cover its end and how he could cover some of it

23  on his end, right?

24  A.  Yes.  I mean, this e-mail described -- first of all, there

25  was still $2 million left from the investment that was made the

I2FPBER2                      Martin - Cross

1    month before, that that would in part go to it.  Stephens would

2    put up one, Bergstein would put up one, DB Zwirn would put up

3    two or allow two.

4    Q.  Okay.  Now, does it sound right that by this time, now that

5    we're getting into July, August of 2007, the new company, BT

6    Music, is set up?  Does that sound correct?

7    A.  I think so.

8    Q.  And is it true that there were, in essence, two companies,

9    there was BT Music, which was one company and that company was

10   owned, in part, by Stephens and, in part, by Mr. Bergstein and

11   his entities, right?

12   A.  Yes, sir.

13   Q.  Did Stephens have the majority ownership of BTM?

14   A.  I'm not positive about that.  Yesterday when we were

15   looking at those exhibits, the proposal was that we'd own

16   55 percent.  I think that's what happened, but I'm not positive

17   about that.

18   Q.  But BT Music was definitely a company, this new company,

19   that Stephens had a significant ownership in, right?

20   A.  Yes, sir.

21   Q.  And RTD2, which is the one we talked about yesterday, that

22   was a company that was Mr. Bergstein's, right?

23   A.  That's my understanding; yes, sir.

24   Q.  Is it true that once BT Music was set up, there were times

25   when Mr. Bergstein loaned money to BT Music to get in capital?

1    A.   I have no knowledge of that.

2    Q.   Were you aware that in September of 2007, RTD2 loaned one

3    million dollars to BT Music and had a secured note as a result

4    of that loan?

5    A.   I don't recall that, no, sir.

6    Q.   Now, as time goes on, is it accurate to say that once BT

7    Music is set up in that latter half of 2007, among other

8    things, BT Music is trying to acquire other assets to add to

9    its library collection of films and videos to try to make more

10   revenue and value for the company?

11   A.   I don't know that for a fact.  I mean, that was the

12   proposed plan back in early '07, that Mr. Bergstein would

13   embark upon that sort of endeavor.  As I said, as far as the

14   operations go, we were relatively passive; so I presume that

15   that was either taking place or proposing to take place.

16   Q.   Okay.  Well, you mentioned -- I think at one point, in one

17   of your answers, you made a reference to a company called

18   Image?

19   A.   Yes.

20   Q.   Do you remember what Image was?

21   A.   I have a vague recollection of that, that Image was a

22   company that Mr. Bergstein wanted to acquire or get a

23   significant position in, and he was -- the proposal was, I

24   believe, that he was going to somehow combine Image with BT

25   Music and BTP, but I don't believe that ever happened.  But I

1    know there were discussions about his interests in Image

2    Entertainment, I believe it was, which was primarily a film

3    company.

4    Q.  And Image was kind of getting into this whole video

5    delivery or streaming to people at home; does that sound right?

6    A.  I really don't recall exactly what Image did, no.

7    Q.  Let me ask a big-picture question.  So Sheridan was in the

8    business of dealing with distribution of music of its catalog,

9    right?

10   A.  Yes.

11   Q.  And then some of these other companies that y'all were at

12   least considering, like Image, were in the business of

13   distributing videos, movies, right?

14   A.  Yes.

15   Q.  Is it accurate that, in this time frame of 2006 through

16   2010, the whole universe of music and movies was changing

17   rapidly from the old system, where people went to movie

18   theaters and record stores, to the system we all have today,

19   where you get it at home and it's streaming and all other kinds

20   of ways that were not the traditional ways, that older guys

21   like you and me were used to using earlier?  Is that fair to

22   say?

23   A.  I think that's accurate, yes.

24   Q.  And so, as an overlay to this whole business proposition

25   with Sheridan from 2006 to 2010, the idea was to get into this

I2FPBER2                          Martin - Cross

1    new market where things were changing as to how people received

2    their entertainment, but it was a new horizon, and there were

3    risks associated with knowing which types of delivery of

4    entertainment would ultimately succeed in which companies?

5    A.   That sounds right.  I am certainly not an expert on the

6    business, but I recall people in the industry talking at that

7    time that digital distribution of media, whether it's music or

8    videos or films or whatever, was going to be happening more and

9    more.

10   Q.   Well, let's say it in the reverse.  Up until the time that

11   you guys got involved in Sheridan, when Stephens got

12   involved -- is it accurate that you remember that the main way

13   people got videos and music, was going to music stores or going

14   to movie theaters and the like?

15   A.   I think it had already -- by '06, I think the transition

16   had already started to occur.

17   Q.   That's right.  It had started, and was getting bigger and

18   bigger?

19   A.   Yes.

20   Q.   And now, today, very few people go to music stores, and we

21   can all get videos at home?

22   A.   Yes, sir.

23   Q.   Is it true, sir, that you wrote an e-mail to Mr. Bergstein

24   telling him, in essence, you know, I've thought about this

25   business plan, and I think about my kids and the young people,

I2FPBER2                              Martin - Cross

1    and I realize I totally agree that we're transitioning and it's

2    going to be a whole new way of delivering media?

3    A.  Yes.

4    Q.  Or something along those lines?

5    A.  Yeah.  In fact, I saw that paragraph in one of the e-mails

6    I looked at yesterday, where I told him and mentioned my kids

7    and the thought that movies were going to be -- and this was,

8    you know, '07, '08, that movies were going to be watched over

9    small screens as opposed to on the big screens, yes.  That was

10   something that he seemed to be clued in to.

11   Q.  So in other words, the business concept, the big picture is

12   one that you believed made sense and believed him, right?

13   A.  Well, I mean, I saw that happening in the industry.

14   Whether or not Sheridan/BT Music/R2D2 CT1 could take advantage

15   of that, I didn't know.  I mean, there was no specific plan at

16   that time to do that, but that was the waters in which they

17   were swimming, if you will.

18   Q.  Okay.  So now we turn the corner, and we're up to January,

19   early 2008?

20   A.  Yes, sir.

21   Q.  Is it true that, at that time, DB Zwirn, the bank, has come

22   back to Sheridan, BT Music and said that it had reassessed the

23   value of Sheridan's music catalog and assets, and it determined

24   that they were worth less, such that there wasn't enough equity

25   in the assets relative to the amount of money owed to the bank

I2FPBER2                         Martin - Cross

1   for DB Zwirn to be comfortable?

2   A.  I don't recall that specifically.  No, I don't recall that

3   specific statement by them.

4   Q.  Well, do you remember as a general matter?

5   A.  Well, I do recall -- actually, what I recall is

6   communication e-mails from Mr. Bergstein talking about the

7   asset value of Sheridan and the equity value of Sheridan and

8   projecting a positive value for the equity of Sheridan at that

9   time, you know.  I'm not sure I fully believed it at the time,

10  but I do recall getting those e-mails; so -- but I don't recall

11  specifically DB Zwirn doing a valuation and saying it came up

12  short of what they were owed.

13  Q.  Well, do you recall a time that Mr. Bergstein provided

14  $8 million worth of assets to BT Music, the company that

15  Stephens now had a significant stake in, to get more equity

16  into the company?

17  A.  No, I have no recollection of that whatsoever.

18  Q.  I ask you to look at Exhibit Z112, Z112.  And it's a

19  multi-page document; so look it over, and once you've had a

20  chance to understand what it is, just let me know.  If you

21  understand what it is.

22  A.  Okay.

23  Q.  Do you recognize -- let's take it in reverse order.  Well,

24  first of all, do you recognize this?

25  A.  I see it for what it is, yes.

1  Q.  Well, is it something that you recognize?

2  A.  Yes.  Well, it's something I -- it's an e-mail that I'm

3  copied on and one that I was sent.

4  Q.  And is it true that there's a document attached to it that

5  you signed?

6  A.  That I signed?

7  Q.  Yes, sir.  Let me come up with one more.

8  A.  My signature is not on it, but there's a signature --

9  Q.  One moment.  I'm going to ask you to also look at Z121.  Do

10  you recognize Z121?

11  A.  Yes.

12  Q.  Is that your signature?

13  A.  Yes.

14  Q.  Does Z121 correlate to Z1 -- let me get my exhibits.  Does

15  it correlate to Exhibit Z112?

16  A.  Yes, sir.

17  Q.  You signed the document that is at Z112, right?

18  A.  Yes.

19  Q.  So you've seen this document before, the one you -- strike

20  that.

21          You looked at it before you signed it, right?

22  A.  Yes.

23  Q.  And you signed it in your capacity as a manager at the new

24  company, BT Music --

25  A.  Yes.

I2FPBER2                          Martin - Cross

1   Q.  -- didn't you?  Is that right?

2   A.  Yes.  I signed it in reliance upon -- so on the first,

3   Z112 --

4   Q.  Let me stop you because the document is not in evidence.

5   I'm just going to walk you through it.

6   A.  Okay.

7   Q.  So now that you've looked at the signature and the

8   document, do you recognize what this is?

9   A.  I recognize what I think it is, yes.

10  Q.  And tell us, if you recall, based on looking at it.  Not

11  the explanation behind it.  We can get to that.

12  A.  Okay.

13  Q.  Just what is that document, if you recognize it?

14  A.  The document appears to be a note from BT Music to BT

15  Music -- BTM Holdings, and I don't recall that specific entity,

16  and the note was a purported payment for assets contributed to

17  BT Music by BTM Holdings, and I don't recall that contribution

18  of assets or what those were or anything else; so...

19  Q.  You signed -- is it true, sir, that you signed a promissory

20  note --

21  A.  Yes, it is.

22  Q.  -- as a contract document acknowledging that BT Music owed

23  $8 million to BT Music, I think it's, Holdings, right?

24  A.  BTM Holdings, yes.

25  Q.  And you signed that document, right?

I2FPBER2                         Martin - Cross

```
 1   A.  I did sign it, yes.
 2   Q.  Well, is it true -- well, let's go back to the plan and the
 3   entities involved.  So Sheridan, y'all later spun off a new
 4   company that was called BT Music, right?
 5   A.  Spun it off?  That was created back in the original
 6   transaction, and I believe BT Music was the parent -- became
 7   the parent company of Sheridan.
 8   Q.  That's right.  Okay.  Well, I used bad terminology, spun
 9   off.  Sorry.
10           So BT Music was the parent company --
11           THE COURT:  Now, just avoid testifying.
12           MR. BIENERT:  I agree.  I apologize.
13   Q.  BT Music, am I correct, was the parent company for
14   Sheridan?
15   A.  That's my understanding, yes.
16   Q.  And is it true that BT Music had a parent company, BT
17   Holdings?
18   A.  I'm just now seeing that.  I don't recall that.  I see that
19   in this exhibit.
20   Q.  Well, all right.  Let's explore that.
21   A.  It's not clear that it's a parent company.  It may be some
22   other entity.  I'm not sure if it's a parent company or what it
23   is.
24   Q.  Well, let me ask you this.  Did you have an understanding
25   that the BTM Holdings company reflected in that document was a
```

I2FPBER2                          Martin - Cross

1    David Bergstein company?

2    A.  That's what I'm saying, I don't know if that was solely

3    owned by him, or we had an ownership interest in it or not.  As

4    you just said, if BTM Holdings owned BTM Music, that would

5    imply that we didn't own any of BTM music, but we did own some

6    of BT Music.  That's why I was wanted the to name manage or

7    something.

8    Q.  Well, although it's tough to remember now, ten years later,

9    at the time you had signed this document, do you believe you

10   would have had an understanding of the relationship of the

11   parties in the document you were signing a note for?

12   A.  It's possible.  You know, when Stephens makes an investment

13   like this, we have an abiding faith in our partners that

14   they're going to do what they say they're going to do, and we

15   tend to trust them to transact business on our behalf, since

16   we're partners, that is good for both of the parties.

17           So it's often the case, and likely the case here, that

18   I trusted Mr. Bergstein knew what he was doing was helpful to

19   the business, and so I signed as his partner in BT Music, that

20   this was a transaction that would help all the owners of BT

21   Music.

22   Q.  And if BT Music received $8 million in assets, that would

23   be helpful --

24   A.  That would be a good thing, yes.

25   Q.  All right.  Your Honor, I would --

I2FPBER2                    Martin - Cross

1   A.  If they, in fact, were worth $8 million.

2   Q.  I'm sorry, say that again?

3   A.  If, in fact, they were worth $8 million, that would have

4   been a boon to --

5   Q.  Okay.

6   A.  -- although, net-net, if we got 8 million of assets and

7   created a liability at the same time for 8 million, that would

8   have been net zero to BT Music.

9   Q.  Well, that's the nature of the loan, right?

10  A.  Well, it's the nature of the loan, and presumably that 8

11  million of assets would be helpful and synergistic to the

12  business and grow beyond 8 million.

13  Q.  Right.  Okay.

14          MR. BIENERT:  Your Honor, I move into evidence

15  Exhibits Z112 and Z121.

16          THE COURT:  Any objection?

17          MR. KOBRE:  Your Honor, we haven't been provided with

18  Z121.

19          THE COURT:  All right.  We can get that corrected, I'm

20  sure.

21          MR. BIENERT:  Yes, your Honor.

22          (Defendant's Exhibits Z112 and Z121 received in

23  evidence)

24          THE WITNESS:  May I stretch?

25          THE COURT:  You may.  Ladies and gentlemen, you may

1    stand up and stretch as well.

2              MR. KOBRE:  Your Honor, may we have a sidebar?

3              THE COURT:  Do you have an objection to the exhibit?

4              MR. KOBRE:  To part of the exhibit, to the front page

5    of the exhibit.

6              THE COURT:  All right.  We'll have a sidebar.

7              MR. BIENERT:  Your Honor, to make it easy, we'll

8    redact the front page.

9              THE COURT:  Why don't you confer with Mr. Kobre,

10   please.

11             (Pause)

12             MR. BIENERT:  We have no ability to publish, your

13   Honor, anyway; so it doesn't matter.  We're going to introduce

14   it subject to our redacting.  I will get a confirmation from

15   Mr. Kobre to redact it, before we actually have it as the

16   official exhibit.

17             THE COURT:  All right.  Is that acceptable to the

18   government?

19             MR. KOBRE:  It is, your Honor.

20             THE COURT:  All right.  That was easy.  Yes?  You'd

21   like to take a break?

22             JUROR:  It's cold.

23             THE COURT:  Cold.  Let's get the temperature adjusted

24   here, and why don't we take our mid-morning break now.  We'll

25   get to work.  I'll get Flo a ladder, and she'll be up there

I2FPBER2                          Martin - Cross

1   with the air conditioning unit.

2              (Jury not present)

3              I'll see you in ten minutes.

4              (Recess)

5              THE COURT:  Bring our jurors in, please.

6              (Jurors present)

7              THE COURT:  Please be seated.  Ladies and gentlemen,

8   please keep me posted on the weather report from the jury box,

9   and we'll see how things improve or not.

10             JUROR:  All right.  Excuse me, your Honor, before we

11  continue, do you mind if the witness just speaks into the

12  microphone?  Some of the jury members are having difficulty

13  hearing him.

14             THE COURT:  Thank you.  Mr. Martin.

15             THE WITNESS:  I will do so.

16             THE COURT:  Thank you.  And, Mr. Bienert, I'd

17  recommend the same for you also.

18             MR. BIENERT:  Yes, your Honor.

19             THE COURT:  Thank you.  You may inquire.

20             MR. BIENERT:  Thank you, sir.

21  BY MR. BIENERT:

22  Q.  Mr. Martin, I've put in front of you Exhibits Z112 and Z121

23  in evidence.  That's the note, and the second one is your

24  signature page, right?

25  A.  Yes, sir.

I2FPBER2                              Martin - Cross

1    Q.   And I just want -- the only point I want to focus you on is

2    if you look at the dates of the two e-mails with each, there

3    are a two-day gap in between your receipt of the note and your

4    signing it; do you see that?

5    A.   Yes, I do.

6    Q.   Is it true, sir, that during that two-day gap, you were

7    being called multiple times by the banker at DB Zwirn, a lady

8    by the name of Ellen Burke, wanting you to get this note

9    signed?

10   A.   I don't recall.

11   Q.   I'm just going to place -- if you could look at Exhibits

12   Z113 and Z114, and look them over.  And when you're done, I'm

13   going to ask if it refreshes your recollection.

14   A.   Yes, sir.

15   Q.   Does it refresh your recollection as to whether you were

16   being contacted by Ms. Burke at DB Zwirn?

17   A.   Yes, there's an e-mail from her and -- I'm sorry.

18   Q.   Forget about the e-mails.  Just the question.

19   A.   It refreshes my recollection that she was contacting me, as

20   well as our general counsel.

21   Q.   And there were multiple contacts within a day's time?

22   A.   I don't recall how many.

23   Q.   More than one?

24   A.   I don't know.

25   Q.   And she was expressing urgency to you that she wanted this

I2FPBER2                          Martin - Cross

1   note addressed, namely, the note that we looked at earlier, the

2   $8 million note, right?

3   A.  Yes.

4   Q.  This was something being pushed by the bank, right?

5   A.  Yes.  Well, the original transmission of the note came from

6   the attorneys for the bank.

7   Q.  Is it fair to say, sir, that during the entire time that

8   you were involved with Sheridan -- or let me back up.

9       Is it fair to say that during the time from 2006, when

10  you got involved with Sheridan, up until certainly early 2008,

11  it was a repetitive item that DB Zwirn was repeatedly

12  contacting Sheridan saying we need more money?

13  A.  Yes, DB Zwirn was repeatedly asking for payments on their

14  debt.

15  Q.  And is it accurate that in between getting the note and

16  signing the note, in that couple-of-day period, you would have

17  communicated with, spoken to Mr. Bergstein about the assets

18  that were being provided to BT Music as part of that note?

19  A.  Yes.  I would have called him and asked him what was going

20  on with both DB Zwirn and what the rush was, as well as what

21  these assets were that he was proposing to contribute, and how

22  that whole transaction satisfied DB Zwirn.  I would have had no

23  knowledge about that; so I would have been asking him questions

24  about what was going on.

25  Q.  He provided you information that the assets were basically

I2FPBER2                         Martin - Cross

1   movies and movie scores from a whole bunch of different films?

2   A.  I don't recall what he told me but, obviously, it was

3   sufficient enough that I had faith in him and the transaction

4   that I signed the note.

5   Q.  Okay.  Now, moving forward, after this point, were there

6   times when you guys received appraisals for the value of the

7   Sheridan assets?

8   A.  As I testified earlier, I recall on several occasions --

9   not several occasions, maybe two or three, getting appraisals

10  that Mr. Bergstein sent me as to the assets in BT Music.

11  Q.  I place Z119 for identification.  I just ask you if you

12  could look at that, and once you have, just tell me if it

13  refreshes your recollection as to whether you received

14  appraisals around that time that, among other things, indicated

15  a value of the Sheridan music library and other assets?

16  A.  Yes, I recall this e-mail, and it appears to be --

17              MR. KOBRE:  Objection.

18              THE COURT:  Yes.  It's not in evidence.

19              THE WITNESS:  Okay.

20  BY MR. BIENERT:

21  Q.  When you received information about the appraisal value of

22  Sheridan, was it troubling relative to the amount of money owed

23  by Sheridan to DB Zwirn?

24              MR. KOBRE:  Objection, hearsay.

25              THE COURT:  One moment.  Try rephrasing your question.

1          MR. BIENERT:  Sure.

2  Q.  In January 2008, were you concerned about the financial

3  picture of Sheridan relative to the amount of money it owed to

4  the bank DB Zwirn?

5          MR. KOBRE:  Objection.

6  A.  So --

7          MR. KOBRE:  Relevance, your Honor.

8          MR. BIENERT:  It guides what they did next, your

9  Honor.

10         THE COURT:  I'll allow it.

11  A.  Ask the question again, please.

12  Q.  Yes, sir.  In late January 2008, did you have concerns

13  about Sheridan's financial situation relative to how much money

14  was owed to DB Zwirn, versus the value of the Sheridan assets?

15  A.  I had those concerns from the outset, or shortly after we

16  made our investment and those were continuing.  I had

17  discussions, these discussions, with Mr. Bergstein, but it was

18  relevant to this note transaction you were just -- I was

19  seeking clarification on what assets he was contributing.

20  Q.  And was the concern, among others, that Sheridan owes more

21  money to DB Zwirn than its assets were worth?

22  A.  That -- I testified earlier that that was the case, yes,

23  that the debt owed to DB Zwirn was more than Sheridan could pay

24  back on a consistent basis.

25  Q.  All right.  So now, continuing into 2008, did Sheridan and

I2FPBER2                         Martin - Cross

1    BTM continue to try to move forward, operate as a business and

2    seek other potential assets?

3    A.  As far as I recall, yes, that was -- we continued.  DB

4    Zwirn either got paid some money or forebeared on some debt

5    obligations, and we tried to continue to right-side the

6    business and get it in a better position.

7    Q.  And is it true that going forward, in or around May of

8    2008, the part of the business plan where the Sheridan assets

9    were transferred into the new company, namely BTM, occurred?

10   A.  That occurred?

11   Q.  Yes.

12   A.  I don't recall exactly when that occurred, but that was

13   always part of the plan, that BT Music and Sheridan Square

14   would be part of the same entity.

15   Q.  Did there come a time in the middle of 2008 where you

16   received additional Sheridan Square financial statements from

17   Mike Olsen?

18   A.  I don't recall specifically, but presumably we were getting

19   monthly or quarterly financial information from Sheridan

20   Square.

21   Q.  I'm placing in front of you Exhibit Z130 for

22   identification, and ask if you would look at it, and then I'll

23   ask you if it refreshes your recollection.

24   A.  Yes, sir.

25   Q.  Were you provided financials in the middle of 2008 from

I2FPBER2                           Martin - Cross

1    Mr. Olsen of Sheridan?

2    A.  Yes, sir.

3           MR. KOBRE:  Object --

4    Q.  And do you recall whether they indicated that the

5    year-to-date for that year, as well as the two prior years,

6    were in the positive or the negative?

7           MR. KOBRE:  Objection, relevance and hearsay.

8           THE COURT:  Yes, let me see you at sidebar.  Ladies

9    and gentlemen, stand up and stretch and take that deep breath.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I2FPBER2                          Martin - Cross

1                   (At the side bar)

2                   THE COURT:  Is this for the truth of its content?

3                   MR. BIENERT:  It is, but it's also -- it's for two

4        things.  So, one, it's going to effect what happened to the

5        business thereafter; and, secondly, I would submit that this

6        page is a business record because it's the financial

7        statements, and they were -- so I assume that, yes, it is a

8        business record.

9                   THE COURT:  Okay.

10                  MR. BIENERT:  And I would submit it's relevant

11       because --

12                  THE COURT:  Yes?

13                  MR. BIENERT:  -- because it shows the true picture of

14       Sheridan for the couple of years that have just passed and,

15       frankly, reveals, I believe, what this witness will say, that

16       they had been misled in 2006 and 2007 about how dramatically

17       under water the business was, which, frankly --

18                  THE COURT:  Let me see.  Your point is they were not

19       dramatically under water?

20                  MR. BIENERT:  No, they were.

21                  THE COURT:  Okay.  And your point is, he was not

22       misled?

23                  MR. BIENERT:  No, that he was.

24                  THE COURT:  He was misled?

25                  MR. BIENERT:  Yes, and that's just -- so, your Honor,

1    this is pretty well the end.  I'm at the ending point of the

2    Sheridan narrative, and then I'm going to move into the

3    bankruptcy issues.

4            So I would submit that it was relevant because, in a

5    nutshell, my view is that the government's direct was basically

6    Mr. Bergstein comes in, says all these great things, continues

7    to push you repeatedly for more loan money, takes your money

8    and runs.

9            Our version of the facts are that it's a very

10   different story, that, frankly, Mr. Bergstein and Mr. Martin

11   and Stephens were misled by Sheridan when they were basically

12   given numbers that suggested the business was better than it

13   was.  It turns out that this thing was hemorrhaging money, and

14   the reason that the deal kept changing was because throughout

15   the entire time, DB Zwirn and the bankers and the creditors,

16   are totally insisting on more money.

17           So over time, they're continuing to have to make

18   decisions, well, do we liquidate and get out?  This is all

19   argument I'll make later.  But do we liquidate and get out, or

20   do we keep trying to keep this thing going along?  And that

21   brings us up to where I am now.

22           And then the next event in time, which we'll get to,

23   is the business gets thrown into involuntary bankruptcy, which

24   freezes the ability to do any business with it, and then that

25   will be where I wrap up, and that's probably ten minutes.

I2FPBER2                          Martin - Cross

1          MR. KOBRE:  Your Honor, the issue of Sheridan's

2     finances is totally irrelevant.  He's testified repeatedly that

3     he understood that -- he's testified repeatedly that he

4     understood that Sheridan was under water, its assets weren't

5     worth as much as its debts.  It's all irrelevant.

6          The government -- the testimony and the purpose of the

7     government's testimony in this case was that Mr. Bergstein made

8     certain misrepresentations to Stephens, and that was the gist

9     of this testimony.  Whether the financial condition of Sheridan

10     or whether he may have been misled by others at an earlier

11     period is just not relevant.

12          THE COURT:  What are the misrepresentations that you

13     maintain were made by Mr. Bergstein with regard to Sheridan?

14          MR. KOBRE:  So there's two sets.  One is that he said

15     that he told Stephens that the money that Stephens was going to

16     be kicking in once Mr. Bergstein proposed the transaction,

17     would be used for business purposes or for particular purposes.

18     In one instance, to pay down part of a loan.  And the money was

19     not used that way.  It was used, for example, to pay casino

20     debt of Mr. Bergstein.

21          And, second, there were occasions on which

22     Mr. Bergstein represented that he was going to be kicking in

23     money alongside Stephens, along the idea of like the

24     skin-in-the-game sort of thing and, in fact, did not kick in

25     the money, as he said he would.

1          Really, it's those two classes.  And then the

2   testimony of the witness is also relevant just because, in

3   fact, Stephens, the money that was used to pay the $1 million

4   from the settlement to buy the note at the end of the day from

5   Stephens was Weston money, represented to Weston that it was

6   part of that Swartz IP.  So that's sort of another aspect of

7   it.

8          But the reason for going through the transactions, the

9   reason why the business dealings are relevant is because of

10  these -- particularly the misrepresentations of Mr. Bergstein.

11  And all of this business about Sheridan and its financial

12  condition is not in dispute.  He's made it very clear, and it's

13  just we're going off on a tangent here.

14          MR. BIENERT:  Well, first of all, obviously, we're

15  talking about a 404(b) note, not the indicted conduct.  I

16  believe that I'm entitled to address the theme that the

17  government presented in direct, which, again -- and I agree

18  with his assessment, their theme is he's just continuing to

19  say, I need loan money, give it to me, and then he spends it

20  for himself.

21          Our position is it's kind of a little, mini, in some

22  ways, what has happened later.  Although, very different

23  scenarios.  My client, I think by my count, is up to $12

24  million in payments towards this deal that he's made 7 million

25  towards, and my client is continually putting more money in.

I2FPBER2                        Martin - Cross

There were continuing cash needs for all of these businesses

and others.  No matter what they do, they keep having to

hemorrhage more money.

So, No. 1, it explains that it is not just my client

taking money and not giving anything.  And, two, the ongoing

efforts to keep this afloat, when not realizing how bad it is,

but seeing more and more, it explains why it's a continuum.

They made a very big deal on their direct about how,

you know, this loan wasn't enough, and then when he came back

again and wanted more money, and he came back again and wanted

more money.  That's because this was a continuum of money

needs, and so it all ties in together.

THE COURT:  Well, money?

MR. BIENERT:  Needs.

THE COURT:  Right.

MR. BIENERT:  So it all ties in together.  I would

also submit, just bigger picture, this whole operation --

strike that.

This whole business venture, it also shows how my

client operates in these deals.  He gets involved in the deal.

He's making a wager that by throwing a lot of money at it,

between himself and others, they can come out at the end and

make a lot of money at the end.  And so when he gets in deals,

he's throwing millions into it, and he's hoping that, at the

end, everything goes to the next step and the next step and

I2FPBER2                      Martin - Cross

they make the money they're supposed to.

          And in this particular case, the intervening fact,
which we're going to learn about, which is the next line of
questioning, is the bankruptcy that he talked about in direct.
But it's, obviously, a more detailed story than just the few
words he said already.  So I think it's part of the overall
theme of how my client does business, legitimately.

          THE COURT:  I've heard the argument of the parties.
First of all, the Court hasn't foreclosed the defendant from
calling witnesses at this stage of the game on how he does
business.  I don't know, generalized, how he does business
would be relevant in any event to how he dealt with the
transactions which form the basis of the charges in the
indictment.

          This is 404(b) evidence, and the defendant is entitled
to a full and fair cross-examination on 404(b) evidence.  We
have now gone too far afield from the core, and my conclusion
is that the probative value of this line of cross-examination
is substantially outweighed by the danger of jury confusion and
waste of time.  So, therefore, I'm sustaining the objection.

          (Continued on next page)

1              (In open court)

2              THE COURT:  You may continue.

3              MR. BIENERT:  Thank you, your Honor.

4    BY MR. BIENERT:

5    Q.  Mr. Martin, did I understand your testimony correctly

6    that -- on direct, that by the time you got into late 2008 or

7    '9, you really didn't want to deal with Mr. Bergstein again?

8    A.  We had developed concerns about what was happening with the

9    businesses and the continued requests for additional capital.

10   Q.  But you continued to communicate with Mr. Bergstein and

11   talk to him about other matters, including business matters,

12   right?

13   A.  After what time?

14   Q.  Into 2009 and even 2010.

15   A.  I might have.  I don't know.

16   Q.  Placing in front of you Exhibit Z132 and Z134, I would just

17   ask you if you would look at those, and tell me if it refreshes

18   your recollection as to whether you continued to talk to

19   Mr. Bergstein about business matters?

20   A.  Yes.

21   Q.  And is it true that in 2009 -- strike that.

22              On the topic of loans, is it true that one of the

23   things that Stephens sometimes has is it has loans with its

24   own -- with banks that it uses in various financial

25   relationships, where it sometimes borrows money and has to pay

1  on notes?

2  A.  No, typically what happens is we make private equity

3  investments, and the companies that we invest in will have

4  loans.  The loans are not to Stephens, but they are to the

5  entities we invest in.

6  Q.  And so an example would be, frankly --

7  A.  Sheridan.

8  Q.  -- the Sheridan situation, correct?

9  A.  Yes.

10  Q.  So when y'all bought into Sheridan in 2006, you paid $8

11  million, you later found out that Sheridan owed DB Zwirn

12  several multiples of that, right?

13  A.  I don't think we later found that out.  We would have known

14  going in how much money they owed.

15  Q.  But did you have a belief that they would be able to pay

16  the debt?

17  A.  Oh, yeah, that's the presumption.  Most of these

18  investments that we make, there's some equity and some debt,

19  and the expectation is that the cash flow of the business will

20  not only pay off the debt but will grow over time and make us

21  all money.

22  Q.  All right.  And by the way, on the topic of the debt of

23  Sheridan to DB Zwirn in 2006, once you guys bought in, your

24  company, Stephens, was the majority owner of, in terms of

25  equity, of Sheridan, right?

I2FPBER2                    Martin - Cross

1   A.  Yes, sir.

2   Q.  Did Stephens ever pay the notes to DB Zwirn directly for

3   Sheridan?

4   A.  You mean after we invested, did we ever pay DB Zwirn

5   anything?

6   Q.  Yes, towards the notes.

7   A.  Directly?

8   Q.  Yes.

9           MR. KOBRE:  Objection, relevance.

10           THE COURT:  Sustained.

11   Q.  Now, back to 2009, one of the things that you talked to

12   Mr. Bergstein about is just attorney references for dealing

13   with banks on covenants and issues with loans?

14           MR. KOBRE:  Objection, relevance.

15           MR. BIENERT:  It goes to the contact.

16           THE COURT:  Goes to what?

17           MR. BIENERT:  The communication.  I can approach.

18           THE COURT:  I'll allow you to inquire.  Go ahead.

19   BY MR. BIENERT:

20   Q.  You were talking to Mr. Bergstein as late as September 2009

21   about, for example, dealing with banks and recommendations of

22   attorneys?

23   A.  Yes, even though we had --

24   Q.  That's -- I just wanted a "yes" or "no," sir.

25   A.  I asked him for an attorney reference, yes.

I2FPBER2                          Martin - Cross

1   Q.   Okay.  And now, if we go to -- in 2010, is it true that

2   your company, Stephens, sent a proposal to Mr. Bergstein for

3   being involved in a deal called Miramax with Disney?

4            MR. KOBRE:  Objection, relevance.

5            THE COURT:  I'll allow it.  Go ahead.

6   A.   We have a corporate finance department that does advisory

7   work, and our corporate finance department had expressed an

8   interest in getting involved in that transaction, if possible.

9   Q.   And that transaction wound up making literally billions of

10  dollars, right?

11  A.   I have --

12           MR. KOBRE:  Objection.

13  A.   -- no idea.

14           THE COURT:  Sustained.

15  Q.   Your corporate department made the proposal to do -- to get

16  involved in the Miramax deal with Mr. Bergstein in March of

17  2010; is that true?

18           MR. KOBRE:  Objection.

19           MR. BIENERT:  Goes to the timing of the relationship,

20  your Honor.

21           THE COURT:  Overruled.  Go ahead.

22  A.   The question?

23  Q.   Yes.  Is it true, sir, that your corporate department, in

24  March of 2010, was sending a proposal to Mr. Bergstein about

25  working with him on the Miramax deal?

I2FPBER2                        Martin - Cross

1    A.  What happened was that our corporate finance department

2    expressed an interest in doing that.  I passed on that interest

3    to Mr. Bergstein, and I passed on to our corporate finance

4    department my concerns about Mr. Bergstein.

5    Q.  And people from your corporate finance department,

6    including Jennifer Bishop and Phyllis Briggins sent him a

7    proposal, right?

8    A.  I think they did send him a proposal, yes.

9    Q.  Now, is it also true that you were aware, in March of 2010,

10   that Mr. Bergstein's companies had been put into what's called

11   an involuntary bankruptcy?

12   A.  I did become aware of that.

13   Q.  And if you look at Exhibit Z134, are you making a reference

14   to that in what you say?

15           MR. KOBRE:  Objection, document not in evidence.

16           MR. BIENERT:  I'll lay a foundation, your Honor.

17           THE COURT:  Yes.

18   Q.  Do you have 134 in front of you, sir?

19   A.  I do.

20   Q.  If you look at the very top of that document, do you

21   recognize it as being an e-mail from you?

22   A.  Yes.

23   Q.  And do you recognize who it's to and the topic and the

24   timing?

25   A.  Yes, sir.  I do.

I2FPBER2                         Martin - Cross

```
 1   Q.  And do you recognize the e-mail below that as one you
 2   wrote?
 3   A.  Yes -- No, the one -- you mean the top e-mail?
 4   Q.  Yes, sir.
 5   A.  Yes.
 6   Q.  And was it an accurate representation of what --
 7   communication that you made to Mr. Bergstein in or around March
 8   of 2010?
 9   A.  Yes.
10           MR. BIENERT:  Your Honor, can I just ask him to read a
11   line from the note as a past recollection recorded?
12           THE COURT:  Let me see the document.
13           MR. BIENERT:  I'm just going to the very top, couple
14   of lines, your Honor.
15           THE COURT:  Any objection?
16           MR. KOBRE:  Yes, it's not a recollection.
17           MR. BIENERT:  Well, it's a past recollection recorded.
18           THE COURT:  Yes, I'll allow it.  The top e-mail?  Go
19   ahead.
20           MR. BIENERT:  Actually, I'm not going to put it in
21   evidence, but we'll just read from it.
22   BY MR. BIENERT:
23   Q.  Did you write to Mr. Bergstein:  "What does the recent
24   creditors group filing mean"?  Do you see that?
25   A.  I do see that.
```

I2FPBER2                          Martin - Cross

1    Q.  Is that a reference to the bankruptcy, involuntary

2    bankruptcy?

3    A.  That looks like it's a reference to creditors filing some

4    sort of proceedings against him or his entities.

5    Q.  And did you have an understanding in that time frame, of

6    March of 2010, that his companies were put in bankruptcy

7    involuntary, some of them?

8    A.  At some point, I gathered that, yes.

9    Q.  And did you know the name of the party or person who put

10   his companies in involuntary bankruptcy?

11   A.  I don't recall.

12   Q.  And were the companies that were put in bankruptcy included

13   R2D2?

14   A.  I believe so.  Yes, sir, that's my recollection.

15   Q.  Which was connected with the BT Music company that you were

16   involved with Mr. Bergstein in, right?

17   A.  R2D2, at that time, was an obligor on notes to us.

18   Q.  So is it the reality that once Mr. Bergstein's companies

19   were put in bankruptcy, then it affected the assets that you

20   and he had in BTM and the Sheridan assets because of the

21   bankruptcy?

22   A.  It affected the assets that what?

23   Q.  That Stephens had an interest in, as well as

24   Mr. Bergstein's company?  If you know about it?

25   A.  I don't know.  I mean CT1 and R2D2 were obligors on notes

I2FPBER2                          Martin - Cross

1   to us.  I don't know whether they formally owned part of BT

2   Music at that point in time.

3   Q.  Well, did you have an understanding, going forward, that

4   once the assets were in bankruptcy, it would be difficult for

5   the companies to continue doing business as you guys had

6   envisioned before?

7   A.  Well, my recollection was that in 2009, I believe, that

8   Sheridan Square had been taken over by the creditors already,

9   by DB Zwirn, I believe.  And so the only thing we had at that

10  point in time was the $7 million note that I testified about

11  yesterday that was created, and where R2D2 and CT1 were the

12  obligors on that.  So I don't think we had any continuing

13  interest in the cash flows of Sheridan at that time.

14  Q.  All right.  So let me back up.  So your understanding was

15  that in 2009, the bank that Sheridan owed all the money to came

16  in and basically took action to take control of Sheridan's

17  assets?

18  A.  That's my recollection, at some point in time.  I'm not

19  sure exactly when that was, but they basically took over those

20  assets.

21  Q.  And so what you were left with, since the assets had been

22  taken by DB Zwirn, was the promissory note which was attached

23  to RTD2 and CT1, both companies of which were in bankruptcy

24  involuntary?

25  A.  Yes, except there were also two other obligors, as I

I2FPBER2                           Martin - Cross

1    recall, on that note, one being Bergstein personally and one

2    being Pangea Media.

3    Q.  And as it relates to Pangea Media, did you, at some point

4    in 2011, tell Mr. Bergstein that you were being asked by a

5    trustee to put Pangea into bankruptcy?

6    A.  I don't recall that specifically.

7    Q.  Placing Z135 in front of you for identification, if you

8    could take a look at it.

9    A.  I have, yes.

10   Q.  Does that refresh your recollection?

11   A.  Yes, it does.

12   Q.  Is it true that you were asked by a bankruptcy trustee to

13   try to force Pangea into bankruptcy?

14   A.  Somebody at Stephens was.  I don't know whether it was

15   myself or Mr. Farrow.

16   Q.  And you communicated to Mr. Bergstein that unless he and

17   Mr. Tutor, his partner in several of his businesses, offered

18   around $3 million to your company, you suggested that you might

19   do that, put it in bankruptcy, right?

20   A.  Yeah, so this was October 2011.  There had been previous

21   conversations from Mr. Bergstein about him buying the note or

22   somebody buying the note or somehow paying this, a portion of

23   this 7 million that we were owed.  And this is an e-mail to him

24   to where I said that we'd like to get $3 million in cash for

25   that note right away.

I2FPBER2                        Martin - Cross

1   Q.  And you knew that -- in other words, you were communicating
2   to him that if you don't pay me the kind of money we want, we
3   may put another of your companies in bankruptcy, right?
4   A.  Well, I was communicating to him that we were being asked
5   by the bankruptcy trustee to join the creditors group, and I
6   was telling him that might be our best option, unless we got
7   payment on the note.
8   Q.  Did you actually tell him, I can't see a reason not to do
9   that?  Namely, join creditors to force this company into
10  bankruptcy unless he paid you money?
11  A.  Yes.
12  Q.  So at least in 2011, you were prepared to take payment from
13  Mr. Bergstein, even knowing that there were bankruptcy issues
14  in play?
15  A.  No.  I mean, our counsel would have made the request, which
16  he ultimately made, which is that somebody needs to buy the
17  note.  That's why I think Mr. Tutor was included.  We knew
18  somebody had to buy the note.  It wasn't Mr. Bergstein himself.
19  Q.  But that's not what you conveyed to Mr. Bergstein, did you?
20  You said "you," meaning "you," Mr. Bergstein and Mr. Tutor,
21  right?
22  A.  Well, the e-mail isn't clear on that.  I said "you or
23  Mr. Tutor" but basically what I'd been seeking, which I'd been
24  seeking for, you know, two years, was some sort of restitution
25  on the $7 million note that we paid, somehow or another.  Okay?

1    And I did not know or have a concrete idea of how that would

2    ever get done, but it was part of an ongoing series of

3    negotiations and requests to Mr. Bergstein to pay us the money

4    on our note.

5    Q.  Whatever was your intent, the words that you used are

6    contained in the exhibit; is that right, sir?

7    A.  The words are in the e-mail, yes.

8            MR. BIENERT:  Your Honor, I offer into evidence

9    Exhibit Z135.

10            MR. KOBRE:  Objection, hearsay.

11            THE COURT:  Let me see.

12            MR. BIENERT:  And, your Honor, it's not for the truth

13   of the content, but the fact that the words were said and it's

14   613.

15            THE COURT:  I'm going to allow it.

16            (Defendant's Exhibit Z135 received in evidence)

17            MR. BIENERT:  Do we have a screen?  Put up

18   Exhibit Z135.  We need to turn on the projector.  I'll just go

19   over it aloud, and we'll move on because it's short.

20   BY MR. BIENERT:

21   Q.  So, sir, the words that you used were:  "We are being

22   approached by Mr. Gumport to join the creditors to force Pangea

23   into bankruptcy," right?

24   A.  Yes.

25   Q.  And Pangea was another company of Mr. Bergstein, right?

1    A.   That's my understanding.

2    Q.   I can't see a reason not to do -- strike that.  "I can't

3    see a reason not to, unless you and Mr. Tutor are willing to

4    offer some immediate cash settlement on the order of $3

5    million.  Let me know by e-mail response only, please."  That's

6    what you actually said to Mr. Bergstein, right?

7    A.   That's what I said.

8    Q.   And at the time you wrote this, you already knew that the

9    companies that you had the loan against, RTD2 and CT1, were

10   actually in forced bankruptcy, right?

11   A.   I did know that.

12   Q.   And you were literally indicating in the e-mail that you

13   were contemplating forcing yet another company into bankruptcy

14   of his, right?

15   A.   Yes, sir.

16   Q.   All right.  Now, let's move on and talk about ultimately

17   you sold the note, the $7 million note for $1 million, right?

18   A.   Yes, sir.

19   Q.   And you talked about that with all of us, with Mr. Kobre,

20   yesterday?

21   A.   Right.

22   Q.   Let me just ask you a few questions about that, and we will

23   be done.

24        First of all, once the bankruptcy happened, your

25   company's note was what's called an unsecured note, right?

I2FPBER2                          Martin - Cross

1    A.  I believe so.

2    Q.  And in bankruptcy, there are notes that are secured that

3    take priority over unsecured notes, right?

4    A.  Yes, sir.

5    Q.  So in the time frame where you were in 2010, 2011, the $7

6    million, which you could not collect against because of a

7    forced bankruptcy of R2D2 and CT1, if the bankruptcy went all

8    the way through, would not get paid unless there was enough

9    money left over, after secured creditors got paid, to pay your

10   company, right?

11   A.  No, I don't think that's right because R2D2 and CT1 were in

12   bankruptcy.  Okay?  I was not clear at the time, or now, as to

13   what assets were secured and what were unsecured, nor what the

14   liabilities were.  I mean, we had sort of written this thing

15   off.  We were hoping to get paid something, but I didn't know

16   if there might be money left over to pay to us after all those

17   creditors were paid off, nor did I know what assets

18   Mr. Bergstein or Pangea Media had, which weren't in bankruptcy

19   at the time.

20           So there could be some possibility of getting us paid

21   from them, where those were entities that weren't in

22   bankruptcy.  So we were just desperate to get paid something at

23   that point in time.

24   Q.  So if I'm fairly characterizing it, that you didn't know

25   one way or the other whether there would be enough assets,

1  after paying secured creditors, to pay you?  Maybe there would,

2  maybe there wouldn't be, you just didn't know?

3  A.  That's basically correct.

4  Q.  So there was a risk in remaining in the bankruptcy position

5  because it may be, at the end of the day, there wouldn't be any

6  money to pay your note?

7  A.  Yes.

8  Q.  And did you have an understanding that, at the time that

9  R2D2 and CT1 were put into involuntary bankruptcy, that they

10  were worth upwards of 50 to $100 million?

11  A.  I had no -- I don't think I had an idea at the time, again,

12  what their assets were worth or what their debt was; so I just

13  didn't follow the bankruptcy at that point in time.

14  Q.  Did you understand that, ultimately, Mr. Bergstein

15  prevailed and the companies were taken out of bankruptcy?

16          MR. KOBRE:  Objection.

17          THE COURT:  Sustained.

18  Q.  You guys chose to sell your note for a discount before

19  waiting to see what happened in bankruptcy, right?

20  A.  That's essentially correct, yes.

21  Q.  Now, you were asked a lot of questions about whether or not

22  you knew or would have an understanding or would sell to a

23  purchaser who was an affiliate; do you remember that?

24  A.  Yes.

25  Q.  Did you have an understanding of what -- strike that.

1              The term "affiliate" is a term that, in the bankruptcy

2     world, has an actual legal definition.  Was that your

3     understanding?

4     A.  So I'm generally familiar with bankruptcy law, but I don't

5     have knowledge of what the specific definition of affiliate or

6     related party or whatever is, no.

7     Q.  Well, have you heard that in the bankruptcy code, an

8     affiliate is an entity that directly or indirectly owns,

9     controls or holds power to vote 20 percent or more --

10             MR. KOBRE:  Objection.

11    Q.  -- of the outstanding voting securities of the debtor?

12             THE COURT:  You're asking a question of this witness?

13             MR. BIENERT:  Yes, your Honor.

14             THE COURT:  What he's heard is not relevant.  If he

15    heard that, it doesn't make it true.  It doesn't make it

16    untrue.  So the objection is sustained.

17    BY MR. BIENERT:

18    Q.  Okay.  Well, let me ask it this way.  Do you agree with me,

19    sir, that between yourself and Mr. Kobre, in discussing

20    yesterday for all of us the sale of the note for $1 million,

21    that between his questions and your answers, y'all used the

22    term "affiliate" multiple times?

23    A.  That's my recollection, we used that term, yes.

24    Q.  And you didn't just drop in here after catching a flight.

25    You spent time talking to these guys prior to coming to the

I2FPBER2                          Martin - Cross

```
 1   stand, right?
 2   A.  Yes, sir.
 3   Q.  How many hours did you spend talking to the prosecutors or
 4   the FBI about this case?
 5   A.  You mean when I got here?
 6   Q.  Anytime.  All total?
 7   A.  All total, five or six hours.
 8   Q.  And you knew, based on those conversations, that one of the
 9   things that you were going to ask to come in here and testify
10   under oath about was this issue with the sale, and whether it
11   was an affiliate, right?
12   A.  That was brought up, yeah.
13   Q.  Did anybody at the front table that you met with ever tell
14   you what the definition of an affiliate is --
15   A.  No, to --
16              MR. KOBRE:  Objection.
17   Q.  -- in the bankruptcy code?
18              THE COURT:  Overruled.
19   A.  So it's common knowledge, and it was common knowledge when
20   I sent this e-mail that --
21   Q.  I'm sorry, sir.
22              MR. BIENERT:  I move to strike, your Honor.
23              THE COURT:  I'll allow it.  Go ahead.
24   A.  It's common knowledge -- it was common knowledge when I
25   sent this e-mail asking for some payment or some transaction,
```

I2FPBER2                    Martin - Cross

1   that you can't, in a bankruptcy, do a transaction with an

2   affiliate because it could get overturned by the bankruptcy

3   court.  So we, at that time, and at the time that we ultimately

4   did the transaction, we did not want to be transacting business

5   with an affiliate.  And I didn't know precisely what the term

6   means, but we didn't want to be doing business with somebody

7   that was associated with Mr. Bergstein.

8   Q.  So let me go back to my question.  Your understanding,

9   before you came in here from your talks with the government

10  that you were going to testify about, in looking at this

11  transaction from the bankruptcy, as to whether or not it was an

12  affiliate, you knew that before you came in here, right?

13  A.  I knew that could be a subject, yes.

14  Q.  And I just want to be clear.  At no time did either they

15  tell you, or did you take it upon yourself to locate in the

16  bankruptcy code, what a definition of an affiliate is, right?

17  A.  No, I --

18            THE COURT:  Those are two different questions.

19  Q.  I'll take it one at a time.

20            At no time did any of the government prosecutors or

21  agents tell you or provide to you a definition, under the

22  bankruptcy code, of an affiliate; is that accurate?

23  A.  Not that I recall.

24  Q.  And at no time did you take it upon yourself to go look at

25  what that is, right?

I2FPBER2                      Martin - Cross

1   A.  No, sir.

2   Q.  So is it fair to say when you were talking or testifying to

3   us, you were using your, you'd say, common knowledge

4   understanding of an affiliate, but you weren't purporting to

5   tell us that you know what the definition in the bankruptcy

6   code of an affiliate was?

7   A.  I did not and do not.

8   Q.  Is it fair to say, from a common knowledge standpoint, the

9   bankruptcy code can be a pretty thick book with a lot of rules

10  and regulations that most people don't commonly know unless

11  they practice in that area of law?

12          MR. KOBRE:  Objection.

13          THE COURT:  Sustained.

14  Q.  Your company did get a million dollars from the purchase,

15  right?

16  A.  Yes, sir.

17  Q.  Did you ever do any investigation into the company CAC,

18  which borrowed -- strike that -- which bought the note from

19  you, to see whether or not Mr. Bergstein had ever been an

20  owner, control, hold voting power in that company?

21  A.  We relied on the representations in the purchase agreement.

22  Q.  So does that mean you never did investigate CAC?

23  A.  Other than asking them to represent that, no, we did not.

24  Q.  Is it true, sir, that at the end of the day, as it relates

25  to what I'll call the Sheridan episode, that from the time

1  Stephens started dealing with David Bergstein in around

2  December of 2006, up until the end of the whole episode, that

3  Mr. Bergstein and his affiliates put many millions of dollars

4  into the Sheridan transaction than Stephens did?

5          MR. KOBRE:  Objection.

6          THE COURT:  Overruled.

7  A.  Put more money than Stephens did?

8  Q.  Yes, sir.

9  A.  That -- not to my knowledge and, you know, I don't think

10 that's the case.

11 Q.  Well, let's review.

12 A.  Are you talking about cash?

13 Q.  I'm talking about assets, money, value.

14 A.  So ultimately, I don't actually know what they put into.  I

15 know what was represented, and I think that that amount that

16 was actually represented as to being put in was less than what

17 we put in.

18 Q.  Okay.  The simple reality is, you don't know one way or the

19 other?

20 A.  I don't know what?

21 Q.  How much money was actually put in by Bergstein and/or his

22 companies?

23 A.  That's correct.  I do know how much we put in.

24          MR. BIENERT:  That's all I have, your Honor.  Thank

25 you, sir.

1    THE COURT:  All right.  Any redirect?

2    MR. KOBRE:  Yes, your Honor.

3  REDIRECT EXAMINATION

4  BY MR. KOBRE:

5  Q.  You were asked some questions on cross-examination,

6  Mr. Martin, about Stephens selling the note, the $7 million

7  note to CAC; do you remember that?

8  A.  Yes.

9  Q.  And if we can just put up Government Exhibit 1420.  And

10  before we actually look at that, what was -- actually, let's

11  take that down for just a minute.

12    What was your view on whether Stephens would be

13  willing to sell that note to Mr. Bergstein or any company

14  associated with him?

15  A.  My view was based on, primarily, the viewpoint of our

16  general counsel, which he works with me on legal matters, but

17  as I said, it's common knowledge --

18    MR. BIENERT:  Your Honor, I'm going to object that

19  this calls for a legal conclusion, and is beyond his expertise.

20    THE COURT:  Yes.  Confine yourself to your own

21  personal understanding.

22  A.  Okay.  So my understanding --

23    MR. BIENERT:  And I apologize, your Honor, I'll object

24  that his understanding is not relevant to the defendant.

25    MR. KOBRE:  Your Honor, I'm simply -- I'll rephrase

1    the question.

2    BY MR. KOBRE:

3    Q.  Did you, as a senior managing director of Stephens, want,

4    at this point, to have further business dealings with

5    Mr. Bergstein?

6    A.  No.

7    Q.  Did you want to have any further business dealings with any

8    of his entities?

9    A.  No.

10   Q.  And, in fact, are you aware of whether anyone from Stephens

11   communicated to Mr. Bergstein that Stephens did not want to

12   sell the note to him or any of his affiliates?

13   A.  I'm aware that our counsel communicated that.

14   Q.  And if you can look at Government Exhibit 1420, and if we

15   could enlarge the second e-mail down from the top, and even if

16   we just -- yes, that would be great.

17          And this is an e-mail from Jackson Farrow to David

18   Bergstein and to yourself.  And what's the date of this e-mail?

19   A.  November 3rd, 2011.

20   Q.  Okay.  And David Bergstein is a recipient of this e-mail?

21   A.  Yes.

22   Q.  And it says here, and I'm reading from the second line

23   down:  "The agreement needs to sufficiently identify the

24   purchaser and have the purchaser rep and warrant that it has no

25   affiliation with any of the obligors on the note."  Is that

1   what you were just referring to?

2   A.  Yes.

3   Q.  If we can put up Defense Exhibit Z135.

4           Do you remember you were asked some questions about an

5   e-mail that you said -- saying that you can't see a reason not

6   to join the bankruptcy proceedings unless Mr. Bergstein and

7   Mr. Tutor are willing to offer some immediate cash settlement

8   or to pay off, at least in part, to give you some payment for

9   the note?

10  A.  I do remember it, yes.

11  Q.  And just explain what you were conveying there to

12  Mr. Bergstein?

13  A.  I was conveying that we were seeing no movement on getting

14  paid anything on our note, and I was conveying that our best

15  option might just be to join the bankruptcy, unless we did see

16  some movement on the note.

17          And I threw out -- as I said, it was a series of

18  negotiations or discussions about buying the note, and I

19  conveyed to him that we might as well join the bankruptcy,

20  unless we could get some immediate cash settlement.  I think

21  the word "some" and "on the order" are -- you know, I think I

22  wrote those intentionally.

23  Q.  Okay.  And do you actually have the exhibit in front of

24  you?

25  A.  I do.

I2FPBER2                      Martin - Redirect

1    Q.   Exhibit 135?

2    A.   I do.

3    Q.   What's the date of that e-mail?

4    A.   October 13th, 2011.

5    Q.   And the e-mail that we just looked at now, was that in the

6    following month, almost a month later?

7    A.   I don't have the date on that, but yes, I think it was.

8    Yes, it was November.  Yeah.

9    Q.   So was this e-mail in Z135 sort of an initial -- a much

10   more preliminary communication about a potential purchase of

11   the note?

12   A.   It was one of several, as I recall.

13   Q.   Okay.  And was that before you had chances to discuss with

14   others in your group internally what you might require and what

15   things needed to be -- what elements would be needed for the

16   purchase of the note, the details, so to speak?

17   A.   Yes.  I mean, we weren't getting into the legal particulars

18   or the details of how the transaction would take place when

19   those initial discussions began.

20   Q.   And, in fact, if we look at Government Exhibit 1421, do you

21   recognize that?

22   A.   I do.

23   Q.   And what is that?

24   A.   That's the actual agreement of the sale of the note.

25   Q.   And if we could go to page 2 and just enlarge section 4.2.

1  Do you see there it says:  "Purchaser represents and warrants

2  to the seller that" and then if you skip down to the little

3  Roman Numeral ii --

4  A.  Yes.

5  Q.  -- "purchaser is not an affiliate of any of the obligors of

6  the security note, including Bergstein, Pangea, R2D2 or CT1"?

7  A.  Yes.

8  Q.  And when it says "Bergstein" there, does that refer to the

9  defendant, Mr. Bergstein?

10  A.  Yes.

11  Q.  If Mr. Bergstein had anything to do at all with CAC Group,

12  who ultimately purchased the note, would you have sold the note

13  to CAC Group?

14  A.  No, that was a condition of our sale.

15  Q.  You were asked some questions on cross-examination about

16  whether, at various times, the defendant had contributed money

17  to Sheridan Square Entertainment.

18          Do you have any personal knowledge of whether, in

19  fact, he ever contributed money to Sheridan Square

20  Entertainment?

21  A.  The only personal knowledge I have is representations by he

22  or his attorneys that money had been received from him.

23  Q.  So you never actually saw any money being transferred --

24  A.  No.

25  Q.  -- into Sheridan Square Entertainment?

1   A.  I did not.

2   Q.  You were asked some questions on cross-examination about

3   this transaction with Sheridan Square Entertainment and BT

4   Music.  Who proposed that transaction?

5   A.  As I recall the form of the transaction -- let me ask you.

6   Are you referring to the one in the middle of 2007?

7   Q.  Right.  I'm referring to the one where BT Music would get a

8   loan.

9   A.  Right.

10  Q.  And that's the first loan that we talked about on direct

11  examination.

12  A.  Right.  As I recall from the exhibits yesterday, the form

13  of that transaction was proposed by Mr. Bergstein.

14  Q.  And just generally speaking, who approached who about

15  getting involved with Sheridan Square and this transaction?

16  A.  Are you talking about Bergstein getting involved or --

17  Q.  Yes.

18  A.  Yes.

19  Q.  Bergstein getting involved together with Stephens, whose

20  idea was that?

21  A.  So I saw one of the first exhibits offered to me today was

22  an e-mail from Mr. Bianco.  He does refer to Mr. Bergstein, but

23  it's obviously who he's referring to.  He said there may be an

24  individual who would have an interest on partnering on Sheridan

25  Square; so that would be the first time I heard of it.

I2FPBER2                        Martin - Redirect

1   Q.  But following that, who approached who?

2               MR. BIENERT:  Objection.  It's a vague question, your

3   Honor.

4               THE COURT:  Yes, rephrase it.

5   Q.  Did you approach Mr. Bergstein or did Mr. Bergstein

6   approach you about engaging in this transaction?

7   A.  I don't recall who initiated the e-mail.

8   Q.  You talked about the formation, as part of that

9   transaction, of BT Music.  I mean, who operated BT Music?

10  A.  Well, BT Music was an LLC, and an LLC typically has

11  managers which really, for an LLC, constitute directors.  But

12  the actual running of the operations was Mr. Bergstein.

13  Q.  Okay.  Right.  I'm not referring to sort of the technical

14  legalities.  I'm just asking who actually did the things that

15  needed to be done for BT Music?

16  A.  That would be Mr. Bergstein.

17  Q.  Did you have experience in the film industry?

18  A.  Only going to movies.

19  Q.  And does Stephens specialize in film-related investments?

20  A.  No.

21  Q.  So who did you rely on for those things in connection with

22  the BT Music transaction?

23  A.  Well, we -- as I said, we are generally passive investors;

24  so we rely on our partners and the managers and the executives

25  of the company we invest in to make those decisions.

I2FPBER2                    Martin - Redirect

1    Q.  And who is your partner in the BT Music transaction that

2    you engaged in with Mr. Bergstein?

3    A.  Mr. Bergstein.

4    Q.  When it came time to -- you were asked some questions on

5    cross-examination about your having extended a loan to the

6    initial loan that you extended to BT Music, and how much was

7    that for, that initial loan?

8    A.  The initial loan?

9    Q.  The initial loan, the first one.

10   A.  A million dollars.

11   Q.  And whose idea was it that you would contribute that money,

12   that Stephens would contribute the money?

13   A.  You're talking about the one to Sheridan Square?

14   Q.  Correct.

15   A.  I don't recall specifically.  I think -- I mean, at that

16   time, we were talking amongst the principals of Sheridan Square

17   and Mr. Bergstein and myself, and I don't recall which of them

18   came up with the exact need and the exact proposal.

19   Q.  And the additional times when Stephens provided money to

20   the businesses, who asked for that money?

21   A.  It was always -- so we weren't keeping up.  I mean, we

22   would get monthly financials, but we weren't keeping up with

23   the exact imminent needs of the business; so it was either --

24   it was primarily Mr. Bergstein, but it could also have been

25   Mr. Olsen communicating what was necessary at Sheridan

I2FPBER2                          Martin - Redirect

Square/BT Music.

           Also, conveying what was important to DB Zwirn.  He
seemed to have the connection with DB Zwirn that where he knew
exactly what they needed or what they would settle for.
Q.  And did you rely on his representations about what DB Zwirn
was saying or not saying in connection with the transactions?
A.  Yes, I did.  As I said, he seemed to have the relationship
with him, and my understanding is he had other loans with them,
including the people that he was dealing with.
Q.  Regardless of whether Mr. Bergstein had an interest in
Sheridan or purportedly gave money to Sheridan, would you have
given any of Stephens money or loaned any money if he was going
to divert any portion of that money to himself?
           MR. BIENERT:  Objection.  All of this has been asked
and answered.
           THE COURT:  Overruled.
A.  Absolutely not.
Q.  You were asked some questions on cross-examination about
the bankruptcy proceedings that you learned some of
Mr. Bergstein's entities had been involved in.  Based on the
note that you had, did you believe that you had a claim in
bankruptcy that you could have made a claim in bankruptcy on
that note?
A.  Yes.  As I testified I believe a few minutes ago, we knew
we had a claim.  We had no idea what that claim might be worth

1    or whether it might be satisfied in bankruptcy.  Our

2    expectations were low.

3    Q.  What, if anything, did you rely on in agreeing to sell your

4    note to CAC Group?

5         MR. BIENERT:  Objection, relevance.

6    A.  Can you be more specific?

7         THE COURT:  Overruled.

8    Q.  Sure.  Sure.  With respect to your requirement that the

9    note not -- that you would not sell the note --

10   A.  Oh.

11   Q.  -- to any affiliate or associate of Mr. Bergstein, what did

12   you rely on?

13   A.  We -- typically, we relied on what we customarily rely on,

14   which is a legal document with the representations and

15   warranties that that's not the case.

16   Q.  Did you get that in this case?

17   A.  We did.

18   Q.  Who signed that document or who -- well, let me ask you

19   this.  We looked yesterday at Government Exhibit -- why don't

20   we take a look at that now -- Government Exhibit 1420.  And can

21   you just enlarge the upper portion and the top of that e-mail.

22        Is that the e-mail from Mr. Bergstein?  I'm sorry,

23   just the very top, the two lines.  E-mail from Mr. Bergstein to

24   yourself, among others, and it says:  Attached please find the

25   revised agreement, redline and clean?

I2FPBER2                          Martin - Redirect

1          And then if we go to the following page or, rather,

2     page 4, and enlarge 4.2.  Who is it, your understanding,

3     drafted this paragraph?

4     A.  Mr. Bergstein or his representatives.

5     Q.  And what did this paragraph represent to whether the

6     purchaser, CAC Group, was an affiliate of Pangea, R2D2 or CT1?

7     A.  It affirmatively states that the purchaser is not an

8     affiliate of Pangea, R2D2 or CT1.  I think the final version

9     includes Bergstein in that, as well.

10    Q.  It does.  We saw that earlier.  Did you rely upon this in

11    selling the note to CAC?

12    A.  Yes, we specifically relied on that.

13              MR. KOBRE:  Nothing further.

14              THE COURT:  All right.  You may step down.

15              (Witness excused)

16         Ladies and gentlemen, I usually am a stickler for

17    going right up to the minute.  My clock here says 12:56.  I'm

18    going to go wild and crazy and say, let's break now, and we'll

19    pick up at 2:00.  Enjoy your lunch.

20              (Jury not present)

21              (Continued on next page)

22

23

24

25

1             THE COURT:  All right.  Please be seated.  So I have a

2      letter application from the defense regarding a trial subpoena

3      served on Daniel Ray.  Has the government received a copy of

4      the defendant's application?

5             MR. IMPERATORE:  Yes.

6             THE COURT:  Why shouldn't I, or should I, grant their

7      application?  Let me put it to you that way.

8             MR. IMPERATORE:  Your Honor should not, and let me put

9      this into some context for the Court.  So, first of all, let me

10     just begin by addressing the argument that this is a personal

11     appearance subpoena.  We have made clear to the defense that

12     this is not a personal appearance subpoena.  It's not requiring

13     Mr. Ray to appear in New York, and we've conveyed that.

14            THE COURT:  You've conveyed that to defense.  Have you

15     conveyed that to Mr. Ray?

16            MR. IMPERATORE:  No, your Honor.  We thought it

17     would -- the prudent thing to do would be to let defense

18     counsel know, since he's associated with the defense team.

19            MR. FISH:  Your Honor, this morning the government

20     told me that.  I sent an e-mail to Mr. Ray this morning; so

21     he's not going to --

22            THE COURT:  Okay.  Thank you.

23            MR. IMPERATORE:  Let me put this into some context,

24     your Honor.  The government has received hardly any material

25     relating to this individual, who the defense has alternatively

1  called an expert or a summary witness, but in any event, he was

2  noticed to the government way back in the beginning of

3  December.

4           When the government received marked exhibits on

5  January 30th from the defense, it received nothing for Dan Ray.

6  When the defense produced reciprocal rule 26.2 material on

7  February 2nd, the government received nothing from Dan Ray.

8  The government also repeatedly asked for materials related to

9  Dan Ray during the week of February 2nd, and on February 7th

10 that didn't happen.

11          The government first attempted to serve the subpoena a

12 week ago, first, by sending it to defense counsel and asking if

13 they would accept receipt.  They did not.  We received no

14 response.  We tried earlier in the week to e-mail it to

15 Mr. Ray, and we received no response.  So it's not as though

16 this was some last-minute attempt to get material from Mr. Ray.

17          What we did receive, and this is after your Honor

18 ordered it, was some limited production of documents that

19 Mr. Ray purportedly relied on in doing his summary analysis.

20 We believe that that -- first of all, as I think your Honor

21 clarified, the materials on which Mr. Ray has relied in doing

22 his analysis, which has not been shared with the government,

23 are, of course, subject to disclosure under rule 16, or in

24 response to a rule 17 subpoena.

25          The materials that we did receive from the defense, we

I2FPBER2                         Martin - Redirect

1   believe, are woefully inadequate on this point, and just to

2   highlight why we believe that --

3           THE COURT:  Well, let's for one second assume that

4   you're right.  Let's just take that arguendo, that the

5   materials you received are woefully inadequate under discovery

6   requests that you have previously served.  Why isn't that

7   enough then?  Why isn't that enough that if the defense has

8   failed to produce that which I've directed them to produce, I

9   recall, raising the specter of preclusion?  Maybe I'm dreaming

10  that, but I believe I did.

11          MR. IMPERATORE:  And we believe that your Honor is

12  correct, that that alone may be enough.

13          THE COURT:  All right.

14          MR. IMPERATORE:  And I can --

15          THE COURT:  So for starters, looking at this through

16  the lens of your having asked for this, you say, in a timely

17  fashion, you say I've ordered it produced.  There's the remedy

18  of preclusion.  Let me ask you, is this subpoena not also

19  subject to United States against Nixon?

20          MR. IMPERATORE:  Your Honor, I don't know the answer

21  to that now that we're in trial.  I don't know whether Nixon

22  applies once the trial has already begun.  I think we would

23  take the view that it's not, but even if it were --

24          THE COURT:  Well, you ought to think about that one.

25  Maybe go back, talk to some of your friends in the office

1    because it may not appear that I have a long memory, but

2    sometimes I do, and I'm going to hold your office to whatever

3    position you take on that.

4             MR. IMPERATORE:  Your Honor, I just --

5             THE COURT:  So we're not going to have the Thursday

6    position of the United States on whether Nixon applies to this,

7    and then next week, when it's a defense subpoena, oh, no, Nixon

8    doesn't permit that.

9             MR. IMPERATORE:  And, your Honor, I don't --

10            THE COURT:  Go back and talk about it.

11            MR. IMPERATORE:  I just don't know the answer to that

12   question.

13            THE COURT:  Go back and find out.

14            MR. IMPERATORE:  Let's assume that it does apply,

15   which believe that these materials that are sought are, do

16   comply with Nixon, and I think, again, your Honor has to

17   approach it from the perspective of the defense has represented

18   that this is an individual who is a summary witness, who is

19   summarizing evidence that's going to be introduced in court.

20            Of course, that is material that is subject to

21   production in response to a rule 17 subpoena.  And let me just

22   highlight a couple of examples of materials that they clearly

23   have that are called for by the subpoena that their production

24   highlights that they have and have not produced.

25            So after this subpoena was served on Mr. Ray

I2FPBER2                        Martin - Redirect

yesterday, after they refused to accept service, the defense

did produce a limited volume of e-mail correspondence to us, I

believe it was last night or in the morning, with Dan Ray

materials we had not received before that relate to his

engagement.  Actually, it was just this morning.

         What it reflects is that Mr. Ray was engaged

approximately eight or nine months ago, and he has been

supplied with specific documents that are clearly subject to a

rule 17 subpoena and are rule 16 materials.  For example, on

page 70 of the defense's production this morning, it refers to

this individual, a Mr. Hemmings -- I'm sorry, Mr. Ray as having

received a bunch -- quote, a bunch of additional documents from

Bergstein going back into January.

         It also reflects on page 64 that he has reviewed

general ledgers that have been produced for companies like

K-Jam Media and Integrated Administration, which, of course,

are materials that it appears the defense is seeking to

introduce at trial.  These have not been produced to the

government.  They're subject to production under a variety of

theories, none the least in response to a rule 17 subpoena.

         So all of that is the context here, your Honor.  We

believe that the defense -- that this is someone who could be

precluded as a witness on this basis alone, for failure to

comply with other disclosure requirements, but when it comes to

the subpoena, clearly these are materials that are responsive

I2FPBER2                        Martin - Redirect

1    to the subpoena and need to be produced.

2              THE COURT:  You were quoting from a document?

3              MR. IMPERATORE:  From my own summary, your Honor, yes.

4              THE COURT:  "Bunch," is that a word in the e-mail

5    or --

6              MR. KOBRE:  Yes.

7              MR. IMPERATORE:  I'll let Mr. Kobre address that.

8              THE COURT:  I mean "bunch" is a good English word, and

9    I'm just trying to figure it out.

10             MR. KOBRE:  Your Honor, if I could respond because I

11   was the one who had a chance to briefly review the document

12   that defense produced this morning, and it is direct a quote

13   from some e-mail correspondence among employees of the company

14   that employs Mr. Ray, a company that I believe is called

15   Hemming.  And it refers to them having received "a bunch of

16   additional documents from Bergstein."

17             And the only reason that the end quote is there is

18   because it was just a quick note that I was copying and

19   pasting.  But then it goes on to say that those documents have

20   been received between January 30th, 2018, and February 2nd,

21   2018.  That's on page 70 of the PDF file that we received this

22   morning, and then on page 64 of that PDF file, it talks about

23   individuals, I believe Mr. Ray, having "reviewed the GLs,"

24   which I take it to mean general ledgers --

25             THE COURT:  Yes.

1          MR. KOBRE:  -- that have been produced, and it goes on

2     to say, again in quotes:  "We only have K-Jam Media 2010 to

3     2013 and Integrated Administration 2011 to 2013.  Even the ones

4     you already had in the workpaper were duplicates for K-Jam and

5     Integrated Admin," and that's a quote.  And, your Honor, just

6     to be clear, I was just, in a rushed manner, just going through

7     it and picking out quotes that I was able to find.

8          THE COURT:  I understand.  I understand.  Let me hear

9     from the defendants.  Why isn't it appropriate to order the

10    production of any materials supplied to Hemmings, the company,

11    or Ray, the individual, for use in this case, for his

12    consideration and education and background and actual or

13    potential use in this case?

14         MR. FISH:  Well, your Honor, I can say, No. 1, we have

15    not received such material from the government.  So the

16    material that has to be produced is the material that he is

17    summarizing.

18         For example, in the 3500 material of the government's

19    summary witness, there's an indication that he had received

20    various spreadsheets that had been prepared by a U.S.

21    Attorney's Office analyst or an agent, I'm not sure which.

22    Those spreadsheets were not produced by the government to us.

23    They were provided to him as sort of a starting point and

24    background.

25         So, you know, there really should be one set of rules

I2FPBER2                      Martin - Redirect

1    for both sides.  I would hope that the government would agree

2    with it.

3            THE COURT:  I'm not disagreeing with the one set of

4    rules approach --

5            MR. FISH:  Right.

6            THE COURT:  -- to the extent that sometimes in a

7    criminal case one set of rules doesn't apply equally to both

8    sides.  But you may be right on this point.  But go on as to

9    why I shouldn't order, in your case, and then I'll hear you why

10   I might have to order it in the government's case.

11           MR. FISH:  Well, I think that the materials that

12   should be provided are the materials on which he's going to

13   be -- the materials that he's going to be summarizing.

14           To the extent that the defense starts an analysis, it

15   becomes a dry hole, and he's not going to be testifying about

16   it, the fact that that information had been provided -- and I'm

17   just speaking hypothetically here -- it doesn't fall with any

18   of the rules.  It's not part of our case in chief.  It's not

19   impeachment.  It's not anything.  He has no personal knowledge.

20           If, for example, he went and did an analysis of, I

21   have no idea, I'll make up some entity, X, and he had a whole

22   bunch of bank records for X, and he ran them and did an

23   analysis and said, you know what, we're not having him testify

24   about X, there's no charts about X, X is not in the case, I

25   don't think the defense has any obligation to produce these X

I2FPBER2                           Martin - Redirect

materials.  So that's the general thing.

        A couple of specific things as the bunch of materials,
I believe, and Mr. Bisconti can correct me if I'm wrong, that
really is largely, I think, co-terminus with the materials we
produced during the case.  And it does also demonstrate that
this was not a hide-the-ball situation.  As the materials we
produced this morning show, these materials were provided to
Mr. Ray, according to the materials we provided today, within
the last month.

        I mean, I know Mr. Allen, he didn't know, but he
argued in court that Mr. Ray had had these materials for months
then before we provided them to the government, which just is
not true, as now demonstrated by the e-mail.  Now, I know
Mr. Allen didn't know one way or the other and was just
assuming, but I just made that point as well.

        THE COURT:  All right.  Let me hear from the
government.  Is the standard anything which the summary witness
receives from the party is subject to subpoena or production,
or is it that which the summary witness expects to testify
about?

        Now, remember, my question so far is going to that
which goes to the witness.  It may be a different situation
about what comes back from the witness, but that which is given
to the witness.

        MR. KOBRE:  If we might just have a moment, your

I2FPBER2                        Martin – Redirect

1    Honor?

2              THE COURT:  I tell you what, we'll take this up.

3    We'll see you at ten minutes to 2:00.  All right?

4              (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I2F6BER3

1                   A F T E R N O O N   S E S S I O N

2                          2:00 p.m.

3            THE COURT:  Please be seated.

4            Thinking about it over the lunch break, some of the

5    issues that arise here sound familiar with issues that arose

6    with regard to some of the subpoenas that the defendant sought

7    to have me issue.  They submitted subpoenas to me, and I recall

8    writing -- I can't say as I sit here whether it was after

9    having been persuaded by the government's brief or not -- that

10   a Rule 17 subpoena is not the way to enforce a right under

11   *Brady, Giglio*, 3500 or Rule 16 and that that was not a proper

12   use of a Rule 17 subpoena and that the defendant's subpoena

13   flunked the Nixon standard.

14           Why is this different than that in that you, the

15   government, have your legitimate rights under Rule 16 and 3500

16   and you're entitled to ask me to enforce those rights; but why

17   isn't any and all type subpoena the appropriate vehicle as

18   distinguishing the rights that you already have?

19           MR. ALLEN:  Your Honor, is correct that a Rule 17

20   subpoena is not a proper way to get what should be produced

21   under Rule 26.2 or under Rule 16.  The proper way to get Rule

22   16 or Rule 26.2 materials is through order pursuant to those

23   rules.

24           Look, we understand that some of the requests in

25   subpoena may need to be tailored more than they were, but what

I2F6BER3

we're basically looking for are underlying records that we

believe were relevant and admissible at trial.  In other words,

bank records, invoices, things like that that we don't think

have been produced yet.  That is a request for materials that

would be relevant and admissible at trial, which we think would

be appropriate under the Nixon standard.  We haven't gotten

them through Rule 16 and so we're trying an alternate course.

            Understand that we're not trying to just embed the

Rule 16 standard and Rule 17.  We're using a separate course to

get materials that we think exist and that we think we have a

right to.

            THE COURT:  At least I know no one is about to get on

a plane and we can talk about it further at another time.  I am

not at this stage of the game persuaded by the government's

argument and I certainly don't have to deal with it to the

extent the existing subpoena is overbroad and the proposal is

something narrower.  If there is something narrower, I will

deal with that when the time comes.

            Bring my jury in, please.

            (Continued on next page)

I2F6BER3                          King - direct

1          (In open court; jury present)

2          THE COURT:  Ladies and gentlemen, good afternoon.

3   Please be seated.

4          The government may call its next witness.

5          MR. IMPERATORE:  The government calls James King.

6          THE COURT:  Common up, Mr. King.

7          THE DEPUTY CLERK:  Remain standing in the witness box.

8   Step up and raise your right hand.

9    JAMES KING,

10       called as a witness by the Government,

11       having been duly sworn, testified as follows:

12          THE COURT:  Sit down and if you don't mind, pull the

13   microphone a little bit closer here.

14          THE WITNESS:  James King.

15          THE COURT:  I think we can agree the spelling is the

16   customarily one?

17          THE WITNESS:  Yes.

18          THE COURT:  Thank you.

19          You may inquire.

20   DIRECT EXAMINATION

21   BY MR. IMPERATORE:

22   Q.  Good afternoon.

23          Mr. King, how old are you?

24   A.  61.

25   Q.  Where do you currently live?

I2F6BER3                         King - direct

1   A.  Stony Brook, New York.

2   Q.  Where is that?

3   A.  On Long Island.

4   Q.  How far did you go in school?

5   A.  I have a masters in -- an MBA.

6   Q.  Masters of business administration?

7   A.  Yes.

8   Q.  What do you currently do for a living?

9   A.  Self-employed certified public accountant.

10  Q.  What is a certified public accountant?

11  A.  Someone licensed by the State of New York to perform

12  certain services.  Most especially to express what is called an

13  audit opinion for a public company.

14  Q.  Mr. King, if I could ask you to keep your voice up and slow

15  down.

16  A.  Sure.

17  Q.  Have you also done in the course of your career tax

18  preparation work?

19  A.  Yes.  Actually, in my own firm that is primarily what I do.

20  I am a tax specialist.  I have actually never performed an

21  audit of a public company.

22  Q.  How long have you been a certified public accountant?

23  A.  I received my license I believe it was in 2002.  I passed

24  the exam a number years before that, but I worked for a

25  corporation and there was no reason at that time to apply for

I2F6BER3                          King - direct

1    my license.

2    Q.  How are you currently employed?

3    A.  I am self-employed.

4    Q.  When you say "self-employed," do you have your own

5    accounting firm?

6    A.  Yes.  I have a limited liability company that is named

7    James P. King & Associates, LLC.

8    Q.  How long have you had your own firm?

9    A.  I think I organized that firm in 2003 or 2004.

10   Q.  Now, are you familiar with someone named Jerry Swartz?

11   A.  Yes.

12   Q.  Who is Jerry Swartz?

13   A.  I worked at a company named Symbol Technologies.  Jerry

14   Swartz was the cofounder of Symbol Technologies, which was

15   found I believe in 1975.  I worked there from June of 1988

16   until May of 2001.  And after I left Symbol Technologies and I

17   started my own firm, Dr. Swartz eventually became a client of

18   mine.

19   Q.  Let me back up a moment.

20           You mentioned Symbol Technologies?

21   A.  Yes.

22   Q.  What type of work did you do there?

23   A.  I was the tax director for the company.

24   Q.  How did you and Dr. Swartz meet?

25   A.  I met Dr. Swartz shortly after I started with Symbol

I2F6BER3                         King - direct

1  Technologies and I met him many times during my 13-year

2  employment there.

3  Q.  Generally speaking, what did Dr. Swartz do for a living?

4  A.  Well, he was -- he is scientist and engineer who developed

5  the basic patents which enable the handheld laser scanner.

6          THE COURT:  Move on.  Move on, Mr. Imperatore.

7          MR. IMPERATORE:  Yes, your Honor.

8  Q.  Did there come a time when you went to work for Dr. Swartz

9  personally, putting aside the work that you did at Symbol?

10  A.  Yes.  Soon after I left Symbol in May of 2001, I started a

11  relationship with Dr. Swartz within weeks of leaving Symbol

12  Technologies.

13  Q.  After you left Symbol, what type of work have you done for

14  Dr. Schwartz over the years.

15  A.  Well, I have prepared his personal return and the return

16  for his family partnerships, his childhood trusts, his sports

17  foundation.

18  Q.  When you say prepared his return, you are referring to a

19  tax return?

20  A.  Yes.

21  Q.  Now focusing on the period roughly 2002 through the

22  present, how often have you been interacted with him roughly?

23  A.  From 2002 to 2004 it might have been once a month.  June,

24  July 2004 to present date is almost weekly.

25  Q.  On what types of issues do you deal with him?

I2F6BER3                        King - direct

1    A.  Well, initially it was just tax returns and tax advice; but

2    then in 2004, I began to get involved in his personal

3    investments, the investments of the family and childhood

4    trusts.  I was named the sole trustee or cotrustee of all the

5    family and childhood trusts in the foundation.

6    Q.  Over the years had Dr. Swartz consulted with you in making

7    investment decisions?

8    A.  Yes.

9    Q.  What role have you played in Dr. Swartz's personal

10   investments?

11   A.  Well, I evaluate all the material that we receive and we

12   then meet and together with other advisors we discuss the merit

13   of the investment.

14   Q.  Do you make recommendations to him?

15   A.  Yes.

16   Q.  How old is Dr. Swartz now?

17   A.  77.

18   Q.  Has he experienced any health issues in the last, say, 12

19   years or so?

20   A.  Yes.  In early July of 2008 he had a brain hemorrhage.

21   Q.  Do you recognize anyone in the courtroom that you met

22   through Dr. Swartz?

23   A.  Yes.  I see Mr. Bergstein.

24   Q.  Would you identify Mr. Bergstein by an article of clothing

25   he is wearing.

I2F6BER3                          King - direct

1   A.  He is wearing a sweater -- a gray sweater.

2              THE COURT:  What table is he at?

3              THE WITNESS:  Second one.

4              THE COURT:  Identification noted.

5   BY MR. IMPERATORE:

6   Q.  When did you first meet Mr. Bernstein approximately?

7   A.  The one and only time I met him in person was in June of

8   2007.

9   Q.  How did you meet him?

10  A.  We had a meeting at the offices of Fried Frank, the firm

11  where Dr. Swartz's son-in-law was a partner at the time, David

12  Hinnus.  We used a conference room there to meet with

13  Mr. Bergstein.

14  Q.  What was the context of this initial meeting generally

15  speaking?

16  A.  Well, Mr. Bergstein had expressed an interest in acquiring

17  a company which Dr. Swartz had a significant equity interest.

18  Q.  What, if anything, did Mr. Bergstein tell you about

19  himself?

20  A.  Well, he had made, well, a personal fortune in the world of

21  what is called distressed asset investing, buying companies

22  that are in financial trouble and turning them around.

23  Q.  Now, did there come a time when Mr. Bergstein proposed an

24  investment to Dr. Swartz?

25  A.  Yes.  Later that year -- I believe it was in August of

I2F6BER3                         King - direct

1    2007 -- he sent some subscription documents for a company that

2    he and another individual named Ron Tutor owned.  Well, they

3    owned together named CT 1 Holdings, LLC.

4    Q.  How do you know about this?

5    A.  Well, I received a copy of the subscription documents from

6    Mr. Bergstein.

7    Q.  Were you involved in consulting with Dr. Swartz about that

8    investment?

9    A.  Yes.  Dr. Swartz asked me to review the subscription

10   documents and then when he decided to make an investment, I

11   completed the subscription documents.

12   Q.  What is a subscription document?

13   A.  The first legal document that you would sign when you make

14   a legal commitment to invest in a company.

15   Q.  Did you participate in any negotiations with Mr. Bergstein

16   about this potential investment?

17   A.  Well, part of Dr. -- of the business arrangement that was

18   proposed at the time at the same time that Dr. Swartz committed

19   to making the investment was Dr. Swartz was negotiating a sale

20   of a company.  So we negotiated the terms of the sale of the

21   company and also a consulting contract for Dr. Swartz.

22   Q.  But focusing on CT 1, did you have discussions with

23   Mr. Bergstein about that?

24   A.  Yes.

25   Q.  How much money did Mr. Bergstein seek form Dr. Swartz in

1   connection with the investment in CT 1?

2   A.   The amount was $1.5 million.

3   Q.   According to Mr. Bergstein, how was Dr. Swartz's $1.5

4   million investment going to be spent?

5   A.   Well, primarily it was going to be used to purchase film

6   libraries from companies that were in financial trouble; but

7   then some of the proceeds were also going to be used to fund

8   new films for production costs on films.

9   Q.   So those purposes?

10  A.   Yes.

11  Q.   According to Mr. Bergstein was he going to take any of this

12  money for himself?

13  A.   No.  I didn't anticipate that would be the case.

14  Q.   What, if anything, did Mr. Bergstein say CT 1 was?

15  A.   It was -- CT 1 was a holding company that held principally

16  two companies that had been acquired within the two years prior

17  to that date.  One was Capital Films and other was Think Films.

18  Q.   In other words, some businesses in the film business?

19  A.   Yes.  It was a holding company to hold these film

20  companies, which they had acquired.

21       MR. IMPERATORE:  Ms. Emmerick, will you please display

22  Government Exhibit 650 for identification.

23  Q.   You also have that in a binder, Mr. King.

24       Do you recognize Government Exhibit 650?

25  A.   Yes.

I2F6BER3                        King - direct

1   Q.  What is it?

2   A.  This is the subscription agreement.

3   Q.  How do you recognize it?

4   A.  I remember reviewing this and completing it.  This is my

5   handwriting.

6           MR. IMPERATORE:  The government offers Government

7   Exhibit 650.

8           THE COURT:  Any objection?

9           MR. FISH:  One moment, your Honor.

10          No objection.

11          THE COURT:  Received.

12          (Government's Exhibit 650 received in evidence)

13          MR. IMPERATORE:  Ms. Emmerick, will you publish that,

14  please.

15  BY MR. IMPERATORE:

16  Q.  So it says, Subscription Document CT 1 Holdings, LLC,

17  membership interests.

18          Where did this come from, Mr. King?

19  A.  I believe this was sent by e-mail to me from -- directly

20  from Mr. Bergstein.

21  Q.  What, if anything, did Mr. Bergstein say about his

22  involvement in this company, CT 1 Holdings, LLC?

23  A.  Well, I -- he was the manager of CT 1 Holdings and he and

24  his silent partner, Ron Tutor, owned the company through

25  another company called R2D2.

```
 1   Q.  That is T-u-t-o-r?

 2   A.  Yes.

 3   Q.  Was Mr. Tutor's involvement significant in evaluating this

 4   investment?

 5   A.  Yes.  Very much so, because he was a very wealthy

 6   individual.  He was the CEO of a large construction company and

 7   so he provided tremendous credibility that he was Mr.

 8   Bergstein's business partner.

 9          MR. IMPERATORE:  Ms. Emmerick, please publish page 3.

10   Q.  We see here the name Jerry Swartz listed.

11          Why is Dr. Swartz's name listed in this document?

12   A.  He was going to be the purchaser of these membership

13   interests in CT 1.

14          MR. IMPERATORE:  Ms. Emmerick, please turn to page 4.

15   Q.  We see your name listed down here in Roman numeral seven,

16   Mr. King?

17   A.  Yes.

18   Q.  Why is your name listed in this document?

19   A.  Well, the question is, Did the purchaser rely on the advice

20   of any professional advisor in evaluating the merits and risks

21   of this investment.  And the answer was, yes, that I was the

22   professional advisor.

23          MR. IMPERATORE:  Ms. Emmerick, please turn to page 9.

24   Q.  Looking at the top here the first full paragraph says, The

25   company, what is the company being referenced here?
```

I2F6BER3                         King - direct

1   A.  CT 1.

2   Q.  The company intends to use the proceeds of this offering

3   for acquisitions, its general business operations, the purchase

4   of minority ownership interests in certain subsidiaries of CT 1

5   and the fees and expenses of this offering.

6            How, if at all, was this important to you and

7   Dr. Swartz in evaluating this investments?

8   A.  Well, it provides written assurance that the proceeds from

9   the offering amount of money that Dr. Swartz would be

10  contributing would be used for the stated purposes, primarily

11  for acquisitions.  The general business operations we didn't

12  understand to be significant because it was just a few people

13  in the holding company.  So we didn't really think that much

14  would be spent on business operations.

15  Q.  I will ask you to keep your voice up a bit, Mr. King.

16  A.  Okay.

17  Q.  If some of Dr. Swartz's money was going to be diverted to

18  Mr. Bergstein personally, is that something you would have

19  wanted to know?

20  A.  Oh, yes.

21  Q.  If that were the case, if some of Dr. Swartz's investment

22  money was going to Mr. Bergstein, would you recommended that

23  Dr. Swartz invested in this venture?

24  A.  No.  Absolutely not.

25            MR. IMPERATORE:  Let turn back to page 2, please.

I2F6BER3                        King - direct

1  Q.  There is a reference here down at the bottom to a client

2  trust account in the name of Susan H. Tregub.

3        What was your understanding what that account was?

4  A.  Susan Tregub was Mr. Bergstein's attorney and this was a

5  attorney trust account that was set up to receive the

6  subscription proceeds until the offering was completed.

7  Q.  What comfort, if any, did it give you that proceeds of this

8  offering would go into an attorney-client trust account?

9  A.  I think it is another level of assurance that this attorney

10  who has professional obligations would ensure that the proceeds

11  were used appropriately.

12  Q.  What ultimately did Dr. Swartz decide to do with respect to

13  Mr. Bergstein's proposal regarding CT 1?

14  A.  To invest 1.5 million.

15  Q.  After Dr. Swartz gave his $1.5 million to Mr. Bergstein,

16  what happened?

17  A.  Well, for a period of time we had requested financial

18  statements and then tax returns for the partnership, a limited

19  liability company.  It is treated as a partnership for tax

20  purposes.  We made repeated requests, but we never received

21  either the financial statements or the tax returns.

22  Q.  To whom did you make those requests?

23  A.  Directly to Mr. Bergstein.

24        MR. IMPERATORE:  Ms. Emmerick, you can take that down.

25  Q.  What, if anything, would those documents have told you

1    about the use of Dr. Swartz's investment proceeds?

2    A.  Well, it would have indicated how the money was being

3    spent.  It would show the sources and uses of funds, if the

4    money was used to purchase companies, if it was used to fund

5    the production costs of new films, and to what extent it was

6    used for operating expenses.

7    Q.  As Dr. Swartz's financial advisor, did you ever get any

8    window into how this money was actually spent?

9    A.  No.  Not at all.

10   Q.  Did Dr. Swartz ever get his money back?

11   A.  No.

12   Q.  Did he ever see any return on his investment?

13   A.  No.

14   Q.  Did Mr. Bergstein ever tell you how he had spent and used

15   Dr. Swartz's money?

16   A.  No.

17   Q.  Now, after the initial CT 1 investment, did Mr. Bergstein

18   propose other investments to Mr. Swartz?

19   A.  Yes.  Within a few weeks after that investment in August of

20   2007, Dr. Swartz made another investment in the company named

21   Alliance Film --

22   Q.  Let me stop you there.  We're not going to discuss these

23   other investments --

24   A.  Okay.

25   Q.  -- in any detail.

1    Over time did Dr. Swartz make other investments with

2  Mr. Bergstein?

3  A.  Yes.

4  Q.  One or more than one?

5  A.  Several.

6  Q.  Generally speaking, what types of investments were they?

7  In what business area?

8  A.  Well, all companies in the motion picture, the film

9  industry.

10  Q.  What years were the investments made?

11  A.  Between August 27 and June of 2008.

12  Q.  By the end of June 2008 how much money had Dr. Swartz

13  invested with Dr. Bergstein roughly?

14  A.  Six and a half million.

15  Q.  As of June 2008 had Dr. Swartz received any money back or

16  any return on his investment?

17  A.  No.

18    MR. IMPERATORE:  Ms. Emmerick, please publish

19  Government Exhibit 653 in evidence.

20  Q.  So we're not going to get into this in any detail, but do

21  you recognize what this is?

22  A.  Yes.

23  Q.  What is it?

24  A.  This was a letter that Dr. Swartz sent to Mr. Bergstein.

25  Q.  Do you know whether it was actually sent to Mr. Bergstein?

I2F6BER3                              King - direct

1   A.  Yes, it was.

2   Q.  How do you know that?

3   A.  I got a copy of the e-mail.  It was sent by e-mail and I

4   was copied on that e-mail.

5   Q.  For what purpose was this letter sent?

6   A.  Dr. Swartz had just returned home from recovering from his

7   brain hemorrhage.

8             MR. FISH:  Relevance.

9             THE WITNESS:  I am sorry?

10            THE COURT:  Confine yourself to the question.

11            MR. FISH:  I am objecting to the question on relevance

12   grounds.

13            THE COURT:  I will allow it.

14   Q.  I can repeat the question.

15            For what purpose was this letter sent?

16   A.  It was to summarize all of the investments and loans to

17   companies owned and controlled by Mr. Bergstein.

18   Q.  Did you have personal involvement in the investments listed

19   here?

20   A.  Yes.

21   Q.  Do you know whether they were in fact made?

22   A.  Yes.

23            MR. IMPERATORE:  If we can turn to the second page.

24            It is an original signed by Jerry Swartz.

25            You can take that down.  Thank you.

I2F6BER3                    King - direct

1   Q.   Was it the case that as of the sending of this letter that

2   Dr. Swartz had invested more than $6 million with Mr.

3   Bergstein?

4   A.   Yes.

5   Q.   What sense of urgency, if any, did Mr. Bergstein convey

6   when he was seeking investments from Dr. Swartz?

7   A.   Well, on the last two occasions -- the last three

8   occasions, Dr. Swartz was contacted late in the day and Mr.

9   Bergstein needed the money either that day or the next day.

10  Q.   Do you know whether Mr. Bergstein ever responded to this

11  letter?

12  A.   I -- I don't know personally if he responded.  I never

13  received any written response.

14  Q.   Did Dr. Swartz ever see his money back or return on his

15  investments after this letter was sent?

16  A.   No.

17  Q.   Mr. King, were you involved in doing the accounting for

18  Dr. Swartz's investments with Mr. Bergstein?

19  A.   Yes.

20  Q.   Let's fast forward.

21       How ultimately did you decide to account for

22  Dr. Swartz's investments to Mr. Bergstein?

23  A.   Well, I treated them as worthless as early as March 31st of

24  2009.  I prepared a personal financial statement for Dr. Swartz

25  in connection with his divorce proceeding and treated all the

I2F6BER3                          King - direct

1    investments and loans as wholly worthless.

2    Q.  When you say that you made that decision, did you make that

3    decision over time?

4    A.  Yes.

5    Q.  Did you account for all of them as of 2009 as being

6    worthless, or some at some later point in time?

7    A.  Well, in my personal opinion I felt that they were

8    worthless as of 2009.  You know, primarily because of the

9    fiscal crisis in September 2008, I felt that any hope for

10   recovery was almost certain that it was never going to happen.

11   Q.  Did you make some determinations later in time about

12   whether these investments had value?

13   A.  Yes.  I mean, ultimately I was waiting to receive copies of

14   the tax returns, which I had hoped would provide the support

15   that they were worthless, but ultimately I received objective

16   evidence when there was petition for involuntary bankruptcy

17   filed in March of 2010.

18   Q.  To what extent did that petition for involuntary bankruptcy

19   affect your conclusion that these investments were worthless?

20   A.  Well, I read the petition and called Mr. Bergstein to get

21   confirmation from him directly that the claims of unsecured

22   creditors were wholly worthless.

23   Q.  Let's shift gears.

24               MR. IMPERATORE:  Ms. Emmerick, please display

25   Government Exhibit 654 for identification.

I2F6BER3                        King - direct

1    Q.   Mr. King, do you recognize Government Exhibit 654?

2    A.   Yes.

3    Q.   Is this an e-mail that you received?

4    A.   Yes.

5              MR. IMPERATORE:   The government offers Government

6    Exhibit 654.

7              MR. FISH:   Objection to foundation at this point.

8              THE COURT:   Overruled.   Received.

9              (Government's Exhibit 654 received in evidence)

10             MR. IMPERATORE:   Ms. Emmerick, will you please publish

11   Government Exhibit 654.

12   BY MR. IMPERATORE:

13   Q.   Down here at the bottom there is an e-mail from Margaret

14   O'Connor to someone named Paul Parmar.

15             Who is Margaret O'Connor?

16   A.   Jerry's administrative assistance.

17   Q.   She is writing an e-mail to Mr. Parmar.  If we can look up

18   at the top, Mr. Parmar writes to Margaret O'Connor, Dear

19   Margaret, I am attaching the medical billing company pitch book

20   and teaser as well.

21             That ultimately gets forwarded from Ms. O'Connor to

22   you; is that right?

23   A.   Yes.

24   Q.   Who was Paul Parmar?

25   A.   I looked him up immediately.  I Googled him.

I2F6BER3                          King - direct

1    Q.   I don't want to ask you about what you read on Googled.

2    A.   Well, he was somebody who was introduced to Dr. Swartz by

3    Mr. Bergstein.

4    Q.   And why was this e-mail being forwarded to you?

5    A.   He was looking to see if Jerry would make an equity

6    investment in MB Tablet.

7    Q.   What was your understanding of what MB Tablet was?

8    A.   As described it was called a medical billing -- they sold

9    software for medical billing purposes so that a physician

10   holding a palm -- an iPad would enter any procedures that he

11   had done and then immediately generate a bill that would go to

12   the insurance company.

13   Q.   What was the date or year in which Paul Parmar solicited

14   Dr. Swartz for this investment?

15   A.   It was at this time, April of 2010.

16   Q.   Did Dr. Swartz ultimately invest with Paul Parmar?

17   A.   No.

18   Q.   By the way, did Jerry Swartz personally send and receive

19   e-mails?

20   A.   To my knowledge I don't think Jerry ever typed an e-mail

21   message himself.  His administrative assistant would print all

22   his e-mails and then go through them with Dr. Swartz and Jerry

23   would dictate replies and then she would type them on behalf of

24   Dr. Swartz.

25   Q.   If an e-mail was sent to Dr. Swartz's personal e-mail

I2F6BER3                         King - direct

1  account, how would it be brought to his attention typically?

2  A.  She would print out all of the e-mails and then review them

3  with Jerry.

4           MR. IMPERATORE:  Ms. Emmerick, you can take that down.

5  Thank you.

6  Q.  Mr. King, I want to change topics now and move forward in

7  time and ask you about something called Swartz IP.

8           MR. IMPERATORE:  Ms. Emmerick, please publish

9  Government Exhibit 657 in evidence.

10          You can blow up the top, please.

11 Q.  So this is an e-mail from David Bergstein to copying Jerry

12 Swartz and it attaches various documents, including something

13 called JSI Swop Final, Final SIP Note, and WTT Sidler.

14          Do you see that?

15 A.  Yes.

16 Q.  I will read this e-mail and ask you a few questions about

17 it.  This is from Mr. Bergstein to you.  It says, Jim, these

18 are documents for a deal that we are entering into with the

19 entity that I formed to hold the interests that Jerry and I

20 have together.  I am the initial shareholder in the entity, and

21 pursuant to Jerry's request, I will change the name.  I would

22 like to issue shares to Jerry (or an entity of his choice.)

23 Thus far, it is well capitalized with a number of investments

24 which we should go over.  I made Jerry the VP and he will be

25 receiving $100,000 per year plus expenses to start.

I2F6BER3                    King - direct

1            It goes on to say, Swartz IP is entering into this

2    funding agreement and will use a portion of the funds to make

3    investments in certain targets we have identified.

4            Now, did Swartz IP ever have any of Jerry Swartz's

5    money in it?

6    A.  No.

7    Q.  When it refers here to identifying certain targets down

8    here in the second paragraph, did Dr. Swartz and Mr. Bergstein

9    identify any targets together?

10   A.  To my knowledge, no.

11   Q.  Up at the top it refers to "holding the interests that

12   Jerry and I have together."

13           As of November 17th, 2011, did Mr. Bergstein and

14   Dr. Swartz hold any interests together?

15   A.  No.

16   Q.  What was your reaction to seeing that this entity, Swartz

17   IP, had Dr. Swartz's last name in?

18   A.  I was very unpleasantly surprised.

19   Q.  Why?

20   A.  Well, we had communicated to Mr. Bergstein earlier that

21   year -- I believe it was in August -- in an e-mail exchange

22   that Dr. Swartz's name should not be used in the name of any

23   company formed by Mr. Bergstein.

24   Q.  Why at that point did you not want Dr. Swartz's name in any

25   company associated with Mr. Bergstein?

I2F6BER3                         King - direct

1   A.  Well, I didn't believe in Mr. Bergstein was a trustworthy

2   individual and I didn't want Dr. Swartz to be associated with

3   him in any way.

4   Q.  After you received this e-mail, did you speak with Mr.

5   Bergstein?

6   A.  Yes.

7   Q.  In person or over the phone?

8   A.  Over the phone.

9   Q.  Who called whom?

10  A.  I believe I called him.  He may have called me.

11  Q.  Why did you speak with Mr. Bergstein?

12  A.  Well, to review the terms of the attached documents and

13  also to restate our request to him that Jerry's name was not be

14  used in the name of the company.

15  Q.  Now, during that call did Mr. Bergstein indicate whether

16  Swartz IP had any money in it at that time?

17  A.  No.

18  Q.  Did Mr. Bergstein say anything about Swartz IP holding any

19  money or assets of Jerry Swartz's?

20  A.  No.

21  Q.  Did Mr. Bergstein ask Dr. Swartz to contribute any money?

22  A.  No.

23  Q.  Did Mr. Bergstein ask you to be the chief financial officer

24  or CFO of Swartz IP?

25  A.  No.

I2F6BER3                          King - direct

1   Q.  By the way, have you ever met or spoken to someone named

2   Keith Wellner?

3   A.  No.  I never spoken to him.

4          MR. IMPERATORE:  Ms. Emmerick, please publish

5   Government Exhibit 656 in evidence.

6   Q.  Do you recognize what this is, Mr. King?

7   A.  Yes.

8   Q.  What is it?

9   A.  This was what is called -- well, a reference known as the

10  note for the loan agreement.

11  Q.  Was this one of the attachments in the e-mail that we

12  looked at a moment ago?

13  A.  Yes.

14  Q.  It has handwriting on it.  There is a cross-out and a

15  circle?

16  A.  Yes.

17  Q.  There is a cross-out through the words Swartz.

18          Do you recognize whose markings these are?

19  A.  Yes.  That would be Dr. Swartz.

20  Q.  How do you know these are his markings?

21  A.  Well, in my almost 30 years association of Dr. Swartz, it

22  is his common practice that he circles key terms of any

23  document or crosses out terms and he will write notes in the

24  columns.

25  Q.  Do you recall whether Dr. Swartz made these markings in

I2F6BER3                          King - direct

1    your presence?

2    A.  Yes.  Because we met at that time on a weekly basis, and I

3    presented these documents out for him and then reviewed it with

4    him at our next meeting.

5    Q.  What did that signify when are Dr. Swartz crossed out his

6    name, Swartz, in the name Swartz IP Services Group?

7    A.  Again, it emphasized that he did not want his name to be

8    used in the name of any company formed by Mr. Bergstein.

9    Q.  Why not?

10   A.  Well, for the same reasons that I didn't want Mr. Bergstein

11   to use his name, that we didn't want Dr. Swartz to be

12   associated with Mr. Bergstein in this regard.

13   Q.  Was this ultimately communicated to Mr. Bergstein that

14   Dr. Swartz's name should not be used in any company name of Mr.

15   Bergstein's?

16   A.  Yes.  We communicated that previously and he acknowledged

17   that and he acknowledged it again shortly after receipt of this

18   document.

19   Q.  Now, did Dr. Swartz have any involvement in or association

20   with something called Swartz IP Services Group, Inc.?

21   A.  No.

22   Q.  Did Dr. Swartz sign any documents on behalf of Swartz IP?

23   A.  No.

24   Q.  Did you?

25   A.  No.

1   Q.  Did Dr. Swartz ever invest any money in Swartz IP?

2   A.  No.

3   Q.  Did Swartz IP ever hold any of Dr. Swartz's assets?

4   A.  No.

5   Q.  Did Dr. Swartz otherwise give any money to Swartz IP?

6   A.  No.

7   Q.  Did Swartz IP ever hold anything belonging to Dr. Swartz?

8   A.  No.

9   Q.  Was Dr. Swartz ever an owner, director or shareholder of

10  Swartz IP?

11  A.  No.

12  Q.  Were you ever the chief financial officer of Swartz IP?

13  A.  No.

14  Q.  Did you have any association with that company?

15  A.  No.

16  Q.  At bottom what ultimately happened to Mr. Bergstein's

17  Swartz IP proposal?

18  A.  Well, we didn't have any further contact so to my knowledge

19  the entity was never funded and nothing happened.

20  Q.  Now, between roughly December 2011 and February 2012, did

21  you hear again from Mr. Bergstein as far as you recall in those

22  months?

23  A.  No.  During those months I didn't have in contact with him.

24          MR. IMPERATORE:  Ms. Emmerick, please publish for

25  identification Government Exhibit 659 and 660.

I2F6BER3                          King - direct

1    Q.   Do you recognize what these are, Mr. King?

2    A.   Yes.

3    Q.   What are they?

4    A.   They are e-mails from Mr. Bergstein to me concerning an

5    investment in the Wimbledon Fund.

6              MR. IMPERATORE:   The government offers Government

7    Exhibits 659 and 660.

8              MR. FISH:   No objection.

9              THE COURT:   Received.

10             (Government's Exhibits 659 and 660 received in

11   evidence)

12             MR. IMPERATORE:   Ms. Emmerick, please begin by

13   publishing Government Exhibit 659 in evidence.

14   BY MR. IMPERATORE:

15   Q.   So down at the bottom there is an e-mail from someone named

16   Jeffrey Hallac to Jerry Swartz and copying David Bergstein.

17   And it says, David asked me to send you the attached

18   documentation on Wimbledon Funds Class TT.  And then Mr.

19   Bergstein forwards you this e-mail and he says, Jim --

20             MR. IMPERATORE:   If you can highlight this please, Ms.

21   Emmerick.

22   Q.   -- this fund invests in the Tewksbury Fund, which is not

23   available to the public.  Pursuant to the arrangements made

24   years ago Weston was allotted the right to a certain amount of

25   investment in Tewksbury, which was syndicated in the offering.

1  The fund is very liquid.  As people redeem, Weston has the

2  opportunity to refill with other investors.  I am not involved

3  in the fund, but I thought it would be something interesting

4  for Jerry's charitable entity.  Very strong regular returns

5  with liquidity.  Have a look.

6          Do you recall receiving this e-mail, Mr. King?

7  A.  Yes.

8  Q.  Was this an investment proposal?

9  A.  Yes.

10 Q.  Did you notice any connection between what Mr. Bergstein

11 was proposing here and the November 2011 e-mail we looked at a

12 few moments ago?

13 A.  Yes.  The Wimbledon Fund was a counterparty in that note

14 agreement and the swap agreement.

15 Q.  What was your reaction to getting this?

16 A.  Well, I actually --

17         MR. FISH:  Objection, relevance.

18         THE COURT:  One second.

19         Sustained.

20 Q.  Mr. King, were you involved in consulting with Dr. Swartz

21 about this proposal?

22 A.  Yes.

23 Q.  What was your reaction to this proposal?

24         MR. FISH:  Objection, relevance.

25         THE COURT:  Sustained.

I2F6BER3                        King - direct

1   Q.  What, if anything, did you advise Dr. Swartz?

2              MR. FISH:  Objection, relevance.

3              THE COURT:  Overruled.

4   A.  I advised Dr. Swartz against making a personal investment.

5   And being the sole trustee or cotrustee of all the family and

6   childhood trusts, I was not going to consider this as an

7   investment for any of those entities as well.

8   Q.  Do you know if Dr. Swartz ever make an investment in

9   something called Wimbledon Class TT?

10  A.  No.

11             MR. IMPERATORE:  Let's publish Government

12  Exhibit 660 --no.  I am sorry.

13  Q.  Before we get there, let me direct your attention to later

14  in the spring of 2012.

15             Did Dr. Swartz enter into a consulting agreement with

16  something called Integrated Administration?

17  A.  Yes.

18  Q.  Did that have anything to do with Swartz IP?

19  A.  No.

20  Q.  In connection with that, did Dr. Swartz receive some money

21  from Mr. Bergstein?

22  A.  Yes.

23  Q.  How much money did Mr. Bergstein pay Dr. Swartz roughly in

24  the spring of 2012?

25  A.  80,000 I believe.

I2F6BER3                         King - direct

1    Q.  What did Mr. Bergstein say this was a payment for?

2    A.  It was for past consulting services in accordance with the

3    terms of that consulting agreement.

4    Q.  When you say "past consulting services," what are you

5    referring to?

6    A.  They were consulting services performed for CT 1, the film

7    company.

8    Q.  When you say "consulting services," is that something

9    separate from the repayment for the equity in these film

10   investments?

11   A.  Yes, totally separate.  Those investments were written off

12   and there was no legal right to any recovery of those monies.

13   Q.  Up until this point had Mr. Bergstein ever paid Dr. Swartz

14   any money as far as you know?

15   A.  No.  There is one company Illuminer that did receive 5,000.

16   That was a company that did consulting work directly.  That was

17   a company that Mr. Bergstein has some interest in or

18   association with.

19   Q.  I will ask you to slow down and keep your voice up.

20            MR. IMPERATORE:  Ms. Emmerick, please publish

21   Government Exhibit 660 in evidence.

22   Q.  This is another e-mail from Mr. Bergstein.  Now we are

23   later in the spring of 2012.  This is dated May 24, 2012.  It

24   is an E-mail from Mr. Bergstein to you copying Jerry Swartz.

25            Mr. Bergstein says, Jerry asked that I forward this to

1  you, which I believe was done once before directly by Weston.

2  This is basically a feeder fund to the Tewksbury Fund, which is

3  generally not available to the public.

4          Mr. Bergstein goes on to say, This is a very liquid

5  fund that provides regular returns upwards of eight percent.

6          Did you notice any similarities between this and the

7  proposal Mr. Bergstein sent about two months prior?

8  A.  Yes.

9  Q.  What similarities did you notice?

10  A.  Well, it is the same proposal.  It's the same fund.

11  Q.  What did you do with this?

12  A.  Well, again I just simply deleted the e-mail.

13  Q.  Now, you testified earlier about Dr. Swartz's earlier

14  investments and losses with Mr. Bergstein.  What concerns, if

15  any, did that prior experience raise for you with respect to

16  advising Dr. Swartz on this proposal?

17  A.  Well, I had advised Dr. Swartz that he as well as the

18  family and childhood trusts should not invest in any fund that

19  was either managed or controlled by Mr. Bergstein or any

20  associate of Mr. Bergstein.

21  Q.  Why not?

22  A.  Well, I didn't feel that Mr. Bergstein was a trustworthy

23  individual.

24          MR. FISH:  Objection, your Honor, relevance.

25          THE COURT:  Sustained.

I2F6BER3                        King – cross

1   Q.   Now, did Dr. Swartz ultimately invest in Wimbledon Class

2   TT?

3   A.   No.

4   Q.   Did Dr. Swartz ever invest in or give any money to Swartz

5   IP?

6   A.   No.

7                MR. IMPERATORE:   One moment, please.

8                THE COURT:   Yes.

9                MR. IMPERATORE:   No further questions.

10                THE COURT:   All right.   You may inquire.

11   CROSS-EXAMINATION

12   BY MR. FISH:

13   Q.   Mr. King, on direct examination you looked at a

14   subscription agreement that referred to general business

15   operations.

16                Do you recall that?

17   A.   Yes.

18   Q.   Can you explain what expenses associated with general

19   business operations are?

20   A.   Well, it would be the salary of the officers and employees,

21   rent, utilities.   Things such as that.

22   Q.   Now, you testified about certain investments that

23   Dr. Swartz made in 2007 and 2008; correct?

24   A.   Yes.

25   Q.   You also testified about Swartz IP, the documents we saw in

I2F6BER3                          King - cross

1    2011; correct?

2    A.  Yes.

3    Q.  Now, it is true that between 2008 and 2011 Dr. Swartz and

4    Mr. Bergstein had continued contact; correct?

5    A.  Yes.

6    Q.  And they continued to discuss investments during that

7    entire time period; correct?

8    A.  I believe so.

9         By the way, Dr. Swartz had communications with Mr.

10   Bergstein that you are unaware of?

11   A.  I am sure he did.

12   Q.  I believe you testified that you learned in about 2010 that

13   some businesses associated with Mr. Bergstein had bankruptcy

14   involved -- bankruptcy filings?

15   A.  Yes.  They petitioned for involuntary bankruptcy.

16   Q.  After that you asked Mr. Bergstein to write some sort of

17   letter confirming that the investments of Dr. Swartz would not

18   result in any certain recovery due to the bankruptcy; is that

19   correct?

20   A.  Yes.  I recall that.

21   Q.  You received that letter back in 2010; is that correct?

22   A.  Yes.

23   Q.  Why did you request that letter?

24   A.  Well, in particular there was one company, Alliance Film

25   Finance, because that was not one of the companies that were

1   covered by the petition for involuntary bankruptcy, and that as

2   well as the loans totaling $1,650,000, those loans were

3   personally guaranteed by Mr. Bergstein.  So I wanted some

4   written acknowledgment that those loans would not be repaid and

5   that the investment and the loans were worthless.

6   Q.  Why was that of value to you having that letter?

7   A.  It is always good to have as much documentary support as

8   you can when you want to claim tax deduction for losses.  So I

9   was just trying to get something in writing acknowledging that

10  the losses -- the loans and investments were worthless.

11  Q.  Were there any other purposes besides tax purposes?

12  A.  Well, I had already formed the opinion they were worthless.

13  The Internal Revenue Service may not accept my opinion so I was

14  hoping to get something directly from Mr. Bergstein

15  acknowledging that they were wholly worthless at this point.

16  Q.  You did receive that?

17  A.  Yes.

18  Q.  And this is in 2010?

19  A.  We had -- in 2010 -- Alliance Film Finance -- Mr. Bergstein

20  continued to make representations to Dr. Swartz that ultimately

21  Alliance Film Finance was profitable and ultimately he would

22  receive a return on his investment, but we continued -- he

23  continued to provide financial statements or tax returns.  So

24  finally at some point -- I forget when it was.  I think it was

25  in March of 2012 -- I called Mr. Bergstein and asked him, Jerry

I2F6BER3                          King - cross

1    believes that he is going to receive some return.  Can you

2    confirm to me in writing at this date that in fact the

3    investment is worthless, and he did so.

4    Q.  Were you still having contact with Mr. Bergstein at that

5    time?

6    A.  Direct contact?

7    Q.  Yes.

8    A.  It was very limited.  Every few months.

9    Q.  Now, after this bankruptcy and after you formed the view

10   that these investments would never be repaid, Dr. Swartz

11   continued to meet with Dr. Bergstein with Mr. Bergstein about

12   potential investments; correct?

13   A.  Yes.

14   Q.  There was something --

15   A.  Well.  Can I clarify that?

16   Q.  Sure.

17   A.  I don't think he was meeting with him to discuss potential

18   investments for two reasons:  One, Dr. Swartz was prohibited by

19   the court orders in his divorce proceedings from making any

20   investments as the divorce attorneys advised us; number two,

21   because of the large property settlement, he wasn't really able

22   to make any new investments.  So I believe all the meetings

23   concerned consulting opportunities for various companies that

24   were owned or controlled or which had some affiliation with Mr.

25   Bergstein.

I2F6BER3                         King - cross

1   Q.  Let me see if I understand you correctly.  Because of

2   certain orders in connection with the divorce case, Dr. Swartz

3   couldn't make investments?

4   A.  He was sort of restricted from making new investments.

5   Q.  As a result of that, he was more interested in a consulting

6   arrangement, rather than investments?

7   A.  Well, even without the divorce -- even without the divorce

8   proceedings, at this point in time he really didn't have

9   financial resources to make new investments particularly risky

10  investments.

11  Q.  But he said he would still meet about consulting

12  arrangements?

13  A.  Yes, absolutely.

14  Q.  If I understand you correctly, it would have been more

15  advantageous rather than to have money repaid to have a new

16  stream of income through a consulting arrangement?

17              MR. IMPERATORE:  Objection, your Honor.

18              THE COURT:  Basis?

19              MR. IMPERATORE:  Form.

20              THE COURT:  Yes.  Rephrase.

21  Q.  Would it have been more advantageous at this point in time

22  for Dr. Swartz to receive a payment -- a consulting payment

23  rather than as a return on an investment?

24  A.  No.  I think it is irrelevant.  I don't understand.

25  Actually, I can explain the technical.  It was actually a

I2F6BER3                    King - cross

1    disadvantage for him to receive a consulting fee.  The reason

2    is the losses on the loans were capital loss that to this day

3    remains unutilized.  He has large capital loss carryovers and

4    you can only deduct those against capital gains.  And so it

5    actually would have been more advantageous for him to receive a

6    repayment of the loan.

7    Q.  For tax purposes?

8    A.  Yes, and generally speaking.

9    Q.  Would it have any impact on the divorce litigation?

10             MR. IMPERATORE:  Objection, your Honor.  The court's

11    ruling in limine.

12             THE COURT:  I understand.  I am going to allow it.

13             Go ahead.

14    A.  Well, he had treated the loans an investments as wholly

15    worthless, and I didn't want to Dr. Swartz to think -- I had

16    gotten to the point where he had accepted those losses and they

17    were written off.  And so if he was going to receive any

18    compensation for the consulting services that he performed for

19    which he was never paid, those payments should be as they

20    rightly characterized as consulting fees.

21    Q.  I have a different question.  My question was:  If they had

22    repaid as being repayment of the loan, would there have been a

23    disadvantage with respect to the divorce litigation?

24             MR. IMPERATORE:  Objection, if what had been repaid?

25             THE COURT:  See whether you can rephrase it.

1         MR. FISH:  Sure.

2  Q.  Mr. King, you said that there was a large loss that you had

3  written off; correct?

4  A.  Uh-huh.

5  Q.  Loans and investments, etc.?

6  A.  Right.

7  Q.  And you said that there would have been a tax advantage if

8  those loans had been repaid rather than receiving consulting

9  payments?

10  A.  Yes.

11  Q.  What I am asking is -- I understand there would have been a

12  tax advance -- would there have been a disadvantage because the

13  pending divorce proceedings?

14  A.  No, it would not have.  I don't think so it would have any

15  impact on the divorce settlement.

16  Q.  You don't believe that the portion of the money that had

17  been repaid might have had to go to someone other than Mr.

18  Swartz in connection with the divorce?

19         MR. IMPERATORE:  Objection to the characterization

20  that the money was repaid.

21         THE COURT:  Sustained.

22         Rephrase it.

23  Q.  I am asking if money had been repaid is it possible that a

24  portion of the money that had been repaid would have had to go

25  to Mr. Swartz's spouse in connection with his divorce?

I2F6BER3                         King – cross

1    A.  Yes.

2              MR. IMPERATORE:  Objection.

3              THE COURT:  I will allow it.  Anything is possible.

4    A.  Can I speak?  I would have been thrilled.  I would have

5    been thrilled if Mr. Bergstein had been repaid the 1,650,000.

6    If Dr. Swartz has to share that with his spouse, who cares.  He

7    is still ahead by 825,000.  That was not a concern of ours

8    whatsoever.

9    Q.  The reason I am asking you these questions you testified,

10   Well, we have $100,000 in consulting payments, but really it

11   would have been better for us if they had been repayment of

12   debt?

13             MR. IMPERATORE:  Mischaracterization, your Honor.

14             THE COURT:  I don't think that is the testimony.

15             Put a fresh question to the witness rather than

16   characterizing.

17   A.  One has nothing to do with the other to answer your

18   question.  I can explain that if you want an explanation.  If

19   you want the answer to your question, I can provide it.

20   Q.  Let me ask you this question.  I understand you would have

21   been thrilled if the money had been repaid.  Any money that had

22   been repaid, there was a chance some of it would have had to go

23   to Dr. Swartz's spouse?

24   A.  And who cares.

25   Q.  Any money that Dr. Swartz received for consulting fees, it

I2F6BER3                    King - cross

1  is not impacted in the same way; correct?

2  A.  That is not correct at all.  The money he gets paid for

3  consulting fees ultimately goes into his brokerage account and

4  she would get half of that.  So there is no difference

5  whatsoever.

6  Q.  After the divorce started?

7  A.  Yes, absolutely.

8  Q.  Let me show you what has been marked for identification as

9  Government Exhibit 655.

10        Do you recognize this?  I don't know if you do.

11 A.  Yes, I do.

12        MR. FISH:  We'll offer Government 655.

13        MR. IMPERATORE:  Objection, hearsay, your Honor.

14        MR. FISH:  Not for its truth.

15        THE COURT:  You are offering what part of it?

16        MR. FISH:  I am offering the entire exhibit.

17        THE COURT:  Let me see page 2.

18        Go back to page 2 if you will.

19        I will allow it.

20        (Government's Exhibit 655 received in evidence)

21 BY MR. FISH:

22 Q.  Mr. King, Government Exhibit 655 is an e-mail from Mr.

23 Bergstein to yourself and Dr. Swartz and your response;

24 correct?

25 A.  Yes.

I2F6BER3                          King - cross

1   Q.  This is from August 22nd, 2011; correct?

2   A.  Yes.

3   Q.  And in it Mr. Bergstein is telling you about an entity

4   called Swartz Management Company; correct?

5   A.  Yes.

6   Q.  And Mr. Bergstein then describes the investments, and the

7   first one is Geotag.

8           Are you familiar with Geotag?

9   A.  Yes.

10  Q.  What is Geotag?

11  A.  Geotag is a company that owns a patent on -- basically an

12  algorithm, a mathematical formula that enables you when you do

13  an Internet search, it will show you the people in your

14  geographic area.  So if you are looking for a lawyer, it will

15  show people nearby who are a lawyer.

16  Q.  Was that a business that Dr. Swartz was having discussions

17  with your investing or consulting for?

18  A.  Consulting, yes.

19  Q.  Because at this point he couldn't invest, just consult?

20  A.  That's correct.

21          MR. FISH:  If we can turn to the next page.

22  Q.  Number two is Illuminer.

23          Do you know how that is pronounced?

24  A.  You pronounced it correctly.

25  Q.  Do you know what that is?

I2F6BER3                          King - cross

1    A.   That is a company that I believe either makes LED lighting

2    or is somehow involved in LED lighting technology.

3    Q.   Dr. Swartz was having discussions with this company?

4    A.   Yes.

5    Q.   The next one, 4D theaters, can you explain what that is?

6    A.   Yes.  They were going to have a theater in the Theater

7    District in New York that would be in addition to the 3D --

8              THE COURT:  We have heard about this.

9              Move on, please.

10   Q.   And then cascade Technologies.

11   A.   Yes.

12   Q.   By the way, Dr. Swartz was discussing a potential work for

13   4D theaters; correct?

14   A.   Yes.

15   Q.   Would that have been consulting work or investing?

16   A.   Purely consulting.  He really didn't have the money to

17   invest.

18   Q.   He didn't have the money to invest.  Well, how could he

19   consult for a 4D theater?

20   A.   Well, I am not sure what role he ultimately would have

21   played in their technology.  It never really proceeded past the

22   first discussions stages.

23   Q.   Cascade Technologies.

24   A.   Yes.

25   Q.   Dr. Swartz was discussing -- had discussions with Cascade

I2F6BER3                          King - cross

1  Technologies; correct?

2  A.  Yes.

3  Q.  What is Cascade Technologies?

4  A.  I am not certain actually.  I have seen the name Daniel

5  Farkas.  I know Dr. Swartz met or spoke with him once or twice.

6  Beyond that, I am not familiar with Cascade Technologies.

7  Q.  Dr. King, I am going to show you a document.  It is my only

8  copy so I will have you review it and then we'll go from there.

9  A.  I am familiar with this document.

10 Q.  I am sorry?

11 A.  I am familiar with this document.

12 Q.  You are familiar with it?

13 A.  Yes.

14 Q.  Is that your response to the e-mail we just saw?

15 A.  Yes.

16         MR. FISH:  I would offer Exhibit Z 146.

17         MR. IMPERATORE:  Not for its truth, your Honor.

18         THE COURT:  Not admitted for its truth but the fact it

19 was said and received on that basis.

20         (Defendant's Exhibit Z 146 received in evidence)

21 BY MR. FISH:

22 Q.  Looking at this e-mail, Mr. King, do you see it on the

23 screen?

24 A.  Yes.

25 Q.  First of all, this was sent on August 27th, 2011?

I2F6BER3                    King - cross

1    A.  Yes.

2    Q.  This is some years after the investments that had been

3    written off; correct?

4    A.  Yes.

5    Q.  You sent the e-mail and you talk about the JV agreement.

6    That's the joint venture agreement; correct?

7    A.  Yes.

8    Q.  You said that Jerry will hold his joint venture interests

9    in his own name; correct?

10   A.  Yes.

11   Q.  So you weren't saying that Jerry was not going to enter

12   into an agreement with Mr. Bergstein; correct?

13           MR. IMPERATORE:  Objection, your Honor, not for its

14   truth.

15           THE COURT:  Right.

16   Q.  Well, did you communicate this to Mr. Bergstein?

17   A.  Yes.  In a telephone conversation.  After this e-mail was

18   sent, I called Mr. Bergstein to communicate to him that I had

19   spoken to members of Jerry's family, specifically his two

20   sons-in-law who are attorneys --

21           MR. FISH:  Your Honor, I move to strike.

22           THE WITNESS:  Okay.  I am answering your question.

23           MR. IMPERATORE:  Can he finish his answer, your Honor.

24           MR. FISH:  I don't think he is responding to the

25   question.

I2F6BER3                          King - cross

1             THE COURT:  Go ahead.

2     A.   After I sent this e-mail -- this was basically an e-mail

3     that Jerry dictated to me.  So I am replying to Mr. Bergstein's

4     e-mail, I believe which was sent on August 22nd of 2011.  But

5     after I sent this e-mail, I contacted Jerry's two sons-in-law,

6     who are both attorneys and very accomplished attorneys, and I

7     asked to have a conference call with them, which I did.  I sent

8     them all this material and --

9             THE COURT:  I think you have finished your answer.

10            Next question.

11    A.   The gist of it is they had said --

12            MR. FISH:  Objection.

13            THE COURT:  Sustained.

14            Next question.

15    Q.   Now, in this e-mail you said Jerry may be willing to

16    contribute his equity interests in some private companies,

17    e.g., iSense and JV companies holding individual licenses to

18    Akina's products and technology.

19            What is iSense.

20    A.   The name of the company has since changed.  It is a company

21    run by a neuroscientist on the west coast and it has to do

22    with --

23            THE COURT:  We know about it.  The jury can recite it.

24            THE WITNESS:  Sorry.

25            THE COURT:  I learned this from a judge who I appeared

I2F6BER3                          King - cross

1    before.  He said, If I can give you the answer to a question,

2    then it is repetitive.  When we all know the answer to the

3    question, then we have covered it.

4              Move on, please.

5    BY MR. FISH:

6    Q.  Now Mr. Swartz is requesting credit card for travel

7    expenses in connection with his consulting work; correct?

8    A.  That's correct.

9    Q.  And he wanted to three to five staff people; correct?

10   A.  Yes.

11   Q.  There is a reference here to a technical advisor Vitaly.

12   Who is Vitaly.

13   A.  His last name is Vitaly.  He is the son of one of the

14   engineers.  The son of the person who was kind of Jerry's

15   estate manager and his mother was the maid or the housekeeper.

16             MR. FISH:  Just for the record Exhibit Z 146 are the

17   documents bearing Bates Nos. JS231 and JS232.

18   Q.  Now, those communications were in or about August of 2011;

19   correct?

20   A.  The e-mail exchange?

21   Q.  The e-mails.

22   A.  Yes.

23   Q.  We all saw later the exhibits we looked at before were from

24   November of 2011; correct?

25   A.  Yes.

I2F6BER3                          King - cross

1    Q.  And isn't it true that in November 2011 you advised

2    Mr. Swartz not to sign the agreement but Mr. Swartz did not

3    fully close the door on the idea?

4            MR. IMPERATORE:  Objection.  What agreement?

5            MR. FISH:  I will ask it a different way.

6    Q.  Mr. King, you had opportunities to be interviewed by the

7    FBI and prosecutors in connection with this case; correct?

8    A.  That's correct.

9    Q.  You had met with them in or about September of 2016; isn't

10   that right?

11   A.  I don't recall exact dates, but go ahead.

12   Q.  Around the fall of 2016 you met with them; isn't that

13   correct?

14   A.  The very first time we met?

15   Q.  I am not asking the first time.

16

17   A.  We may have met earlier.  I don't recall.

18   Q.  During that meeting, did you tell the FBI agent and the

19   government in November 2001 Mr. Bergstein reproposed the

20   structured --

21           MR. IMPERATORE:  Objection. your Honor.  Hearsay and

22   lack of foundation under Rule 613(b).

23           THE COURT:  Let me see you at side bar.

24           (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I2F6BER3                          King - cross

1              (At the side bar)

2              THE COURT:  First you all, Mr. Fish, where are we

3    headed so I can understand this?

4              MR. FISH:  Sure.  This is from the FBI 302.  That is

5    what the report says.  I thought he said things inconsistent

6    with the report so I am trying to confront the prior

7    inconsistent statement.

8              THE COURT:  Do you want to use it to refresh his

9    recollection?

10             MR. FISH:  My goal was to confront him with the prior

11   inconsistent statement and have him reject it and then we can

12   call the agent to say he told it to him.

13             MR. IMPERATORE:  Your Honor, the objection is there is

14   no inconsistency at this point.  The second to last question

15   that was asked was he asked something about, Isn't it true that

16   there was some agreement, and I objected and your Honor

17   sustained the objection.  He has not yet elicited any

18   inconsistency with that statement.

19             MR. FISH:  I thought he said he didn't know what the

20   agreement was and here he is talking about it.  I am trying to

21   use the words in the report.

22             MR. IMPERATORE:  He hasn't established what agreement

23   we're talking about.

24             MR. FISH:  All I can look at is the report.

25             THE COURT:  It's not inconsistent to say, I have no

I2F6BER3                    King - cross

1    bloody idea what is in that agreement.  I haven't seen it and I

2    don't want to know.  Don't sign any agreements with this

3    character.  That's the kind of advice a parent would give or a

4    lawyer would give or an accountant would give.

5              MR. FISH:  The inconsistency is that he has denied --

6    I will ask it again.

7              THE COURT:  Go ahead.

8              MR. FISH:  The issue is not what he said.  The issue

9    is that Swartz did not fully close the door on the idea, the

10   last line there.  In addition, he says the -- I am going to get

11   to it.  Ultimately he is uncomfortable with a consulting

12   relationship between Swartz IP.

13             MR. IMPERATORE:  There is no inconsistency.  You

14   cannot just read a 302 into the record.

15             THE COURT:  I got it.  You have to do a better job of

16   laying what may be an inconsistency.

17             MR. FISH:  First I was questioning him without the

18   document and without mentioning the report and I got a slew of

19   objections.

20             MR. IMPERATORE:  There was a sustained objection.

21             MR. FISH:  I don't know what the objection was.

22             THE COURT:  We are where we are.  At this stage I am

23   not going to back through a transcript and reconstructing

24   rulings.  Where we are now is I agree you have not laid a

25   foundation.

I2F6BER3                        King - cross

1                MR. FISH:  I will try again.

2                THE COURT:  You can show it to him and see whether it

3        refreshes his recollection.  It may or may not.  It is for

4        another day whether you can call a witness or not.  I don't

5        have to decide that one right now.

6                MR. FISH:  Okay.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I2F6BER3                           King - cross

1                    (In open court; jury present)

2    BY MR. FISH:

3    Q.  Mr. King, is it true that in November 2011 Dr. Swartz's

4    sons-in-law were ultimately comfortable with a consulting

5    arrangement through Swartz IP?

6    A.  No.  That is not true.  They were not consulted at that

7    time at all.

8    Q.  Did you have an opportunity to speak with the government at

9    some point in the fall of 2016?

10   A.  I don't remember when our first meeting was.  I don't know.

11   I can't remember that first meeting when it was.

12   Q.  During that meeting did you tell the government -- FBI

13   agents and the prosecutors -- that Swartz's sons-in-law really

14   did not want Swartz to have any further relationship with

15   Bergstein but were ultimately comfortable --

16                    THE COURT:  You cannot read from a document not at

17   issue.

18                    MR. FISH:  I am asking if he said this.  I am asking

19   about a prior inconsistent statement.

20                    THE COURT:  You cannot read from a document not in

21   evidence.

22                    MR. FISH:  I haven't indicated that I am reading from

23   a document.

24                    THE COURT:  I thought I told you at side bar you could

25   show it to him to see whether it refreshes his recollection.

1          MR. FISH:  I can take that approach.  He didn't say he

2     didn't recall.  He said it didn't happen.

3     A.  It didn't happen in November 2011.  I recall very

4     distinctly.

5          MR. IMPERATORE:  Your Honor, there is no question

6     pending.

7          THE COURT:  There is no question.

8          MR. FISH:  Your Honor, I --

9          MR. IMPERATORE:  Objection to characterization.

10          THE COURT:  Let's pause.

11          Give me the document.

12          Have you ever seen this document before?

13          THE WITNESS:  No.

14          THE COURT:  Hand it back to me.  Hand it back to the

15     questioner.

16          Ask your question.

17     BY MR. FISH:

18     Q.  Did you tell the government that Dr. Swartz's sons-in-law

19     really did not want Swartz to have any further relationship

20     with Mr. Bergstein or ultimately comfortable with a consulting

21     arrangement -- consulting relationship through SIP?

22     A.  No.  It was very clear that his son-in-laws as well as his

23     daughters did not want him to have any relationship with Mr.

24     Bergstein whatsoever, including a consulting relationship.

25     Q.  Isn't it true that in November 2011, Dr. Swartz did not

I2F6BER3                          King - redirect

1   fully close the idea on an agreement with Mr. Bergstein?

2   A.  On a consulting agreement?

3   Q.  Consulting agreement.

4   A.  Yes.  Contrary to the advice of -- the advice he was

5   receiving from me personally and his family, he continued to

6   consider a possibility of having a consulting agreement with

7   Mr. Bergstein or his companies.

8              THE COURT:  Anything else?

9              MR. FISH:  I am looking.

10             No further questions.

11             THE COURT:  Any redirect?

12             MR. IMPERATORE:  Briefly, your Honor.

13             Can We please look at Government Exhibit 655 in

14  evidence.

15  REDIRECT EXAMINATION

16  BY MR. IMPERATORE:

17  Q.  Do you recall being shown this exhibit, Mr. King, by

18  defense counsel?

19  A.  Yes.

20  Q.  This refers to something called Swartz Management Company.

21             Do you see that?

22  A.  Yes.

23  Q.  This is in August of 2011?

24  A.  Yes.

25  Q.  Did Dr. Swartz agree to have his own name put in the

I2F6BER3                         King - redirect

1   company name of Swartz Management Company?

2   A.  No.

3   Q.  Did you convey that to Mr. Bergstein?

4   A.  Yes.

5   Q.  It goes on to say here, The purpose -- this is in the

6   second to last paragraph -- of SMC will be to have a single

7   entity that has the ownership of projects that we're working on

8   together.

9           To be clear, Mr. King, did Mr. Bergstein and

10  Dr. Swartz own anything together as of August 2011?

11  A.  No.

12  Q.  Was this a false statement?

13  A.  Yes.

14  Q.  Did you discuss this proposal with Dr. Swartz?

15  A.  Yes.

16  Q.  And ultimately what did Dr. Swartz decide to do with

17  respect to Swartz Management Company?

18  A.  Well, he agreed with me that the name should be removed

19  from the name of the company and that he should not serve as an

20  officer or director of the company.

21  Q.  Did Dr. Swartz ultimately have any involvement with

22  something called Swartz Management Company?

23  A.  No.

24  Q.  Did he ever contribute any money to Swartz Management

25  Company?

I2F6BER3                           King - redirect

1   A.  No.

2   Q.  Did Dr. Swartz ever receive any money from Swartz

3   Management Company?

4   A.  No.

5           MR. IMPERATORE:  Can we look, please, at the Defense

6   Exhibit that begins with a Z and put it up on the Elmo.

7   Q.  You were asked about this exhibit.

8           Do you recall being asked about this on

9   cross-examination by defense counsel?

10  A.  Yes.

11  Q.  I believe defense counsel asked you a number of questions

12  about this document; is that right?

13  A.  Yes.

14  Q.  Mr. King, did defense counsel ask you about the first

15  bullet point on this?

16  A.  No.

17  Q.  Why don't you read what that first bullet point says?

18  A.  The name for the JV should not contain Jerry's first or

19  last name.

20  Q.  When was that conveyed to Mr. Bergstein in relation to this

21  Swartz IP e-mail that we looked at earlier.

22  A.  Again, we wanted to emphasize that Dr. Swartz did not want

23  his name used in the name of any company being promoted by Mr.

24  Bergstein.

25  Q.  In other words, you conveyed that to Mr. Bergstein in an

I2F6BER3                          King - redirect

 1   e-mail that the name should not contain Jerry's first or last

 2   name before Mr. Bergstein proposed Swartz IP to you; is that

 3   right?

 4   A.  That's correct.

 5   Q.  To be clear, did any joint venture ever come into being

 6   between Dr. Swartz and Mr. Bergstein?

 7   A.  No.

 8   Q.  Did that proposal ultimately die?

 9   A.  Yes.

10   Q.  Nothing came of it; is that right?

11   A.  That's correct.

12                (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

I2FPBER4                    King - Redirect

1   Q.  All right.  You were asked some questions by defense

2   counsel about sharing payments in a divorce and what impact

3   that would have; do you remember that?

4   A.  Yes.

5   Q.  And whether it would be beneficial to Dr. Swartz.  To be

6   clear, aside from a consulting payment that Dr. Swartz received

7   in the spring of 2012, did he ever receive any money back from

8   any of the $6 million he ever invested with Mr. Bergstein?

9   A.  No.

10  Q.  Let's take a look at Government Exhibit 650.  I think you

11  were shown this on -- you were asked about this on

12  cross-examination; is that right?

13  A.  Well, on direct I was.

14  Q.  Okay.  Let's look at page 9.

15          All right.  Ms. Emmerick, if you can blow up the first

16  full paragraph, please.

17          You were asked some questions by defense counsel about

18  general business operations; do you see that?

19  A.  Yes.

20  Q.  Let me ask you this, Mr. King.  If some of Jerry Swartz's

21  money went to casinos, would that have been general business

22  operations?

23  A.  No.

24          MR. IMPERATORE:  No further questions.

25          THE COURT:  You may step down.  Ladies and gentlemen,

I2FPBER4                          King - Redirect

1    we'll take our mid-afternoon recess.  Enjoy.  Don't talk about

2    the case.  Keep an open mind.

3                (Witness excused)

4                (Jury not present)

5                THE COURT:  We're getting some kind of background

6    noise.  I don't know whether it's the projector or -- it sounds

7    like the fan to some kind of electronic device.  Any help on

8    that subject would be appreciated.

9                (Recess)

10               THE COURT:  Bring in the jury.  Yes, sir?

11               MR. IMPERATORE:  I just wanted to briefly raise, twice

12   during cross-examination Mr. Fish referred, before the jury, to

13   prior inconsistent statements, although he laid no foundation

14   for that.  That was improper, and it should not have happened

15   in front of the jury, and I want to be sure it won't happen

16   again.

17               THE COURT:  I'm sure it won't happen again.  Correct,

18   Mr. Fish?

19               MR. FISH:  Yes.

20               THE COURT:  Okay.  Bring our jury in.

21               (Jury present)

22               All right.  Please be seated.  The government may call

23   its next witness.

24               MR. ALLEN:  Your Honor, the government calls Tim Wray.

25   TIM WRAY,

I2FPBER4                          Wray - Direct

1          called as a witness by the Government,

2          having been duly sworn, testified as follows:

3              THE DEPUTY CLERK:  State your name, spell it for the

4  record, please.

5              THE WITNESS:  Thank you.  My name is Tim Wray, T-i-m,

6  W-r-a-y.

7              THE COURT:  All right.  Mr. Allen, you may inquire.

8  DIRECT EXAMINATION

9  BY MR. ALLEN:

10 Q.  Good afternoon, Mr. Wray.  How old are you?

11 A.  51.

12 Q.  Where do you live?

13 A.  In New York.

14 Q.  Did you go to college?

15 A.  Yes.

16 Q.  Where did you go?

17 A.  Princeton University.

18 Q.  And what year did you graduate?

19 A.  1988.

20 Q.  What did you do after you graduated from Princeton?

21 A.  I spent five -- first thing, I spent five years rowing for

22 the United States National Rowing Team.

23 Q.  And did you eventually begin working in finance?

24 A.  Yes.

25 Q.  What jobs have you held in finance?

I2FPBER4                           Wray - Direct

1  A.  I served as a CEO of a plastics manufacturing company.  I

2  worked for a private equity fund focused on buying troubled

3  companies and turning them around, served as a CFO of a

4  financial technology company, and I worked for two registered

5  investment advisors.

6  Q.  And you said you worked at a private equity fund that

7  specialized in turning around companies, what was the name of

8  that fund?

9  A.  Questor.

10  Q.  And when did you begin working there?

11  A.  In 1998.

12  Q.  And about how long did you work at Questor?

13  A.  For about five years.

14  Q.  Did you get any other degrees while you were working at

15  Questor?

16  A.  Yes.  I was sent to business school.  I got a Master's from

17  the Stanford University Graduate School of Business.

18  Q.  What did you do after you left Questor?

19  A.  That's when I went to work for a financial technology

20  company as their CFO.

21  Q.  What was the name of that company?

22  A.  Credit X.

23  Q.  And how long did you work for Credit X?

24  A.  For almost four years.

25  Q.  And what did you do after that?

1   A.  Went to work for a registered investment advisory firm.

2   Q.  What was the name of that registered investment advisory

3   firm?

4   A.  Family Endowment Partners.

5   Q.  And about how long did you work at Family Endowment

6   Partners?

7   A.  Four years, about four years.

8   Q.  So I want to focus on your time at Family Endowment

9   Partners.  When you started, what was your title?

10  A.  I was a partner overseeing the private investment group.

11  Q.  About how many other partners were there?

12  A.  There were three other partners, I believe.

13  Q.  What type of business was Family Endowment Partners?

14  A.  Investment advisory firm serving, for the most part,

15  private individuals, but there were a few corporate and pension

16  funds.

17  Q.  And what type of services did Family Endowment Partners

18  provide?

19  A.  It provided a wealth of investment advisory work.

20  Q.  About how many clients did Family Endowment Partners have?

21  A.  Somewhere between 70 and 80 clients in total.

22  Q.  And what types of persons or entities were they?

23  A.  Typically high-net-worth individuals.

24  Q.  How did Family Endowment Partners get its clients?

25  A.  Two ways.  Typically through standard marketing.  The group

I2FPBER4                           Wray - Direct

1   of clients that I mainly focused on were brought onboard from a

2   previous advisor.

3   Q.  What was the name of the previous investment advisor?

4   A.  Ballamor Capital, B-a-l-l-a-m-o-r.

5   Q.  And how did it come about that the clients of Ballamor

6   Capital became clients of Family Endowment Partners?

7   A.  The owner of that business was shutting it down and

8   recommended that the clients become clients of Family Endowment

9   Partners.

10  Q.  And did you have any particular involvement with Family --

11  sorry, with the clients that Family Endowment Partners

12  inherited from Ballamor?

13  A.  That advisor had taken a significant portion of their

14  investments and put them into what we call a private direct or

15  private equity in debt funds.  I was brought on to oversee that

16  pool of investments that that advisor had made.

17  Q.  And what did you do on a day-to-day basis?

18  A.  There were approximately, plus or minus, 40 of those

19  investments.  We did -- my group did the due diligence, the

20  oversight, made recommendations to clients on their position

21  and, for the most part, were hired to generate liquidity from

22  those investments.

23  Q.  All right.  I think you testified that Family Endowment

24  Partners was a registered investment advisor; is that right?

25  A.  Yes, that's true.

I2FPBER4                        Wray - Direct

1    Q.   Who is it registered with?

2    A.   The Securities and Exchange Commission, the SEC.

3    Q.   And generally speaking, what does it mean to be a

4    registered investment advisor?

5    A.   You're under the oversight and the guidelines that are

6    provided by the SEC.

7    Q.   And what obligations did you have to your clients while you

8    were at Family Endowment Partners?

9    A.   You have to adhere to the standards established by the SEC,

10   such as fiduciary, following all their rules and requirements.

11   Q.   And you used the term "fiduciary," what does that mean?

12   A.   We have --

13             MR. BIENERT:  Objection, calls for expertise.

14             THE COURT:  Ladies and gentlemen, I will instruct you

15   at the close of this case, but generally speaking, a fiduciary

16   is a person, a special type of person who's an agent for

17   another person.  A fiduciary owes a duty of loyalty, of candor,

18   of honesty, of diligence to that individual and enjoys a

19   special confidential relationship with that person.

20             So a lawyer owes fiduciary duties to his clients, for

21   example.  That's what, in general, a fiduciary is.  Again, I

22   will give you instructions on the concept at greater length

23   after the end of the case.  Go ahead.

24   BY MR. ALLEN:

25   Q.   Mr. Wray, have you heard of an entity called Weston

I2FPBER4                           Wray - Direct

1  Capital?

2  A.  Yes, I have.

3  Q.  What was Weston Capital?

4  A.  They served as the general partner for a few of the funds

5  that our clients were in.

6  Q.  And what funds were those?

7  A.  Wimbleton financing fund and Partners 2 fund.

8  Q.  Focused on the time period between 2010 and 2012, who was

9  Weston's CEO?

10  A.  Albert Hallac.

11  Q.  Who was Weston's chief compliance officer during the same

12  time period?

13  A.  Keith Wellner.

14  Q.  You said you had some clients who had made investments in

15  Weston funds; what were the two funds again?

16  A.  Wimbleton Financing fund and the Partners 2 fund.

17  Q.  About how many clients did you have in each of those two

18  funds?

19  A.  We had about 15 in the Wimbleton Financing fund, and we had

20  one in Partners 2.

21  Q.  And so we call those the Wimbleton Financing fund and the

22  Partners 2 fund.  Did you refer to them as WFF and P2?

23  A.  Yes.

24  Q.  Okay.  So you testified that there were some investors in

25  the WFF fund, and that there was one investor in the P2 fund.

I2FPBER4                          Wray - Direct

1    What types of investors were those people?

2    A.  For the most part, high-net-worth individuals.

3    Q.  And did you personally direct those individuals to invest

4    in either WFF or P2?

5    A.  No.  We inherited those investments from the prior advisor.

6    Q.  Did you do anything to familiarize yourself with the

7    investment that those clients had made in the WFF and the P2

8    funds?

9    A.  Yes.  We completed our standard due diligence, reviewing

10   all the documentation, meeting with management.  There were --

11   we did this across all the investments that we inherited.

12   Q.  You used the term "due diligence."  What is due diligence?

13   A.  We typically request all the related documents for that

14   investment.  We then meet with the stakeholders, whether they

15   be the managers or other parties involved.

16   Q.  In the course of conducting your diligence, did you read

17   the WFF or the P2 offering memorandums?

18   A.  Yes.

19   Q.  What's an offering memorandum?

20   A.  It's the legal document that outlines the nature of the

21   investments, both in size, its focus, et cetera.

22   Q.  And were the offering memorandums important to you?

23   A.  Yes.  They are the -- they are really the guidelines and

24   they outline the intent of the entire structure of the fund and

25   the investment strategy.

1   Q.  All right.  Now, Mr. Wray, I'm going to hand you a folder

2   with a series of exhibits.

3            And while I'm doing that, Ms. Sheinwald, can you

4   publish what's already in evidence as Government's Exhibit 607

5   and go to page 2, please.

6            All right.  Mr. Wray, you can either find the document

7   in the folder, or you can look at it on the screen.  But do you

8   recognize this document?

9   A.  Yes, I do.

10  Q.  What is it?

11  A.  It's the offering memorandum for the Partners 2 fund, for

12  P2.

13  Q.  Ms. Sheinwald, can you please zoom in on the paragraph that

14  says Investment Objective.

15           So the first sentence of the investment objective says

16  that:  Weston Capital Partners Fund II, Limited, will invest

17  all its assets in Weston Capital Partners Master Fund II

18  Limited, which will seek substantial capital appreciation,

19  primarily through investments in startup investment pools or

20  hedge funds in a variety of trading sectors run by talented

21  investment managers which have not yet raised large pools of

22  capital to manage, but whose principals have significant

23  investment experience."

24           What did you understand that language to mean?  In

25  other words, what was the objective of the Partners 2 fund?

I2FPBER4                          Wray - Direct

1          MR. BIENERT:  Your Honor, can I get a time frame of

2    when he would have read this in relation to when he would have

3    advising his clients?

4          THE COURT:  Yes.  Fix the timeframe.

5    BY MR. ALLEN:

6    Q.  You testified that you had read the Partners 2 memorandum?

7    A.  Yes.

8    Q.  Around what timeframe did you read the memorandum?

9    A.  This would have been April of 2010.

10   Q.  Now, back to the question that I had asked.  Based on the

11   language that you see in front of you, what did you understand

12   the objective of the Partners 2 fund to be?

13   A.  That the general partner, Weston, would find sort of

14   younger and new investment -- new funds that were being put to

15   market that did not have long track records, to invest in those

16   with young, talented managers before they raised large amounts

17   of capital.

18   Q.  And was -- the Partners 2 fund was called a fund of funds?

19   A.  Yes.  It's a single-entity fund, or number of vehicles that

20   is then to find a number of funds to invest in.

21   Q.  And based on your understanding of the offering memorandum,

22   was the P2 fund allowed to invest in ways other than what's

23   described in the investment objective?

24   A.  No.

25         MR. BIENERT:  Objection, calls for legal conclusion.

1    THE COURT:  I'll allow it.  This witness is not

2    qualified to express an opinion on a point of law.  He can,

3    however, give his own personal understanding.  Next question.

4    BY MR. ALLEN:

5    Q.  And, Mr. Wray, you advised clients who had invested, or at

6    least a client who had invested, in the Partners 2 fund, right?

7    A.  Yes.

8    Q.  And as you read -- you read the offering memorandum in

9    providing advice to that client, correct?

10   A.  Yes.

11   Q.  Now, based on your understanding, was the P2 fund allowed

12   to make loans to other companies?

13   A.  No.

14   Q.  Was that consistent or inconsistent with the offering

15   memorandum?

16   A.  Inconsistent.

17   Q.  Okay.  Ms. Sheinwald, can you please turn to page 11 and

18   zoom in on the paragraph that begins with the header Investment

19   Adviser.

20        All right.  So the first paragraph says that:  "Weston

21   Capital Asset Management LLC, a Delaware U.S.A. limited

22   liability company, and a registered investment adviser under

23   the U.S. Investment Advisers Act of 1940, as amended, will

24   oversee the investment activities of the master fund, and will

25   be responsible for implementing the master fund's investment

I2FPBER4                          Wray - Direct

1   selection and monitoring process on a day-to-day basis."

2          As you understood it, what did this language mean?

3   A.  That Weston was responsible for selecting the underlying

4   funds that it would invest in and that it would monitor them on

5   a day-to-day basis.

6   Q.  What sorts of obligations did you understand Weston to have

7   as an investment advisor?

8          MR. BIENERT:  Objection, foundation, your Honor,

9   relevance.

10          THE COURT:  I'll allow it.

11   A.  They fall under the same rules and requirements as a

12   registered investment advisor.

13   Q.  What types of obligations did they have to your clients?

14   A.  Similar fiduciary responsibility.

15          THE COURT:  That was your understanding?

16          THE WITNESS:  Yes.

17          THE COURT:  Okay.

18   Q.  And are you familiar with the term conflict of interest?

19   A.  Yes.

20   Q.  What does the term conflict of interest mean?

21          MR. BIENERT:  Your Honor, can I just have a running

22   objection on these types of questions because I don't want to

23   keep interrupting.

24          THE COURT:  Yes.  Ladies and gentlemen, a conflict of

25   interest is basically where one person or entity has a duty or

I2FPBER4                        Wray - Direct

1    an interest which conflicts with another duty or interest.  So

2    it may owe an obligation to one person, which is inconsistent

3    with the obligation it owes to another person or entity.

4           Generically, that's a conflict of interest.  They come

5    in different varieties, but that would be a basic definition.

6           Next question, Mr. Allen.

7    BY MR. ALLEN:

8    Q.  Mr. Wray, did you understand, or as you understood it, was

9    Weston allowed to have conflicts of interests with respect to

10   its customers or clients?

11   A.  It would be customary for them to disclose any conflicts of

12   interest to their investors or to the advisors of investors.

13   Q.  And was Weston allowed to have undisclosed conflicts of

14   interest?

15   A.  Not to my knowledge.

16   Q.  Mr. Sheinwald, we can take the exhibit down.

17          All right.  Mr. Wray, had WFF or P2 suspended

18   redemptions when you began working at Family Endowment

19   Partners?

20   A.  Yes.  They had been suspended prior to us becoming advisors

21   to those clients.

22   Q.  And what does it mean to suspend redemptions?

23   A.  Typically, for funds of this nature, there is a redemption

24   capability.  For example, you can put a request in 90 days in

25   advance and have your investment refunded back to you.

I2FPBER4                          Wray - Direct

1              Funds like this, because of the somewhat illiquid

2       nature of the investments, are allowed, under extreme

3       circumstances, to stop making those redemptions if they can't

4       satisfy the requests of the investors.

5       Q.  As you understood it, did you or your clients have any

6       ability to influence Weston despite the fact that redemptions

7       were suspended?

8              MR. BIENERT:  Vague as to "influence," your Honor.

9              THE COURT:  Yes.  Rephrase it, please.

10      Q.  Was there anything that you could do to change Weston's

11      actions or to cause Weston to make particular investment

12      decisions, even though redemptions were suspended?

13      A.  We can take a range of actions.  Some forms include

14      investor activism, requesting or demanding a plan for receiving

15      those redemptions, all the way to the extreme, of taking legal

16      action, if we deem it necessary.

17      Q.  All right.  So we're going to change subjects for a minute.

18      Did you learn at any point, the WFF, the Wimbleton financing

19      company, was considering a transaction with a company called

20      Gerova?

21      A.  Yes.  We learned of that on the first meeting with Weston.

22      Q.  Around when was that?

23      A.  April of 2010.

24      Q.  What was Gerova?

25      A.  Gerova was a SPAC -- Special Purpose Acquisition

I2FPBER4                              Wray - Direct

1    Corporation, I believe the acronym is -- that was intended to

2    raise capital and then buy an insurance company.

3    Q.  And can you please describe the nature of the transaction

4    between WFF and Gerova, as you understood it?

5    A.  As I understood it, the concept was to contribute the

6    assets of WFF and some other funds.  Insurance companies can

7    write policies based on the level of assets that they have, and

8    the concept was that the Wimbleton fund, and other funds,

9    provided assets for the insurance company to write policies on.

10            This SPAC is a publicly traded company.  The concept

11   being that the shareholders can buy and sell their securities

12   on a daily basis.

13   Q.  And I think you had said you attended a meeting in or

14   around April of 2010 --

15   A.  Mmm, hmm.

16   Q.  -- on the Gerova transaction.  Who from Weston was at that

17   meeting, if anyone?

18   A.  Albert Hallac was there.

19   Q.  And what, if anything, did you do after that presentation?

20   A.  We requested additional information.  This was just a very

21   basic meeting with very little information provided to us.

22   Q.  What types of information did you request?

23   A.  The documents surrounding the Gerova transaction.

24   Q.  What, if anything, happened to Gerova stock price in late

25   2010 and early 2011?

1  A.  The stock price dropped precipitously on news that there

2  was potential fraud or other misdealings in some of the other

3  funds being contributed.

4  Q.  What effect, if any, did that have on WFF's investment on

5  Gerova?

6  A.  Our understanding that we were given was that it --

7  Wimbleton was no longer going to be able to execute on this

8  Gerova transaction.

9  Q.  Did that have any effect on the value of WFF?

10 A.  We were not given any information on any of the values of

11 the WFF holdings.

12 Q.  Did it have any effect on WFF's ability to provide

13 liquidity or an ability to redeem?

14 A.  The Gerova plan was given to us by Weston as the path of

15 liquidity, and this was no longer capable of doing that.

16 Q.  Did you eventually learn that Weston was going to take part

17 in a transaction to unwind or rescind the Gerova transaction?

18 A.  Yes.

19 Q.  What, if anything, did you do once you learned about the

20 unwind transaction?

21 A.  Once again, we requested information, the documents related

22 to that unwind transaction.

23 Q.  Okay.  Ms. Sheinwald, could we please publish for the

24 witness only what's been marked for identification as

25 Government Exhibit 614.

1           Mr. Wray, do you recognize this exhibit?

2    A.  Yes, I do.

3    Q.  What is it?

4    A.  It's a letter with a standard due diligence request list

5    attached to it.

6    Q.  And does your signature appear in this letter?

7    A.  Yes, mine is the first there.

8           MR. ALLEN:  The government offers Government

9    Exhibit 614.

10          MR. BIENERT:  No objection.

11          THE COURT:  Received.

12          (Government's Exhibit 614 received in evidence)

13          MR. ALLEN:  Ms. Sheinwald, you can publish.

14   BY MR. ALLEN:

15   Q.  All right.  So, Mr. Wray, this is a letter that's dated

16   December 1st, 2011, and it appears to be directed towards

17   Mr. Albert Hallac and Mr. Keith Wellner.  Who is this letter

18   from?

19   A.  My firm, Family Endowment Partners, and the two other

20   signatories, one is a family -- they're actually both families

21   that accounted for, I think, approximately 60 percent of the

22   invested capital in WFF.  We called this the lead investor

23   group.

24   Q.  And the second signature is of Bill Porter.  Who is Bill

25   Porter?

1    A.  Bill Porter represents the Glen family, Family Placement

2    Plan of Georgia.

3    Q.  And the third signature is of William Cafaro.  Who is

4    William Cafaro?

5    A.  It's a member of the Cafaro family.

6    Q.  Were you involved in writing this letter?

7    A.  Yes.

8    Q.  Why did you send it?

9    A.  We had been making requests for information, and we needed

10   to formalize the process.

11   Q.  Ms. Sheinwald, can you please expand the second paragraph.

12        All right.  So the first sentence says:  "In an effort

13   to consolidate our request and the expected reciprocal free

14   flow of information from you, we are providing the enclosed

15   information request as a group."

16        When you say you're acting as a group, who are you

17   referring to?

18   A.  The three parties that signed the letter.

19   Q.  All right.  And, Ms. Sheinwald, can you please turn to

20   page 2.

21        Mr. Wray, do you recognize this document?

22   A.  Yes.

23   Q.  What is this?

24   A.  It's a due diligence request list.

25   Q.  And does this include the information requests that you

I2FPBER4                         Wray - Direct

1   made from Weston?

2   A.  Yes.

3   Q.  And, Ms. Sheinwald, can you zoom in on the December 14

4   investor meeting materials.

5         Mr. Wray, can you please read this request?

6   A.  "Please provide agenda and any materials that will be

7   utilized at the December 14th, 2011, Wimbleton investor meeting

8   in advance.  Please provide this information in the batch

9   No. 1."

10  Q.  What's the December 14th, 2011, Wimbleton investor meeting?

11  A.  This was a meeting where we were being presented the Arius

12  Libra/Pineboard transaction.

13  Q.  And why did you make that request?

14  A.  It's standard to have been given information to review

15  before meetings like this.  We had been requesting this

16  verbally and were following up with a formal request for the

17  information.

18  Q.  Ms. Sheinwald, can you please zoom in on the requests under

19  the heading Legal.

20        So the first request includes background agreements

21  between Gerova and Wimbleton covering initial transaction and

22  rescind transaction.  What did you understand the initial

23  transaction and the rescind transactions to refer to?

24  A.  This was the Gerova transaction, and then the rescinding

25  or, in a sense, unwinding the Gerova transaction.

I2FPBER4                              Wray - Direct

1   Q.   What types of documents were you seeking in this request?

2   A.   All related legal documents including also any financial

3   disclosures of any kind.

4   Q.   So the third request is for the term sheet and any other

5   agreements between Wimbleton and Newco regarding "proposed"

6   transaction.   What does Newco refer to?

7   A.   It's a standard generic term.   We had been given a broad

8   outline of this Arius Libra/Pineboard transaction with no

9   names; so it stands for new company.   It's a general term we

10  use when a new investment is being proposed or explained.

11  Q.   And did you later learn the name of the Newco that you

12  referred to in paragraph 3 in that third bullet?

13  A.   Yes, at that December 14th meeting.

14  Q.   What was the name of the Newco?

15  A.   One of them was Arius Libra.

16  Q.   All right.   Ms. Sheinwald, can you please turn to page 4,

17  and zoom in on another request under the header:   Financial, if

18  Newco is a privately held entity.

19          All right.   So there are some references to Newco

20  here.   Does that refer to Arius Libra as well?

21  A.   Yes.

22  Q.   And request No. 4 -- if we could highlight that,

23  Ms. Sheinwald -- includes a request for debt and, in

24  particular, A, a list of all current debt; and, B, a list of

25  all former debt.

I2FPBER4                        Wray - Direct

1              What types of information were you requesting in this
2      paragraph?
3      A.  All the loan agreements regarding any debt that these
4      companies had.
5      Q.  And just to be clear, would this request include agreements
6      regarding any loans that Arius Libra had taken or received?
7      A.  Yes.
8      Q.  All right.  And just to be clear, did you make requests in
9      this letter other than the ones that we've looked at today?
10     A.  Oh, other information requests?
11     Q.  Yes.
12     A.  Yes, both verbally and, I think, in a following one we made
13     formal due diligence requests.
14     Q.  And did you give Weston a deadline to provide information
15     or provide the documents you requested?
16     A.  Yes, a number of times.
17     Q.  Do you remember the deadline you gave in this letter?
18     A.  I think since there was a lot of information here, I think
19     we had one, this batch one.  There was probably one prior to
20     the December 14th meeting.
21     Q.  And did Weston send you any documents or materials prior to
22     the December 14th meeting?
23     A.  No, nothing of material value.
24     Q.  Did anyone from Weston, or anyone else, send you any
25     information regarding any loans that Arius Libra had received

1  before the presentation?

2  A.  No.

3  Q.  All right.  You can take that down, Ms. Sheinwald.

4          Mr. Wray, would it have been important for you to know

5  if Arius Libra had to pay off money as part of the unwind

6  transaction?

7  A.  Yes, very important.

8  Q.  Why?

9  A.  Because our assets were part of that transaction.  We

10  wanted to make sure we understood where each asset went.

11  Q.  Would it have been important for you to know if Arius Libra

12  had received any loans?

13  A.  Yes.

14  Q.  Why?

15  A.  To our understanding, Wimbleton funds were going to be a

16  part of this investment; so we would want to understand what

17  other parties had any other interest in this investment.

18  Q.  And if Arius Libra had significant debts, would that affect

19  the value of your investment in WFF or, excuse me, your

20  client's investment in WFF?

21  A.  Very much so.

22  Q.  If Arius Libra had received loans, would it be important to

23  you to know where those loans had come from?

24  A.  Yes.

25  Q.  Why?

I2FPBER4                          Wray - Direct

1  A.  To understand the types of institutions making the loans or

2  the parties that were involved.

3  Q.  Would it have made any difference to you if Arius Libra had

4  received a loan from another Weston entity or fund?

5  A.  Very important, yes.

6  Q.  And why would that have been important to you?

7  A.  Conflict of interest issues.

8  Q.  Can you explain?

9  A.  Weston had a responsibility and loyalty to the Wimbleton

10 advisors, but also to Partners 2 advisors.  So if you have

11 agreements or loans or investments that involve the two

12 parties, basically which entity is Weston supposed to be

13 serving as its top priority of their interest.  It's an

14 inherent conflict.

15 Q.  So let's turn to the December 14, 2011, presentation that

16 you had mentioned earlier.  Did you attend that presentation?

17 A.  Yes, I did.

18 Q.  Where was it?

19 A.  In Palm Beach.

20 Q.  About how long did it last?

21 A.  A couple of hours.

22 Q.  Were there any investors at the presentation other than

23 yourself?

24 A.  It was our lead investor group and their representatives.

25 There were other people there.  I'm not sure if they were

1   investors or not.

2   Q.  And who presented at the meeting?

3   A.  A number of people, Albert Hallac, Keith Wellner, David

4   Bergstein and Paul Parmar.

5   Q.  And you said David Bergstein presented at the meeting.  Was

6   that the first time that you had met Mr. Bergstein?

7   A.  Yes, it was.

8   Q.  And what did Mr. Bergstein present on?

9   A.  Presented on the Gerova unwind transaction and his interest

10  and the structure of the Arius Libra deal.

11  Q.  Did you have any understanding of Mr. Bergstein's role in

12  the unwind transaction based on what he said?

13  A.  Just that he held a security interest in, or entities that

14  he controlled, held a security interest in the Wimbleton fund

15  assets.

16  Q.  And did Mr. Bergstein have any role in proposing or

17  organizing the unwind transaction?

18  A.  He was a part of the unwind transaction, but I'm not sure

19  of his role.

20  Q.  Now, Mr. Wray, were you given any materials during the

21  meeting?

22  A.  We were given this presentation.

23  Q.  Okay.  And are you referring to Government's Exhibit 603?

24  A.  Yes.

25  Q.  Ms. Sheinwald, I think that's not in evidence.  You can

I2FPBER4                          Wray - Direct

1   show it to the witness only, please.

2             Do you recognize this, this document?

3   A.  Yes.  On the screen?  Yes.

4             MR. ALLEN:  The government offers Government

5   Exhibit 603.

6             MR. BIENERT:  No objection, your Honor.

7             THE COURT:  Received.

8             (Government's Exhibit 603 received in evidence)

9   BY MR. ALLEN:

10  Q.  All right.  We can publish.

11            Mr. Wray, did Weston present a proposal for how to

12  unwind the Gerova transaction at the December 14th

13  presentation?

14  A.  Yes.

15  Q.  Can you please describe the general terms of Weston's

16  proposal?

17  A.  The Weston asset -- the Wimbleton fund assets were going to

18  be used to borrow money that would finance the growth of Arius

19  Libra and the underlying business, Pineboard.

20  Q.  Okay.  What's Pineboard?

21  A.  From what I understand from the information given, a

22  medical billing company.

23  Q.  All right.  So I want to focus now on pages 10 through 12

24  of this PowerPoint deck, which is Government Exhibit 603.  So

25  if you could just turn in the hard copy that you have to those

1    pages?

2    A.   Yes.

3    Q.   And who presented on slides 10 through 12?

4            And let's turn, Ms. Sheinwald, to page 10.

5    A.   David Bergstein.

6    Q.   Anyone else present on those slides in those particular

7    pages?

8    A.   I do not believe so, no.

9    Q.   Now, Ms. Sheinwald, can you please publish -- sorry, could

10   you please expand the second bullet.  All right.

11           So this says that Weston was contacted by a party

12   beneficially holding various creditor interests in Gerova.

13   Owari Opus.  What do you understand Owari Opus to be?

14   A.   My understanding in that meeting is that was an entity

15   controlled by David Bergstein.

16   Q.   Can we go to the third bullet, Ms. Sheinwald.

17           Okay.  So the first paragraph says that:  "Owari

18   proposed a series of transactions that they would provide

19   capital and personnel to help Gerova settle a number of their

20   outstanding creditor claims."  What do you understand that to

21   mean?

22   A.   We hadn't been given any information on the Gerova

23   transaction, any documentation or financials, just the general

24   concept here that there were claims against Gerova, but that

25   was about it.

I2FPBER4                              Wray - Direct

1    Q.  And the second and third bullets say that:  "Owari would

2    assist Weston in unwinding their original agreement with

3    Gerova, and that Owari would provide a transaction whereby the

4    hedge fund assets, after return, would be returned to the

5    investment vehicle which would enhance the depressed value of

6    the hedge fund assets."  What did you understand these two

7    bullets to mean?

8    A.  This is related to using the Wimbleton fund assets for the

9    Arius Libra loan and investment.

10   Q.  And what is the investment vehicle that's referenced in the

11   third bullet?

12   A.  I would assume it's that Arius Libra vehicle.

13   Q.  Ms. Sheinwald, would you please turn to page 11, and zoom

14   in on the area under the header the Arius Libra Contribution

15   Agreement.

16          All right.  So the first bullet says:  "The hedge fund

17   investments were contributed to a newly formed entity, Arius

18   Libra, for which WFF received a 59.5 percent interest and REFF

19   received a 6.3 percent interest."  What's REFF?

20   A.  My understanding is it's a real estate fund of

21   Wimbleton's -- I mean, of Weston's.

22   Q.  And if you add up the 59.5 and the 6.3, it's around

23   two-thirds.  Did you have an understanding of who owned the

24   other third of Arius Libra?

25   A.  The understanding from this meeting was that was, I

I2FPBER4                          Wray - Direct

1    believe, an entity controlled by David Bergstein.

2    Q.  And did you have an understanding of why David Bergstein

3    received a third of Arius Libra?

4    A.  I would assume, from the meeting, it was either based on

5    investment or -- as put or for putting together this

6    transaction.

7    Q.  The second bullet says that:  "Owari arranged for a loan

8    against the hedge fund assets to provide the cash necessary to

9    perform the obligations required pursuant to the unwind

10   agreement."  What did you understand the obligations under the

11   unwind agreement to be?

12   A.  We were never given any details from the documentation, but

13   supposedly there were payables or some sort of creditors that

14   demanded payment, and the hedge fund, the loan that was

15   arranged for this hedge fund would pay off such claims.

16   Q.  And did you understand the phrase -- sorry.  What did you

17   understand the phrase "Owari arranged for a loan" to mean?

18   A.  It could have been found a lender that they could borrow

19   money from, or had some -- it's sort of a vague term.  I wasn't

20   sure if it was from an entity that was known.  We were never

21   given any of the details behind this, but we would assume that

22   this entity was the one that led finding the lender for this

23   loan.

24   Q.  Did you have an understanding of who had provided the loan

25   that's referenced here?

I2FPBER4                          Wray - Direct

1    A.  No, no information whatsoever.

2    Q.  And do you have any understanding of whether it was a third

3    party, whether it was a Weston entity?

4    A.  We were not given any details.

5    Q.  Okay.  And what was your understanding as to the status of

6    the loan?

7    A.  I assume that it had been made.

8    Q.  The next two bullets say:  "Owari contributed its interest

9    in Pineboard to Arius and that Owari arranged a loan against

10   the hedge fund assets to fund the continuing Arius investment

11   in Pineboard."  As you understood it, was Pineboard a new

12   company or an old company?

13   A.  I believe it had been in existence.  In this presentation,

14   we were presented financials that go back to prior to the

15   meeting.

16   Q.  What business did you understand Pineboard to be in?

17   A.  This is the medical billing business.

18   Q.  All right.  Ms. Sheinwald, can you turn to page 12 and zoom

19   in on the first set of bullets.

20          All right.  So these bullets say that Arius owns hedge

21   fund interests subject to $8 million loan.  The proceeds of

22   which were used to retire certain obligations created under the

23   unwind agreement and invest in Pineboard.  Based on this

24   language, what did you understand the purposes of the loan to

25   be?

1    A.   To pay off these obligations to unwind the Gerova

2    transaction and to provide capital to Pineboard.

3    Q.   Were you concerned about the $8 million loan referenced in

4    this presentation?

5    A.   Very much so.  It basically had a security interest in the

6    assets of Wimbleton.

7    Q.   Had you asked for documents about this loan prior to the

8    meeting?

9    A.   Absolutely.

10   Q.   Had you received any documents?

11   A.   None whatsoever.

12   Q.   Did you have any understanding of who had actually made the

13   $8 million loan?

14   A.   None whatsoever.

15   Q.   Would it have concerned you if a loan had been extended by

16   one of Weston's funds?

17   A.   Very much so.

18   Q.   Why?

19   A.   Conflict of interest.

20   Q.   And would it have caused you any particular concern if

21   Partners 2 had extended the loan?

22   A.   Yes.

23   Q.   Why?

24   A.   Conflict of interest.

25   Q.   And would that -- did you have clients in both WFF and

1  Partners 2?

2  A.  Yes.

3  Q.  So would you have had a conflict of interest?

4  A.  Yes, that we would have disclosed to our clients.

5  Q.  Okay.  Ms. Sheinwald, you can take down this exhibit.

6          All right.  Mr. Wray, what steps, if any, did you take

7  after the December 14th, 2011, meeting?

8  A.  We began to make repeated requests for additional

9  information.  One of the members of the lead investor group

10  went to Los Angeles to meet with Mr. Bergstein.

11  Q.  And what types of information did you request?

12  A.  Similar to what's in the previous request we looked at, all

13  the documentation around -- legal documentation around all the

14  agreements, plus with this Pineboard company, all the

15  financials, performance, any kind of stakeholder involved in

16  the debt, any lender, any other equity investor.  Basically all

17  information that would help us understand any of these

18  transactions or agreements.

19  Q.  Did you continue to ask for documents about the $8 million

20  loan --

21  A.  Yes.

22  Q.  -- after the presentation?

23  A.  Repeatedly.

24          MR. BIENERT:  Your Honor, can I get a foundation as to

25  who he's asking for the documents?

I2FPBER4                          Wray - Direct

1                THE COURT:  Yes.

2      BY MR. ALLEN:

3      Q.  Who are you asking for the documents?

4      A.  Weston.

5      Q.  And who?

6      A.  Albert Hallac and Keith Wellner.

7      Q.  Did Weston provide you with information or the documents

8      that you wanted?

9      A.  No.

10     Q.  Ms. Sheinwald, can you please publish Government

11     Exhibit 605, which is already in evidence.

12                Mr. Wray, do you recognize this document?

13     A.  Yes.

14     Q.  What is it?

15     A.  This is what was placed in, I believe, a Dropbox folder.

16     Q.  And what do you mean by "Dropbox folder"?

17     A.  One of these shared files companies that you can store

18     documents in, and we had set up one so that Weston could put

19     those documents in and all the investor -- this lead investor

20     group members could look at them.

21     Q.  So was this put in the Dropbox in response to your requests

22     for information?

23     A.  Yes.  The Dropbox was set up specifically to fulfill those

24     requests.

25     Q.  And can you please read this disclosure or exhibit?

I2FPBER4                          Wray - Direct

1   A.  Yes.  "Arius Libra currently has indebtedness in favor of

2   Swartz IP Services Group, Inc.  The face value of the debt is

3   $8 million, and it is secured by a first priority lien of the

4   hedge fund assets of Arius Libra."

5   Q.  Did you have an understanding of what Swartz IP Services

6   Group, Inc. was when you first saw this document?

7   A.  No.

8   Q.  What reaction did you have when you first saw this

9   document?

10  A.  You never fulfill an information request with a sentence.

11  You fulfill it with the documents that you requested.

12  Q.  Okay.  So did you consider this to be unusual?

13  A.  Incredibly unusual.

14  Q.  All right.  Mr. Wray -- or actually, Ms. Sheinwald, can you

15  please publish for the witness what's been marked for

16  identification as Government Exhibit 259.

17          Mr. Wray, do you recognize this document?

18  A.  Yes, this is an e-mail from me.

19          MR. ALLEN:  The government offers Government

20  Exhibit 259.

21          MR. BIENERT:  I have no objection.  I just ask that

22  you clarify who it's to.

23          MR. ALLEN:  Your Honor, he's got cross-examination and

24  we'll go through this later.

25          THE COURT:  Overruled.  Go ahead.  It's received.

1    (Government's Exhibit 259 received in evidence)

2         MR. ALLEN:  Ms. Sheinwald, you can publish.

3  BY MR. ALLEN:

4  Q.  All right.  Mr. Wray, so this is an e-mail.  It's dated

5  April 24th, 2012.  It is from you and it is to Mr. Wellner, and

6  there are a bunch of other people who are copied on the e-mail.

7  What were you asking Mr. Wellner in this e-mail?

8  A.  Again, a follow up to our information request, asking for

9  additional information.  We had also had phone calls with

10 Weston regarding the lack of responding to our requests.  So

11 they had stated they had been fulfilling our requests; so we

12 sent this e-mail to show them exactly how little they had

13 provided.

14 Q.  And did you include follow-up requests in an attachment to

15 this e-mail?

16 A.  Yes.

17 Q.  All right.  Ms. Sheinwald, can you please turn to page 4.

18        Are these those follow-up requests?

19 A.  Yes.

20 Q.  And there's some bolded text, as well as not bolded text,

21 which you can see at the bottom of the page.  What's the

22 difference between what's bolded and what's not bolded?

23 A.  So this takes a prior information request and, in bold, I

24 believe we actually bolded it in red to make it very clear,

25 describing exactly what they had not provided or how limited

I2FPBER4                           Wray - Direct

1    their responses had been.

2    Q.  All right.  Can you go to page 7, please, and zoom in on

3    the requests under Financial, if Newco is a privately held

4    entity.

5              And paragraph 4, which you read earlier, it says

6    "debt" and now in bolded text "Limited.  One sentence received

7    on Pineboard Holdings' debt.  Swartz IP Services Group, with no

8    additional information."  When you say "one sentence received

9    on Pineboard Holdings' debt," what are you referencing?

10   A.  That previous Exhibit 605 that you presented, the single

11   sentence regarding Arius Libra.

12   Q.  In other words, the couple-sentence disclosure on a Swartz

13   IP loan?

14   A.  Right.

15   Q.  And as of the date of this e-mail, had you received the

16   loan agreement for the loan that was referenced in that

17   two-sentence disclosure?

18   A.  No.

19   Q.  Was that loan agreement important to you?

20   A.  Very much so.

21   Q.  Why?

22   A.  Because that's what established the supposed secured

23   interest in the Wimbleton Fund assets.

24   Q.  And again, did that security interest in the Wimbleton Fund

25   assets have any effect on the value of the investment that your

I2FPBER4                          Wray - Direct

1   clients had made in WFF?

2   A.   It put a party in front of our investors, their assets.

3   Q.   And did that increase or decrease the value of those

4   investments?

5   A.   Potentially tremendously decreased them.

6   Q.   Okay.  Mr. Wray -- We can take that down, Ms. Sheinwald.

7            Did you eventually meet with anyone from Weston in

8   order to try to find additional information?

9   A.   Yes.

10  Q.   Who did you meet with?

11  A.   We met with both Albert Hallac and Keith Wellner.

12  Q.   And around when did you meet with Mr. Wellner?

13  A.   I know we met with him during that same time period

14  following this e-mail.

15  Q.   And can you please describe -- or actually, where was that

16  meeting?

17  A.   At their offices.

18  Q.   Where?

19  A.   In New York.

20  Q.   Where in New York?

21  A.   I can't remember the address.

22  Q.   What happened at that meeting?

23  A.   We were there to have this information request fulfilled.

24  Q.   And what happened?

25  A.   We weren't given any information.

I2FPBER4                          Wray - Direct

1   Q.  And did you make any specific requests for the Swartz IP

2   loan that was referenced in the two-sentence disclosure we saw

3   earlier?

4   A.  We specifically asked for that document.

5   Q.  And was that request satisfied?

6   A.  No.

7   Q.  What happened when you made that request?

8   A.  Keith left the office for 15 or 20 minutes, and then came

9   back and said that, for some reason, it wasn't on their hard

10  drives.

11  Q.  And when you say "Keith," you mean Mr. Wellner?

12  A.  Yes.

13  Q.  And what was your reaction when Mr. Wellner said that he

14  didn't have the documents on his hard drive?

15  A.  The specific purpose of having a meeting in their offices,

16  they should have all that documentation on file and easily

17  accessible; so it didn't make any sense to us whatsoever.

18  Q.  Were you eventually given a note between Swartz IP and

19  Arius Libra?

20  A.  Yes.

21  Q.  All right.  Ms. Sheinwald, can you please publish what's in

22  evidence as Government Exhibit 610.

23          Now, Mr. Wray, do you recognize this document?

24  A.  Yes, yes.

25  Q.  And this is an e-mail dated May 22nd, 2012, and it is from

1  someone named Howard Kaplan to a couple different people,

2  you're included in that list.

3          And, Ms. Sheinwald, can you please highlight -- or not

4  highlight, but expand the "to" and "from."

5          Who is Howard Kaplan?

6  A.  He was counsel to the investors.

7  Q.  And who are the various individuals who received this

8  e-mail?

9  A.  It's those same members of this lead investor group.

10 Q.  Ms. Sheinwald, can you please turn to page 5.

11         Mr. Wray, what do you see here?

12 A.  It's the first page of a loan agreement.

13 Q.  And who is the loan agreement between?

14 A.  Arius Libra is the borrower and Swartz IP Services, it says

15 here, the holder and the lender.

16 Q.  What's the purported date of this security note?

17 A.  August 3rd, 2011.

18 Q.  Ms. Sheinwald, page 10, please.

19         All right.  So this is a document that's titled Pledge

20 Agreement.  What's a pledge agreement?

21 A.  It's when a party pledges their assets.  In a case like a

22 loan like this, it would be if the loan is not repaid the way

23 it should, the lender can take those assets and use them to

24 repay the loan.

25 Q.  Did you review this document after you received it?

1  A.  Yes.

2  Q.  And what did you understand the effect of this agreement to

3  be?

4  A.  Once again, it put a party above our investors on their

5  assets.

6  Q.  And what party was that?

7  A.  In this, it would be Swartz IP Services.

8  Q.  All right.  And, Mr. Wray, around the time that you

9  received the Swartz IP note, in other words, the document that

10  we've just seen, were you still making information requests of

11  Mr. Hallac or Mr. Wellner?

12  A.  Yes.

13  Q.  And were you getting any responses?

14  A.  Not anywhere close to our satisfaction.

15         MR. ALLEN:  One second, your Honor.  Nothing further,

16  your Honor.

17         THE COURT:  All right.  You may cross-examine.

18         MR. BIENERT:  Thank you, your Honor.

19  CROSS-EXAMINATION

20  BY MR. BIENERT:

21  Q.  Good afternoon, sir.  My name is Tom Bienert.  First of

22  all, that last exhibit, Exhibit 610, if you could bring that

23  up, Ms. Howland.

24         Is it on everyone's screen?  Can you see it on the

25  screen?

I2FPBER4                          Wray - Cross

1    A.  Yes, I have it in front of me.

2    Q.  If you go to, I guess it's page 5 where the note is.  Was

3    this the first time that you would have seen a copy of this

4    note, or do you believe you saw it before this e-mail exchange?

5    A.  This is the first time I've seen it.

6    Q.  Okay.  Meaning the time when you got this, whatever date is

7    on the e-mail would have been the first time you saw the note?

8    A.  I believe that's why it was forwarded to us.

9    Q.  Okay.  All right.  Let's step back in time.

10              You can take that down.

11              There was the -- I want to make sure I'm

12   understanding, from your perspective on behalf of the

13   investors, that you looked out for, what information you were

14   given, if any, at each stage of the transactions that you

15   talked to us about.

16              So we had the -- is it correct that we basically had,

17   I'll call the first transaction is the one where the WFF assets

18   were put into the company Gerova in exchange for stock; and

19   then the second one, would that be what we're calling the

20   unwind, when the WFF assets came out of Gerova; and then the

21   third transaction would be this Arius Libra and whatever

22   happened thereafter.  Does that make sense to you, sir?

23   A.  Okay.

24   Q.  So let's go back and take the first one, what we'll call

25   the WFF Weston assets going into this company, Gerova, in

I2FPBER4                           Wray - Cross

1   exchange for stock.  Was it your understanding that -- strike

2   that.

3              Had you come onboard or inherited Weston and the WFF

4   investors or P2 investors before that transaction occurred or

5   after it occurred?

6   A.  After the agreements had been signed for it.

7   Q.  So you drop into your advisory role for WFF investors after

8   the WFF hedge fund securities had already been provided to

9   Gerova?

10  A.  Yes.

11  Q.  Okay.  Now, Mr. Allen went over with you the P2 offering

12  memo in his direct, but he didn't go over with you the WFF

13  offering memo, did he?  We didn't go over it today?

14  A.  Oh, today, no.

15  Q.  But WFF had its own offering memo, correct?

16  A.  Yes.

17  Q.  And isn't it right that, just like the P2 memo, it had a

18  section that talked about the types of transactions WFF was

19  intended to do, right?

20  A.  Yes.

21  Q.  Do you recall looking at the WFF offering memo in or around

22  the 2010 time frame when you would have learned about the

23  transaction where WFF assets went to Gerova?

24  A.  Yes.

25  Q.  Do you recall whether or not the taking of hedge fund

1    assets with some value of WFF's and putting them into a new

2    company in exchange for that company's stock, was consistent or

3    not consistent with what was the identified objectives of the

4    WFF offering memo?

5    A.  I'd have to look at that document again.

6    Q.  So as you sit here now, you just don't recall, do you?

7    A.  I don't recall everything in the document, but I know the

8    general parameters of the investment.

9    Q.  Well, first of all, just so we're clear, the P2 fund was

10   not involved in that WFF Gerova transaction in 2010, was it?

11   A.  To my understanding, no, but I never saw any of the

12   documents related to the transaction; so I wouldn't know.

13   Q.  All right.  So let's focus on that.  At the time that you

14   were just educating yourself about the Weston hedge fund

15   investors in WFF and P2 that you had now inherited, I'm

16   assuming you were having trans -- strike that -- conversations

17   with Misters Hallac and Wellner in that time frame?

18   A.  Yes.  Yes, we met with them.

19   Q.  And was one of the purposes in your meeting with them to

20   get an understanding of what they were doing with your

21   investors in WFF and P2's funds?

22   A.  Yes.

23   Q.  Did you ever get an understanding from them in that, I

24   think you said, May of 2010 time frame, if I have it right?

25   A.  Late April.

I2FPBER4                              Wray - Cross

1    Q.  Late April 2010 time frame as to whether or not they had

2    turned over WFF's hedge fund securities to the company Gerova?

3    A.  It was our understanding, but again, we never saw the

4    documents as to when and how it occurred.

5    Q.  Did you want the documents?

6    A.  Yes.

7    Q.  And they didn't get that to you?

8    A.  Right.

9    Q.  Was there ever a point in time thereafter, when you did see

10   the documents and then you had a better understanding of what

11   actually happened when Gerova and WFF did the original

12   transaction?

13   A.  No, I never saw the documents.

14   Q.  Would you have wanted to know, on behalf of your investors

15   in 2010, if Misters Hallac and Wellner had taken the WFF assets

16   and provided them to a start-up company in exchange for stock?

17   A.  Yes, with respect to a start-up.

18   Q.  Let's say a company like Gerova, however you define it?

19   A.  Right.

20   Q.  Would you want to know if the assets went in for exchange

21   for their stock?

22   A.  Yes.

23   Q.  Would you have considered that a risky business transaction

24   on behalf of the WFF investors?

25   A.  It would all depend on the way the transaction was

1    structured.

2    Q.   And you never got to see that, right?

3    A.   Correct.

4    Q.   Did you have any understanding of what value, if any, the

5    WFF hedge fund securities had before they were given, or like

6    right at the time, before they were given to Gerova in exchange

7    for stock?

8    A.   No, we never saw any valuations.

9    Q.   Did you have a general -- well, from your investor clients

10   in WFF, did they articulate to you that they believed that the

11   hedge fund assets had value?

12            MR. ALLEN:   Objection, calls for hearsay.

13            MR. BIENERT:   I would say it would prompt what he did

14   thereafter.

15            THE COURT:   No, I'm going to sustain the objection.

16   You can ask him what he did after he spoke to his clients.

17            MR. BIENERT:   Okay.

18   BY MR. BIENERT:

19   Q.   Well, I guess as a prefatory question, did you have

20   discussions with your clients in the timeframe when the WFF

21   hedge fund securities were in Gerova?   Just without telling me

22   the substance, did you have discussions with your clients about

23   their perspective on that transaction?

24   A.   We provided them information based on what we knew.

25   Q.   And after talking to them, did you attempt to get more

I2FPBER4                          Wray - Cross

1    information from Misters Hallac and Wellner?

2    A.  Yes.

3    Q.  To no avail, right?

4    A.  Correct.

5    Q.  All right.  Now, let's go to the next step.  Let's go to

6    the summer of 2011.  When and how did you first learn that

7    there was to be an unwind, where the hedge fund assets that had

8    been with WFF and had gone to Gerova were going to come back to

9    WFF?

10   A.  I believe we heard that from Hallac and Wellner.

11   Q.  And when, approximately, would you have learned that?

12   A.  Sometime early '11 was when the press -- the articles came

13   out about the transaction; so immediately following that.

14   Q.  And so let's say by springtime of 2011, going into summer,

15   what was the value of what WFF's investors had at that time,

16   mainly the stock of Gerova?

17   A.  We never got any information on what the value was.

18   Q.  Did you have an understanding that there was little or no

19   value in that stock?

20   A.  No clue.

21   Q.  And I guess what I'm trying to get at is, did you have a

22   basis or a starting point, for purposes of your discussions

23   with Mr. Hallac and Wellner, when they started raising the

24   unwind transaction, that would even allow you to know what the

25   clients had before the unwind, to evaluate whether the unwind

I2FPBER4                          Wray - Cross

1    made sense?

2    A.   There were some audited financials from '09 which provided

3    a value.   There were conversations.   I'm not sure of numbers

4    given by Hallac and Wellner, but no backup support, third-party

5    valuation information was ever given to us.

6    Q.   Is it true that if you, in the timeframe of spring to

7    summer 2011, as it related to your WFF investors, that since

8    the hedge fund assets were with Gerova, the WFF investors were

9    not at that time able to receive money on their investment?

10   A.   Again, we weren't given any clarity on how those

11   investments were inside Gerova, what was being done with any

12   distributions, or the structures of any at the agreements.

13   Again, we had no clear picture.

14   Q.   Okay.   And so the first -- strike that.

15           So now the topic, the unwind comes up, and is it

16   accurate that you had an understanding that, as part of the

17   unwind, that when the transaction would occur, that WFF assets

18   would come back and ultimately go into this Newco, Arius Libra,

19   that there would be payments made to various parties as part of

20   the unwind?

21   A.   Similar to what's in the presentation, we were given no

22   specific documentation, any payments that were made to any

23   other parties.

24   Q.   So to the degree you knew there might be payments in

25   general, you were never given information as to the amounts or

1    to whom or what?

2    A.  Correct.

3    Q.  And by the way, during all this time, in 2010 and the

4    summer and spring of 2011, the persons that you were asking for

5    the information were Mr. Hallac and Mr. Wellner?

6    A.  Yes.

7    Q.  Did you have an understanding in 2010 as to whether or not

8    Weston was controlled by a company called Fund.com?

9    A.  No, we're not aware of that.

10   Q.  And did you have an understanding in 2010 that Weston

11   was -- strike that.

12          Did you have an understanding in 2010 that a person by

13   the name of Mr. Galanis was weighing in on Weston decisions?

14   A.  No.

15   Q.  Now, at some point, did you come to receive information

16   from Misters Hallac or Wellner, or anyone at Weston, that, as

17   to some approximate value of what these hedge fund securities

18   that had been with Weston and went to Gerova and came back to

19   Weston and went to Arius, were worth?

20   A.  I think, at some point, we received a number from them.

21   Q.  Do you have any ballpark recollection of the number?

22   A.  It's plus or minus 10 million, but you don't provide

23   information like that.  You provide a valuation report by a

24   third party.

25   Q.  And they didn't give you that, right?

I2FPBER4                          Wray - Cross

1    A.  Nope.

2    Q.  First of all, do you have a ballpark estimate of when you

3    were given that understanding and by whom?

4    A.  I don't recall.

5    Q.  All right.  When you got that understanding, do you believe

6    it would have been from either Mr. Hallac or Wellner or both?

7    A.  I'm not sure.

8    Q.  Did you have an understanding that these assets, whether

9    they were 10 million or whatever, were hedge fund assets

10   themselves that were supposed to have an income stream or

11   distributions on occasion?

12   A.  Yes, yes.

13   Q.  And you would have learned that from Weston?

14   A.  Even the offering memorandum has -- they are loans.  It was

15   a credit fund; so there would be interest payments on those

16   loans.

17   Q.  So were you given an understanding as to who would get --

18   what entity would receive the interest payments or any

19   distributions from the hedge fund securities?

20   A.  Per the documents, it would be Wimbleton fund.

21   Q.  And to your knowledge, during that 2010 and 2011 timeframe,

22   did Wimbleton fund receive any distributions or income from

23   those hedge fund securities?

24   A.  We never saw or got any information with that, and the

25   investors didn't receive any payments.

1  Q.  Now, you were shown an Exhibit 614.  I don't need to bring

2  it up.  If you recall, it's the one where you sent an e-mail

3  with a list of due diligence items.  Do you recall that?

4  A.  Yes.  I'll pull it up for you.

5  Q.  And do you recall that you would have sent that to who,

6  that e-mail who were you directing the request for all those

7  due diligence items?

8  A.  The letter is addressed to Albert Hallac and Keith Wellner.

9  Q.  And then I think you were shown a follow-up due diligence

10  letter that had the original, and plus some further things that

11  you either learned or asked about in bold; do you recall that?

12  A.  Yes.

13  Q.  And who was that directed to?

14  A.  It was addressed to Keith Wellner, and Albert Hallac was

15  copied on it.

16  Q.  You mentioned to us the time that you had a meeting in

17  New York, and you mentioned, among others, Mr. Wellner was

18  there and there was a time where he left the meeting to go find

19  you a document, in 15 minutes or so came back and said he

20  didn't have a copy, right?

21  A.  Correct.

22  Q.  Do you have any ballpark estimate as to how long after that

23  meeting you saw the copy, in May, that we looked at in the

24  e-mail?

25  A.  No.

I2FPBER4                           Wray - Cross

1   Q.  You can't recall as you sit here right now?

2   A.  Right.

3            MR. BIENERT:  May I have just a moment, your Honor?

4            THE COURT:  You may.

5            (Pause)

6            MR. BIENERT:  That's all I have, your Honor.  Thanks.

7            THE COURT:  All right.  Any redirect?

8            MR. ALLEN:  No redirect, your Honor.

9            THE COURT:  All right.  You may step down.

10           THE WITNESS:  Thank you.

11           THE COURT:  Thank you.  You're excused.

12           THE WITNESS:  Thank you very much.

13           (Witness excused)

14           THE COURT:  You may call your next witness.

15           MR. ALLEN:  Your Honor, the government calls Albert

16  Hallac.

17           THE COURT:  All right.

18  ALBERT HALLAC,

19       called as a witness by the Government,

20       having been duly sworn, testified as follows:

21           THE DEPUTY CLERK:  Please be seated.  State your name

22  and spell it for the record, please.

23           THE WITNESS:  My name is Albert Hallac, H-a-l-l-a-c.

24           THE COURT:  You may inquire.

25  DIRECT EXAMINATION

I2FPBER4                          Hallac - Direct

1   BY MR. ALLEN:

2   Q.  Mr. Hallac, how old are you?

3   A.  80.

4   Q.  Are you married?

5   A.  Yes, sir.

6   Q.  Do you have any kids?

7   A.  Yes.

8   Q.  How many?

9   A.  Four.

10  Q.  Where were you born?

11  A.  Lebanon.

12  Q.  How long did you live in Lebanon?

13  A.  Just two years.

14  Q.  What other countries have you lived in?

15  A.  Israel, Egypt, Canada and the United States.

16  Q.  When did you move to the United States?

17  A.  In 1968.

18  Q.  Have you lived in the United States since then?

19  A.  Yes.

20  Q.  Are you a United States citizen?

21  A.  Yes.

22  Q.  When did you become a citizen?

23  A.  1970 -- I'm sorry, 2000 -- 2007.

24          THE COURT:  I'm sorry.  Whoa, whoa, wait.

25          THE WITNESS:  2007.

1    THE COURT:  Thank you very much.

2    THE WITNESS:  Sorry.

3    BY MR. ALLEN:

4    Q.  About how far did you get in school?

5    A.  I got a Bachelor's degree in business in McGill University

6    in Montreal.

7    Q.  When did you graduate from McGill?

8    A.  1959.

9    Q.  What kinds of work did you do after you graduated from

10   college?

11   A.  Generally speaking, it was always investment business.

12   Q.  When you say investment business, what do you mean?

13   A.  Such as stockbroker, investment advisor, in that category.

14   I went to New York to take some internships, and I went back to

15   Montreal for a while doing that.

16   Q.  Have you spent your entire career in the investment field?

17   A.  Yes, sir.

18   Q.  Mr. Hallac, I want to direct your attention to the 1990s.

19   Did you open up your own company around that time?

20   A.  Yes.

21   Q.  What was the name of that company?

22   A.  Weston Capital Management.

23   Q.  And what year was Weston founded?

24   A.  It was founded in 1992.

25   Q.  Where was Weston headquartered when you first founded it?

I2FPBER4                          Hallac - Direct

1  A.  Montreal –- it was in West Port, Connecticut.

2  Q.  And Weston opened offices in other cities?

3  A.  Yes, we did.  New York thereafter.  We also had an office

4  in London.  We also had a small office in Tokyo, Japan, and

5  then we moved the head office to Palm Beach.

6  Q.  And where was your New York office located?

7  A.  On Third Avenue and 48th Street.

8  Q.  What offices did you primarily work out of?

9  A.  I primarily worked out of the Connecticut office when we

10 had an office there, and then mostly out of the Palm Beach

11 office later on.

12 Q.  And what was your title at Weston?

13 A.  I was basically the CEO.

14 Q.  Did your title change over time?

15 A.  Yes.  I was sometimes called chairman, sometimes CEO,

16 sometimes founder.

17 Q.  Okay.  And what kind of business was Weston involved in?

18 A.  Well, we were basically in the business of raising capital

19 for hedge fund managers, as well as creating fund of funds.

20 Q.  And let's focus on the fund of funds business for a minute.

21 Did Weston invest or manage its own money or other people's

22 money?

23 A.  Other people's monies.

24 Q.  And what types of clients did Weston have?

25 A.  Well, we started out primarily with high-net-worth

I2FPBER4                        Hallac - Direct

1   individuals.  Shortly thereafter, we started to get pension

2   funds and institutions.  It was, you know, by 2003, '4, '5, it

3   was a large section of the market.

4   Q.  And you had said that Weston had run fund of funds.  What's

5   a fund of funds?

6   A.  Well, it's a fund that invests in individual or hedge

7   funds.

8   Q.  What's a hedge fund?

9   A.  A hedge fund is a limited partnership, a limited

10  partnership managed by a few individuals whereby they trade,

11  generally speaking, quite actively.  They also protect the

12  penalty side, or the loss factor, by going short the market and

13  that's, in theory, a hedge fund.

14  Q.  And what types of benefits are there in investing in funds

15  of funds?

16  A.  Well, the most important advantage is that you now have

17  tremendous diversification of assets and it permits investors

18  to have downside protection.

19  Q.  And are there any disadvantages of investing in fund of

20  funds?

21  A.  Yes.  The fees are definitely, you know, higher than going

22  to a separate hedge fund.

23  Q.  Did Weston manage a single fund of funds or multiple fund

24  of funds?

25  A.  Multiple.

I2FPBER4                          Hallac - Direct

1   Q.   At its peak, how much money did Weston have under

2   management?

3   A.   About 2.8 billion.

4   Q.   When did that peak occur?

5   A.   About the middle of 2008.

6   Q.   And about how many employees did Weston have, at its peak?

7   A.   Fifty, give or take.

8   Q.   How did Weston make money?

9   A.   Well, we charged management fees on assets, generally one

10  percent, and we charged ten percent incentive of participation,

11  in other words, a share of the profits.

12  Q.   Mr. Hallac, are you familiar with the term investment

13  advisor?

14  A.   Yes, sir.

15  Q.   What does it mean to be an investment advisor?

16  A.   First and foremost, it means you're registered with the

17  SEC, and you have to follow its rules and regulations.

18  Q.   Was Weston a registered investment advisor?

19  A.   Yes, sir, I was.

20  Q.   As you understand it, was Weston required to register as an

21  investment advisor?

22  A.   Yes.  If you manage more than a hundred million, you must

23  be registered.

24  Q.   As a technical matter, how did Weston register as an

25  investment advisor?

1  A.  By simply applying for it and filling out a whole bunch of

2  forms.

3  Q.  And do you remember the name or title of the forms that

4  Weston had to fill out?

5  A.  Yes, it's called ADV form.

6          THE COURT:  ADV, as in Victor?

7          THE WITNESS:  Albert, David, Victor.

8  Q.  What types of information is included in an ADV form?

9  A.  Well, it has all the information on the firm.  It has

10  information on who the officers and directors are, from

11  managers, you know, assets, and it has all the information,

12  CFOs, COOs, and so on.

13          THE COURT:  All right.  We're going to end right

14  there, ladies and gentlemen.

15          And you can remain where you are, Mr. Hallac.

16          This is the end of our workweek, and Monday is the

17  national celebration of Presidents' Day, where we honor

18  President Washington, President Lincoln for their contributions

19  to our country.  The courthouse will be closed; so we will have

20  no trial on Monday.  We're going to pick up on Tuesday at

21  10:00.  Of course, you need to be here early.  Tuesday here is

22  going to be like a Monday.  There will be a crowd downstairs;

23  so please get here early.

24          My present intention is that we will sit next Friday,

25  February 23rd, and we will also, if need be, sit the following

 1   week, including up to March 2nd.  I will be working out of your

 2   presence on making sure that we keep this case on track and

 3   keep the pace moving.

 4           You have been all that a trial judge could ask for, in

 5   terms of your cooperative spirit.  Jury service is never easy,

 6   but it's particularly hard in a case that goes on more than a

 7   week.  You have your lives, your dry cleaning, your laundry,

 8   your family, your food shopping, everything, you have worries

 9   about your jobs and what's going on there.  I know this, and I

10   think about you all as my No. 1 job here.

11           So I'm going to work hard on my end, and I want you to

12   know that I understand your end, and I admire the fact that,

13   not bumps in the road with anybody sitting in the jury box at

14   the moment, but we had some bumps in the road, and we're passed

15   that.  So I have to ask that you stay healthy, that you look

16   both ways when you cross the street, drive carefully if you're

17   going to be driving a car, please, please.

18           The other thing is, think of this as how you would

19   want to think about it if somebody in your family were involved

20   in a trial.  You would want a jury that followed the Judge's

21   instruction not to discuss the case with anyone.  You're only

22   human if you have the urge to do that.  That's understandable,

23   but you can't.  It's not right.  It's not fair.  You're not

24   going to do it, the same way you're not going to Google,

25   Safari, Alexa, whatever you want to call it, any of the terms

1    that arise in the trial, any of the persons.

2             You can do that after the trial is over, but we have

3    to exercise that discipline because that's what's fair and

4    that's what's right, and that's what you want to do.  You want

5    to look back on your jury service as having done what's fair,

6    just and right.  So I remind you of that.

7             And, also, no e-mailing or texting, even between

8    yourselves or certainly not with anyone who's a participant in

9    this trial.  No posting on Facebook:  Wow, oh, wow, I'm still

10   on jury service.  Not even that.  Just, you'll get a chance,

11   not now.  When it's over, if you want to take a picture of the

12   front of the courthouse and post it, you can do that.  You can

13   do lots of different things, but not now.  We all have to

14   exercise discipline, and we're all in this together.

15            With those words, have a pleasant long weekend, and a

16   pleasant and happy Presidents' Day, and I'll see you bright and

17   early on Tuesday morning.

18            (Jury not present)

19            THE COURT:  You may step down, Mr. Hallac.  And I'm

20   going to ask you to step out of the courtroom.

21            THE WITNESS:  Thank you.

22            (Witness temporarily excused)

23            THE COURT:  So let me hear from the government what's

24   coming up after Mr. Hallac.

25            MR. IMPERATORE:  Your Honor, I don't think we know our

1    next witness yet after Mr. Hallac.  We will regroup and discuss

2    it.  Generally speaking, we have, you know, quite a bit of

3    additional testimony that will follow Mr. Hallac.  It would

4    include two other investors.  It would include --

5              THE COURT:  Let me see that.  Two other investors.  Go

6    ahead.

7              MR. IMPERATORE:  Our summary, witness, Mr. Hinton.

8              THE COURT:  Right.

9              MR. IMPERATORE:  It would also include a number of

10   very short witnesses who have received Weston money through

11   Mr. Bergstein.

12             THE COURT:  Mr. Hallac is a short witness.  I think

13   you mean a brief witness.

14             MR. IMPERATORE:  Yes, thank you.  Yes, some of them, I

15   don't think they're short, they are brief, though.  But yes, we

16   have a number of brief witnesses who have received Weston

17   money.  We will also have brief testimony of an IRS witness.

18   Oh, and a witness from Deutsche Bank, who will be relatively

19   brief.

20             THE COURT:  IRS, Deutsche Bank.

21             MR. IMPERATORE:  So just to take a step back, we have

22   two longer witnesses, one is Mr. Hallac.  Our expectation is he

23   would be, you know, in the realm of the length of Mr. Wellner's

24   direct, perhaps a bit shorter.

25             THE COURT:  Oh, he's going to be quite a bit shorter.

1          MR. IMPERATORE:  Okay.  And so we also have --

2          THE COURT:  No, no.  You have lots of time on your

3    hands to make it quite a bit shorter.

4          MR. IMPERATORE:  We understand, your Honor.

5          THE COURT:  Unless the name of the game here is the

6    government wants a mistrial in this case.

7          MR. IMPERATORE:  Your Honor, we --

8          THE COURT:  Because we're going to lose jurors, and

9    you're going to lose their comprehension, and if you want to

10   get this case to the jury, you'll make sure that you cut down

11   on the scope of your examination.

12         MR. IMPERATORE:  We understand that, your Honor, but

13   we also want to highlight that we've done some unofficial

14   totaling.  We think in the two weeks that we've had, the direct

15   examinations of government witnesses have been in the range of

16   about nine hours.

17         And so I think there are two things that have factored

18   into the pace of this case, both of -- one of which is outside

19   of anyone's control, and that is juror issues, in terms of

20   either not appearing or showing up late either at the beginning

21   of the day and breaks and the weather, and secondly, you know,

22   our expectation was we would sit, you know, four days -- or,

23   I'm sorry, five days this week.  It's three for, obviously,

24   reasons outside of anyone's control.

25         And then, secondly, the length of cross-examination to

1    date for the witnesses we had called have been, first, well

2    beyond what was projected; second, beyond anything we would

3    have expected; and third, you know, have dwarfed the length of

4    the direct examinations.  And so, you know, our unofficial sort

5    of ballpark estimate is that the cross of Wellner alone, we

6    think, is probably longer than the direct examinations of all

7    the government witnesses we have called to date, or at least

8    around the same amount of time, roughly nine hours.

9            So, you know, these two issues, which are beyond our

10   control, have contributed to the pace of the case.  We are

11   mindful of the issues that your Honor has raised and, of

12   course, the last thing we want is a mistrial, but we also have

13   to prove up our case and put on our proof.  We're tying to do

14   so in a streamline manner.

15           We will go back this weekend and see, you know, ways

16   that we can streamline it, but the reality is, we do have, you

17   know, additional witnesses we plan to call, Hallac being a

18   substantial one and so is Brattle Group, the summary witness,

19   and then we have a number of, I think, shorter witnesses --

20           THE COURT:  Whoa, whoa, whoa, whoa.  I'm trying to

21   keep tally here.

22           MR. IMPERATORE:  Okay.

23           THE COURT:  So you have Hallac?

24           MR. IMPERATORE:  Hallac.

25           THE COURT:  Two other investors?

1          MR. IMPERATORE:  Correct.

2          THE COURT:  Summary witness.

3          MR. IMPERATORE:  Correct.

4          THE COURT:  How many brief witnesses you said received

5   Weston money?

6          MR. IMPERATORE:  It will depend, in part, on whether

7   we can obtain stipulations with the defense on some of these,

8   but it's in the realm of like six or seven who will be

9   exceedingly brief, like a few minutes.

10          THE COURT:  Yes.  And the cross?  Oh, you can't

11   control that.  Yes, well, you get to control who you put on;

12   so, you know, you're opening the door.  Don't come whining to

13   me.  Go ahead.  Six or seven brief witnesses.  What is that,

14   two weeks?

15          MR. IMPERATORE:  Your Honor, I think --

16          MR. ALLEN:  Your Honor, a lot of the brief witnesses

17   will literally be, someone will say I got a check, like one

18   check; it was for whatever purpose, and then they'll be done.

19   They aren't the kind of witnesses you might be able to

20   project --

21          THE COURT:  It will be curious to see whether there's

22   a good-faith cross-examination or just a game.  Because if it's

23   a bona fide basis for cross-examination, that's one thing, but

24   if somebody just declines to stipulate because it's more fun

25   that way, that may be their right.

I2FPBER4                        Hallac - Direct

1            MR. KOBRE:  Your Honor?

2            MR. FISH:  Just to be clear, we have not received any

3    request for stipulations on these witnesses.

4            MR. KOBRE:  Your Honor, that's actually not correct,

5    if I could briefly address that.  We sent defense counsel

6    stipulations with respect to four different witnesses, the

7    single stipulation that would address something we believe that

8    would be totally non-controversial, which is certain payments

9    that were made to law firms from Weston monies.

10           I've spoken with representatives of each of those four

11   law firms.  They have all told me that the money was for

12   personal legal services provided to Mr. Bergstein.  I sent

13   defense counsel a stipulation.  They revised it in a way that

14   it would not be acceptable to us, and quite frankly, is not

15   consistent entirely with what we've learned from the law firms.

16   And we haven't gotten a response back to our revisions.  Those

17   should be short witnesses, but it's a stipulation that should

18   be non-controversial.

19           MR. FISH:  I was understanding Mr. Allen to be

20   referring to a different class of witnesses, the ones that they

21   produced their 3500 material.  With respect to law firm

22   witnesses, I believe we received a proposed stipulation

23   yesterday or two days ago, the revised.  We've been going back

24   and forth with them.  We haven't stonewalled.  We submitted

25   revisions.  We got a revision back, and we're going to address

I2FPBER4                          Hallac - Direct

it.

I understood Mr. Allen to be referring to a bunch of, basically, other people who received payments.  We did receive a stipulation on the law firms, and we made a counterproposal. We didn't say no.

MR. KOBRE:  Your Honor, the counter proposal was received back two days ago -- I'm sorry.  We sent back to defense counsel two days ago our revised stipulations to their stipulation.  Haven't heard back since then and, quite frankly, these are witnesses with California law firms.  And so the government has now gone to the expense, and I will tell your Honor that we now intend that we will call one of those law firms.  It will be a short witness, but if we get the stip back and we're able to, you know, satisfy it that way, then that's great.  But these witnesses we're starting to make travel arrangements for them.  You know, we expect them to testify next week.

THE COURT:  So, Mr. Fish, you'll be back to the government on these counterproposals or --

MR. FISH:  Yes, but I just --

THE COURT:  By? Yes, I know you'll be back to them because that part I wasn't in doubt.  I was going to say by when?

MR. FISH:  Probably today.  Mr. Bisconti --

THE COURT:  Thank you.

1         MR. FISH:  -- is taking the lead on that.

2         THE COURT:  Mr. Bisconti, that sounds fine.  And now,

3    when will the government get the stipulations on the so-called

4    brief witnesses to the defense?

5         MR. IMPERATORE:  Your Honor, we will regroup and

6    consider that over the weekend.

7         THE COURT:  No, no.  You'll regroup and consider when

8    you're going to get the stipulation, so you come in on Tuesday

9    and say, thank you for asking that question, we contemplated

10   when we're going to get back to the defense on it, and it will

11   be in about a week?

12        MR. IMPERATORE:  That's not what I'm saying, your

13   Honor.  I think the issue is we have to confer with the defense

14   as to whether the defense -- we will propose stipulations as to

15   these three witnesses.  I think that the question for the

16   defense is whether, you know, these are stipulations that

17   they're willing to enter into, but yes, we'll propose them this

18   weekend.

19        THE COURT:  All right.  All right.  So it seems to me

20   that step one is to have a conversation.  It's better,

21   actually, that you take a few minutes this afternoon to have

22   the conversation.  I don't care if you want to take a break

23   first, but then have the conversation and get the ball rolling.

24   And if it's, don't bother with the stipulation because I ain't

25   stipulating to anything, that's one thing.  But if there's a

1    good-faith desire to maybe avoid the live testimony, then let's

2    have at it and get it to the defense and let them consider it.

3    That's what we need to do.  That's what you need to do.

4              MR. IMPERATORE:  Yes, your Honor.  There's another

5    witness, it's a 404(b) from DB Zwirn whose direct will be --

6              MR. ALLEN:  Probably 30 minutes, maybe 40.

7              THE COURT:  Maybe 20.

8              MR. ALLEN:  I'll take the hint; 20 it is.

9              MR. BIENERT:  And I was just going to comment.  I was

10   kind of optimistic when I didn't hear a mention of a 404(b)

11   witness, but they have one.  The most loaded issue, your Honor,

12   not only legally -- and we've, of course, made our position on

13   that, but I would just say, from a 403 standpoint and where we

14   are now in the sense of time and undue wasted time, are these

15   404(b) issues.

16             And here's the problem from our standpoint, and I

17   would say that, gosh, I've got to remember the name now, but

18   the person that we dealt with, oh, Mr. Martin --

19             THE COURT:  Right.

20             MR. BIENERT:  -- on the older deal, and trust me, that

21   was truncated, as best -- at least I tried to do hitting the

22   various aspects of the deal.  One of the problems with these

23   old deals from 2007 or '8 is they literally have 20 and 30

24   moving parts that usually involve ten to 15 just contracts and

25   agreements.

1            And the problem is, in addition to all the other

2    things we've already said, when we're sitting here in court and

3    they put somebody on who, in what sounds like a very nice

4    pithy, hey, he hit me up for money, and I gave it to him and I

5    didn't get it back.  Then he hit me up for money again, and I

6    gave it to him, and I didn't get it back.

7            That sounds all nice and easy, but when we look at the

8    deals, there are really a whole bunch of twists and turns, from

9    our perspective, as to why the deal took longer, why it didn't

10   go as planned, et cetera.  And it gets very time consuming and

11   difficult, and I would at least ask the Court to reconsider,

12   given where we are on timing, whether or not under 403, in

13   addition to everything we've already argued, which I've already

14   addressed, but under 403, should there be an end to the 404(b)

15   issue.

16           THE COURT:  So we're talking about the Zwirn witness?

17           MR. BIENERT:  And the other one I was going to say.  I

18   can tell you right now what the issue is.  We raised it, but it

19   would be hard for you to remember from this morning, it was a

20   while ago.

21           The stipulation on the IRS stuff, at least to the

22   degree they are putting someone on about tax info, whether or

23   not this was on his income tax returns.  That's an extremely

24   loaded issue because, again, it's very -- whatever you think of

25   Mr. Bergstein, whatever their position is, obviously we have a

1   different position.

2          But whether or not and how these financial

3   transactions from years ago needed to be treated for tax

4   purposes, are they a loan, are they a loss in equity, are they

5   nothing because there was no income because it was all

6   expenses, all of that is incredibly laden with, No. 1, expert

7   testimony about what you need to report and how and when, and

8   just a lot of layers of, well, here's what we thought at the

9   time and why we didn't think it needed to be reported, or

10   here's really where it was reported, but it's in a totally

11   different return than you think it is because there's so many

12   companies involved.

13          I think at least -- I realize I'm characterizing.  You

14   tell me if I'm wrong, but I felt like you were actually

15   teetering on the whole tax issue in the various hearings.  And

16   I would submit to your Honor that, again, given where we are,

17   and under a 403 analysis with something that I would say should

18   have no relevance, but at best, is marginal and could be

19   interpreted wrongly by the jury and prejudicial, that they

20   shouldn't be putting on tax evidence.

21          And to the degree that they want a stipulation, it

22   can't just be this guy didn't report it on his income tax

23   returns, because there's 20 different layers of why that would

24   be appropriate, and it becomes very cumbersome and large.

25          So those are the two other issues that they still seem

1       to have on their agendas that I would ask your Honor to

2       reconsider or think about over the weekend.  If you need more

3       briefing.  But the other stuff is core case, and I get core

4       case, but now that we're talking about these old issues, it's

5       very difficult to cross-examine and not have it cover a lot of

6       topics.

7                   THE COURT:  Thank you.  I certainly am going to think

8       about it.

9                   Now, Mr. Imperatore, talk about the tax issue.  Do you

10      really think it's as simple as doing a form 1040, where you add

11      up your W2 and your 1099 and did you include this 1099 on your

12      taxes?  Answer:  No.  Therefore, you failed to report income?

13      We're not dealing with that here.

14                  MR. IMPERATORE:  Well, Mr. Bienert opened -- and I'm

15      paraphrasing his opening statement -- he said Mr. Bergstein was

16      entitled to income for services he performed.  What the tax

17      returns show is that Mr. Bergstein reported no income related

18      to these two transactions and no income from the various shell

19      companies through which he funneled money to himself.

20                  Those shell companies didn't file tax returns, and we

21      separately have two e-mails between him and his accountant

22      where he doesn't even advise his accountant about this money.

23                  So this -- first of all, the proof on this is really

24      discrete because, again, we actually have tried to discuss a

25      stipulation with the defense on this.  It sounds like they're

1  not interested, but the testimony of the IRS agent would

2  basically be authenticating the returns.  These shell companies

3  never filed returns, and there's no income from them on

4  Mr. Bergstein's tax returns, and here's the e-mails to his

5  accountant where he doesn't even report the money.

6           That is very important to address a central argument

7  that they're making in this case, which is, he was entitled to

8  income for services rendered.  And as your Honor will recall,

9  he's trying to authenticate invoices which we contend are not

10 genuine, which purport to reflect money for services that he

11 performed in connection with these deals.

12          This brief testimony is very important to rebut this

13 proffered good-faith defense and good-faith receipt of money.

14 Now, Mr. Bienert may want to cross-examine somebody for all

15 kinds of issues.  These other issues are irrelevant.  He's

16 mentioned expert testimony.  We provided -- the expert

17 deadlines have passed, but regardless, expert testimony, as

18 your Honor knows, sheds no light on Mr. Bergstein's state of

19 mind.

20          What really matters is what he said to his accountant

21 and what he put on his returns.  If he's claiming he's entitled

22 to income, well, he can make arguments about why it's not on

23 his returns or why he didn't tell his accountant about it, but

24 the expert testimony sheds no light on it.  What we're talking

25 about here is a testimony that would be on the stand for what

I2FPBER4                          Hallac - Direct

1   feels like 15 or 20 minutes to put in these returns and e-mails

2   and just display that these things were never declared.

3            THE COURT:  Mr. Bienert?

4            MR. BIENERT:  Yes, your Honor.  A couple things.

5   First, with the caveat that I have to go back and look at the

6   documents because I'm just generalizing.  A lot of the

7   invoices, the question is going to be which entity were they

8   invoices of and to.  They're not necessarily all the tight ones

9   that we're talking about in the case.

10           No. 2, I thought, and again I'd have to go look at it

11  because I wasn't prepared to argue this, but I thought that the

12  case law that we cited was basically saying that whether

13  someone does or doesn't report income may or may not be

14  relevant to whether or not they were committing a crime or

15  believed that something -- when there's no tax charges.  And

16  that, in essence, what the cases stand for is that at least

17  when you don't have tax charges filed, then the introduction of

18  the tax issue can basically lead to prejudicial confusion with

19  the juries.  Again, I want to look at it, make sure I'm not

20  misstating things.

21           THE COURT:  Well, that may be true in some areas, and

22  if it's not true, it ought to be true in some areas, for sure,

23  and I think it is.  Here, however, it's a different

24  circumstance because the assertion is advanced by the defense

25  that I'm entitled to get something here.  This money was

I2FPBER4                        Hallac - Direct

1    appropriate, aboveboard payment to me.

2             We're not talking about somebody doing bad things on

3    their income tax return in some collateral respect.  It's going

4    to rebut the contention that it was bona fide income.  That's

5    what it's going to rebut.  So it's quite different than the

6    garden variety case where we're not getting into income tax

7    returns.

8             MR. BIENERT:  Well, first of all, I would submit

9    that's part of the argument, but I agree that is part of the

10   argument.  What I would want to do because, to be honest, I

11   want to look at the case law before I'm arguing that.  Can we

12   just -- to the degree that we have a supplement, or are we just

13   resubmitting what we already said?

14            THE COURT:  That's fine.  I'm not understanding why

15   it's a complicated issue that would prolong the trial.  It

16   doesn't sound like it would be.

17            MR. BIENERT:  Well, obviously --

18            THE COURT:  One can go to the Internal Revenue code

19   and throw out words, but it doesn't necessarily mean anything

20   relevant to the question of whether it was reported as income

21   somewhere.

22            MR. BIENERT:  I think where the complication would

23   come in, your Honor --

24            THE COURT:  And if we play shell game, well, it wasn't

25   reported here, it wasn't reported here, but maybe it was

1  reported someplace else; so then we have to get another witness

2  maybe to have that established, it's just we're playing a shell

3  game.  If it wasn't reported, it wasn't reported.

4          MR. BIENERT:  Well, I think -- and so, first of all,

5  setting aside the legal issue, which I would want to make sure

6  I'm citing --

7          THE COURT:  Sure.

8          MR. BIENERT:  On just the factual issue, I do think --

9  I think that the cross-examination wouldn't be super long.  It

10 would be probing, asking questions, and it really would

11 primarily then be us needing to call a tax person to basically

12 say, in these situations, this is what you would and wouldn't

13 have to report.  That's what it would be.  That's how I see it.

14         THE COURT:  Well, you do have the issue of the expert

15 deadline having passed.

16         MR. BIENERT:  Right, but the expert deadline was

17 before the ruling under 404 that the IRS stuff was coming in.

18 We didn't need --

19         THE COURT:  No, you were on notice of the 404(b)

20 evidence, and you moved to exclude it.  It doesn't work that,

21 oh, because I challenged the admissibility of something,

22 therefore, I appropriated to myself an exemption on the

23 deadline.

24         MR. BIENERT:  First of all, I want to check the

25 timing.  That's my recollection.  I may be wrong.  I'll check.

1          THE COURT:  All right.

2          MR. BIENERT:  What I do know is that at the time we

3     were getting experts, they didn't designate a tax expert.  We

4     weren't looking to do a tax case; so we didn't.  Now, if we do

5     it at all, it's a rebuttal expert.  It's not us affirmatively

6     wanting to put on an expert on a tax case, and I think it is of

7     a different ilk whether or not we should be able to call an

8     expert to respond to tax things that they put on.  Then whether

9     or not it was all part of, I guess to use a term we use here,

10    our case in chief to put on a tax defense, it never was.

11         THE COURT:  Well, is your IRS guy going on as an

12    expert, Mr. Imperatore?

13         MR. IMPERATORE:  No, he's not, your Honor.  And I

14    would just note that, again, they can make whatever arguments

15    they want.  What we're putting in are the returns and the

16    certifications that show that these other entities never --

17    these entities through which he paid himself, you know,

18    laundered the money to himself, didn't file tax returns, and

19    those entities show no income on his own returns.  And in his

20    e-mail with his own accountant, he says nothing about this

21    money.

22         So this is so discrete, we made our rule 404(b)

23    notice, as ordered by the Court, on December 18th, and they

24    never raised the issue of calling an expert.  So you know --

25    and the expert, by the way, would shed no insight whatsoever on

1    the defendant's state of mind, which is the only thing that

2    matters here.

3             And, finally, I'll just note, your Honor, we did cite

4    in our reply brief on our motion in limine a number of Second

5    Circuit cases which squarely hold that tax return evidence is

6    admissible under rule 404(b) exactly in this situation, where a

7    defense gets up and argues to the jury that he received money

8    that he was entitled to receive.  I mean, that evidence comes

9    in to rebut that.

10            THE COURT:  I recall that, and that's to be contrasted

11   with just the garden variety of not reporting the proceeds of

12   criminal activity, which generally is not admissible.  That's a

13   different situation, and usually the government doesn't even

14   try to offer it, but if it did, it's likely too tangential to

15   get into.

16            All right.  Let me pause the discussion on that and

17   say I am about to hand out court Exhibit No. 9, which is now

18   the full instructions, and I suppose supersedes Court Exhibit 7

19   which were --

20            THE LAW CLERK:  It's the continuation.  It's not the

21   full.

22            THE COURT:  Oh, my goodness.  I apologize.  So you

23   have to read the two documents together.  We saved some paper.

24   So Court Exhibit 7 is the general preliminary instructions, and

25   Court Exhibit 9 is the balance of the instructions to the jury.

1          As you can see, the text of the jury instructions is

2    approximately 83 pages in length.  By my calculation, it will

3    take approximately three-and-a-half hours to instruct the jury.

4    What I propose to do is, with regard to the preliminary

5    instructions one through 27, except for things that are in

6    brackets, things that I cannot know until a later point in the

7    trial, but as to everything else, pages 1 to 27, that I first

8    would hear from both sides as to whether they have any

9    objections to those first 27 pages, and then if there are no

10   objections or those objections are resolved, then I would, in

11   the course of the trial, tell the jury these are instructions

12   that govern and control in this case and are of equal

13   importance to any other instruction given in this case, and

14   that the typed text of them, all of them, will be available at

15   the end of the case.  But then deliver the first 27 pages in

16   smaller bites, smaller comprehensible bites, maybe 15 minutes

17   at the end of a day or 15 minutes after a lunch break and work

18   it down.  Is the concept acceptable to the defendant?

19          MR. FISH:  Your Honor, I want to do some research,

20   your Honor, but I don't believe that's permissible.  But I want

21   to do research.  I want to look at the law on that.

22          THE COURT:  I'll cite you to what I understand to be

23   the law, because I looked at this.  It provides, specifically

24   in 30C, that the Court may instruct the jury before or after

25   the arguments are completed or at both times.

1        MR. FISH:  I agree with that, but I believe that's

2    after the close of evidence.  I was understanding that you were

3    proposing giving these instructions in the course of the trial.

4        THE COURT:  That's correct.

5        MR. FISH:  Yes, I --

6        THE COURT:  So, Mr. Fish, I'm going to direct you to

7    research that.

8        MR. FISH:  Okay.

9        THE COURT:  All right?  You can research whether it's

10   waivable by the defense, and you can let me know whether you

11   choose to waive it.  If you're right, I really would like to

12   know it.

13       MR. FISH:  Okay.  As I said, I want to research it.

14   My recollection from another case, when I was in the office, is

15   that it created a problem.

16       THE COURT:  All right.  Okay.  That's fair enough, and

17   I'll give the government the task of doing that.

18       In any event, what I will ask you to do, because you

19   have the long weekend, is to get me your comments on Court

20   Exhibit 7 and 9 by Tuesday morning at 9:30, and so if you have

21   any objections to it, you can also point out if there are

22   things that may come up that may change your view on certain

23   things.  That's perfectly fine, but the indictment won't

24   change.  The elements of the offense won't change, and so it's

25   appropriate to get your position by Tuesday morning in writing,

I2FPBER4                        Hallac - Direct

1    and then we can have a session in which we orally discuss any

2    issue you want to orally discuss.

3           MR. BIENERT:  Practical question, your Honor.  I know

4    when we submitted things to your Honor, I think we actually

5    e-mailed an electronic version.  Is this something we can get

6    an electronic version of?  And the main reason is you may

7    remember Mr. Miller, who was here with me on motions.  He's the

8    person that's done a lot on the original submission of our jury

9    instructions.  I want to get this to him, and I'd rather not --

10   I think we can scan it but --

11          THE COURT:  We can get you a PDF of it to both sides.

12          MR. BIENERT:  I'd appreciate that, your Honor.

13          THE COURT:  All right.  So that's what we'll do.

14   We'll PDF it to both sides tonight.  What else?

15          MR. KOBRE:  Just one matter, your Honor.  We

16   understand the Court's ruling about the subpoena to the defense

17   counsel's summary witness, but if we can just renew, your

18   Honor, our request.  Again just, you know, we have received --

19   really, we received no real 3500 material or rule 26.2 material

20   with respect to the summary defendant.

21          This morning we received a hundred pages of nothing, a

22   hundred pages of non-substantive e-mail correspondence.  We

23   have produced for our summary witness hundreds, if not

24   thousands, of pages, including very close draft and very close

25   to finalized exhibits, and we just received nothing.  We have

1    nothing.

2         The e-mails that we received this morning for their

3    summary witness clearly reference a record that we don't

4    believe the government ever received, the general ledgers for

5    K-Jam Media or Integrated Administration.  And we're concerned

6    that the trial is moving along, and the defense is going to

7    have their summary witness, and we're going to be sandbagged in

8    a way where we haven't had a chance to see even the underlying

9    documents that this summary witness is relying on, let alone

10   any draft of his analysis or any correspondence really

11   reflecting the substance of it.

12        And, you know, I think at this point, I would just

13   ask -- this seems to be basic rule 16 material for the defense,

14   and it's really a little bit too facile for the defense to say,

15   well, as Mr. Fish said earlier, we're still not in a position

16   to know what it is that is going to be introduced through the

17   summary witness, and we can't give you any of the underlying

18   documents as well.  I mean, we're now two weeks into trial.

19   They ought to be giving us 3500 material and the underlying

20   documents that that summary witness has been provided and their

21   exhibits, and certainly any draft exhibits they have, but 3500

22   material as well.

23        THE COURT:  Who wants to respond to that?

24        MR. FISH:  Well, you know, we don't have a draft

25   exhibit; so I'll be honest with that.  But I also say that I

1    think that Mr. Kobre's characterization of their production

2    with respect to the Brattle witness is a little off base.  They

3    produced draft charts with our agreement that we won't use

4    them.

5              No. 2, as I said, and I'm not even saying that they're

6    wrong, maybe they're right.  The 3500 material they produced

7    for their witness shows that he received -- we don't have -- we

8    have no underlying data.  They loaded stuff in.  The records

9    are the records, the bank records in this case.  I imagine if

10   we call a summary witness, he'll be working off the same

11   records.  They already have them.

12             THE COURT:  Let me ask you this.  Let me shortcut this

13   and watch this.  Mr. Kobre, has the government produced its

14   3500 material on its summary witness?

15             MR. KOBRE:  Yes.

16             THE COURT:  Mr. Fish, has the defendant produced its

17   26.2 material on its summary witness?

18             MR. FISH:  Well, we produced material this morning --

19             THE COURT:  I didn't ask you that.  Have you produced

20   your 26.2 material?

21             MR. FISH:  Your Honor, we produced a bunch this

22   morning.  I'm not going to say that whatever -- we're going to

23   look at it over the weekend and find something else that has to

24   be produced.  However, I believe we have produced most of it.

25             THE COURT:  No, no, no.  Now, listen, I can't hold you

1    or anybody else accountable for that which you're not aware of

2    or that which doesn't exist --

3            MR. FISH:  Right.

4            THE COURT:  -- or anything of that sort.  But I don't

5    think it's unreasonable to ask the question that I've put to

6    the government.  Have you produced your 26.2 production, to the

7    best of your knowledge, information and belief, after

8    consulting with your colleagues at defense counsel table, all

9    three lawyers?

10           MR. FISH:  Your Honor, I will answer the question, we

11   made a production this morning.  We've been working --

12           THE COURT:  You told me that already.

13           MR. FISH:  I'm just giving you the background that I

14   was reviewing stuff last night.  We all were reviewing stuff

15   last night.  We will review it again tomorrow and make sure we

16   didn't miss something that should be produced, but that is the

17   situation.

18           THE COURT:  And if you did?

19           MR. FISH:  Then we will turn it over immediately.

20           THE COURT:  When?  Immediately.

21           MR. FISH:  As soon as we find it.

22           THE COURT:  Okay.  And I expect that will be by 5:00

23   tomorrow night.

24           MR. FISH:  If we have it.  If Mr. Ray has something we

25   don't have, we'll talk to Mr. Ray about it.

1            THE COURT:  And get it from him and produce it

2    immediately; is that right?

3            MR. IMPERATORE:  Yes, your Honor.

4            THE COURT:  Okay.  That's also my direction and my

5    order.  Go ahead.

6            MR. KOBRE:  I guess what I'm having trouble with is

7    Mr. Fish just said, well, you know, the record that the summary

8    witness is relying on, they assume it's probably just -- it's

9    probably, I think he said, just the same bank records as the

10   government's summary witness is relying on.

11           We have produced as discovery and in exhibits all the

12   materials that our summary witness will rely on.  They are

13   largely just the bank records.  That is the kind of analysis

14   that he did.  According to the e-mail that we got this morning

15   with respect to their summary witness, it is evident that their

16   summary witness has been provided and is reviewing various

17   documents including, quote, unquote, a bunch of additional

18   documents from Bergstein between January 30th and February 2nd.

19           THE COURT:  Stop right there.  Let me ask Mr. Fish

20   about the so-called bunch of documents between January 30th and

21   February 5th provided by Mr. Bergstein?

22           MR. FISH:  So two things.  No. 1 -- and again,

23   Mr. Bisconti has been working on this as well.  My

24   understanding is that the bunch of documents is largely the

25   material that was at issue in the beginning of the case.

1                No. 2 --

2                THE COURT:  Meaning the --

3                MR. FISH:  The material we produced after the Court

4      ordered us to produce things that we showed --

5                THE COURT:  Which was produced on or about what date?

6                MR. BISCONTI:  I believe it was February 7th, your

7      Honor.

8                MR. FISH:  No. 2, I am a hundred percent sure of this,

9      that Mr. Ray has reviewed material that will not be part of any

10     possible testimony.  So as I said, there are dry holes, and

11     some of that material refers to things that will likely be dry

12     holes.

13               THE COURT:  Let's see whether we can dispel the

14     paranoia.  Okay?  So is it correct that all of the materials

15     produced to the government on February 7th were produced to the

16     summary witness?  Is that accurate?

17               MR. FISH:  Yes.

18               THE COURT:  Okay.  And what else was produced to your

19     summary witness?

20               MR. FISH:  A lot of the discovery, the government's

21     discovery, a lot of that was produced.

22               THE COURT:  All right.  So government discovery and

23     what else?

24               MR. FISH:  There may have been draft charts, just as

25     the defense --

1           THE COURT:  All right.

2           MR. FISH:  No, I'm saying work product.  Just as the

3    government provided some work product to their summary witness,

4    which we did not receive, there may have been equivalent

5    transmissions in that direction.

6           THE COURT:  All right.

7           MR. FISH:  That was not produced by the government.  I

8    don't think that was inappropriate.

9           THE COURT:  But there is not raw documents that have

10   been produced to the summary witness that have not been made

11   available to the government with the exception of what you're

12   calling work product directs; is that accurate?

13          MR. FISH:  There may be some material which we aren't

14   using that was provided, and my understanding is there might

15   have been some material that there may be applicable privileges

16   to, but there's no material that he's going to be relying on

17   that he's been provided with that has not been provided to the

18   government.

19          THE COURT:  But if there is privileged material, it

20   seems appropriate that you log it in some way or give the

21   government some idea of what you're talking about --

22          MR. FISH:  Sure.

23          THE COURT:  -- in that regard.

24          MR. FISH:  Yes.  I mean, I would say, to the extent

25   we're not using it, I don't think it's even discoverable.

I2FPBER4                        Hallac - Direct

1    Look, I'm not questioning their good faith at the front table.

2    I do believe that there's an unwarranted paranoia here.

3            We're not planning -- I mean, the one issue would be,

4    you know, obviously, we may identify issues we want to

5    cross-examine their witness about, I mean that would be one

6    issue, but there's not going to be someone springing out with a

7    whole bunch of documents that they haven't seen.  That is not

8    our plan.

9            THE COURT:  I don't think they're necessarily

10   concerned about -- and I don't mean to be picking on words --

11   whole bunch, maybe just a handful, you know.

12           MR. FISH:  Or any.

13           THE COURT:  The fact of the matter is, 26.2 has a very

14   tough sanction associated with it.  If a party who called the

15   witness disobeys an order to produce or deliver a statement,

16   the Court must -- the word is "must," it's not my word --

17   strike the witness' testimony from the record.

18           MR. FISH:  I understand.

19           THE COURT:  And I will enforce that rule.

20           All right.  Anything else?

21           MR. KOBRE:  Not from the government.

22           MR. BIENERT:  No, your Honor.

23           THE COURT:  All right.  Have a good weekend, and I'll

24   get your letter on Tuesday morning addressing Court Exhibits 7

25   and 9, and any objections you have to the language therein.

I2FPBER4                     Hallac – Direct

1    Thank you very much.

2              (Adjourned to February 20, 2018, at 10:00 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                          INDEX OF EXAMINATION

 2   Examination of:                             Page

 3   DOUGLAS MARTIN

 4   Cross By Mr. Bienert . . . . . . . . . . . .1153

 5   Redirect By Mr. Kobre  . . . . . . . . . . .1227

 6   JAMES KING

 7   Direct By Mr. Imperatore . . . . . . . . . .1250

 8   Cross By Mr. Fish  . . . . . . . . . . . . .1280

 9   Redirect By Mr. Imperatore . . . . . . . . .1301

10   TIM WRAY

11   Direct By Mr. Allen  . . . . . . . . . . . .1307

12   Cross By Mr. Bienert . . . . . . . . . . . .1344

13   ALBERT HALLAC

14   Direct By Mr. Allen  . . . . . . . . . . . .1356

15                        GOVERNMENT EXHIBITS

16   Exhibit No.                            Received

17    650   . . . . . . . . . . . . . . . . . . .1258

18    654   . . . . . . . . . . . . . . . . . . .1267

19    659 and 660   . . . . . . . . . . . . . . .1275

20    655   . . . . . . . . . . . . . . . . . . .1288

21    614   . . . . . . . . . . . . . . . . . . .1322

22    603   . . . . . . . . . . . . . . . . . . .1330

23

24

25
</pre>

259   . . . . . . . . . . . . . . . . .1339

DEFENDANT EXHIBITS

Exhibit No.                                    Received

Z112 and Z121   . . . . . . . . . . . . . .1193

Z135   . . . . . . . . . . . . . . . . .1218

Z 146   . . . . . . . . . . . . . . . . .1291