I2K5ber1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,              New York, N.Y.

 4              v.                          16 Cr. 0746(PKC)

 5   DAVID BERGSTEIN,

 6              Defendant.

 7   ------------------------------x
                                           February 20, 2018
 8   Before:                               10:15 a.m.

 9
                     HON. P. KEVIN CASTEL,
10
                                           District Judge
11
                           APPEARANCES
12
     GEOFFREY S. BERMAN
13        Interim United States Attorney for the
          Southern District of New York
14   BY:  EDWARD IMPERATORE
          ROBERT ALLEN
15        ELISHA KOBRE
               Assistant United States Attorneys
16
     BIENERT, MILLER & KATZMAN, PLC
17        Attorneys for Defendant
     BY:  THOMAS H. BIENERT, JR.
18        ANTHONY R. BISCONTI

19   SATTERLEE STEPHENS LLP
          Attorneys for Defendant
20   BY:  ANDREW L. FISH

21             - also present -

22   Ellie Sheinwald, U.S. Paralegal Specialist
     Sarah Emmerick, U.S. Paralegal Specialist
23   Caroline Howland, Defense Paralegal Specialist

24   SA Shannon Bieniek, FBI

25
```

I2K5ber1

```
1              (Trial resumed; jury not present)
2              THE COURT:  Please remain standing for our jury.  Good
3      morning, ladies and gentlemen.
4              (Jury present)
5              THE COURT:  Please, be seated.
6              Good morning, ladies and gentlemen.  I hope you had a
7      productive, restful, fun weekend, and it's good to see you all
8      back.  I know that this can be a challenge at times including
9      your dedication to being here and getting a good start, which I
10     commend and we are ready for action.
11             So, Mr. Hallac, the Court reminds you that you are
12     still under oath.
13             THE WITNESS:  Yes, sir.
14      ALBERT HALLAC, resumed.
15             THE COURT:  You may inquire, Mr. Allen.
16             MR. ALLEN:  Thank you, your Honor.
17             Before we get started, we would like to move a couple
18     of exhibits into evidence pursuant to a stipulation that's
19     already in evidence as Government Exhibit 400, and the exhibits
20     that we offer are Government's Exhibits 108, 182, 212, 216,
21     219, 239, 241, 248, 252, 253, and 254.
22             THE COURT:  Any objection?
23             MR. BIENERT:  No, your Honor.
24             THE COURT:  Thank you.
25             (Government's Exhibits 108, 182, 212, 216, 219, 239,
```

I2K5ber1                        A. Hallac - direct

1    241, 248, 252, 253, and 254 received in evidence)

2              THE COURT:  Do you plan on reading the stipulation or

3    does that accomplish what you were striving to do?

4              MR. ALLEN:  The stipulation has already been read into

5    evidence so we are just moving forward.

6              THE COURT:  You may inquire.

7    DIRECT EXAMINATION

8    BY MR. ALLEN:

9    Q.  Mr. Hallac, when we stopped last week you had testified

10   that Weston was a investment advisor and was registered with

11   the SEC.  Were you personally an investment advisor?

12   A.  Yes, I was.

13   Q.  Why were you an investment advisor?

14   A.  By just being the head of the company and the majority

15   stock holder at the time.

16   Q.  For which Weston funds did you act as an investment

17   advisor?

18   A.  Actually, I could have for all of the funds.

19   Q.  Did you also act as an investment advisor for the people

20   who invested in Weston's funds?

21   A.  If they asked me some advice I would definitely be able to

22   do so.

23   Q.  As you understand it, what sorts of obligations did you

24   have as an investment advisor?

25   A.  To keep the clients in a position of very little risk, to

I2K5ber1                          A. Hallac - direct

1    keep them informed of everything that's going on, and to make

2    them aware if something new has happened for which they may

3    have to hear.

4    Q.  And, are you familiar with the term "fiduciary duty?"

5    A.  Yes, sir.

6    Q.  What do you understand that term to mean?

7    A.  It means that we need to treat our clients even better than

8    the way we treat ourselves.

9    Q.  And, as you understand it, did you have a fiduciary duty

10   towards your clients?

11   A.  Yes, I did.

12   Q.  Mr. Hallac, have you heard the term "conflict of interest?"

13   A.  Yes, sir.

14   Q.  What's a conflict of interest?

15   A.  Well, a conflict of interest is where you take an action

16   which, in fact, is contrary to the interest of another person.

17   Q.  And, as you understand it, are investment advisors allowed

18   to have conflicts of interest?

19   A.  No.  Not at all.

20   Q.  What would you be required to do --

21           THE COURT:  Ladies and gentlemen, as I think I

22   explained to you, it is a conflict between a duty to one person

23   or entity to whom you owe obligations, as well as another

24   person to whom you may owe obligations or duties and those

25   duties may put the person in a conflict between the interests

I2K5ber1                      A. Hallac - direct

1    of each of those two groups of individuals to whom they owe a

2    duty.

3              Next question.

4    Q.  Mr. Hallac, as you understand it, what would you be

5    required to do if you learned of a conflict of interest?

6    A.  Well, immediately to correct it and inform the parties

7    involved.

8    Q.  And, as you understand it, what types of consequences are

9    there if an investment advisor breaches his or her fiduciary

10   duties?

11   A.  Quite severe.

12   Q.  What do you mean by that?

13   A.  It could also become criminal activity.

14   Q.  How many hedge funds did Weston manage at its peak?

15   A.  The height, maybe 12, 13 hedge funds.

16   Q.  Ms. Sheinwald, will you please publish what is in evidence

17   as Government Exhibit 1?

18             Mr. Hallac, do you recognize this exhibit?

19   A.  Yes, sir.

20   Q.  What is it?  What does it depict?

21   A.  It depicts a chart of Weston, our company, and just

22   underneath it is Weston Advisors which is Weston Capital Asset

23   Management, and Weston Capital Asset Management in this

24   instance is the investment advisor to these two funds, the

25   Partners Funds and the Wimbledon Funds.

I2K5ber1                          A. Hallac - direct

1   Q.  So, let's start with the box that says the Wimbledon Funds

2   and underneath that there is a box that says Wimbledon

3   Financing Master Fund WFF?

4   A.  Yes.

5   Q.  What is WFF?

6   A.  It's the Wimbledon Financing Fund.

7   Q.  And what did WFF invest in?

8   A.  Excuse me?

9   Q.  What did WFF invest in?

10  A.  It invested in hedge fund managers that themselves lend

11  money against hard assets -- real estate or so.

12  Q.  Focusing on the 2011 to 2012 time period, about how many

13  investors were there in WFF?

14  A.  There was about 70 investors.

15  Q.  And, generally speaking, what types of investors were they?

16  A.  There were some very high net worth individuals, there were

17  a couple of small insurance companies, and there were sort of

18  average investors as well.

19  Q.  Let's now move to the box that says Partners Funds and

20  underneath that box there is a fund called Weston Capital

21  Partners Master Fund II Limited and then P2 in parentheses.

22          What was the P2 fund?

23  A.  The P2 fund was the second fund in our seeding platform.

24          THE COURT:  In the what platform?

25          THE WITNESS:  Seeding.  S-E-E-D-I-N-G.

I2K5ber1                    A. Hallac - direct

1        THE COURT:  Thank you.

2   A.  That's the platform utilized to promote hedge fund managers

3   into having their own businesses.  So, we would then give them

4   capital, help them out raising money.  And that was the Weston

5   Partners Funds.

6   Q.  Just to be clear, what types of investments did the

7   Partners 2 fund or P2 fund make?

8   A.  It could only make one type which is to give capital to a

9   hedge fund manager, oversee his activities, and help him out.

10  Q.  And, focusing on the time period between 2011 and 2012,

11  about how many investors were there in the P2 fund?

12  A.  There were probably 25, 30 at most.

13  Q.  What types of investors were they?

14  A.  In this case they were much larger investors, they were big

15  pension funds like an Allstate, other pension funds, insurance

16  companies, and also high net worth individuals that lived

17  offshore.

18  Q.  You used the term pension fund.  What is a pension fund?

19  A.  A pension fund is an entity that is part of a major

20  corporation where there is an investment committee that manages

21  money for the employees.

22  Q.  Does the P2 fund have an offering memorandum?

23  A.  The P2 fund did have one, yes.

24  Q.  According to that offering memorandum, how was money in the

25  P2 fund supposed to be invested?

1    　　　　　MR. BIENERT:  Your Honor, foundation.  When and where?

2    　　　　　THE COURT:  Overruled.

3    Q.  You are the CEO of Weston Capital, right?

4    A.  Yes, sir.

5    Q.  Did you review the offering memorandum for your funds?

6    A.  Our attorneys did.  I, from time to time, reviewed them.

7    Q.  So, according to the original memorandum for the P2 fund,

8    how is money in the P2 fund supposed to be invested?

9    A.  It was supposed to be invested strictly to find a manager

10   to do some background checks to determine this is the kind of

11   guy we would like to have under our umbrella and we would just

12   hand over a bunch of capital, sometimes $20 million, sometimes

13   $30 million, and we would make sure that he had all the

14   services that he needed from us in order to succeed, because if

15   he succeeds then our clients succeeded.

16   Q.  Did the offering memorandum for the P2 fund allow Weston

17   make loans to individual companies?

18   A.  No, sir.

19   Q.  Let's now turn to the Wimbledon TT Fund which is on the

20   very right-hand side of Government Exhibit 1.  There is a box

21   that says Wimbledon TT Portfolio and then TT in parentheses.

22   　　　　　What was the Wimbledon TT Fund?

23   A.  It was a fund that was managed by a gentleman called

24   Mr. Tewksbury and who actually traded commodity interests in

25   extremely high speed.  It was a different type of operation.

I2K5ber1                          A. Hallac - direct

1    Q.   Now, was the Wimbledon TT Fund managed by Tewksbury?

2    A.   Yes, sir.

3    Q.   Mr. Hallac, would the Wimbledon TT Fund invest in Tewksbury

4    or was it managed by Tewksbury?

5    A.   It was managed by Tewksbury.

6    Q.   The Tewksbury Fund was a separate fund from Wimbledon TT,

7    right?

8    A.   It was.

9    Q.   And so what did Wimbledon TT invest in?

10   A.   So, we went to Soc Gen, Soc Gen told us that they had

11   availability and capacity in the Tewksbury Fund and we then

12   would invest through Soc Gen and we would get the return and

13   the results of Tewksbury.

14   Q.   So, what types of individuals invested in the Wimbledon TT

15   Fund, again, focusing on 2011 through 2012?

16   A.   First, they were all offshore investors and, second of all,

17   they were, generally speaking, high net worth individuals.

18   Q.   Did the Wimbledon TT Fund invest directly or notionally in

19   the Tewksbury Fund?

20   A.   Notionally.

21   Q.   And, what does it mean to be notionally invested in

22   something?

23   A.   It means that you have no direct interest or line to the

24   manager.  You are investing through a bank and the bank itself

25   holds an interest with a manager and advised you of such a

I2K5ber1                          A. Hallac - direct

1    case.

2    Q.  And, in those situations, does the bank have actual

3    exposure to the manager?

4    A.  Yes, they do.

5    Q.  And, what does it mean to have actual exposure to a

6    manager?

7    A.  It means that they themselves have given the money to the

8    manager and any profit or loss will accrue to the bank.

9    Q.  And, did the TT Fund have an offering memorandum?

10   A.  Yes, it did.

11   Q.  And, had you reviewed that memorandum during your time at

12   Weston?

13   A.  I'm sure I went through it at some point.

14   Q.  And, how was the TT Fund's money supposed to be invested,

15   according to that memorandum?

16   A.  Only through strategies that Mr. Tewksbury was generating

17   and trading.

18   Q.  And, was TT allowed to invest in anything other than the

19   Tewksbury Fund?

20   A.  No, sir.

21   Q.  Ms. Sheinwald, we can take Government Exhibit 1 down.

22           Now, Mr. Hallac, you testified that Weston was

23   managing around $2.8 billion at its peak, right?

24   A.  Yes, sir.

25   Q.  How much money is Weston managing today?

I2K5ber1                         A. Hallac - direct

1    A.   Zero.

2    Q.   Is Weston still in business today?

3    A.   No, sir.

4    Q.   Mr. Hallac, did you commit any crimes when you were working

5    at Weston?

6    A.   Yes, I did.

7    Q.   We will talk about this in more detail later but, generally

8    speaking, what did you do?

9    A.   Well, I kept my investors from knowing the truth about some

10   of the investments we were making.  It started with my making a

11   transaction with a Fund.com who actually purchased part of

12   Weston Capital.  It was basically being run by a fellow called

13   Jason Galanis.  Jason Galanis was involved with the SEC and was

14   not supposed to manage any public companies.  I did not tell my

15   investors that he was the main partner of Fund.com, I just told

16   them that we made the transaction.  That was one of the first

17   things that happened.

18          Another thing that happened was we made a deal with

19   Mr. Galanis and Gerova.  My clients knew about it but they

20   never knew about Mr. Galanis's existence in Gerova.

21          Another instance is we actually made a loan to one of

22   Mr. Bergstein's companies called Arius Libra which was made

23   from P2 without the knowledge of our investors.

24          Also, there was a company through TT that I controlled

25   and some monies were transferred to that company for my

I2K5ber1                         A. Hallac - direct

1    personal use.

2              The last thing that I'm aware of is the fact that we

3    got involved with a public company, Mr. Bergstein wanted to be

4    financed/guaranteed.  We were not in a position to have a large

5    enough balance sheet at the time.  He created a balance sheet,

6    sent it over by e-mail, told me to send it to the attorney

7    representing him and the transactions.

8    Q.  Let's break some of that down.

9              So, Mr. Hallac, did you cause the P2 fund to do things

10   that were prohibited by its offering memorandum?

11   A.  Yes, sir.

12   Q.  Did you then take steps to hide those actions from the P2

13   funds investors?

14   A.  Yes, we did.

15   Q.  Did you also cause the TT Fund to do things that were

16   prohibited by its offering memorandum?

17   A.  Yes, sir.

18   Q.  And, did you take steps to hide those actions from the TT

19   funds' investors as well?

20   A.  Yes, sir.  We did.

21   Q.  Did you take money from the Weston fund that you should not

22   have taken?

23   A.  Yes, sir.

24   Q.  And, did you commit any crimes with respect to a fund

25   called Partners III?

I2K5ber1                          A. Hallac - direct

1    A.  Yes, sir.

2    Q.  What did you do with respect to Partners III?

3    A.  This is the balance sheet that I was talking about which a

4    balance sheet was created which was totally erroneous and false

5    and was sent to the lawyers of this company called Bidz which

6    was a public company.

7    Q.  Mr. Hallac, did you ultimately plead guilty to federal

8    charges in connection with your crimes?

9    A.  Yes, I did.

10   Q.  What charges did you plead guilty to?

11   A.  Conspiring -- conspiring to do investment advisor crimes as

12   well as securities crimes.  I also was charged with crimes for

13   securities laws.  I was also charged with crimes in -- I'm

14   sorry.  So, I was also charged with conspiring to wire charges

15   and wire fraud, and in fact I was also charged for in fact and,

16   indeed, committing wire fraud.

17   Q.  And around when did you plead guilty to those charges?

18   A.  That was July of 2015, thereabouts.

19   Q.  Mr. Hallac, did you commit those crimes alone or with other

20   people?

21   A.  With others.

22   Q.  Do you see anyone in this courtroom who committed those

23   crimes with you?

24   A.  Yes, I do.

25   Q.  Who do you see?

I2K5ber1                          A. Hallac - direct

1    A.  Mr. Bergstein.

2    Q.  Can you please identify Mr. Bergstein and an article of

3    clothing that he is wearing?

4    A.  He is wearing a gray sweater.

5         THE COURT:  Identification noted.

6    Q.  Mr. Hallac, did you meet with the government before you

7    pled guilty?

8    A.  Yes, sir.

9    Q.  How many times?

10   A.  By then, probably 10, 15 times.

11   Q.  What agencies were at those meetings?

12   A.  Well, the SEC was there, the FBI was there, the prosecuting

13   attorneys were there.

14   Q.  When you pled guilty, did you do so pursuant to a

15   cooperation agreement with the government?

16   A.  Yes, sir.

17   Q.  Ms. Sheinwald, can you please publish for the witness only

18   what's been marked for identification as Government Exhibit

19   3505-16?

20        Mr. Hallac, did you recognize this document?

21   A.  Yes, sir.

22   Q.  What is it?

23   A.  It is a cooperation agreement.

24        MR. ALLEN:  The government offers Government Exhibit

25   3505-16.

I2K5ber1                              A. Hallac - direct

1          THE WITNESS:  Yes.

2          MR. BIENERT:  No objection, your Honor.

3          THE COURT:  Received.

4          (Government's Exhibit 3505-16 received in evidence)

5    BY MR. ALLEN:

6    Q.  Ms. Sheinwald, can you please publish that?

7          Mr. Hallac, is this your cooperation agreement with

8    the government?

9    A.  Yes, sir.

10   Q.  Ms. Sheinwald, can you please publish the last page?

11         Mr. Hallac, do you see your signature on this page?

12   A.  Yes, I do.

13   Q.  Does this contract contain all of the terms and conditions

14   of your agreement with the government?

15   A.  Yes.

16   Q.  Has anyone made any promises to you other than what's

17   contained in this contract?

18   A.  No, sir.

19   Q.  So, as you understand it, what are your obligations under

20   your cooperation agreement?

21   A.  Well, it is to tell the truth as it's happened, it is for

22   me to be available to the government in terms of information

23   and help, and also I am not allowed to lie or commit further

24   crimes.

25   Q.  And, if you do everything that you are supposed to do under

I2K5ber1                          A. Hallac - direct

1    the cooperation agreement, what's your understanding of what

2    the government will do for you?

3    A.  Well, the first thing will be for me to receive the 5B

4    letter.

5    Q.  You said it is a 5B letter?

6    A.  Yes, sir.

7    Q.  What does that letter do?

8    A.  It basically outlines my behavior, my crimes, and outlines

9    what I did to help the government.

10   Q.  Who does that letter go to?

11   A.  It goes to the judge.

12   Q.  As you understand it, is the government going recommend any

13   particular sentence for you?

14   A.  There has been no promise of any sentence.

15   Q.  When you are sentenced, who determines what your sentence

16   will be?

17   A.  The Judge, sir.

18   Q.  As you understand it, what is the highest sentence that the

19   Judge can give you?

20   A.  70 years.

21   Q.  What is the lowest sentence that the Judge can give you?

22   A.  I guess zero.

23   Q.  And what sentence do you hope to get?

24   A.  Well, hopefully zero.

25   Q.  Has anyone promised you a particular sentence?

I2K5ber1                          A. Hallac - direct

1    A.  No, sir.

2    Q.  As you understand it, does the outcome of this trial have

3    any bearing on the sentence that you will receive?

4    A.  No.

5    Q.  Mr. Hallac, you testified that your cooperation agreement

6    requires you to tell the truth.  What do you understand would

7    happen if you don't tell the truth?

8    A.  Well, I would be charged and indicted for perjury.

9    Q.  What's perjury?

10   A.  Perjury is lying to the Court.

11   Q.  And, would you still get that letter that you referenced

12   earlier?

13   A.  Not at all.

14   Q.  What happens to your cooperation agreement?

15   A.  I guess it is going to be ripped up.

16   Q.  I am going to change subjects for a bit.  Ms. Sheinwald,

17   you can take down that exhibit.

18          Mr. Hallac, are you familiar with a company called

19   Gerova?

20   A.  Yes, sir.

21   Q.  What is Gerova?

22   A.  Gerova is a financial corporation in Bermuda which was in

23   fact the company controlled by Jason Galanis.

24   Q.  Did Weston enter into any transactions with Gerova?

25   A.  Yes, we did.

I2K5ber1                           A. Hallac - direct

1   Q.  Around when did it do that?

2   A.  Around beginning of 2010.

3   Q.  In very broad strokes, can you please describe that

4   transaction?

5   A.  We had two funds that totaled about 18 funds or so and

6   these funds were exchanged with Gerova for stock.  So, those

7   instruments and those funds were valued at $85 million at the

8   time and we gave that to Gerova and Gerova gave us $85 million

9   worth of public stock but it was not registered.

10  Q.  What does it mean -- what do you mean that it was not

11  registered?

12  A.  In other words, we couldn't sell it in the open market, we

13  had to wait six months prior to doing so and register it with

14  the SEC.

15  Q.  Why did you have to wait six months?

16  A.  Because it's very usual in these matters to do that so

17  there is a waiting period for the company to get set up.

18  Q.  Why did you agree to trade WFF's hedge fund assets for

19  stock in Gerova?

20  A.  Because you believed at the time that the value of our

21  assets was going down and to get, instead, public stock would

22  be to give liquidity to our clients.

23  Q.  What's liquidity?

24  A.  It is something they can sell pretty much right away other

25  than a hedge fund that would take sometimes months to try to

I2K5ber1                         A. Hallac - direct

1    sell.

2    Q.  Now, I want to direct your attention to the beginning of

3    2011.  What issues, if any, arose with the Gerova transaction

4    around that time?

5    A.  Well, a lot of negative articles started to appear in

6    January or beginning of February of 2012 -- no, 2011.  Excuse

7    me.  Those articles were all about Gerova, about Galanis, and

8    some of the associates at Gerova.  What happened is that the

9    stock started to completely cave, tumble, go down, and by

10   February the 5th or thereabouts, maybe it was sometime in

11   February, the stock was delisted by the New York Stock Exchange

12   when it -- at $5 a share.

13   Q.  What does it mean for a stock to be delisted?

14   A.  One of the advantages of having a stock that is actually

15   listed, like as a member on the New York Stock Exchange, makes

16   it very easy to trade back and forth, it gives it a market.

17   Once you delist a stock it is pretty well finished.

18   Q.  You had said that Gerova's -- the stock that you received

19   was restricted for a period of six months?

20   A.  Yes.

21   Q.  When the stock was delisted was the stock you received

22   tradeable?

23   A.  No, it was not.

24   Q.  What effect, if any, did Gerova's stock being delisted have

25   on WFF and WFF's investors?

I2K5ber1                          A. Hallac - direct

1   A.  Well, it was devastating because now the value of the fund

2   looked to be zero.

3   Q.  As you understand it, had Gerova failed to meet any of its

4   obligations to Weston around the time that its stock was

5   delisted?

6   A.  Yes.

7   Q.  How so?

8   A.  I'm sorry, can you repeat the first question?

9   Q.  As you understand it, had Gerova failed to meet any of its

10  obligations to Weston at the time that its stock was delisted?

11  A.  Well, the most important obligation was the fact that we

12  didn't have the stock, they had our, what do you call it -- the

13  stock was worthless.  They had our investments which could

14  still possibly be sold and they, in most instances, reneged on

15  many of their promises.

16  Q.  Without getting into the specifics, did you consider filing

17  a lawsuit against Gerova?

18  A.  At one point we did, yes.  We met with our outside

19  attorneys.

20  Q.  Did anyone offer you an alternative to suing Gerova?

21  A.  Yes.

22  Q.  Who?

23  A.  Mr. Bergstein.

24  Q.  So, Mr. Hallac, around when did you first meet

25  Mr. Bergstein?

I2K5ber1                           A. Hallac - direct

1    A.  Sometime in April of 2011.

2    Q.  How did you first meet him?

3    A.  Jason Galanis introduced me to him.

4    Q.  And where did that meeting take place?

5    A.  It was a restaurant in Palm Beach.

6    Q.  Did you stay in contact with Mr. Bergstein after that first

7    meeting?

8    A.  Yes, I did.

9    Q.  And, did Mr. Bergstein eventually propose a transaction

10   involving Gerova to you?

11   A.  Yes, he did.

12   Q.  What did he propose?

13   A.  Well, he informed me that he was, himself, involved with

14   Gerova had lent him money and he felt that he had a particular

15   way or possible way of getting out of Gerova as it sort of

16   never existed -- the deal that is.  And one of the things that

17   he proposed was what he called an unwind agreement whereby we

18   got our hedge funds back and Gerova got whatever they got up to

19   that point.

20   Q.  Around when did Mr. Bergstein propose the unwind

21   transaction?

22   A.  It had to be around, I would say, May, June.

23   Q.  And, just to be clear, who proposed that transaction, you

24   or Mr. Bergstein?

25   A.  Mr. Bergstein did.

I2K5ber1                    A. Hallac - direct

1   Q.  And did you seek out Mr. Bergstein in any way?

2   A.  No.

3   Q.  Let's talk about the unwind transaction.  According to

4   Mr. Bergstein, what would happen to the WFF assets after they

5   were unwound or taken back from Gerova?

6   A.  Well, the condition of the transaction was that all of

7   these assets that we would receive back would then go into a

8   Newco that he was creating.

9   Q.  What is a Newco?

10  A.  As it says, a new company with no name and then he gave it

11  the name of Arius Libra.

12  Q.  What was Arius Libra supposed to be?

13  A.  It was supposed to be an entity that was going to go into

14  the medical billing business.

15  Q.  Did Arius Libra exist at the time Mr. Bergstein proposed

16  the unwind transaction?

17  A.  Not at the time, no.

18  Q.  According to Mr. Bergstein, what was the purpose of moving

19  WFF's assets into Arius Libra?

20  A.  Well, so that we would have some assets, some collateral to

21  start raising some capital in order to go and buy the medical

22  billing business, and also to meet the obligations of the

23  unwind.

24  Q.  So, you said that the purpose was to get assets to be used

25  as collateral, how would you actually get money from that

I2K5ber1                          A. Hallac - direct

1    collateral?

2    A.  Well, a few ways.

3           First and foremost, you could sell it but you would

4    probably take a tremendous beating.  The other way, which was

5    the easiest which Mr. Bergstein recommended, was to actually

6    borrow money from one of his banks whereby we would then be

7    able to fund the activities required.

8    Q.  Did Mr. Bergstein say where he was going to borrow money

9    from?

10   A.  Yes.  He said from Deutsche Bank.

11   Q.  And, according to Mr. Bergstein, what was the money from

12   that loan from Deutsche Bank going to be used to do?

13   A.  It was going to be 50 percent used to complete the unwind

14   and 50 percent to be used to complete the purchase of the

15   medical billing assets from Mr. Parmar.

16   Q.  What, if anything, did Mr. Bergstein tell you about his

17   relationship with Deutsche Bank?

18   A.  Well, he said he worked with them for many years and had --

19   you know, he did business and he introduced them to a lot of

20   people.

21   Q.  Did Mr. Bergstein say anything about the likelihood that

22   Deutsche Bank would make the loan that he had proposed?

23   A.  Well, in view of his closeness with them, he felt that it

24   would be not an issue at all to borrow $10 million in order to

25   be able to do that.

I2K5ber1                              A. Hallac - direct

1    Q.   Did Mr. Bergstein offer any assurances about getting the

2    loan?

3    A.   Well, he said in the unlikely event that Deutsche Bank

4    doesn't make the loan, a very close friend of his called Jerry

5    Swartz would guarantee part of the loan with $5 million or

6    something like that.

7    Q.   What did Mr. Bergstein tell you about who Jerry Swartz was?

8    A.   Well, he just said that he was a pretty well known guy, he

9    had invented some incredible medical machineries, and at the

10   end of the day was someone he knew since he was a child because

11   Mr. Swartz had learned under Mr. Bergstein's father.

12   Q.   And, according to Mr. Bergstein, what role would Mr. Swartz

13   play in the Deutsche Bank loan?

14   A.   None other than a guarantor.

15   Q.   Now, were Mr. Bergstein's statements about the likelihood

16   of getting a loan from Deutsche Bank important to you?

17   A.   It was the only way that we could proceed.

18   Q.   What do you mean by that?

19   A.   Well, Weston had no cash of its own and we were not in a

20   position to put up $10 million.

21   Q.   Now, Ms. Sheinwald, can you please publish Government

22   Exhibit 100 and expand the e-mail at the very bottom of page 1?

23            Mr. Hallac, this is an e-mail, it is dated July 11th,

24   2011, and it is from Mr. Bergstein to you, Jeffrey Hallac and

25   Keith Wellner.  What is the date of this e-mail in relation to

I2K5ber1                          A. Hallac - direct

1   the time that Mr. Bergstein first proposed the unwind

2   transaction to you?

3   A.   That date was July 11th, this e-mail; he must have proposed

4   a concept of the unwind as I pointed out before sometime around

5   May, June.   Early June, middle of June.

6   Q.   This e-mail, Jeffrey Hallac is one of the recipients of

7   this e-mail.   Who is Jeffrey Hallac?

8   A.   My son.   He worked in the company.

9   Q.   What was his role at Weston?

10  A.   He was in marketing.

11  Q.   Mr. Hallac, can you please read Mr. Bergstein's e-mail

12  address?

13  A.   Yes, sir.   I just have to put on my a glasses.   ABCXYZ@CC.

14  Q.   What precedes that domain name?

15  A.   David Bergstein.

16  Q.   Do you find anything unusual by Mr. Bergstein's e-mail

17  address?

18  A.   Yes, I did.

19  Q.   What did you find unusual?

20  A.   Because I have never seen -- I'm sorry.   Go ahead.

21  Q.   What did you find unusual?

22           MR. BIENERT:   Objection.   Relevance, your Honor.

23           THE COURT:   Overruled.

24  Q.   What did you find to be unusual?

25  A.   So, I had never seen an address that way.   I had never seen

I2K5ber1                              A. Hallac - direct

1    CC and had never seen six letters put together.  In any case,

2    he pointed out that this was a Chinese address and it was great

3    about deleting e-mails.

4              THE COURT:  I didn't hear the last part.

5              THE WITNESS:  That this particular address was great

6    in terms of deleting an e-mail.

7              THE COURT:  Thank you.

8              Next question.

9    BY MR. ALLEN:

10   Q.  What specifically did he say about deleting e-mails?

11   A.  That it helped him sort of control his inbox, I guess.

12   Q.  So, the second paragraph in this e-mail, Government Exhibit

13   100 under the header Matrix Medical Acquisition says:  Weston

14   will contribute the identified fund to Newco with $5 million of

15   leverage in place.

16             What did you understand the identified funds to be?

17   A.  Well, these were the funds -- he was referring to the funds

18   that we had taken back from Gerova.

19   Q.  What does Newco refer to?

20   A.  That would refer to Arius Libra.

21   Q.  What did you understand Mr. Bergstein to mean when he

22   referenced $5 million of leverage?

23   A.  Well, I guess he was saying you are going to put $2.5

24   million worth of capital and we are going to get a loan of $2.5

25   million.

I2K5ber1                          A. Hallac - direct

1              THE COURT:  Say that again.  I didn't hear you.

2              THE WITNESS:  Okay.

3              It means that he would want us to put up $2.5 million

4     in capital and borrow an additional $2.5 for a total of $5

5     million.

6     BY MR. ALLEN:

7     Q.  Just to be clear, you said putting up $2.5 million in

8     capital.  Was that money or was that the WFF assets?

9     A.  These were the WFF assets, by the way, for a total of $10

10    million, you understand.

11    Q.  Okay.  Explain that.

12    A.  In other words, the leverage that he is talking about here

13    is $5 million of leverage but so but we had assets that were

14    worth more than $5 million but the two combined would give us

15    $10 million for the acquisition.

16    Q.  So, as you understood it around the time you got this

17    e-mail, where was the $5 million in leverage going to come

18    from?

19    A.  Well, as far as I knew it was going to come from Deutsche

20    Bank.

21    Q.  And, did the amount that was supposed to come from Deutsche

22    Bank change over time?

23    A.  No.  It was always $10 million.

24    Q.  When Mr. Bergstein says that the leverage will be in place,

25    what did you understand "in place" to mean?

I2K5ber1                           A. Hallac - direct

1   A.  Means that the loan would have been made and the funds

2   would be available.

3   Q.  Does it mean the loan would have been made at the time of

4   the transaction?

5   A.  Yes.

6   Q.  Mr. Hallac, did you have any conversations with

7   Mr. Bergstein about the Deutsche Bank loan around the time of

8   this e-mail?

9   A.  Well, the most important thing was that I was trying to

10  remind him that we needed to have the loan repaid before the

11  end of the year.

12  Q.  And around the time of this e-mail, what was Mr. Bergstein

13  telling you about the status of the Deutsche Bank loan?

14  A.  That there was no problem, no issues, he has just been very

15  busy working on too many deals and he will definitely get it

16  and, again, if he couldn't get it he will ask for Jerry Swartz'

17  help.

18  Q.  Did Mr. Bergstein tell you he had already spoken with

19  people at Deutsche Bank?

20  A.  Yes, he did.

21  Q.  What did he say?

22  A.  He said he spoke to Mr. Edrington who was a gentleman at

23  Deutsche Bank and he needed us to give them some information.

24  Q.  Ms. Sheinwald, you can take down this exhibit?

25          Mr. Hallac, let's now jump to the beginning of August

I2K5ber1                          A. Hallac - direct

1   of 2011.  What, if anything, did Mr. Bergstein say about the

2   status of the Deutsche Bank loan around this time?

3   A.  Well, the usual comments that it definitely will get done

4   but, in the meantime, time is really of the essence.  He did

5   not want Gerova to go bankrupt as it seemed it was on the way

6   to be, and he wanted to make sure that we did the unwind as

7   quickly as possible, therefore we needed cash as quickly as

8   possible.

9   Q.  Did he say anything about the Deutsche Bank loan being

10  delayed?

11  A.  Temporarily, yes.

12  Q.  And, did Mr. Bergstein propose getting a loan from a

13  different source?

14  A.  The difference source was one of our funds, P2.

15  Q.  How much money did Mr. Bergstein initially request from P2?

16  A.  The first amount turned out to be $3.6 million.

17  Q.  Did Mr. Bergstein tell you what the $3.6 million would be

18  used for?

19  A.  Well, we received a list of requirements to make wire

20  transfers after we made the loan but it was -- it was as

21  before, some money was for the unwind meaning Gerova people and

22  those kinds of guys, and then we also had some of it would go

23  to Paul Parmar.

24  Q.  And what urgency, if any, did Mr. Bergstein convey about

25  the need to get money from P2?

I2K5ber1                          A. Hallac - direct

1    A.  Well, he said it is the only place we can get it quickly

2    and, you know, which was a very difficult situation.

3    Q.  What, if anything, did Mr. Bergstein say about how the P2

4    loan would be repaid?

5    A.  Well, he felt, again, the easiest way was going to be for

6    him to arrange a Deutsche Bank loan and before the end of the

7    year in order to repay P2.

8    Q.  And then the Deutsche Bank loan would be used to repay P2?

9    A.  Yes, sir.

10   Q.  Are you familiar with the term "bridge loan?"

11   A.  Yes, sir.

12   Q.  What's that?

13   A.  As it implies, it is someone giving you a little money to

14   bridge an amount of time at which point you are going to get

15   the money that you are looking for.

16   Q.  And, did you consider the P2 loan to be a bridge loan?

17   A.  A very short bridge loan, yes.

18   Q.  Ms. Sheinwald, can you please publish for the witness

19   what's been marked for identification as Government Exhibit

20   1600?

21          Mr. Hallac, do you recognize this document?

22   A.  Yes, sir.

23   Q.  What is it?

24   A.  It's Mr. Bergstein sending me an e-mail.

25          MR. ALLEN:  The government offers Government Exhibit

I2K5ber1                            A. Hallac - direct

1    1600.

2               MR. BIENERT:  No objection, your Honor.

3               THE COURT:  Received.

4               (Government's Exhibit 1600 received in evidence)

5    BY MR. ALLEN:

6    Q.  Ms. Sheinwald, you can publish.

7               Mr. Hallac, this is an e-mail from Mr. Bergstein to

8    you that's dated August 1, 2011, which is about three weeks

9    after the last e-mail that we saw.  When is August 1, 2011, in

10   relation to when the unwind agreement was actually executed?

11   A.  Well, the unwind was executed on August 3rd and the first

12   loan was paid on August 3rd.

13   Q.  Had Mr. Bergstein already asked for the P2 loan at the time

14   you got this e-mail?

15   A.  Yes, sir.

16   Q.  So, the first paragraph says that Mr. Bergstein has formed

17   a new corporation called Arius Libra, Inc.  Is that the same

18   Arius Libra that we have talked about before?

19   A.  Yes, sir.

20   Q.  And the second paragraph says that Arius will issue stock

21   to the agreed upon group with 51 percent going to your groups.

22              What did you understand "your groups" to mean?

23   A.  Well, as far as I was concerned it was the two funds that

24   we had transferred which was the WFF and the Wimbledon Real

25   Estate Financing Fund.

I2K5ber1                        A. Hallac - direct

1   Q.  And the third paragraph says that Weston and Gerova execute

2   an unwind agreement.  The unwind puts the assets back in

3   Weston's name, forgives past monetary transfers between the

4   parties, and obligates Weston to pay certain amounts.

5           What assets is this paragraph referencing?

6   A.  Again, the assets -- the hedge fund assets that we had

7   handed over to Gerova.

8   Q.  And what past monetary transactions do you understand

9   Mr. Bergstein to be referencing?

10  A.  Well, basically that we owed some money to Gerova and he

11  listed them and he expected them to be paid.

12  Q.  Ms. Sheinwald, you can take down this exhibit.

13          Mr. Hallac, around this point in time about how often

14  were you talking to Mr. Bergstein about the unwind transaction?

15  A.  Quite frequently.  Daily, probably, or every few days.

16  Q.  What did Mr. Bergstein say that he was going to get out of

17  the unwind transaction?

18  A.  He was going to be a stockholder.

19  Q.  In what?

20  A.  In Arius Libra and its subsidiary.

21  Q.  And around how much stock was Mr. Bergstein going to own in

22  Arius Libra?

23  A.  Those amounts changed a few times but at the end he had 34

24  percent.

25  Q.  And was Mr. Bergstein also going to get any money from the

I2K5ber1                              A. Hallac – direct

1    unwind agreement?

2    A.  No, except profits if they came in.

3    Q.  Have you heard of DPRE or Gion?

4    A.  Yes, sir.

5    Q.  What are those?

6    A.  These are two entities controlled by Mr. Bergstein.

7    Q.  And were DPRE and Gion going to get payments under the

8    unwind agreement?

9    A.  Yes.  They were actually going to be paid to Mr. Bergstein.

10   Q.  So, other than the equity that Mr. Bergstein held in

11   Arius Libra and the DPRE and Gion payments, did Mr. Bergstein

12   claim he was entitled to any other money?

13   A.  Not that I'm aware of.

14   Q.  Did Mr. Bergstein tell you he was going to get management

15   fees in connection with the unwind transaction?

16   A.  No, sir.

17   Q.  Did Mr. Bergstein tell you that he was going to get

18   consulting fees in connection with the unwind transaction?

19   A.  No, sir.

20   Q.  Did Mr. Bergstein tell you that he was going to get salary

21   in connection with the unwind transaction?

22   A.  No, sir.

23   Q.  As far as you understood it, was Mr. Bergstein going to get

24   anything other than equity in Arius Libra and the Gion and DPRE

25   payments?

I2K5ber1                          A. Hallac - direct

1   A.  That was it.

2   Q.  Was the fact that Mr. Bergstein was not getting anything

3   else important to you?

4   A.  Sure.

5   Q.  Why?

6   A.  Well, it put us in the same position.

7   Q.  What do you mean by that?

8   A.  Well, you know, we weren't going to be getting any fees

9   either and our funds were actually getting a controlling

10  interest in Arius Libra and he was getting a non-controlled

11  control position in Arius Libra.

12  Q.  Did you consider Mr. Bergstein to be a partner in the

13  transaction?

14  A.  Yes, sir.

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I2KPBER2                          Hallac - Direct

BY MR. ALLEN:

Q.  Mr. Hallac, did you ultimately enter into the unwind
transaction that Mr. Bergstein proposed?

A.  I'm sorry, I didn't hear that first part.

Q.  I'm sorry.  Did you ultimately enter into the unwind
transaction that Mr. Bergstein had proposed?

A.  Yes, we did.

Q.  And did you also loan Arius Libra money from the P2 fund?

A.  Yes, we did.

Q.  How big was that loan at first?

A.  At first, it was 3.6 million.

Q.  How big did it get?

A.  A little over 9 million.

Q.  Ms. Sheinwald, can you please publish Government Exhibit 2.

        Mr. Hallac, do you recognize this chart?

A.  Yes, sir.

Q.  Now, do you see the arrows that say Stock and Assets that
go between WFF and Arius Libra?

A.  Yes, sir.

Q.  What do those arrows represent?

A.  It represents that assets and stocks were going to go from
one entity to the other.  So Wimbleton Financing was going to
send our assets back to Arius Libra, and Wimbleton Financing
Master Fund would then receive -- or give up the stock of
Gerova.

I2KPBER2                          Hallac - Direct

1   Q.  And to be clear, this is describing the unwind transaction,

2   correct?

3   A.  Totally, yes.

4   Q.  And do you see the arrow that says $8,735,572 loan?

5   A.  Yes, sir.

6   Q.  What does that arrow signify?

7   A.  That arrow signifies that the Partners Fund had loaned

8   Arius Libra that amount of money.

9   Q.  And when was that money supposed to be repaid?

10  A.  Before December the 30th.  By the way, this is the same

11  $9 million loan that I was talking about a few moments ago.

12  Q.  And finally, Mr. Hallac, do you see the arrow that says

13  Assets as Security on Loan?

14  A.  Yes, sir.

15  Q.  What does that arrow signify?

16  A.  Well, it signified that we would then use these assets to

17  get a loan from Deutsche Bank.

18  Q.  Did you have any hesitations about giving the P2 fund a

19  security interest in WFF, which was the different Weston fund?

20  A.  Yes, it was very scary.

21  Q.  And why was it very scary?

22  A.  Because it was illegal.

23  Q.  Why was it illegal?

24  A.  Because there's all kinds of conflicts between funds, and

25  there's -- and the clients were not informed.

I2KPBER2                          Hallac - Direct

1    Q.  Did you discuss those concerns with Mr. Bergstein?

2    A.  Yes, I told him that our clients would not know about it.

3             MR. BIENERT:  I'm sorry, may I have a foundation as to

4    time?

5    Q.  Did you discuss those concerns with Mr. Bergstein around

6    the time that you entered into the unwind transaction?

7    A.  Yes, sir.

8    Q.  What did you say to Mr. Bergstein?

9    A.  I said:  We can only do this if we're going to be able to

10   get the Deutsche Bank loan.

11   Q.  And what did Mr. Bergstein say in response?

12   A.  That I should not worry, it will be definitely be

13   delivered, and he felt very, very comfortable about getting the

14   Deutsche Bank loan.

15   Q.  Mr. Hallac, you also testified earlier about P2's offering

16   memorandum?

17   A.  Yes.

18   Q.  Ms. Sheinwald, can you publish page 2 of Government

19   Exhibit 607.

20             Do you recognize this document?

21   A.  Yes, sir.

22   Q.  What is it?

23   A.  It's a offering memorandum -- well, it's a signature page

24   of an offering memorandum.

25   Q.  And, Ms. Sheinwald, can you expand the area around the area

I2KPBER2                         Hallac - Direct

1    Investment Objective.

2              Mr. Hallac, do you understand that P2's offering

3    memorandum could limit how P2's money could be invested?

4    A.  Yes, yes.  It was limited.

5    Q.  And was the P2 loan to Arius Libra an investment that was

6    allowed by P2's offering memorandum?

7    A.  No, it was not allowed.

8    Q.  Was the P2 loan to Arius Libra an investment in another

9    hedge fund manager?

10   A.  No, it was not.

11   Q.  Were loans, in general, even within the investment mandate

12   of the P2 fund?

13   A.  No.  There was no loans allowed to any hedge fund manager.

14   Q.  Why did you authorize the P2 loan if it was against P2's

15   investment mandate?

16   A.  Well, the circumstances were dire.  Gerova looked like it

17   was going bankrupt at any moment, the funds were needed.

18   Parmar was looking for some cash, and we wanted to get sort of

19   that unwind done before the whole thing blew up at Gerova.

20   Q.  Did you think anyone would find out about the P2 fund?

21   A.  Well, if we had gotten paid back, I probably felt that we

22   would.

23   Q.  Sorry, if you had gotten paid back, you felt what?

24   A.  If we had gotten paid back from the loan of Deutsche Bank,

25   I felt that that would be the one way to secure the fact that

I2KPBER2                        Hallac - Direct

1  no one would know, because the money would have been back.

2  Q.  In other words, if Deutsche Bank had given you a loan and

3  you had paid back P2, no one would have found out about that

4  loan?

5  A.  That's what I'm saying.

6  Q.  Mr. Hallac, did you express any concerns to Mr. Bergstein

7  about the P2 loan being inconsistent with P2's offering

8  memorandum?

9  A.  Yes, on many occasions.

10  Q.  What did you say?

11  A.  I mean, basically, the gist of my comments was consistently

12  the fact that this is not what we're supposed to do with the

13  money at P2.  It was only to make loans -- I'm sorry, to make

14  investments to hedge funds who wanted to become hedge fund

15  managers; so this was a total contradiction.

16  Q.  What did Mr. Bergstein say in response?

17  A.  That we would get paid before the end of the year.

18  Q.  Ms. Sheinwald, can you please publish Government

19  Exhibit 108.

20          Mr. Hallac, this is an e-mail dated August 3rd, 2011,

21  from Mr. Bergstein to you, Keith Wellner and Jeffrey Hallac.

22  Is there anything attached to this e-mail?

23  A.  Yes, there's the Gerova unwind.

24  Q.  Ms. Sheinwald, can we go to page 2, please.

25          And so this is a contract -- If we can expand the very

I2KPBER2                          Hallac - Direct

 1   top that says Unwind Agreement.

 2            Is this the unwind agreement that you entered into

 3   with Mr. Bergstein?

 4   A.  Well, actually, that's the first one that was signed, yes.

 5   Q.  Okay.  And were there particular payments that were

 6   required as part of this agreement?

 7   A.  Yes.

 8   Q.  Ms. Sheinwald, can you please turn to page 6 and expand the

 9   bottom half.

10            Mr. Hallac, do you see the section entitled Additional

11   Consideration?

12   A.  Yes, sir.

13   Q.  What does that section refer to?

14   A.  It refers to additional payments to be made under the

15   unwind agreement.

16   Q.  Did you discuss those payments with Mr. Bergstein while you

17   were negotiating the unwind agreement?

18   A.  Yes.  I think there were negotiations, discussions.  Keith

19   Wellner, you know, in-house counsel, was doing a lot of the

20   legal work with Mr. Bergstein.

21   Q.  Based on your conversations with Mr. Bergstein and

22   Mr. Wellner, can you please go through the payment that you see

23   here and then also at the top of the next page, and explain

24   briefly the purpose of each payment?

25   A.  500,000 to Gerova was apparently a wire transfer that we

I2KPBER2                          Hallac – Direct

1    needed to make, as they were in dire need of cash.

2          259,897 was paid to the entity controlled by

3    Mr. Bergstein called DPRE.

4          And then there's another amount to another entity,

5    which was 700,000 to Wimbleton C, one of our funds.

6    Q.  Why is Wimbleton C entitled to a payment?

7    A.  To be repaid for a loan that it made to Gerova.

8          There's also 1,458,000 to be paid to Jason Galanis,

9    which was apparently his settlement with Gerova to sort of walk

10   away.

11         And then there was 300,000, which was paid to Gion

12   Funding, which is another one of Mr. Bergstein's entities,

13   which was paid at the time.

14         And the last payment is 1.8 million to Weston Capital.

15   That payment was not made in its entirety.  Only 900,000 was

16   paid, and the 900 remaining to be paid was to be paid at

17   another time.  These were for fees and expenses that Weston

18   Capital had expended prior to handing over the Wimbleton

19   Financing fund to Gerova.

20   Q.  And just to be clear, when Weston gave the WFF assets to

21   Gerova, did Weston continue to play any role with respect to

22   those assets?

23   A.  Yes.  We continued to manage the fund underneath.

24   Q.  Mr. Hallac, based on what Mr. Bergstein told you, were any

25   other payments required under the unwind agreement?

I2KPBER2                        Hallac - Direct

1    A.  Yes.  Now we had to make the payments to acquire the assets

2    of the medical billing business from Paul Parmar.

3    Q.  But for the Gerova cleanup portion, were any other payments

4    required?

5    A.  I don't recall any others.

6    Q.  And as you understood it, was Mr. Bergstein owed any other

7    money beyond what's listed in this agreement?

8    A.  I think that's it.

9    Q.  All right.  Ms. Sheinwald, can you please publish what's

10   already in evidence as Government Exhibit 106.

11         Mr. Hallac, this is an e-mail dated August 3rd, 2011,

12   from Mr. Bergstein with the subject Executed Arius Docs.  Do

13   these documents relate to the loan from P2 that we've discussed

14   earlier today?

15   A.  Yes, sir.

16   Q.  What was your role, if any, in the preparation of these

17   documents?

18   A.  I had no role, other than approved them.

19   Q.  And what was Mr. Bergstein's role in preparation of these

20   documents?

21   A.  Well, we would receive from him or his office these

22   borrowing certificates to make payments.

23   Q.  And did you have an understanding as to Mr. Bergstein's

24   role in the preparation of the actual P2 loan documents?

25   A.  Well, I think he and Mr. Wellner did it together.  I don't

I2KPBER2                         Hallac - Direct

1   know who did more, but anyway, it was done together.

2   Q.  Do you see any references to someone named Kia Jam in this

3   e-mail?

4   A.  Yes, sir.

5   Q.  Who is Kia Jam?

6   A.  Mr. Bergstein was in Kia Jam's office.  They were extremely

7   good friends, and Kia basically signed most, if not all, of the

8   legal documents.

9   Q.  And you had said that Mr. Bergstein was in Kia Jam's

10  offices.  How did you know that?

11  A.  I was there many times, and I saw them both there with

12  their own personal offices.

13  Q.  Can you describe that office, please?

14  A.  Yeah.  You came in, there was a -- there was a receptionist

15  on the left side.  You know, you went to the right and you

16  would hit Mr. Jam's office.  You know, he was a producer.  He

17  was involved in the movie business.  Pictures all over the

18  place.

19          If you had turned left instead, after one or two small

20  offices, you'd get into Mr. Bergstein's, you know, reasonably

21  large office, and you'd have to pass by his secretary before

22  you got to his office.

23  Q.  What was the secretary's name?

24  A.  Her name was Frymi, F-r-y-m-i, and that's her first name.

25  Q.  Ms. Sheinwald, can you please turn to page 18 of this

I2KPBER2                           Hallac - Direct

1    document.

2             Mr. Hallac, this is a document titled Agreement Re:

3    Contribution of Assets to Arius Libra.  Did you refer this as

4    the contribution agreement?

5    A.  Yes, we did.

6    Q.  What did you understand this agreement to do?

7    A.  Well, basically, it outlined in legal form the contribution

8    of assets that we would have to make to Arius Libra.

9    Q.  On page 19 -- please, Ms. Sheinwald -- do you see any

10   signatures here, Mr. Hallac?

11   A.  Yes, that's Kia Jam's signature again.

12   Q.  And what is his title?

13   A.  In this case, secretary.

14   Q.  Page 21, please.  Mr. Hallac, what do you see here?

15   A.  These are the same list of payments that were required to

16   be made under the unwind agreement.

17   Q.  And do you see any differences between what's in the unwind

18   agreement that we saw earlier today?

19   A.  Yes.  There's only one small change.  Jason Galanis' amount

20   was reduced to a million-and-a-quarter from a

21   million-four-something.

22   Q.  Ms. Sheinwald, page 24, please.

23             Now, Mr. Hallac, this is a loan document.  It's dated

24   August 3rd, 2011.  It's titled Secured Note, and in the upper

25   right-hand corner -- if you can expand that, Ms. Sheinwald --

I2KPBER2                        Hallac - Direct

1    has an amount of $3.6 million.  Who do you understand this loan

2    agreement to be between?

3    A.  Between P2 and Arius Libra.

4    Q.  And is this the actual note for the P2 loan?

5    A.  Yes, sir.

6    Q.  And the amount that's listed is 3.6 million.  Was that

7    amount later increased?

8    A.  Yes, it was.

9    Q.  Was there any collateral for this loan?

10   A.  Yes.

11   Q.  What was the collateral?

12   A.  All the underlying hedge fund that we had on the WFF.

13   Q.  And is there a maturity date for this loan?

14   A.  December the 30th, 2011.

15   Q.  Ms. Sheinwald, if you can expand the third paragraph.

16        Mr. Hallac, who asked for the December 30th, 2011,

17   maturity date?

18   A.  I did.

19   Q.  Was that date important to you?

20   A.  Yes.

21   Q.  Why was it important to you?

22   A.  Because if it was not paid by then and reported to our

23   auditors by then, our clients would then have seen in the 2011

24   audited balance sheets and statements that there had been a

25   loan of up to $9 million during the year to Arius Libra.  So I

I2KPBER2                          Hallac - Direct

1    wanted the balance sheet to be clean, no loans owing or

2    receivable.

3    Q.  Did you tell Mr. Bergstein the reason why that maturity

4    date was important to you?

5    A.  Many times, and I also told him it is to keep it away from

6    our clients.

7    Q.  Ms. Sheinwald, page 26, please.

8             Mr. Hallac, who signed this document?

9    A.  This is Kia Jam again.

10   Q.  What's his title?

11   A.  It's secretary.

12   Q.  All right.  Let's now go, Ms. Sheinwald, back to page 7.

13            Now, this is an agreement, it's entitled Pledge

14   Agreement.  Mr. Hallac, what was the purpose of the pledge

15   agreement?

16   A.  Well, this is where you list all of the assets that are

17   pledged.

18   Q.  And what are the assets that are being pledged?

19   A.  These were all the hedge fund assets that were pledged that

20   were at Gerova and came to Arius Libra.

21   Q.  And so is this document part of the P2 loan?

22   A.  It is part and parcel, yes.

23   Q.  And, Ms. Sheinwald, page 16, please.

24            Mr. Hallac, who signed the pledge agreement?

25   A.  Also Kia Jam.

I2KPBER2                        Hallac - Direct

1    Q.  What was his title?

2    A.  Secretary.

3    Q.  Who did he sign on behalf of?

4    A.  Arius Libra.

5    Q.  Ms. Sheinwald, you can take that down.

6            Mr. Hallac, did you plead guilty to any crimes in

7    connection with the P2 loan?

8    A.  Yes, I did.

9    Q.  Was the P2 loan in the best interests of P2's investors?

10   A.  No, sir.

11   Q.  Why not?

12   A.  That money belonged to the shareholders of P2.  The loan

13   that was being made, albeit with some collateral, was receiving

14   5 percent interest.  It's not that it was a huge amount of

15   interest, and it was also a loan that, you know, had a short

16   duration; so it wasn't in the interest of any of them.

17   Overall, it had no advantage to the P2 investors.

18   Q.  Was the P2 loan consistent with how P2's offering

19   memorandum stated that its money was supposed to be invested?

20   A.  Yes, but not invested in loans, invested in hedge fund

21   managers.

22   Q.  And was the P2 loan an investment in a hedge fund manager?

23   A.  No, sir.

24   Q.  Did you ever tell Mr. Bergstein that the P2 loan was not

25   allowed by P2's offering memorandum?

1   A.  Yes, many times.

2   Q.  When did you have those conversations?

3   A.  I guess when he first asked about making the loan from P2

4   to Arius Libra.

5   Q.  And did you mention the offering memorandum to

6   Mr. Bergstein?

7   A.  Sure.

8   Q.  What did he say?

9   A.  Not to worry.  It would be repaid before December the 30th.

10  Q.  About how many times did you mention the illegality of the

11  P2 loan to Mr. Bergstein?

12  A.  Probably a dozen, 15 times.  I don't know exactly.

13  Q.  As you understand it, did the P2 loan create any conflicts

14  of interest?

15  A.  Yes, it did.

16  Q.  If the P2 loan was not repaid, what, if anything, could the

17  P2 fund do?

18  A.  Well, they could take over all of the assets underlying the

19  WFF fund.

20  Q.  So in other words, the P2 fund could foreclose on the WFF

21  fund assets?

22  A.  Correct.

23  Q.  Why did you use the WFF assets as collateral in light of

24  the conflict of interest?

25  A.  Well, unfortunately, these were the assets that had been

I2KPBER2                        Hallac - Direct

1    exchanged for Gerova, and these were the available assets
2    available to Arius Libra.
3    Q.  As far as you understood it, did Arius Libra have any other
4    assets?
5    A.  No, it did not.
6    Q.  Did you ever disclose the P2 loan to P2's investors?
7    A.  No, I did not.
8    Q.  Why not?
9    A.  Well, if I had disclosed it ahead of the transaction, they
10   absolutely would have turned it down and refused to permit me
11   to do so.
12   Q.  Did you tell Mr. Bergstein that you were not going to
13   disclose the P2 loan to P2's investors?
14   A.  Yes, I did.
15   Q.  Around when did you have those conversations?
16   A.  At the time, as the loan was requested and later.
17   Q.  And what did Mr. Bergstein say when you told him that you
18   were not going to disclose the P2 loan?
19   A.  He says:  Don't worry.  You won't have to.
20   Q.  Did the bridge loan from Deutsche Bank that Mr. Bergstein
21   had promised ever actually come through?
22   A.  No, sir.
23   Q.  Did you ever get a loan from Deutsche Bank?
24   A.  No, sir.
25   Q.  Did you get a loan from any other bank?

I2KPBER2                        Hallac - Direct

1     A.  No, sir.

2     Q.  All right.  Mr. Hallac, you testified that you never

3     disclosed the P2 loan to P2's investors.  At the time you made

4     it, did you disclose the P2 loans to WFF's investors?

5     A.  No, sir.

6     Q.  Why not?

7     A.  Well, you know, this would also be a conflict of interest

8     for them, and they would absolutely not have allowed it.

9     Q.  And did you have any investors who had invested in both the

10    P2 fund and the WFF fund?

11    A.  Unfortunately, we did.  Yes, one large investor.

12    Q.  What was the name of that investor?

13    A.  William Cafaro.

14    Q.  Mr. Hallac, how big was the P2 loan at first?

15    A.  It was 3.6 million.

16    Q.  And did Mr. Bergstein eventually ask for more money from P2

17    beyond that 3.6 million?

18    A.  Yes, sir.

19    Q.  How much money was ultimately loaned out?

20    A.  As I said, the maximum was about a little over 9 million.

21    Q.  And when did Mr. Bergstein begin requesting more money from

22    the P2 fund?

23    A.  Shortly thereafter, after we made the first loan.

24    Q.  Did Mr. Bergstein tell you what the additional money was

25    going to be used for?

I2KPBER2                         Hallac - Direct

1    A.  Well, we used to get these borrowing certificates; so you

2    saw who they were being sent to, in terms of money and wiring

3    instructions, but the explanations were very, very small, very

4    sort of, "It's just this guy for this kind of an expense."  In

5    other words, we were never able to -- on many occasions we were

6    never able to get a full statement, "Can we have a list of

7    bills where you spent 150,000 on this?" or whatever; so it was

8    very difficult.  We knew who it went to, but we never knew what

9    it was for.

10   Q.  Well, did Mr. Bergstein tell you in the borrowing

11   certificates it will be used for particular purposes?

12   A.  Yes, usually it was for Pineboard, you know, for Gerova

13   unwind, those kinds of things, but never specifics and the

14   reasons for it.

15   Q.  And what's Pineboard?

16   A.  Pineboard became a subsidiary of Arius Libra.  Pineboard is

17   the one that was acquiring the assets of Paul Parmar.

18   Q.  And when Mr. Bergstein said money will be used for

19   Pineboard, was that important to you?

20   A.  Yes.  I mean, it was supposed to be used for Pineboard.

21   Q.  All right.  Ms. Sheinwald, can you please publish

22   Government Exhibit 120.

23         Mr. Hallac, this is an August 29th, 2011, e-mail from

24   Mr. Bergstein to you and to Keith Wellner.  The e-mail says

25   that $25,000 will be sent to Michael Barnes and $150,000 will

1    be sent to Graybox.  What did you understand Graybox to be?

2    A.  I knew that Graybox, as per Mr. Bergstein, was his entity.

3    Q.  And Mr. Bergstein later says:  "I need the 150K to handle

4    what is going on with Bidz/Matrix.  What is Bidz?

5    A.  Bidz is a public entity.  Mr. Bergstein thought it would be

6    a good idea to use that entity at that time to put the medical

7    billing business into.  So he was trying to acquire stock in

8    Bidz whenever it was available, and at the end of the day, he

9    wanted to build this whole big sort of holding company.

10    Q.  And what is Matrix?

11    A.  Matrix was a name given to the medical billing business.

12    Q.  And when you say medical billing business, what are you

13    referring to?

14    A.  Mr. Parmar's business.

15    Q.  All right.  Mrs. Sheinwald, can you please publish page 2.

16          Mr. Hallac, this is an attachment to the e-mail we

17    just saw, and it has the title Borrowing Certificate.  And the

18    first paragraph references "a certain secured note of August 3,

19    2011, by and among Arius Libra, Inc. and Weston Capital

20    Partners Master Fund II Limited."  Does that reference the P2

21    loan agreement that we saw earlier today?

22    A.  Well, this one actually was probably the second part of the

23    loan agreement because it says August 29th.  The first loan

24    agreement with P2 was actually August 3rd, but it's still part

25    of the overall pledging of assets --

I2KPBER2                        Hallac - Direct

1    Q.  Let's take a step back.  Ms. Sheinwald, please go back to
2    page 1, please.
3            And what's the date of this e-mail, Mr. Hallac?
4    A.  August 29th.
5    Q.  And, Mrs. Sheinwald, page 2, please.
6            All right.  So when this first paragraph says, or
7    references, "the borrowing to be made on August 29th, 2011," is
8    that just referencing this request for funds?
9    A.  Yes.  I'm sorry, I didn't see the -- I didn't see that it
10   said based on the loan agreement of August 3rd, I'm sorry.
11   Q.  And just to be clear, what is the loan agreement of
12   August 3rd, 2011?
13   A.  That was the $3.6 million that was made between P2 and
14   Arius Libra.
15   Q.  Okay.  And do you recognize -- actually, if we can go to
16   the following page, Ms. Sheinwald.
17           Do you recognize the signature on this borrowing
18   certificate?
19   A.  Yes, sir.
20   Q.  Whose signature is it?
21   A.  Kia Jam.
22   Q.  Now, Mr. Hallac, you testified that you ultimately
23   disbursed close to 9 million or around $9 million of money from
24   the P2 fund at Mr. Bergstein's request.  Were you still
25   disbursing money pursuant to the P2 loan in early 2012?

I2KPBER2                          Hallac - Direct

1   A.  Yes.  We, unfortunately, made a couple of payments in early

2   2012.

3   Q.  Ms. Sheinwald, can you please go to Government Exhibit 216,

4   and if you could expand -- yes, you already have it -- the

5   e-mail at the very bottom of the page.

6           Mr. Hallac, this is an e-mail dated April 10th, 2012,

7   and it's from Mr. Bergstein just to you.  There's no subject.

8   In this e-mail Mr. Bergstein says:  "Is there any way you can

9   advance another 100K?"  He continues:  "This is not for Gerova

10  matters but for my matters.  I am going to trial on Tregub in

11  two weeks, and I needed to pay down 500K to Mitchel Silberberg

12  in order to proceed, which I did last week.  I will have last

13  week's funds out to you by tomorrow, and you can have this 100K

14  back by Friday."

15          So Mr. Bergstein says that the $100,000 that he wants

16  is not for Gerova matters but "for my matters."  Mr. Hallac,

17  what did you understand that to mean?

18  A.  Well, exactly as it says, this trial that he was in with

19  this Tregub was a personal matter, and this was -- he was suing

20  Tregub, and he was expecting to, you know, gain a very large

21  amount of money.  But --

22  Q.  When Mr. Bergstein asks for $100,000 "not for Gerova

23  matters but for my matters," was he asking for a personal loan?

24  A.  I guess you could say, yes.

25  Q.  And did you ultimately make that loan?

I2KPBER2                          Hallac - Direct

1   A.   Yes.

2   Q.   Where did that money come from?

3   A.   From the P2 fund.

4   Q.   Now, was the $100,000 loan that you made to Mr. Bergstein

5   from the P2 fund ever repaid?

6   A.   No, sir.

7   Q.   Mr. Bergstein also says in this e-mail that he will have

8   last week's funds out to you tomorrow.  What did you understand

9   "last week's funds" to be a reference to?

10  A.   It refers to another loan that was made the previous week

11  for 100,000 that was urgent or immediately required.

12  Q.   And do you remember what that $100,000 was for?

13  A.   Not specifically, but it was definitely something personal.

14  Q.   And was that money ever repaid?

15  A.   No, sir.

16  Q.   So Mr. Bergstein references the Tregub trial in this

17  e-mail, and you explained that a little bit earlier.  Had you

18  discussed that trial with Mr. Bergstein?

19  A.   Not in detail.  He told me the circumstances surrounding

20  the reason for the trial.

21  Q.   And based on your discussions with Mr. Bergstein, your

22  understanding, did that trial have anything to do with Arius

23  Libra?

24  A.   Very, very indirectly, but it had nothing directly to do

25  with it.

I2KPBER2                      Hallac - Direct

1   Q.  And did it have anything to do with the business that you

2   were doing with Mr. Bergstein?

3   A.  No.  It was much more for Aramid than for himself.

4   Q.  And do you see a reference to a firm called Mitchell

5   Silberberg or an entity called Mitchell Silberberg?

6   A.  Yes, sir.

7   Q.  Did you have an understanding who Mitchell Silberberg was?

8   A.  No, I'm afraid not.  I don't recall who he was.

9   Q.  And based on this e-mail, did you understand Mitchell

10  Silberberg had anything to do with Arius Libra or anything to

11  do with your business with Mr. Bergstein?

12  A.  No, he did not.

13  Q.  Now, Mr. Hallac, as you understand it, was giving

14  Mr. Bergstein money for personal purposes consistent with P2's

15  offering memorandum?

16  A.  No, it was not.

17  Q.  Was it a crime for you to use investor money to pay for

18  Mr. Bergstein's personal lawsuits?

19          MR. BIENERT:  Objection, your Honor.  Calls for a

20  legal conclusion, relevance.

21          THE COURT:  That's overruled.

22  Q.  I ask only for your understanding, Mr. Hallac.

23  A.  It was not allowed.

24  Q.  Was this part of the conduct that you pled guilty to in

25  Federal Court?

1   A.  Yes, sir.

2   Q.  Did you know when you gave this $100,000 loan to

3   Mr. Bergstein, that it was wrong?

4   A.  Yes, sir.

5   Q.  Why did you do it?

6   A.  The circumstances were very difficult.  Once you start to

7   do those things, it becomes very difficult to sort of step

8   back.

9   Q.  Ms. Sheinwald, can you please publish Government Exhibit --

10

11          THE COURT:  All right, ladies and gentlemen, we're

12  going to take our mid-morning break.  Please keep an open mind

13  and do not discuss the case.  See you in ten minutes.

14          (Jury not present)

15          THE COURT:  See you in ten minutes.

16          (Recess)

17          THE COURT:  Please remain standing for the jury.

18          (Jury present)

19          THE COURT:  All right.  Please be seated.  You may

20  continue, Mr. Allen.

21  BY MR. ALLEN:

22  Q.  All right.  Ms. Sheinwald, can you please publish

23  Government Exhibit 219 and expand the top e-mail.

24          Now, Mr. Hallac, this is an e-mail, and it is dated

25  April 12th, 2012.  It's from Mr. Bergstein to you, and

I2KPBER2                          Hallac - Direct

1   Mr. Bergstein says in this e-mail:  "I hate to even ask again,
2   but I need $200,000 sent to Pineboard for the stuff discussed
3   yesterday."
4           Mr. Hallac, did you loan the $200,000 to
5   Mr. Bergstein?
6   A.  Yes, sir.
7   Q.  Where did that money come from?
8   A.  From the same account at P2.
9   Q.  And what did you understand the purpose of this loan to be?
10  A.  It was -- I don't really recall that specific purpose.
11  Q.  Ms. Sheinwald, can you expand the area that says:
12  "Purpose, Pineboard funding."
13          Mr. Hallac, does that refresh your recollection of the
14  purpose of this loan?
15  A.  Right, it does.
16  Q.  And so what was the purpose of this loan?
17  A.  It was to help fund Pineboard.
18  Q.  And again, what was Pineboard?
19  A.  Pineboard was the actual medical billing company
20  underneath, as a subsidiary of Arius Libra.
21  Q.  All right.  Ms. Sheinwald can you please publish Government
22  Exhibit 239.  If you could just expand the e-mail.
23          Mr. Hallac, this is an e-mail that's dated May 17th,
24  2012, and it's from Mr. Bergstein just to you.  And in this
25  e-mail Mr. Bergstein says:  "I'm going into surgery.  I will

I2KPBER2                          Hallac - Direct

1    call when I get out and able to speak.  There are a bunch of

2    Sovrin and Pineboard expenses that need to be paid by tomorrow.

3    I was planning on liquidating a few things, but it is a bad

4    market day for this.  If possible, please wire 150K to the

5    Wells Fargo integrated administration account."

6              Mr. Hallac, did you end up making this disbursement?

7    A.  Yes, sir.

8    Q.  Where did the money come from?

9    A.  From P2.

10   Q.  And Mr. Bergstein references Sovrin and Pineboard in this

11   e-mail.  What is Sovrin?

12   A.  Sovrin was a company that he created after starting Arius

13   Libra and Pineboard.  Mr. Bergstein hired a couple of

14   gentlemen, and put them in charge of that company.  But

15   basically, it became a competitor to Pineboard and was in the

16   medical billing and other similar businesses.

17   Q.  As far as you know, was any ownership interest in Sovrin

18   ever transferred to Arius Libra or any Weston entity?

19   A.  No, it was not.

20   Q.  Why did you agree to reimburse Sovrin's expenses?

21   A.  Well, at the time, we were supposed to be owners in Sovrin

22   to the same extent that we were in Arius Libra.  So, therefore,

23   we had an interest that Sovrin, as well as Arius Libra, being

24   able to meet their expenses, at least temporarily.

25   Q.  And when you say supposed to be an owner in Sovrin, why do

1   you say "supposed to be"?

2   A.   Well, because we had discussed it with Mr. Bergstein on

3   many occasions, and on many occasions he says:  Yes, you are.

4   When he said "you," he meant the funds, Weston Financial Fund

5   and Real Estate Financing Fund, and he meant it to be owned by

6   us, as well, in the same way as Arius Libra was.

7   Q.   And as far as you know, did you ever get -- and by "you," I

8   mean the WFF Fund or the REF Fund -- ever get an ownership

9   interest in Sovrin?

10  A.   No, we never did.

11  Q.   Now, Mr. Bergstein asks for this money to be wired to an

12  account by the name of Integrated Administration.  What did you

13  understand Integrated Administration to be?

14  A.   That was another entity controlled by Mr. Bergstein.  This

15  was the entity that he used to pay salary, major medical, that

16  kind of stuff.

17  Q.   And did Mr. Bergstein tell you what Integrated

18  Administration was?

19  A.   Yes.

20  Q.   Ms. Sheinwald, you can take down this e-mail.

21       Now, Mr. Hallac, did Mr. Bergstein ever say anything

22  to you about buying life insurance policies?

23  A.   Yes, sir.

24  Q.   Can you please explain what he told you?

25  A.   He said that there were some life insurance policies

I2KPBER2                          Hallac - Direct

1   available through the Gerova bankruptcy.  There were about five

2   or six different policies, and he wanted to buy them because

3   these policies have an interest in sort of development.  He

4   said, if you hold them to the time that the particular person

5   passes, you now get the insurance benefit instead of the person

6   who passed because they sold it to you.

7   Q.  As far as you understand, did Mr. Bergstein buy those life

8   insurance policies?

9   A.  Yes, he did.

10  Q.  Who did he buy them from?

11  A.  Gerova, as far as I know.

12  Q.  And did WFF, or any Weston funds, have any ownership

13  interest in those life insurance policies?

14  A.  No, we did not.

15  Q.  Did those life insurance policies have anything to do with

16  the business that you were conducting with Mr. Bergstein?

17  A.  No, sir.

18  Q.  And did those life insurance -- sorry.  Were those life

19  insurance policies owned in any way by Arius Libra?

20  A.  No, sir.

21  Q.  Mr. Hallac, do you know someone named Eugene Scher?

22  A.  Yes, sir.

23  Q.  What, if anything, has Bergstein told you about Eugene

24  Scher?

25  A.  He told me that Eugene Scher was now the COO of Gerova.  He

I2KPBER2                        Hallac - Direct

1    would be the one, you know, signing a lot of the documents, and

2    he was basically Mr. Bergstein's contact at Gerova, trying to

3    get their hands on a variety of documents, trying to make --

4    what do you call -- getting loans ahead of other people, you

5    know, and that kind of stuff.  But generally speaking, he was

6    the man at Gerova for Mr. Bergstein.

7    Q.  Based on what Mr. Bergstein told you, what relationship did

8    Mr. Scher and Mr. Bergstein have?

9    A.  Well, I mean, he seemed like a very close relationship.

10   They were good friends, and he felt that Eugene had helped him

11   in his life, and he liked him, and he gave him this job.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

I2K5ber3                          A. Hallac - direct

1    BY MR. ALLEN:

2    Q.  Were you ever asked to send any money to Mr. Scher?

3    A.  Yes.

4    Q.  Please explain what happened.

5    A.  We made a loan to a firm called Cascade.  Cascade was owned

6    by Daniel Farkas.  Gene Scher began to work for Mr. Farkas in

7    addition to what he was doing at Gerova and he was trying to

8    help him out.  And in that particular loan --

9    Q.  Who was trying to help who out?

10   A.  Mr. Bergstein was trying to help Mr. Scher out.

11   Q.  You said "we had made a loan to Cascade."  Who had made the

12   loan to Cascade?

13   A.  Weston Capital through the Wimbledon C fund.

14   Q.  If you would continue with what you were saying before?

15   A.  Right.

16          So, the Wimbledon C fund made that advance, there were

17   supposed to be fees of commissions to be paid if people raised

18   money, but since we didn't raise the money it came from

19   Wimbledon C, Mr. Bergstein suggested that we actually pay Gene

20   Scher what would have been a commission of $25,000.  And we

21   paid him that.

22   Q.  Where did that money come from?

23   A.  It came from Wimbledon C -- it a came actually from

24   Mr. Farkas' company Cascade, but the original $200,000 that we

25   gave them.

I2K5ber3                          A. Hallac - direct

1  Q.  As far as you understand, had Mr. Scher done any work to

2  earn the $25,000?

3  A.  Not from Wimbledon C.

4  Q.  I want to change subjects for a bit and direct your

5  attention to December of 2011.  Mr. Hallac, did any investor

6  presentations take place in December of 2011?

7  A.  Yes, sir.

8  Q.  To which investors?

9  A.  To the P2 and specifically to the Wimbledon Financing Fund

10  investors.

11  Q.  So, let's focus on the WFF investors and that presentation.

12  How did the December 2011 presentation come about?

13  A.  Well, investors had been waiting for a detailed

14  presentation and information on the financing fund, what was

15  happening with this unwind.  So, even though they were getting

16  information here and there, the fact remains is that they were

17  trying to understand more and what it meant.  So, we agreed to

18  make the meeting December the 14th.

19  Q.  How, if at all, did you prepare for the December 14th, 2011

20  presentation?

21  A.  Well, there were a few people involved.  Mr. Bergstein was

22  involved reviewing it, Paul Parmar was involved reviewing it,

23  and Mr. Wellner did that as well, and a couple of people from

24  our marketing department were doing that.

25  Q.  And did Mr. Bergstein have any role in the -- sorry.

I2K5ber3                         A. Hallac - direct

1          Did you create a presentation, like an actual

2   PowerPoint presentation?

3   A.  Yes.

4   Q.  Did Mr. Bergstein have any role in the creation of that

5   presentation?

6   A.  He definitely looked at it.  He definitely made some

7   changes on many pages, yes.

8   Q.  And did you have any calls with Mr. Bergstein about the

9   presentation in the weeks preceding it?

10  A.  Yes.  There was a lot of calls back and forth.

11  Q.  Ms. Sheinwald, can we please publish Government Exhibit 172

12  and if we could zoom in on the top part?

13          Mr. Hallac what do you see here?

14  A.  I see there is a call between -- this is November 28, 2011,

15  so this was before the actual meeting, and it was probably a

16  presentation between Mr. Bergstein and I.

17  Q.  What is the subject called?

18  A.  The subject was Financing Fund Investor Presentation.

19  Q.  Ms. Sheinwald, can you please expand the area that shows

20  the participants in the call?

21          Who was involved in this call?

22  A.  Andrew Molloy, Albert Hallac, Jeffrey Hallac, Keith

23  Wellner, David Bergstein.

24  Q.  Who is Andrew Molloy?

25  A.  He is the gentleman that was in our marketing department.

I2K5ber3                          A. Hallac - direct

1    Q.  You can take this down.

2            Mr. Hallac, you said, you testified that there were

3    PowerPoint slides that were created for the December 2011

4    presentation.  How involved were you in the presentation of

5    those slides?

6    A.  Well, I wasn't too involved with it generally.  I didn't

7    prepare these presentations, I didn't know how to use a

8    PowerPoint, but I was involved in the sense that I looked at

9    the presentation just a day or two before it was shown to the

10   investors.

11   Q.  And, as you understand it, what was Mr. Bergstein's role,

12   if any, in the PowerPoint slides?

13   A.  If I remember correctly, his work was mostly in trying to

14   come up with the valuation for Arius Libra and how it got to

15   that point.

16   Q.  Ms. Sheinwald, can you please publish Government Exhibit

17   187?

18           This is an e-mail dated December 14th, 2011 from

19   Mr. Bergstein to you and some other people at Weston.  The time

20   this e-mail is sent is December 14th, 2011 at 9:31 a.m.  When

21   is that in relation to when the investor presentation occurred?

22   A.  The presentation occurred at 12:00 noon.

23   Q.  A couple hours earlier the same day?

24   A.  A couple hours later.

25   Q.  And, is there an attachment to this e-mail?

I2K5ber3                          A. Hallac - direct

1   A.  Yes, there is; Weston Arius Libra.

2   Q.  Ms. Sheinwald, page 2, please.

3            Do you recognize this attachment, Mr. Hallac?

4   A.  Yes.  It is slides of the presentation.

5   Q.  Have you reviewed this exhibit before your testimony today?

6   A.  No.  Not today, no.

7   Q.  Let me give you a binder so you can have a paper copy of

8   it.  In totality, can you turn to Government Exhibit 187,

9   please, and quickly flip through the exhibit.

10  A.  Okay.

11  Q.  Is this the final version of the presentation, as far as

12  you can tell, that was given to investors on December 14, 2011?

13           MR. BIENERT:  I apologize, your Honor, but I think the

14  jurors are signaling that some of their monitors aren't

15  working.

16           A JUROR:  None of them are.

17           THE COURT:  Are you seeing anything on your monitor?

18           THE JURY:  No.

19           THE COURT:  No.  Well, it's up on the screen so if you

20  will, for the moment, just look at the screen.  We will see

21  whether we can get that sorted out.

22           Thank you, Mr. Bienert.

23  BY MR. ALLEN:

24  Q.  Mr. Hallac, since you have had a moment to flip flew the

25  presentation, as far as you can tell is it the same as the

I2K5ber3                        A. Hallac - direct

1   final presentation that was actually given on December 14th,

2   2011?

3   A.  Yes, sir.

4   Q.  And, what is your understanding of why Mr. Bergstein was

5   e-mailing you the final version of the presentation on 9:30

6   that morning?

7   A.  Because he went through some of the items that he was

8   interested in making sure that they were correct as per his

9   thoughts and ideas and I sent it to us for printing and to be

10  ready for the luncheon.

11  Q.  So, let's turn to the presentation itself.  Where did the

12  presentation take place?

13  A.  It took place in a restaurant in Palm Beach.

14  Q.  Who attended?

15  A.  Oh, there were the people, a lot of the clients and

16  investors in WFF; people like the Cafaros, people from Family

17  Endowment, there were three or four people there, and these

18  people that were there controlled probably, I would say, 60

19  percent of the fund's assets.

20  Q.  About how long did the presentation last?

21  A.  I would say, in totality, probably a couple of hours.

22  Q.  Who presented at the presentation?

23  A.  It came sequentially.  First, Keith Wellner started out

24  explaining the beginning and the life of Wimbledon Financing

25  Fund.  After that, Paul Parmar rose and talked about the

I2K5ber3                              A. Hallac - direct

1    medical billing industry, what he was planing to do and what

2    his thoughts were regarding acquiring some of these companies.

3    After that, Mr. Bergstein spoke to the clients and investors

4    and told them how he got involved with Gerova and what his

5    involvement would be in the case of Arius Libra and Pineboard.

6    Q.  Ms. Sheinwald, can you please turn to slide 11 which would

7    be page 12 of the e-mail?  And if you can expand the bullets

8    under the header the Arius Libra contribution agreement and

9    make those as big as possible, please?

10          So, Mr. Hallac, the second bullet says Owari arranged

11   for a loan against the hedge fund assets to provide the cash

12   necessary to perform the obligations required pursuant to the

13   unwind agreement.

14          What did you understand Owari to be?

15   A.  Owari is an entity that Mr. Bergstein started and it was

16   the owner of a piece of Arius Libra.

17   Q.  So, when the presentation said that Owari arranged for a

18   loan against the hedge funds assets, was it accurate to say

19   that?

20   A.  No.

21   Q.  Why not?

22   A.  It was partially accurate, but it was actually, more

23   importantly, was not created by him that loan, that was the P2

24   loan he was referring to and he had nothing to do with actually

25   making that loan.

I2K5ber3                           A. Hallac - direct

1   Q.  Did Mr. Bergstein ever, in fact, arrange a Deutsche Bank

2   loan?

3   A.  Never did.

4   Q.  Did he arrange any loans from any third-parties?

5   A.  Never did.

6   Q.  Turn to the next page, please, Ms. Sheinwald, slide 12,

7   page 13.

8            Mr. Hallac, this slide says that Arius owns hedge fund

9   interests subject to $8 million loan, the proceeds of which

10  were used to retire certain obligations created under the

11  unwind agreement, invest in Pineboard.

12           Who issued the $8 million loan that's referenced in

13  this presentation?

14  A.  P2.

15  Q.  How many $8 million loans were there?

16  A.  Just one.

17  Q.  Who was that loan from?

18  A.  P2.

19  Q.  You can take this down, Ms. Sheinwald.

20           Mr. Hallac, in the weeks that followed the December

21  presentation what questions or requests, if any, did you get

22  from WFF's investors?

23  A.  Well, clients were very interested in knowing all about the

24  hedge fund loan, they were interested in knowing how the

25  valuation would come about.  They were very interested in the

I2K5ber3                          A. Hallac - direct

1    contribution agreement that we had and the various items of

2    that nature so that they could understand how this transaction

3    was going to go forward.

4    Q.  And, did you get requests for documents from WFF's

5    investors?

6    A.  Yes, we did.

7    Q.  Did you, in particular, get a request for the contribution

8    agreement?

9    A.  I did personally, yes.

10   Q.  And, did you or others at Weston get requests for documents

11   regarding that $8 million loan that was referenced in the

12   presentation?

13   A.  I think in a few instances, yes, it was sent out.

14   Q.  Did you or anyone else at Weston ever send investors the P2

15   note in response to those requests?

16   A.  We never did.

17   Q.  Did you ever send the pledge agreement between P2 and WFF

18   in those to those requests?

19   A.  No, sir, we did not.

20   Q.  I mean P2 and Arius Libra in response to the requests.

21   A.  No, we did not.

22   Q.  Why didn't you send the investors the P2 note or any

23   related documents?

24   A.  We, unfortunately, had not received any loans yet from

25   Deutsche Bank and it was -- we were in a bad position right now

I2K5ber3                        A. Hallac - direct

1    to inform the P2 investors that we had in fact loaned money

2    when we didn't tell them before.

3    Q.   What do you think would have happened if you had told

4    investors of the loan at that time?

5    A.   You mean around December you mean?

6    Q.   Yes.

7    A.   There would have been a small riot in the restaurant.

8    Q.   Ms. Sheinwald, will you please publish Government Exhibit

9    259?

10           Mr. Hallac, this is an e-mail from Tim Wray dated

11   April 24, 2012, to Mr. Wellner including a number of people

12   including yourself copied.

13           Who is Mr. Wray?

14   A.   Mr. Wray is an executive at Family Endowment.  He

15   represented many of the clients, the larger clients that

16   invested in the WFF fund.

17   Q.   What is Family Endowment?

18   A.   Family Endowment is an advisory company and money

19   management company.

20   Q.   Ms. Sheinwald, if you could please expand the "to" and

21   "from" lines and the first paragraph?

22           Mr. Hallac, we can see in this e-mail Mr. Wray

23   references a follow up information request.  Is there an

24   information request successfully attached to this email?

25   A.   Yes, there is.

I2K5ber3                           A. Hallac - direct

1    Q.  If you can turn to page 6 of the pdf and I will ask you to

2    blow up Financial (if Newco is a privately held entity).

3              Mr. Hallac, if you look at the fourth paragraph it

4    says debt, in unbolded text, and then it says a list of all

5    current debt and a list of all former debt in paragraphs A and

6    B, also in unbolded text and in bolded text, it says limited.

7    One sentence received on Pineboard holding debt (Swartz IP

8    Services Group), with no additional information.

9              Was as you understand it, was this a request for

10   documents related to the $8 million loan that you referenced in

11   the December 14th, 2011 presentation?

12   A.  No, because he has the wrong parties.  In other words, the

13   debt should have been on P2 but he, instead, asked for the debt

14   on Swartz IP.

15   Q.  Mr. Hallac, take a step back.  The fourth request is debt,

16   list of all current debt and list of all former debt.  What is

17   that request asking for?

18   A.  Exactly that.  To give them the total amount of debt that

19   Arius Libra has.

20   Q.  So this is a request for debt that Arius Libra held, right?

21   A.  Yes, sir.

22   Q.  And was that information ever given to Tim Wray or any

23   other investors?

24   A.  No, it was not.

25   Q.  And when there is bolded text, you understand that to be an

I2K5ber3                          A. Hallac - direct

1   updated request?

2   A.  Yes, sir.

3   Q.  Okay.Ms. Sheinwald, we can take this down.

4           Now, did Mr. Wellner tell you that he was going to

5   travel to California around the time of this e-mail which,

6   again, was dated April 24th, 2012?

7   A.  Yes.  He told me he was going to be doing that.

8   Q.  Did Mr. Wellner tell you the purpose of this trip to

9   California?

10  A.  Yes.  He told me he wanted to speak with Mr. Bergstein

11  alone.

12  Q.  And did you meet with Mr. Wellner after he returned from

13  California?

14  A.  Yes, I did.  He came to the New York office.

15  Q.  And, again, where in New York is your office or was your

16  office?

17  A.  It was on Third Avenue and 48th Street.

18  Q.  Approximately when did that meeting take place?

19  A.  Somewhere around May 17th, 18th.  Around that time.

20  Q.  And what, if anything, did Mr. Wellner give you during that

21  meeting?

22  A.  He gave me two documents; one was a note for $8 million

23  between Swartz IP and Arius Libra, and upon looking at it I

24  asked Keith what is this.  He said, well, ask Bergstein and

25  walked away.

I2K5ber3                          A. Hallac - direct

1  Q.  Did Mr. Wellner give you anything else during that meeting?

2  A.  Yes.  He gave me a -- sort of a list of my assets which

3  were to be used as collateral for a loan that Swartz IP was

4  going to make to Purplebox which is the company that I

5  controlled.

6  Q.  We will talk more about Purplebox later but I want to talk

7  about this Swartz IP note that you were given by Mr. Wellner

8  for a second.

9         Ms. Sheinwald, can you please publish what is already

10  in evidence as Government Exhibit 610 and expand on the bottom

11  e-mail?

12         Mr. Hallac, this is an e-mail from Ira Greenberg to

13  Howard Kaplan, with yourself and Mr. Wellner cc'd.  Who is Ira

14  Greenberg?

15  A.  Ira Greenberg was the first lawyer that we had hired at the

16  time that all this craziness were going on.

17  Q.  Who is Howard Kaplan?

18  A.  Howard Kaplan was and still is the lawyer for the clients

19  of the Wimbledon Financing Fund.

20  Q.  And, can you tell whether there were any documents attached

21  to this e-mail?

22  A.  Yes, there were many, including some loan agreements.

23  Q.  And was a loan agreement between Swartz IP and Arius Libra

24  attached to this e-mail?

25  A.  Yes, sir.

I2K5ber3                          A. Hallac - direct

1   Q.   Who is it sent to?

2   A.   It is sent to Howard Kaplan.

3   Q.   And, again, who does Mr. Kaplan represent?

4   A.   All the investors of the Wimbledon Financing Fund.

5   Q.   Ms. Sheinwald, let's go to page 5 of where we are now and

6   expand, please, the title secured note down through -- yes,

7   right there.

8            Mr. Hallac, do you recognize this document?

9   A.   Now I do.

10  Q.   What is it?

11  A.   It's a note, $8 million note.

12  Q.   Between who?

13  A.   Between Arius Libra and Swartz IP.

14  Q.   What's the date of this note?

15  A.   August 3rd, 2011.

16  Q.   Mr. Hallac, when did you first see this note?

17  A.   When Keith Wellner came into my office and dropped it on my

18  desk.

19  Q.   When was that?

20  A.   Around May 17th, 16th.

21           THE COURT:  Of what year?

22           THE WITNESS:  Of 2011.  Sorry.

23           THE COURT:  Thank you.

24  Q.   Did you have any reaction when you saw this document?

25  A.   Yes, you could say that.

I2K5ber3                          A. Hallac - direct

1    Q.  What was your reaction?

2    A.  I was pretty upset.

3    Q.  Why were you upset?

4    A.  Because all of a sudden there is a new note here floating

5    around the world that never existed before.

6    Q.  And what do you mean it never existed before?

7    A.  That that note was never seen by anyone of Weston Capital.

8    This was a note that was probably done much later than August

9    the 3rd.

10   Q.  So let's talk about August the 3rd, 2011.  Did you even

11   know that Swartz IP existed on August 3rd, 2011?

12   A.  No, I did not.

13   Q.  And, by the way, I think you had said the year was -- did

14   you say the year was 2011 or 2012 when you got this document?

15   A.  No, 2012.  I'm sorry if I said '11.

16   Q.  August 3rd, 2011; did you even know that Swartz IP existed

17   at that time?

18   A.  No, I didn't.

19   Q.  And, to be clear, was there a loan from Swartz IP to

20   Arius Libra for $8 million on August 3rd, 2011?

21   A.  No, there was none.

22   Q.  Is this a real or fake document?

23   A.  This is a fake document.

24   Q.  So, the first paragraph says:  For value received,

25   Arius Libra, Inc., promises to pay to the order of Swartz IP

I2K5ber3                          A. Hallac - direct

1   Services, Inc., the principal sum of $8 million.

2              Did, in fact, Arius Libra receive a loan for around $8

3   million in August of 2011?

4   A.  No, sir.

5   Q.  Did Arius Libra receive a loan from anyone in August of

6   2011?

7   A.  No, sir.

8   Q.  Mr. Hallac, did Arius Libra receive a loan in August of

9   2011?

10  A.  Yes.

11  Q.  From who?

12  A.  P2.

13  Q.  And how big was that loan when it was first given?

14  A.  $3.6 million.

15  Q.  How big did it eventually become?

16  A.  A little over $9 million.

17  Q.  Ms. Sheinwald, page 10, please?

18             Mr. Hallac, this is a document entitled pledge

19  agreement and it was also attached to the e-mail we saw

20  earlier.  What do you understand this agreement to be?

21  A.  Well, it simply says it is a pledge agreement between

22  Swartz IP and the Wimbledon Master Fund.

23  Q.  And, what effect do you understand this pledge agreement to

24  have?

25  A.  I mean, I have not seen this particular pledge agreement

I2K5ber3                          A. Hallac - direct

1    before but I am just reading the top part.

2              MR. BIENERT:  Objection, your Honor.  No foundation.

3    He shouldn't be testifying about it.

4              THE COURT:  Yes.  If the witness hasn't seen it

5    before.

6              THE WITNESS:  No.

7              THE COURT:  There is no need for him to be reading

8    from it.

9              THE WITNESS:  No, I agree.  No, I have seen it before.

10   I was just looking to read first paragraph before responding.

11             THE COURT:  Well, read it to yourself.

12             THE WITNESS:  Okay.

13   BY MR. ALLEN:

14   Q.  You also have a paper copy in the binder.

15   A.  Okay.  All right.

16   Q.  Mr. Hallac, this is attached to the e-mail that Ira

17   Greenberg sent to Howard Kaplan with you and Mr. Wellner cc'd,

18   right?

19   A.  Right.

20   Q.  What did you understand this pledge agreement to do,

21   purportedly?

22   A.  It basically makes the WFF fund owing to Swartz IP or

23   assets to Swartz IP.

24   Q.  Does it give Swartz IP collateral?

25   A.  Yes.

I2K5ber3                              A. Hallac - direct

1   Q.  What's the collateral?

2   A.  The -- the hedge funds.

3   Q.  And were those hedge funds previously used as collateral

4   for a different loan?

5   A.  Certainly were.

6   Q.  What loan was that?

7   A.  That was a loan between P2 and Arius Libra for $9 million.

8   Q.  So, as you understand it, who would then have ownership of

9   the WFF assets if this loan note were real?

10  A.  It would be a very confusing situation.

11  Q.  Ms. Sheinwald, can you please go to page 20?

12          Mr. Hallac, who is this note signed by -- or agreement

13  signed by?

14  A.  Mr. Bergstein.

15  Q.  Do you recognize that as Mr. Bergstein's signature?

16  A.  Yes, I do.

17  Q.  You can take that down, Ms. Sheinwald.

18          So, I want to change subjects now.  We have been

19  talking about the P2 fund and the P2 loan for a while and now I

20  want to talk about a different Weston fund which is the

21  Wimbledon TT Fund.  Very quickly, what did Wimbledon TT invest

22  in?

23  A.  It invested in a manager called Tewksbury.

24  Q.  And was the Wimbledon TT Fund invested directly or

25  notionally in the Tewksbury Fund?

I2K5ber3                         A. Hallac - direct

1    A.  It was invested notionally.

2    Q.  What does it mean to be invested notionally in something?

3    A.  In this particular case, Wimbledon TT invested with Soc

4    Gen, which is a big Swiss bank, through the bank.  It did not

5    have a direct contact with the manager Tewksbury so that all

6    ownership was with Soc Gen in the middle and they had the

7    capacity, so they were the only ones to be able to sell us that

8    position.

9    Q.  I am going to direct your attention to the fall of 2011.

10   Were you considering a transaction between Wimbledon TT and a

11   company called Core Clearing at that time?

12   A.  Yes.  Yes, we were.

13   Q.  What was Core Clearing?

14   A.  Core Clearing was owned by a fellow called Steve Sugarman

15   and he was trying to buy a broker-dealer and needed money.

16   Q.  In just a sentence or two, can you please explain the

17   outlines of the Core transaction that was proposed to you?

18   A.  Basically, we would invest $10 million to $12 million, they

19   would use that to purchase the broker-dealer.  They would, in

20   fact, guarantee to pay any redemption or sale of assets that

21   came in, they would also guarantee that at the end of the

22   transaction we would receive 1 percent higher return than

23   Wimbledon TT was normally receiving from the manager, as well

24   as some warrants to go to the investors of TT which were never

25   given.

I2K5ber3                            A. Hallac - direct

1   Q.  Without getting into any of the specifics, did you have any

2   concerns about the deal with Core Clearing?

3   A.  Yes, I had a couple of concerns.

4   Q.  What concerns did you have?

5   A.  Well, number one, that Jason Galanis was involved and was

6   going to end one a lot of that money; and number two, more

7   importantly, when you own a broker-dealer you are not in

8   control, totally, of your cash assets so if I needed to have

9   one of my clients receive $1 million in one week's time, I

10  thought that Mr. Sugarman and Core would not be able to meet

11  that redemption.

12  Q.  Did you discuss the Core Clearing deal with Mr. Bergstein?

13  A.  Yes.  I was in his office in Santa Monica at the time.

14  Q.  Did Mr. Bergstein propose any alternative transactions

15  around that time?

16  A.  Well, he said that if I decided not to do the transaction

17  with Core he would be very happy to speak to Jerry Swartz and

18  have them do it.

19  Q.  Can you please describe the outlines of what Mr. Bergstein

20  proposed to you?

21  A.  It was basically similar, whereby they would get whatever

22  cash from TT we would in fact redeem and give them but they

23  would also do the same thing, they would pay 1 percent more per

24  annum and they would also pay redemptions as they came in.

25  Q.  Now, so if I understand correctly, Mr. Bergstein proposed

I2K5ber3                         A. Hallac - direct

1   that you would pay the Tewksbury returns plus 1 percent; is

2   that correct?

3   A.   Correct.

4   Q.   What were the Tewksbury returns like?

5   A.   Well Tewksbury was a wonderful manager who generally had

6   very consistent returns year in and year out, and at that time

7   he was making about 8 and a half, 9 and a half, 10 percent a

8   year.

9   Q.   And what, if anything, did you tell Mr. Bergstein about

10  Tewksbury returns?  In other words, did you tell him how big or

11  small they were?

12  A.   Yes.  He saw the printout, the one-pager on the Wimbledon

13  TT.

14  Q.   And did Mr. Bergstein say anything about how he was

15  planning to meet the Tewksbury returns plus 1 percent?

16  A.   Well, he pointed out that he was doing a lot of trading

17  recently and that, you know, making, beating 8 and a half or 9

18  percent per annum was really not a big deal and that he

19  probably could do twice as much.

20  Q.   What did Mr. Bergstein tell you about Swartz IP when you

21  were proposing the swap transaction?

22  A.   Well, he mentioned that Swartz IP was owned 75 percent by

23  Jerry Swartz and 25 percent by himself but he ran it --

24  Mr. Bergstein ran it -- and that's all I know about Swartz IP.

25  Q.   Had you ever heard of Swartz IP before Mr. Bergstein

I2K5ber3                          A. Hallac - direct

1   mentioned it in connection with this TT transaction?

2   A.  No, sir.

3   Q.  Who is Mr. Swartz?

4   A.  Jerry Swartz is an inventor, medical inventor who was at

5   the time an older person who was in the midst of a long

6   divorce.  He was pretty wealthy, he invented a couple of very

7   well-received machines, and at the end of the day he was very,

8   very friendly with Mr. Bergstein and, you know, Mr. Bergstein

9   thought this we could do business with him and maybe he would

10  be helping us out which hadn't happened before from the

11  Deutsche Bank loan.

12  Q.  What, if anything, did Mr. Bergstein tell you about

13  Mr. Swartz' involvement in Swartz IP?

14  A.  He said he owned 75 percent of the company and he said that

15  he put in about $16 million to $18 million in it and gave me a

16  balance sheet -- an unaudited balance sheet showing Mr. Swartz'

17  investment.

18  Q.  We will talk about the balance sheet later but before we

19  do, was Mr. Bergstein's claim that Mr. Swartz' involvement in

20  Swartz IP important to you?

21  A.  Absolutely.

22  Q.  Why?

23  A.  He was a known person who was a majority holder of the

24  company so it was a deep pocket to turn to.

25  Q.  Had you ever met Jerry Swartz before?

I2K5ber3                            A. Hallac - direct

1    A.  No.  I met him on August 17th or so.

2    Q.  So, you had met Jerry Swartz on August 17th or so of what

3    year?

4    A.  Of 2012.

5    Q.  2012 or 2011?

6    A.  I'm sorry.  I'm sorry.  2011.

7    Q.  And how did you first meet Mr. Swartz?

8    A.  Mr. Bergstein arranged the meeting.  He has been telling

9    people that he was doing business with Weston Capital and with

10   Jerry Swartz and basically felt that we should get together,

11   especially if we might do something in the future.

12   Q.  To be clear, was there any discussion of Swartz IP during

13   that August meeting with Mr. Swartz?

14   A.  No, sir.  There was none.

15   Q.  Ms. Sheinwald, can you please publish Government Exhibit

16   142?

17           Mr. Hallac, this is an e-mail from Mr. Bergstein to

18   you, Mr. Wellner and your son Jeffrey Hallac.  It is dated

19   November 8, 2011.  The first sentence says:  Spoke to Jerry and

20   I have an arrangement that will work for the total return swap.

21           Who does "Jerry" refer to?

22   A.  Mr. Swartz -- Jerry Swartz.

23   Q.  What do you understand "the total return swap" to refer to?

24   A.  We called that particular transaction with Core and with

25   Swartz IP a total return swap which means basically that you

I2K5ber3                           A. Hallac - direct

1  give me the returns of Tewksbury and guarantee those things and

2  so I'm going to swap you money for a return.

3  Q.  And, in actuality, was the agreement a swap or a loan?

4  A.  It ended up being a loan.

5  Q.  Can you just explain the difference?

6  A.  Yes.  In a swap there is absolutely no guarantee that you

7  are going to make money and, more importantly, a swap also

8  determines a lot of other sets of conditions.

9          In the case here, there was no way that Mr. Bergstein

10  could guarantee the returns.

11  Q.  Mr. Hallac, you testified you were concerned about

12  redemptions with respect to the Core transaction, the Core

13  Clearing transaction.  Did anything about Mr. Swartz'

14  involvement give you comfort with respect to Swartz IP ability

15  to do redemptions?

16  A.  Yes.  I felt, unequivocally, that should we be short $1

17  million for a month that Mr. Swartz would be able to in fact

18  arrange the payment because if you didn't pay a redemption in

19  our business you basically, might as well, be out of business.

20  Q.  Did you think that Swartz IP had assets before you even

21  entered into the transaction?

22  A.  Well, I saw that there was at least $16 million, $18

23  million of liquid assets so it seemed very possible, therefore

24  that Swartz IP could meet all redemptions.  But, still, it was

25  a good thing to know that he was there.

I2K5ber3                          A. Hallac - direct

1  Q.  Ms. Sheinwald, can you please publish Government Exhibit

2  156?

3          Mr. Hallac, this is a November 15th, 2011 e-mail from

4  Mr. Bergstein to you and Mr. Wellner.  Is there an attachment

5  to this e-mail?

6  A.  Yes, sir.

7  Q.  Please read the name of the attachment?

8  A.  SIP BS .pdf.

9  Q.  Ms. Sheinwald, page 2, please, and if we can expand the

10 first half of the exhibit?

11         Mr. Hallac, this is the attachment to the e-mail that

12 we just saw and it has the title Swartz IP services, Inc.,

13 unaudited balance sheet, September 30th, 2011.

14         Did you ask Mr. Bergstein to send you a balance sheet

15 for Swartz IP?

16 A.  Yes, I did.

17 Q.  Why did you make that request?

18 A.  Well, if you are going to be lending them $17.7 million you

19 would like to see a balance sheet.

20 Q.  And, according to this balance sleet, how much cash and

21 securities does Swartz IP have as of September 30th, 2011?

22 A.  Just a little over $16 million.

23 Q.  What does cash and securities refer to?

24 A.  It means that it's money that can be made readily available

25 because even if you own stocks, you can sell them in one day

I2K5ber3                          A. Hallac - direct

1    and get the cash within two to three days.

2    Q.  And, just to be clear, as far as you understand it, is

3    what's on this balance sheet money that Swartz IP had before

4    the transactions were moved to TT or does it include the money

5    that Wimbledon TT was going to lobe to Swartz IP?

6    A.  Clearly, I thought it was money existing before, naturally.

7    Q.  And, according to this balance sheet, does Swartz IP have

8    any other assets beyond the $16.2 million in cash and

9    securities?

10   A.  Yes.  It had a small note receivable and it had also some

11   long-term notes so they must have then -- $2 million to

12   somebody.

13   Q.  What do the total amount of assets that this balance sheet

14   claims that Swartz IP services has?

15   A.  I guess about $18.5 million, $19 million in total.

16   Q.  Do you see a reported total?

17   A.  Yes.  19.4, yes.

18   Q.  Mr. Hallac, you referenced a notes receivable, what is a

19   notes receivable?

20   A.  Basically that Swartz IP must have made a loan so instead

21   of having, they call it a note as opposed to a loan because a

22   note is usually shorter term indebtedness.

23   Q.  And, does this balance sheet suggest to you that Swartz IP

24   owned any companies?

25   A.  Actually, no, it did not.

I2K5ber3                              A. Hallac - direct

1    Q.  And, how can you tell from this balance sheet that

2    Swartz IP did not own any companies?

3    A.  Well --

4              MR. BIENERT:  Objection.  Foundation, your Honor.

5              THE COURT:  Lay a foundation.

6    BY MR. ALLEN:

7    Q.  Mr. Hallac, are you familiar with how balance sheets

8    generally work?

9    A.  Yes, I am.

10   Q.  How long have you spent in finance?

11   A.  60 years.

12   Q.  Have you seen balance sheets that purport to show ownership

13   in other companies?

14   A.  Yes.

15   Q.  Does this balance sheet bear any resemblance to those?

16   A.  No.  Not at all.

17   Q.  Why not?

18   A.  Well, first of all, there is too much cash and securities

19   so you can't be owning any company, that's number one.  Number

20   two, you could not be owning a company just because you have a

21   $2 million note receivable.

22             So, clearly this balance sheet does not own any

23   company.

24   Q.  Do you see where it says investments and subsidiaries and

25   affiliates?

I2K5ber3                          A. Hallac - direct

1  A.  Yes, sir.

2  Q.  How much is represented to have been invested in

3  subsidiaries and affiliates?

4  A.  $500,000.

5  Q.  Is that a meaningful amount to you?

6  A.  Not at all.

7  Q.  Would that $500,000 suggest ownership of a couple of

8  companies?

9  A.  It would not suggest that.

10  Q.  Were the contents of this balance sheet important to you,

11  Mr. Hallac?

12  A.  Yes.

13  Q.  Why were they important to you?

14  A.  They showed at least that there was $16 million, $17

15  million, $18 million of cash available.

16  Q.  To be clear, would you have entered into the Swartz IP

17  transaction if Swartz IP did not have $16.2 million in cash and

18  securities?

19  A.  Probably not.

20  Q.  Why not?

21  A.  Because it's absolutely -- it would have been insane for me

22  to do that and I would not have, at all, have done it.

23  Q.  Would you have had concerns about Swartz IP's ability to

24  meet redemptions if it had no assets?

25  A.  Yes.  Absolutely.

I2K5ber3                        A. Hallac - direct

1  Q.  Ms. Sheinwald, can we please expand the liabilities
2  section?
3          Mr. Hallac, this is the section of the balance sheet
4  entitled Liabilities and Owners' Equity.  What is a liability?
5  A.  When you owe something to somebody.
6  Q.  Can you please describe the liabilities reflected on this
7  balance sheet?
8  A.  It says that there is a note payable to the shareholder of
9  $1 million.
10 Q.  Do you see any loans or debts reflected on this balance
11 sheet other than that one note payable?
12 A.  No.  Just a few small expenses.
13 Q.  Do you see any bank loans reflected on this balance sheet?
14 A.  No, sir.
15 Q.  Do you see any margin loans reflected on this balance
16 sheet?
17 A.  No, sir.
18 Q.  What's a margin loan?
19 A.  It's when you open an account with a brokerage firm and you
20 use that to buy securities and then you ask the broker-dealer
21 to give you a margin loan on all the assets you purchased with
22 that cash.
23 Q.  Based on your review of this balance sheet, did you
24 understand Swartz IP to have any significant liabilities?
25 A.  No, sir.  I did not.

I2K5ber3                        A. Hallac - direct

1    Q.  Was it important to you that Swartz IP did not have any

2    significant liabilities?

3    A.  Yes.  Absolutely.

4    Q.  And, would you have entered into the Swartz IP transaction

5    if in fact Swartz IP had significant liabilities?

6    A.  No.

7    Q.  You can take down this exhibit, Ms. Sheinwald.

8              Mr. Hallac, other than getting a balance sheet, did

9    you make any requests of Mr. Bergstein to help you get

10   comfortable with the Swartz IP transaction?

11   A.  Yes.

12   Q.  What did you request?

13   A.  I asked for an audited balance sheet.  I asked for the name

14   of the -- for the CFO to actually sign the unaudited balance

15   sheet.  I asked for Jerry Swartz to sign the note.

16   Q.  Who is the CFO?

17   A.  His name is Jack something or other.  I'm sorry, it escapes

18   me.

19   Q.  Why would you want the CFO to sign the balance sheet?

20   A.  It would be very comforting instead of just being simply

21   handed a piece of paper.

22   Q.  Why did you want an audited balance sheet?

23   A.  Well, I think when you make these kinds of loans I think it

24   is the least you get is an audited balance sheet.

25   Q.  Why did you want Jerry to sign the agreements?

I2K5ber3                          A. Hallac - direct

1    A.  Because that means that he personally approved it and

2    personally signed it.

3    Q.  And, did Mr. Bergstein agree to have the Swartz IP

4    agreements signed by Mr. Swartz?

5    A.  Yes, he didn't disagree.  He said he would do it but he

6    wanted to wait.

7    Q.  Ms. Sheinwald, Government Exhibit 163, please.

8            Mr. Hallac, this is an e-mail dated November 17th,

9    2011, and is from Mr. Wellner to Mr. Bergstein and you.  The

10   first line says:  Fine with changes.  Let's get it signed by

11   Jerry.

12           When Mr. Wellner says "let's get it signed," what do

13   you understand it to refer to?

14   A.  Well, the agreement.  The whole swap agreement, the loan.

15   Q.  And, do you understand "Jerry" to refer to Mr. Swartz?

16   A.  Yes, sir.

17   Q.  Did you eventually agree to enter into the swap transaction

18   or TT Swartz IP, Wimbledon TT loan with Mr. Bergstein?

19   A.  Yes, we did.

20   Q.  Did you keep asking Mr. Bergstein to have Mr. Swartz sign

21   the agreement even after you had entered into it?

22   A.  Yes.

23   Q.  Did that ever happen?

24   A.  No, sir.

25   Q.  Ms. Sheinwald, can you please publish Government Exhibit

I2K5ber3                           A. Hallac - direct

1   177?

2          Mr. Hallac, this is an e-mail from Mr. Bergstein to

3   you, Jeffrey Hallac and Keith Wellner, and it is dated December

4   4, 2011.  When is December 4th, 2011, in relation to the

5   execution of the Swartz IP agreement?

6   A.  About a month later.

7   Q.  A month?

8   A.  A week, two and a half weeks later.

9   Q.  And the second sentence says:  Just in case you are not

10  able to decipher my fax of Friday, I am resending a list of

11  some of the items that are urgently needed from you.

12         What is the fax that you are referencing here?

13  A.  I had sent a fax two days before because I didn't have a

14  computer available, so I just wrote it and sent it by fax.  So,

15  I felt that he might not be able to read my writing so I sent

16  it by e-mail.

17  Q.  What was in the fax that you sent Mr. Bergstein?

18  A.  Basically a list of requests that we were still awaiting

19  for many transactions such as the TT transaction, we were

20  waiting for balance sheets, Jerry was to sign it.

21         There were many other requests in that list.  There

22  was about maybe 10, 15 requests.

23  Q.  Ms. Sheinwald, can we zoom in on the three bullets

24  beginning with the "closing documents on Tewksbury," which is

25  right there.

I2K5ber3                          A. Hallac - direct

1          So, the first request that you make here is the

2   closing documents on Tewksbury with Soc Gen's name in and

3   signed by Jerry; is that right?

4   A.  Yes, sir.

5   Q.  And the second request is a Swartz balance sheet signed by

6   his CFO.  Right?

7   A.  Yes, sir.

8   Q.  And the third request is:  Arrange for us to be able to log

9   into the Deutsche Bank account at any time to verify the

10  investments as well as the presence of $5 million cash at all

11  times.

12         Why did you ask to be able to log into the Deutsche

13  Bank account?

14  A.  So that, in fact, we could see the list of investments, we

15  could see whether he has actually agreed and was following the

16  request of keeping $5 million in cash at all times.  So, that's

17  the reason for it.

18  Q.  And, did Mr. Bergstein respond to this e-mail?

19  A.  Yes, he did.

20  Q.  Let's turn now to Government Exhibit 179, please.  This is

21  an e-mail, it is dated December 5, 2011, from Mr. Bergstein to

22  you, Jeffrey Hallac and Keith Wellner and the very first line

23  says:  Albert, see my comments on your list.

24         So, can you please expand, Ms. Sheinwald, the same

25  three requests which begin with the closing documents on

I2K5ber3                         A. Hallac - direct

1    Tewksbury and go through arranging to give a login to the

2    Deutsche Bank accounts?

3            Mr. Hallac, you asked for closing documents signed by

4    Jerry.  Can you please read Mr. Bergstein's response to that

5    request?

6    A.  Yes.

7            You have the set signed by Kia indicating the correct

8    parties including the side letter.  When we get a signature

9    back from you, including if we amend for the settlement, I will

10   then get a final Jerry signature.  Each time I go back to him

11   with changes it is an ordeal so this is most efficient.

12   Q.  Was the agreement ever signed by Mr. Swartz?

13   A.  No.  It was never signed.

14   Q.  Did Mr. Swartz ever reach out to you to discuss the

15   agreement?

16   A.  No, sir.

17   Q.  Can you please read Mr. Bergstein's response to your

18   request for the Jerry Swartz balance sheet signed by his CFO?

19   A.  Mr. Bergstein says I am having the whole thing reviewed

20   now.  You will have this by the end of the month to include all

21   the transactions.

22   Q.  Did you, in fact, ever get a signed balance sheet?

23   A.  No, I did not.

24   Q.  Did anyone from Swartz IP ever reach out to you about the

25   balance sheet?

I2K5ber3                          A. Hallac - direct

1   A.  No, sir.

2   Q.  Can you please read Mr. Bergstein's response to your

3   request to be able to log into the Deutsche Bank accounts?

4   A.  His response was there are currently -- there is something

5   appearing on the screen.

6   Q.  Sorry.  It looks like it stoped.

7   A.  It says no device or something like that.

8           Anyway, there are currently four accounts on the same

9   sign in.  Only one pertains to Tewksbury money.  I will split

10  the account out separately.  In the meantime, I will generate a

11  printout every week.

12  Q.  And did Mr. Bergstein ever give you access to any of the

13  Deutsche Bank accounts?

14  A.  No.  We never got direct access.

15  Q.  Did you ever get audited financial sheets for Swartz IP?

16  A.  No.  We never did.

17  Q.  Ms. Sheinwald, you can take down this exhibit.

18          Mr. Hallac, we have talked about your concern that

19  Swartz IP be able to mete out any redemption requests that were

20  filed by investors in Wimbledon TT.

21  A.  Yes, sir.

22  Q.  Did you ask Mr. Bergstein to keep any reserves at Swartz IP

23  in order to meet redemptions?

24  A.  That's why I asked him to keep the $5 million.

25  Q.  Keep $5 million?

I2K5ber3                          A. Hallac - direct

1   A.  In cash.

2   Q.  In cash.

3   A.  Yes, sir.

4   Q.  Ms. Sheinwald, can you please publish Government Exhibit

5   176 and turn to page 2?

6            Mr. Hallac, do you recognize this document?

7   A.  Yes.  It's the side letter that we had in the agreement

8   with Swartz IP.

9   Q.  What's a side letter?

10  A.  It is an additional set of terms and conditions that one

11  adds after an agreement is signed.

12  Q.  Ms. Sheinwald, can you please zoom in on the first full

13  paragraph?  This says that the representations made in this

14  letter are a material inducement to WTT who has relied on the

15  representations contained herein in making their decision to

16  enter into that certain note dated November 14th, 2011, between

17  WTT and Swartz IP Services Group.

18            What do you understand material inducement to mean?

19  A.  All of the various conditions that we asked them in terms

20  of returns, in terms of guarantees, in terms of the getting the

21  document that we had asked for and, most importantly, also

22  receive the returns from Swartz IP but, more importantly, all

23  the materials that we asked of them originally.

24  Q.  So, does material inducement mean that this letter was

25  important to you?

I2K5ber3                          A. Hallac - direct

1    A.  Yes, it was.

2    Q.  When this paragraph says it is a material inducement to

3    WTT, what is WTT?

4    A.  That's called the Wimbledon TT Fund.

5    Q.  Okay.  Ms. Sheinwald, can you please turn to page 3 and

6    zoom in on paragraph 6?

7         Mr. Hallac, can you just read this language, please?

8    A.  Until such time as the note is repaid in full, Swartz IP

9    shall maintain in the Deutsche Bank account the sum of

10   $5 million less any redemption (as defined in the NPA) in other

11   cash or liquid assets.

12   Q.  Who proposed this language?

13   A.  We did.  I did.

14   Q.  And, Ms. Sheinwald, you can take down this -- not the

15   exhibit but the expanded part.

16        Mr. Hallac, did you and Mr. Bergstein also agree to

17   have Swartz IP make any particular payments to anyone?

18   A.  Yes.  We did ask them to make payments of redemptions

19   whenever they happened.

20   Q.  And, what about payments to the Partners II fund?

21   A.  Yes, we did, when we closed the transactions.

22   Q.  Ms. Sheinwald, will you please turn back to page 2 and zoom

23   in on paragraph 3?

24        Mr. Hallac, this paragraph says that upon receipt of

25   $12.5 million from WTT, Swartz IP agrees to make the following

I2K5ber3                          A. Hallac - direct

1    distributions:

2                A.   $3,025,675 to Partners Fund; and

3                B.   $4,474,325 to or as directed by Pineboard

4    Holdings, Inc.

5                Who asked for the $3 million payment to be made to the

6    Partners Fund?

7    A.   I did.

8    Q.   And this says Partners Fund.  Does this actually reference

9    the Partners 2 fund?

10   A.   Yes, sir.

11   Q.   And why did you ask that $3 million be paid to the Partners

12   2 fund?

13   A.   You know, there was still a $9 million obligation owing and

14   I was very concerned that that money would disappear, so I

15   suggested that we make at least a part payment to the P2 fund.

16   Q.   And, to be very clear, where did this $3 million that

17   Swartz IP was paying the Partners 2 fund come from?

18   A.   It came from WTT.

19   Q.   Now, Mr. Hallac, who asked for the $4.4 million to be used,

20   either be sent to or used as directed by Pineboard Holdings?

21   A.   Mr. Bergstein.

22   Q.   Did Mr. Bergstein explain why he wanted $4.4 million to go

23   to Pineboard?

24   A.   Yes; that there were obligations due and they had to get

25   paid sooner rather than later.

I2K5ber3                          A. Hallac - direct

1    Q.  And, did you have an understanding of how that $4.4 million

2    was going to be funded?

3    A.  Well, it was going to be funded temporarily from the money

4    that was in Swartz IP.

5    Q.  Was that money from Wimbledon TT?

6    A.  And that money was from Wimbledon TT, yes.

7    Q.  You can take that down, Ms. Sheinwald.

8             Mr. Hallac, was using Wimbledon TT money to pay back

9    the P2 loan and a fund Pineboard consistent with a notional

10   investment in the Tewksbury Fund?

11   A.  No, sir.  It was not.

12   Q.  Why not?

13   A.  None of our -- first of all, none of our clients knew about

14   it.  As far as being a notional investment, this was not a

15   notional investment.  Giving money though Pineboard was not a

16   notional investment.  The only way you have a notional

17   investment in Tewksbury is if you have a direct line between

18   theirself through a bank to the actual assets and the returns.

19   Q.  Mr. Hallac, did you ultimately enter into the transaction

20   that Mr. Bergstein had proposed with Swartz IP?

21   A.  Yes, sir.

22   Q.  And, did Mr. Bergstein agree to the side letter that we

23   just saw?

24   A.  Yes, sir.

25   Q.  Ms. Sheinwald, can you please publish Government Exhibit

I2K5ber3                              A. Hallac - direct

1    609?

2           Do you recognize this document?

3    A.  Yes, sir.

4    Q.  What is it?

5    A.  It's the front page of the note agreement.

6    Q.  Why is it called a Note Purchase Agreement?

7    A.  Actually, it was supposed to be called a swap, a total

8    return swap.  I think the lawyers ended up calling it a note

9    purchase agreement.

10   Q.  How much of TT's money was transferred to Swartz IP

11   pursuant to this agreement?

12   A.  At the time, it was $17.7 million.

13   Q.  Was that $17.7 million transferred all at once?

14   A.  In two tranches.

15   Q.  About how big was each tranche?

16   A.  One was $12,500,000 the second one was $5,200,000.

17   Q.  Where was the money transferred?

18   A.  It was transferred to the Swartz IP account at Deutsche

19   Bank.

20   Q.  Who controlled that account?

21   A.  Mr. Bergstein.

22   Q.  Where did Wimbledon TT get the money that it transferred to

23   Swartz IP?

24   A.  It had an account with Soc Gen -- Société Générale -- it

25   redeemed, meaning it sold its Tewksbury investment with Soc Gen

I2K5ber3                        A. Hallac - direct

1    and asked Soc Gen to transfer the $17.7 to Swartz IP.

2    Q.  What discussions, if any, did you have with Mr. Bergstein

3    about where the Wimbledon TT money was coming from?

4    A.  We had discussions that it was coming from our investors.

5    Q.  What did you tell Mr. Bergstein?

6    A.  I told him that, you know, we needed to make sure of one

7    the things most importantly, that any time there was a

8    redemption we had to meet that redemption in the time

9    specified.

10   Q.  Now, Mr. Hallac, you testified earlier that you wanted to

11   get Jerry Swartz' signature, you wanted financials and you

12   wanted the CFO's signature before you entered into this

13   agreement.  Did you get those things before you entered into

14   this agreement?

15   A.  No, we did not.

16   Q.  At the time the transaction closed was it your

17   understanding that you would eventually get signatures from

18   Mr. Swartz, audited financials, and a signature by CFO of

19   Swartz IP?

20   A.  I thought we would get that pretty reasonably soon, yes.

21   Q.  And why did you enter into the transaction before you

22   actually got those things?

23   A.  That was a big mistake.

24   Q.  In the lead-up to your execution of the agreement, did

25   Mr. Bergstein ever tell you that he or any of his entities

1    would get fees of any kind for arranging the Swartz IP

2    transaction?

3    A.  No, sir.

4    Q.  Did Mr. Bergstein ever tell you that he was going to use

5    any of the TT money for personal purposes?

6    A.  No, sir.

7    Q.  Did Mr. Bergstein ever tell you that Kia Jam, or any of Kia

8    Jam's companies would be receiving any of the TT money?

9    A.  No, sir.

10   Q.  If Mr. Bergstein or Mr. Jam were to have received -- sorry

11   if Mr. Bergstein were to have told you that he was going to

12   receive some of TT's money himself, would that be something you

13   would have wanted to know?

14   A.  Absolutely.

15   Q.  Why?

16   A.  Because we wouldn't have been able to do the transaction

17   and I -- it was completely and totally illegal.

18   Q.  Is the same thing true with Mr. Jam?

19   A.  Absolutely.

20          MR. ALLEN:  Your Honor, this may be a point to break

21   for lunch.  I am about to change subjects.  Or, I can keep

22   going.

23          THE COURT:  Ladies and gentlemen, I think it's a good

24   time for our lunch break, so let's take our lunch break.

25          Remember, please do not discuss the case and keep an

I2K5ber3                          A. Hallac – direct

1    open mind.  It was foggy but at least a decent temperature this

2    morning.  I hope it has cleared up a little bit and I hope it

3    remains warm and you get to enjoy it.

4              See you at 2:00.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I2K5ber3                        A. Hallac - direct

1              (Jury not present)

2              THE COURT:  Mr. Hallac, just wait where you are,

3    please.

4              THE WITNESS:  I'm sorry.

5              THE COURT:  Now you may step down.  Thank you.

6              THE WITNESS:  Thank you.

7              THE COURT:  See you at 2:00.

8              (Witness excused)

9              MR. IMPERATORE:  Your Honor, I apologize.

10             I wanted to advise the Court we are reaching the point

11   in the trial where we would like to offer the designations of

12   Mr. Bergstein's deposition.  That could be as early as

13   tomorrow.

14             THE COURT:  And where do I find the designations and

15   objections and counter-designations?

16             MR. IMPERATORE:  Your Honor, it was filed on ECF.  We

17   also submitted a paper copy to the Court with the government's

18   designations.

19             THE COURT:  Color version?  No?  Yes.

20             MR. IMPERATORE:  I believe it was but we are happy to

21   provide another copy.  I will let you know.  Let me see what we

22   have.  Thank you.

23             MR. IMPERATORE:  Thank you.

24             (Luncheon recess)

25             (Continued on next page)

I2KPBER4                        Hallac - Direct

1                    A F T E R N O O N   S E S S I O N

2                              2:17 P.M.

3           (Trial resumed; jury not present)

4           THE COURT:  Please remain standing.  I'm almost done

5    on the deposition designations.  I have a lot of stickies.

6           (Jury present)

7           All right.  Please be seated.

8           Mr. Allen, you may continue.

9    BY MR. ALLEN:

10   Q.  All right.  Ms. Sheinwald, would you please publish

11   Government Exhibit 3.

12          Mr. Hallac, does this exhibit show a basic outline of

13   the transaction between Swartz IP and Wimbleton TT?

14   A.  Yes, sir, it does.

15   Q.  And did you plead guilty to any crimes in connection with

16   this transaction?

17   A.  Yes, I did.

18   Q.  Based on the offering memorandum for Wimbleton TT, how was

19   Wimbleton TT's money supposed to be invested?

20   A.  Among other things, it was to be invested in a notional

21   fashion with the traders.

22   Q.  The traders in what?

23   A.  In that fund.

24   Q.  What fund?

25   A.  The Wimbleton TT fund.

I2KPBER4                          Hallac - Direct

1   Q.   Sorry.  How was the Wimbleton TT fund's money supposed to

2   be invested?

3   A.   With Tewksbury, the manager.

4   Q.   And did Swartz IP have any direct or actual exposure to the

5   Tewksbury fund?

6   A.   No, they did not.

7   Q.   So was the loan to Swartz IP a direct or notional

8   investment in the Tewksbury fund?

9   A.   No, it was not.

10  Q.   Why not?

11  A.   Because the cash did not remain with the bank that was

12  facilitating the transaction.  The money went to Swartz IP, and

13  the only way that you can have a notional investment is

14  basically having a direct relationship with the bank that

15  arranges it.

16  Q.   Did you ever tell Mr. Bergstein that Wimbleton TF was only

17  supposed to invest in Tewksbury?

18  A.   Yes.

19  Q.   Ms. Sheinwald, would you please publish Government

20  Exhibit 246 and expand the bottom e-mail.

21          Mr. Hallac, this is an e-mail from Mr. Bergstein, and

22  it's being sent to the e-mail --

23          THE COURT:  Slow down.  Go back.  Start again.

24  Q.   This is an e-mail from Mr. Bergstein, and it's being sent

25  to someone named Dennis Pelino.  The date is May 24th, 2017,

1   and the first line, Mr. Bergstein says:  "Wimbleton TT is

2   basically a feeder fund to the Tewksbury fund, which is not

3   generally available to the public."

4            Mr. Hallac, was that true at the time that

5   Mr. Bergstein sent this e-mail, was Wimbleton TT basically a

6   feeder fund to the Tewksbury fund?

7   A.  It was no longer that.

8   Q.  Why not?

9   A.  Because, to me, a feeder fund into Tewksbury, you have to

10  actually be directed by the manager to create such a fund and

11  where the relationship is between the fund and the trader.  In

12  this case, it was no longer a feeder fund.

13  Q.  And so in this e-mail, again, which is dated May 24th,

14  2012, Mr. Bergstein continues to say:  "Weston recently had a

15  redemption in their Wimbleton TT fund, which created

16  availability for them to bring in another 4 million in the next

17  week or so.  This is a very liquid fund that provides regular

18  returns upwards of 8 percent."

19           Again, Mr. Hallac, at this time, where was Wimbleton

20  TT's money?

21  A.  Actually it was with Swartz IP.

22  Q.  And Wimbleton TT still had money in the Tewksbury fund?

23  A.  No, it did not.

24  Q.  So is it true to say that Wimbleton TT, on May 24th, 2012,

25  was a feeder fund of the Tewksbury fund?

I2KPBER4                        Hallac - Direct

1   A.  No, it was not true.

2   Q.  And is it true to say that Wimbleton TT was a very liquid

3   fund that provides regular returns, upwards of 8 percent,

4   again, in May of 2012?

5   A.  I mean, it was true, but only for Tewksbury, not for the TT

6   fund.

7   Q.  Okay.  Ms. Sheinwald, can you please expand the top e-mail

8   in this exhibit.

9          Mr. Hallac, this is an e-mail from Mr. Bergstein, and

10  it's sent to you, and it's dated May 24th, 2012, at 3:40 p.m.

11  Do you see any attachments to this e-mail?

12  A.  Yes, sir.

13  Q.  And what types of attachments do you see?

14  A.  Well, there's an explanatory memorandum, and there's also a

15  Swartz organization PPM and there's a class TT historical

16  performance.

17  Q.  And just to be clear, is that the explanatory memorandum

18  for the TT fund?

19  A.  Yes, sir.

20  Q.  And who is sending these attachments to who?

21  A.  Mr. Bergstein was sending these attachments to us.

22  Q.  Who is "us"?

23  A.  Keith Wellner, Albert Hallac.

24  Q.  And so to be clear, Mr. Bergstein is sending the TT

25  offering memorandum to you?

I2KPBER4                        Hallac - Direct

1    A.  Yes.

2    Q.  Ms. Sheinwald, can you please go back to Government

3    Exhibit 3.

4            Now, Mr. Hallac, was the agreement with Swartz IP in

5    the best interests of Wimbleton TT's investors?

6    A.  No, sir.

7    Q.  Why not?

8    A.  We redeemed out of an amazing manager that a lot of people

9    wanted to be in, and we put it in with an organization or an

10   entity that we had no understanding whether it had any money or

11   not.

12   Q.  Did you believe that it was wrong to enter into the Swartz

13   IP transaction when you did it in November of 2011?

14           MR. BIENERT:  Objection, relevance, your Honor.

15           THE COURT:  Overruled.

16   A.  Yes, sir.

17   Q.  You did believe it was wrong?

18   A.  Absolutely.

19   Q.  Okay.  And as part of that Swartz IP transaction, was any

20   money transferred to another Weston fund?

21   A.  Yes.

22   Q.  And how much money was transferred and to what fund?

23   A.  Three million and $25 -- $25,000 were transferred from

24   Swartz IP to the Partners fund.

25   Q.  Why was that $3 million transferred to the Partners 2 fund?

I2KPBER4                        Hallac - Direct

1  A.  I had asked for it to be done when we did the side letter;

2  so that P2 could receive some money.

3  Q.  And what was P2 going to do with that money?

4  A.  It was going to go to investors.

5  Q.  Did it have any connection to the P2 loan?

6  A.  It is, in fact, repaying 3 million of that loan.

7  Q.  And was that use of money from Wimbleton TT consistent or

8  inconsistent with your fiduciary duties as an investment

9  advisor?

10 A.  No, they were totally inconsistent.  I did not do the right

11 thing.

12 Q.  Did it create a conflict of interest?

13 A.  Yes, it did.

14 Q.  Could you please explain that conflict of interest?

15 A.  I was taking money from one fund with certain types of

16 shareholders, and transferring it to another fund with

17 different shareholders.

18 Q.  And did you ever disclose the payment that was made from TT

19 to Partners 2 to investors in either of those funds?

20 A.  No, I did not.

21 Q.  Did you or Mr. Wellner disclose the agreement with Swartz

22 IP to investors in the Wimbleton TT fund before or around the

23 time that you entered into that transaction?

24 A.  No, we did not.

25 Q.  Why didn't you disclose it?

I2KPBER4                        Hallac - Direct

1    A.  We were just not disclosing it because they would have

2    turned it all down; so we were not able to do so.

3    Q.  When you say they would have turned it all down, who are

4    you referring to?

5    A.  The investors in P2.

6    Q.  What about the investors in TT?

7    A.  Well, the investors in TT were totally -- they were not

8    told about it; so they were -- you know, they were totally

9    upset.

10   Q.  And how do you think the investors in TT would have reacted

11   if you had told them about the Swartz IP transaction?

12   A.  Well, they wouldn't have been happy, especially that we

13   were using their money to make payments on other things.

14   Q.  Did you believe it was wrong not to disclose the Swartz IP

15   transaction to your investors?

16            MR. BIENERT:  Objection, relevance, your Honor.

17            THE COURT:  Overruled.

18   A.  Yes, sir; I do.

19   Q.  Did you have any discussions with Mr. Bergstein about

20   whether to disclose the Swartz IP transaction to investors?

21   A.  Yes.

22   Q.  What did you say?

23   A.  That we couldn't disclose it.

24   Q.  What did Mr. Bergstein say in response?

25   A.  Not -- you know, not to worry, not to do it because it

1    would destroy the whole structure.

2    Q.  Ms. Sheinwald, you can take down this exhibit.

3         So I want to go back to Swartz IP or actually stay at

4    Swartz IP.  Mr. Hallac, what updates, if any, did Mr. Bergstein

5    give you about Swartz IP's investment activity after you

6    entered into the transaction?

7    A.  Other than a few, two or three weeks' of Deutsche Bank's

8    account statements, we received nothing.  So we did not know

9    what the money did, what it was doing, where it was invested

10   after the first two or three weeks.

11   Q.  So I want to now turn to what's been marked as Government

12   Exhibit 175 and already in evidence.  All right.  This is an

13   e-mail dated December 1st, 2011, from Mr. Bergstein to you,

14   Mr. Wellner and Mr. Hallac.  And could you please read the body

15   of this e-mail?

16   A.  Yes.  "Balances and positions on Swartz account prior to

17   processing in-progress wires.  I will set up a weekly report

18   and a summary of what was sent out and get it to you tomorrow."

19   Q.  And can you turn to page 2, please, and please expand the

20   top half of this page.

21        Mr. Hallac, what do you see here?

22   A.  That's a Deutsche Bank statement.

23   Q.  And what is this a statement for?

24   A.  For the account of Swartz IP, supposedly.

25   Q.  And do you see the account number for this particular

I2KPBER4                         Hallac - Direct

1    account?

2    A.  Yes, sir.

3    Q.  Can you circle it?

4            And, Ms. Sheinwald, can you please zoom in on the

5    balance information, the area below -- you have Key Values, and

6    then it goes down to Total Account Value.

7            What is the total account value that's depicted in

8    this exhibit?

9    A.  It's just under 7,100,000.

10   Q.  All right.  Ms. Sheinwald, if you could go back to

11   Government Exhibit 156, page 2, please.

12           Mr. Hallac, you received an unaudited balance sheet

13   that said Swartz IP had over 16 million cash and securities

14   before the transaction.  What did you make of the difference

15   between what is on the balance sheet and what you saw in the

16   Deutsche Bank balance sheet?

17   A.  What, I mean, they were very, very different.  My

18   assumption was that these were separated accounts because you

19   could not have gone from 16 million in cash, plus 17, 7, and

20   then end up with just $7 million later on.  So I just assumed

21   that this was just the money that TT had given to Swartz IP.

22   Q.  And just to be clear, did you ever see any bank accounts or

23   brokerage accounts that in any way supported the $16.2 million

24   in cash and securities?

25   A.  No, I never did.

I2KPBER4                         Hallac - Direct

1    Q.  Okay.  Ms. Sheinwald, you can take that down.

2             Mr. Hallac, did you receive any other Deutsche Bank

3    screen shots from Mr. Bergstein?

4    A.  Yes, we did.

5    Q.  Ms. Sheinwald, Government Exhibit 180, please.

6             Mr. Hallac, what's the date of this e-mail?

7    A.  December 6th.

8    Q.  Can we go to page 2.  If you could, again, zoom in on the

9    same part of the exhibit.

10            Mr. Hallac, what's the account balance in this screen

11   shot?

12   A.  9,770,000.

13   Q.  Okay.  And that's the funds available to trade, right?  Is

14   there a total account value?

15   A.  Yes, 13,088,000.

16   Q.  Okay.  Let's go now to Government Exhibit 205.  What's the

17   date of this e-mail?

18   A.  March 1st, 2012.

19   Q.  Page 2, please.  Mr. Hallac, do you see an account balance

20   here?

21   A.  Yes, sir.

22   Q.  What's the total account value?

23   A.  12,024,000.

24   Q.  Did these screen shots give you any comfort with the

25   transaction?

I2KPBER4                        Hallac - Direct

1   A.  Well, I mean, it showed that there was some cash in the

2   account and, hopefully, it was true.

3   Q.  And did that mean -- did the fact that there was cash in

4   the account reassure you in any way?

5   A.  Well, I mean, it was a small reassurance but, yes, it did

6   reassure us a little bit.

7   Q.  How so?

8   A.  Well, you know, $12 million, the other amounts of money

9   that were not there, that were missing, could have been

10  invested in other things.  Unfortunately, we were not getting

11  those statements.

12  Q.  Okay.  Now, Ms. Sheinwald, let's go to Government

13  Exhibit 204, please.

14          By the way, Mr. Hallac, when you got -- the last

15  e-mail that we saw was dated March 1, 2012.  At that time, had

16  Mr. Swartz signed any of the contracts?

17  A.  No, sir.

18  Q.  And had you received audited financials?

19  A.  No, sir.

20  Q.  Had the CFO of Swartz IP signed the balance sheet for you?

21  A.  No, sir.

22  Q.  So Government Exhibit 204 -- Ms. Sheinwald, could you just

23  expand the "to" and "from" -- is an e-mail from Dawn Berbes to

24  Mr. Bergstein dated March 1, 2012.  Mr. Hallac, who is Dawn

25  Berbes?

I2KPBER4                          Hallac - Direct

1    A.  She was my assistant.

2    Q.  And did she have access to your e-mail?

3    A.  Yes, sir.

4    Q.  And the subject of this e-mail is:  "Items to be

5    completed," and there's an attachment that is titled:  "Items

6    to complete and agree on 02.27.2012.docx;" do you see that?

7    A.  Yes, sir.

8    Q.  Ms. Sheinwald, can you go to page 4.

9            Is this that same attachment, Mr. Hallac?

10   A.  Yes, sir.

11   Q.  And if we could zoom in on the area headed Hedge Fund

12   Loans/Sale, and one of the bullet says here:  Deutsche Bank

13   loan.  Mr. Hallac, what does the Deutsche Bank loan refer to?

14   A.  This is the loan that we had been expecting since the

15   unwind agreement was done.

16   Q.  Had you received that loan?

17   A.  No, sir.

18   Q.  And what's the date of this attachment?

19   A.  February the 27th, 2012.

20   Q.  And if we could expand that same area again.

21           You also have a bullet here that says:  "What about

22   Swartz 5 million guarantee?"  What does that refer to?

23   A.  Well, that was part of the idea that if Deutsche Bank

24   wouldn't give us a $10 million loan, that Jerry Swartz would

25   then guarantee part of the loan with $5 million.

I2KPBER4                        Hallac - Direct

1  Q.  Okay.  And let's now go to or zoom in on the area under the

2  header Swartz IP/Wimb. TT.

3          Mr. Hallac, the second bullet here references a second

4  side letter.  What's the second side letter?

5  A.  That's the second side letter that went with the second

6  tranche of investments.

7  Q.  And was the second side letter ever executed?

8  A.  As far as I know, yes.

9  Q.  What was the point of that side letter?

10  A.  It had certain additional conditions.

11  Q.  And the fourth bullet here says:  "Separate account so we

12  have total transparency once and for all."  What did that mean?

13  A.  Well, Mr. Bergstein had suggested that he couldn't show us

14  that and give us access because all of the Swartz accounts were

15  commingled and, therefore, he couldn't let us see the whole

16  thing.  So I said here, finally, could you please separate

17  these accounts so we can have transparency once and for all.

18  Q.  And were the accounts ever separated, as far as you know?

19  A.  No, they were not.

20  Q.  Were you ever given access to any of Swartz IP's accounts?

21  A.  No, sir.

22  Q.  So the sixth and seventh bullets say:  "Have agreement

23  signed by Jerry," and "Balance sheet/financials to be signed by

24  CFO."  And, again, had either of these two things occurred at

25  the time you sent this e-mail?

1   A.  No, sir.

2   Q.  So we'll talk about this more later, but do you see any

3   references to redemptions in this attachment?

4   A.  Yes.  That was, unfortunately, a one million dollar

5   redemption in TT, which meant that somebody wanted to get out

6   of their position.  Were looking for one million dollars, and

7   we had to make the payment.

8   Q.  Okay.  Ms. Sheinwald, you can take this down.

9           So let's talk a little bit more about that redemption,

10  Mr. Hallac.  Which investor filed that one million dollar

11  redemption?

12  A.  It was actually a bank on behalf of clients.  It was RBC,

13  Royal Bank of Canada.

14  Q.  Around when did RBC file its redemption request?

15  A.  The end of 2011.

16  Q.  End of 2011 or -- okay.

17  A.  For January of 2012.

18  Q.  Okay.  And how much money?  I think you said it was a

19  million dollars was the size of the request, right?

20  A.  Yes.

21  Q.  How did you find out about the redemption request?

22  A.  So the redemption request went directly to the

23  administrators in the Bahamas, which then sent it to the bank,

24  Société Générale, and they then forward it to us, and we make

25  arrangements for payments to be made and the redemption to take

I2KPBER4                         Hallac - Direct

1   place.

2   Q.  What, if anything, did you tell Mr. Bergstein after you got

3   the RBC redemption request?

4   A.  I said that you had to pay it, not to delay the payment;

5   otherwise, it will be extremely dangerous and disastrous.

6   Q.  What did Mr. Bergstein say in response?

7   A.  He says, you know, he'll make the payment.

8   Q.  And was that redemption paid around the time you asked

9   Mr. Bergstein to pay it?

10  A.  No.

11  Q.  Ms. Sheinwald, can you please publish Government

12  Exhibit 208.

13          All right.  Mr. Hallac, this is an e-mail from Keith

14  Wellner to David Bergstein.  You are cc'd, as well as Jeffrey

15  Hallac, and it's sent on March 9th, 2012.  When is that in

16  relationship to when the redemption request was first made?

17  A.  Well, the redemption request was first made in January of

18  2012, and March 9th it was already late.

19  Q.  What's the subject line of this e-mail?

20  A.  It is:  Dollars still not in.

21  Q.  And what does that refer to?

22  A.  The million dollar payment redemption so that we could pay

23  the client.

24  Q.  Do you have an understanding of why Mr. Wellner was sending

25  this e-mail to Mr. Bergstein?

I2KPBER4                         Hallac - Direct

1   A.  As being the COO and running the administrative offices, he

2   wanted to make sure that this redemption was paid.

3   Q.  All right.  Ms. Sheinwald, Government Exhibit 221, please.

4   You can expand the e-mail.

5          All right.  This is an e-mail from you to

6   Mr. Bergstein, and it's dated April 17th, 2012.  So that's over

7   a month after the last e-mail that we just saw.  Had

8   Mr. Bergstein paid the redemption by April 17th, 2012?

9   A.  No, sir.

10  Q.  And at this point, about how late was the payment on the

11  redemption request?

12  A.  At least three months.

13  Q.  And so this e-mail, you say:  "David, if you didn't do it

14  yesterday, you must make the wire transfer first thing today.

15  As you know, not doing it will create a much bigger problem for

16  us."  What do you mean "not doing it will create a much bigger

17  problem for us"?

18  A.  Well, in the business of fund of funds and hedge funds, if

19  you do not pay a redemption on schedule, it imparts tremendous

20  problems to the investors and they start questioning.  They

21  start talking to others, and before you know it, every investor

22  starts to redeem because they feel something is wrong at the

23  firm.

24  Q.  Ms. Sheinwald, can you please publish Government

25  Exhibit 227 and zoom in on the second e-mail from the top.

1          Mr. Hallac, this is an e-mail from you to

2    Mr. Bergstein with Keith Wellner and Jeffrey Hallac copied, and

3    the date is now April 23rd, 2012.  Had the redemption been paid

4    yet?

5    A.  That's correct, it hadn't been paid.

6    Q.  And in this e-mail you say:  "David, another e-mail this

7    a.m. from Soc Gen looking for the transfer."

8          When you say "from Soc Gen looking for the transfer,"

9    what are you referencing?

10   A.  I'm talking about the one million dollar redemption

11   payment.

12   Q.  And you continue:  "It cannot take four days just to give

13   the coordinates of the fed wire number."  What do you mean by

14   that statement?

15   A.  Well, usually when a wire transfer is delayed or can't be

16   found, the first thing you do is go to the Federal Reserve

17   Board and try to get the details of that transfer, and it will

18   tell you immediately whether it was sent; if so, at what time;

19   and what happened to the money.

20   Q.  Had Mr. Bergstein claimed that he already wired the money?

21   A.  The previous e-mails seem to say that, yes.

22   Q.  And had the redemption, in fact, been paid at this time?

23   A.  No, sir.

24   Q.  You continue in this e-mail:  "You know, as well as I

25   do" -- and if you could highlight this part, Ms. Sheinwald --

1    "you know, as well as I do, that not paying a fund redemption

2    opens up all kinds of Pandora's boxes and puts us in great

3    jeopardy."  What do you mean by "opens up all kinds of

4    Pandora's boxes"?

5    A.  It just opens everybody's eyes to a major problem at Weston

6    Capital.

7    Q.  If you could, Ms. Sheinwald, now go to the top e-mail.

8          And this is an e-mail from David Bergstein to you,

9    copying Jeffrey Hallac and Keith Wellner later that day, and

10   Mr. Bergstein said:  "It was sent."  And does that refer to the

11   redemption payment?

12   A.  Yes, it does.

13   Q.  So overall, how late was Mr. Bergstein in paying the

14   redemption request that you had received from RBC?

15   A.  Basically, over three months; so February, March, April.

16   Q.  And did Mr. Bergstein, as far as you know, try to sell any

17   Wimbleton TT shares to other people during the period

18   redemption was outstanding?

19   A.  Yes.  They sent an e-mail.  Mr. Bergstein sent an e-mail to

20   Dennis Pelino, hoping that he'd buy some of the TT shares, and

21   he also asked us to speak to Jerry Swartz and see whether he'd

22   be interested in owning some Tewksbury.

23   Q.  And did Mr. Bergstein explain to you why he was trying to

24   sell or solicit investment in Wimbleton TT from Mr. Swartz?

25   A.  Well, to help pay for the redemption of one million

I2KPBER4                      Hallac - Direct

1    dollars.

2    Q.  Ms. Sheinwald, can you please publish Government

3    Exhibit 212.

4         Mr. Hallac, this is an e-mail from Jeffrey Hallac to

5    Jerry Swartz, cc'ing David Bergstein, and in this e-mail

6    Jeffrey Hallac says:  "Jerry, I hope things are good with you.

7    David asked me to send you the attached documentation on

8    Wimbleton fund class TT.  If you have any questions, feel free

9    to give me a call."

10        Mr. Hallac, do the names of the attachments on this

11   e-mail look familiar to you?

12   A.  Yes.

13   Q.  What are they?

14   A.  These are all information on the Wimbleton Fund TT, which

15   shows the random, shows the stronghold performance of the

16   manager, the organization, the whole thing.

17   Q.  This e-mail is dated March 15, 2012.  Had the one million

18   dollar RBC redemption been paid at this point?

19   A.  No, sir.

20   Q.  Ms. Sheinwald, can you put up page 2.

21        Mr. Hallac, what do you see here?

22   A.  This is the Wimbleton TT explanatory memorandum.  It's a

23   small offering memorandum.

24   Q.  And what type of information is contained in this

25   explanatory memorandum?

I2KPBER4                          Hallac - Direct

1   A.  Well, it talks about the manager.  It talks about the

2   trading.  It talks about the redemptions and purchases.  In

3   other words, how long do we have.  It talks about the

4   subscription documents, leverage because this fund was

5   leveraged sometimes, it borrowed money; so it gave all the

6   information needed for an investor to make a decision.

7   Q.  And does it include the limits on how Wimbleton TT's money

8   can be invested?

9   A.  Oh, yes, it does.

10  Q.  Ms. Sheinwald, can you go to page 66.

11          Mr. Hallac, do you recognize this document?

12  A.  Yes, sir.  That's a one-pager on Wimbleton TT.

13  Q.  And does it show Wimbleton TT's annual returns?

14  A.  Yes, sir.

15  Q.  Can you circle them?  Okay.

16          Did Mr. Swartz end up buying any shares in TT?

17  A.  No.

18  Q.  And just, you can take this down, Ms. Sheinwald.

19          Just to be clear, around this time, in March of 2012,

20  where was all of TT's money?

21  A.  It was with Swartz IP.

22  Q.  So if there had been an investment in Wimbleton TT, where

23  would that money have gone?

24  A.  Well, good point.

25  Q.  Where would it have gone?

I2KPBER4                          Hallac - Direct

1   A.   Technically speaking, it would have had to go to Soc Gen if

2   Soc Gen had permitted us to have some capacity, but

3   Mr. Bergstein, if he tried to sell some more TT, would make

4   sure that the money would go alongside the other monies that

5   are now in Swartz IP.

6   Q.   Did you learn of other instances where Mr. Bergstein

7   solicited investments in the TT fund from other people?

8   A.   I don't remember offhand.

9   Q.   We saw an e-mail earlier today where there was a

10  solicitation made to Dennis Pelino, right?

11  A.   I saw that, yes.

12  Q.   Can we put 246 back up, please.

13          Do you know who Dennis Pelino is?

14  A.   It's actually a person that I met in Mr. Bergstein's office

15  in Santa Monica.  He was based in Miami.  He seemed to be an

16  old friend of Mr. Bergstein.  You know, he was involved in all

17  kinds of different businesses, and the latest thing that he was

18  doing around that time was getting involved in electronic

19  cigarettes.

20  Q.   And again, in this e-mail, Mr. Bergstein says:  "Weston

21  recently had a redemption in their Wimbleton TT fund, which

22  created availability for them to bring in another $4 million."

23  Was there, in fact, $4 million of availability in Wimbleton TT?

24  A.   No, because we had none received from the bank.

25  Q.   Had you ever told Mr. Bergstein that there was $4 million

I2KPBER4                          Hallac - Direct

1   of availability in Wimbleton TT?

2   A.  No, I did not.

3   Q.  Did you know that Mr. Bergstein was sending this e-mail to

4   Dennis Pelino?

5   A.  I found out later.

6   Q.  Did you know before he sent it --

7   A.  No, sir.

8   Q.  -- that he was going to send it to Dennis Pelino?

9   A.  No, sir.  I did not.

10  Q.  Now, at this time, in May of 2012, Wimbleton TT's money is

11  invested in Swartz IP, right?

12  A.  Yes.

13  Q.  So does the concept of availability even make any sense?

14  A.  No, not at all.

15         MR. BIENERT:  Objection, argumentative.

16         THE COURT:  Overruled.

17  Q.  Can you explain why not?

18  A.  Well, to have availability, it can't be told by

19  Mr. Bergstein to an investor.  To have availability, we have to

20  be in contact with one of the main banks that dealt with

21  Tewksbury.  In this case, Société Générale.  So the only way to

22  know that there's an availability is to be -- is for Swiss --

23  I'm sorry, Société Générale to, in fact, tell us we have

24  availability, are you interested in it or not.  And that's the

25  only way we could have made that transaction from then.

I2KPBER4                    Hallac - Direct

 1          THE COURT:  And Soc Gen is how people commonly refer

 2   to Société Générale, right?

 3          THE WITNESS:  Exactly.

 4          THE COURT:  Thank you.

 5   Q.  What is Société Générale?

 6   A.  Société Générale is a major French bank.  At some time it

 7   was the largest bank in France.

 8   Q.  All right.  Ms. Sheinwald, you can take down this exhibit.

 9          Which, by the way, Mr. Hallac, you testified about the

10   million dollar RBC redemption?

11   A.  Yes.

12   Q.  And we just saw an e-mail in May of 2012 that it claimed

13   there was another redemption that created 4 million in

14   availability.  As far as you know, were there any redemptions

15   in May of 2012 in Wimbleton TT?

16   A.  Not $4 million.  We did have a small redemption around that

17   time, very tiny.

18   Q.  About how big was that redemption?

19   A.  Around 400,000.

20   Q.  All right.  So I want to change subjects for a bit now, and

21   talk about something called Purplebox.  Mr. Hallac, are you

22   familiar with an entity called Purplebox?

23   A.  Yes, sir.

24   Q.  And what is Purplebox?

25   A.  It's an LLC corporation that was created in 2011.  It

1    was -- you know, it was discussed, I think, between Mr. Wellner

2    and Mr. Bergstein.  And Mr. Bergstein thought it would be a

3    good idea for the executives of Weston Capital to create this

4    other entity; so that should there be investment opportunities,

5    they should be put into Purplebox and not into Weston Capital

6    because we were concerned about Jason Galanis taking over

7    Weston and throwing out the managing board.

8    Q.  Who created Purplebox?

9    A.  Actually, Keith Wellner called Rosenman, it's a law firm,

10   to create it.

11   Q.  And around when was Purplebox created?

12   A.  It eventually was created in November of 2011, and I got

13   involved in it.

14   Q.  Who controlled Purplebox?

15   A.  I did.

16   Q.  Did Mr. Bergstein have any role in Purplebox's creation?

17   A.  No.  Other than suggesting it, no.

18   Q.  As far as you know, did Mr. Bergstein have any entities

19   with similar names?

20   A.  Yes, his own, which was called Graybox.

21   Q.  Did Purplebox receive any money from Swartz IP?

22   A.  Yes, it did.

23   Q.  How much?

24   A.  750,000.

25   Q.  When did Purplebox receive that $750,000 from Swartz IP?

I2KPBER4                        Hallac - Direct

1    A.  It was, I think, in early December of 2011.

2    Q.  Who transferred the money from Swartz IP to Purplebox?

3    A.  I'm assuming somebody at Mr. Bergstein's office or himself.

4    Q.  Ms. Sheinwald, could you please publish Government

5    Exhibit 182.

6            Now, Mr. Hallac, this is an e-mail from Dawn Berbes --

7    Berbes or Berbes?

8    A.  Berbes.

9    Q.  This is an e-mail from Dawn Berbes to David Bergstein with

10   you copied, and in the e-mail Ms. Berbes says:  "Hi, David.

11   Please find attached the wire instructions for Purplebox.  Let

12   me know if you need anything else."  And the date of the e-mail

13   is December 7th, 2011.  What do you understand Mrs. Berbes to

14   be doing in this e-mail?

15   A.  She was responding to an e-mail from Mr. Bergstein asking

16   for the wire instructions of Purplebox.

17   Q.  And who is she sending those wire instructions to?

18   A.  Mr. Bergstein.

19   Q.  How much money was ultimately received by Purplebox?

20   A.  Actually, 750,000.

21   Q.  And what did you do with the money when you got it?

22   A.  In early January, 240,000 was transferred to my personal

23   account; 120,000 was transferred to Jeffrey's account; 120,000

24   to Keith Wellner's account; and 250,000 to Weston Capital's

25   account.

I2KPBER4                          Hallac - Direct

1    Q.  Who decided on how the money would be divided up?

2    A.  I did.

3    Q.  What did you do with the $240,000 that you kept?

4    A.  I put it in my bank account.

5    Q.  Did you believe that it was wrong for you to receive money

6    from Swartz IP through Purplebox?

7    A.  Yes.

8    Q.  Why was it wrong?

9    A.  Well, first of all, it ultimately was money from our

10   clients, the TT investors.  Second of all, we did nothing to

11   earn that 750.  That was not supposed to be that way, and so it

12   was a completely wrong thing.

13   Q.  Did you plead guilty to any crimes in connection with the

14   money you received through Purplebox?

15   A.  Yes, I did.

16   Q.  And what, if anything, happened with the $240,000 you

17   received?

18   A.  I was ordered by the SEC to disgorge those funds.

19   Q.  Did you, in fact, do that?

20   A.  Yes, I did.

21   Q.  You testified today that Mr. Wellner went to California in

22   early 2012 -- or sorry, in May of 2012, I think you testified,

23   and came back with some documents; do you remember that?

24   A.  Yes.

25   Q.  Ms. Sheinwald, can you please publish Government

I2KPBER4                          Hallac - Direct

 1    Exhibit 606.

 2              Mr. Wellner, do you recognize this document?

 3    A.  Excuse me?

 4    Q.  Do you recognize -- I'm sorry, did I call you Mr. Wellner?

 5    A.  Yes, you did.

 6    Q.  Mr. Hallac, do you recognize this document?

 7    A.  Yes, I do now.

 8    Q.  What is it?

 9    A.  It's an assignment agreement.

10    Q.  And what's the date of this document?

11    A.  Thank you.  The date is December the 1st, 2011, and it's

12    between Purplebox and Swartz IP Services.

13    Q.  When did you actually get this document?

14    A.  When Keith came back from California around May 17th, 18th,

15    something like that.

16    Q.  And what year?

17    A.  I'm sorry, of 2012.

18    Q.  Had you ever seen this document beforehand?

19    A.  I had not.

20    Q.  As far as you know, did this document exist before

21    Mr. Wellner gave it to you in May of 2012?

22    A.  No, it did not exist.

23    Q.  So do you believe that the December 1st, 2011, date on this

24    document is accurate?

25    A.  No, it's not.

I2KPBER4                          Hallac - Direct

1   Q.  When Mr. Wellner gave you this document, did he say

2   anything about it?

3   A.  I asked him what it was, and he said, well, you know,

4   Mr. Wellner thinks that it will look better that we borrowed

5   money from Swartz IP, and that we got a payment from Swartz IP.

6   So if you hand over all your assets to Swartz IP, it will look

7   like a loan and no harm done.  It will be a payment to us.

8   Q.  Who said that?

9   A.  Wellner said that Mr. Bergstein told him to tell me that.

10  Q.  Okay.  And just to be clear, what did Mr. Wellner tell you

11  that Mr. Bergstein told him to say?

12  A.  That it would appear much better for the Weston guys if

13  this was not a payment directly from Swartz IP to us, to

14  Purplebox, but rather, that it should be a loan to Purplebox by

15  Swartz IP, which would be guaranteed by whatever assets I had

16  left at the time, and they were listed in that form.

17  Q.  And to be clear, had Purplebox done any work or done

18  anything to justify getting a $750,000 payment?

19  A.  No.

20  Q.  And what does this assignment agreement purport to do?

21  A.  It basically purports to have and control all of my

22  remaining assets if somehow Purplebox did not payback 750,000

23  to Swartz IP.

24  Q.  So it transfers -- it makes a transfer into a loan; is that

25  right?

1    A.  That's right.

2    Q.  Did you ever sign this document?

3    A.  No.

4    Q.  Ms. Sheinwald, can you go to the next -- or actually, the

5    next-to-last page of this document, please, or the signature

6    page there.

7            Who is this document signed by?

8    A.  That's Mr. Bergstein.

9    Q.  And who is he signing on behalf of?

10   A.  Swartz IP.

11   Q.  All right.  You can take that down.  Why didn't you sign

12   this document?

13   A.  First of all, the harm was done, and second of all, why

14   should I have my assets at risk for someone that could, with

15   his signature, remove all those assets?

16   Q.  And when you say your assets, do you mean just personal?

17   A.  Yes, you know, mostly small limited partnerships, yes.

18   Q.  Okay.  Mr. Hallac, let's move on a bit.  Are you familiar

19   with an investor in the Wimbleton TT fund named Ian Hilton?

20   A.  Yes, I do.  Yes.

21   Q.  Approximately how much money did Mr. Hilton have invested

22   in the Wimbleton TT fund?

23   A.  A little over 9 million.

24   Q.  Was he one of the larger investor in Wimbleton TT?

25   A.  He was the largest investor.

I2KPBER4                        Hallac - Direct

1    Q.  So I want to direct your attention to early 2012.  Did you

2    meet with Mr. Hilton around that time?

3    A.  Yes.

4    Q.  When?

5    A.  If my recollection was correct, it was around April of

6    2012.

7    Q.  Where was the meeting?

8    A.  It was actually in my New York office.

9    Q.  About how long was the meeting?

10   A.  Not very.  About half an hour, 40 minutes.

11   Q.  And what was the reason for the meeting, as you understood

12   it?

13   A.  Well, he was coming in for a regular visit to see how his

14   investments were doing.  He did tell me at the time that he was

15   a little disappointed in Tewksbury because it wasn't doing as

16   well, in terms of high returns, but he would watch and see what

17   happens.  By the end of the year, he'll make a decision.

18   Q.  Were you concerned or worried about your meeting with

19   Mr. Hilton?

20   A.  Well, I certainly was because I realized that a redemption

21   was coming.

22   Q.  And had you already done the Swartz IP transaction at that

23   time?

24   A.  Yes, sir.

25   Q.  Did you tell Mr. Hilton that you'd entered into the Swartz

I2KPBER4                    Hallac - Direct

1    IP transaction when you met with him?

2    A.  I was thinking of doing it.  I tried to do it, but I

3    just -- I couldn't get it out.

4    Q.  Did you tell Mr. Hilton anything about Swartz IP?

5    A.  No, sir.

6    Q.  Did you and Mr. Hilton discuss the possibility of

7    Mr. Hilton redeeming his investment during that meeting?

8    A.  Yes, but it was a discussion as to performance, and it

9    ended by him saying:  Let's watch a little longer, let's see

10   how Tewksbury does, and then we'll decide.

11   Q.  And what happened?

12   A.  Well, he didn't wait until the end of the year.  He decided

13   at the end of June, beginning of July.

14   Q.  And what did he do at the end of June, beginning of July?

15   A.  He redeemed his whole position, 9.1 million.

16   Q.  Did you tell Mr. Bergstein about Mr. Hilton's redemption

17   request when he made it?

18   A.  Yes.

19   Q.  What did you say?

20   A.  I said:  Well, bad news.  It finally hit us.

21   Q.  And when you say "it finally hit us," what were you

22   referring to?

23   A.  To $9 million of redemption, and probably the complete

24   dissolution of the fund.

25   Q.  What, if anything, did Mr. Bergstein say in response?

1   A.  I really don't remember.  I don't know if I was listening,

2   even, but I really don't remember exactly what he said.

3   Q.  Did Swartz IP ever pay Mr. Hilton's redemption request?

4   A.  No, we did not.

5   Q.  And did lawyers become involved at that point?

6   A.  That's correct.  I had to sign a letter to all the TT

7   investors to tell them that because of the investment into

8   Swartz IP, we could no longer meet redemptions and that they

9   would be frozen.

10  Q.  Did you eventually tell Mr. Hilton about the Swartz IP

11  transaction, after he had asked to redeem his investment?

12  A.  Yes.

13  Q.  What was his reaction when you told him that?

14  A.  He demanded a meeting, and he demanded it through one of

15  our employees, who was a salesperson in our London office.  He

16  called me to arrange the meeting, and basically he just wanted

17  to know what was this Swartz IP?  Why did we do it?  What was

18  in it for the investors?  And, you know, it was a -- looking

19  for answers, basically.  Why do you leave a manager like

20  Tewksbury to go into some unknown entity?

21  Q.  Ms. Sheinwald, can you please show the witness what's been

22  marked for identification as Government Exhibit 613.  To the

23  witness only.

24       Mr. Hallac, do you recognize this document?

25  A.  Yes.

I2KPBER4                          Hallac - Direct

1   Q.  And is this a letter that you sent?

2   A.  Yes.

3             MR. ALLEN:  Government offers Government Exhibit 613.

4             THE COURT:  Any objection?

5             MR. BIENERT:  No, your Honor.

6             THE COURT:  Received.

7             (Government's Exhibit 613 received in evidence)

8             (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I2K5ber5                         A. Hallac - direct

1    BY MR. ALLEN:

2    Q.  Ms. Sheinwald, if you can publish, please?

3              Mr. Hallac, what is the date of this letter?

4    A.  August 30th.

5    Q.  And who is it being sent to?

6    A.  Every investor and every administration office of our

7    clients.

8    Q.  Will you please summarize, very briefly, what you say in

9    this letter?

10   A.  Well, we tried to explain first the Swartz IP transaction

11   and some of the benefits that they would receive from that

12   transaction.  And then we explained that because of

13   insufficient capital, liquid capital, that Swartz IP could not

14   make the $9 million payment.

15   Q.  Mr. Hallac, what about the $16 million that was represented

16   to be in Swartz IP on the balance sheet that Mr. Bergstein sent

17   you?

18   A.  Well, you know, we have never received confirmation of that

19   $16 million, it was never audited.  We also were never told by

20   Mr. Bergstein what he was doing with the money, where he was

21   investing it other than telling us that he was paying less than

22   this and less than that.  But, at the end of the day, we never

23   knew if there was any money before we got there in Swartz IP.

24   We never knew that.

25   Q.  And when you sent this letter to your investors in

I2K5ber5                          A. Hallac - direct

1    Wimbledon TT, was this the first time you made a formal

2    disclosure about the Swartz IP transaction?

3    A.  Yes, sir.

4    Q.  Generally speaking, what was the reaction of your investors

5    to this letter?

6    A.  Most of the investors had small investments but in the case

7    of Mr. Hilton, it was devastating.  He was taken a back, he had

8    Richard Crosby come to New York to meet with me to see what we

9    could do, was there any way to speak to Mr. Bergstein to try to

10   get some money and, you know, there was just an attempt at

11   recovering some of his funds.

12   Q.  Ms. Sheinwald, we can take this down.

13            Let's change subjects for a bit.

14            Mr. Hallac, were you investigated by the Securities

15   and Exchange Commission after the transaction that we have

16   talked about today?

17   A.  Yes.  Yes.

18   Q.  What happened to that investigation?

19   A.  After probably three years, I settled with the SEC for

20   myself and Weston Capital.

21   Q.  When did you settle?

22   A.  In 2014.  July 2014.

23   Q.  What penalties, if any, did you receive through that

24   settlement?

25   A.  I received a penalty of what is called disgorgement, the

I2K5ber5                          A. Hallac - direct

1    $240,000 had to be paid back to the SEC on behalf of the

2    clients, and I received a penalty of an equal amount, and I

3    have paid the full disgorgement plus some of the penalty so

4    far.  The SEC also barred me from being involved in the

5    securities industry.

6    Q.  Did Mr. Bergstein ever tell you that he was being

7    investigated by the SEC?

8    A.  Yes, at one point he did, but he didn't use the word

9    investigated, it was they requested a meeting.

10   Q.  Around when did that conversation take place?

11   A.  Probably end of '13, beginning of '14.  Something like

12   that.  I'm not sure.

13   Q.  Did he call you or did you call him?

14   A.  My recollection is he called me to tell me that he had had

15   a meeting and that it went well and -- go ahead.

16   Q.  What, if anything, did Mr. Bergstein say about the people

17   that questioned him from the SEC?

18            MR. BIENERT:  Objection.  Relevance, your Honor.

19            THE COURT:  Sustained.

20   BY MR. ALLEN:

21   Q.  What, if anything, did Mr. Bergstein tell you about what he

22   said about Mr. Wellner when he was being questioned by the SEC?

23            MR. BIENERT:  Same objection, your Honor.

24            THE COURT:  Sustained.

25            MR. ALLEN:  Your Honor, if we could be seen at side

1    bar there is a clear relevance to this.

2              THE COURT:  Why don't you try a different question.

3    BY MR. ALLEN:

4    Q.  Did Mr. Bergstein say that he was saying anything about

5    trying to divert the focus on him when he was questioned by the

6    SEC?

7    A.  Yes, he did.  He told me that --

8              MR. BIENERT:  Same objection, your Honor.

9              THE COURT:  Overruled.

10   A.  Yes, he did.  He told me that I don't have to worry much

11   because he put on -- most of the blame on Mr. Wellner.

12   Q.  Mr. Hallac, had you also been involved in civil litigation

13   stemming from what happened to Weston?

14   A.  Yes.

15   Q.  Were you sued by Mr. Parmar?

16   A.  Yes.

17   Q.  Did you meet with Mr. Parmar during the course of that

18   lawsuit?

19   A.  Yes, I did.

20   Q.  Around when was that meeting?

21   A.  It had to be in '14, sort of early '14, March.

22   Q.  What was the purpose of that meeting?

23   A.  My attorney was trying to settle with Mr. Parmar.

24   Q.  Settle what?

25   A.  Settle this lawsuit where basically I had nothing do with

I2K5ber5                                A. Hallac - direct

1   it.

2   Q.  And who was present during that meeting?

3   A.  Well, my lawyer Mr. Kaplan, my other lawyer Mr. Chris

4   Albanese, and Parmar and his lawyer were there.

5   Q.  You said Mr. Kaplan.  Howard Kaplan, is that your lawyer?

6   A.  No, my lawyer is Marty Kaplan.  Howard Kaplan is the

7   opposition.

8   Q.  During that meeting did your lawyer say anything about

9   serving up Mr. Bergstein?

10  A.  Yes, I think at one point he mentioned that, yes.

11  Q.  Did you discuss that language with your lawyer before he

12  said it?

13  A.  No.  We didn't talk about it at all.

14  Q.  Did you say anything about serving up Mr. Bergstein?

15  A.  No.  I had no reason to do so.

16  Q.  Did you take your lawyer's statement to mean that you

17  should frame Mr. Bergstein?

18  A.  Not at all.

19  Q.  And at the time of that meeting did you in fact believe

20  that Mr. Bergstein had stolen money from Weston's investors?

21  A.  I believed that.

22  Q.  Mr. Hallac, you were also investigated by criminal

23  authorities for your own crimes, right?

24  A.  Yes, sir.

25  Q.  When did you first learn that you were being investigated

I2K5ber5                          A. Hallac - direct

1  by the government for your crimes?

2  A.  Not for sure, but I think my lawyers were letting me know

3  that there was probably people were going to the prosecutors

4  here in New York, clients, banks, whatever telling them --

5  telling the prosecutors of the experience they've had.  So,

6  somewhere around, you know, after the SEC situation I would say

7  the end of '13, beginning of '14.

8  Q.  Did you eventually meet with the government in connection

9  with their criminal investigation?

10  A.  Yes.  I went there with my attorneys.

11  Q.  And, did you provide the government information about the

12  crimes you had committed while you were working at Weston?

13  A.  Yes, I did.

14  Q.  Did you also provide the government with information about

15  other crimes you committed?

16  A.  Yes, I did.

17  Q.  Did you tell the government that you hadn't paid your taxes

18  for a period of time?

19  A.  Yes, I did.

20  Q.  Please describe what you told the government.

21  A.  I told the government that for a period of about five years

22  I had invested money in all of the Weston Funds that were

23  offshore, meaning not residing in the United States but were

24  residing in offshore domiciles.  While the money was invested

25  in these various offshore funds I did not pay any taxes.  When

I2K5ber5                           A. Hallac - direct

1    the funds were returned and -- excuse me.  At the end of 2009

2    the government instituted what is called an amnesty whereby

3    they were giving people like me, who had invested in offshore

4    activities, the chance to send the money back, pay whatever

5    taxes were owing plus a penalty, and then there would be no

6    question of indictments or jail time.

7    Q.  Did you in fact avail yourself of the amnesty program?

8    A.  Yes.  Yes, I did.

9    Q.  What did you do under the amnesty program?

10   A.  Well, I met with the federal authorities, gave them all of

11   my fund accounts, showed how much money was invested, how much

12   money was -- it was worth that day, where the money was, and

13   they worked out a new tax payment that would be owed under the

14   new circumstances and I made the payments and I got the

15   amnesty.

16   Q.  Just to be clear, did you go through that amnesty program

17   before or after you were being investigated by the SEC and the

18   government?

19   A.  No.  That was before.

20   Q.  And, aside from the tax that you didn't pay on your

21   offshore funds, had you paid the rest of your taxes?

22   A.  Oh, yes.

23   Q.  Now let's change topics for a bit.  Are you familiar with

24   something called Bidz.com?

25   A.  Yes, sir.

I2K5ber5                         A. Hallac - direct

1    Q.   What is Bidz.com?

2    A.   It's a -- it was a public company that Mr. Bergstein was

3    interested in acquiring.

4    Q.   And was there a connection between Bidz.com and the unwind

5    transaction?

6    A.   Well, yes, there is.

7    Q.   What was that connection?

8    A.   Very minor.  It was the fact that in the payments that were

9    made for the unwind some payments were paid to acquire some

10   Bidz stock which were in fact advanced by Wimbledon C.

11   Q.   How did you first learn about Bidz.com?

12   A.   From Mr. Bergstein.

13   Q.   So, let's turn, let me direct our attention to the spring

14   of 2012.  Did Weston become involved in a transaction involving

15   Bidz.com around that time?

16   A.   Yes.

17   Q.   Can you please describe the general nature of the

18   transaction with Bidz.com and how Weston was involved?

19   A.   Well, as I mentioned, Mr. Bergstein needed some additional

20   financing to make the purchase as he wanted to acquire it so

21   that he could turn it private.  What he needed was a guarantor

22   that would have enough money on his balance sheet that can

23   guarantee or make payment for the acquisition should

24   Mr. Bergstein not be able to pay for it.

25   Q.   What was Weston's role going to be in this transaction?

I2K5ber5                          A. Hallac - direct

1   A.   Other than a guarantor, no role.

2   Q.   And, as a guarantor, what would Weston be doing?

3   A.   It would actually hand over a balance sheet which would be

4   acceptable to the board of directors of Bidz and if it were,

5   then we could go ahead and be the guarantor.

6   Q.   Who asked Weston to guarantee the Bidz transaction?

7   A.   Mr. Bergstein.

8   Q.   Did you have any conversations with Mr. Bergstein before

9   whether Weston would actually have to honor that guarantee?

10  A.   Yes.  He assured me that I would never have to honor the

11  guarantee, it was just for a short period of time and if he

12  can't raise the capital elsewhere, he'll just get it from Jerry

13  Swartz.

14  Q.   Did you understand that the guarantee would be part of SEC

15  filings?

16  A.   Yes.  Afterwards.

17  Q.   And did you discuss that with Mr. Bergstein?

18  A.   Yes.

19  Q.   What did he say?

20  A.   He advised me what to do because my lawyer at that time was

21  very, very concerned about what I was doing and so I needed

22  advice and so I went to Mr. Bergstein as to what to do because

23  my attorney wanted to make sure that I was telling the board of

24  directors of Bidz that my balance sheet could not be depended

25  upon.

I2K5ber5                          A. Hallac - direct

1    Q.  I think you are jumping ahead a bit so let's take this one

2    step at a time.

3    A.  Sure.

4    Q.  Did you have any conversations with Mr. Bergstein about

5    which Weston fund would serve as at guarantor for the Bidz

6    transaction?

7    A.  Yes.  The first one was P2.

8    Q.  And please describe the discussions you had about P2

9    serving as a guarantor.

10   A.  The fact was that P2 had a good balance sheet, it had

11   received a lot of money back from the C manager, the managers

12   that we were now ceasing to do business with, and it did have

13   an amount sufficient to work as the guarantee.

14   Q.  Was there a problem with using P2 as the guarantor?

15   A.  Yes.  Unfortunately.

16   Q.  What was the problem?

17   A.  The problem was that I had to liquidate P2 at that time.

18   Q.  And, did you tell Mr. Bergstein that the P2 fund was going

19   to be liquidated?

20   A.  Yes.

21   Q.  And so, what was the outcome of that conversation?

22   A.  Well, he said he would get back to me.  I think we tried to

23   find another fund.  And then at some point --

24   Q.  Did you find another fund?

25   A.  To find another fund.

I2K5ber5                          A. Hallac - direct

1    Q.  Did you find another fund?

2    A.  There was a discussion on his part or my part but, anyway,

3    on both parts that there would be the possibility of

4    Partners III which was our last created fund.  I said to him,

5    unfortunately, Partners III had zero dollars in it.

6    Q.  What do you mean Partners III had zero dollars in it?

7    A.  It was created as a structure.  We were trying to raise

8    capital for that fund but we were not successful so it had no

9    money.

10   Q.  Did you tell Mr. Bergstein that Partners III had no money?

11   A.  Yes, I did.

12   Q.  What did he say in response?

13   A.  Well, he asked me to send him -- I think he already had the

14   Partners II balance sheet and I don't know when, exactly, but

15   he went and created a balance sheet and he said this is Weston

16   Capital Partners Fund III.

17   Q.  Ms. Sheinwald, can you please publish Government Exhibit

18   235, and Mr. Hallac, what is the date and time of this e-mail?

19   A.  May 15th.

20   Q.  What year?

21   A.  I'm sorry.  2012.

22   Q.  What time is this e-mail sent?

23   A.  11:17 a.m.

24   Q.  This is an e-mail from David Bergstein to you and there is

25   an attachment entitled WPIII .pdf.  Do you have an

I2K5ber5                          A. Hallac - direct

1    understanding of what that attachment is?

2    A.  Yes.  It is the Partners Fund III, pdf there is electronic

3    transfer.

4    Q.  To be clear, who was sending that balance sheet to whom?

5    A.  Mr. Bergstein was sending that balance sheet to me.

6    Q.  Ms. Sheinwald if you can turn to page 2.

7         According to this document, Mr. Hallac, what was the

8    financial condition of the Partners III fund?

9    A.  Well, it had an excellent balance sheet.  It had net assets

10   of a little over $55 million.  It had a lot of cash and cash

11   equivalents and it had a lot of investments at fair value, so

12   it was a balance sheet more than sufficient to help guarantee

13   the transaction in Bidz.

14   Q.  And, to be clear, how much money did Partners III actually

15   have?

16   A.  I am afraid to say zero dollars.

17   Q.  So, is this balance sheet truthful or false?

18   A.  It is false.

19   Q.  Who drafted this balance sheet?

20   A.  Well, it came from David and I am assuming he did it.

21   Q.  Did you discuss this balance sheet with Mr. Bergstein after

22   he sent it to you?

23   A.  Well, actually I got a call before it or just after it

24   telling me that I am getting this balance sheet and that I

25   should please send it to Aaron Grunfeld, his attorney in the

I2K5ber5                          A. Hallac - direct

1    transaction.

2    Q.  And, Aaron Grunfeld was Mr. Bergstein's attorney in what

3    transaction?

4    A.  In the Bidz transaction.

5    Q.  And did you do what Mr. Bergstein asked?

6    A.  Yes, I did.

7    Q.  Ms. Sheinwald, can you please publish Government Exhibit

8    236?

9            Mr. Hallac, this is an e-mail dated May 15th, 2012 at

10   11:56 a.m.  Do you know when this e-mail is sent relative to

11   the e-mail that we just saw?

12   A.  Shortly thereafter.

13   Q.  Do you know how many minutes?

14   A.  Quickly, maybe less than an hour, 45 minutes.

15   Q.  And who is this e-mail to?

16   A.  This e-mail is from me to David Bergstein.

17   Q.  David Bergstein is copied.  Who is the e-mail being sent

18   to?

19   A.  I'm sorry.  I sent it to Aaron Grunfeld.  I didn't have my

20   glasses on.  Sorry.

21   Q.  And in this e-mail you say:  Dear Aaron.  We are actually

22   liquidating Partners Fund 2 now.  We would like to switch the

23   commitment letter to Partners Fund III.  I have attached the

24   financial statements for Partners Fund III.

25           Is the Partners III fund balance sheet that

I2K5ber5                         A. Hallac - direct

1  Mr. Bergstein sent you attached to this e-mail?

2  A.  Yes, sir.

3  Q.  And you later say in this e-mail:  Furthermore, we do not

4  wish our commitment letter to become a public document, and if

5  it will be used for that purpose we will need to know well in

6  advance and that all parties reflected in the letter are

7  redacted.

8       Why did you include that language in that e-mail?

9  A.  Actually Mr. Bergstein suggested I put that down because I

10 was very, very concerned to have Partners III which didn't

11 exist, really, advertised all over the place, as having

12 $55 million in it.

13 Q.  Why were you concerned?

14 A.  Because there was no money in the fund.

15 Q.  Did you eventually sign a guarantee on behalf of

16 Partners III in connection with the Bidz transaction?

17 A.  Yes.

18 Q.  Ms. Sheinwald, can you please publish Government Exhibit

19 241?

20      So, this is an e-mail dated May 17th, 2012, so two

21 days later, from Tamara Lipowsky to a bunch of people and I

22 think you are included in the "to" field.  Who is Tamara

23 Lipowsky?

24 A.  She is a lawyer at Bingham and Co. and she is the lawyer of

25 the board of directors for Bidz.

I2K5ber5                           A. Hallac - direct

1   Q.  Did David Bergstein also receive this e-mail?

2   A.  Yes.

3   Q.  Just answering yes or no, do you see any attachments to

4   this e-mail?

5   A.  Yes.

6   Q.  What are they?

7   A.  There is a merger agreement.

8   Q.  Let's now go, Ms. Sheinwald, to page 175.

9           Mr. Hallac, do you recognize this document?

10  A.  Yes.

11  Q.  What is it?

12  A.  That's the guarantee that we gave Mr. Bergstein's company.

13  Q.  What's the date of the guarantee?

14  A.  May 17th, 2012.

15  Q.  And who is the guarantee issued by?

16  A.  It's issued by Partners Fund III.

17  Q.  As you understood it, what was the purpose of this

18  guarantee?

19  A.  The purpose was very clear:  Should Mr. Bergstein's

20  company, which was called Glendon, not pay the money to Bidz as

21  per whatever transaction was going to be concluded, we would

22  stand behind the payment.

23  Q.  So, in other words, you would pay extra money that needed

24  to be paid?

25  A.  Absolutely, yes.

I2K5ber5                          A. Hallac - direct

1    Q.  And, would Partners III have actually had the ability to

2    make those payments?

3    A.  No, it did not.

4    Q.  Why not?

5    A.  It had no money.

6    Q.  Ms. Sheinwald, can you please go to page 181?

7            Mr. Hallac, do you see your signature here?

8    A.  Yes, sir.

9    Q.  And, who are you signing on behalf of?

10   A.  I am signing on behalf of the company Weston Capital but

11   also on behalf of Partners Fund III.

12   Q.  Ms. Sheinwald, we can take that down.

13           Mr. Hallac, who was your lawyer in connection with the

14   Bidz transaction?

15   A.  Marc Reisler.

16   Q.  What law firm was he at?

17   A.  I knew you would ask me that.  I'm sorry.

18   Q.  It's fine if you don't remember, we can show you something

19   later to refresh your memory.

20   A.  It is a well known firm.  I'm sorry.

21   Q.  Did your lawyer eventually confront you about the P3

22   balance sheet?

23   A.  Yes.

24   Q.  And what, if anything, did he tell you?

25   A.  He said to me, look, if I did not go to the SEC and tell

I2K5ber5                          A. Hallac - direct

1    them directly that this was not a balance sheet that was one

2    Weston could depend on and back, in other words that it was not

3    a clear cut, correct balance sheet, that he would go to the

4    SEC.

5    Q.  So, in other words, he found out that the balance sheet was

6    fake?

7    A.  Yes.

8    Q.  Did you have any conversations with Mr. Bergstein after

9    your lawyer threatened to go to the SEC?

10   A.  Yes.

11   Q.  What did you tell Mr. Bergstein?

12   A.  I told him exactly what was happening and what the hell do

13   I do now.

14   Q.  What did Mr. Bergstein say in response?

15   A.  Well, he gave me a bunch of texts to send to that lawyer,

16   the first being that there was what is called lawyer-client

17   privilege and that he had no right to go to the SEC and that,

18   you know, and then he said you might as well fire him and then

19   assure him that you would be going to the SEC with your new

20   attorney.

21   Q.  And so you said Mr. Bergstein told you to fire your lawyer?

22   A.  Yes.

23   Q.  Did you in fact fire your lawyer?

24   A.  Yes.

25   Q.  Ms. Sheinwald, can you please publish Government Exhibit

I2K5ber5                          A. Hallac - direct

1    248 and let's zoom in on the bottom e-mail.

2              So, Mr. Hallac, this is an e-mail dated May 25th, 2012

3    between -- from you to MarcReisler@HKlaw.com -- does that

4    refresh your memory as to the law firm?

5    A.  Yes.

6    Q.  What law firm?

7    A.  I am still looking at it, I will get back to you.

8    Q.  And Mr. Wellner is copied on this e-mail.  In this

9    e-mail -- sorry, there is no subject but you say -- you tell

10   your lawyer in the second paragraph:  We strongly object to the

11   e-mail you are proposing to send Bidz or counsel for Bidz.

12             Why did you tell your lawyer that you strongly object

13   to the e-mail that he was proposing to send to Bidz?

14   A.  Well, as I mentioned, I discussed that whole episode with

15   Mr. Bergstein and so there was a discussion and then that was

16   the first recommendation of what to send him.

17   Q.  And you later say in this e-mail:  You are not allowed to

18   violate attorney-client confidences and am frankly shocked that

19   you would even propose to do so.

20             You continue at the end:  All you have the right to do

21   if you are uncomfortable with matters, as they stand, is to

22   simply resign without providing a reason.

23             Why did you send this email?

24   A.  To make sure that Marc Reisler didn't go to the SEC and

25   that was what Mr. Bergstein suggested to achieve that.

I2K5ber5                          A. Hallac - direct

1   Q.  Did Mr. Bergstein play any role in drafting this e-mail?

2   A.  Yes.  He drafted it and I just copied it.

3   Q.  Ms. Sheinwald, can you zoom in on the e-mail directly above

4   this one?

5           So, Mr. Hallac, this is you forwarding the e-mail that

6   you just sent to your lawyer to Mr. Bergstein and the time here

7   is 12:01 p.m.  Do you know, were you on the east coast when you

8   sent this?

9   A.  Yes, I was.

10  Q.  And, if you could go to the e-mail below this,

11  Ms. Sheinwald.  So, the date -- the time here is 3:01 p.m.?

12  A.  Right.

13  Q.  Do you know why there is a difference between 12:01 p.m.

14  and 3:01 p.m.?

15  A.  No.  I really --

16  Q.  Let me put it this way.  Is there a three-hour time

17  difference in California?

18  A.  Yes.

19  Q.  So, let's go back to the middle e-mail, Ms. Sheinwald.

20          Why did you forward this e-mail to Mr. Bergstein?

21  A.  Just to show him what I meant.

22  Q.  And let's go down to the top e-mail.

23  A.  Yes.

24  Q.  And this is an e-mail from Mr. Bergstein to you, it's dated

25  May 25th, 2012, at 3:14 p.m.  By the way, Mr. Hallac, had you

I2K5ber5                          A. Hallac - direct

1   already signed the guarantee agreement when these e-mail

2   exchanges are occurring?

3   A.  Yes.

4   Q.  So in this e-mail, which is May 25th, 2012 at 3:14 p.m.,

5   Mr. Bergstein says:  Albert, please send the following

6   follow-up e-mail.  Mark, on further reflection, please be

7   notified that we are terminating your representation of Weston

8   and its affiliates in this matter.  We will notify Mr. Grunfeld

9   and counsel for Bidz that we have done so.

10          Who is Mr. Grunfeld?

11  A.  He is Mr. Bergstein's attorney in the Bidz matter.

12  Q.  Let's now go, Ms. Sheinwald, to Government Exhibit 251.  Is

13  this the same general e-mail chain as we just saw?

14  A.  Yes.

15  Q.  In other words, is the bottom e-mail the same e-mail that

16  you had sent to Mr. Reisler that we looked at earlier?

17  A.  Yes, sir.

18  Q.  And, at the top e-mail, if you could highlight that,

19  Ms. Sheinwald, this is an e-mail that Mr. Bergstein sends you,

20  it is dated May 25th, 2012 at 3:27 p.m.  When is that in

21  relation to the e-mail we just saw?

22  A.  I missed the other one but it seemed to be very close, 20

23  minutes or so.

24  Q.  So, the e-mail where Mr. Bergstein tells you to fire

25  Mr. Reisler, when was that e-mail sent in relation to this one?

I2K5ber5                           A. Hallac - direct

1    A.   A little before that.

2    Q.   And, in this e-mail Mr. Bergstein says send this, copy

3    Grunfeld, Keith, blind copy me.   What does it mean to blind

4    copy someone?

5    A.   Believe it or not I didn't know how to do it.   I guess you

6    blind cc someone so that only the person who is receiving it

7    actually sees it but no one else on the e-mail chain sees it.

8    Q.   Okay.   And so, as you understand it, is Mr. Bergstein

9    instructing you to send the e-mail below in a way that he will

10   get it but no one will know he got it?

11   A.   Right.

12   Q.   And that e-mail says Marc, on further reflection, please be

13   notified that we are terminating your representation of Weston

14   and its affiliates in this matter.   As previously expressed and

15   as has been confirmed to you in a copy of Mr. Grunfeld's

16   e-mail, we have already notified Mr. Grunfeld that the

17   financials cannot be relied on and we are taking the necessary

18   steps to clear this error up.   Later today we will notify Bidz,

19   copying you, of your termination.   I hereby instruct you to

20   have no further communications with Bidz or their

21   representative.

22           Did you in fact send this e-mail to Mr. Reisler?

23   A.   I think I did, yes.

24   Q.   And did you in fact fire Mr. Reisler?

25   A.   Yes, I did.

I2K5ber5                          A. Hallac - direct

1   Q.  Ms. Sheinwald, can you please show Government Exhibit 252

2   and zoom in on the top e-mail?

3          Mr. Hallac, this is an e-mail from you to your lawyer

4   Marc Reisler dated May 25th, 2012 at 3:29 p.m.  Do you know how

5   long that is after the e-mail we just saw from Mr. Bergstein?

6   A.  Yes.  Just a couple of minutes.

7   Q.  Do you notice any similarity between this e-mail and the

8   one that Mr. Bergstein wrote for you?

9   A.  If I'm not mistaken it is totally exactly the same.

10  Q.  Ms. Sheinwald, can you please publish Government Exhibit

11  249 and let's zoom in on the bottom e-mail.  Actually, if you

12  can zoom in even further down so we can get a signature block?

13         Mr. Hallac, does this finally refresh your memory as

14  to Mr. Reisler's law firm and what is that law firm?

15  A.  Holland & Knight.

16  Q.  If you can take this down and zoom in on the e-mail?

17         So, this is Marc Reisler, Marc Reisler to you, Keith

18  Wellner is now included, and the date is Friday, May 25, 2012

19  at 5:15 p.m.  In the first sentence of this e-mail Mr. Reisler

20  says:  Albert, this will acknowledge receipt of your e-mail as

21  of 3:29 p.m. terminating Holland & Knight, LLP, as counsel for

22  Weston Capital Management and its affiliate Weston in the Bidz

23  matter.  In the final paragraph Mr. Reisler says:  Please

24  advise Holland & Knight by 12 noon New York time on Tuesday May

25  29, 2012, when and how Weston or it representatives advised

I2K5ber5                        A. Hallac - direct

1   Bidz that the financial statements are inaccurate and cannot be
2   relied upon.  Weston's actions in this regard will influence
3   Holland & Knight's future course.
4          What do you understand Mr. Reisler to be telling you
5   to do in this e-mail?
6   A.  He wants me to make sure that the SEC is aware that this is
7   not a balance sheet to be accepted and he wants -- he want us
8   to do it, otherwise he is still threatening to do it himself.
9   Q.  Ms. Sheinwald, can you please get rid of this zoom?
10          Did you forward this e-mail to Mr. Bergstein?
11  A.  Yes, sir.  I did.
12  Q.  What did Mr. Bergstein say in response?
13  A.  A good start.
14  Q.  Can you highlight that area?
15          What does he say?
16  A.  He said:  A start.
17  Q.  Mr. Hallac, did you hire a new lawyer after Mr. Bergstein
18  instructed to you fire Mr. Reisler?
19  A.  Yes, I did.
20  Q.  How were you introduced to that lawyer?
21  A.  Actually, Aaron Grunfeld, at Mr. Bergstein's
22  recommendation, but anyway, Aaron Grunfeld did in fact
23  introduce me to a fellow called Patel who I found out was in
24  Mr. Grunfeld's offices, they were sharing space.
25  Q.  Who did Mr. Grunfeld represent in the Bidz transaction?

I2K5ber5                        A. Hallac - direct

1    A.  He represented Mr. Bergstein.

2    Q.  Ms. Sheinwald, can you please publish Government Exhibit

3    253 and expand the third e-mail from the top?

4            This is an e-mail from Nimish Patel to you dated May

5    25, 2012.  Who is Mr. Patel?

6    A.  He is the lawyer that Aaron Grunfeld suggested and

7    recommended that I use.

8    Q.  In this e-mail Mr. Patel says:  Hi Albert.  Since this is a

9    extremely time sensitive filing, you should consider using

10   Holland & Knight to finish the review.

11           Were you going to consider using Holland & Knight to

12   finish the review?

13   A.  No, sir.

14   Q.  Why not?

15   A.  That's going right back to where we started and they

16   wouldn't have accepted and he would have gone to SEC.

17   Q.  Ms. Sheinwald, can you please expand the top two e-mails?

18           So, in the bottom e-mail, the bottom e-mail is you to

19   Mr. Bergstein dated May 28, 2012 at 6:45 a.m. and you say this

20   is what the new lawyer sent late on Friday.  I will need to

21   respond to him by tonight.  Any thoughts?

22           What does Mr. Bergstein say in response to this

23   e-mail?

24   A.  He helped me say the following:  Tell him that you already

25   terminated Holland & Knight.  You and them have been through

I2K5ber5                         A. Hallac – direct

1    the filing and you are comfortable with it.  If they need to

2    sign something affirming that, you will.  If you have not

3    formally retained them, make sure that it is effective by early

4    morning tomorrow.

5              THE COURT:  Mr. Allen, how much more do have you in

6    your examination?

7              MR. ALLEN:  Five minutes.

8              THE COURT:  Good.

9              We will rest up with our mid-afternoon break.  Please

10   do not discuss this case among yourselves or with anyone.  We

11   will be back in action in 10 minutes for the remaining five

12   minutes of the examination of this witness.

13             Thank you.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

I2K5ber5                          A. Hallac – direct

1              (Jury not present)

2              THE COURT:  See you in 10 minutes.

3              (recess)

4              THE COURT:  Please remain standing for the jury.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  All right, Mr. Allen, you have 300

3    seconds.

4    BY MR. ALLEN:

5    Q.  Ms. Sheinwald, can you please publish Government Exhibit

6    254?

7           Mr. Hallac, this is an e-mail from Mr. Bergstein to

8    you and Mr. Wellner dated May 29th, 2012 and it says Dear

9    blank, and then continues on.

10          As you understand it, what was the purpose of this

11   e-mail?

12   A.  Well, this was still the fact that I was concerned about

13   the veracity of the Partners III statement and Mr. Bergstein

14   sent me a suggested letter to go to whoever it had to go to

15   either at the board of Bidz or the lawyer of Bidz.

16   Q.  So, let me reparse this letter.  It says:  As I indicated

17   in our communications on Friday, we are now being represented

18   by Richardson & Patel in the Bidz matter.  I trust you will

19   have no further communication with any of the counsel for or

20   directly with Bidz.  As a matter of information, we have

21   notified Mr. Grunfeld that the Partners III financials cannot

22   be relied upon.

23          Was this an e-mail that was being drafted to be sent

24   to Mr. Reisler?

25   A.  Yes.

I2K5ber5                          A. Hallac - direct

1    Q.  And who drafted this e-mail?

2    A.  Mr. Bergstein helped me out with that by sending this

3    particular draft.

4    Q.  Were you worried that Mr. Reisler was going to go to the

5    SEC still?

6    A.  Yes.

7    Q.  Mr. Hallac, did the Bidz transaction eventually close?

8    A.  Yes.

9    Q.  And did you in fact provide a guarantee?

10   A.  No.  Well, we signed -- I provided a guarantee but I did

11   not have to put up any money.

12   Q.  Who was the guarantee provided by?

13   A.  Still remained Partners III.

14   Q.  Was there any effort to switch to a different fund from

15   Partners III?

16   A.  Yes, there was.

17   Q.  What fund was that.

18   A.  Wimbledon C.

19   Q.  How did that effort ultimately turn out?

20   A.  The lawyers for the board of Bidz turned it down.

21   Q.  Why was that?

22   A.  Well, because the balance sheet of the phony P3 was a lot,

23   lot better than Wimbledon C.

24   Q.  And so, after the lawyers for Bidz turned down the

25   Wimbledon C balance sheet, in other words turned down

1    Wimbledon C as the guarantor, what did you do?

2    A.  We left things as they were and then things were filed with

3    the SEC and I kind of waited for things to happen.

4    Q.  When you say you left things as they were, do you mean you

5    kept the P3 balance sheet?

6    A.  Yes.

7    Q.  As far as you know, did Mr. Bergstein or yourself ever tell

8    anyone at Bidz that the P3 balance sheet was fake?

9    A.  Well, I didn't speak to anyone at Bidz.  I don't know what

10   Mr. Bergstein did.

11   Q.  Did you tell anyone at Bidz that the P3 balance sheet was

12   fake?

13   A.  No.  I didn't tell anyone, or anyone at Bidz for sure.

14   Q.  Ms. Sheinwald, you can take down this exhibit.

15             Mr. Hallac, did you plead guilty to any crimes in

16   connection with the guarantee that you issued from the P3 fund

17   in the Bidz transaction?

18   A.  Yes, I did.

19   Q.  Did you know that it was wrong to use the P3 balance sheet

20   at the time that you sent it to Bidz?

21   A.  Yes, I did.

22   Q.  Who sent you the P3 balance sheet?

23   A.  Mr. Bergstein.

24   Q.  Who told you to send that balance sheet to Bidz?

25   A.  Mr. Bergstein.

I2K5ber5                          A. Hallac - cross

1    Q.  Who told you to fire your lawyers after they found out that

2    the P3 balance sheet was fake?

3    A.  Mr. Bergstein.

4              MR. ALLEN:  One second, your Honor.

5              (Counsel conferring)

6              MR. ALLEN:  Nothing further.

7              THE COURT:  You did that with 60 seconds to spare.

8              MR. ALLEN:  I will save those for later.

9              THE COURT:  Mr. Bienert, you may cross-examine.

10             MR. BIENERT:  Thank you.

11   CROSS EXAMINATION

12   BY MR. BIENERT:

13   Q.  Sir, my name is Tom Bienert.

14             You started off talking about in direct the

15   relationship with Fund.com and Mr. Galanis and Weston so I'm

16   going to go back there and start there and try to track,

17   somewhat, this in order of what we went over today.

18             In terms of the Fund.com, this is well before you had

19   met with Mr. Bergstein, right?

20   A.  That's correct.

21   Q.  Is it true that the Fund.com-Gerova relationship goes back

22   to 2009?

23   A.  That's correct.  The end of 2009, beginning of 2010.

24   Q.  And you met Mr. Bergstein in April or so of 2011, a year

25   and a half to two years later, right?

I2K5ber5                          A. Hallac - cross

1    A.   That's correct.

2    Q.   As to the Fund.com deal to acquire Weston, you were the

3    head of Weston at the time of that deal, right?

4    A.   Yes.

5    Q.   And you agreed to sell Weston, in essence your company, to

6    Fund.com, right?

7    A.   Yes.

8    Q.   And you knew that Jason Galanis, who had had issues with

9    the SEC, was affiliated with Fund.com, right?

10   A.   Yes.

11   Q.   Why did you do that deal?

12   A.   First of all, the transaction that took place with Fund.com

13   was in fact brought to me by someone who was then the CEO of

14   Fund.com, his name was Joe Bianco.  Joe Bianco had been a

15   reasonably good friend of mine.  He had suggested that there

16   could be tremendous opportunities with Fund.com as they needed

17   to have a marketing operation.  He pointed out that

18   Mr. Galanis, even though having been censured by the SEC, was

19   definitely someone who is right now not running Fund.com but he

20   really was just simply there to sort of guide it but the person

21   who actually ran Fund.com was Bianco, he told me, as well as

22   the fellow who ran the broker-dealer of Fund.com who is a

23   fellow named Greg Webster.

24   Q.   Was Weston profitable at the time in 2009 when it agreed to

25   go into the transaction to be acquired by Fund.com?

I2K5ber5                          A. Hallac - cross

1    A.  No.  It ceased to be profitable in 2009.

2    Q.  Was Weston able to make redemptions to its investors in

3    2009 at the time it agreed to be acquired by Fund.com?

4    A.  Oh, absolutely.

5    Q.  Did you have an understanding of what Fund.com and

6    Mr. Galanis' objective was in buying Weston?

7    A.  What they told me was they were interested in getting

8    involved in the money management business.  They already owned

9    a company called Advisor Shares which was an ETF company.  They

10   thought we could be extremely helpful to that company by

11   raising capital and bringing the managers.

12           There wasn't much to know about Fund.com.  I know that

13   they had, you know, a name or, you know, sort of a, what you

14   might call a computer name, an Internet name, but at the end of

15   the day there was really nothing to know because there were

16   not -- they were doing nothing.  They just had advisor shares.

17   Q.  So they were a company that did not have any significant

18   value at the time you entered the deal; is that true?

19   A.  No.  They had no value as far as I'm concerned.

20   Q.  But, is it true that as part of this transaction that you,

21   personally, were paid several million dollars?

22   A.  I was paid $2.5 million.

23   Q.  So, at the time you did the Fund.com agreement to let it

24   buy Weston you were paid $2.5 million, right?

25   A.  Yes.

I2K5ber5                          A. Hallac - cross

1  Q.  And, was there also an understanding as part of the deal

2  that you would get paid another $2.5 million at some future

3  date?

4  A.  Well, actually it could have been more than $2.5 million,

5  it just depended when there would be a call on my shares and

6  what the value of Weston would be, so it could have gone up or

7  down but 2.5 was the minimum.

8  Q.  At the time that you entered this agreement that got you,

9  personally, at least $2.5 million, you did not let your

10  investors at Weston know of Jason Galanis who had SEC problems'

11  affiliation with Fund.com, did you?

12  A.  No, I did not.

13  Q.  Now, if we move forward to the next big exchange, at least

14  relevant to this matter we have the WFF and Real Estate Fund

15  assets going into Gerova in exchange for stock in Gerova,

16  right?

17  A.  Yes.

18  Q.  And that occurred in 2010; is that right?

19  A.  Yes.  January 21st, 2010.

20              (Continued on next page)

21

22

23

24

25

I2KPBER6                          Hallac – Cross

BY MR. BIENERT:

Q.  And just so I'm accurate, that's the deal where the WFF
hedge fund securities were given to Gerova, as well as some
real estate fund securities given to Gerova in exchange for
Gerova stock, right?

A.  Yes, 85 million for the clients.

Q.  And at the time that you received the Gerova stock, the
stock was not yet registered and could not even be exchanged at
that time, right?

A.  Not at that time.

Q.  Was giving WFF's hedge fund securities, with a value of
many tens of millions of dollars, in exchange for unregistered
stock, was that something that was allowed by the offering memo
of WFF in 2010 when you did it?

A.  Well, we didn't depend on the offering memorandum.  What we
did is we made a presentation to our investors.  We prepared a
lot of information.  All of the investors knew about that
transaction.  They knew about the exchange of shares, and there
was nothing hidden from them when we made the transaction with
Gerova.

Q.  My question is a little different, sir.  Was that
transaction, independent of what you did or didn't say to
investors, was it something that was within the parameters of
the WFF offering as to how WFF would invest funds for its
investors?

I2KPBER6                       Hallac - Cross

A.  Well, WFF was already invested in funds and had no further
capital.  That's No. 1.

            No. 2, the hedge funds underneath the WFF were in
liquidation by 2009, after what happened in 2007 and 2008.
What's important is had we done the transaction without
speaking to the investors, then the offering memorandum comes
into play, but since we told the investors everything that we
were with doing, it's unimportant what the offering memorandum
would say.

Q.  Sir, let me ask it again.  Yes or no, did you believe at
the time that you did the WFF hedge funds into Gerova in
exchange for stock transaction was within the parameters in the
offering memo of how WFF would invest?

A.  It wasn't.  Absolutely it was not.

Q.  Sir --

A.  It was not within the parameters.

Q.  But is it your testimony that even when something is not
within the parameters of what an offering memo says, it can be
okay to do it, nonetheless, if proper disclosures are made
before doing so?

A.  Yes, that's what I'm saying.

Q.  So for purposes of someone evaluating, let's say an
outsider, whether or not an investment that is done by Weston
is or isn't approved, there's more to the analysis than simply
reading an offering memo, right?

I2KPBER6                    Hallac - Cross

1    A.  I guess.

2    Q.  Well, you just gave us an example, right?

3    A.  Yes.

4    Q.  In other words, the offering memo can sound like you can't

5    do something, but if you disclose things and go over it with

6    investors and you address any potential conflicts or other

7    issues, you can go forward, nonetheless; is that right?

8    A.  Yes.

9             MR. ALLEN:  Object to the form.

10            THE COURT:  Overruled.

11   Q.  But even with all of the disclosures that you gave to the

12   investors about the type of transaction, where you were going

13   to give WFF assets for 80-something-million dollars, or so, in

14   exchange for stock, is it true that you still didn't advise the

15   investors of WFF or RF of the involvement of Mr. Galanis?

16   A.  That is correct.

17   Q.  And, in fact, you admitted as part of pleading guilty --

18   A.  Yes.

19   Q.  -- in this courtroom, or at least in the courthouse, at

20   least that that was something that you did that constituted

21   fraud on your investors?

22   A.  Yes, sir.

23   Q.  Now, in 2010, after the WFF hedge fund assets had gone to

24   Gerova and now WFF, or I should say Weston was holding the

25   stock, the stock price wound up going down to basically,

1    effectively, nothing because of the bad press, and it wasn't

2    registered, right?

3    A.   Yes.

4    Q.   And once it became delisted, you couldn't trade the stock

5    even if it had a value, right?

6    A.   That's correct.

7    Q.   At the time that the stock price was down to zero, namely

8    the Gerova stock price that the WFF fund now had, who was in

9    control of Weston?

10   A.   I always was in control of Weston.

11   Q.   And what impact, if any, did Mr. Galanis have -- or strike

12   that.  Let me ask it better.

13        What ability to weigh in or decide things at Weston

14   did Mr. Galanis have at that time?

15   A.   He didn't really get involved with Weston.  In fact, the

16   hedge funds that belonged to Weston Financing Fund and Real

17   Estate Financing Fund, when they were transferred and exchanged

18   for stock at Gerova, we continued -- "we" Weston Capital and

19   Keith Wellner in particular -- continued to manage the funds.

20   Q.   Even though they were officially part of Gerova?

21   A.   Even though they were officially part of Gerova.

22   Q.   So now we get to the -- we'll get to early 2010 when you

23   guys are -- strike that.

24        Is it true that in early 2010, faced with the

25   situation with stock that had no value, the things that had

I2KPBER6                         Hallac - Cross

1  value to your investors was over at Gerova, you and Mr. Wellner

2  and others were trying to make decisions as to what options you

3  had?

4  A.  You mean beginning of 2011, I presume?

5  Q.  Yes, sir.  If I misspoke, 2011.  Thank you.

6  A.  Could you repeat the question?  Sorry.

7  Q.  Yes, sir.  Is it true that at that timeframe, when you had

8  worthless stock and your assets of value for WFF were in

9  Gerova, you and others in your company were trying to figure

10  out what options you had, right?

11  A.  Yes.

12  Q.  And you mentioned litigation, but you concluded, was not a

13  good option?

14  A.  That's correct.

15  Q.  Why?

16  A.  Well, first of all, litigations are very expensive,

17  unfortunately, and Weston Capital was not full of capital at

18  the time and neither was Gerova.  So you have two entities that

19  basically did not have the capital wherewithal to support a

20  long fight.

21        Second of all, trying to approve all of that would

22  have also probably rendered whatever value existed in the hedge

23  funds worthless by the time the litigation would have ended.

24  Q.  Okay.  And so was it at this timeframe -- what's the

25  timeframe when you're coming to that conclusion, by the way, in

1  2011?

2  A.  Well, very quickly, in the first quarter.

3  Q.  Now, let's go back to when you first would have met

4  Mr. Bergstein, which I think you said you believed was in

5  around April of 2011?

6  A.  Yes, sir.

7  Q.  Do you believe that you would have met with him in around

8  April 11th of 2011?

9  A.  Actually, it was April 12th.

10  Q.  Have you looked at any e-mails or things to refresh your

11  memory so that you recall that date?

12  A.  I recall that date only because it's my daughter's

13  birthday.

14  Q.  So you independently remember April 12th that you met with

15  him?

16  A.  That's correct, sir.

17  Q.  At the time that you would have met with Mr. Bergstein in

18  April of 2011, were you getting pressure from investors in WFF

19  or Real Estate Fund about the situation with Gerova?

20  A.  Well, we were getting some pressures from WFF.  The Real

21  Estate Fund was a sort of a non-entity, so to speak, because

22  there were no clients in REFF.  It was actually a fund that we

23  created for a hedge fund manager, and he then decided to get

24  out of the deal, and we were left with the fund.  So there was

25  no one complaining, but then again, there was no great value

1    there.  But for WFF, yes, people were starting to complain.

2    Q.  Do you remember an investor by the name of Lionel Sterling?

3    A.  Yes, I do.

4    Q.  Tell us about Mr. Sterling and what, if any, pressure, if

5    at all, he was bringing in 2011?

6    A.  Well, rightly so, he was very upset.  He called regularly.

7    He wanted to be updated.  He called mostly Keith, you know,

8    Wellner, and he called me from time to time because he also had

9    a place in Florida.  So I met him a few times down there, you

10   know, and he wanted to know what we were going to do to help

11   him get his money back.

12   Q.  And he was a WFF investor?

13   A.  Yes.

14   Q.  And he was upset because his investment funds, at least,

15   were in Gerova, correct?

16   A.  Well, he was upset before that.  Okay?  Because the market

17   was completely going down, and the valuation of these hedge

18   funds were also going down dramatically; so that was No. 1.

19         What he was upset about is, why did we do the deal

20   with Gerova.  We should have done something better.

21   Q.  At the time of this timeframe, when we get into early 2011,

22   was Weston honoring redemptions in the WFF funds?

23   A.  No.  Redemptions had ceased at the end of 2008.

24   Q.  And similarly, were there actually any investors in the

25   Real Estate fund who could make a redemption?

I2KPBER6                    Hallac - Cross

1    A.  No, that's what I just pointed out to you.

2    Q.  Just WFF.  All right.  If we could go ahead and look at

3    Exhibit Z154?

4    A.  Where do I find that?

5    Q.  Hold on just a second.  I want to make sure that I -- I'm

6    going to bring it to you because I don't think it's in evidence

7    yet.  Sir, I'm going to place in front of you an exhibit marked

8    as Z154.  I simply ask you to look at it, and you can skim

9    through the pages and orient yourself, and see whether you

10   recognize it.  Don't say anything about it, and then let me

11   know.

12   A.  Okay.

13   Q.  Do you recall when you met with Mr. Bergstein, in April of

14   2011, what the topics were that you were going to speak with

15   him about?

16   A.  I thought we were just going to talk about one topic

17   according to Jason and then Mr. Bergstein, and that

18   Mr. Bergstein was interested in hiring Weston Capital and its

19   marketing team to raise money for an entity that would acquire

20   Touchstone that belonged to Disney.

21        Having just finished the Miramax deal, it seemed

22   highly acceptable that there would be another deal possibly

23   taking place.  So I met with him for only one reason, and that

24   is that we might get an opportunity to raise a substantial

25   amount of capital for something that we thought we could.

I2KPBER6                          Hallac - Cross

Q.  Okay.  So let me break this down so we understand it.  So
your initial meeting with Mr. Bergstein was to talk about
potentially raising capital for a new business deal that he was
interested in putting together; is that right?
A.  Yes.  And I was introduced to Mr. Bergstein by Jason.
Jason tried to do me a favor, you know, said that:  You should
go and meet Mr. Bergstein because if you're able to convince
him that you can, you know, it will be a good situation for you
guys.
Q.  And you said you had an interest in meeting with him
because he had done a Miramax transaction.  What was your
understanding of what, and why did it affect your interest in
meeting him?
        MR. ALLEN:  Objection to relevance.
        THE COURT:  I'm going to allow it.  Go ahead.
A.  Well, the fact that he did Miramax simply makes you have a
little bit more confidence that the gentleman can do what he
says he can do, which is to acquire Touchstone.  It just
happened to be three times bigger, but that's all.
Q.  What was Miramax?
A.  That was a movie company that belonged to Mr. Weinstein.
Q.  And what is it you --
A.  And then sold to Disney.
Q.  And what was your understanding of what Mr. Bergstein did
regarding Miramax?

1    MR. ALLEN:  Objection, relevance.

2    THE COURT:  Yes, sustained.

3  Q.  Well, you were there to talk about a particular deal

4  involving Touchstone, right?

5  A.  Right.  This is what I was told we were meeting for, and

6  this is what I was there for, yes.

7  Q.  And Touchstone was films, movies?

8  A.  Touchstone was a big division of Disney, yes.

9  Q.  And so was the idea, at least what you thought you were

10 meeting with Mr. Bergstein for, was to talk about whether your

11 company, Weston, could help him raise money to do a business

12 deal that involved acquiring a film library called Touchstone

13 from the Disney corporation?

14 A.  Yes.

15 Q.  Is it true that one of the things that Weston, as of that

16 timeframe, would hold itself out as doing is helping companies

17 or people raise money for appropriate business deals?

18 A.  Well, not just at that time.  That was our business.  We

19 raised capital for --

20    THE COURT:  All right.  You answered the question.

21 Listen, when you go on, it just prolongs --

22    THE WITNESS:  I know what you're saying.

23    THE COURT:  -- the process.

24    THE WITNESS:  Okay.

25    THE COURT:  You answer the question, and then he'll

I2KPBER6                          Hallac - Cross

1    talk.  Go ahead.

2                MR. BIENERT:  Yes, your Honor.

3    BY MR. BIENERT:

4    Q.  All right.  And after meeting with Mr. Bergstein, did you

5    have follow-up correspondence with him about what y'all had

6    talked about, potentially raising money on a Touchstone deal?

7    A.  Absolutely.  He sent us a whole bunch of documents to show

8    us, you know, how he was planning to do it.

9    Q.  And about how long, if you recall, did you and Weston

10   continue to dialogue with Mr. Bergstein about a potential

11   Touchstone deal, give or take?

12   A.  Say two, three months.

13   Q.  Now, do you know what a placement agreement is?

14   A.  Yes.

15   Q.  What is a placement agreement?

16   A.  It's usually when someone in the business of raising

17   capital arranges for a placement agreement with a firm, be it a

18   movie company or something else.

19   Q.  Is it the type of document that you at Weston would use as

20   part of your business?

21   A.  Yes.

22   Q.  I'm going to ask, if you look at Exhibit B14, and just flip

23   through it to see if you recognize what it is, and let me know

24   once you're through?

25   A.  Okay.

I2KPBER6                          Hallac - Cross

1   Q.  Do you recognize what this document is, without reading

2   from the document?  I just want to know if you recognize it.

3   A.  Yes, it's my lawyer putting together a placement agreement.

4   Q.  And is this something that you actually sent to

5   Mr. Bergstein as part of talking to him --

6              MR. ALLEN:  Objection.

7   Q.  -- about a potential business deal?

8              THE COURT:  Basis?

9              MR. ALLEN:  Reading from the document and relevance.

10             THE COURT:  Sustained.

11             MR. BIENERT:  May I address relevance, your Honor?

12             THE COURT:  No.  I sustained.  You're reading from a

13  document not in evidence.

14             MR. BIENERT:  Fair enough, your Honor.

15             THE COURT:  I don't have to get to a second basis.

16             MR. BIENERT:  Yes, your Honor.

17  BY MR. BIENERT:

18  Q.  So without -- I'm not going to read anything from the

19  document, but do you recognize the "to" and "from" as e-mails

20  you recognize and may have been using or corresponding through

21  around the date that's on this document?

22  A.  Yes, sir.

23  Q.  And do you recognize this document to be the type of thing

24  that you would be engaging in business in, in or around this

25  time frame?

I2KPBER6                          Hallac - Cross

1   A.  Yes, sir.

2              MR. BIENERT:  Your Honor, I'd ask to move in evidence

3   Exhibit B14.

4              THE COURT:  All right.  Any objection?

5              MR. ALLEN:  Objection, relevance, and it's also

6   hearsay.

7              MR. BIENERT:  I can address your Honor about it.

8              THE COURT:  Sustained.

9   BY MR. BIENERT:

10  Q.  Now, when do you believe was the first time that you would

11  have spoken with Mr. Bergstein about what was come to be known

12  as the unwind agreement?

13  A.  My recollection is somewhere around May, June.

14  Q.  Of 2011, right?

15  A.  Yes, sir.

16  Q.  So after meeting with him and having the discussions you

17  already described for us, it was at some point later that the

18  idea of a potential unwind of the Gerova, Weston, WFF deal came

19  up, right?

20  A.  Yes.

21  Q.  And we looked at Exhibit C14.  If we can bring that up.  I

22  believe that's in evidence.  I think it's a government exhibit.

23  If we could pull up Government Exhibit 100.  It's in evidence;

24  so you can publish.

25             Okay.  Sir, do you remember talking about this with us

I2KPBER6                        Hallac - Cross

1    on direct testimony?  Mr. Allen went over it with you?

2    A.  Yes, sir.

3    Q.  And is it just fair to say is that this is Mr. Bergstein,

4    in July of 2011, sending you broad-stroke steps of what we've

5    come to call the unwind from Gerova, and then the medical

6    acquisition going forward?

7    A.  That's the second e-mail you're referring to?

8    Q.  Yes, sir.  I think it's the e-mail -- yes, sir.  It's the

9    second e-mail.

10   A.  Okay.  Yeah, that was -- we received many of those but,

11   yes, that was one of the ideas to try to arrive at a structure

12   and a financial arrangement.

13   Q.  And is it accurate, sir, that if you received this e-mail

14   on July 11th, or thereabouts, you would have spoken, as a

15   concept, about this with Mr. Bergstein in, let's say, the weeks

16   before that?

17   A.  It seems so.

18   Q.  And so if we look at this in terms of the broad strokes, it

19   notes that there are three big headings, the Gerova unwind, the

20   Matrix medical acquisition, and then the merger into a public

21   shell.  Do you see that last entry?

22   A.  Yes, sir.

23   Q.  What was your understanding of what the merger into a

24   public shell aspect of the deal would accomplish, and what was

25   the purpose of it?

I2KPBER6                         Hallac - Cross

1    A.  Well, the e-mail stopped right after the first line.  I'm

2    sorry, I can't -- about the merger part.

3    Q.  Yes, sir.

4    A.  If you can move it up a little bit.

5    Q.  Can we go to the next page?

6    A.  Yes, sir.

7    Q.  Are you able to see it, sir?

8    A.  Mmm, hmm.

9    Q.  What was your understanding of what the purpose and intent

10   of -- in the step-by-step progression of the deal that you guys

11   were discussing would be the merger into a public shell?

12   A.  Well, the merger of a public shell, I think, talked about

13   Bidz, and Mr. Bergstein had a thought of putting Bidz and

14   Cascade together.  And then when we acquired the medical

15   billing business, you know, at that point, they could all fit

16   together and would accrue tremendous value by the mere fact

17   that they were all in a public company.

18           This e-mail that I'm looking at, just so you know,

19   there have been many different descriptions of potential

20   structures.  This is not the one that we finalized with at all.

21   Q.  Okay.  So this is just a broad-stroke structure, and things

22   changed over time?

23   A.  Absolutely.

24   Q.  But is it fair to say that in 2011, in the early stages of

25   the discussion, part of the endgame of the process would be to

I2KPBER6                          Hallac - Cross

1   merge into a public shell?

2   A.  That was his idea, yes.

3   Q.  And when you discussed this, was it your understanding that

4   the merger into a public shell could provide more value for the

5   business proposition?

6   A.  Frankly, I was not that interested in getting involved in a

7   public business at the time.  I felt that a private placement

8   was much easier to raise money with, and I was much more

9   interested in the medical billing business.  And all that I was

10  waiting for, for this particular piece of the business, was we

11  were waiting to acquire the assets, and we were waiting for

12  capital for us to be able to raise money for the medical

13  billing business.

14          So, you know, I'm agreeing with you, but there's a lot

15  of things going on between the time I met Mr. Bergstein on

16  July 11th.

17  Q.  Okay.  You made a reference to a private placement memo,

18  raising money that way.  Explain to us what you mean by raising

19  money in a private placement memo?

20  A.  Well, the first document you showed me was indeed a

21  placement agreement because the first thing we were trying to

22  do was to try to do something with Pagoda, whether it being the

23  so-called entity that would acquire Touchstone.  He was also

24  working Touchstone with Jason Galanis, ultimately part of the

25  Touchstone deal.  In fact, Pagoda was run by --

I2KPBER6                          Hallac - Cross

1              MR. ALLEN:  Your Honor, move to strike.  This is about

2    a document not in evidence.

3              THE COURT:  I'm going to let it stand, but you

4    finished your answer.

5    Q.  Just in simple terms, is using a private placement memo one

6    method of trying to raise money?

7    A.  Absolutely.

8    Q.  And is that a method that you guys, at Weston, had used as

9    a part of your business?

10   A.  Right.

11   Q.  Is it true that, as part of the business deal we're

12   discussing, that Weston had agreed to raise money for

13   Pineboard?

14   A.  Yes, absolutely.

15   Q.  Is it true that Weston had agreed to raise money for a

16   company called Cascade?

17   A.  Absolutely.

18   Q.  Is it true that one of the things that you spoke about with

19   the folks at Bidz, and specifically the head of it, a guy named

20   David Zinberg --

21   A.  Yes.

22   Q.  -- is trying to raise money for Bidz?

23   A.  Correct.

24   Q.  Now, let's now get to the unwind.  So the unwind

25   transaction is discussions in the summer of 2011; is that

1    right?

2    A.  Yes.

3    Q.  And it basically culminates on documents that are dated as

4    of dates of, I guess, July for the unwind agreement; does that

5    agreement?

6    A.  Mmm, hmm.

7    Q.  Is that a "yes"?

8    A.  Yes.  Sorry.

9    Q.  And August 3rd for the documents that basically show

10   collateral going into Arius Libra and loans of P2 and those

11   documents; do you remember those topics?

12   A.  Yes, sir.

13   Q.  Was all of this, though, basically happening around the

14   same time?

15   A.  Yes.

16   Q.  And it was happening around early August 2011?

17   A.  Yes.

18   Q.  And as part of the unwind, there were several payments that

19   were going to be made as part of the unwind process from the

20   money that was paid in by the P2 fund, right?

21   A.  Yes.

22   Q.  So, in essence, when the unwind occurred, the new company,

23   Arius Libra, was going to get the hedge fund assets that used

24   to be from WFF but were in Gerova, right; is that right?

25   A.  Yes.

I2KPBER6                          Hallac - Cross

1    Q.   And the new company, Arius, was going to get the loan money

2    from Partners 2, right?

3    A.   Yes.

4    Q.   And in exchange, Arius Libra was going to give Partners 2,

5    in essence, collateral, the collateral to back up the loans of

6    the value of the hedge fund securities?

7    A.   This is all perfectly correct, except you've omitted the

8    most important thing.

9    Q.   Okay.  Tell me what it is?

10   A.   The P2 loan to Arius Libra only came about because

11   Mr. Bergstein never delivered on his promise to get a

12   $10 million loan with those assets as collateral from Deutsche

13   Bank.

14   Q.   Okay.  We'll come to that.

15   A.   Okay.

16   Q.   But in terms of the deal itself, was the P2 loan and the

17   money went --

18   A.   Yup.

19   Q.   -- to Arius Libra, right?

20   A.   Yup.

21   Q.   And by the way, on all of these deals -- let's just focus

22   on one aspect of this.  When it came time to agree or not agree

23   to what became the Arius Libra/Pineboard deal, you, on behalf

24   of Weston, could have said yes or no, right?

25   A.   We were not running Arius Libra at the time.  Mr. Bergstein

1  was running the show for that company at the beginning, yes.

2  Q.  Let me focus it a little more.  On behalf of Weston

3  entities P2 and WFF, on the deal that was negotiated with,

4  among others, Mr. Bergstein and as to the unwind, Mr. Galanis,

5  you on behalf of Weston could either agree to the terms or not,

6  right?

7  A.  Yes, we could have.

8  Q.  And, ultimately, you made the decision, you and others at

9  Weston, to agree to the terms, right?

10  A.  Yes, we did.

11  Q.  And the terms are contained in the documents that we've

12  been looking at here in court, right?

13  A.  Yes.

14  Q.  In fact, that's the reason to have the documents; so that

15  one can look at them and understand what the terms of the deal

16  were, right?

17  A.  Yes.

18  Q.  And by the way, there's no question that the terms of the

19  unwind and the P2 and the Arius Libra, all of that, they're in

20  writing in documents that we've looked at here together, right?

21  A.  Yes.

22  Q.  There wasn't any effort to hide the existence of those --

23  strike that.

24          At the time this deal was done, Mr. Bergstein sent you

25  copies of drafts of the various documents that became the

I2KPBER6                          Hallac - Cross

1    contribution agreement, the security note and the pledge

2    agreement related to P2 and Arius Libra, right?

3    A.  He sent all the documents, yes.

4    Q.  He made clear to you that he wanted things in writing,

5    right?

6    A.  Yes.

7    Q.  And you were fine with them being in writing, correct?

8    A.  Yes.

9    Q.  Did you ever at any time -- strike that.

10           You testified a lot about you and Mr. Wellner, or

11   Weston, having a desire not to let, for example, P2 investors

12   know that their funds were being used on an investment

13   involving WFF.  Do you remember that kind of general topic?

14   A.  I remember it very clearly.

15   Q.  In the time frame of the summer of 2011 and going into

16   August of 2011 when the unwind and the P2 deal was struck, did

17   you ever, at any time, suggest to Mr. Bergstein that you didn't

18   want it to be in writing?

19   A.  That I didn't want it to be in writing?  No, I didn't

20   suggest that.

21   Q.  You didn't suggest to anybody that there couldn't be a

22   record about it because you were trying to hide it from P2

23   investors, for example, did you?

24   A.  We were trying to hide it and we never told them about it.

25   Q.  Did you hear my question, sir?  Did you ever --

1          MR. ALLEN:  Objection.

2          THE COURT:  Try it again.

3    Q.  Did you ever suggest to Mr. Bergstein that you didn't want

4    all these transactions to be in writing because you didn't want

5    there to be a record for P2 or anybody else to see?

6    A.  No, I never suggested it should not be in writing.

7    Q.  Okay.  Let's go over a couple of topics on the unwind.  Is

8    it true that you understood that, as part of the unwind, there

9    would be different payments made by the money that went into

10   the unbind, which was P2 funds, right?

11   A.  Yes.

12   Q.  And some of these funds would go to what became the new

13   company, Arius Libra or Pineboard, right?

14   A.  It was Arius Libra, yes.

15   Q.  But you understood, at the time you struck the deal, that

16   some of these funds were going to go to pay back other parties

17   like Gerova, right?  Is that correct?

18   A.  Are you asking me a question or not?

19   Q.  Yes.  Did you understand that part of the money was going

20   to go to pay Gerova?

21   A.  Yes, that I understood.  Yes.

22   Q.  And you understood that some of the money was going to go

23   to pay Mr. Bergstein's entities?

24   A.  Only if he spent money on the transaction.

25   Q.  In fact --

I2KPBER6                          Hallac - Cross

1   A.  There were two entities that he had, yes.

2   Q.  Was it your understanding that Mr. Bergstein would be able

3   to pay himself through the unwind for the full amount of money

4   that he fronted for Gerova?

5   A.  I didn't know if it was a full amount, but there was a

6   couple of amounts mentioned in the unwind agreement, DPRE and

7   Gion.

8   Q.  But there were also payments, as part of the unwind, that

9   would go to Weston or Weston entities, right?

10  A.  Yes.

11  Q.  And one of the payments was a $700,000 payment to the

12  Wimbleton C fund for loans that it had made with Gerova, right?

13  A.  That it lent to Gerova, correct.

14  Q.  And those loans had been made a year or two before,

15  correct?

16  A.  Well, a year for sure.

17  Q.  When Wimbleton C lent money to Gerova in, what, 2009 or

18  2010; is that the right date?

19  A.  No.  It was after that.  Absolutely after that.  It was

20  probably in early 2011 or late 2010.

21  Q.  When Wimbleton C loaned money to Gerova?

22  A.  Yeah.

23  Q.  Okay.  When Wimbleton C loaned money to Gerova in late 2010

24  or early 2011, was that within the offering memo description of

25  how Wimbleton C would loan money?

I2KPBER6                         Hallac - Cross

1    A.  No, it wasn't, but let me also assure you that you failed

2    to mention --

3              MR. BIENERT:  Your Honor, move to strike.

4    A.  -- at the request --

5              MR. BIENERT:  Your Honor?

6              THE COURT:  Yes, sustained.

7    A.  -- the request for the loan --

8              THE COURT:  No, Mr. Hallac.

9              THE WITNESS:  Yes, sir.

10             THE COURT:  You're done.  Okay?

11             THE WITNESS:  Fine.

12             THE COURT:  Wait for the next question.

13             THE WITNESS:  All right.

14   BY MR. BIENERT:

15   Q.  When Weston agreed to loan money --

16             THE COURT:  Unless you want to be up here for three

17   days answering questions, you listen to the words of the

18   question, you answer the question, and then you're done.  Okay?

19             THE WITNESS:  Okay, sir.

20             THE COURT:  Go ahead.  Let's move.

21   BY MR. BIENERT:

22   Q.  When Wimbleton C -- first of all, who was the person at

23   Weston who agreed to do the loan by Wimbleton C to Gerova?

24   A.  I did.

25   Q.  When you made the decision to loan Wimbleton C money to

1    Gerova, did you inform Wimbleton C investors that the loan was

2    prohibited?

3    A.   No, I did not.

4    Q.   When you later, as part of doing the unwind with, among

5    others, Mr. Bergstein, did you inform Mr. Bergstein that the

6    payment out of the unwind with P2 funds that would go to

7    Wimbleton C to payback its loan, did you inform Mr. Bergstein

8    that that loan had been a prohibited loan under the Wimbleton C

9    offering memo?

10              THE COURT:  Yes, I mean, there are so many qualifiers

11   in it.  Rephrase your question.

12   Q.   When you talked to Mr. Bergstein about the unwind, did you

13   tell him that the Wimbleton C loan was prohibited?

14   A.   The Wimbleton C loan was prohibited in its own investment

15   memorandum, but --

16              THE COURT:  Did you understand the question that was

17   asked?

18              THE WITNESS:  Well, but, your Honor --

19              THE COURT:  Did you understand?

20              THE WITNESS:  Yes, I understand the question.

21              THE COURT:  Then see if you can answer it.

22              THE WITNESS:  Could you repeat the question, please.

23   BY MR. BIENERT:

24   Q.   Yes, sir.  In summer of 2011, when talking about the unwind

25   transaction with Mr. Bergstein, did you tell him that the

I2KPBER6                          Hallac - Cross

1    Wimbleton C loan that would be paid back was a prohibited

2    transaction?

3    A.  It was prohibited by the offering memorandum of Wimbleton

4    C, correct.  No, I didn't tell -- he knew that.  He knew that

5    every loan we made --

6              THE COURT:  No, stop.  The question is:  Did you tell

7    him?

8              THE WITNESS:  Yes, I did tell him.

9              THE COURT:  Okay.  Then you've answered it.

10             THE WITNESS:  Okay.

11   BY MR. BIENERT:

12   Q.  And when did you tell him?

13   A.  I don't recall the specific moment.

14   Q.  Well, but was it within the time frame of the summer of

15   2011, before the unwind agreement actually was consummated?

16   A.  It was -- first of all, the loan to Wimbleton C was made

17   before the unwind; so it had to be earlier than July.  We made

18   those loans earlier, yes.

19   Q.  Sir, let me back up.  Mr. Bergstein was not part of the

20   Wimbleton C loan to Gerova, was he?

21   A.  Actually, Mr. -- if I'm not mistaken, Mr. Bergstein, in

22   some fashion, did have and did request the possibility that we

23   make a loan to Gerova.

24   Q.  And did you discuss -- is it then your testimony that you

25   did discuss that Gerova would make a Wimbleton C loan -- strike

I2KPBER6                           Hallac - Cross

1        that.

2                Did you discuss with him that, before the loan was

3        made by Wimbleton C, that Weston would make a Wimbleton C loan

4        to Gerova?

5        A.  But he knew about the loan to Gerova from Wimbleton C.

6        Q.  Right, because it got paid back in the unwind, correct?

7        A.  No, he knew that before the unwind was completed.

8        Q.  So let me ask my question again directly.

9        A.  Yes, sir.

10       Q.  Is it your testimony that you discussed with Mr. Bergstein,

11       before Weston loaned money to Gerova by Wimbleton C, did you

12       discuss that with Mr. Bergstein beforehand?

13       A.  Yes, I did.  I did.

14       Q.  Okay.  Was it your understanding that Mr. Bergstein had

15       lent money to Gerova before the unwind?

16       A.  That's what Mr. Bergstein told me, yes.

17       Q.  And were you --

18                THE COURT:  No, no.  The question was, was that your

19       understanding?  It could be yes.  It could be no, I don't

20       recall.  I don't know.

21       A.  It was my understanding, yes.

22                THE COURT:  Okay.  Next question.

23       Q.  And was it your understanding that Mr. Bergstein was paying

24       a lot of expenses of Gerova in the 2011 time frame, before the

25       unwind?

I2KPBER6                          Hallac - Cross

1         MR. ALLEN:  Objection, this calls for hearsay.

2         THE COURT:  I'll allow it.

3    A.  Would you repeat the question, please.

4    Q.  Was it your understanding, before the unwind, that

5    Mr. Bergstein had been paying a lot of expenses of Gerova?

6    A.  I wasn't -- no, I wasn't at all aware of that.  He

7    mentioned it a few times but, no, I was not under the

8    impression that he had done that.

9    Q.  Well, if we go to the unwind in July of 2011 --

10   A.  Yes.

11   Q.  -- part of that deal, you knew that money was being paid to

12   Mr. Bergstein's entities as part of the unwind transaction,

13   right?

14   A.  Right.

15        THE COURT:  By whom, sir?  Mr. Bienert?  By whom?  Put

16   it in your question.

17   Q.  Is it true, sir, that as part of the unwind itself, you

18   understood that the money was being paid from the P2 proceeds

19   that were funding the unwind, to, among other entities, a

20   couple of entities of Mr. Bergstein?

21   A.  Yes, for a total of 500,000, compared to 4 million that we

22   were paying in totality.  So it was a small amount that was

23   being paid to him.

24        THE COURT:  You've answered the question.

25   Q.  And you understood that the reason that P2 funds were lent,

I2KPBER6                          Hallac - Cross

1    why there were payments as part of the unwind made to

2    Mr. Bergstein's two entities, is because he had advanced and

3    lent money as part of Gerova?

4              MR. ALLEN:  Objection, form, and it's calling for

5    speculation and hearsay.

6              THE COURT:  Sustained as to form.

7    Q.  Well, let me ask it this way.  You ultimately were the

8    person who agreed that Weston's P2 fund's money could be used

9    to fund the unwind, right?

10   A.  Yes.

11   Q.  Did you take it upon yourself to, at least, be satisfied

12   before you agreed that Weston P2 money could be paid out to

13   people, that you had an understanding of why it would be paid?

14   A.  No, I did not.

15   Q.  So at the time you did the unwind, you did not focus on the

16   purpose of the payments out of the unwind to third parties and

17   the reasons for them; is that true?

18   A.  No, I focused on those payments.  I saw what they were.  I

19   read the obligations.  I read the documents.

20   Q.  Now, what was your understanding --

21   A.  My understanding was we had to pay 500,000 to Gerova, and

22   then 250 to Mr. Jason Galanis, 500-and-some-odd $26,000 to

23   Mr. Bergstein, 1.8 million to Weston Capital, which was only

24   paid to the extent of half, and 700,000 to Wimbleton C, which

25   had been advanced to Gerova.  That's it.

I2KPBER6                          Hallac - Cross

1  Q.  And as it relates to the part that went to Mr. Bergstein

2  entities --

3  A.  Yes.

4  Q.  -- is it your testimony that you did not take it upon

5  yourself to have an understanding of why he was being paid that

6  money?

7  A.  He said --

8            THE COURT:  Do you understand the question?

9  A.  Yes, but the only way I know is that Mr. Bergstein told me

10  he made those advances, and he showed me documents which said

11  that he made those advances; so I believed him.

12  Q.  Okay.  Do you know what WFM Media Holdings was in 2010?

13  A.  That was -- no, I really never understood it.  You know,

14  people in Gerova can copy names left and right.  It was another

15  one of the entities at Gerova, I think, that Mr. Galanis

16  started.

17  Q.  Is it true that WFM Holdings was a Gerova entity that held

18  some of the hedge fund assets that, in the earlier deal, Weston

19  had given to Gerova?

20  A.  It is true.

21  Q.  And were you aware that a Bergstein entity, DPRE

22  Enterprises, had, as collateral for a loan to WFM Media, an

23  interest in Aramid, one of the former WFF hedge fund

24  securities?

25  A.  That's what Mr. Bergstein showed us, yes.

1    Q.  You actually saw a document that said that, right?

2    A.  Yes, I said he showed it.

3    Q.  First, do you recognize that document?

4    A.  Yes, sir.

5    Q.  Have you seen it before?

6    A.  Yes, sir.

7    Q.  Did you see it as part of the matters we've been discussing

8    here today?

9    A.  As part of the unwind, yes.  Oh, you want it back.

10             MR. BIENERT:  Your Honor, I'd ask to move into

11   evidence Exhibit A015.

12             THE COURT:  Objection?

13             MR. ALLEN:  Your Honor, hearsay; so if they can

14   provide a non-hearsay basis.

15             THE COURT:  All right.

16             MR. BIENERT:  Would you like me to hand it up, your

17   Honor?

18             THE COURT:  Well, first of all, do you have a

19   non-hearsay basis for it?

20             MR. BIENERT:  I do, your Honor.

21             THE COURT:  All right.  Let me see the document.  So

22   let me hear you at sidebar as to what the non-hearsay basis to

23   this document is.

24             Ladies and gentlemen, you can stand up and stretch.

25             (Continued on next page)

I2KPBER6                        Hallac - Cross

 1            (At the side bar)

 2            THE COURT:  Go ahead.

 3            MR. BIENERT:  Yes, your Honor, it's a loan document

 4    contract; so it has an independent existence.  It is not a

 5    hearsay document, and to the degree that it were, I'd lay a

 6    business foundation.  But contracts exist independently of the

 7    hearsay rules; so it's an authentication issue, not a hearsay

 8    issue.

 9            MR. ALLEN:  This witness, obviously, can't lay a

10    foundation for a business record for a document he's not part

11    of.

12            THE COURT:  All right.  So we're back to the

13    foundation issue.

14            MR. BIENERT:  Right, and he said he recognizes it, and

15    he had previously told me that he had seen the document --

16            THE COURT:  Hang on a second now.

17            MR. BIENERT:  I didn't want to ask the next question

18    because I'd be --

19            THE COURT:  One second, please.

20            (Pause)

21            Okay.  Overruled.

22            (Continued on next page)

23

24

25

I2KPBER6                         Hallac - Cross

1              (In open court)

2              MR. BIENERT:  Can we publish?

3              THE COURT:  Yes, you may.

4              MR. BIENERT:  Ms. Howland, you can publish

5    Exhibit A015.

6              (Defendant's Exhibit A015 received in evidence)

7    BY MR. BIENERT:

8    Q.  And, sir, you can look at it on the screen or in front of

9    you, but do you recognize this to be a document that you would

10   have seen as part of the discussions leading into the unwind?

11   A.  Yes, sir.

12   Q.  And if you look at this document, it indicates in the first

13   numbered paragraph, one, to the loan, it indicates that DPRE

14   Enterprises loans up to $2 million to WFM Media Holdings; do

15   you see that?

16   A.  Yes, sir.

17   Q.  What did you understand DPRE Enterprises to be?

18   A.  It's an entity that Mr. Bergstein controlled.

19   Q.  And what is your understanding WFM Media Holdings to be?

20   A.  It was one of the entities in Gerova.

21   Q.  And in fact, if we read the next sentence, it says it's a

22   wholly owned subsidiary of Gerova Financial, right?

23   A.  Right.

24   Q.  And if we go to the next page, if we look at No. 2, it

25   says:  Aramid assignments and Aramid distributions; do you see

I2KPBER6                         Hallac - Cross

1    that, sir?

2    A.  Okay, sir.

3    Q.  What was Aramid?

4    A.  It was a fund that Weston Capital -- that WFF fund owned,

5    as well as Mr. Bergstein had an interest in Aramid, as he was

6    in legal battles with them.  And also, Aramid was partly owned

7    by Stillwater, which was the other company that Gerova

8    acquired.

9    Q.  Okay.  So Aramid was one of the WFF hedge fund assets that

10   went to Gerova that later came back and went to Arius Libra,

11   right?

12   A.  Correct.

13   Q.  All right.  You can put that document down.

14           Now, let's talk about, you mentioned the Deutsche Bank

15   and the loan; so let's go to that document.  And you indicated

16   when was it that you began having discussions with

17   Mr. Bergstein about getting funding from Deutsche Bank that

18   would relate to the Arius Libra deal?

19   A.  I don't really recall exactly.  It was probably a month

20   before we did, you know, the transaction with the unwind and,

21   you know, I mean, there's not a long time.  Maybe it was May or

22   June.  That seems to be a recollection.

23   Q.  Okay.  And you testified that you never did get the loan

24   from Deutsche Bank, right?

25   A.  Yes, I did.

1  Q.  Did there come a time when Mr. Bergstein communicated to

2  you that Deutsche Bank was not able to do the loan that you

3  guys had been discussing?

4  A.  When did he make that indication?

5  Q.  Well, first of all, did he ever tell you that it looked

6  like Deutsche Bank would not make the loan?

7  A.  No, sir.

8  Q.  So your testimony is that throughout the entire, you know,

9  episode, at least the time frame that you were talking about on

10  direct, there was never a time when Mr. Bergstein indicated to

11  you that Deutsche Bank would not be able to do the loan?

12  A.  No, I just heard there were some delays.  That's all I

13  heard.

14  Q.  Who, within Weston, if anyone, was in charge of making sure

15  that Weston was providing the materials that would be necessary

16  to try to get such a loan?

17  A.  Well, that was being discussed by Mr. Wellner and

18  Mr. Bergstein.

19  Q.  Is it true that Deutsche Bank, through a person named Sean

20  Edrington, had been in touch with Mr. Wellner about the loan?

21  A.  Yes, there's some e-mails going back and forth, yes.

22  Q.  And is it true that the reason that Deutsche Bank

23  ultimately was not able to provide the loan was because

24  Mr. Wellner and Weston would not deliver to Deutsche Bank the

25  detailed financials that it needed to approve the loans?

1          MR. ALLEN:  Objection, foundation and hearsay.

2          THE COURT:  One moment, please.  No, I'll allow you to

3     answer, if you know the answer.

4     A.  What is your question again, sir?  I'm sorry.

5     Q.  Yes, sir.  Is it true that the reason that Deutsche Bank

6     didn't fund the Arius Libra or Pineboard deal was that

7     Mr. Wellner and/or Weston ultimately did not provide to

8     Deutsche Bank the financial information that it needed to be

9     able to ultimately decide on the loan?

10    A.  Well, as far as I know, no one, including Mr. Wellner, did

11    not go and give information to Mr. Edrington.  That would have

12    been -- so it's not to my knowledge, that's No. 1.

13         And No. 2 --

14         THE COURT:  No, so it's --

15    A.  It's not to my knowledge, that's it.  I don't remember

16    anybody at Weston trying to delay anything.  I just saw

17    e-mails, and I know they were working on putting the

18    information to Mr. Edrington.

19    Q.  Okay.  Now, let's talk a little bit about the hedge fund

20    securities, the ones that had been in WFF that went to Gerova,

21    that came back and went to Arius Libra.  Okay?  Is that a term

22    that makes sense for me to use with you, hedge fund securities,

23    or is there another term?

24    A.  No, no, that's fine.

25    Q.  Now, Mr. Wellner was the person within Weston who was in

I2KPBER6                        Hallac - Cross

1  charge of keeping track of the finances of the hedge fund

2  securities, right?

3  A.  Well, he was in charge of looking at them and looking at

4  what their performance had been.  Yeah, he was the one managing

5  those hedge funds, but the finances, I don't understand by

6  finances.

7  Q.  All right.  Well, let's break that down.

8  A.  Okay.

9  Q.  The hedge funds securities were companies, right?

10 A.  Yes.  Entities, yeah.

11 Q.  In fact, one of them was Aramid, right?

12 A.  Yes.

13 Q.  And these companies or entities, they were running their

14 own businesses, right?

15 A.  Which were mostly in liquidation at that time.

16 Q.  Were all of them in liquidation?

17 A.  I would say probably they were all in liquidation.  Aramid

18 was in a major legal fight, and I will tell you that we had

19 received some money from these liquidations that came in two

20 years and three years later, which --

21            THE COURT:  Okay.  You've answered the question.

22            THE WITNESS:  Thank you, sir.

23            THE COURT:  Go ahead.  Next question.

24            THE WITNESS:  Thank you.

25 BY MR. BIENERT:

1   Q.  You've referenced some money.  Is it true, sir, that the

2   hedge fund securities would occasionally result in money being

3   paid?

4   A.  Oh, yes, absolutely.

5   Q.  And the money could be in the form of distributions made

6   from the company that was operating, right?

7   A.  It was distributions, yes.

8   Q.  Is it true that if the hedge fund security got sold, in

9   total or in part, that there would be money that would come in

10  from the sale?

11  A.  Absolutely.

12  Q.  And that the money that would come in from the sale of a

13  hedge fund security would go to whichever fund or entity was

14  the beneficial owner of the security, right?

15  A.  The beneficial owner, yes.

16  Q.  So during the time that the funds were with WFF, before

17  doing business with Gerova, then WFF would make any

18  distributions on the hedge fund securities, right?

19  A.  Okay, yeah.

20  Q.  And then during the time that those hedge fund securities

21  were with Gerova, then Gerova would make money off of the hedge

22  fund securities, if any came in, right?

23  A.  Yes.

24  Q.  And then if we go to after the unwind and after the

25  creation of Arius Libra, then if money would come in from the

I2KPBER6                    Hallac - Cross

1  hedge fund securities, then that money should go to Arius

2  Libra, right?

3  A.  If money came in, yes.

4  Q.  Mr. Wellner would, on occasion, circulate summaries of

5  information related to the hedge fund securities, right?

6  A.  Yes.

7  Q.  I place in front of you Exhibit C001.  I just ask you to

8  look at it.

9        MR. BIENERT:  It is in evidence, your Honor; so if we

10  can go ahead and put that up on the board.

11  Q.  Do you recognize this as the type of document you would

12  occasionally get from Mr. Wellner with information about --

13  related to hedge fund securities?

14  A.  Yes, sir.

15  Q.  And if you look at the next page or the next few pages,

16  tell us in general what you recognize this to be?

17  A.  Well, this is sort of an accounting statement showing fees

18  owed, fees received, cash paid by Weston, cash received by

19  Weston.  It's an entire timeline and analysis of payments that

20  had been made either to Gerova or to, you know, accounting

21  firms, administration firms.  There was a lot of expenses that

22  we had to pay on behalf of Gerova for audits, you know, all

23  kinds of things.

24  Q.  So when you say there were "expenses that we had to pay on

25  behalf of Gerova," first of all, who's "we," Weston?

I2KPBER6                          Hallac - Cross

1    A.  Yes.  I'm sorry.

2    Q.  And so what you're saying is that these hedge fund

3    securities, they have expenses and sometimes, at different

4    points in time, Weston was advancing or paying those expenses,

5    right?

6    A.  Well, it was not these hedge funds that have expenses.  It

7    is our fund that was managing the fund of funds.

8    Q.  Well, is it -- when Weston -- let's just take Weston.  If

9    Weston incurred costs related to the management of hedge fund

10   securities or of a fund, would Weston pay itself back for those

11   costs?

12              MR. ALLEN:  Object to the relevance.

13              THE COURT:  One moment, please.

14              MR. BIENERT:  I can address it, your Honor.

15              THE COURT:  Sustained.

16   Q.  Once the Arius Libra/Pineboard deal was done in August of

17   2011, the WFF or former WFF hedge fund securities went to Arius

18   Libra, right?

19   A.  Yes.

20   Q.  So from August of 2011 into, say, summer of 2012, what was

21   done with distributions that were paid by any of the hedge fund

22   securities?

23              MR. ALLEN:  Object to the relevance.

24              MR. BIENERT:  I can make an offer, your Honor.

25              THE COURT:  I'll allow it.

I2KPBER6                        Hallac - Cross

1   Q.  What would happen for those distributions?

2   A.  This is not a yes or no answer.  So can I answer the

3   question?

4   Q.  If you know generally.  If you can't answer it, tell me you

5   can't answer it.

6   A.  Yes or no, I cannot answer.

7            THE COURT:  No, it's not a "yes" or "no" question.

8   The question is:  So from August of 2011 into say summer of

9   2012, what was done with distributions?  That was the question.

10  A.  Okay.  If it belonged to Arius Libra, it would go to Arius

11  Libra, but not all of the assets were transferred in the name

12  of Arius Libra.  For example, Aramid did not allow any

13  transfers out of the name that we had originally, which was the

14  Wimbleton Financing Fund, and it would never do that.

15           In fact, they didn't even pay us $1.4 million of

16  monies that they were holding for us, meaning WFF now, not the

17  new company, not Arius Libra.  So I can't tell you that Aramid

18  paid money to Arius Libra because they never transferred it and

19  they never paid anything.

20  Q.  All right.

21           THE COURT:  Next question.

22  Q.  Once the unwind and the contribution agreement with P2 and

23  Arius Libra and the medical companies was in effect as of

24  August of 2011 --

25  A.  Yes.

I2KPBER6                        Hallac - Cross

Q.   -- and the distributions of hedge fund securities that went

to Arius, it was the intent that those distributions would go

to Arius Libra, right?

A.   Sure.

Q.   Is what you're saying, though, is that at least one

company, Aramid, refused to do the paperwork to allow its hedge

fund entity to go into Arius Libra?

A.   Correct.

Q.   But what about as to other companies, for example, a

company named Quantek?

A.   Quantek actually did not go into Arius Libra as a name.

Q.   And why is that?

A.   Well, because it's all about these fund administration

companies.  Sometimes they don't move quickly.  Sometimes they

refuse to do it.  Some hedge funds don't want to do it because

they're thinking, you know, they're going to deal with new

investors.  So there's a whole world out there in terms of

being able to do certain things.

        So overall, whatever belonged to Arius Libra went to

Arius Libra and Quantek.  Just to let you know Quantek was a

fund that made distribution early on.  That was when we were

still with Gerova.  So, for instance, you will see plenty of

distributions from Quantek in Gerova, and you'd see

distribution in Gerova; so I'm agreeing with you that normally

this would happen.

I2KPBER6                          Hallac - Cross

1    Q.  Is it true that Quantek made distributions after the time

2    that the hedge fund assets, including Quantek, had been

3    contractually provided to Arius Libra?

4    A.  I do not recall, nor -- you know, I mean, you're talking

5    about 25 years here.

6               THE COURT:  No, no.  If you don't recall, say you

7    don't recall.

8               THE WITNESS:  I just said it.

9               THE COURT:  No.  You started to go off, it's been 25

10   years, et cetera.

11              THE WITNESS:  I'm sorry.  No, I don't recall.

12              THE COURT:  All right.  Go ahead.  Next question.

13   BY MR. BIENERT:

14   Q.  Is it true that Weston received Quantek payments between

15   August of 2011 and summer of 2012 that did not go to pay down

16   the P2 loan?

17   A.  Okay.  All I remember is that Quantek made payments.  When

18   these payments were made, I would have to check.

19   Q.  Okay.  Well, do you have any memory of ever using Quantek

20   payments to pay down the P2 loan?

21   A.  I don't think so.

22   Q.  Do you have any memory of ever taking Quantek payments and

23   delivering that amount of money to Arius Libra?

24   A.  As I said, I'm not the CFO.  I don't know these details.

25   Q.  In other words, you would rely on Mr. -- strike that.

I2KPBER6                         Hallac - Cross

1              Who was the CFO?

2   A.  A young lady called Cameron Dalessio.

3   Q.  You would rely on Ms. Dalessio to make those payments?

4   A.  I would count on her to do the accounting and then tell me

5   there's a payment, or she would go to Keith Wellner and tell

6   him, you know, what do we do with this?  We got 500,000, who

7   does it belong to?  Does it belong to Gerova?  Arius Libra?

8   Weston Capital?

9   Q.  Now, sir, you talked about the SEC at some point learning

10  they were investigating you --

11             THE COURT:  All right.  We're going to call it a day,

12  ladies and gentlemen.  Have a pleasant one.  See you back

13  tomorrow morning, same time, for a good start.  Don't discuss

14  the case.  Please keep an open mind.  If there's anything you

15  need to make things comfortable, please, let my courtroom

16  deputy, Flo, know, and we'll see what we can do.  Thank you

17  very much.  Okay.  Cut off the AC.

18             (Jury not present)

19             (Continued on next page)

20

21

22

23

24

25

I2KPBER6                          Hallac - Cross

1           THE COURT:  Just leave the documents there.

2           THE WITNESS:  Okay.

3           THE COURT:  And you may step down.  Thank you.

4           THE WITNESS:  Thank you, sir.

5           THE COURT:  All right.  I'll give you my rulings on

6    the completion issue and, of course, I've looked at it with the

7    rule in mind and the interests of fairness.

8           An adverse party may offer a statement of that adverse

9    party under the federal rules.  It's important, from the

10   standpoint of fairness, that the statement that's offered be

11   complete and in the proper context, but the rule, in its

12   reference to fairness, does not obviate the rule of evidence,

13   which allows only an adverse party to offer a statement of a

14   party.

15          So going through things, I found in a number of

16   instances that the defense's point was well taken and that more

17   should be offered.  So if you'll turn to page 60, lines 11

18   through line 17 shall be read.

19          Page 72, where is the government starting its read?

20   On my copy it appears to be line 8, but it looked like it would

21   need to be line 7.

22          MR. IMPERATORE:  That's correct, your Honor.  It

23   should be line 7.

24          THE COURT:  All right.  And I'm going to require you

25   to read through the end of line 16.  Also, on page 72, you need

I2KPBER6                        Hallac - Cross

1   to read from line 12 through line 9 on page 73.

2          And I also overlooked page 71, line 24 through

3   page 72, line 6, that should be read as well.

4          Next, page 85, the read should begin on line 13 and go

5   through the end of line 22.

6          On page 118, I will instruct the jury, if someone

7   reminds me to do so, that I've only allowed the read to include

8   one wire because the question reads...  And if you could just

9   go through page by page and tell me what each of the wires are

10  for, and I'll make it clear, if you remind me.  Ladies and

11  gentlemen, I've only allowed the response to be read as to one

12  wire.  So there's no additional read back there.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

I2K5ber7

1          THE COURT:  On page 126 the read should begin on, I

2     guess it's 0233, line 1, if you look at the columns on the

3     left-hand side of page 126, through page 127, line 7.

4          On page 136, where does the government's read begin?

5     Line 24 or line 25 of 250?  My copy it looks like it is 24 but

6     that doesn't seem to make sense.

7          MR. IMPERATORE:  Line 25, your Honor.  And I

8     apologize.  It looks like the pagination got a little bit off

9     when we printed the pdf.

10          THE COURT:  All right.  Thank you.

11          And on page 143 the read should begin with line 5 and

12     go through the end of line 21.  So, those are my required

13     inclusions of defendant's requests under Rule 106.

14          Have a very pleasant evening.  See you tomorrow.

15          MR. BIENERT:  Your Honor, one question?

16          THE COURT:  Yes.

17          MR. BIENERT:  On the recording of Mr. Hallac, his

18     lawyer and Mr. Parmar, which was alluded to in direct and the

19     part alluded to in direct was the comment, "serve up on a

20     platter," something like that, which I will ask him about

21     orally and, obviously, he sounds like if he doesn't deny it I

22     am not going to ask to play anything but that is the same

23     recording, your Honor, that has the comment where Parmar says

24     something like I made your fifteen a hundred, and your Honor

25     had said you were -- I don't know if it was tentative or not

I2K5ber7

```
1   you basically said you weren't going to let me go there but I
2   could raise it with you.  Obviously I'm not going to go there
3   but I'm telling you I would like to be able to and why.
4             THE COURT:  Show me the transcript page and I will let
5   you know.
6             MR. BIENERT:  Okay.
7             THE COURT:  The transcript of the recording.
8             MR. BIENERT:  Yes, your Honor.
9             THE COURT:  All right.
10            MR. BIENERT:  We will get that over.  It is a short
11  snippet.  Do you want us to e-mail to you or bring a copy in
12  the morning?
13            THE COURT:  Bring a copy the morning.  I recall it
14  being a short snippet.
15            MR. ALLEN:  Unless I am mistaken, this is a statement
16  by Mr. Parmar about the valuation of his medical billing
17  company.  I don't see how this would possibly be admissible, it
18  is a hearsay statement.
19            THE COURT:  This is under 106 you're urging me to
20  include; right, Mr. Bienert?
21            MR. BIENERT:  Well, again, you are testing me on my
22  association of numbers with rules.
23            THE COURT:  Well, the rule on completeness.
24            MR. BIENERT:  No.  In fairness that is not -- it is a
25  different topic and this is on the topic of, that we raised a
```

I2K5ber7

1   lot and your Honor thus far said I couldn't go there but I am

2   raising it again.

3          This is on the topic of my client's good faith belief

4   that the medical billing company was very valuable and that

5   guided many of his actions into mid -- we will call it summer

6   2012, the time frame of the case, and the fact that Mr. Parmar

7   never provided those assets but sent them elsewhere.

8          THE COURT:  But he is not charged with a bad

9   investment.

10         MR. BIENERT:  Well, he is charged with acting with

11  specific intent to defraud in taking loan money and using it in

12  certain ways and so this goes back to, we have mentioned it a

13  lot but we believe that we definitely should be able to play

14  out in front of the jury certain aspects of the fact that with

15  a note that wasn't even due to your Honor until November of

16  2016, because that's when the Swartz IP note was due, which is

17  four and a half years after the time frame we are talking

18  about, the jury should be able to understand the status of the

19  medical billing enterprise as they assess my client's actions

20  in receiving and using loan money on a note that is due some

21  years later.

22         And so, it is to that point.

23         THE COURT:  Well, are you suggesting that if a person

24  diverts the proceeds of a loan that their subjective belief

25  that everything will work out well and no one will lose any

I2K5ber7

money defeats their scienter, their knowledge of falsity, their

fraudulent intent in intentionally using the loan proceeds in

an appropriate way?

             MR. BIENERT:  As phrased by your Honor, I would say

that that is unlikely to be a defense, but I think the loaded

issue, your Honor, is diverts and intentionally using the

money.  In other words, that's the government's position, I get

that, but our defense and our view is a different one and that

is it is not a diversion, which I am taking your Honor's

meaning an improper use of the money when we have a loan

agreement from one business to another that do not have any

restrictions on how the money can be used, and when we have a

principal in the business who is spending millions of dollars

on various aspects related to -- I will call them projects but

these projects in particular.

             THE COURT:  But in that particular instance, if you

are allowed to use the proceeds for any reason whatsoever, it

wouldn't matter whether you had a good faith belief that all

would work out well.  If you were allowed to use the money in

that fashion then it doesn't matter that it didn't work out,

correct?

             MR. BIENERT:  I would say arguably yes, but arguably

no.  In other words --

             THE COURT:  Well, this is not a civil lawsuit,

correct?

I2K5ber7

1                MR. BIENERT:  Absolutely.

2                THE COURT:  Let's keep that in mind.

3                MR. BIENERT:  Yes.

4                THE COURT:  This is a criminal prosecution and the

5        fraud that's charged that may or may not be proven -- but

6        that's charged -- is that the proceeds of the loan were used in

7        a way that was prohibited.  If the government fails to prove

8        that, then you may be entitled to an acquittal.

9                Let me inquire of the government.

10               Do you disagree with that?  Isn't that the premise of

11       the government's case, that the loan was not a proper use of

12       the funds that Mr. Hallac, for example, had an obligation as an

13       investment advisor to use the funds in accordance with his

14       agreements with those to whom he was a fiduciary or the fund to

15       which he was a fiduciary, and by authorizing the funds to go in

16       any other direction his crime was complete and anyone who aided

17       and abetted the crime's crime was complete.

18               Isn't that the government's theory of the case or did

19       I miss something?

20               MR. ALLEN:  No, your Honor; that's correct.

21               THE COURT:  All right.

22               MR. BIENERT:  Well, I understand that's their position

23       but, again, our view is aiding and abetting still requires

24       intent, your Honor, so just because Mr. Hallac did something

25       that he knew was improper certainly does not mean that my

I2K5ber7

1    client aided and abetted it with an intent that makes him

2    guilty.

3              THE COURT:  Correct.

4              MR. BIENERT:  And that's a threshold question.

5              THE COURT:  Correct.  But the requisite culpable

6    mental state is not vitiated by the belief that all in the end

7    will turn out well and no one will lose money.

8              MR. BIENERT:  Not in and of itself, agreed.  However,

9    evidence of my client's mental state is what was he doing and

10   understanding in this spectrum of time that I think spans from

11   early August 2011 until June of 2012 when he is taking money

12   and spending it.  In other words, the government's case does

13   not end when there is a decision to make the loans.  The money

14   of the loans goes on over the better part of a year and then it

15   ends.  And, frankly, I will note for your Honor as one of the

16   things that I certainly will be pointing out in closing, the

17   loan money available was $25 million on SIP, if you look at the

18   note, but what wound up being used was $17.5 million so I think

19   there is $8 million still left, from our perspective.  There

20   was a reason that the loan money quit getting used by the

21   summer of 2012 and that's because in the continual time and the

22   issues with getting the medical assets and believing that there

23   would be a company there that would make a lot of money versus

24   getting to a point where that wasn't going to happen, that's

25   what that ties into.

I2K5ber7

1          And so, it does relate to my client's understanding of

2     the deal which I would submit guides or at least is something

3     that should be considered in guiding when he takes the next

4     installment of money and uses it, is he in good faith.

5          THE COURT:  However -- however -- in presenting either

6     evidence or argument, you may not present evidence or argument

7     that does not go to a defense and we both have agreed with each

8     other, quite appropriately, that the subjective hope that all

9     will work out well in the end is not a defense and may not be

10    presented as a defense in evidence or in argument.

11         MR. BIENERT:  Well, let me be clearer.

12         I agree with that, but only if it's because there is

13    already no issue that the crime already occurred and that the

14    person is guilty of the crime already.  In other words, my

15    position is that's not the case here.  We have a different

16    transaction, an unusual transaction that is not a specific

17    point in time.  August 3rd I made a deal, I lied, I got money,

18    I'm done.  What we have is August 3rd and then mid-November is

19    the Swartz IP, we have two different loans to businesses with,

20    from our perspective, no limits on how they can be used.  And

21    then the question is over time, in using that money, is he in

22    good faith.

23         So, we never get to the point, in my view, that

24    Mr. Bergstein is arguably saying, well, gee I committed a crime

25    but everything will work out fine so it doesn't matter.  That

I2K5ber7

1   is not my argument.

2           THE COURT:  But at the close of the government's case

3   I suspect it will be the government's position that they have

4   proven beyond a reasonable doubt that Hallac, at least, and

5   Weston, violated their duties as investment advisors in

6   allowing, for example in the case of the P2 loan, the loan to

7   have been made with P2 funds and that they have proven beyond a

8   reasonable doubt that the defendant knew it was a violation of

9   Hallac's duties, and that aware of that it was a violation of

10  his duties he aided and abetted that violation.

11          Now you, I suspect, will assert that either A, they

12  did not prove it; or B, if they made out a prima facie case at

13  the close of the entire case, you will have a defense to that.

14  I understand that, that's why we have a jury, that's why we

15  have a trial here and everybody is entitled to reserve their

16  position on that.  But, the government's position on the prima

17  facie case is that the crime is completed at the time the

18  assistance to Hallac is given in having a loan extended by P2

19  and a belief that the loan will get repaid does not vitiate the

20  crime and that's where the rubber is meeting the road in this

21  discussion, it seems to me.

22          MR. BIENERT:  Well, a couple other points.

23          I mean, obviously, I see it differently, I think -- I

24  will just move on to the next point other than saying clearly,

25  if something that happens over time, in my view, we can put on

I2K5ber7

```
 1    as part of our defense, what my client's understanding was
 2    during that time.
 3            Number two, I have sat here every day, I think,
 4    including today, and heard the government ask questions of
 5    witnesses that have no time limit.  They repeatedly say, "Were
 6    you ever paid back any of that money that you loaned to
 7    Mr. Bergstein?"  They did it with Mr. Hallac today on several
 8    loans that he did in 2012 where they say at the end did he ever
 9    pay that money back.
10            THE COURT:  And you will just refresh my recollection,
11    and you objected to that and I overruled your objection?
12            MR. BIENERT:  On that I don't believe I did object.
13            THE COURT:  Okay.
14            MR. BIENERT:  Well, but your Honor, because I believed
15    that the continuum is appropriate.  I'm not objecting to
16    something that our view is you can do.  But, what it shows is I
17    feel like the government is sort of having a
18    cake-and-eat-it-too scenario in at least its arguments because
19    if their real view was that the crime was over and done with
20    when the quote misreps or conflicts were done, then frankly
21    they shouldn't be putting anything on beyond, I guess it is
22    August 3rd and November 15th.  But they're putting all this
23    stuff on that goes all the way, certainly through the summer of
24    2012 because, A, that's the time frame they're alleging the
25    scheme in the indictment, and B it certainly implied and
```

I2K5ber7

1    implicit in what they're doing that they view the status of

2    payments as relevant through that time.  And by the same token,

3    our defense is allowed to address what's going on with the *res*

4    *gestae*, I guess if I am using the Latin term right, the *raison*

5    *d etre* -- since we had French with Société Générale earlier.

6    Since that was the basis of the deal it was appropriate and we

7    are allowed to present our defense as to what my client

8    understood as to that deal and how it guided his good faith.

9              THE COURT:  Well, I didn't create the rules of the

10   road in a trial.  Okay?  But a lawyer can object to evidence

11   that the lawyer believes is not admissible.  The fact that the

12   lawyer doesn't object doesn't therefore mean that if that

13   lawyer offers the evidence, the other side can't object.

14   That's the fact of the matter because a Judge, when faced with

15   a timely objection, thinks about the issues in the context

16   presented by the objection and you can't, in my view, assert

17   that the government's objection needs now to be overruled

18   merely because you elected not to object to irrelevant evidence

19   or the fact that they offered it made it relevant.

20             Now, there are instances where a party opens a door

21   and therefore, because the party has opened the door, in

22   fairness, a response is appropriate and I believe in that and

23   I'm going to make sure that you get that fair opportunity to

24   respond but the door opening is what's getting you there, not a

25   general right to inquire into whatever time period you choose.

I2K5ber7

1        So, the best way I know how, as a trial Judge, is to

2    not make blanket pronouncements, that's why I rule on

3    objections when they come up and try to avoid any blanket rule

4    on evidence.

5        So, let's see what happens.  See you tomorrow.

6        (adjourned to February 21, 2018 at 10:00 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   ALBERT HALLAC

 4   Direct By Mr. Allen  . . . . . . . . . . .1396

 5   Cross By Mr. Bienert . . . . . . . . . . .1562

 6                      GOVERNMENT EXHIBITS

 7   Exhibit No.                           Received

 8    108, 182, 212, 216, 219, 239, 241, 248, . . .1395

 9            252, 253, and 254

10   3505-16  . . . . . . . . . . . . . . . .1408

11   1600   . . . . . . . . . . . . . . . . .1424

12   613  . . . . . . . . . . . . . . . . . .1532

13                      DEFENDANT EXHIBITS

14   Exhibit No.                           Received

15    A015   . . . . . . . . . . . . . . . . .1598

16

17

18

19

20

21

22

23

24

25
```