```
I2LPBER1
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               16 Cr. 0746(PKC)

DAVID BERGSTEIN,

                  Defendant.

------------------------------x
                                             February 21, 2018
                                             10:10 a.m.
Before:

                  HON. P. KEVIN CASTEL,

                                             District Judge

                        APPEARANCES

GEOFFREY S. BERMAN
       Interim United States Attorney for the
       Southern District of New York
BY:  EDWARD IMPERATORE
     ROBERT ALLEN
     ELISHA KOBRE
            Assistant United States Attorneys

BIENERT, MILLER & KATZMAN, PLC
       Attorneys for Defendant
BY:  THOMAS H. BIENERT, JR.
     ANTHONY R. BISCONTI

SATTERLEE STEPHENS LLP
       Attorneys for Defendant
BY:  ANDREW L. FISH

            – also present –

Ellie Sheinwald, U.S. Paralegal Specialist
Sarah Emmerick, U.S. Paralegal Specialist
Caroline Howland, Defense Paralegal Specialist

SA Shannon Bieniek, FBI

1           (Trial resumed; in open court)

2           (Jury not present)

3           THE COURT:  Please remain standing for the jury.

4           (Jury present)

5           THE COURT:  Please be seated.  Good morning, ladies

6      and gentlemen.  Good to see you.  Let's get started.

7           Mr. Hallac, the Court reminds you that you're still

8      under oath.

9           THE WITNESS:  Yes, your Honor.

10          THE COURT:  Mr. Bienert.

11          MR. BIENERT:  Thank you, your Honor.

12     ALBERT HALLAC, (Resumed)

13     CROSS-EXAMINATION (Resumed)

14     BY MR. BIENERT:

15     Q.  Mr. Hallac, we're going to focus first on the TT/Swartz IP

16     loan situation.

17     A.  Okay.

18     Q.  Now, you've been interviewed approximately how many times

19     by the government, either people from the U.S. Attorney's or

20     the FBI or the SEC, in relation to this matter?

21     A.  Many times, maybe 20, 25 times.

22     Q.  And spent many, many hours with them, right?

23     A.  Yes, sir.

24     Q.  Is it true that you have told the FBI, on multiple

25     occasions, that you understood that the TT/Swartz IP

I2LPBER1                          Hallac - Cross

1    transaction was not a prohibited transaction?

2    A.   Apparently I did say that, yes.  At the time --

3    Q.   And did --

4    A.   I did say that, yes.

5    Q.   And, in fact, sir, you told them in 2015 when you first met

6    them?

7              MR. ALLEN:  Objection, your Honor.

8              THE COURT:  Basis?

9              MR. ALLEN:  It's asking for hearsay.

10             THE COURT:  Yes.  Try it another way.

11             MR. BIENERT:  Sure.

12   Q.   Well, first of all, you testified on direct, with

13   Mr. Allen, that you believed that the TT/Swartz IP transaction

14   was not allowed; isn't that what you told us a couple of days

15   ago?

16   A.   Yes, sir.

17   Q.   But that's not what you told the FBI on multiple occasions

18   in 2015 and 2016, is it?

19   A.   I don't remember when I last told them that, but I had been

20   thinking a lot about the whole situation, and I was definitely

21   erroneous about my thinking and my opinion on the TT situation

22   because --

23   Q.   Well, when you met with the FBI in February of 2015 --

24             MR. ALLEN:  Same objection.

25             THE COURT:  Yes.

I2LPBER1                        Hallac - Cross

1           MR. BIENERT:  613, your Honor.

2           THE COURT:  Again, let me hear you at sidebar.

3           Stand up and stretch.

4           (Continued on next page)

1          (At the side bar)

2          THE COURT:  First, let me hear the objection, then I

3   want to hear the response to the objection.

4          MR. ALLEN:  Your Honor, I don't think there's a proper

5   basis to ask about a prior inconsistent statement under 613

6   because he's said that he made the statements in the past.  So

7   I don't think Mr. Bienert now just gets to read from a 302 and

8   ask about hearsay.  There's no basis to introduce a prior

9   inconsistent statement.

10         MR. BIENERT:  From an impeachment standpoint, your

11  Honor, first of all, I am allowed to go over what he told the

12  FBI in this case three separate times in the past that is

13  directly contrary to what he said on the stand.

14         Secondly, his last answer, unsolicited, was along the

15  lines of, well, I've been thinking a lot about this, and I

16  realize I thought wrong.  But when he told the FBI, he didn't

17  just say it was my opinion.  What he basically said is I relied

18  on Wellner.

19         THE COURT:  I relied on?

20         MR. BIENERT:  Keith Wellner, in-house counsel.  And on

21  three different occasions, he said:  Wellner thought there was

22  no problem with the TT/Swartz IP loan legally.  Another one:

23  Wellner told David Bergstein and Alec Hallac that the total

24  return swap was acceptable; and on a third occasion:  That loan

25  was within the rights for us to make.

I2LPBER1                        Hallac - Cross

1            So it's impeachment.  It's also impeachment of the

2      explanation he just spontaneously gave, that it was his own

3      thoughts.  It also impeaches, frankly, Wellner, who testified

4      multiple times that it was an illegal loan; so...

5            THE COURT:  Well, you know, I think the trolley just

6      went off the track on that one.

7            MR. BIENERT:  Too far?

8            THE COURT:  Because I think you can impeach Wellner,

9      maybe --

10            MR. BIENERT:  Okay.

11            THE COURT:  -- with a statement Wellner made, but

12      impeaching Wellner through this witness may be a bridge too

13      far.

14            MR. BIENERT:  Well, let's stay focused.  This witness'

15      own statements about what he said.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

I2LPBER1                         Hallac - Cross

1              (In open court)

2              THE COURT:  Ladies and gentlemen, if you'd like to,

3    you can stand up and stretch and take a deep breath.  That's

4    never a bad idea.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the side bar)

2           THE COURT:  Okay.  Your response?

3           MR. ALLEN:  Your Honor, I don't think you get to

4     put -- so he's asked whether he made a statement in the past.

5     The witness has acknowledged that he did.  I don't think he

6     gets to then put in and just read from the 302 the same

7     statement that the witness has already acknowledged that he

8     did.  That's not inconsistent, and if he wants to --

9           THE COURT:  Well, no, but let's back up.  On direct,

10    he said the TT transaction was prohibited, correct?

11          MR. ALLEN:  Yes, yes.

12          THE COURT:  Okay.  This is cross-examination, and on

13    cross-examination, can you not impeach him with a prior

14    inconsistent statement that, on a prior occasion, he said that

15    it was not prohibited?

16          MR. ALLEN:  Well, he says --

17          THE COURT:  The fact that he conceded that on

18    cross-examination doesn't mean that the statement doesn't

19    impeach his direct testimony.

20          MR. ALLEN:  He certainly can ask him:  Didn't you say

21    something different to the FBI?  He's already done that.  We

22    didn't object to that question.  And the witness said:  In

23    fact, I did say something different to the FBI.

24          But now what Mr. Bienert wants to do is put in that

25    actual statement, and that statement is just hearsay, and

1    there's no exception to it now.

2              THE COURT:  Well, that's a different problem.  That's

3    impeaching, but you have to have a basis for getting the

4    statement in.  You can impeach him, but how do you get the

5    statement in?

6              MR. BIENERT:  Well, first of all --

7              THE COURT:  As opposed to confronting him with it and

8    asking him if it refreshes his recollection?

9              MR. BIENERT:  Well, I certainly can do the latter.

10             THE COURT:  Right.

11             MR. BIENERT:  I would also submit that, under straight

12   rule 613, I can ask him the precise reported statement and say:

13   Is it true that that's what you said?

14             I would also just add the fact that he did it on three

15   separate occasions.  The cumulative effect of the impeachment

16   is relevant because it shows that his latest recollection has

17   definitely changed, after many times, to say it a different way

18   and that has impact and relevance.

19             And then, finally, the hearsay part, you don't get to

20   under the straight impeachment.  The hearsay part would come in

21   if I were trying to, for example, introduce the written

22   statement, but I'm not.  I'm not going to introduce the

23   statement.

24             THE COURT:  For its truth.

25             MR. BIENERT:  Correct.

I2LPBER1                         Hallac - Cross

1              MR. IMPERATORE:  Here's the problem, your Honor, and

2      Judge Kaplan addressed this in Ghailani, *United States v.*

3      *Ghailani*, which interprets rule 613(b).  The first step in this

4      is to determine whether the prior statement to the FBI was, in

5      fact, inconsistent with his statement on the stand, but

6      Mr. Bienert already successfully elicited from the witness that

7      he said he made a prior statement --

8              THE COURT:  No, no, no, no.  You want to substitute a

9      different statement.  What the defendant is asserting is that

10     it is inconsistent with the direct testimony that the

11     government elicited from the witness.

12             MR. IMPERATORE:  But he has already successfully

13     elicited from the witness, on cross, that he made a different

14     statement to the FBI previously.  So that's the end of it.  He

15     doesn't now get to elicit the hearsay of, you know, each prior

16     statement that he made to the FBI.  He's already agreed that he

17     made a prior inconsistent statement to the FBI.

18             THE COURT:  You maintain that the limits of proper

19     cross-examination would be on direct you elicit:  Was this a

20     prohibited transaction?  Answer:  Yes, it was.  On cross, as

21     far as you're allowed to go is to say:  Did you say something

22     different to the FBI at another point in time?  Answer:  Yes.

23     You're done; that's your position?

24             MR. IMPERATORE:  Well, it was more specific than that.

25     Isn't it a fact that you told the FBI previously that it was

I2LPBER1                           Hallac - Cross

1     not a prohibited transaction?  And he said:  Yes.  So he's

2     already agreed to that.

3            THE COURT:  That's right.

4            MR. IMPERATORE:  Yes.

5            THE COURT:  So in other words, that's all you get in

6     cross-examination?

7            MR. IMPERATORE:  Well, if he had denied it, it would

8     be a different story.  He would then have a basis to inquire

9     about these specific statements, but he's already acknowledged.

10           THE COURT:  But the number of times you said that?  I

11    mean your position is that his direct testimony is truthful,

12    and what he said to the FBI was not truthful, correct?

13           MR. IMPERATORE:  Well, it's the witness' -- I mean,

14    his testimony, but yes, we -- right.

15           THE COURT:  Okay.  So you maintain --

16           MR. ALLEN:  He can ask him --

17           THE COURT:  -- you may not elicit that this was a

18    position that you consistently took over a period of time?

19           MR. ALLEN:  I think that's a fine question, but the

20    objection we have is to their trying to read statements that

21    he's allegedly made, or that he made, to the witness and then

22    getting him to confirm or deny those statements under 302.

23    That's just hearsay, and in a sense, it's not inconsistent.

24    They Don't have a basis for it.  He can certainly inquire about

25    the number of times, the number of meetings, how long he held

I2LPBER1                          Hallac - Cross

1    the position.

2              THE COURT:  Well, the basis in which it would come in

3    is to prove an inconsistency and, there, I don't know how it

4    proves the inconsistency at this point.

5              MR. BIENERT:  Well, it proves the inconsistency

6    because the fact that he's sitting with the FBI and the

7    importance of being honest --

8              THE COURT:  Right.

9              MR. BIENERT:  -- and knowing all that goes with it,

10   and the fact that on three different occasions, over a span of

11   about a year-and-a-half, he consistently says it was not a

12   prohibited transaction.  That, in and of itself, is relevant

13   impeachment.  It is also, I would say --

14             THE COURT:  I'm going to let you do that, though:

15   Didn't you take the position that it was not a prohibited

16   transaction on three different occasions over a year-and-a-half

17   period?  I'm going to let you do that.

18             MR. ALLEN:  And we don't have any objection to that.

19             MR. BIENERT:  And I think I'm allowed to explore the

20   setting of saying that.  In other words, he wasn't saying

21   this --

22             THE COURT:  Yes.

23             MR. BIENERT:  -- in a coffee shop with his buddy.

24             THE COURT:  That's fine with me.  The objection, to

25   the extent the objection is overruled as to that, you can do

I2LPBER1                         Hallac - Cross

 1    that.

 2              MR. BIENERT:  And the way at least I believe is in my

 3    head, at least, kind of the impeachment 101 is you actually use

 4    the words of the statement and say:  Is this what you said?

 5    And they either say "yes" or "no," and frankly, if they say no,

 6    I can call --

 7              THE COURT:  Well, the statements you read to me go far

 8    beyond that.  They now set up, in essence, a quasi

 9    advice-of-counsel defense.

10              MR. BIENERT:  Oh, by him.  I see what you're saying.

11              THE COURT:  The whole factual scenario, and that, I'm

12    not going to let you do because that is not what the statement,

13    which you are impeaching, relates to.  That's going beyond the

14    impeachment quality, and now introducing a narrative of

15    Wellner, a lawyer, told Hallac and also told Bergstein that

16    this was lawful conduct.  That is not part of anything that was

17    elicited on direct.

18              That's beyond impeachment of the statement made on

19    direct, and that, you can't get into.  So you can elicit the

20    setting in which the statement was made, the fact that it was

21    contradictory to his direct testimony, and contradictory to

22    what he presently maintains.

23              MR. BIENERT:  Can I just add on the last point?  I

24    think if you look at his answer, again, it was a spontaneous

25    statement.  I didn't ask him, but he said:  I've thought a lot

Case 1:16-cr-00746-PKC   Document 338   Filed 03/14/18   Page 14 of 228          1637

I2LPBER1                         Hallac – Cross

1  about it, and I realize my opinion has changed.  That's

2  different than at the time saying:  I was told this by Wellner.

3  So it has an added impeachment quality.

4              THE COURT:  No, it's not an added impeachment quality.

5  It's a new narrative, and the objection is sustained as to

6  that.

7              MR. BIENERT:  Okay.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I2LPBER1                          Hallac - Cross

1              (In open court)

2              THE COURT:  Please be seated.  You may continue.

3              MR. BIENERT:  Thank you, your Honor.

4   BY MR. BIENERT:

5   Q.  So on this topic of talking to the FBI about whether the

6   TT/Swartz IP loan was prohibited or not, on three separate

7   occasions you met with the FBI and told them that you

8   understood it was an allowed transaction; is that true?

9   A.  It is true to the extent that I said the structure, not the

10  transaction as a whole.  The structure of the loan was similar

11  to some others we had done in the past, but that's the only

12  thing that was similar.  That's what I said.  So I didn't say

13  the whole transaction was allowable.

14  Q.  And when you told the FBI that the structure of the

15  transaction was allowed, you understood at the time that it was

16  important that you be honest with the FBI, right?

17  A.  Yes, I tried to be.

18  Q.  And you understood that it was important that you be

19  accurate in what you told the FBI, right?

20  A.  Yes.

21  Q.  Now, you just made a comment that you had done this

22  structure before.  Is it true that the TT/Swartz IP transaction

23  came about after you had previously been negotiating with a guy

24  named Sugarman in relation to doing a TT transaction with a

25  company called COR?

I2LPBER1                         Hallac – Cross

1    A.  Yes, sir.

2    Q.  And is it more or less a summary of that, that although you

3    had gone a long way towards that transaction with COR, for

4    various reasons, you did not want to actually do the

5    transaction with COR?

6    A.  That's correct.

7    Q.  And so, at somewhat of the last minute or far into that

8    relationship with COR, you let the COR folks and Jason Galanis

9    know that you were not going to do that deal with them, right?

10   A.  That's right.

11   Q.  And instead, that's when TT did the deal with Swartz IP,

12   correct?

13   A.  Yes, sir.

14   Q.  And as a result of changing at the last minute and doing,

15   or planning to do the deal with someone else, is it true that

16   Mr. Galanis and Mr. Sugarman of COR were threatening you with

17   various actions, saying you had to do the deal with them?

18   A.  That's correct.

19   Q.  And so it's against this backdrop, where you had an almost

20   agreement with COR involving a TT swap or loan and a lot of

21   threats that you better go through with it, that you were

22   talking to Mr. Bergstein about what actually became the

23   TT/Swartz IP swap or loan?

24   A.  That's correct.

25   Q.  Right?  If we can look at Exhibit Z147.  It is just for

I2LPBER1                    Hallac - Cross

1   identification, not in evidence.

2           I'm going to ask you to take a look at Exhibit Z147,

3   and once you've had a chance to look at it, I'm going to ask

4   you to look at the first paragraph and ask you if it refreshes

5   your recollection.  Well, first of all, look at the document

6   and tell me once you've had a chance to.

7   A.  I've seen it.

8   Q.  Do you recall that in the time frame -- first of all, the

9   TT/Swartz IP agreement with Mr. Bergstein ultimately got done

10  in November of 2011, right?

11  A.  Yes.

12  Q.  But you were talking about the transaction in the time

13  frame of October 2011; is that true?

14  A.  You mean to Mr. Bergstein or to Mr. Sugarman?

15  Q.  Both.

16  A.  I think Mr. Bergstein was aware of that transaction.

17  Q.  And is it true that you had formed the intention in October

18  of wanting to use the TT fund money to do the Swartz IP

19  transaction with Mr. Bergstein?

20  A.  I had not said no to COR yet; so there may have been --

21  there may have been some thoughts going through my mind, but it

22  was not a definite situation about doing anything with

23  Mr. Bergstein when he came to Swartz IP.

24  Q.  Well, is it true that internally amongst yourself, Jeffrey

25  Hallac and Mr. Wellner, y'all had been discussing whether you

I2LPBER1                          Hallac - Cross

1    could or couldn't use the TT funds to do the transaction with

2    Mr. Bergstein?

3    A.  There were some internal discussions, yes.

4    Q.  And at one point, you concluded that you could not use the

5    TT funds because of the situation with COR and the issues

6    raised and the threats by them; is that right?

7    A.  We were concerned about the threats, yes.

8    Q.  And is it true that when you weren't able to use the TT

9    funds, or thought you weren't able to, that was when you and

10   Mr. Wellner and your son, Jeffrey Hallac, agreed to try to use

11   Deutsche Bank to see if it could fund, in essence, what became

12   the Swartz IP transaction?

13   A.  I don't recall that.

14   Q.  Have you had a chance to look at the document in front of

15   you?  And I'll just ask you to look at paragraph one.

16   A.  Okay.  Yes.

17   Q.  Does that refresh your recollection as to whether or not

18   you had a discussion or conversations with your son on this

19   topic?

20   A.  Well, it's an e-mail from my son.

21           THE COURT:  Don't read from the document.

22           THE WITNESS:  Okay.

23           THE COURT:  Take a look at the document.

24           THE WITNESS:  Okay.

25           THE COURT:  And ask yourself the question:  Having

I2LPBER1                          Hallac - Cross

1    read the document, whether it gives you a new and refreshed

2    recollection on the subject that you were asked about?

3              THE WITNESS:  Okay.

4    A.  No, there was no discussions that I recall having had

5    internally to do with Deutsche Bank.

6    Q.  All right.  Do you recall conveying, in the October

7    timeframe, to Mr. Bergstein that you guys didn't think you

8    could use the TT funds for Swartz IP?

9    A.  No, I really don't recall that.

10   Q.  Okay.  Do you recall discussing among your son, Mr. Wellner

11   and Mr. Bergstein, that you believed you could get 17 to $20

12   million in lending from Deutsche Bank?

13   A.  The only lending that I heard was about $10 million on the

14   hedge funds of WFF.  I never, to this point, remember that

15   Deutsche Bank was going to lend us 17 to $20 million on TT.

16   Q.  Do you recognize the document in front of you, as with the

17   to's and froms and the subject matter, as something you would

18   have been communicating about with the people referenced on

19   this document in or around October 2011?

20   A.  Well, I know I was communicating with these people in

21   October, certainly.

22             MR. BIENERT:  Your Honor, I'd move into evidence

23   Exhibit Z147.

24             MR. ALLEN:  Objection, hearsay.

25             THE COURT:  Let me see the document.

I2LPBER1                          Hallac – Cross

1          MR. BIENERT:  I'd submit, your Honor, the fact that

2    they were said and impeachment.

3          MR. ALLEN:  And object to relevance.

4          (Pause)

5          THE COURT:  Let me see you at sidebar for a moment.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I2LPBER1                        Hallac - Cross

1              (At the side bar)

2              THE COURT:  Why is this not sought to be admitted for

3    the truth of its content?  It appears to me that that's what

4    you asked him about:  Didn't you believe that you could get 17

5    to 20 million at the time?

6              MR. BIENERT:  Correct.

7              THE COURT:  All right.

8              MR. BIENERT:  Well, first of all, and just so your

9    Honor knows, it's the first paragraph that I'm interested in.

10   It's the fact that it was said.  If you notice who this is to

11   and from, this is from Jeffrey Hallac and cc'd the Albert

12   Hallac, and it's to my client.  So it's the fact that in

13   October of 2011, these guys were telling my client that they

14   believed, and they said we, Weston, could get 17 to $20 million

15   for the raise.

16             This is directly contradictory to the entire

17   presentation of not only this witness, but Mr. Wellner, that

18   basically it was all up to my client.  Our position is they had

19   represented they would get the money, and that's what this

20   says; so it's impeachment.

21             And it's the fact that they said these words to my

22   client, and it's my client's state of mind that is important

23   here.  I would say that a theme in the case is the government

24   has repeatedly had witnesses say Mr. Bergstein said he would

25   take care of the funding or the raise and, therefore, he

I2LPBER1                      Hallac - Cross

1   dropped the ball.  And here we have, in essence, the Weston

2   principals telling my client in October that we can get the

3   raise.

4           THE COURT:  All right.

5           MR. ALLEN:  I'm not even sure, your Honor, that this

6   has anything to do with this case.  The first on the subject

7   line is Pagoda agreement, which is a transaction that's not

8   relevant here.  I think we can get a total of 17 to 20 million

9   for the raise, I'm not even sure if it's about the Swartz IP

10  transaction.

11          THE COURT:  Well, that's an easy one because

12  Mr. Bienert can establish that with the witness.

13          MR. BIENERT:  Sure.

14          THE COURT:  You can lay a foundation.

15          MR. BIENERT:  I'd also say if you look at the subject,

16  it says:  Deutsche Bank; it says:  Pineboard.  It's clearly our

17  topic.

18          MR. ALLEN:  Pineboard is the third thing.  In any even

19  you can't get in every document on hearsay is for the fact that

20  it was said.  The reason -- obviously, he said it for the truth

21  of it.

22          THE COURT:  I don't think you want to go down that

23  path.  We have a specific document here.  It is sent to the

24  defendant, who is on trial, at or about the time of the events

25  for which he is being tried, and copied to the witness now on

I2LPBER1                          Hallac - Cross

1    the stand, speaking about:  I still think we can get a total of

2    17 to 20 million in for the raise.

3              Now, I will require Mr. Bienert to see whether you can

4    endeavor to establish from the witness that paragraph one

5    relates to the transaction.

6              MR. BIENERT:  Okay.

7              THE COURT:  And assuming that it does, and I do assume

8    that, then I'm going to let you offer it.

9              Now, is there anything else about the document?  Okay.

10             MR. ALLEN:  Your Honor, we would ask, though, that the

11   rest of the document be redacted if he's only offering the

12   first paragraph on a truth basis.  The rest is hearsay and

13   shouldn't come in.

14             THE COURT:  I tend to agree with that.  So just you

15   can redact, and then "Best, Jeffrey Hallac," that's it.  We

16   don't need to get into camping or anything like that.

17             MR. BIENERT:  Assuming that the foundation is laid --

18             THE COURT:  Yes.

19             MR. BIENERT:  -- am I allowed to have Ms. Howland pull

20   up just paragraph one --

21             THE COURT:  Yes.

22             MR. BIENERT:  -- to demonstrate to the witness, and

23   then we'll get the redacted one later?

24             THE COURT:  Yes, that's fine.  You can do the

25   redaction later.  That's fine.

I2LPBER1                        Hallac – Cross

1              MR. BIENERT:  Okay.  Thank you.

2          (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     BY MR. BIENERT:

3     Q.   Sir, directing your attention to paragraph one of that

4     document in front of you, what matter or what deal is being

5     addressed there, to your understanding?

6     A.   A deal that is addressed here is the transaction where we

7     had been trying to borrow money against the assets of WFF.

8     We're still trying to do that so that we can complete not only

9     the underlying but also the medical billing business, and when

10    my son says --

11         THE COURT:  Okay, stop.  You've answered the question.

12         MR. BIENERT:  So I would offer Exhibit Z147, your

13    Honor, and we will redact it before it is actually --

14         THE COURT:  All right.  Well, paragraph one is

15    received.  The balance, except for the bibliographic at the top

16    will be redacted.  Go ahead.

17         MR. BIENERT:  Thank you, your Honor.

18         (Defendant's Exhibit Z147 received in evidence)

19         MR. BIENERT:  Ms. Howland, if you can publish it.  The

20    way it's on our screen is appropriate.  Just show that.

21         THE COURT:  Yes.

22    BY MR. BIENERT:

23    Q.   So, sir, in October of 2011, your son, Jeffrey Hallac, who

24    worked with you, right?

25    A.   He worked in the firm, yes.

I2LPBER1                        Hallac - Cross

1   Q.  And by the way, roughly how old is your son?

2   A.  You mean today?

3   Q.  Well, at the time of this?  I'm just tying to get clear.

4   Your son was not a teenager --

5   A.  No, no.

6   Q.  -- working there?  He's an older man?

7   A.  Yes.  He's 43 years old now.

8   Q.  Okay.  So your son sends this e-mail to Mr. Bergstein and

9   copies you, and it's telling Mr. Bergstein:  "Now that we can't

10  use Wimbledon TT assets to complete the transaction, getting

11  some understanding of Deutsche's ability to lend against our

12  assets is increasingly important.  I still think we can get a

13  total of 17 to 20 million in for the raise; so long as our

14  assets can be pledged as collateral."

15          Do you see that, sir?

16  A.  Yes, I do.

17  Q.  So if 17 to 20 million that your son is saying he thinks we

18  can get a total of, what was your understanding of what that

19  money would be intended to do?

20  A.  The 17 to 20 he was referring to is not the TT money, and

21  what he thinks that it's going to do for us is to complete the

22  medical billing business and Pineboard.  That's what we were

23  trying to do since the beginning of our meetings with

24  Mr. Bergstein.

25  Q.  So basically, Arius Libra and Pineboard?

I2LPBER1                          Hallac - Cross

1    A.  Yes, sir.

2    Q.  All right.  You can take that down.

3            Now, if we could bring up Government's Exhibit 609,

4    which you were asked about on direct, and it is -- sir, do you

5    remember exhibit -- this is Exhibit 609.  It's the Swartz IP

6    Group, and it says Note Purchase Agreement.  Do you see that?

7    A.  Yes, sir.

8    Q.  Do you remember talking about this yesterday with Mr. Allen

9    and us?

10   A.  Yes, sir.

11   Q.  Now, you commented yesterday, did you not, that the title,

12   Note Purchase Agreement, had been changed by the lawyers?  Do

13   you remember saying that?

14   A.  Yes, I do.

15   Q.  Who were the lawyers?  What lawyers?

16   A.  Well, in this case, Marc Reisler, Mr. Wellner is a lawyer,

17   and Sugarman's lawyers.

18   Q.  So first of all, the name of this document is Swartz IP

19   Services Group Inc., right?

20   A.  Yes.

21   Q.  And when you say the lawyers, and you say Mr. Reisler, he

22   was at, is it the firm Howard Kaplan?

23   A.  No, sir.

24   Q.  What firm was he at?

25   A.  It was at a firm called HK -- I'm sorry, I don't remember

I2LPBER1                        Hallac - Cross

1    the name.

2    Q.  Holland and Knight?

3    A.  Yes.  Thank you.

4    Q.  And so your lawyers at Holland and Knight reviewed this

5    document, right?

6    A.  Yes.

7    Q.  And they even changed the title of it from something else

8    to what's called a Note Purchase Agreement, right?

9    A.  I do not know when the change took place.

10   Q.  Okay.  Now, the fact that your lawyers would have seen this

11   document, they would have, obviously, read the contents of the

12   document, correct?

13   A.  The lawyer would be Mark Reisler, and he would have read

14   this because he wrote some of it originally for the COR

15   transaction.

16   Q.  Okay.  Now, did Holland and Knight -- which Weston entity

17   did Holland and Knight represent on occasion in the years 2010,

18   '11 and '12?

19   A.  I don't recall that Holland and Knight represented our

20   funds at any time before.  There may have been one small

21   transaction.  I'm not -- I don't recall what it was, but it was

22   not of this caliber or this kind.

23   Q.  Okay.  So let's break that down.  When Holland and Knight

24   reviewed this document, were they representing Weston, or were

25   they representing the Weston TT fund, or were they representing

1    some other fund of Weston?

2    A.  To tell you the truth, I really do not know.  The first

3    meeting took place between Mr. Wellner and Mr. Reisler.  I may

4    have spoken to Mr. Reisler three times, you know, at that point

5    in time.  Most of my conversation with Reisler were to do with

6    Bidz at the end, and so any introduction, any retainers, I'm

7    not aware of.

8    Q.  Well, did you have knowledge that Holland and Knight would

9    have represented more than one Weston entity during the time

10   frame 2010 through 2012?

11   A.  As you ask me today, I don't really recall what they had

12   done for us earlier.

13   Q.  Okay.  Did the topic of conflicts of interest come up in

14   any discussions you had with Holland and Knight as it related

15   to the Swartz IP transaction?

16   A.  I had no conversation regarding that.

17   Q.  All right.  Now, one of the topics that you went over was

18   the issue of what was being done with the Swartz IP money, just

19   in terms of a general topic; do you remember that?

20   A.  We must have had some discussion.

21   Q.  Is it true, sir, that Weston, on multiple occasions, asked

22   Mr. Bergstein to send hundreds of thousands of dollars of

23   Swartz IP money after the TT loan to Weston?

24   A.  Yes, we did, because he couldn't give us the money from

25   where he was supposed to come originally.

I2LPBER1                        Hallac - Cross

1   Q.  So if we can pull up for identification Exhibit Z043.

2            Sir, I'd ask you to take a look at that on the screen

3   and tell me, once you've had a chance to look at it, if you

4   recognize it?

5   A.  I'm cc'd on it.  I think he did send an e-mail, yes, Keith

6   Wellner.

7   Q.  Do you recognize looking at the "to" and the "from" and the

8   parties cc'd and the topic and time set forth in this document,

9   as a document that you would have received as part of your work

10  at Weston?

11  A.  Well, you know, it talks about sending money to the bank of

12  New Canaan; so to my mind, it meant that probably it was money

13  going to Wimbledon C that had to go back quickly.  I'm not

14  really sure about that 500,000.  I know of a 500,000 but --

15  Q.  My question is a little different.

16  A.  Okay.

17  Q.  Focus on my question.  It's just:  Do you recognize this

18  document as one that you would have received as part of your

19  work at Weston in this timeframe that's reflected on the

20  document?

21  A.  This particular e-mail, I don't recall.

22  Q.  Do you recall the topic of 500,000 that you just mentioned?

23  A.  As I said, there was a couple of 500,000s.  One was

24  Wimbledon C for sure.  I don't know what the other 500,000

25  would have been.

I2LPBER1                          Hallac - Cross

1    Q.   Okay.  Well, let's make sure I understand that.  So after

2    the unwind agreement and after the initial TT-to-Swartz IP loan

3    in somewhere around November of 2011, right?

4    A.   Yes.

5    Q.   There would have been occasions when Weston would have

6    asked Mr. Bergstein to send it, or one of its funds, money from

7    Swartz IP, right?

8    A.   Yes.

9    Q.   And when you asked Mr. Bergstein or when Weston asked him

10   to do that, you understood that this was money that was at

11   least partially, if not entirely, TT money that had been loaned

12   to Swartz IP, right?

13   A.   It was a two-way traffic with Mr. Bergstein, Weston and TT.

14   Q.   So is the answer, yes; is that correct?

15   A.   The answer is correct, yes.

16   Q.   And so you understood when you asked Mr. Bergstein to send

17   money from -- TT money from Swartz IP to Wimbledon C or to

18   Weston, that you were using TT-lent money to pay either other

19   Weston funds or other Weston debt; is that right?

20   A.   Yes.

21   Q.   Now, you talked about the side letter, or you were asked

22   about it.  And that is Exhibit 176, if we could have that

23   pulled up.  It's in evidence.  Oh, it's in?  Okay.

24          So, sir, do you remember this generally?  And we'll go

25   to the next page, which is the actual side letter itself.  But

I2LPBER1                          Hallac - Cross

1    do you recognize this as something you talked about in direct

2    with the government?

3    A.   Yes.

4    Q.   And this was a letter that was sent back from Swartz IP to

5    Weston, basically representing that certain things would be

6    followed in the handling of the TT funds that went to Swartz

7    IP, right?

8    A.   Yes.

9    Q.   Who drafted this side letter, if you know?

10   A.   To my mind, either Keith Wellner or Mr. Bergstein.

11   Q.   And you know that it came from Mr. Bergstein, right?

12   A.   Now that you tell me, yes.

13   Q.   Well, let's look at the next page, and there are two

14   signature lines; do you see that?

15   A.   Yes, sir.

16   Q.   One is by Swartz IP Services, and it's signed, right?  Kia

17   Jam?

18   A.   Yes.

19   Q.   And one is by WTT, or the Weston TT fund; do you see that?

20   A.   Yes.

21   Q.   It's not signed?

22   A.   Yes.

23   Q.   Why didn't Weston sign this side letter?

24   A.   First of all, Weston Capital is not in a position to sign

25   for the actual funds that we administer.

I2LPBER1                        Hallac - Cross

1    Q.   Well, I --

2    A.   This should have been signed by Swiss Financial in the

3    Bahamas, who are the administrators of Wimbledon TT.

4    Q.   Okay.  So the signature line here calls for someone from

5    WTT or Weston TT to sign, right?

6    A.   Yes, in the box.

7    Q.   And if I'm understanding your testimony, is it your

8    testimony that no one at Weston would have been authorized to

9    do that?

10   A.   I don't think so, no.

11   Q.   Okay.  But you do agree that this document was sent to you

12   and Mr. Wellner at Weston, right?

13   A.   Yes, I do.

14   Q.   And did you guys try to get a signature from someone at

15   Weston TT?

16   A.   I don't recall.  I didn't try.

17   Q.   Is it true, sir, that Mr. Wellner and you, at Weston, did

18   not want to sign or have this agreement signed by Weston TT?

19   A.   I absolutely don't remember that he didn't want this

20   signed.

21   Q.   Now, if we go back and we look to the page before --

22   A.   Yes.

23   Q.   -- it talks about the conditions.  If we just go through

24   them quickly, the first condition is just that there is an

25   account at Deutsche Bank, and it gives the account number; do

I2LPBER1                         Hallac - Cross

1    you see that?

2    A.  Yes, sir.

3    Q.  And then the second condition basically says that until the

4    note has been repaid in full, then Swartz IP will maintain this

5    Deutsche Bank account that was discussed above, right?

6    A.  Yes.

7    Q.  And by the way, let's talk about paid in full.  This loan

8    was entered in November of 2011, but it was a five-year note,

9    right?

10   A.  Yes.

11   Q.  Meaning, it wasn't even -- the due date for the payment in

12   full was five years later, all the way up to November of 2016,

13   correct?

14   A.  Yes, except for redemptions.

15   Q.  Right.  And then in paragraph three there is a specific

16   representation as to where money will go, and it covers about

17   7-and-a-half million dollars, right?

18   A.  Yes, sir.

19   Q.  And your understanding is that money was paid out, right?

20   A.  Yes.

21   Q.  So that was abided by?

22   A.  Yes.

23   Q.  Then it talks about not paying any loans to any parties by

24   SIP; do you see that, paragraph four?

25   A.  Yes.

I2LPBER1                     Hallac - Cross

1   Q.  And by the way, you didn't see this as precluding the
2   repayment of loans to Wimbledon C, did you, or did you?
3   A.  No, I didn't.
4   Q.  So you talked to us a little while ago about the fact that
5   after this was entered, Weston asked Mr. Bergstein to send
6   $500,000 to pay to Wimbledon C, right?
7   A.  Yes.
8   Q.  And that was to repay a loan, right?
9   A.  Yes.
10  Q.  Were you asking him to violate paragraph four of this side
11  agreement?
12  A.  Like I said, I have no idea of the discussions that led to
13  this particular request.
14  Q.  And then the last paragraph says, from the other proceeds
15  of the note, then Swartz will basically invest the sum in
16  securities or make payments, right?
17  A.  Yes.
18  Q.  And you received on occasion documents, or I should say
19  banking records, that showed investments of money from the
20  Swartz IP loan, right?
21  A.  We did at the beginning, yes.
22  Q.  Now, are there any other restrictions that you're aware of
23  on the funds that TT lent to the company Swartz IP than the
24  ones that we have covered here?
25  A.  Yes, $5 million was supposed to remain in cash.

I2LPBER1                        Hallac - Cross

1    Q.  Oh, yes.  Let's go to the next page because if I missed

2    that, I don't -- yes, there we go.  Paragraph six, my

3    apologies:  "Until such time as the note is repaid in full,

4    Swartz shall maintain $5 million, less any redemption, in

5    either cash or liquid assets," right?

6    A.  Yes.

7    Q.  Now, is it true, sir, that you wanted that because you

8    wanted to have money available in the event that any of the

9    investors in TT wanted to redeem their money?

10   A.  That was the precondition of the transaction, yes.

11   Q.  And in negotiating this and then entering the deal with

12   Mr. Bergstein, you felt comfortable that that $5 million amount

13   would be appropriate for the reserve for redemptions, right?

14   A.  Yes.

15   Q.  Now, you testified, I guess yesterday, that at some point,

16   Mr. Hilton came in and wanted a redemption, and his redemption

17   was far more than $5 million, right?

18   A.  Yes, it was.

19   Q.  Was it 9 million, is that what you recalled?

20   A.  Yes, around 9 million.

21   Q.  So that amount was well beyond the $5 million redemption

22   amount that you had told Mr. Bergstein you were comfortable

23   with, right?

24   A.  Yes.

25   Q.  Is it also true, sir, that as part of the actual loan

I2LPBER1                         Hallac - Cross

1    agreement that we looked at earlier, that it wasn't just Swartz

2    IP that had to pay all of the redemptions, but Weston was

3    supposed to pay 50 percent of the redemptions?

4    A.  Yes, except to a limit of the cash that was left in

5    Wimbledon TT, roughly, at the time, two-and-a-half million

6    dollars.  Until that cash expired, we were -- we would pay half

7    the redemption, and Swartz IP the other half.  Once the

8    two-and-a-half million disappeared in redemptions, then Swartz

9    IP would pay a hundred percent of the redemptions.

10   Q.  So Weston was supposed to pay money towards the redemptions

11   up to 50 percent, right?

12   A.  Only up to two-and-a-half million, which we kept in cash at

13   TT.

14   Q.  Okay.  So you went over with Mr. Allen yesterday this one

15   million dollar redemption, and you talked about how it was

16   ultimately made, but it took a lot longer than you would have

17   liked; do you recall that?

18   A.  Yes, sir.

19   Q.  How much of that one million dollar redemption did Weston

20   pay?

21   A.  In this redemption, we paid zero because we had used up the

22   two-and-a-half million dollars on other redemptions prior to

23   that.

24   Q.  Okay.  And by the way, on the topic of how much money the

25   TT fund had before the Swartz IP deal, is it true, sir, that

1  you represented to Mr. Bergstein that TT fund had far more

2  money than the $17.5 million that it lent to Swartz IP?

3  A.   Far more money?

4  Q.   Yes, sir.

5  A.   What does that mean?

6  Q.   Well, how about does the number 85 to $110 million worth of

7  value mean anything?

8  A.   Absolutely not.  The only time that would have happened

9  would have been two years before that, when the fund had maybe

10  300 million.  We never told Mr. Bergstein there was 85 million

11  in cash.

12  Q.   Well, where and when did you tell him that there was no

13  more than around the 17-and-a-half million that you sent him?

14  A.   Well, I didn't say 17-and-a-half.  I said we had an

15  additional two-and-a-half million in cash.  So when we did the

16  transaction, we told them that we had a couple of million

17  dollars in cash.

18  Q.   So you told him when you did the transaction, that you had

19  about 19-and-a-half million dollars?

20  A.   Approximately.

21  Q.   All right.  Well, first of all, sir, do you have any

22  e-mails or written records of telling him that?

23  A.   Mr. Bergstein and I spoke on the phone.  I have no records.

24  Q.   Well, there's a lot of e-mails that we've looked at in this

25  case.  So you guys communicated a lot by e-mail, right?

I2LPBER1                          Hallac - Cross

1    A.  By phone.  I'm a phone person.  I'm really not an e-mail.

2    Q.  And you certainly, if you had wanted to make a record of an

3    important point, like we're giving you basically all of the

4    money that we have in this fund, you could have sent him an

5    e-mail that you were sending him, for example, 17-and-a-half

6    million of the 19-and-a-half million that the fund had, right?

7    A.  I could have done that, but I didn't.

8    Q.  And let's go back to the note itself, which is exhibit --

9    I'll get the right number -- Government Exhibit -- I think it

10   was 610 that we pulled up -- 609.  Let's zoom in on, first,

11   that middle part, just the heading.

12        Sir, you just told me that you only had 19-and-a-half

13   million dollars at the time you did the loan, right?

14   A.  Yes.

15   Q.  Why would you make a loan for $25 million?

16   A.  This is what you call a notional amount.  25 million meant

17   that Mr. Bergstein and I agreed that if new monies came in to

18   Wimbledon TT, we would be able to put into this note up to 25

19   million.  This does not in any way reflect the fact that there

20   was not 25 million in TT.

21   Q.  So is it something that Weston would do, is it would give

22   loans for amounts of money beyond what it even had to loan?

23   A.  I just want to say that there are many loans that are made.

24   Even Mr. Bergstein made a loan of --

25        MR. BIENERT:  Your Honor, I'd move to strike.

I2LPBER1                         Hallac - Cross

1    A.  -- up to $2 million.

2              THE COURT:  Yes.  See whether you can answer the

3    question --

4              THE WITNESS:  Okay.

5              THE COURT:  -- as it's phrased by the questioner.

6              THE WITNESS:  Okay.

7              THE COURT:  And then leave it at that.

8    A.  Okay.  It is very usual for people to make notes for larger

9    amounts than have been paid out where the note was made.

10   BY MR. BIENERT:

11   Q.  Sir, is it true that it was actually Mr. Bergstein, not you

12   and Mr. Wellner, who was trying to suggest that less money be

13   spent and more be used to pay back the debt to P2 or TT?

14   A.  Mr. Bergstein made those comments.

15             MR. ALLEN:  Objection, your Honor.  It's calling for

16   hearsay.

17             THE COURT:  Yes, sustained.  Rephrase the question,

18   please.

19             (Continued on next page)

20

21

22

23

24

25

I2L5ber2                              A. Hallac - cross

1    BY MR. BIENERT:

2    Q.  There were times when you and Mr. Wellner wanted to use

3    funds that could be repaid to TT or P2 and Mr. Bergstein

4    indicated to you that he --

5            MR. ALLEN:  Objection, your Honor.

6            THE COURT:  And Mr. Bergstein indicated?

7            MR. BIENERT:  -- indicated that he opposed doing that.

8            THE COURT:  Yes.  That's sustained.

9    BY MR. BIENERT:

10   Q.  Is it true that your directives to Mr. Bergstein -- you and

11   Mr. Wellner's -- for how money should be spent by Swartz IP,

12   caused more money to be spent or go in the direction of Weston

13   than was originally envisioned when the loan was made in

14   November 2011 and when the side letter was signed by Kia Jam?

15           MR. ALLEN:  Object to the form.

16           THE COURT:  Do you understand the question?

17           THE WITNESS:  I think so, but not really.

18           THE COURT:  Okay.  Rephrase it, please.

19   BY MR. BIENERT:

20   Q.  The side letter contained goals of how money should be kept

21   and what should be available; is that fair to say?

22   A.  Yes.

23   Q.  And it made clear that one of the objectives was to pay

24   back money to P2, right?

25   A.  No.  What was clear is that money should be paid back to TT

I2L5ber2                         A. Hallac - cross

1    should there be a redemption.  That was the upper most desire.

2    Q.  Did you have any concern in November -- strike that.

3            Was it part of your desire or intent in entering this

4    loan that any money be paid back to the TT investors not for a

5    redemption but just to pay back the note before its maturity

6    date in 2016?

7    A.  I hadn't even thought about that.

8    Q.  So, from your perspective it would have been okay for

9    Swartz IP not to pay any of the money back until November of

10   2016, as long as redemptions would be met if and when they came

11   up?

12           MR. ALLEN:  Objection.  Calls for speculation.

13   Relevance.

14           THE COURT:  Sustained.

15   BY MR. BIENERT:

16   Q.  In terms of written documents, sir, other than the side

17   letter which we talked about, were there any other restrictions

18   on the TT SIP note that weren't contained in the side letter or

19   in the actual note itself, that you're aware of?

20   A.  No, sir.

21   Q.  Now, if we could go to Exhibit 610 which was reviewed with

22   the government yesterday?  If you would publish that,

23   Ms. Howland?

24           And just to orient you, sir, do you recall this was an

25   e-mail exchange that was forwarded -- and if we can go to the

I2L5ber2                          A. Hallac - cross

1   next page where you were asked about it -- oh, I remember this.

2   My apologies.

3           This is a document that if we go a few pages in, it

4   actually has the Arius Libra Swartz IP note and pledge

5   agreement that you testified to that Mr. Wellner brought you

6   and you believe was fabricated.

7           Do you recall that topic?

8   A.  Yes, sir.

9   Q.  And you indicated when you were confronted by this document

10  with Mr. Wellner you recognized it as a not real or fake

11  document; is that true?

12  A.  Yes, sir.

13  Q.  And what, if anything, did you tell Mr. Wellner about the

14  document, what you would do or not do?

15  A.  I asked what is this document.  He just said:  Ask

16  Bergstein.

17          That's all he said.

18  Q.  And, did you do anything with the document?

19  A.  From this e-mail you know that I did.  What I did is I sent

20  it to Howard Kaplan along with many other documents because

21  Mr. Bergstein wanted to settle with all these WFF people and he

22  wanted to include this phony balance sheet so that it would

23  show the investors there was more money owed against their

24  assets.  So, we said that, I did it for Mr. Bergstein, and that

25  was supposed to be a settlement e-mail that my new lawyer was

I2L5ber2                          A. Hallac - cross

1   sending to the investors of WFF.

2   Q.  Can we go to the signature page at the end of the document?

3   And, unfortunately, I don't have the page number in front of

4   me, I don't have a hard copy.  If we can pull up page 19 of 21?

5         You were shown the last page by Mr. Allen and you said

6   you believed it was Mr. Bergstein's signature.  Do you remember

7   that yesterday?

8   A.  Yes, sir.

9   Q.  On the pledge agreement, you signed that agreement, right?

10  A.  I signed this agreement at this point in time, yes.  I

11  signed that in May of 2012.

12  Q.  You signed it with Mr. Wellner, right?

13  A.  He did too, yes.

14  Q.  Did he sign it in your presence?

15  A.  I don't remember.

16  Q.  All right.  You can take that down.

17        Now, if we can look at Exhibit 204, another exhibit

18  you went over with the government, and you recall, sir, this is

19  a document you went over with the government and they directed

20  you to the first portion here where it says items to complete

21  and agree on and they focused you on the sentence:  What about

22  Swartz $5 million guarantee; right?

23  A.  Yes.

24  Q.  And you testified yesterday that this was a reference to

25  the $5 million that was supposed to stay in a bank account at

I2L5ber2                        A. Hallac - cross

1    Deutsche Bank relative to the TT-Swartz IP side letter, right?

2              MR. ALLEN:  Objection.  Misstates.

3              THE COURT:  Rephrase it.

4    BY MR. BIENERT:

5    Q.  What did you say about this so I'm not getting it wrong.

6    A.  Well, this $5 million reference has got to do not with TT,

7    it has got to do with a guarantee that Mr. Jerry Swartz was

8    originally supposed to make to Deutsche Bank so that we could

9    get some money.  Mr. Bergstein mentioned that Mr. Swartz or

10   Swartz IP, at many different times, pointed out certain

11   guarantees that could be obtained from Mr. Swartz or from --

12   sorry -- this $5 million guarantee could be one of a couple

13   things.

14   Q.  Well, do you remember at this time frame in April 2012 --

15   I'm sorry, March 2012 time frame and April, that among other

16   things Mr. Wellner was trying to get a loan against the assets

17   and help pay some of the debt?

18   A.  Yes.

19   Q.  Do you remember him dealing with a company in exchange or a

20   transaction that we have referred to as Patriot?

21   A.  Yes.

22   Q.  Is it true, sir, that this reference here is to a $5

23   million guarantee that the folks considering the Patriot loan

24   with Mr. Wellner and you wanted from a third-party?

25   A.  Yes, because Aramid was part of those funds and they needed

I2L5ber2                        A. Hallac - cross

1   to have a guarantee from a third-party that had substance, not

2   Weston Capital.

3   Q.  So, this $5 million, just so we are clear, this $5 million

4   reference here is not at all the $5 million that was referenced

5   in the side letter of the TT Swartz IP, correct?

6   A.  Correct.  Yes.

7   Q.  Now, back on the $5 million that was to be available for

8   redemptions in the Swartz IP-TT loan, is it true, sir, that

9   when you met with the FBI in 2015 and were discussing that, you

10  told the FBI that as long as there was $5 million available for

11  redemptions, then Swartz IP could invest the rest of the money

12  as it saw fit?

13              MR. ALLEN:  Objection.  Rule 613.

14              THE COURT:  Yes.  What's the impeachment?  Let me hear

15  you at side bar.

16              MR. BIENERT:  Sure.

17              THE COURT:  What is your basis for -- I will hear you

18  at side bar.

19              Ladies and gentlemen, please stand up and stretch and

20  take that deep breath also.  Ladies and gentlemen, I'm going to

21  give everybody a 10-minute recess.  Please do not discuss the

22  case among yourselves or with anyone else.

23              Thank you.

24              (Witness steps down)

25              (Jury not present)

I2L5ber2                          A. Hallac - cross

1           (At side bar)

2           THE COURT:  I can say for the record that this trial

3    has blown through my all-time record for side bars in any trial

4    of any type, ever, a record I did not want to break but that's

5    the way it is.

6           So, let me hear the objection and the response.

7           MR. ALLEN:  The objection is he just started to ask

8    about a prior statement.  You need to establish under 613 some

9    inconsistency beforehand.  He can't just read statements that

10   were made in the past.  So, there is no inconsistency, there is

11   nothing to impeach yet.  You need to establish a foundation.

12   *Is it your testimony that such and such?*  And then you can try

13   to confront with a prior consistent statement.

14          But, the predicate hasn't been done here.

15          MR. BIENERT:  And I think he is getting a step ahead

16   of the game.  I think I can ask any question that is a

17   legitimate, factual question as long as I have a good faith

18   basis.  I can ask did you tell the FBI then?  And then I can

19   say because that was true.

20          MR. ALLEN:  His prior statement to the FBI is hearsay

21   and there is no exception until you lay a foundation.

22          MR. BIENERT:  It is --

23          THE COURT:  No.  What you can ask is not what did you

24   tell the FBI but you can ask did it happen.

25          MR. BIENERT:  Did it happen.  Right.

I2L5ber2                          A. Hallac - cross

1          THE COURT:  That, you can ask.  If he says no, it

2     didn't happen, then you're one step closer.  That's all.

3          MR. BIENERT:  Agreed.

4          I will just say for the record I think you can do it

5     both ways but I understand your admonition and I will ask it --

6     I won't ask about a statement, I will just ask did it happen

7     and I won't get to a statement unless and until we get there.

8          THE COURT:  Generally speaking, reading a document not

9     in evidence is not a good thing to do, reading from a document

10    not in evidence.  Okay?

11         MR. BIENERT:  Okay.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I2L5ber2                        A. Hallac - cross

1              (In open court)

2              THE COURT:  We are in recess.

3              MR. ALLEN:  Your Honor, we do have some issues we can

4    raise with the Court if we have a few minutes.  I don't know if

5    now is a good time or not.

6              THE COURT:  Sure.  Go for it.

7              MR. ALLEN:  We want to give the Court maybe an update

8    about timing.

9              Your Honor had asked us to work with the defense to

10   get stipulations for witnesses.  Over the weekend we offered to

11   stipulate to 14 witnesses, actually, which would basically be

12   with the exception of a couple witnesses Paul Hinton, our

13   summary witness, a couple victims, an IRS witness and a witness

14   from Deutsche Bank, most of the remaining witnesses.  I think

15   it would allow us to rest either at the very end of this week

16   or early next week but hopefully soon.  It depends on the

17   length of the cross-examinations.

18             We have gotten agreement on some stipulations, there

19   are still five that are outstanding that we are waiting to hear

20   on from the defense.  But one thing though, which I think the

21   Court should be aware of in terms of timing, is that we

22   received a disclosure last night from the defense that provided

23   notice that they intend to call 13 additional witnesses and

24   this is in addition to the 19 witnesses that they had provided

25   in the first letter they had sent us.

I2L5ber2                            A. Hallac - cross

1          So, to the extent the defense is not playing games and

2    actually intends to call 30 witnesses in their defense case,

3    this is not a trial that's going to be ending any time soon.

4    And so, we wanted to raise that for the Court.

5          And then, also, we were given a notice of 13

6    additional witness but there have been no 26.2 materials

7    produced for any of those witnesses, and we also still never

8    received any contemporaneous notes of meetings with witnesses

9    from the prior set with the exception of a couple notes that

10   were sent to us after your Honor's order for Dan Ray.  That's

11   where we are in terms of timing --

12         THE COURT:  Let me back this up.

13         So, you are waiting to hear on five more stips but

14   assuming you get these stipulations, you think it's plausible

15   that you will be resting by the end of this week?

16         MR. ALLEN:  I think so.  Mr. Bienert told us yesterday

17   that he had 90 minutes of cross for Mr. Hallac, so if

18   Mr. Hallac, we are assuming he is not going to take a full day

19   today.

20         THE COURT:  I understand.  I understand.  Okay.

21         Now, the next thing you told me is that you got notice

22   of the defense's intention to call 13 additional witnesses

23   when?

24         MR. ALLEN:  Last night.

25         THE COURT:  Who gave you this notice?

I2L5ber2                          A. Hallac - cross

1              MR. ALLEN:  Mr. Bisconti sent it, I think.

2              THE COURT:  Does the defense wish to explain itself?

3              MR. BIENERT:  I can certainly explain in general,

4       although I don't know the specifics on each witness.

5              First of all, we are not going to call 30 witnesses

6       but we are hyper --

7              THE COURT:  Well, no, no.  But that's the problem.

8       Why don't you designate 180 witnesses.  Its great, because then

9       the government, your adversary, will not know who to prepare

10      for cross-examination on.

11             It's a great plan but it's a corruption of the trial.

12             MR. BIENERT:  Well, that's not what's happening at

13      all, your Honor.  I can assure you of that.

14             First of all, like the government --

15             THE COURT:  Mr. Hallac, you can stay out.  We will get

16      you when you are needed.

17             MR. BIENERT:  Like the government, we certainly expect

18      to be giving them notice a day in advance of who we are calling

19      so they know who to prep for.

20             Number two, many of the witnesses are lining up people

21      that we might need for short testimony to address various

22      things that have been happening in the last week or two, much

23      of which is on these, what I will call side issues, the 404(b),

24      etc., that we at least need to cue up people in the event that

25      we need to put them on for some aspect of it or not.

I2L5ber2                          A. Hallac - cross

1              THE COURT:  I could have sworn that I read that I

2     ordered the government to disclose its 404(b) evidence in mid

3     to late December 2017.  That's what I remember doing and that's

4     what I remember reading in submissions.

5              Is my recollection in error?

6              MR. BIENERT:  It is certainly true as to some things,

7     yes.  There was a notice given but the notice that we received

8     in December did not fully indicate --

9              MR. ALLEN:  False.

10             THE COURT:  Let Mr. Bienert finish, please.

11             MR. BIENERT:  The notice we were given gave topic and

12    very short descriptors.  We then got a lot more information,

13    for example, in our hearing in front of your Honor on January

14    25th where there was a lot more explanation of what was going

15    to happen.

16             We then, over time, have received various Jencks Act

17    statements and exhibits relevant to these witnesses and we

18    pretty well get new exhibits and new statements every day.

19    That's been an ongoing thing.  Every day, I would think it is a

20    rare day when I'm not standing here when we didn't receive new

21    exhibits or new Jencks last night.  And then we are hearing

22    what's being said at trial.  Often times that is a good bit

23    beyond what we expected or understood the witness would say.

24             So, that's how it happens, it is a continuum.  And I

25    have not had a situation or it is certainly a challenging one,

I2L5ber2                          A. Hallac - cross

1    I would say, from my standpoint, that when we are dealing with

2    other issues and we are learning more about them as we go, to

3    decide what, if anything, we can put on to address it.

4              THE COURT:  Well, Mr. Bienert, the problem I have with

5    the statement you just made is advising your adversary of an

6    intention to call 19 witnesses and in the, I believe third week

7    of trial, you turn around on a Tuesday night and advise you

8    have 13 more who you plan to call but provide no 26.2 materials

9    doesn't sound to me like a continuum at all.

10             MR. BIENERT:  Well, I --

11             THE COURT:  I mean, you didn't advise them, oh, I have

12   two witnesses here that I want to add to the 19 and then there

13   is three more I want to add.  You, all of a sudden, last night,

14   dropped 13 witnesses at once.  Where is the continuum?

15             MR. BIENERT:  Well, the continuum as to the witnesses,

16   your Honor, are as a result of discussions at the end of the

17   day about things that have happened in the preceding day or

18   days and so, for example, and these are things that I expect.

19             THE COURT:  The end of which day?

20             MR. BIENERT:  Well, there was discussions yesterday

21   for sure, there were discussions over the weekend as to maybes,

22   but last night there was a more fulsome discussion of these are

23   the issues that we think we may need to address and we may need

24   to reach out to people who may need to address them.

25             THE COURT:  I thought you were talking about

I2L5ber2                          A. Hallac - cross

1   discussions in this courtroom.

2            MR. BIENERT:  No, no, no, your Honor.  I'm talking

3   about what we do, not shockingly at the end of days or chunks

4   of trial we do a lot of things but among them is talking about

5   what, if anything, we may need to rebut.

6            THE COURT:  And dropping on the government 13 proposed

7   witnesses, you're characterizing as a continuum?

8            MR. BIENERT:  No.  I'm characterizing --

9            THE COURT:  I thought that's what you said to me.

10            MR. BIENERT:  What I am trying to say, I am not always

11   artful, your Honor, is that our decision making is reacting on

12   a continuum to things that we receive and things we hear and

13   see here at trial.

14            THE COURT:  That may be true.

15            MR. BIENERT:  That's what happens.

16            THE COURT:  That may be true.  Your decision-making

17   may be on a continuum.  It may in fact be on a continuum, but

18   your disclosure to opposing counsel is not.  Therein lies the

19   problem.

20            We are in recess.

21            (Recess)

22            (Witness resumes the stand)

23            (Continued on next page)

24

25

I2L5ber2                          A. Hallac - cross

1          (Jury present)

2          THE COURT:  Please, be seated.

3          You may continue.

4          MR. BIENERT:  Thank you, your Honor.

5  BY MR. BIENERT:

6  Q.  So, sir, back to the understanding of the TT-Swartz IP loan

7  and what parameters there were on it.  Was it your

8  understanding that if the $5 million was kept available for

9  redemptions then Swartz IP could otherwise determine how to

10  invest the other money?

11  A.  Yes.

12  Q.  And on the topic of transfer or what Swartz IP did with the

13  money after getting the $17.5 million from TT, is it true that

14  $750,000 went from Swartz IP back to Weston Financial Services

15  in November as part of the original deal?

16  A.  That's what I understand.  I was not made aware of it at

17  the time but I do understand that it was done.

18  Q.  And that later in November another $1,700,000 was paid to

19  pay down the P2 loan?

20  A.  That's correct.

21  Q.  And then, in December, there was another $1,325,000 from

22  Swartz IP back to pay down the P2 loan?

23  A.  That's right.

24  Q.  Also, in December, there was the $750,000 payment from

25  Swartz IP to what went to the Purplebox account --

I2L5ber2                          A. Hallac - cross

1   A.   Yes, sir.

2   Q.   -- that Mr. Wellner set up, right?

3   A.   Yes, sir.

4   Q.   And is it true that also in December there was a $750,000

5   payment from Swartz IP to Fund.com that you guys requested?

6   A.   We did not request any payment to Fund.com.

7   Q.   You don't have -- do you remember that topic at all?

8   A.   Look.  This was really a negotiation between Mr. Galanis

9   and Mr. Bergstein.  He arranged all these various payments.

10  Q.   Is it true that in March of 2012 there was another $500,000

11  that was paid to Weston Capital Management at your request from

12  Swartz IP?

13  A.   At my request or at Weston's request?

14  Q.   Weston's request.

15  A.   If you say so, then yes, but I don't recall it.

16  Q.   Well, before the break when I was asking you about the

17  $500,000 request and was it accurate that you said two things

18  to us, there was one that went to Wimbledon C and another that

19  you thought you remembered that went for another purpose.

20        Do you recall that testimony earlier today?

21  A.   Yes, sir.

22  Q.   What were the two $500,000 payments that you had in mind

23  when you gave that answer?

24  A.   What I had in mind is that there may have been more than

25  one $500,000 payment, one that was at least possible to be for

I2L5ber2                          A. Hallac - cross

1    Wimbledon C but the other one I have no recollection at all.

2    There was a lot of payments going back and forth between all

3    these entities.

4    Q.  Well, is it true, sir, that at the end of the day of the

5    $17.5 million or thereabouts that went from TT to Swartz IP,

6    that over $7 million of it was paid back by Swartz IP to either

7    TT funds -- strike that -- Weston Funds or Weston entities or

8    redemptions of Weston investors?

9    A.  Sounds possible.

10   Q.  Now, the $17.5 million that was lent to this business

11   Swartz IP, as we already discussed, it was a loan that matured

12   in five years, right?

13   A.  Yes.

14   Q.  And it had an interest rate and things like that attached

15   to it, correct?

16   A.  I think so, yes.

17   Q.  When Weston would ask Swartz IP to send it money or send

18   money for P2, some of the things we just discussed, what, if

19   anything, would Swartz IP receive in exchange for sending that

20   money to Weston or whatever designated entity Weston

21   designated?

22              MR. ALLEN:  Object to the form.

23              THE COURT:  Rephrase it.

24   BY MR. BIENERT:

25   Q.  Would Swartz IP get anything in exchange from sending

I2L5ber2                           A. Hallac - cross

1  millions of dollars from Swartz IP to the Weston entities or

2  directives that we just discussed?

3  A.  I don't think there was any paperwork.

4  Q.  Well, independent of whether there was any paperwork would

5  Swartz IP get anything for that in exchange for doing that?

6  A.  You mean some fees you mean?

7  Q.  Sure.

8  A.  Why would they do that?  We never charged fees for

9  Mr. Bergstein when we gave him money.

10  Q.  So, is your answer no, Swartz IP would not get anything in

11  exchange?

12  A.  That's correct.

13  Q.  Were they deemed loans, from your perspective?  In other

14  words, if Swartz IP had received its $17.5 million and had that

15  money, and Weston said, for example, send us $500,000 to go to

16  Wimbledon C, was it your understanding that that was a loan to

17  Wimbledon C that would ever get paid back?

18          MR. ALLEN:  Object to the form.

19          THE COURT:  Do you understand the question?

20          THE WITNESS:  No, sir.

21          THE COURT:  Rephrase it, please.

22  BY MR. BIENERT:

23  Q.  When Weston asked Swartz IP to send it money, did you have

24  any understanding as to whether Swartz IP would ever be paid

25  back or reimbursed that money that it didn't pay?

I2L5ber2                          A. Hallac - cross

1    A.   Okay.  I need to therefore just give you a small answer.

2    Swartz IP was permitted to invest money.  The reason we also

3    did the deal with Swartz IP was because Mr. Bergstein said that

4    he could make much higher returns than Mr. Tewksbury.  So, you

5    have to understand the funds were co-mingled all over the

6    place, Mr. Bergstein sends totals and statements that are half

7    correct, half not, and all that I can say to you is that there

8    was really not a proper accounting and Mr. Bergstein made clear

9    that he could make plenty of money with that $17 million and it

10   would solve a lot of problems that he had for the repaying us

11   back.

12   Q.   Well, sir, do you agree that any money that Mr. Bergstein

13   took from the $17.5 million and sent back to Weston or one of

14   the places you said to send it, that was no longer money that

15   Mr. Bergstein had available to invest, was it?

16   A.   Yes.  That's right.

17   Q.   So, if he started with $17.5 million that he could invest

18   some of, if $7 million went back to Weston then the amount of

19   money he could invest went down a lot, right?

20   A.   Yes, like other investments that we had asked him to make.

21   Q.   All right.  Let's talk about Jerry Swartz for a moment.

22        You testified on direct about when the Swartz IP TT

23   loan was enacted you went ahead and you executed the loan and

24   loaned the money but there were some things that you still

25   wanted, one of which was some sort of a signature or something

I2L5ber2                        A. Hallac - cross

1    from Mr. Swartz.  Do you recall that?

2    A.  Yes.

3    Q.  And, you testified that you waited several months and

4    didn't get it, right?

5    A.  That's correct.

6    Q.  But, you knew Mr. Swartz, right?

7    A.  I met him once for an hour.

8    Q.  And you had a meeting with him and exchanged contact

9    information, right?

10   A.  Yeah.  We had that.

11   Q.  If we could look at Exhibit H7?

12           MR. ALLEN:  Is this in evidence?

13           MR. BIENERT:  It is in evidence.

14   Q.  I direct your attention to Exhibit page 7 and just to

15   orient you, sir, I will focus on the bottom of the page first,

16   there is an e-mail from Jerry Swartz to Albert Hallac.  Do you

17   see this is in August of 2011?  Do you see Mr. Swartz wrote you

18   an e-mail basically attaching some other things on some other

19   projects he is involved?

20   A.  Yes.

21   Q.  Do you remember meeting Mr. Swartz around August 2011?

22   A.  I definitely met him.

23   Q.  Then, if we go to the e-mail above in the middle of the

24   page, you emailed him back saying how much you enjoyed meeting

25   him and are looking forward to doing things together and hope

I2L5ber2                          A. Hallac - cross

1    to see you soon; right?

2    A.   It is a polite e-mail that you send normally to anyone you

3    do business with.

4    Q.   And this, by the way, was in August 2011, a couple of

5    months before the Swartz-TT loan, correct?

6    A.   Yes.

7    Q.   So, during those many months that you told us you were

8    waiting on a signature from Mr. Swartz, did you ever e-mail

9    Mr. Swartz about getting his signature?

10   A.   That would have been hurtful to Mr. Bergstein.  I let him

11   do whatever he needed to do to deliver what he promised.

12   Q.   So is the answer no, you never did e-mail him?

13   A.   Because I told you I couldn't because he was responsible to

14   obtain it.

15             THE COURT:  Who is he?

16             THE WITNESS:  Mr. Bergstein.  Sorry.

17   BY MR. BIENERT:

18   Q.   So, just to be clear, you never reached out to Mr. Swartz

19   in these successive months when you said you wanted to get a

20   signature from him, right?

21             MR. ALLEN:  Asked and answered, your Honor.

22             MR. BIENERT:  I don't think he answered.

23             THE COURT:  Well, you can answer it.

24             THE WITNESS:  No, I did not reach out.

25   BY MR. BIENERT:

I2L5ber2                          A. Hallac - cross

1    Q.  You testified about your meeting with Mr. Hilton and this

2    is what led to him saying he may redeem and then, as I recall,

3    did you tell us that you basically asked him to hang in there

4    and later he did redeem?

5            Is that, more or less, what you told us?

6    A.  Yes, sir.

7    Q.  You told us yesterday that when you met with him he said he

8    was not happy with the funds' returns.

9            Do you remember telling us that?

10   A.  Tewksbury's returns, yes.

11   Q.  So, first of all, do you recall approximately when that

12   meeting was, what month and year?

13   A.  I think it was April of that year, of 2012.

14   Q.  How would Mr.  -- strike that.

15           So, was there a method that Weston used or the Weston

16   TT Fund used to apprise its investors of the status of its

17   funds or its investment returns?

18   A.  We sent some monthly returns.

19   Q.  Okay.

20           So, every month folks at Weston would send to the TT

21   investors a purported statement of how its investment was

22   doing, right?

23   A.  On how the -- TT performance, yes.

24   Q.  And so, with the TT Swartz IP agreement being reached in

25   November, by the time Mr. Hilton came and saw you, he would

I2L5ber2                        A. Hallac - cross

1    have received in the ballpark of five monthly statements

2    telling him how his investment was doing, right?

3    A.   Telling him how Mr. Tewksbury was performing.

4    Q.   Okay.  So, the statements that you guys sent, they just

5    said what the TT Fund was doing, they did not, on their face,

6    say this is what your individual funds are doing, right?

7    A.   That's correct.

8    Q.   Is it true, sir, that you or Mr. Wellner or no one at

9    Weston ever, in those monthly statements between November and

10   April of -- November 2011 to April of 2012, never let

11   Mr. Hilton or the TT investors know their money was at

12   Swartz IP?

13   A.   No, sir.

14   Q.   Did y'all talk amongst yourselves about potentially

15   changing the monthly statement that went out suggesting the

16   money was tracking TT?

17   A.   No, we did not.

18   Q.   Now let's talk a little bit about the P2 fund.  So, if we

19   go back in time to July of 2011, this is when the discussions

20   about getting Arius Libra and the Pineboard and the unwind were

21   all coming to a head, correct?

22   A.   Yes, sir.

23   Q.   Is it true that you were the person, within Weston, who

24   came up with the idea that potentially the P2 fund would be a

25   fund that Weston could use to do the deal?

I2L5ber2                          A. Hallac - cross

1    A.  It was not a deal, it was a short-term loan.

2    Q.  To do the loan.

3    A.  Yes, sir.

4    Q.  And at that time, by late July of 2011, is it accurate that

5    you had already taken money -- some money that was in TT, and

6    had, in essence, liquidated it so it was available as cash?

7    A.  Are you talking about taking cash from TT and sending it to

8    where?

9    Q.  My apologies, sir.  I am still hung up on TT.  I misspoke.

10   A.  Okay.

11   Q.  Let's try this again.

12   A.  Okay.

13   Q.  Is it true that in the July 2011 time frame that the P2

14   fund had some available cash because you had done something to

15   make it more readily available based on some deadlines that

16   were coming up on the P2 fund?

17   A.  The P2 fund was going to be liquidated at the end of the

18   year.  We had redeemed from a manager in the normal course of

19   business sometime in June, May-June, and the money that was in

20   the end in the P2 fund, was the proceeds of that redemption

21   that came in around that time.

22              (Continued on next page)

23

24

25

1    BY MR. BIENERT:

2    Q.   And about how much money had been redeemed in the regular

3    course of business about that time?

4    A.   $12 million, before expenses and fees and whatever.

5    Q.   And so what would happen with that money at the end of the

6    year, based on what the schedule was?

7    A.   We would finalize -- we would finalize the balance sheet,

8    the statements and all the investors would get their money of

9    the entire fund, not just the 12 or $10 million.

10   Q.   And so when it came to the business deal being discussed

11   with Mr. Bergstein, what became the unwind and Arius Libra and

12   Pineboard, you were the person who first raised the idea that

13   you had this liquidated money from P2, correct?

14   A.   Yes.

15   Q.   Now, on the topic of whether the P2 loan was prohibited,

16   did Mr. Wellner indicate to you that it was not a prohibited

17   use of the fund money?

18   A.   I don't recall him saying that.

19   Q.   Now, you testified, I believe, that you had discussions

20   with Mr. Bergstein about whether using the P2 funds was or

21   wasn't an authorized use of the funds; do you remember that

22   topic in direct?

23   A.   Yes.

24   Q.   When would you have had those discussions with

25   Mr. Bergstein?

I2LPBER3                     Hallac - Cross

A.  Probably when he asked if we can come up with money, since

he couldn't get the loan from Deutsche Bank.  He asked if we

could come up with money, and the P2 money that was sitting

there would be an asset, and he would make sure to send it back

to us before the end of the year.  That was the key condition,

by the way, without which it would never have been done, that

we get repaid that loan back before the end of the year.

Q.  And you --

A.  And Mr. Bergstein knew that.  I'm sorry.

Q.  My apologies.  Was part of your thinking, sir, that the

money was available but had to be addressed at the end of the

year, and you wanted to make interest or some money on that

money while it was sitting there?

A.  Actually, Mr. Bergstein suggested five percent return.  You

know, I didn't negotiate.  I said fine, because you do have to

get some return.

Q.  Now, did you ever, in writing, indicate to Mr. Bergstein

that it was a prohibited transaction?

A.  No, I did not.

Q.  Is there a reason you didn't?

A.  I just -- because you just said, it's a prohibited

transaction.  He knew about it.  He didn't need to have it on

paper.

Q.  So I'm asking, is the reason you didn't put it in paper is

because you believed it would be indicative of wrongdoing and

I2LPBER3                          Hallac - Cross

1    you didn't want a record?

2    A.  Yes, sir.  It was wrongdoing.

3    Q.  But all the documents that reflected the P2 loan going into

4    Arius and the exchange of assets, those were in writing,

5    correct?  We looked at them yesterday?

6    A.  Those were not what?

7    Q.  They were all in writing?

8    A.  Yes.

9    Q.  Let's switch to a topic of a relationship among the funds.

10   So you talked about this topic of conflicts of interest during

11   your direct testimony; do you recall that?

12   A.  Yes, sir.

13   Q.  So, first of all, as it related to you and Mr. Wellner and

14   your son, Jeffrey Hallac, and the Weston folks, on the one

15   hand, and Mr. Bergstein on the other -- and by relationship, I

16   mean during, say, 2011 going into 2012.

17           Is it fair to say that Mr. Bergstein would come up

18   with potential deal options or ideas for different deals, and

19   then as to some of the deals that were of interest to you, you

20   would discuss Weston's being able to try to raise money for

21   those deals?

22           MR. ALLEN:  Object to the form.  It seems like seven

23   questions in one.

24           THE COURT:  Sustained.

25   Q.  Was the relationship that you had with Mr. Bergstein -- and

I2LPBER3                        Hallac - Cross

1    when I say "you," I mean Weston -- in 2011 and '12 one where he

2    would suggest different types of business transactions to you?

3    A.  Yes, and the first one was getting involved with Disney and

4    Touchstone.

5    Q.  The potential movie deal, right?

6    A.  Yes, sir.

7    Q.  And was it also the relationship that, in discussing such

8    potential deals, you would address with him Weston's ability to

9    raise money for the deals?

10   A.  To raise money, yes.

11   Q.  How long had Weston been in the business of raising money

12   for deals as of 2011?

13            MR. ALLEN:  Objection, relevance.

14            THE COURT:  Sustained.

15   Q.  So you mentioned the Pagoda and Touchstone deal.  Well, let

16   me back up.  Once you guys arrived at the idea of doing Arius

17   Libra and then Pineboard with the medical companies, was the

18   idea that Arius Libra was going to be a company that might hold

19   several smaller companies like the medical billing company?

20   A.  Mr. Bergstein had made that suggestion, yes.

21   Q.  And so is it true that there were other businesses that you

22   guys discussed potentially being part of Arius Libra?

23   A.  Not necessarily, but we did discuss other businesses, yes.

24   Q.  And some of those businesses were -- Cascade was one,

25   right?

I2LPBER3                          Hallac - Cross

1   A.   Yes, sir.

2   Q.   Do you recognize the name of Illumina?

3   A.   Illuminer.

4   Q.   Was that a business that you guys discussed potentially

5   getting involved in?

6   A.   That was a business that Mr. Bergstein suggested could use

7   an infusion of a couple of million dollars, and we tried to put

8   together some documents and some offering memorandums to try to

9   do that, yes.

10  Q.   And, obviously, Bidz was one as well, right?

11  A.   No, not Bidz, not at that time.  Bidz comes in --

12  Q.   2012?

13  A.   In 2012, and my team was ready to do a lot for Bidz, but

14  Mr. Bergstein kept delaying and delaying.  There's plenty of

15  e-mails at Weston Capital whereby one of the salespeople kept

16  sending e-mails requesting information with Mr. Bergstein.

17  Q.   There's no question about explaining the Bidz deal pending,

18  sir.

19  A.   I'm just telling you that we tried to raise money, but

20  there was no cooperation, sir.

21  Q.   We'll come back to Bidz in a moment.

22  A.   Okay.

23  Q.   And if we get to the time frame by the end of 2011 -- well,

24  turning into the new year 2012, is it true that you were,

25  obviously, a principal of Weston management, right?

I2LPBER3                          Hallac - Cross

1   A.  Yes, sir.

2   Q.  And you were one of the managers of the P2 fund; is that

3   right?

4   A.  Yes.  Well, I was one of the managers of the company that

5   managed all of our funds, your investment advisor.

6   Q.  And let's talk about that topic, all of your funds.  So

7   you -- and you owed a fiduciary obligation to that fund?

8   A.  Yes, sir.

9   Q.  That would be the P2 fund, right?

10  A.  Amongst others, right.

11  Q.  You also had a fiduciary duty to the WFF fund, right?

12  A.  Yes, sir.

13  Q.  And you owed a fiduciary duty to the TT fund, right?

14  A.  Yes, sir.

15  Q.  And you were also on the board of directors -- in fact, you

16  were chairman of the board, right, of Arius Libra, the new

17  company?

18  A.  I don't know if I was chairman.  I was definitely on the

19  board; so was Mr. Bergstein.

20  Q.  And the majority owner of Arius Libra was by Weston, right?

21  A.  By Weston funds, yes.

22  Q.  So when you're discussing deals with Mr. Bergstein, or

23  anyone, in this time frame, you were covering sort of several

24  hats for several duties of loyalty to several different

25  entities when you're having these discussions; is that true?

I2LPBER3                          Hallac - Cross

A.   There was not spread loyalty.  It was the same loyalty for

every fund.

Q.   All right.  Even when there were transactions that you were

involved in that involved one fund putting in money that might

have gone to the benefit of another fund?

A.   These were wrongdoings.

Q.   When you would send e-mails, and the various e-mails that

we've at least discussed so far, would you ever put in the

e-mail which hat you were wearing?

        In other words, if you were sending an e-mail that was

addressing something that implicated Pineboard, Arius and P2,

would you indicate in your e-mails which fiduciary hat you were

wearing if it applied to only one of the three companies?

A.   First of all, I don't recall if I ever wrote for only one

fund; so I doubt that.  Second of all, when you manage a firm

that has assets and that has investments, you manage them

totally as important to you.

        Plus, there was a whole investment team behind me.  I

wasn't alone at the time.  Everybody was leaving.  We were

getting smaller, but you don't just write and say, oh, I'm

calling about Pineboard or, oh, I'm writing about P2.  You just

talk about what the subject is, and everybody knows what you're

doing.

Q.   And by the way, the entire business model of Weston and the

funds it managed was that your Weston management company would

I2LPBER3                          Hallac - Cross

1    be involved in the management of multiple funds at once, right?

2    A.  Yes, sir.

3    Q.  And so there was nothing inherently wrong, from your

4    perspective, about managing more than one fund at a time,

5    correct?

6    A.  No.

7    Q.  It's just a matter of how you handled each situation as it

8    arises, right?

9    A.  Yes.  Yes, sir.

10   Q.  Now, at the time of the unwind and Arius Libra deal,

11   et cetera, Mr. Bergstein and his attorneys were helping both

12   Gerova and Weston with various legal situations, right?

13   A.  They were helping Gerova, and when they helped Weston, it

14   was because we were asked to be involved with one of his funds.

15   Q.  Okay.  And Gerova, if we go to the time frame of 2011 as

16   the time y'all were leading up to the unwind and all those

17   deals, Gerova had several different legal matters that needed

18   to be addressed, right?

19   A.  I think so, many legal matters.

20   Q.  More than five or six?

21   A.  I have no idea.  I know there was a lot of lawsuits.

22   Q.  And is it true that Weston dealt with a lawyer by the name

23   of Alex Weingarten to help it with some of its legal issues?

24   A.  Mr. Bergstein suggested that Alex would handle his, as well

25   as Gerova's, as well as Weston's, yes.

I2LPBER3                           Hallac - Cross

1   Q.   So a lawyer who represented Mr. Bergstein, a guy by the
2   name of Alex Weingarten, was also doing legal work for Gerova
3   and doing some legal work for Weston in the same time frame,
4   right?
5            MR. ALLEN:  Object to the relevance.
6            THE COURT:  Sustained.
7   Q.   When Weston spent money on attorneys for legal matters
8   relative to a particular deal or to a particular fund, where
9   did it get the money to pay itself for the attorneys fees?
10            MR. ALLEN:  Object to the relevance.
11            MR. BIENERT:  It goes to the expense issue, your
12   Honor.
13            THE COURT:  I'm going to allow it.
14   BY MR. BIENERT:
15   Q.   Do you have my question in mind, sir?
16   A.   Please repeat, just to be on the safe side.
17   Q.   If Weston paid a lawyer to do legal work for one of its
18   funds or for any type of transaction it had, or legal matter,
19   where would the money come from for Weston to pay for it?
20   A.   It generally would be from a variety of sources.  In this
21   particular case, we actually paid for Mr. Bergstein's lawyer
22   and Gerova's lawyer 150,000 came to pay O'Melveny and something
23   else, Myers.  We paid $150,000 that were never repaid back to
24   us.  So monies came usually, when we managed the fund, if there
25   was a legal matter, it came from the fund in question.

I2LPBER3                          Hallac - Cross

1   Q.  So if a legal matter was deemed by Weston, in the example

2   of a Weston legal matter, attributable to a particular fund,

3   then the legal fees to pay for that work were taken from the

4   fund itself, right?

5   A.  Generally, if it had money.

6   Q.  As it related to the medical business that became

7   Pineboard, did Weston hire a consultant in order to help

8   understand and look into this medical industry?

9   A.  Yes, we did.

10  Q.  And was the name of the consultant Meacham?

11  A.  Yes.

12  Q.  And I'm assuming that Weston paid Meacham for its services?

13  A.  We sure did.

14  Q.  And where did the money come from to pay Meacham, if you

15  know?

16              MR. ALLEN:  Objection to the relevance.

17              THE COURT:  I'm going to allow it.

18  A.  The money came from Weston Capital.

19  Q.  So it came out of the Weston Capital fund, not one of the

20  particular hedge funds -- or strike that -- fund; is that

21  correct?

22  A.  Yes, it came from a company, not from any of the other

23  funds.

24  Q.  You mentioned on direct, I think there was a few questions

25  where you referenced a company by the name of Sovrin?

I2LPBER3                         Hallac - Cross

1    A.  Yes.

2    Q.  S-o-v-r-i-n?

3    A.  Yes, sir.

4    Q.  Did you understand that Sovrin was a company that

5    Mr. Bergstein set up to do work on the Pineboard medical rollup

6    project?

7    A.  His intentions changed quite a bit during the term of the

8    relationship.  Whatever that was, we were supposed to be owners

9    of that entity, as well as the other one, as well as Pineboard,

10   and we never received our shares.

11   Q.  Sir, I'm not asking about ownership.  Let me ask my

12   question again.  Did you have an understanding that Sovrin was

13   a company that Mr. Bergstein set up to do work on the Pineboard

14   medical rollup project?

15   A.  No, sir.  I did not have that understanding.

16   Q.  Did you ever visit Sovrin in California?

17   A.  No, I didn't.

18   Q.  You were asked questions about the December 2011 meeting

19   with the WFF investors at the hotel in Florida; do you recall

20   that topic?

21   A.  Yes, sure.

22   Q.  Now, was this a meeting that was scheduled in advance so

23   that notice was given to the investors of the time and place of

24   the meeting?

25   A.  We did give a notice, yes, a few weeks before, two weeks

I2LPBER3                          Hallac - Cross

1  before, maybe.

2  Q.  And who did the notice go to?

3  A.  It went to all the investors of the WFF fund.

4  Q.  Was it your understanding that that meeting was recorded?

5  A.  Absolutely, for the investors.

6  Q.  So what happened to the recording?

7  A.  Usually these recordings last for 30 days, and then that's

8  it, they're destroyed.  That's the same for everyone who has a

9  meeting and has recordings.

10 Q.  Well, at the time that this meeting was happening, and

11 certainly in the weeks following, you or Mr. Wellner or folks

12 at Weston were getting contacted by a lot of investors in WFF

13 with questions, right?

14 A.  Yes, and we told them go to the tape.

15 Q.  Did you ever make an effort to preserve the recording so

16 there would be a memorialization of what was said later on?

17 A.  To tell you the truth, I didn't even think about it, and we

18 kept it for a certain period.  I don't even know who ended the

19 period.

20 Q.  Let's talk about Bidz and P3.  Now, sir, when you were with

21 the government yesterday, they showed you several exhibits; so

22 for example, Exhibit 236.  If we could pull that up.

23 A.  Okay.

24 Q.  Do you remember, sir, discussing this with Mr. Allen?

25          If we can just go to the top so we can see the first

1  part of it, highlight the top portion.

2            And basically, this particular document is the one

3  where, on May 15th, 2012, you were communicating with

4  Mr. Grunfeld, a lawyer, and had an attachment of the WP3

5  purported balance sheet; do you remember that?

6  A.  Yes, sir.

7  Q.  And this was all as part of doing a transaction with this

8  company called Bidz, right?

9  A.  Yes, sir.  There was an e-mail before that one, though.

10 Q.  And just, do you agree with me that the e-mails you went

11 over yesterday, in terms of dealing with this purported P3

12 balance sheet and Mr. Grunfeld on this topic, they were all in

13 kind of mid-May 2012?

14 A.  Yes, but you're missing an e-mail.

15 Q.  I'm missing several, sir.

16 A.  Okay.

17 Q.  But is it true, sir, that prior to May of 2012, you had

18 signed a commitment letter on behalf of the P2 fund -- I'm

19 sorry, on behalf of Bidz, in other words, to raise money and do

20 a transaction with Bidz?

21 A.  That is correct because Mr. Bergstein told me --

22 Q.  Sir?

23 A.  -- he would never call on it.  That's how the deal was

24 done.  You want me to answer it.  I have to answer it.

25 Q.  Okay.  If we could look at Exhibit Z165, just for

I2LPBER3                        Hallac - Cross

1    identification.

2              Sir, if you could take a look at Exhibit Z165 and tell

3    me, once you've satisfied yourself that you can look at it?

4    A.  I can say quickly that that's the commitment letter that we

5    wrote to Mr. Zinberg and Mr. Grunfeld.

6    Q.  And who was with Mr. Zinberg?

7    A.  He was introduced as the owner of Bidz.

8    Q.  And when was the timing of when you submitted a commitment

9    letter to him in relation to Bidz?

10   A.  Well, the letter is dated April 25th.

11   Q.  And in the commitment letter dated April 25th, was there a

12   particular fund that you referenced using in the transaction

13   with Bidz and Mr. Zinberg?

14   A.  Well, I'm just looking because I don't recall which fund.

15   You know, there were so many funds.  It was Weston Capital

16   Partners 2.

17   Q.  Okay.  So a month before the e-mails that you went over

18   with us yesterday, you had sent a commitment letter to Bidz

19   seeking to do business with Bidz in relation to the Partners 2

20   fund; is that accurate?

21   A.  The Partners 2 fund still had funds in its account, and

22   Mr. Bergstein desired that company to be the guarantor.

23             MR. BIENERT:  Objection, your Honor, as nonresponsive.

24             THE COURT:  Yes.  Listen to the words of the question.

25             THE WITNESS:  Okay.

I2LPBER3                          Hallac - Cross

1           THE COURT:  I assume, Mr. Hallac, you would like to

2   complete your testimony in a timely fashion.  We all have that

3   interest in common.  So I have to ask you to listen to the

4   words of the question, answer what is asked by the question,

5   and nothing else.

6           THE WITNESS:  Okay.

7           THE COURT:  The folks at the front table will have an

8   opportunity to conduct a redirect when you're finished, and

9   they can bring out what they feel is appropriate.  Go ahead.

10  BY MR. BIENERT:

11  Q.  So, sir, the question is, is it true that in April of 2012,

12  you sent a commitment letter to Bidz suggesting or offering to

13  do business with them as it related to P2?

14  A.  Yes.

15  Q.  And by the way, the exhibit in front of you, did you sign

16  it, if you look at the back?

17  A.  Yes, I did.

18          MR. BIENERT:  Your Honor, I would move into evidence

19  Exhibit Z165.

20          THE COURT:  Any objection?

21          MR. ALLEN:  No, your Honor.

22          THE COURT:  Received.

23          (Defendant's Exhibit Z165 received in evidence)

24  BY MR. BIENERT:

25  Q.  Now, that document relates to Partners 2.  Now, let's talk

I2LPBER3                          Hallac - Cross

1    about Partners 3.  Did Partners 3 -- strike that.

2            Did you ever do any transactions where -- on behalf of

3    Weston, you offered to have Partners 3 do an equity deal with

4    any entity?

5    A.  Yes.

6    Q.  And was one of them Pagoda?

7    A.  I'm sorry, could you repeat the question?  Because I didn't

8    think we were talking about Pagoda here, sorry.

9    Q.  The question was, had you offered to do a commitment with

10   Partners 3 acquiring equity in Pagoda?

11   A.  Yes.

12   Q.  And that would have been done in April of 2012; is that

13   true?

14   A.  No, no.  It would have been done earlier, as far as I

15   remember.

16   Q.  I'm going to place in front of you Exhibit Z166 for

17   identification, and ask you to look at that, sir, and tell me

18   once you've seen it.

19   A.  I don't -- I don't -- I don't recall this document.  I

20   don't remember this document.

21   Q.  All right.

22   A.  And this signature is a computer signature.

23   Q.  First of all, do you see a signature on the document?

24   A.  It's a computer signature, yes, sir.

25   Q.  And do you know whose computer signature it is?

I2LPBER3                          Hallac - Cross

1    A.  Mine, which anybody at Weston can go into.

2    Q.  I'm going to direct your attention to the cover e-mail on

3    that document, and do you recognize the "from" and "to" e-mails

4    and the references there to date and attachments?

5    A.  Yes, sir.

6    Q.  And do you recognize these as e-mail addresses that you

7    would have been corresponding with in or around the date

8    reflected on the document?

9    A.  Yes.

10            MR. BIENERT:  Your Honor, I would move into evidence

11   Exhibit Z166.

12            THE COURT:  Any objection?

13            MR. ALLEN:  No, your Honor.

14            THE COURT:  Received.

15            (Defendant's Exhibit Z166 received in evidence)

16            MR. BIENERT:  If we can please publish Exhibit Z166,

17   Ms. Howland.

18   BY MR. BIENERT:

19   Q.  If we look at the first page, sir --

20   A.  Yes.

21   Q.  -- this is an e-mail that you sent to Mr. Bergstein on

22   May 1st, 2012; is that right?

23   A.  That's what it says.

24   Q.  And attached to it, if we go to page 2, is an equity

25   commitment letter dated April 25th, 2012, right?

I2LPBER3                        Hallac - Cross

1    A.   Yes.

2    Q.   And it's to Keith Harris of Pagoda Entertainment, right?

3    A.   That's what it says.

4    Q.   Who is Keith Harris?

5    A.   He's an individual investment banker in London who was a

6    friend of Jason Galanis and was appointed to be, you know, the

7    chairman or the head of Pagoda.

8    Q.   And looking at the e-mail that you took this document and

9    sent it to Mr. Bergstein, do you agree that you would have seen

10   it and been somewhat familiar with it around the time reflected

11   on the e-mail, around May of 2012?

12   A.   I don't even remember if we're still talking about Pagoda

13   or the movie business in May 2012.

14   Q.   Well, my question is a little different, sir.

15   A.   Oh.

16   Q.   And that is, just when you look at this e-mail -- and it's

17   an e-mail from you to Mr. Bergstein on May 1st -- do you

18   believe that you sent the e-mail?

19   A.   It's very -- no, I did not send this e-mail.  I have no

20   recollection of it and everybody has my password.

21   Q.   So let's discuss that.  When you say "everyone," do you

22   mean -- are you telling us that there are many people within

23   Weston who have your password and can send documents as though

24   they are Albert Hallac?

25   A.   Yes, sir.

I2LPBER3                        Hallac - Cross

Q.  And was that a customary practice in the 2012 timeframe at
Weston?

A.  Not totally, but I did travel a lot and some answers were
required.

Q.  Well, looking at page 2 of this document, the topic in the
first paragraph says:  This letter agreement sets forth the
commitment of Weston Capital Management LLC on behalf of,
basically, the P3 fund, right?

A.  Yes, yes.

Q.  And it goes on to say:  "to purchase directly or indirectly
equity interests of Pagoda Entertainment."  Do you see that?

A.  Yes.

Q.  Now, in May of -- strike that.

        In April of 2012, did the P3 fund have any money to be
able to buy an equity interest in a company?

A.  Exactly, it did not have any money.

Q.  Now, if we go up to May of 2012, a month later, and -- I'm
sorry.  Let me take one other step back, and then we'll go
forward.

        Is it true that, as to the Partners 3 fund, that it
was a fund that you and the other folks at Weston had been
soliciting investment into as early as November of 2011?

A.  We did that through the whole year of 2010.  I don't think
November 2011 we were raising money for that fund.  We tried
hard in the whole year 2010.

I2LPBER3                         Hallac - Cross

1   Q.  So the bottom line is Partners 3 had been in existence for

2   a while, and there had been attempts to raise money for it well

3   before the May 2012 e-mails that we went over yesterday with

4   the government, right?

5   A.  That's right.

6   Q.  And if we go back, by the way, to Exhibit Z166 --

7   A.  Yes.

8   Q.  -- the commitment letter for Partners 3 regarding Pagoda?

9   A.  Yes.

10  Q.  If we look at paragraph 1, it makes a representation that

11  the investors commit to purchase an aggregate of $100 million

12  of equity securities of the parent, which would be Pagoda,

13  right?

14  A.  Yes, that's what it says.

15  Q.  Obviously, P3 was in no position to spend $100 million to

16  purchase equity, was it?

17  A.  No, sir.

18  Q.  Prior to sitting here today, do you have any recollection

19  at all of there being either an equity commitment letter

20  relating to P3 into Pagoda or any discussions of the topic at

21  all?

22  A.  No, sir.

23          THE COURT:  How much longer do you have, Mr. Bienert?

24          MR. BIENERT:  20 minutes.

25          THE COURT:  Thank you.

I2LPBER3                          Hallac - Cross

1   Q.  Now, going back to May, when we had all the exchanges about

2   the P3 balance sheet that was not accurate and was falsified,

3   do you remember that topic?

4   A.  Yes, sir.

5   Q.  Is it true that Mr. Bergstein advised Attorney Grunfeld not

6   to rely on or use the P3 balance sheet?

7              MR. ALLEN:  Objection, calls for hearsay.

8              THE COURT:  Sustained.

9   Q.  Well, did you have an understanding that within a few days

10  of the Partners 3 balance sheet episode that you discussed,

11  Attorney Grunfeld sent a letter telling the Bidz folks not to

12  rely on any of that information?

13             MR. ALLEN:  Objection, hearsay again.

14             THE COURT:  Sustained.

15             MR. BIENERT:  Your Honor, it's not for the truth.

16  It's for the fact that it was said.

17             THE COURT:  Thank you.

18  BY MR. BIENERT:

19  Q.  Do you have any recollection of the Bidz folks using

20  another balance sheet and not P3?

21  A.  It was sent another balance sheet, yes; so I was told.

22  Q.  You weren't involved in sending the accurate balance sheet?

23  A.  There was never any accurate balance sheet.  I was involved

24  with Mr. Grunfeld, following instructions from Mr. Bergstein

25  what to say and what to send.

I2LPBER3                          Hallac - Cross

1    Q.  No, sir.  Okay, let's break this down.

2    A.  Okay.

3    Q.  You sent a falsified P3 balance sheet, and we looked at

4    e-mails related to that yesterday, right?

5    A.  Yes, I did.

6    Q.  But at some point thereafter, there was another balance

7    sheet for Wimbledon C, or one of the other funds, that was

8    actually used in place of the false P3 one, correct?

9    A.  Yes, sir.

10   Q.  And you know that that was actually sent, right?

11   A.  Yes.

12   Q.  Let's talk about Paul Parmar.  Now, what role -- what was

13   your understanding, when the original deal was struck in July,

14   August 2011, of what role, if any, these medical company assets

15   would play in the Arius Libra/Pineboard transaction?

16   A.  The role, it would be acquired by Arius Libra and

17   Pineboard, that we would begin a money-raising activity to

18   start acquiring more medical billings companies based on a plan

19   that Mr. Parmar, in particular, presented to us at the

20   suggestion of Mr. Bergstein.

21   Q.  And is it true that you had multiple communications, some

22   in person, some on the phone, and some in writing, in that,

23   we'll call it August, September, October 2011 time frame with

24   Mr. Parmar about what the medical billing companies were, what

25   they did, and what y'all hoped to do with those companies?

I2LPBER3                           Hallac - Cross

1   A.  Yes, sir.

2   Q.  And Mr. Parmar was one of the presenters at the

3   December 2014 meeting with the WFF investors, right?

4   A.  Yes, sir.

5   Q.  And in the time of the fall of 2011, you viewed the medical

6   companies and rollup as a good investment over several years,

7   right?

8   A.  Yes, I did.

9   Q.  Now, did you -- how long of a project did you think the

10  medical billing rollup was before it would create a good return

11  for your investment?  Did you have a window?

12  A.  In any new business you think in terms of three years as a

13  minimum.

14  Q.  So in 2011, when the deal was struck, you're thinking that

15  to take this business through the various steps that you guys

16  had discussed and to turn it into a successful and profitable

17  business, maybe going out to 2014 or thereafter?

18  A.  Yes, except we never got started.

19  Q.  Well, in terms of you did do contracts with Mr. Parmar to

20  acquire his medical assets, right?

21  A.  Through Mr. Bergstein.  We never negotiated with Mr. Parmar

22  directly.  It was all done by Mr. Bergstein.

23  Q.  Well, you know there was a purchase agreement, right?

24  A.  Yes.

25  Q.  And the purchase agreement was with Arius Libra and

I2LPBER3                        Hallac - Cross

1    Mr. Parmar's company, right?

2    A.  Yes.

3    Q.  And you certainly were part of Arius Libra, right?

4    A.  No question.

5    Q.  And in a general sense, was it your recollection that the

6    purchase agreement involved basically specified particular

7    assets that Mr. Parmar would sell to Arius Libra in exchange

8    for certain payments, right?

9    A.  Yes.

10   Q.  And is it true that pursuant to the purchase agreement,

11   Arius Libra paid money to Mr. Parmar?

12   A.  Yes.

13   Q.  But Mr. Parmar never delivered the medical assets, did he?

14           MR. ALLEN:  Objection, relevance.

15           THE COURT:  Yes, sustained as to relevance.

16   Q.  How many months did you spend talking to Mr. Parmar -- and

17   by "talking" I mean either on the phone, in person or in

18   e-mails -- about continuing to go forward on the medical rollup

19   project, approximately from when to when?

20   A.  I remember a period of January, February of 2012 being an

21   active period of trying to convince him to do what was right.

22   Q.  And did that activity continue at any level beyond February

23   of 2012?

24   A.  Probably, yes.  I don't recall exactly when but, yes, it

25   did.

1    Q.  Did issues get raised as to whether or not he actually had

2    all the rights that he purported to sell to Arius Libra?

3           MR. ALLEN:  Objection to relevance.

4           THE COURT:  Sustained.

5    Q.  Now, you were asked on direct -- strike that.

6           Did there come a time, just sort of a time for

7    reference, when you viewed the Arius Libra Pineboard project or

8    deal pretty well over and done with?  And I don't mean any

9    legal repercussions.  I just mean as an ongoing project that

10   people were working on?

11   A.  Well, people weren't working on these projects, except that

12   we were not one of those.  We were not involved.

13   Q.  So do you have a timeframe when, from Weston's perspective,

14   you were no longer communicating with people about ongoing

15   movement in the business itself, from Pineboard to medical

16   roll-ups, et cetera?

17   A.  I would say if I had to choose a period, I would say

18   somewhere around, you know, early summer 2012.

19   Q.  Now, after that, I think you mentioned yesterday there was

20   a time when lawyers got involved in legal proceedings as a

21   topic; do you recall just referencing that?

22   A.  Yes, sir.

23   Q.  Did you meet again with Mr. Parmar in 2014 as it related to

24   a time after there had been various legal proceedings

25   initiated?

I2LPBER3                        Hallac - Cross

1    A.  Yes, I did meet with him and his lawyer.

2    Q.  And do you recall Mr. Allen went over with you yesterday,

3    asked you whether you recalled a statement being made about

4    serving Mr. Bergstein up?  Do you remember that topic?

5    A.  Yes.

6    Q.  Was it said by your lawyer to you and Mr. Parmar in 2014

7    that you could not have any connection to Mr. Bergstein

8    because:  If we have the opportunity, we need to serve him up

9    as the villain?

10   A.  What is the question?  I'm sorry.

11   Q.  Is that what your lawyer said to you and Mr. Parmar?

12   A.  He said that to Mr. Parmar, yes.

13   Q.  In your presence?

14   A.  Yes, sir.

15   Q.  Is it also true that, as part of various legal proceedings

16   after 2012 -- so once we get into the 2013, '14 years -- that

17   there was a lawsuit that you helped bring by the P2 fund

18   against Arius Libra?

19   A.  Yes, sir.

20   Q.  And that, as part of one of the lawsuits, you filed an

21   affidavit relating to the status of the payment by Arius Libra

22   of the P2 loan?

23          MR. ALLEN:  Objection, hearsay and also relevance,

24   your Honor.

25          THE COURT:  Sustained.

I2LPBER3                          Hallac - Cross

1    Q.  Let me turn to the topic of your legal situation as it

2    relates to your criminal charges.  So, sir, you've been

3    cooperating with the government since 2014; does that sound

4    right?

5    A.  My cooperation agreement was signed in July of 2015.

6    Q.  And you've been cooperating ever since, right?

7    A.  Yes, sir.

8    Q.  And you've pleaded guilty to certain charges, right?

9    A.  Yes, sir.

10   Q.  And you've had, is it fair to say, dozens of meetings with

11   the prosecutors and the FBI in this case?

12   A.  I don't know how many, but certainly many, many.

13   Q.  And as you sit here now, you face as much as 70 years in

14   prison?

15   A.  That's what it says.

16   Q.  And you could go anywhere from zero to 70; is that right?

17   A.  Yes, sir.

18   Q.  And is it true that one of the things you understand is

19   that, while the Court will determine your sentence, depending

20   on whether you provide substantial assistance to the

21   government, the government has circumstances where it can file

22   a motion on your behalf related to your cooperation; do you

23   have an understanding of that?

24   A.  No, sir.

25   Q.  Now, the amount of money that you mentioned as part of your

I2LPBER3                        Hallac - Cross

1   SEC and/or criminal cooperation, you paid, was it, $240,000?

2   A.  No, that was just an SEC disgorgement amount, which also

3   needed to add interest to it.

4   Q.  Did you pay any other sums of money, as you sit here today,

5   relative to, for example, your criminal conviction?

6   A.  I paid mostly to the SEC so far.  I've paid nothing to the

7   U.S. Department of Justice.

8   Q.  Have you had any representations to you by anyone, other

9   than your attorney, and I'm not going to ask about that, as to

10  how much money you may owe, if any, relative to your crimes and

11  your guilty plea?

12  A.  I have not been given a bill, nor have I looked at it as

13  what it would mean.

14  Q.  Have you been given any representations as to whether, from

15  the standpoint of sentencing, which you will have down the

16  line, how much money the loss amount that might be attributed

17  to you and your actions?

18  A.  Again, I didn't calculate those amounts.

19  Q.  Well, I know you testified to us that you talked about the

20  Purplebox money that you received?

21  A.  Yes.

22  Q.  $750,000 to Weston, and if I understand it right, you got

23  about 240,000, right?

24  A.  Weston received only 250.  I received 240, and Keith and

25  Jeffrey received another amount.

I2LPBER3                        Hallac - Cross

```
 1   Q.  Now, your son, Jeffrey, he worked at Weston during the
 2   entire time of the events we've been talking about here the
 3   last few days, right?
 4   A.  Mostly, yes.
 5   Q.  And he was involved in these transactions, along with
 6   Mr. Wellner and you from beginning to end, right?
 7   A.  His involvement was in marketing.  Being my son, he was at
 8   meetings, but his involvement was to listen to what was being
 9   discussed so that should a deal be made, he would be able to
10   understand and go out and raise capital for the transaction.
11   Q.  Is it true that your son, Jeffrey, was part of discussions
12   with Weston about whether or not these loans, the P2 loan or
13   the TT loan, were allowed?
14   A.  He might have said that, yes.
15   Q.  Is it true that your son, Jeffrey, working at Weston, had a
16   fiduciary obligation to the investors at Weston?
17   A.  Absolutely.
18   Q.  To your knowledge, as part of your deal, has your son been
19   charged with anything?
20          MR. ALLEN:  Objection to relevance.
21          MR. BIENERT:  Motive, your Honor.
22          THE COURT:  No, I'll allow it.
23          Ladies and gentlemen, whether or not any other person,
24   other than the defendant on trial, has been charged is not
25   relevant to your decision making, or the reasons why they have
```

I2LPBER3                         Hallac - Cross

1    or they haven't been charged are not relevant, or the reasons

2    why another person decides to plead guilty does not bear

3    directly on the guilt or lack of guilt of the defendant on

4    trial.

5            You can, of course, take all the facts and

6    circumstances surrounding the witness' agreements with the

7    government and understanding with the government in assessing

8    his credibility, and for that reason and no other reason.

9            Go ahead, Mr. Bienert.

10           MR. BIENERT:  Thank you.

11   BY MR. BIENERT:

12   Q.  But the amount of money that you were involved in that was

13   lost to investors as part of these deals that you've been

14   discussing was a lot more than the $750,000 that was involved

15   in Purplebox, right?

16   A.  Yes.

17   Q.  In other words, we've talked about the money that was

18   loaned to Arius Libra and the money that was loaned to Swartz

19   IP, and those total 17-and-a-half, plus another almost $9

20   million, right?

21   A.  Well, $6 million.

22   Q.  And some of that money was paid back, right?

23   A.  Yes, sir.

24   Q.  Yes, okay?

25   A.  Yes.

I2LPBER3                        Hallac - Cross

1   Q.  And some of that money, several million, went back to

2   Weston or Weston entities, right?

3   A.  Weston entities that had disbursed money on behalf of these

4   assets of these companies.  Mr. Bergstein's companies, yes.

5   Q.  Do you have an understanding as to whether or not, as part

6   of your sentencing in this case, that the dollar amount that

7   could be applied to your sentencing could be the many millions

8   of dollars lost by the investors at Weston?

9   A.  Well, that's what the indictment says, yes.

10  Q.  Do you know whether or not you have agreed to pay

11  restitution as part of your plea agreement?

12  A.  I think I did, yes, sir.

13  Q.  And you just don't know, as you sit here now, what the

14  amount of restitution is, right?

15  A.  No, sir.

16          MR. BIENERT:  Your Honor I just have one other thing

17  I'm looking for.

18          THE COURT:  Sure.

19  Q.  Sir, is it true that, on occasion, you would be provided a

20  listing of expenses relative to the Arius Libra and Pineboard

21  transaction?

22  A.  I guess there were some statements sent by Paul Parmar, and

23  I saw those, yes.

24  Q.  And if you could take a look at Exhibit Z63, and without

25  commenting on the document, tell me if this is something that

I2LPBER3                          Hallac - Cross

1    you recognize?

2    A.  Yes, sir, I do.

3    Q.  And did you take any action or do anything as a result of

4    receiving Exhibit Z63?

5    A.  No, sir.

6    Q.  Do you recognize the "to" and "from" and the date as one

7    that you would have received in or around that time on these

8    documents?

9    A.  Yes, I see who it's from.  Yes.

10             MR. BIENERT:  Your Honor, I'd move into evidence

11   Exhibit Z63.

12             MR. ALLEN:  Objection, hearsay.

13             MR. BIENERT:  I can address, your Honor.

14             THE COURT:  Pardon me?

15             MR. BIENERT:  I can address.  By the way, your Honor,

16   I'm done except I would want to address at a sidebar one aspect

17   of things before I totally finish.

18             THE COURT:  All right.  Ladies and gentlemen, please

19   stand up and stretch.  Let me see you at the sidebar.

20             (Continued on next page)

21

22

23

24

25

I2LPBER3                        Hallac - Cross

1            (At the side bar)

2            THE COURT:  What is the relevance of the fact that

3    Mr. Bergstein said this to this case?

4            MR. BIENERT:  Because the reason it's important, your

5    Honor, is our position is it was always the understanding of

6    the parties, and in particular Weston, Hallac and Wellner, that

7    Mr. Bergstein would be advancing fees and could be reimbursed

8    for them.

9            So here, we have an example of Mr. Bergstein sending

10   him a list of expenses with a dollar amount, and I particularly

11   asked him:  Did you do anything as a result of it?  And he

12   said:  No.  In other words, he didn't say, hey, this is wrong;

13   he didn't write an e-mail saying, that's not the deal.  So this

14   e-mail, the fact that he sent it, that he received it, and

15   didn't do anything about it to correct some purported false

16   understanding of the deal, is relevant for the fact that it was

17   said and there were no actions taken to change it.

18           MR. ALLEN:  This is, obviously, a false exculpatory

19   that his client is making.  This is exactly what the hearsay

20   rules are meant to prevent.  There's no real non-truth basis.

21   He wants this in for there to be evidence that there are

22   legitimate expenses, and what our witness are going to show is

23   that those were lies being sent to Hallac.  This is what the

24   hearsay rules are meant to prevent.

25           THE COURT:  Well, how do you address the argument that

I2LPBER3                         Hallac - Cross

1    the purpose it's being offered for is to show that Hallac had

2    no reaction to expenses?

3              MR. ALLEN:  I mean, he can ask Mr. Hallac:  Did you

4    pay expenses for Mr. Bergstein, and did you question them?

5    That's fine, but you don't get to put in his clients' own

6    statements about the validity of expenses that are sort of

7    centrally in dispute in this trial.

8              THE COURT:  Yes, I think you have another way of

9    getting to it.  You can ask him:  Did Bergstein send you

10   expenses?  Did you react when you received them?  And that's

11   fair game.  But the probative value of this is, in any event,

12   apart from the hearsay issue, is substantially outweighed by

13   the danger of jury confusion.  So the objection is sustained.

14             Now, you had one other point you wanted to raise?

15             MR. BIENERT:  Obviously, before -- because I'll be

16   done with him, except for the Parmar issue, and I just want to

17   reiterate that our view is that, No. 1, because Parmar was the

18   res gestae of the assets, and that was what was crucial to the

19   deal, I should be able to get in at least the basics of what

20   happened with the Parmar assets; namely, that there was a lot

21   of difficulty in the spring of 2012 in getting Parmar to

22   deliver, and that it turned into a bunch of name calling, and

23   they never got the assets.  And that is, frankly, why the

24   business was ended as of, say, May of 2012.

25             I'm able to, I would submit, get into that for a

I2LPBER3                          Hallac - Cross

1    couple of reasons.  One, for all of the reasons we argued

2    several times, and in writing, we think it's an appropriate

3    defense to the charges, or part of the defense.

4          But No. 2, the government's continual reference to,

5    did you ever get paid?  Did he ever make good on what he

6    promised with no end in sight?  And certainly not putting any

7    limits on when that was relevant.  Coupled with the fact that

8    the money at issue in the indictment was spent up until the

9    summer of 2012, opens the door to fair commentary that the

10   money takings were while the business was still in play, but

11   ultimately, the business became not in play, and that's when

12   the money taking stopped.

13          THE COURT:  That's when the?

14          MR. BIENERT:  Taking of money by Mr. Bergstein ended.

15          THE COURT:  Let me hear from the government.

16          MR. ALLEN:  Your Honor, if this were a civil tort case

17   and Mr. Parmar were added as a party, this would certainly make

18   sense.  This is a federal criminal trial, and what Mr. Bienert

19   is describing has no relationship or relevance to the charges

20   in this case.

21          It's all conduct that occurred after the crimes here

22   were completed, and it, frankly, is a huge risk of confusion

23   for the jury because what Mr. Bienert, obviously, wants to do

24   is blame the losses here on someone else.  And it may well be

25   the case that Mr. Parmar did bad things, but that has no

relevance to what Mr. Bergstein is guilty of, the crimes which
he has been charged.

THE COURT:  I agree with the government on this.
First of all, I sustained the objection on relevance, but apart
from the objection on relevance, I think 403 also supports the
ruling because the suggestion in written submissions to this
Court, argument to this Court and questioning in front of this
jury, is that what went wrong here is that Paul Parmar did not
live up to his obligations, and if he had lived up to his
obligations, we wouldn't be here.  And who knew, who could
foresee that he wouldn't live up to his obligations?

That's the gist of what I hear coming from the defense
side, and that is not a defense to the crime that has been
charged by the grand jury, and it's not permissible argument in
this case or permissible questioning in this case.

There is a danger of jury confusion in this case.  I
think what Mr. Allen said a moment ago echos what I've said in
prior proceedings about money damages.  If this were a claim
for money damages, it might have a bearing on the amount of
loss that investors suffered and the causation for that loss,
but that's not it.  This is a criminal case, and if Mr. Parmar
had lived up to all of his obligations, there still would have
been a completed crime.

The mens rea, the criminal intent, was formed at the
time of the transactions charged in the indictment and was

1    completed then, and as in many criminal cases of this type, the

2    subjective belief that, in the end, everything would work out

3    fine and no one would be out a loss, is not a defense to the

4    crime nor is it permissible argument to the jury.  So the

5    objection is sustained.

6            MR. BIENERT:  May I, at least for the record --

7    because obviously, I'm making a record here -- comment on a few

8    of those points?  Because I think there's at least some

9    confusion, at least as to what our position is.

10           The reason this is not the analogy to a criminal

11   case -- strike that.  The analogy to a civil case is not a good

12   one because it is a criminal case.  That's why in a civil case

13   someone's good faith or intent typically isn't in play.  It's

14   negligence.  They either paid the money back or they didn't,

15   and I agree that once you get in that arena, there's a question

16   of how much money is owed and why.

17           In a criminal case, of course, the focus isn't on

18   whether or not somebody thought it would all work out in the

19   end, whether they committed the crime or not.  It's about

20   whether they had the sufficient intent and mens rea to commit

21   the crime to begin with, and that's what I think is off in the

22   analogies.

23           In this case, where the government has specifically

24   pleaded an ongoing crime throughout the end of 2012, I believe,

25   but certainly well into the summer of 2012, where their

1    indictment talks about money being used throughout that entire

2    time, and where the question becomes did my client have the

3    specific intent to, in essence, defraud in using loan money to

4    businesses, his mental state is always allowed to be presented

5    and facts relating to it.

6           His good-faith belief that the business would come to

7    fruition and, therefore, be able to pay the money by, for

8    example, the TT Swartz maturity date of 2016, is always

9    something that we should be able to put in.  We are not

10   offering it to say, hey, fellows, he committed a crime, but

11   because he felt the money would be paid back, who cares?  We're

12   offering it to say he didn't commit a crime because the element

13   of intent is missing.

14          And the reason the element of intent is missing is

15   because he wasn't told all these things that the witnesses say.

16   We dispute that, and based on the agreements he had, he was

17   using this money in what he believed was good faith relative to

18   the end goal, which was turning the medical companies into a

19   $100-million-plus business.

20          THE COURT:  If the government has failed to prove to

21   the satisfaction of the trier of fact that your client knew

22   that the actions in obtaining the loans was a breach of the

23   investment advisor's fiduciary duties and that he did not act

24   with knowledge of that, then your client should be acquitted;

25   and if they fail to prove the requisite mens rea, then your

I2LPBER3                        Hallac - Cross

1    client should be acquitted.

2            But if your client is aware and knew and intended that

3    the transfer be made in violation of the fiduciary duties of

4    the investment advisor, then the crime is complete, even if he

5    had a subjective belief that, in the end, no one would lose any

6    money.

7            MR. BIENERT:  The problem with that, your Honor --

8            THE COURT:  I'm not in a debate with you.

9            MR. ALLEN:  Perhaps Mr. Bienert can make his record

10   when the jury is not waiting.

11           MR. BIENERT:  Okay.

12           THE COURT:  I think that's a fine idea.  Mr. Bienert,

13   we've discussed this at considerable length.

14           MR. BIENERT:  The problem is --

15           THE COURT:  You argue and I rule.  I have extensive

16   briefing from you.  I suspect I may have more briefing from

17   you, and other tribunals may have briefing from you.  I allowed

18   you to explain your reason in the offering because you asked

19   for that, and you're entitled to make a record.

20           What you're not entitled to do is engage in a debate

21   over whether you believe the Court's ruling is correct or not.

22   I won't allow the government to do that, and I won't allow you

23   to do that either.  By all means, make your record of what your

24   purpose in offering something is, what your evidentiary basis

25   is, why you're right, but when the Court rules, you're welcome

I2LPBER3                          Hallac - Cross

1    to disagree.  Okay?  Thank you.

2                (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I2LPBER3                              Hallac - Cross

1              (In open court)

2              THE COURT:  Mr. Bienert.

3    BY MR. BIENERT:

4    Q.  Sir, is it true that Mr. Bergstein, on occasion, would

5    submit purported expenses that he paid in relation to the deal

6    to, among others, you?

7    A.  You mean such as these?

8    Q.  I'm not asking you to comment on the document.

9    A.  Yes, he would send some totals.

10   Q.  And is it true that after receiving such recitations of

11   purported expenses, you never sent any replies or contacted

12   Mr. Bergstein and said he was not allowed to submit expenses?

13   A.  You're saying that I told Mr. Bergstein he was not allowed

14   to submit expenses?

15   Q.  I'm asking you, is it true that you never --

16   A.  No, sir.  I never said that my whole life.

17             MR. BIENERT:  That's all I have, your Honor.

18             THE COURT:  All right.  We'll pick up after lunch with

19   redirect.  Please do not discuss the case.  Enjoy lunch and

20   we'll pick up at 2:05.  All right?  Thank you.

21             (Jury not present)

22             (Continued on next page)

23

24

25

I2LPBER3                          Hallac - Cross

1              THE COURT:  Have a pleasant lunch.

2              MR. IMPERATORE:  Your Honor, I just want to note one

3       thing.  I apologize.  We may get to the IRS witness today.  I

4       just wanted to let the Court know about that.

5              THE COURT:  Well, with regard to the IRS witness --

6       you can have a seat -- I have everybody's written submissions.

7       Is there anything further from the written submissions that

8       anyone wishes to raise?

9              MR. IMPERATORE:  Not unless the Court has any

10      questions.

11             MR. BIENERT:  Submitted, your Honor.

12             THE COURT:  Okay.  I adhere to my prior rulings and

13      will allow the evidence to come in.  Have a good lunch.

14             (Luncheon recess)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

```
 1                  A F T E R N O O N   S E S S I O N

 2                              2:10 p.m.

 3              (Trial resumed; jury not present)

 4              THE COURT:  Please remain standing for our jury.

 5              (Jury present)

 6              THE COURT:  Please, be seated.  How are you doing,

 7      ladies and gentlemen?

 8              THE JURY:  Thank you.  Fine.

 9              THE COURT:  Good to see you.  We are back in action.

10              Redirect by Mr. Allen.

11      REDIRECT EXAMINATION

12      BY MR. ALLEN:

13      Q.  Mr. Hallac, you were asked some questions about Bidz on

14      cross-examination and, in particular, you were asked whether

15      you sent a Wimbledon C balance sheet to Bidz after you had sent

16      the fake Partners III balance sheet.

17              Do you remember that line of questioning?

18      A.  Yes, sir.

19      Q.  So, I want to clarify a couple of things.  First, who made

20      the Partners III balance sheet?

21      A.  Mr. Bergstein.

22      Q.  And was that balance sheet truthful or fake?

23      A.  It was fake.

24      Q.  Second, did you try to switch from the Partners III balance

25      sheet to another balance sheet after your lawyer threatened to
```

I2L5ber4                        A. Hallac - redirect

1   report you to the SEC?

2   A.   Yes, sir.  I did.

3   Q.   What fund did you try to switch to?

4   A.   Wimbledon C.

5   Q.   And what happened when you tried to switch to Wimbledon C?

6   A.   The attorney for the board of directors of Bidz turned down

7   Wimbledon C as being nonsufficient to be a guarantor.

8   Q.   And, did Wimbledon C have as much money as the Partners III

9   fund purportedly had, at least according to the balance sheet

10  that you gave Bidz?

11  A.   No.  It had much less, just about $3 million.

12  Q.   So, what ultimately happened?

13  A.   Partners III went through as the fund that was guaranteeing

14  the purchase.

15  Q.   Now, you were also asked some questions about loans that

16  Wimbledon C had made to Gerova and other entities.  Do you

17  remember that?

18  A.   Yes, sir.

19  Q.   Were those loans allowed by Wimbledon C's offering

20  memorandum?

21  A.   No, sir.

22  Q.   And, did you also make loans from Wimbledon C to

23  Mr. Bergstein?

24  A.   Yes, sir.

25  Q.   And, were those loans allowed by Wimbledon C's offering

I2L5ber4                              A. Hallac - redirect

1   memorandum?

2   A.   No, sir.  They were not.

3   Q.   Is that part of the conduct that he pled guilty to?

4   A.   Yes, sir.

5   Q.   Mr. Hallac, I want to direct your attention to July of

6   2012.  Did you have a meeting with Mr. Bergstein in July of

7   2012?

8   A.   Yes, I did.

9   Q.   And what happened at that meeting?

10  A.   I went to see him in order to be able to see if there is

11  any chance of getting any funds back for the investors.

12  Q.   And, did the talk of a Wimbledon C come up at that meeting?

13  A.   Yes.

14  Q.   What happened with Wimbledon C?

15  A.   He suggested that I should --

16          MR. BIENERT:  Object to the relevance, your Honor,

17  given the timing.

18          THE COURT:  Yes.  Why is this relevant?

19          MR. ALLEN:  Your Honor, I can proffer the reason at

20  side bar or I can explain it here.

21          THE COURT:  Let me hear it at side bar.

22          Ladies and gentlemen, you can stand up and stretch,

23  and don't forget the deep breath also.

24          (Continued next page)

25

I2L5ber4                          A. Hallac - redirect

 1           (At side bar)

 2           MR. ALLEN:  He would testify that Mr. Bergstein asked

 3    him for a loan from Wimbledon C basically to keep putting more

 4    money into all the businesses and Mr. Hallac refused that

 5    request.

 6           That's all the testimony would be.  It goes to

 7    Mr. Bergstein's attempt to continue the scheme.

 8           MR. BIENERT:  Well, therein lies the problem, your

 9    Honor.

10           They're saying that the scheme went all the way into

11    July.  I'm able to address what my client's thoughts were on

12    around what was going on in July.  If I understand their

13    position at their side bars is they're saying the crime was

14    over and done with when the loans were made which I think was

15    November of 2011.  While I disagree, I understand the Judge's

16    ruling, and so based on that they should not be spending time

17    with witnesses on what my client said or didn't say in 2012.

18           MR. ALLEN:  They also, I feel like they opened the

19    door to this, too, because they made a number of questions

20    about Wimbledon C that seemed to imply that it was okay for

21    Mr. Hallac to make the loans from Wimbledon C and so therefore

22    the P2 loans were okay too.  I think this line of questioning

23    shows that even Bergstein understood those Wimbledon C loans

24    were good.

25           THE COURT:  On that basis, I will allow it.

1        (In open court)

2    BY MR. ALLEN:

3    Q.   Mr. Hallac what, if anything, did Mr. Bergstein say about

4    Wimbledon C during that July meeting?

5    A.   He suggested that if I were to give him the last $3 million

6    that was in the Wimbledon C, that everything would work out and

7    make a lot of money and be able to pay the investors and so on.

8    And I said there was no way I'm going do that and I left.

9    Q.   Mr. Hallac, you were also asked some questions about

10   Touchstone and Miramax on cross-examination.  Do you remember

11   that?

12   A.   Yes, sir.

13   Q.   I think you testified that Mr. Bergstein had proposed a

14   Touchstone deal to you, right?

15   A.   Yes, sir.

16   Q.   That was one of the things you talked about during your

17   first meeting with him?

18   A.   Yes.

19   Q.   Did that Touchstone deal have anything to do with the P2

20   loan?

21   A.   No, sir.

22   Q.   Did it have anything to do with the Swartz IP transaction?

23   A.   No, sir.

24   Q.   Did it have anything to do with anything Arius Libra or

25   medical billing related?

I2L5ber4                         A. Hallac – redirect

1   A.  No, sir.

2   Q.  Did you ever raise money for a Touchstone transaction?

3   A.  No, sir.

4   Q.  Did anything ever come of the Touchstone deal that you had

5   discussed with Mr. Bergstein?

6   A.  Nothing.

7   Q.  You also were asked questions about Illuminer.  Do you

8   remember that?

9   A.  Yes, sir.

10  Q.  Did Illuminer have anything to do with the P2 loan or with

11  the Swartz IP transaction?

12  A.  No, it did not.

13  Q.  You were asked some questions about the P2 loan and

14  Arius Libra and I want to talk about some of that stuff now.

15  One thing you were asked is whether you had first raised the

16  issue of borrowing money from the P2 fund.  Do you remember

17  those questions?

18  A.  Yes, sir.

19  Q.  So, just to be clear, who actually asked you for a loan

20  from Weston?

21  A.  It was Mr. Bergstein.

22  Q.  Was that loan Mr. Bergstein's idea or your idea?

23  A.  It was his idea.

24  Q.  And who actually proposed that the loan come from P2?

25  A.  Mr. Bergstein.

I2L5ber4                        A. Hallac - redirect

1   Q.  And did you tell Mr. Bergstein which funds had money?

2   A.  He knew that P2 had money.

3   Q.  Because you had told him, right?

4   A.  Yes, sir.

5   Q.  And so, when you testified that you had agreed to the P2

6   loan, again, who had requested that loan?

7   A.  He did.

8   Q.  You were also asked about Arius Libra and, in particular,

9   whether you were on the board of Arius Libra.  Do you remember

10  that?

11  A.  Yes, sir.

12  Q.  Were you on the board?

13  A.  Yes.

14  Q.  Did you have any control over Arius Libra despite the fact

15  that you were on the board?

16  A.  None whatsoever.  It was totally run by Mr. Bergstein.

17  Q.  What involvement did you have in the day-to-day operations

18  of Arius Libra?

19  A.  Very, very little.

20  Q.  What involvement did you have in the day-to-day operations

21  of Pineboard?

22  A.  Nothing at all.

23  Q.  And who actually controlled Arius Libra?

24  A.  Mr. Bergstein.

25          MR. BIENERT:  Calls for legal conclusion, your Honor.

I2L5ber4                          A. Hallac - redirect

```
 1              THE COURT:  I will allow it.
 2              THE WITNESS:  Mr. Bergstein.
 3   BY MR. ALLEN:
 4   Q.  Did you ever sign any contracts on behalf of Arius Libra?
 5   A.  Not that I recall.  No, sir.
 6   Q.  Did you see contracts that were signed on behalf of
 7   Arius Libra?
 8   A.  No, sir.
 9   Q.  And, as you understand it, who would have signed a contract
10   on behalf of Arius Libra?
11              MR. BIENERT:  Speculative, your Honor.
12              THE COURT:  I will allow it.
13              THE WITNESS:  Would have been Mr. Bergstein.
14   BY MR. ALLEN:
15   Q.  And, Mr. Hallac, you were also shown a defense exhibit that
16   was labeled A15.
17              Ms. Sheinwald, can you please publish that?
18              Mr. Hallac, do you recognize this document as the one
19   that you were shown on cross-examination?
20   A.  Yes, sir.
21   Q.  Were you given this document in connection with the unwind
22   agreement?
23   A.  Yes.
24   Q.  And this purports to be a loan between a company called
25   DPRE and Gerova, right?
```

I2L5ber4                        A. Hallac - redirect

1    A.  Yes.

2    Q.  Ms. Sheinwald, can you please publish Government Exhibit

3    108 and go to page 22?

4            Is this the same contract, Mr. Hallac?

5    A.  It appears to be, yes.

6    Q.  And the date on this contract is October 18, 2010.  Do you

7    know whether this document was actually signed on October 18,

8    2010?

9    A.  No.  I do not.

10   Q.  And, in Section 1.1 there are a series of disbursements

11   that are referenced.  Do you see that?

12   A.  Yes.

13   Q.  Do you have any first-hand knowledge whether any of these

14   disbursements were actually made?

15   A.  No, I do not.

16   Q.  Have you seen any bank records or documents that confirm

17   that Mr. Bergstein actually loaned this money?

18   A.  No, I did not.

19   Q.  Setting aside what Mr. Bergstein told you, have you ever

20   seen any actual evidence of the DPRE loan?

21   A.  No, I did not.

22   Q.  Ms. Sheinwald, can you go to page 27, please?

23           Mr. Hallac, this is another agreement between Gion and

24   Gerova.  Do you recognize this document?

25   A.  Yes.

I2L5ber4                        A. Hallac - redirect

1   Q.  Was this also included with the unwind agreement?

2   A.  Yes, it was.

3   Q.  It was an exhibit to it, right?

4   A.  Yes.

5   Q.  And have you seen, again, any underlying documents that

6   would support there actually having been a loan between Gion

7   and Gerova?

8   A.  I did not see any documents.

9   Q.  And the date of this contract is March 25th, 2011.  Do you

10  know whether this contract was actually signed on March 25th,

11  2011?

12  A.  No, sir.

13  Q.  Other than what Mr. Bergstein told you, do you have any

14  basis to think that this agreement is real?

15  A.  No.  Just what he told me.

16  Q.  If Mr. Bergstein had told you that, in reality, Gion has

17  zero security, I am telling you, as a matter of law, they're

18  effed, would that have mattered to you?

19  A.  Absolutely.

20  Q.  Would it have mattered to you if Mr. Bergstein had said

21  that Gion was a bullshit transaction?

22  A.  Yes, it would have mattered.  Absolutely.

23  Q.  And, if he had told you those things, would that have made

24  a difference to whether you would have entered into the unwind

25  agreement?

I2L5ber4                         A. Hallac - redirect

1    A.   I probably would have done nothing.

2    Q.   Would you still have paid Mr. Bergstein the sums to settle

3    his Gion claim?

4    A.   Definitely not.

5    Q.   Ms. Sheinwald, can you please publish Government Exhibit

6    902AT and highlight the phrases that were just referenced?

7              MR. BIENERT:  Your Honor, no basis to play this with

8    this witness.  Foundation.

9              MR. ALLEN:  I was going to publish the transcript,

10   your Honor.

11             MR. BIENERT:  Still the same objection.

12             THE COURT:  Is it in evidence by stipulation or

13   otherwise?

14             MR. ALLEN:  Yes, your Honor.

15             THE COURT:  Then you can publish it.

16   BY MR. ALLEN:

17   Q.   Ms. Sheinwald, can you please highlight the line *Gion has*

18   *zero security, I'm telling you as a matter of law, they're*

19   *effed.*  It's in the middle paragraph.  Next can you please

20   highlight the area in the subsequent paragraph where there is

21   reference to "bullshit transaction."

22             Okay, take that down.

23             Mr. Hallac, were you asked --

24             MR. BIENERT:  Your Honor, I object.  There was no

25   question pending.  This witness doesn't know anything about

I2L5ber4                        A. Hallac - redirect

1    this.  It was displayed without a question or anything.

2            THE COURT:  Well, there is discretion with regard to a

3    published exhibit.  If somebody wants to publish an exhibit

4    that's in evidence that's in the discretion of the trial Judge.

5            MR. FISH:  And, your Honor, it was only admitted as an

6    aid to the jury, not as substantive evidence.

7            THE COURT:  That is correct.  Mr. Fish is correct

8    about that.  So, I am going to strike the publication of the

9    exhibit without prejudice to your ability to play that portion

10   of the recordings because it is the recording, not the

11   transcript, that is the evidence.

12           MR. ALLEN:  That's correct, your Honor.  I apologize

13   for that.

14           THE COURT:  You can do that later.

15           MR. ALLEN:  We will move on.

16   BY MR. ALLEN:

17   Q.  Mr. Hallac, you were asked whether the contracts that you

18   or Mr. Wellner signed contained the parties' complete

19   understandings of the various agreements.

20           Do you remember that?

21   A.  Yes.

22   Q.  Did Mr. Bergstein also tell you things that gave you

23   comfort in entering into those contracts?

24   A.  In general, yes.

25   Q.  So, for example, did Mr. Bergstein tell you that Mr. Swartz

I2L5ber4                          A. Hallac - redirect

1   was involved in Swartz IP?

2   A.  Yes.

3   Q.  And, did he make representations to you about how much

4   money Swartz IP had?

5   A.  Yes.

6   Q.  And were those two representations important in your

7   determination to enter into the Swartz IP transaction?

8   A.  They were key.

9   Q.  Did you rely on those representations?

10  A.  Yes, I did.

11  Q.  And would you have entered into the contract without them?

12  A.  No, I would not.

13  Q.  Did you also rely on things that Mr. Bergstein was saying

14  in connection with the P2 loan?

15  A.  Yes.

16  Q.  Did you think that Mr. Bergstein was close to getting a

17  loan from Deutsche Bank when he made the P2 loan?

18  A.  Yes, sir.  I did.

19  Q.  And, did Mr. Bergstein tell you that he had in fact reached

20  out to people at Deutsche Bank?

21  A.  Yes, he told me that.

22  Q.  And if those were not true, would you have entered into the

23  P2 loan?

24  A.  No, sir.

25  Q.  So, is it true, Mr. Hallac, that the contracts that you

I2L5ber4                           A. Hallac - redirect

1    signed contain your complete and total understanding of

2    everything that is important with respect to the transactions?

3    A.  Yes.

4    Q.  Did some of the things that Mr. Bergstein were saying also

5    matter to you?

6         MR. BIENERT:  Objection, your Honor.  Argumentative,

7    your Honor.

8         THE COURT:  Rephrase it.

9    BY MR. ALLEN:

10   Q.  Did you rely on the things that were contained in the

11   contracts, the statements contained in the contracts?

12   A.  Yes, I did.

13   Q.  And, did you also rely on other representations that were

14   made to you orally?

15   A.  Yes, sir.

16   Q.  Now, you were asked some questions about the involvement of

17   your lawyers in the Core Clearing and what later became the

18   Swartz IP transaction.  Do you remember that?

19   A.  Yes.

20   Q.  Was the Swartz IP transaction, was the contract used in

21   that transaction based on the contract that was created for the

22   Core Clearing transaction?

23   A.  Yes.  Pretty similar, yes.

24   Q.  And did you have a law firm that you regularly used while

25   you were at Weston?

I2L5ber4                              A. Hallac - redirect

1    A.  Yes, we did.

2    Q.  Who were your normal lawyers?

3    A.  It was called KMZ.

4    Q.  KMZ?

5    A.  Yes KMZ Rosenman.

6    Q.  What does that stand for?

7    A.  Katten Muchin Rosenman.

8    Q.  Did you use those lawyers to look at the Core contract?

9    A.  No, sir.

10   Q.  Did you use those lawyers to look at the Swartz IP

11   contract?

12   A.  No, sir.

13   Q.  Why not?

14   A.  Keith felt it would be best to use a new lawyer for those

15   transactions.

16   Q.  And, did you have concerns about whether Katten would agree

17   to those transactions?

18   A.  I thought that they might not so I agree that we go to

19   these other lawyers.

20   Q.  Why did you think Katten might not agree with it?

21   A.  Because they were very bad transactions in the sense of

22   legalities.

23   Q.  So, what lawyers did you go to?

24   A.  We went to Marc Reisler's firm.

25   Q.  And had you used them before?

I2L5ber4                        A. Hallac - redirect

1    A.  No, I have never used them before.

2    Q.  They were new lawyers, in other words?

3    A.  Yes, sir.

4    Q.  And when you asked them or when you gave him the contract,

5    did you show them the offering memorandum for TT?

6    A.  I did not show that to them.

7    Q.  Did you tell them that Swartz IP had no exposure to the

8    Tewksbury Fund?

9    A.  I hadn't spoken to them so I didn't tell them.

10   Q.  Did you tell Holland & Knight that you were not going to

11   disclose the Swartz IP transaction to your investors?

12   A.  No, I did not tell them that.

13   Q.  Did you tell Holland & Knight that you didn't do any due

14   diligence on the Swartz IP transaction?

15   A.  No, I did not.

16   Q.  Do you think they would have wanted to know those things?

17   A.  Yes, they would have.

18   Q.  Did you even ask Holland & Knight to evaluate whether the

19   Swartz IP transaction was consistent with the Wimbledon TT

20   offering memorandum?

21   A.  No, we did not.

22   Q.  So, what did they actually do with respect to the contract?

23   A.  It was a business contract and made sure that the various

24   terms and conditions were acceptable and could be delivered by

25   both sides.  It was just simply to have the facts showed.

I2L5ber4                          A. Hallac - redirect

1    Q.  Now, you were also asked some questions about the structure

2    of the Swartz IP agreement, how it is structured as a loan.  Do

3    you remember that?

4    A.  Yes, sir.

5    Q.  Had you done swaps through Wimbledon TT in the past?

6    A.  Yes.

7    Q.  What is a swap?

8    A.  It is making a transaction with another financial

9    institution in which you receive a particular return for a

10   certain amount of cash and therefore you exchange those assets

11   and you keep the fruits of each of those assets.

12   Q.  And the swaps that you had done through Wimbledon TT, who

13   did you do them with?

14   A.  They were done with Société Générale, the French bank.

15   Q.  Did that bank have actual exposure to Tewksbury?

16   A.  Yes, they did.

17   Q.  Was the Swartz IP transaction a swap?

18   A.  It was really not a swap, no.  It tried to be a swap but it

19   became a note.

20   Q.  And, can you please explain the difference?  Why is the

21   Swartz IP transaction not a swap?

22   A.  For all intents and purposes it is a swap but it was not

23   called such.

24   Q.  And, was there any economic difference between the swaps

25   you had done in the past and the Swartz IP transaction?

I2L5ber4                          A. Hallac - redirect

1    A.   No, there was not.

2    Q.   Well, did Swartz IP have exposure to Tewksbury?

3    A.   No, they did not.

4    Q.   And when you did the swaps, did those banks have exposure

5    to Tewksbury?

6    A.   It certainly did.

7    Q.   You were also asked about a maturity date of the Swartz IP

8    loan, when was that maturity date?

9    A.   It was, I think, four years past, or five years.

10   Q.   How did the requirement to pay redemptions interact, if at

11   all, with that maturity date?

12   A.   If there was a redemption, no matter what the maturity date

13   was on that contract, Swartz IP would have to make payment.

14   Q.   When?

15   A.   Depending -- usually it was 30 days' notice to make a

16   payment for redemption.

17   Q.   Did Swartz IP have the ability to wait until the maturity

18   date to pay redemption?

19   A.   Absolutely not.

20   Q.   When did Swartz IP have to pay redemptions?

21   A.   They did have to pay redemption in January of 2000 -- I

22   guess it were January 2012.

23   Q.   Did Swartz IP have an obligation to pay redemptions as they

24   came in?

25   A.   Yes.  Absolutely.

I2L5ber4                         A. Hallac - redirect

1   Q.  And, if Swartz IP did not pay redemption as it came in,

2   would that be a breach of the contract?

3   A.  It would be very dangerous for the firm, yes.

4   Q.  Now, you were also asked whether Swartz IP could determine

5   how to invest the money that it had.  Did you understand that

6   Mr. Bergstein was going to actually invest the money in

7   Swartz IP?

8   A.  He told me he was going to trade it.

9   Q.  And, can you please describe what he told you?

10  A.  He told me that he was trading the market, it was very

11  successful, he was making large returns, he had been dealing

12  with Bank of America and other banks.  He had a portfolio of

13  bonds that he was thinking of using and acquiring.

14          So, that's what he told me.

15  Q.  When you say he was dealing with Bank of America and other

16  banks, do you mean he was trading their stocks or he was doing

17  business with them?

18  A.  I'm sorry.  He was trading their stocks.  Sorry.

19  Q.  Did you think that Mr. Bergstein could spend the money in

20  Swartz IP on himself?

21  A.  No.  Not at all.

22  Q.  Did you think that Mr. Bergstein could spend the money on

23  Kia Jam?

24  A.  Definitely not.

25  Q.  Did you think that Mr. Bergstein could use a million

I2L5ber4                          A. Hallac - redirect

1   dollars of the TT money to pay back old loans that he had

2   gotten from Stephens?

3   A.  Absolutely not.

4   Q.  If you had known those things, would you have entered into

5   the TT transaction with Mr. Bergstein?

6   A.  No, sir.

7   Q.  Now, you were shown an exhibit that was marked Defendant's

8   Exhibit H6.  Do you remember that?  It was an e-mail in August

9   of 2011 between yourself, Mr. Bergstein, and in one of the

10  instances Mr. Swartz.

11          Do you still have that in front of you?

12  A.  What is the number of exhibit?

13  Q.  H6.

14  A.  No.  I just have Zs here.

15  Q.  I will just hand it to you right now.

16  A.  Thank you.

17  Q.  Mr. Hallac, do you recognize that exhibit?

18  A.  Yes, sir.

19  Q.  And is there an e-mail between Mr. Swartz and you and that

20  exhibit?

21  A.  Yes, sir.

22  Q.  Is that e-mail around the time that you met with Mr. Swartz

23  in August of 2011?

24  A.  Yes.  It was probably a few days later.

25  Q.  Any reference of Swartz IP in that e-mail?

I2L5ber4                        A. Hallac - redirect

1    A.  No, sir.

2    Q.  And when you met with Mr. Swartz in August 2011, any

3    discussion with Swartz IP?

4    A.  No, sir.

5    Q.  You were also asked about some questions about a meeting

6    that you had with Paul Parmar.  Do you remember those

7    questions?

8    A.  Yes, sir.

9    Q.  And Mr. Bienert read a statement to you that your lawyer

10   had made during that meeting.  Do you remember that?

11   A.  Yes.

12   Q.  Just to be clear, did you make that statement?

13   A.  No, I did not.

14   Q.  Who made the statement?

15   A.  My lawyer.

16   Q.  What was your lawyer's job at that meeting?

17   A.  He was trying to arrange a settlement with Paul Parmar.

18   Q.  And who did your lawyer represent?

19   A.  He represented me.

20   Q.  Did you discuss what your lawyer said beforehand?

21   A.  No, sir.  We did not.

22   Q.  And when Mr. Bienert read you the statement, did he read

23   you the entire sentence that your lawyer said?

24   A.  I think it might have been, yes.

25   Q.  Do you know for sure?

I2L5ber4                              A. Hallac - redirect

1    A.  No, I don't.

2    Q.  Did your lawyer in fact say:  *We cannot have any connection*

3    *to Bergstein, because if we have the opportunity, we have to*

4    *serve up David Bergstein as the villain because he is the*

5    *villain.*

6    A.  He did not read the whole sentence.

7    Q.  Did your lawyer ever tell you to blame David Bergstein?

8    A.  No, he never did that.

9    Q.  And, as far as you understand it, did your lawyer think

10   that Mr. Bergstein had, in fact, committed crimes?

11          MR. BIENERT:  Objection, your Honor.  Relevance.  A

12   lawyer's thought.

13          THE COURT:  Do you know what your lawyer thought,

14   Mr. Hallac?  Do you know what was going on in your lawyer's

15   mind in terms of his thinking?

16          THE WITNESS:  No.

17          THE COURT:  Okay.  Sustained.

18   BY MR. ALLEN:

19   Q.  Mr. Hallac, you were asked some questions about the

20   financial penalties that you could face as a result of this

21   case.  Do you remember that?

22   A.  Yes, sir.

23   Q.  Can we please publish Government Exhibit 3505-16 and turn

24   to page 2, please?

25          Do you recognize this document, Mr. Hallac?

I2L5ber4                          A. Hallac - redirect

1   A.  Yes, sir.

2   Q.  What is this?

3   A.  I'm sorry.  They took the first page off, I thought it was

4   the cooperation agreement.

5   Q.  Can you go back to page 1, please?

6        Do you recognize it now?

7   A.  Yes, sir.

8   Q.  What is it?

9   A.  The cooperation agreement.

10  Q.  And Ms. Sheinwald, can we please go to page 2?  Can you

11  highlight or expand the two paragraphs that begin it is further

12  understood the defendant shall make restitution...

13        Just to be clear, Mr. Hallac, are you required to make

14  restitution by your guilty plea?

15  A.  I think so, yes.

16  Q.  And, who determines the amount of restitution that you

17  would have to make?

18  A.  The Court.

19  Q.  Are you required to pay forfeiture pursuant to your guilty

20  plea?

21  A.  Yes, sir.

22  Q.  What is forfeiture?

23  A.  Giving up something that you have.

24  Q.  Something -- what do you mean something that you have?

25  A.  I mean to forfeit.  It means to give away.

I2L5ber4                          A. Hallac - redirect

1    Q.  What exactly are you required to give away?

2    A.  Assets, money, goods.

3    Q.  Assets that are derived from the crime you committed?

4    A.  Yes, sir.

5    Q.  Who determines amount of forfeiture?

6    A.  The Court.

7    Q.  And did you agree to pay both restitution and forfeiture

8    when you pleaded guilty?

9    A.  Yes.

10   Q.  Last subject.

11          Mr. Hallac, you were asked some questions about

12   someone named Lionel Sterling?

13   A.  Yes.

14   Q.  Do you remember that?

15   A.  Yes, sir.

16   Q.  Who was Lionel Sterling?

17   A.  He was a client of WFF, the Wimbledon Financing Fund.

18   Q.  And I think you testified on cross-examination that he was

19   not a happy investor to say the least; is that right?

20   A.  That's correct.

21   Q.  Did you make any efforts to buy out Mr. Sterling's interest

22   in WFF?

23   A.  In a moment in time it was suggested that he be bought out.

24   Q.  And, did Mr. Bergstein play any role in those efforts?

25   A.  It was his suggestion and Keith Wellner negotiated it with

I2L5ber4                          A. Hallac - redirect

1   Lionel Sterling.

2   Q.  Ms. Sheinwald, can you please publish Government Exhibit

3   213 for the witness only?

4           Do you recognize this document, Mr. Hallac?

5   A.  Yes.  I think so.  Yup.

6   Q.  Is it an e-mail that you received?

7   A.  Actually, this particular e-mail I did not receive, even

8   though I am in there.  I mean, both Mr. Solomon and -- work for

9   Mr. Bergstein but I don't specifically remember that agreement.

10  It feels like it was the agreement with Lionel Sterling but I'm

11  not a hundred percent sure.

12          MR. ALLEN:  The government offers Government Exhibit

13  213.

14          MR. BIENERT:  Objection, your Honor.  No foundation

15  and relevance.

16          THE COURT:  See whether you can fix the foundation

17  issue.

18          MR. ALLEN:  Your Honor, we do have a stipulation as to

19  the authenticity of this document so I don't know that the

20  foundation --

21          MR. BIENERT:  There is difference between authenticity

22  and foundation, your Honor.

23          THE COURT:  I'm aware.

24          MR. BIENERT:  I'm objecting to foundation, not

25  authenticity.

I2L5ber4                        A. Hallac - redirect

1    Q.  Well, okay.  Can you please show the witness the last page

2    of the attachment -- I'm sorry, the first page of the

3    attachment?

4            Does this refresh your memory, Mr. Hallac?

5    A.  Yes.

6    Q.  Do you recognize this document?

7    A.  Yes, I do.  Absolutely.

8    Q.  Can you please slowly school through the attachment,

9    Ms. Sheinwald?

10           Do you recognize this attachment, Mr. Hallac?

11   A.  Yes, I do.

12           MR. ALLEN:  The government offers Government Exhibit

13   213.

14           MR. BIENERT:  Objection.  Relevance, your Honor.

15           THE COURT:  I will allow it.

16           (Government's Exhibit 213 received in evidence)

17   BY MR. ALLEN:

18   Q.  Let's publish and let's just go to the first page of the

19   attachment.

20           So, Mr. Hallac, what do you see here?

21   A.  This is a confirmation by Hedgebay which was a broker of

22   selling those kinds of funds where he was going to purchase

23   Lionel Sterling's shares for $250,000.

24   Q.  Can you zoom in, Ms. Sheinwald, on the parts that say value

25   and payment amount?

A. Hallac - redirect

1           Mr. Hallac, what do these two figures mean?

2    A.  Mr. Sterling, when he made the investment in WFF, put up

3    $500,000 for whatever shares he acquired, and they were making

4    a transaction whereby Lionel would be paid 250.

5    Q.  You can take the expanded part down, Ms. Sheinwald.

6           Do you know who the buyer of these shares was going to

7    be?

8    A.  I have never met the buyer but it was all arranged by

9    Hedgebay.

10   Q.  Can you please highlight the area that says future share

11   registration?

12   A.  Yes.  It was a group called CAC.

13   Q.  Have you heard of CAC Group before?

14   A.  Actually, I have, but not in context of this particular

15   transaction, but.

16   Q.  Can you go to page 3, please, Ms. Sheinwald?

17          Who here is signing on behalf of the buyer?

18   A.  Kia Jam.

19   Q.  And, Ms. Sheinwald, can you publish what is already in

20   evidence as Government Exhibit 214?

21          Mr. Hallac, is this the same subject line as the

22   previous e-mail that we just saw?

23   A.  Yes.

24   Q.  Was it sent on the same day as the previous e-mail that we

25   just saw that had the contract attached?

I2L5ber4                              A. Hallac - redirect

1    A.  Yes, sir.

2    Q.  What did Mr. Bergstein say in this e-mail?

3    A.  He is not paying for this.

4            MR. ALLEN:  One second, your Honor.

5            MR. BIENERT:  Actually, can we have him read it

6    accurately, your Honor?  The words are different than he said.

7            THE COURT:  Does he say?  Is it in evidence.

8            THE WITNESS:  I cannot pay for this.

9            THE COURT:  All right.

10   BY MR. ALLEN:

11   Q.  What did you understand "I cannot pay for this" to mean?

12   A.  It means that whereas he had previously said that he would

13   help Keith pay off Mr. Sterling's shares, he now decided that

14   he wasn't going to pay for it.

15   Q.  And, as you understood it, why did you and Mr. Wellner and

16   Mr. Bergstein want to pay off Mr. Sterling?

17   A.  Well, Mr. Sterling --

18           MR. BIENERT:  Objection as to speculation of

19   Mr. Bergstein.

20   BY MR. ALLEN:

21   Q.  Why did you want to pay off Mr. Sterling?

22   A.  He was being extremely adamant, he was extremely upset and

23   threatened to sue, and Keith suggested to Mr. Bergstein that it

24   would be a silly thing to have happen for someone to start

25   suing at this point in time.

I2L5ber4                          Porter - direct

1              MR. ALLEN:  No further questions, your Honor.

2              THE COURT:  All right.  You may step down.

3              (Witness steps down)

4              THE COURT:  Thank you, sir.

5              THE WITNESS:  Thank you.

6              THE COURT:  Call your next witness.

7              MR. KOBRE:  The government calls William Porter.

8     WILLIAM PORTER,

9          called as a witness by the Government,

10         having been duly sworn, testified as follows:

11              THE WITNESS:  William Porter.

12              THE COURT:  You may inquire.

13              MR. KOBRE:  Thank you, Judge.

14    DIRECT EXAMINATION

15    BY MR. KOBRE:

16    Q.  How old are you?

17    A.  64.

18    Q.  And where do you live?

19    A.  Atlanta, Georgia.

20    Q.  What kind of work do you do?

21    A.  I am a CPA and work with a family office in Atlanta.  I am

22    a finance professional.

23    Q.  Do you do this work through a consulting firm that you own?

24    A.  Yes.

25    Q.  What is that called?

I2L5ber4                          Porter - direct

1   A.   Valuation Econometrics.

2   Q.   And the consulting work that you do, who are some of your

3   clients?

4   A.   Well, the Glenn family in Atlanta is one, and I have a

5   group of folks that I work with in Tampa that are in the

6   restaurant business, and another fellow who is in the

7   technology space in Atlanta.

8          So, I have basically three relationships.

9   Q.   Thank you.

10         And so, specifically focusing on your work for the

11  Glenn family, what sort of service do you provide for them?

12  A.   I have held the role of chief investment officer since

13  about 2007, 2008.

14  Q.   And, any other kind of work that you do for the Glenn

15  family.

16  A.   Tax.  Long-term financial planning.

17  Q.   And in your role as chief investment officer for the Glenn

18  family, what are some of your duties and responsibilities?

19  A.   I presume that you want to know over the span of time and

20  not specifically today because it changes over time.

21  Q.   Sure.  Just generally speaking.

22  A.   I handle the direct transactions and complicated

23  transactions that are outside of the normal and we have an

24  investment advisory firm that does the standard, regular,

25  day-to-day administrative process.

I2L5ber4                          Porter - direct

1    Q.  And, specifically focusing on investments, are you involved

2    in the investment process or investments on behalf of the Glenn

3    family?

4    A.  Yes.

5    Q.  And just describe what your role is with respect to that or

6    what your role has been.

7    A.  I have, with these complex transactions that I am tasked to

8    work on, I take the role of being involved in management when

9    needed, or standing on the outside and doing ongoing diligence

10   and/or communications with managers.

11   Q.  And, have you been involved in evaluating investments on

12   behalf of the Glenn family?

13   A.  Yes.

14   Q.  Are you familiar with an entity called Weston Capital

15   Management?

16   A.  Yes.

17   Q.  Just briefly, what is Weston?

18   A.  Weston was a fund manager, sponsor.

19   Q.  Was the Glenn family invested in any of Weston's funds?

20   A.  Yes.  I believe three or four.

21   Q.  And just if you could list them for us?

22   A.  There was Wimbledon HDN Fund, Weston Atlas Capital

23   Partners, there was another one I can't remember the name of

24   it, and the Wimbledon Financing Fund.  I think were the four.

25   Q.  And focusing specifically on Wimbledon Financing Fund, is

I2L5ber4                              Porter - direct

1   that sometimes referred to as WFF?

2   A.  Yes.  That's what we call it.

3   Q.  And, as far as your work with the Glenn family and

4   specifically with respect to their investments in Weston, did

5   you meet anyone involved in business dealings with the WFF

6   fund?

7   A.  Yes.

8   Q.  Do you see any such person in the courtroom here today?

9   A.  Well, Mr. Hallac was here earlier, and I see Mr. Bergstein

10  at the table back there.

11  Q.  And if you could just point to him and identify an item of

12  clothing Mr. Bergstein is wearing?

13  A.  He is back there.

14          THE COURT:  Identify an article of clothing that he is

15  wearing, please?

16          THE WITNESS:  I believe it's a brown shirt with a

17  collar up.

18          THE COURT:  Identification noted.

19  BY MR. KOBRE:

20  Q.  About how many times did you meet, in your lifetime, how

21  many times did you meet the defendant Mr. Bergstein?

22  A.  I met him twice in face to face meetings and had another

23  meeting where he attended telephonically.

24  Q.  Roughly, when did the two meetings occur, just roughly

25  speaking?

I2L5ber4                         Porter - direct

1    A.  The first one would have been in the December 2011 period,

2    the second one would have been in May, early May of 2012, and

3    then the phone call would have been sometime after that.

4    Q.  Okay.  We will come back to those meetings a little later.

5         First, just coming around to some background about

6    you, can you tell us a little bit about your educational

7    background?

8         MR. BIENERT:  Objection.  Relevance, your Honor.  Not

9    an expert.

10        THE COURT:  I will allow it.

11   A.  I have graduated from the University North Carolina, Chapel

12   Hill, with an accounting degree, went to work with Peat

13   Marwick, one of the big international firms.  Left Peat Marwick

14   in 1977, 1978 with a couple guys and we formed a local

15   accounting firm in Atlanta that still exists today.  So, I have

16   basically practiced public accounting since 1975.

17   Q.  And how did you come to work for the Glenn family, as you

18   described earlier?

19   A.  I was introduced to Tom Glenn in one of the projects that I

20   worked on for Trust Company Bank back years ago -- we now know

21   them as Sun Trust Bank -- but I worked with him on a program.

22   At the time he was a loan officer at the bank.

23   Q.  And did that lead to -- what did that lead to?

24   A.  At some point in time after that project was completed, he

25   called me to ask if I would be interested in helping him with

his tax returns.  This is sometime around 1979, 1980, 1981.

Q.  Did your role grow with the Glenn family from beyond just the taxes?

A.  Yes.

Q.  Describe how that came about.

A.  For years I was in a private public accounting firm and we did work for him, just basic tax and long-term financial planning.  And then, in or around 2001, I left the accounting firm and began to work within his office and we basically founded a family office that would help manage his family's financial affairs.

Q.  And, did there come a time when you specifically took on the larger role that you described earlier as chief investment officer?

A.  Yes.

Q.  And just describe briefly how that came to be.

A.  In 2006, early 2007, Tom asked me if I would take on this larger role because he was uncomfortable with some of the direct private transactions that had been placed in the family's portfolio.

Q.  And when you took on this role, was the Glenn family at that point already invested in some of the Weston funds?

A.  Yes.

Q.  In particular, WFF?

A.  I believe that the family already had invested in the

1    entity that is now known as WFF but at the time it had another

2    name.

3    Q.  And when we say the family, was it the family itself or a

4    particular entities that they held?

5    A.  I understand the question.  The family's assets are

6    basically broken into various investment partnerships and a

7    private foundation.  We managed one of the largest private

8    foundations, a charitable organization that is in Georgia, so.

9    Q.  Was it that charitable foundation and other entities that

10   were invested in WFF?

11   A.  Yes.  That's what I mean by the family.  Yes.

12   Q.  So, had you been involved in the original decision to

13   invest in WFF on behalf of the Glenns?

14   A.  I was not involved in the original decision when the monies

15   were placed in the predecessor of WFF.

16   Q.  Got it.

17          And so, I think you said you took over the role as

18   chief investment officer around 2006 or 2007?  Is that right?

19   A.  Late '06 or early '07, somewhere in that range; yes.

20   Q.  About how much money had the family Glenn had at that time

21   invested in the WFF fund?

22   A.  I think it was in the range of $8 million or $9 million.

23   Q.  As part of your taking on the role of chief investment

24   officer, did you take any steps with regard to reviewing the

25   investment into WFF?

I2L5ber4                          Porter - direct

 1  A.  Yes.

 2  Q.  Describe briefly what those were?

 3  A.  I did a detailed review of the offering memoranda that were

 4  circulated in the latter part of 2007, along with the operating

 5  agreements and all the other documents that surrounded the

 6  investment, met with Albert Hallac and the guy Matt Hoffman at

 7  Weston offices in New York.  And so, we had meetings, had phone

 8  calls, and reviewed their documents.

 9  Q.  Okay.  If you can display Government Exhibit 612 which is

10  in evidence?

11          And we are not going to go through this in any kind of

12  detail but do you recognize this?  It should be on your screen.

13  A.  Oh, it is on my screen.  I'm sorry.  Yes, I do.

14  Q.  What is it?

15  A.  I presume this is the cover page for one of the offering

16  memoranda.

17  Q.  For what fund?

18  A.  For the Wimbledon Financing Fund.

19  Q.  And so, it would have been this document or one of a

20  similar nature that you reviewed?

21  A.  Yes.  I think yes, that this would be one of them.

22  Q.  And, based on your review, what did you understand the WFF

23  funds -- let me back up for a second.

24          Are you familiar with the term investment mandate?

25  A.  Yes.

I2L5ber4                        Porter - direct

1   Q.   What is an investment mandate of a fund?

2   A.   When an investor like one of the Glenn family entities is

3   deciding to invest in a fund like WFF, we are interested to

4   know what the expectations are for the style of investing

5   because there are so many different ways that people can make

6   investments.  So, the mandate is the contractual arrangement

7   that is presented to the investor that describes the rules

8   within which the investor -- the investment manager will

9   operate.  So, we know that they're making investments in this

10  style of investing or this style of investing, and that way we

11  can monitor what they're doing compared with the original

12  mandate and have a reasonable expectation that they will follow

13  that mandate.

14  Q.   Based on your review of the offering memorandum and I think

15  you also described earlier having had meetings with Albert

16  Hallac, what was your understanding of the investment mandate

17  of the WFF fund?

18  A.   WFF was to allocate the monies that it had collected from

19  our Glenn entities and from all of its other investors and

20  allocate that money into pools of capital, I call them sub

21  funds.  Each of these pools or subfunds were to be managed by a

22  lender specialist.  So, each of the pools was to be a lender,

23  we weren't making private equity investments in operating

24  businesses, we were to be making -- WFF was to be making

25  investments in these pools and those pools were to be lending

money, either first mortgage loans or second mortgage loans,

asset-based lending, a wide range diversified across a wide

portfolio of styles.

Q.  Are you familiar with the term "fund of funds?"

A.  Yes.

Q.  What is a fund of funds?

A.  Just what I described.  A fund of funds is a fund, the

Wimbledon Financing Fund, that would allocate its --

        THE COURT:  This is cumulative of other testimony in

the trial.  The jury has already heard the concept of a fund of

funds.  Move on.

        MR. KOBRE:  Yes, Judge.

Q.  Were there any particular characteristics of the WFF fund

that were particularly attractive to you in analyzing that

investment?

A.  Yes.  We liked, continued to like the lending space so less

risk and more stable, less volatility.

Q.  When you say less risky, why did you believe it was less

risky?

        MR. BIENERT:  Objection.  Relevance, your Honor.

        THE COURT:  Sustained.

BY MR. KOBRE:

Q.  At some point prior to 2011 did you ask to withdraw your

investment from the WFF fund?

A.  Yes.

1   Q.  And, describe how that came about.

2   A.  In the latter part of 2008 we sent notification to Weston

3   that we wished to have our investment in the Wimbledon

4   financing funds redeemed.  It is called a redemption request.

5   Q.  Why did you ask for a redemption?

6   A.  Uncomfortable with the internal management process at

7   Weston, management of Wimbledon Financing Fund, uncomfortable

8   with the communications that we were getting from them,

9   primarily.

10  Q.  Now turning your attention to sometime in late 2011, did

11  you receive an update or did you receive word from anyone at

12  Weston about a transaction that was going to happen with WFF?

13  A.  Yes.

14  Q.  Could you describe what you learned from Weston at that

15  point in late 2011?

16  A.  It was a proposed -- what we understood, there was a

17  proposed transaction for the Wimbledon -- the subfunds that had

18  been contributed to Gerova for the Gerova transaction that had

19  been unwound and for the subfunds then to be contributed to

20  some new entity by the name of Arius Libra.

21  Q.  Do you remember how you got word of that?

22  A.  It seems like we may have received a letter from Weston.

23  That's my recollection.

24  Q.  Was there an investor meeting also scheduled to describe or

25  discuss this proposed transaction?

I2L5ber4                          Porter - direct

1    A.   Yes.

2    Q.   And, what was your reaction to hearing about this proposed

3    unwind transaction?

4              MR. BIENERT:   Objection.   Relevance, your Honor.

5              THE COURT:   Sustained.

6    BY MR. KOBRE:

7    Q.   What did you do after you learned about the proposed unwind

8    transaction from Weston?

9    A.   Well, we went to the December -- there was a meeting in

10   Florida on December 14th, so my first action was to attend the

11   meeting.  Actually, before that we sent a letter to Mr. Hallac

12   and Weston asking for information and a full due diligence list

13   of information requests on this proposed transaction.

14   Q.   And if we take a look at Government Exhibit 614 in

15   evidence?  If we can just enlarge the body of the letter

16   including the signatures, please?

17             Is your signature on this letter?

18   A.   Yes.

19   Q.   What is this letter?

20   A.   This was a letter that was jointly written by

21   representatives of three of the largest investor groups in WFF

22   where we were requesting from Mr. Hallac and Weston a

23   significant amount of information about the proposed

24   transaction with Arius Libra.

25   Q.   And was this sent before the presentation?

1   A.  Yes.  Before the presentation on December 14th, yes.

2   Q.  Now, did you attend that December -- we can take that down,

3   thank you, Ms. Emrich.

4           You said you attended the presentation on December

5   14th.  Can you describe, first of all, where did it take place?

6   A.  It was in or around Boca Raton, Florida in a hotel, a hotel

7   conference room.

8   Q.  And, who do you recall attending there?  Was there a

9   presentation made at that meeting?

10  A.  Yes.

11  Q.  And, was this meeting specifically for the investors of a

12  particular Weston fund, particularly in WFF?

13  A.  I believe it was just WFF but that's just my recollection.

14  Q.  Who made the presentation?  Who were the presenters?

15  A.  Mr. Hallac, Mr. Wellner.  Both made significant

16  presentations.  Mr. Bergstein was introduced and made

17  significant comments.  And there were a couple of other people

18  who were introduced during the meeting.

19          (Continued on next page)

20

21

22

23

24

25

I2LPBER5                          Porter – Direct

1   BY MR. KOBRE:

2   Q.  Were you actually personally introduced to Mr. Bergstein at

3   the meeting?

4   A.  Yes.

5   Q.  Was that the first time you had ever met him?

6   A.  Yes.

7   Q.  And other than yourself, on behalf of the Glenn family,

8   were there other representatives of other investors there?

9   A.  Yes.

10  Q.  Can you tell us the names of some of those other people,

11  the other investors?

12  A.  Well, the Cafaro family out of Youngstown, Ohio, was

13  represented by Will Cafaro for the family members, along with

14  their lawyer, a guy named Mark Beck, and a CPA that has worked

15  for the Cafaro family for years named Tim McBride.

16  Q.  Was somebody named Tim Wray there as well?

17  A.  Tim Wray was there.

18  Q.  Who is Tim Wray?

19  A.  Tim Wray was there, as well as his partner, Todd Kellerman.

20  Q.  Okay.  During that were there any visual aids presented

21  during the presentation?

22  A.  Yes.

23  Q.  And can we look at Government Exhibit 616 for

24  identification only, please.  Do you recognize this?

25  A.  Yes, I do.

I2LPBER5                          Porter - Direct

1   Q.  What is it?

2   A.  This is the first page of a multi-page presentation deck

3   that was not only handed out to us in paper form, but also

4   presents like a PowerPoint presentation.  And so this was

5   presented on the screen, like you're doing here in the

6   courtroom, and also, I had this piece of paper in my hands

7   during the presentation.  In fact, that's my signature on the

8   bottom right-hand corner.

9               MR. KOBRE:  Government offers 616.

10              THE COURT:  Any objection?

11              MR. BIENERT:  No, your Honor.

12              THE COURT:  Received.

13              (Government's Exhibit 616 received in evidence)

14              MR. KOBRE:  If we can publish Government Exhibit 616.

15  BY MR. KOBRE:

16  Q.  And I'm going to focus your attention on just a few points

17  in this presentation.  If we can go to page -- you said that's

18  your signature on the bottom right-hand corner?

19  A.  And date, yes.

20  Q.  Can we go to page 10 of the presentation.  Sorry, the next

21  page, page 11.  All right.  Let's just go back one page for a

22  moment, and if we could just enlarge from the second bullet

23  point down.

24              Now, particularly with respect to this page, do you

25  recall who it was that was presenting on this page?

1    A.  As I recall, it was Mr. Wellner and Mr. Bergstein.

2    Q.  Both together?

3    A.  Yes.  That's my recollection, yes.

4    Q.  Okay.  And just generally, is this portion of the

5    presentation describing how the unwind transaction would take

6    place?

7    A.  I'm sorry, I just wanted to read and make sure I was clear.

8    Yes, this is the part of the presentation that was describing

9    what order would be the unwind.

10   Q.  And if we look at the bullet point that says:  "Weston was

11   contacted by a party beneficially holding various creditor

12   interests in Gerova, Owari Opus."  What was your understanding

13   from the presentation about what Owari Opus was or who

14   controlled it?

15   A.  They were clear in the meeting that Owari Opus was

16   controlled by this gentleman, David Bergstein, who was

17   introduced at the time.

18   Q.  Can we go to the next slide, and if you could just enlarge

19   from the second bullet point down.

20           Just focusing your attention on the second plus sign

21   there, it says:  "Owari arranged for a loan against the hedge

22   fund assets to provide the cash necessary to perform the

23   obligations required pursuant to the unwind agreement."

24           Did you gain an understanding from the presentation

25   about who was actually making the loan to Arius Libra?

I2LPBER5                        Porter - Direct

1    A.   I believe I understood at this point that there was a loan

2    to Arius Libra in the amount of about $8 million, and it

3    wasn't, as I recall, exactly clear at that time who the lender

4    was, whether it was Owari Opus that was the lender or whether

5    it was some other entity that Owari had arranged for the loan

6    to be obtained from.  The implication, as I recall, was that

7    the loan was from a third party and not directly from Owari

8    Opus.

9    Q.   Had the loan been extended by another Weston fund, what

10   would have been your reaction?

11              MR. BIENERT:  Objection, relevance, speculation.

12              THE COURT:  Yes, I don't get it.

13   Q.   Well, would it have concerned you had the loan been

14   extended by a Weston fund?

15   A.   Yes.

16              MR. BIENERT:  Same objection.

17              THE COURT:  I'll allow it.  Go ahead.

18   Q.   Why?

19   A.   Because Weston has a fiduciary responsibility to each of

20   its funds as a manager.

21              MR. BIENERT:  Your Honor, objection.  It's

22   non-designated expert.  It calls for a legal conclusion.

23              THE COURT:  Yes.

24              MR. KOBRE:  Your Honor --

25   BY MR. KOBRE:

I2LPBER5                          Porter - Direct

 1   Q.  Are you familiar with the term conflict of interest?

 2   A.  Yes.

 3          MR. BIENERT:  Well --

 4          THE COURT:  The objection is not that this individual

 5   isn't aware of these concepts.  It's he's not in a position to

 6   render an opinion or to instruct the jury on the law.

 7          MR. KOBRE:  I'm simply asking for his own

 8   understanding as a non-expert.

 9          MR. BIENERT:  But --

10          THE COURT:  Well, you can ask him what he said, what

11   he did, what he thought at the time.  That, you can inquire

12   about.

13          MR. KOBRE:  Okay.

14   BY MR. KOBRE:

15   Q.  At the time of this presentation, did you think that there

16   was a possibility that the loan had been extended by another

17   Weston fund?

18   A.  No, I had no idea.

19   Q.  What was expressed during the presentation about how the

20   loan money was going to be used?

21   A.  I understood that the money -- you mean the loan?

22   Q.  Correct.

23   A.  The loaned funds, that money?

24   Q.  Yes.

25   A.  So the loan funds were to be used to secure further

1    investments in an entity called Pineboard, and to arrange for

2    the acquisition of the sub-funds, these pools of capital that

3    had been transferred from Gerova.

4    Q.  If we can just highlight the very bottom bullet point.

5              Is this what you were referring to earlier, that the

6    loan would be used to fund continuing Arius investment in

7    Pineboard?

8    A.  Yes.

9    Q.  Did anyone say anything during this presentation about the

10   loan money being used for personal expenses of Mr. Bergstein?

11   A.  No.

12   Q.  Did anyone say anything about -- during the presentation,

13   about the loan being used to pay a salary to Mr. Bergstein?

14   A.  No.

15   Q.  If we can just go to the next page of the slide, of this

16   presentation, and just enlarge the top point, just from "Arius

17   owns."

18             So now this says here that:  "Arius owns the hedge

19   fund interests subject to $8 million loan, and the proceeds of

20   which were," and then the two purposes that you -- that we saw

21   in the prior slide, correct?

22   A.  Yes, that's correct.

23   Q.  From the presentation, what, if anything, did you

24   understand about how many $8 million loans there were?

25   A.  I clearly understood there to be one loan in the amount of

1    8 million.

2    Q.  Did anyone say anything at all during the presentation

3    about multiple $8 million loans, more than one?

4    A.  No.

5    Q.  If we look at the second bullet point under:  "The hedge

6    fund interests subject to," it says it would be subject to the

7    $8 million loan, and then it says:  "Profit participation

8    provided to guarantor of $8 million loan."  Who did you

9    understand the guarantor of the $8 million loan was?

10   A.  At the time of the meeting?

11   Q.  Yes.

12   A.  It wasn't clear that I recall.

13   Q.  All right.  If your understanding was that Mr. Bergstein

14   was not to receive a salary or other payments in this

15   transaction as a result of the Arius transaction, what do you

16   understand he was going to be receiving in order to participate

17   in the transaction?

18   A.  I understood that he owned or controlled Owari Opus, and

19   that Owari Opus had a direct interest in Arius Libra.

20   Q.  And so that was how he was going to be compensated in this

21   transaction?

22   A.  That was my understanding, yes.

23   Q.  During the meeting, was there any discussion about who was

24   going to manage Arius Libra?

25   A.  Well, Arius Libra was, as I understood it, a passive

1    holding company, and it owned this interest in Pineboard and it

2    owned the interests that still were retained in the sub-funds.

3    And as I understood it, Keith Wellner would be providing the

4    efforts to manage the process for the sub-funds because he had

5    the relevant experience and background with them.

6    Q.  And that's with respect to the sub-funds, WFF sub-funds --

7    A.  Yes.

8    Q.  -- that you're referring to?

9    A.  That had been contributed, yes.

10   Q.  And what was your understanding about who was going to be

11   running Pineboard?

12   A.  Oh, Mr. Bergstein and a guy named Paul Parmar.

13   Q.  What did you understand Pineboard was, from this meeting?

14   A.  I understood from this meeting that it was a substantive

15   company already in existence that was in the medical billing

16   business with 10, $12 million of revenue and $3 million worth

17   of cash flow.  And it was -- again, it had two or three

18   different subcategories within the medical billing industry.

19   Q.  But just so we're clear, who was it that was going to

20   actually running Pineboard or manage it day-to-day?

21   A.  I was led to believe that that was going to be Paul Parmar.

22   Q.  Now, during the presentation, was there any discussion of a

23   bank loan being extended to Pineboard?

24   A.  Yes.

25   Q.  And just describe what was said during the meeting about a

I2LPBER5                          Porter - Direct

1   bank loan to Pineboard?

2   A.  It was disclosed that there were already in the works an

3   application for a line of credit, an acquisition line of credit

4   for Pineboard to acquire additional medical billing software

5   companies that would be added to the existing business that was

6   in Pineboard, and they would use that loan with Deutsche Bank

7   to make the acquisitions.

8   Q.  So let's just back up for a second.  Who was it that said

9   that there was going to be a bank loan during the presentation?

10  A.  I'm pretty clear that it was Mr. Bergstein.

11  Q.  And what did he say about what bank would be extending that

12  loan?

13  A.  Deutsche Bank.

14  Q.  Did he say anything about how he was going to be able to

15  manage to get a Deutsche Bank loan?

16  A.  I don't remember all the details, but the clear indication

17  was that he had a relationship already with someone at Deutsche

18  Bank in Los Angeles that was making all that happen.  And he

19  also, during this meeting, presented an investment banking firm

20  that was going to be involved in structuring these

21  acquisitions.

22  Q.  But specifically focusing on Deutsche Bank, did

23  Mr. Bergstein say he had any connections at Deutsche Bank?

24  A.  Yes, as I recall, he did.

25  Q.  Did he drop any names?

1   A.   Seems like he did, but sitting here by myself, without

2   looking back at the notes from that meeting, I wouldn't -- I

3   wouldn't remember the name.

4   Q.   Okay.  Now, following the December 14th, 2011, meeting, did

5   you request any additional documents regarding the Arius Libra

6   transaction?

7   A.   Yes.

8   Q.   And specifically, what did you request, and who did you

9   request it of?

10         MR. BIENERT:  Can we get a time frame, your Honor?

11         THE COURT:  Sure.

12   Q.   Within the next month or so after the December 2011

13   meeting?

14   A.   As I recall, in January of the next year, 2012, we were

15   back communicating with Keith Wellner on a regular basis,

16   asking for the detailed contracts, financial statements and

17   information surrounding all of these transactions, including

18   the unwind and the formation of Arius Libra and the financial

19   statements and operating agreements of Pineboard.  And there

20   was a significant due diligence list that had been floated from

21   that December 1st letter that you had put up earlier, and we

22   were following up on that diligence request in January.

23   Q.   Did you, at that point, get a responses to your request?

24   A.   No.

25   Q.   Showing you what's marked for identification as Government

I2LPBER5                          Porter - Direct

1   Exhibit 617, do you recognize that?

2   A.  Yes.

3   Q.  And what is it?

4   A.  This is an e-mail from Keith Wellner to me on January 17th,

5   that it was in response to an e-mail that I sent to Keith on

6   that day, January 17th.

7   Q.  And was this a follow-up communication regarding the

8   December 2011 investor presentation?

9   A.  Yes.

10          MR. KOBRE:  The government offers Government

11  Exhibit 617.

12          MR. BIENERT:  No objection.

13          THE COURT:  Received.

14          (Government's Exhibit 617 received in evidence)

15  BY MR. KOBRE:

16  Q.  And if we can first focus on the second e-mail on the page,

17  just enlarge the signature block.

18          So that's an e-mail from WPorter@evalfo.com that is

19  your e-mail?

20  A.  That is my e-mail address.

21  Q.  And that is to Keith Wellner?

22  A.  Yes.

23  Q.  And some of the individuals on the cc line are those other

24  investors or representatives of other WFF investors?

25  A.  Yes.  It's Tim McBride and Will Cafaro from the Cafaro

I2LPBER5                        Porter - Direct

1   Family Office; Todd Kellerman and Tim Wray, who are with FEP,

2   Family Endowment Partners; and Sharon Fisher, who is a CPA that

3   works with me in the Glenn Family Office.

4   Q.  Okay.  We can go down that page --

5   A.  I'm sorry, Lori Mills is also addressed in that e-mail, and

6   she's with Asset Consulting Group out of St. Louis that

7   represents the Glenns.

8   Q.  Okay.  If we can go to the next page and just enlarge the

9   last paragraph of the e-mail.  This says:  "I, personally,

10  would like to go to Los Angeles and visit David, scheduled in

11  advance, and after we've had a chance to obtain and study the

12  core agreements.  It seems like a good idea for the Cafaro and

13  for the Family Endowment and the Glenn FO folks to coordinate

14  any contact with David to be respectful of his time.  We can

15  contact him directly, but would prefer to work with you and

16  Albert in a coordinated fashion, and we'd like some feedback on

17  timing..."  And it goes on to say set up "a meeting with David

18  that works with his schedule and for everyone else's schedule."

19           First of all, were you referring to David Bergstein

20  here?

21  A.  Yes.

22  Q.  Why did you want to have this meeting with David Bergstein?

23  A.  Well, we first wanted -- if you read that sentence, we'd

24  like some feedback on timing and production of the information

25  that was promised in our Palm Beach meeting; so that we

I2LPBER5                              Porter - Direct

1     could -- and then we wanted to meet with David because we

2     wanted to study the documents, and then have another

3     presentation from him of the Pineboard medical billing business

4     that was purported to be part of this Arius Libra transaction.

5     Q.  Why specifically David Bergstein, as opposed to just

6     getting the information from Keith Wellner or Albert Hallac?

7     A.  Well, David had taken a pretty significant role in the

8     presentation in December, and if he was going to be involved in

9     and was going to be orchestrating, as we understood it, the

10    acquisition process for these other medical billing companies,

11    we felt like we needed to get to know him and know who he was.

12            And we understood that he had a -- he was a manager,

13    he was a board member at Arius Libra, and so he and Keith

14    Wellner and Albert Hallac, being the board members at Arius

15    Libra, had a responsibility to us as a fiduciary.  And in

16    addition, David was somehow entangled with or was involved in

17    the Owari Opus entity.  That was something that was clearly led

18    to be -- we were led to understand that he controlled this or

19    was involved in the formation of this $8 million loan, and at

20    this point in time, nobody had told us enough about the $8

21    million loan to really understand it.  So I wanted to sit down

22    and talk with him directly.

23    Q.  Okay.  And did that meeting, in fact, come about?

24    A.  It did.

25    Q.  Who arranged it?  Who set it up, I should say?

I2LPBER5                            Porter - Direct

1   A.  Keith Wellner was the one that I think handled the

2   administrative side of it.

3   Q.  And can we take this down and put up Government Exhibit 620

4   for identification.  Do you recognize that?

5   A.  Yes.

6   Q.  What is it?

7   A.  This is a printout of the calendar entry in my computer

8   calendar.

9   Q.  And does it also have an e-mail in it?

10  A.  Yes.

11  Q.  Would you just describe that?

12  A.  Yes.  The way that my calendar software works, I just copy

13  in an e-mail string into the calendar entry, and it leaves the

14  trail for me of times, dates and information that is relevant

15  to the meeting.

16          MR. KOBRE:  The government offers 620.

17          MR. BIENERT:  Object on relevance grounds, given the

18  timing, your Honor.

19          THE COURT:  What is the relevance time-wise?

20          MR. KOBRE:  I can lay a foundation, your Honor.

21          THE COURT:  Okay.

22  BY MR. KOBRE:

23  Q.  Approximately when was your meeting with David Bergstein

24  that we were just talking about scheduled for, approximately?

25  A.  May 1st.

I2LPBER5                           Porter - Direct

1   Q.  Of what year?

2   A.  2012.

3               MR. KOBRE:  The government offers 620.

4               MR. BIENERT:  Same objection, your Honor, given the

5   time.

6               THE COURT:  Yes, I think the argument that's being

7   urged is that the timing impacts relevance.  Is that your

8   position?

9               MR. BIENERT:  Yes, your Honor, given our sidebar.

10              THE COURT:  Okay.

11              MR. KOBRE:  Your Honor, may we have a sidebar, please?

12              THE COURT:  Ladies and gentlemen, please stand up and

13   stretch, and don't forget the deep breaths.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. KOBRE:  Your Honor, I mean, it is in May of 2012,

3    but, you know, it's the defendant's attempts to cover up --

4          THE COURT:  I'm sorry?

5          MR. KOBRE:  It's the defendant's attempts to cover up

6    his crimes, to lie about the crimes and to further conceal what

7    happened, and it's pure evidence of the crime even though it

8    happened later in 2012.  There are false statements by the

9    defendant being made here.

10          MR. BIENERT:  Your Honor, they can't have it both

11    ways.  They can't argue that nothing is relevant to my client's

12    state of mind or good faith after, quote, the deals were struck

13    in November of 2011, and then be able to episodically put on

14    what they believe is evidence into 2012 that establishes my

15    client's bad faith.  Yet, at the same time, say that I am not

16    allowed to put into evidence things into 2012 that evidences

17    good faith.

18          What's significant, aside from just that principle,

19    it's very significant to me that what this witness has already

20    said is that the deal presented to him in 2012 ties into this

21    medical billing company with Mr. Parmar, and the assets and all

22    of this stuff is intertwined.

23          I will also just proffer to your Honor that I have

24    read the Jencks that they recently gave us, and at least in the

25    Jencks Act Statement, as well as this witness' what appear to

I2LPBER5                         Porter - Direct

be handwritten notes about the meeting with Mr. Bergstein, it's
all about the medical billing company and what's going on with
Mr. Parmar and what's going on with Pineboard and where things
stand on moving forward on getting these.

It's all the things that we're saying are relevant to
the defense, but if the government has taken the position that
that is not relevant to its proof because the crime was over
with in November, then they can't get into these things in
2012.

THE COURT:  Well, I heard a different rationale
offered by the government, and I will say that the government,
if it had said nothing is admissible after a certain date and I
sustained an objection, it would not mean that the Court had
adopted the proposition that nothing after a certain date can
be offered by defense.  I've never said that.  No one has ever
said that.  I didn't hear the government say it.  If they said
it, I don't care that they said it because that is not the crux
of my ruling.

I've given the rulings that I have made in the context
of a specific objection, but for example, with consciousness of
guilt evidence, take a defendant's flight.  It's, by
definition, after the crime is complete; yet, it's admissible.
Doesn't mean that the defendant can offer anything it wishes
after the completion of the crime, but there are certain
categories that may or may not be admissible.  So how do you

1    respond?

2              MR. KOBRE:  Well, a couple of things.  First of all,

3    exactly like what your Honor was saying, if the defendant,

4    years after a crime is committed, makes statements that reflect

5    his guilt, obviously, those are going to be admissible to prove

6    up the crime happened when it happened.

7              The government is not planning to elicit any

8    statements that Mr. Bergstein made during this meeting

9    regarding Pineboard or whether Pineboard was a good investment

10   or a bad investment.  There are lies directly to this investor

11   that the defendant told lies about there being --

12             THE COURT:  So what are you trying to get out of this

13   witness, and where are you going?

14             MR. KOBRE:  That the defendant told him a lie and told

15   him that the loan, the purported loan, was actually extended by

16   Swartz IP in order to cover up the fact that the loan had

17   really been expended by P2, a lie to deceive this investor

18   about where the money had come from.

19             THE COURT:  Thank you.  Thank you.  I'm going to allow

20   it.

21             (Continued on next page)

22

23

24

25

1           (In open court)

2           MR. KOBRE:  So the government offers Government

3    Exhibit 620.

4           THE COURT:  Received.

5           (Government's Exhibit 620 received in evidence)

6    BY MR. KOBRE:

7    Q.  If we could publish Government Exhibit 620, and just

8    enlarge the top half of the screen.

9           So this is a calendar entry on May 1st, 2012, from

10   2:00 p.m. to 4:00 p.m.  Is that the time that the meeting that

11   you just described with Mr. Bergstein took place?

12   A.  Yes.

13   Q.  And it says here that the meeting will be held next Tuesday

14   at 11:00 in the offices of K-Jam Media, and then there's an

15   address there.  Prior to getting this, had you heard of K-Jam

16   Media?

17   A.  I don't recall.

18   Q.  You attended this meeting.  Can you describe the locale in

19   terms of the building?

20   A.  Yeah, the building was in a vibrant kind of business

21   environment of Los Angeles.  There are three or four public

22   companies that were within a couple of blocks of this address.

23   Q.  Was there a sign outside the door of the office?

24   A.  Yes.  When you came to the offices, there were two or three

25   of those little blocks right next to the door that announce the

1    names of different companies that had offices there, and K-Jam

2    was one of them.

3    Q.   Okay.  And who was present at this meeting, aside from

4    yourself and David Bergstein?

5    A.   Yeah, Albert Hallac and Keith Wellner and David Bergstein

6    and myself, the four of us, were in the meeting.

7    Q.   Okay.  And without getting, at this point, into the

8    substance of the meeting or what was said, who did most of the

9    talking?

10   A.   David Bergstein.

11   Q.   Now, at some point during the meeting, did Mr. Bergstein

12   say anything about the $8 million loan to Arius Libra that had

13   been discussed at the December meeting?

14   A.   Yes.

15   Q.   What did Mr. Bergstein say about the $8 million loan?

16   A.   It was owed to an entity by the name of Swartz IP Services,

17   S-w-a-r-t-z, Swartz IP Services.

18   Q.   Prior to this time, had you ever heard of Swartz IP

19   Services?

20   A.   Not that I recall, no.

21   Q.   Did Mr. Bergstein say anything during the meeting about who

22   owned or controlled Swartz IP Services?

23   A.   It was owned by an individual by the name of Jerry Swartz

24   was the allegation -- or allegation, that's not the right word,

25   but I was told it was owned by a guy named Jerry Swartz.

I2LPBER5                          Porter - Direct

1    Q.  Who told you that?

2    A.  I'm pretty sure it was Mr. Bergstein.

3    Q.  Did Mr. Bergstein say anything about who Jerry Swartz was,

4    or what his relationship with Jerry Swartz was?

5    A.  He indicated that Mr. Swartz was an individual with whom

6    David Bergstein had done a number of business transactions,

7    that he was a regular participant in some of the business deals

8    that David was involved in.

9    Q.  Did Mr. Bergstein say anything about the financial

10   condition of this company, Swartz IP Services?

11   A.  Indicated that it was a significant investment -- pool of

12   investment capital.

13   Q.  Did he say where that investment capital had come from,

14   where Swartz IP had gotten its investment capital?

15   A.  I remember vaguely that conversation, but I don't remember

16   the details.

17   Q.  Was there any suggestion by Mr. Bergstein during this

18   meeting that there was more than one, this one loan, owed by

19   Swartz IP Services?

20   A.  I understood that there was just one loan owed by Arius

21   Libra to Swartz IP Services.

22   Q.  I'm sorry.

23   A.  Yes.

24   Q.  Was there any indication that there was more than one loan

25   owed by Arius Libra?

1   A.  No, there was -- clearly, the discussion for a couple of

2   hours was around the $8 million loan, "a," one $8 million loan

3   owed to Swartz IP Services.

4   Q.  Did the topic of conversation turn to the due date for the

5   loan, when Arius Libra would be required to pay?

6   A.  Yes.  David indicated that Mr. Bergstein indicated that it

7   was due within two or three months.

8   Q.  And what was your reaction to all of this?

9   A.  I was upset and worried about it because the context not

10  only was that it's due in two or three months, but David

11  indicated -- or Mr. Bergstein indicated that it was -- they

12  were very concerned about the value of these sub-funds; that it

13  really needed to sell the sub-funds and pay off this loan; that

14  it was urgent and immediate that this happen quickly.  And it

15  was concerning to me because this was all new information, that

16  there was a short-term due date on a loan that had just been

17  announced to us just a couple of months earlier as having even

18  been in existence.

19  Q.  And what, if anything, did you tell Mr. Bergstein and Keith

20  Wellner and Albert Hallac, who were there, in response to them

21  saying -- in response to Mr. Bergstein saying that WFF assets

22  might have to be sold?

23  A.  I was emphatic that, as a representative of the Glenn

24  family, I would seek for them not to sell the sub-funds and to

25  work to restructure that loan or -- and please provide us with

1    information because, at this point in time, we still hadn't

2    been provided any of the information, like copies of the loan

3    agreements and such, and to seek counsel from the Glenn family

4    and from the other investors, who I believed would also be

5    upset about the prospect or the threat that they were going to

6    sell these sub-funds to pay off this loan.

7    Q.  Okay.  And if we can take a look at Government Exhibit 618

8    for identification.  Do you recognize that?

9    A.  I do.

10   Q.  And what is it?

11   A.  This is a letter that I wrote -- not a letter.  This is an

12   e-mail that I wrote to Keith Wellner the day after the meeting

13   with Mr. Bergstein and Albert Hallac and David and Keith

14   Wellner in the K-Jam offices.

15           MR. KOBRE:  The government offers 618.

16           MR. BIENERT:  No objection.

17           THE COURT:  Received.

18           (Government's Exhibit 618 received in evidence)

19           MR. KOBRE:  And if we can just publish that for the

20   jury and also enlarge -- well, first, let's enlarge the

21   heading.

22   BY MR. KOBRE:

23   Q.  So this is an e-mail from you, and it's dated Thursday,

24   May 3rd, 2012.  Can you describe when that is in comparison to

25   the meeting we just talked about?

1  A.  Yeah, one of the issues is the calendar entries and time

2  date.  Is it East Coast or West Coast?  This time, it was 1:00

3  in the morning in the Los Angeles airport, and I was typing

4  this e-mail.  So it shows up as 4:42 a.m., but I was actually

5  waiting for my flight to depart, the redeye flight that comes

6  back every night.

7  Q.  And just to backtrack to the meeting that you had on

8  May 1st, 2012, with David Bergstein, that happened in

9  California?

10  A.  Yes.

11  Q.  What city?

12  A.  Los Angeles.

13  Q.  And that's where the K-Jam Media offices were?

14  A.  Yes.

15  Q.  And you mentioned that you were going to take a flight back

16  to New York?

17  A.  Yes.  I started this e-mail on the night of Wednesday

18  night, the day after, on May 2nd.  By the time I actually

19  pressed send on the e-mail, the clock had rolled over to

20  May 3rd.

21  Q.  Okay.  And it's an e-mail that you sent to Keith Wellner,

22  copying Albert Hallac, among the other investors; is that

23  right?

24  A.  Yes.

25  Q.  Can we just enlarge the last big paragraph -- actually,

1    just the last paragraph; so we can get it a little bit bigger.

2    I'm sorry, the last full paragraph.

3            And let me just highlight, the last sentence says:

4    David Bergstein -- the last four lines up -- "David Bergstein

5    indicated verbally to me in the meeting yesterday that the debt

6    was due in two or three months, and I presume that we then have

7    time to discuss these details and understand the nature,

8    history and extent of this $8 million debt and develop a plan

9    to resolve the debt without a foreclosure by the lender or a

10   sale of the assets of fund payment of this alleged $8 million

11   debt."  What are you saying here to Mr. Wellner?

12   A.   That I was expecting him and Albert, both, because this was

13   addressed to both of them, in their fiduciary responsibility up

14   at Arius Libra, to take actions as necessary to protect the

15   sub-funds that were owned by Arius Libra at that time from

16   having a foreclosure by this entity that David Bergstein

17   apparently controlled.

18           I gathered from the meeting on the 1st of May that

19   David Bergstein either had direct or indirect control over the

20   decision whether or not to have that debt foreclosed on and

21   take the ownership of those assets.

22   Q.   Okay.  And if we can just zoom back out and just go to the

23   last two sentences on this page, and then we'll go over to the

24   next page.

25           You go on to say -- and I'll just start at the second

I2LPBER5                          Porter - Direct

1   line up from the bottom -- "and I heard David Bergstein say

2   that he believed that these funds' value was continuing to

3   decline."  So, first, what did you mean by that?

4   A.   In the meeting on May 1st in K-Jam's offices, David

5   Bergstein clearly indicated that it was his understanding that

6   the values of the assets inside of these sub-funds was

7   continuing to decline precipitously and that was why the lender

8   was uncomfortable and wanted to foreclose on or force the sale

9   of those assets in order to get the debt collected.

10  Q.   And just continuing on, it says:  "The implication being

11  that his lender was at risk, from a value perspective, with

12  declining collateral value and a near-term debt."

13         When you wrote "being that his lender," who are you

14  referring to?

15  A.   The Swartz IP Services.

16  Q.   Okay.  And go to the next page and just enlarge the rest of

17  that paragraph.

18         "That is language used by David Bergstein that implies

19  a setup by David for precipitous action by the lender.  And if,

20  in fact, the lender is headed by David, then we will insist

21  that he not be in any position at Arius Libra to be involved in

22  making the decisions on how to respond on behalf of that

23  company to the demands of the lender.  He has a specific

24  conflict of interest."

25         Can you explain what you were saying here?

1   A.  Well, if David, David Bergstein, is a manager on the board

2   of directors of Arius Libra, he has a fiduciary responsibility

3   to that company and to its shareholders.

4           If David Bergstein also has control over, which was

5   the implication he gave me, his control over the lender, then

6   he can decide whether to have the lender extend the loan or

7   decide whether to have the lender foreclose on the loan, then

8   he can't be on both sides of that transaction.

9           He either needs to be responsible for the lender's

10  actions, or he needs to be on the board of Arius Libra and take

11  responsibility to protect the assets of Arius Libra, but he

12  can't be on both sides of the fence.

13  Q.  Okay.  We can take that down.

14          Did you subsequently, later that week, meet with

15  anyone else from Weston regarding the loan or the Arius Libra

16  transaction?

17  A.  Yeah, I was flying from LAX, from Los Angeles airport, to

18  JFK here in the New York area that night and had meetings with

19  Tim Wray and Todd Kellerman and Mark Beck.

20  Q.  Those are the other investors?

21  A.  Will Cafaro, and others on that next day, Thursday.

22  Q.  Okay.

23  A.  And then we met -- the answer to your question, we also

24  met -- we met with Keith Wellner in the Weston offices on

25  Thursday afternoon.

I2LPBER5                        Porter - Direct

1   Q.  Okay.  And did those meetings also extend into Friday?

2   A.  Yes.

3   Q.  All right.  And on Friday, who was with present?

4   A.  I remember David being there.

5   Q.  I'm sorry?

6   A.  I'm sorry, I misspoke.  Keith Wellner was there, and I

7   believe that Albert Hallac was either there telephonically or

8   physically, and Tim Wray, Todd Kellerman and myself were there

9   for sure, and I believe Mark Beck was there as well.

10  Q.  To be clear, was David Bergstein at the meetings in

11  New York that Thursday and Friday after the same week as the

12  earlier meeting?

13  A.  No, he was not.

14  Q.  At some point during the Thursday or Friday meetings in

15  New York, did you ask anyone from Weston for the documents

16  relating to the Arius Libra transaction?

17  A.  We'd been asking for those documents back before

18  December 14th and throughout the period January through May; so

19  we continued to ask for that information and specifically

20  asking for those documents in the meetings on that Thursday or

21  Friday.

22  Q.  And when you asked -- did you reiterate the request,

23  though, during the meetings on Thursday and Friday?

24  A.  Yes.

25  Q.  And were you provided with the documents --

I2LPBER5                              Porter - Direct

1    A.  No.

2    Q.  -- during that meeting?

3    A.  No, we were not.

4    Q.  At any point during that meeting, did somebody go out, try

5    to find the documents?

6    A.  Yes, I recall that.

7    Q.  What do you recall?

8    A.  I recall that Tim Wray, who was with me, was demonstrative

9    in demanding that they give us a copy of the loan agreements

10   that were associated with this Arius Libra financing, and it

11   was either Keith Wellner or Albert who left the meeting, came

12   back and indicated that they could not gain access to the

13   information on the computer servers.

14            MR. KOBRE:  Just one moment, your Honor.

15            (Pause)

16            Nothing further.

17            THE COURT:  All right.  Ladies and gentlemen, let's

18   take our mid-afternoon recess.  Please do not discuss the case

19   among yourselves or with anyone.  We'll be back in ten minutes.

20            (Jury not present)

21            THE COURT:  See you in ten.

22            (Recess)

23            (Continued on next page)

24

25

I2L5ber6                           Porter - cross

1              (Jury present)

2              THE COURT:  Is the jury box weather better for some of

3      you?

4              A JUROR:  Yes.

5              THE COURT:  All right.  Good.  We will figure out the

6      right compromise.

7              You may inquire.

8              MR. BIENERT:  Thank you, your Honor.

9      CROSS EXAMINATION

10     BY MR. BIENERT:

11     Q.  Hi, sir.  My name is Tom Bienert.

12             Let's focus on the meeting that you had with

13     Mr. Bergstein in California that you talked about with

14     Mr. Kobre.  That meeting occurred in or around early May?

15     A.  Yes.

16     Q.  And, was this the one and only time that you actually sat

17     down with Mr. Bergstein in a setting where you could dialogue

18     with him and have kind of open-ended questions and answers?

19     A.  Yes.

20     Q.  And, how long did the meeting take, give or take?

21     A.  I remember it being a couple hours.

22     Q.  And, what topics were discussed at the meeting?

23     A.  Primarily, as I recall, the development of Pineboard, the

24     history behind Paul Parmar's initiatives and the technology

25     that was involved and the couple of guys that were running the

I2L5ber6                          Porter - cross

1    medical billing business, and so it was primarily focused

2    around Pineboard's operations.

3    Q.  And, by Pineboard, you mean the medical business aspect of

4    the transaction you had been told about in December?

5    A.  That's correct.

6    Q.  And, did you feel like you were able to ask and have the

7    questions that you had about the thoughts and steps of the

8    medical business addressed at that meeting?

9    A.  No.

10   Q.  What aspects weren't addressed?

11   A.  I was specifically asking for the financial statements of

12   Pineboard, if this was a company that had $12 million of

13   revenue in 2011 and $3 million of cash flow or EBITDA, as it is

14   called in finance business, and was worth $30 million or

15   $40 million according to their calculations, then I was

16   expecting in January to get financial statements on this

17   company and copies of the closing agreements and the documents

18   that supported the operations of this company and was told that

19   a new controller had been hired by David, that information

20   would be forthcoming to me within the next couple of days but

21   that there was nobody there in the offices that day that I

22   could talk with, or and their financial information that could

23   be supplied to me at the too time.

24   Q.  So I have the timing right, when you made reference to

25   requesting information about the business in January, you made

1    those requests of Messrs. Hallac or Wellner?

2    A.  I believe that the requests were originally were made by

3    letter with a due diligence request in December before the

4    December 14th meeting, and specifically requested in the

5    December 14th meeting that Mr. Bergstein attended and we were

6    told -- we, the investor representatives -- were told in the

7    December 14th meeting that that information would be

8    forthcoming within the upcoming few weeks after that meeting.

9    Q.  And then we saw with the government there were some

10   exchanges or there were e-mails where you were requesting

11   information as a follow-up to this, right?

12   A.  Yes.

13   Q.  And that was to Mr. Hallac or Wellner?

14   A.  Yes.

15   Q.  Those e-mails?

16   A.  Yes.

17   Q.  Now, if we could have Exhibit 618 brought back up?

18           If we can go through this, did I understand you

19   correctly, sir -- we will start at the top -- that you typed

20   this e-mail within a few hours of finishing the meeting in Los

21   Angeles with Mr. Bergstein?

22   A.  It was the day after.

23   Q.  Within a day?

24   A.  Yes.

25   Q.  And this was when you were literally going to take a plan

I2L5ber6                          Porter - cross

1  from the west coast back to the east coast and you were going

2  to be meeting here in New York with Mr. Wellner and Mr. Hallac

3  and some other investors; is that right?

4  A.  Yes.  Yes, sir.

5  Q.  So, if this e-mail, you were up until the wee hours of the

6  morning is on Thursday, May 3rd, does that mean that your

7  meeting in New York with Mr. Hallac and Mr. Wellner, those

8  meetings were on May 3rd and May 4th?

9  A.  That's correct.

10 Q.  And this would be the meeting where one of them left saying

11 they would look for documents and came back later and said

12 there was an issue with their system and they couldn't get you

13 the documents, right?

14 A.  I believe that that was on the Friday the 4th.

15 Q.  On May 4th, correct?

16 A.  May 4.

17 Q.  And that definitely happened here in New York that meeting,

18 right?

19 A.  Yes.

20 Q.  Now, if we can go down into the body of the e-mail that you

21 wrote on a day after the meeting with Mr. Bergstein, in the

22 first paragraph you are just confirming that you and other

23 investors are going to be meeting with Mr. Wellner and Hallac

24 the next day and on Friday, right?

25 A.  Yes.

1   Q.  And then, if we go to the next paragraph, you are

2   specifically letting them know that when you meet on Thursday

3   and Friday the 3rd and 4th, you want to talk about Arius Libra,

4   Pineboard, PPM, MD Tablet, etc.

5        Do you see that?

6   A.  Actually, that's not what that sentence says.

7   Q.  Okay.  Well, why don't you clarify for me.  I don't want to

8   be unclear.

9   A.  Well, I propose that we spend Thursday afternoon, first,

10  talking about the status of the actual funds that we invested

11  in -- that would be the subfunds that we have talked about --

12  and not focused on all the noise of this new initiative

13  Arius Libra and Pineboard and PPM/MD Tablet.

14  Q.  I got it.

15       By the way, to clear up, your refer to subfunds, but

16  the subfunds you are referring about what might otherwise be

17  called the hedge fund securities that had been WFF hedge fund

18  securities that were now in Arius Libra?

19  A.  That's correct.

20  Q.  And, you mention here Arius Libra and Pineboard.  You also

21  mention PPM and MD Tablet.  What did you understand them to be?

22  A.  I understood them to be operating elements of the Pineboard

23  entity.

24  Q.  If we can go to the next paragraph, is this where you are

25  basically saying if we talk about the underlying hedge fund

I2L5ber6                          Porter - cross

1    securities on Thursday, then we can move into a discussion

2    after that about Pineboard and Arius Libra and those topics?

3    A.  Yes.

4    Q.  And you are specifically saying that you want this

5    discussion to be without David Bergstein, right?

6    A.  Yes.

7    Q.  And you go on to say you -- that is Weston -- are the

8    managers of WFF.  And who is the "you" that you are saying you

9    to when you make that statement?

10   A.  Wellner and Hallac.

11   Q.  And you go on to say, our interests, as indirect

12   shareholders of Arius Libra, differ from those of David

13   Bergstein, especially in David's capacity as the controlling

14   person over the $8 million debt obligation of Arius Libra;

15   right?  That's what you are saying?

16   A.  Yes.

17   Q.  And you are saying that because, based on your face-to-face

18   discussions with Mr. Bergstein a day before, he clearly

19   indicated to you that he was affiliated with Swartz IP, the

20   company that had made the loan to Arius Libra, right?

21   A.  That's correct.

22   Q.  And you saw that this was at least a potential conflict, if

23   not an actual conflict from your perspective, because he had

24   two hats, right?

25   A.  That's correct.

1    Q.   One hat was I'm affiliated with Swartz IP and I'm loaning

2    money to another company that I have some connection with

3    Arius Libra, right?

4    A.   Well, he had not only a connection, he was on the board of

5    directors.  He was a member of Arius Libra.

6    Q.   Of Arius Libra.

7         Did you have an understanding as to Mr. Hallac and

8    Wellner were also on the board of directors of Arius Libra?

9    A.   I believe they were both on the board of Arius Libra.

10   Q.   Did you have an understanding that Mr. Hallac was the

11   chairman of the board of Arius Libra?

12   A.   I don't recall that but that might be true.  I don't know.

13   Q.   Did you have an understanding that Mr. Wellner was the

14   president of Arius Libra?

15   A.   I don't recall that.

16   Q.   Okay.  So, you are flat out telling Hallac and Wellner that

17   based on Mr. Bergstein's conversation with you, he is in a

18   different position as it relates to looking out for WFF

19   investors than Mr. Hallac and Wellner, right?

20   A.   Not really.  If he is on the board at Arius Libra he has

21   the same fiduciary responsibilities as all the other directors

22   of Arius Libra to protect the interests of Arius Libra and the

23   assets of that company and was challenging Albert and Keith at

24   this point as to how David was going to navigate the conflict

25   of interest if he also had a fiduciary responsibility over the

1    Swartz IP entity which he had led me to believe he had.

2    Q.  And you finish up this paragraph by saying, saying I just

3    want to meet with you guys and not David, it is not being

4    disrespectful, it is just really that our interests are not

5    aligned.

6            That's what you tell Hallac and Wellner, right?

7    A.  As it relates to that loan issue, that's right.

8    Q.  And he readily told you the day before he referenced the

9    loan and talked to you about it, right?

10   A.  Yes.

11   Q.  If we go to the next paragraph, you go on to discuss that

12   you would like to have the benefit of catching up with the

13   other investors, right; Mr. Wray and Mr. Beck and

14   Mr. Kellerman.  Is that what you are referencing?

15   A.  Yes.  They were representatives of the investors.

16   Q.  So, you want the other investors and you to give --

17   basically everybody talk about all the information that you

18   have, right?

19   A.  Yes.

20   Q.  And that was going to happen at the meeting on the 3rd and

21   4th here in New York with Hallac and Wellner, right?

22   A.  Well, that conversation -- part of that conversation would

23   have been had between myself and the investor representatives

24   without Mark Beck -- I mean, without Albert Hallac or Keith

25   Wellner involved, but we would also want to discuss with Albert

I2L5ber6                          Porter - cross

1   and Keith, in a group setting, some of the details that had

2   been relayed to me in that meeting, especially the issue about

3   the due date of this loan being so near.

4   Q.   You reference Robert Silverman -- Robert Silverman and/or

5   Ed DeFrank.  Who did you understand they were?

6   A.   Those were names that were provided to me by Mr. Bergstein

7   in the meeting on May 1st.  I understood that they were

8   involved in the Physicians Medical billings business.  I

9   understood that they were in New York and that David Bergstein

10  had encouraged me, in the meeting on May 1st, to meet with them

11  because they would be able to give me a lot more information

12  about the operations of the company which is one of the key

13  issues that I was trying to get from them in the May 1st

14  meeting, and they -- they being Mr. Bergstein and Mr. Hallac

15  and/or Mr. Wellner -- were going to introduce me to and let us

16  meet with Mr. Silverman and Mr. DeFrank here in New York on

17  Friday the 4th was my understanding when I left the meeting on

18  May 1st.

19  Q.   And now if we turn to the next page, or actually I guess it

20  will be the next paragraph with the let me emphasize?  It is

21  the larger paragraph.

22        You talked about your concern and desire to make sure

23  that shareholders in Arius Libra, through WFF, make sure that

24  the board abides by its fiduciary duty to the shareholders of

25  the company, right?

1   A.  Could you restate that question?  I'm sorry.  I missed it.

2   Q.  Sure.

3        You are basically expressing in this paragraph, to

4   Mr. Hallac and Wellner, that you want to make sure that

5   Arius Libra, both in its own right and indirectly for the

6   investors of WFF, that the fiduciary obligations to those

7   shareholders are met.

8   A.  I'm reminding Keith Wellner and Albert Hallac in this

9   e-mail about that fiduciary obligation so, yes, I'm also

10  encouraging them to abide by it, if that's what you are asking.

11  Q.  Yes.

12        And you are pointing out that, at the bottom, that

13  Mr. Bergstein indicated not only that there was this $8 million

14  debt but that it was due in two or three months.

15  A.  Yes.

16  Q.  And then if we go into the next paragraph, talk about

17  paragraph that we begins with the word "further," you indicate

18  to Hallac and Wellner that not only did Mr. Bergstein tell you

19  about the loan and the money owed by Arius Libra to Swartz IP

20  that he was affiliated with, but he told you that he believed

21  the value of the funds was declining; right, sir?

22  A.  Actually, the word precipitous decline was used.

23  Q.  Sorry.  I didn't mean to cut you off.  Did you finish your

24  answer?

25  A.  I believe so.

1    Q.   These funds that you are referring to here, are these the,

2    what I am calling the hedge fund securities but what you call

3    the subfunds?

4    A.   Subfunds; yes, sir.

5    Q.   So, Mr. Bergstein, in the meeting you had with him,

6    indicated to you that he was part of Swartz IP but also part of

7    Arius, that there was this loan to Arius, and that the hedge

8    fund assets that Arius controlled, he had concerns were having

9    a precipitous decline; right?

10   A.   Could you break that question down?  It was a little --

11   Q.   Sure, I will stick with the last part.

12           He indicated to you on the 1st that he had concerns

13   that the hedge fund assets were going through a precipitous

14   decline.

15   A.   Yes.

16   Q.   And these hedge fund funds, these were assets that were now

17   with Arius Libra but had been WFF hedge fund assets that now

18   WFF had an interest in through Arius Libra, right?

19   A.   Yes.

20   Q.   And you, as someone who was representing investors in WFF,

21   certainly had an interest in making sure that the value and any

22   benefits from the underlying hedge fund securities was abided

23   by and that all was done to preserve that, right?

24   A.   Yes.

25   Q.   And so, one of the things that you express at the end of

I2L5ber6                          Porter - cross

1    this e-mail is that you do not believe that they should be

2    selling or liquidating those hedge fund securities, right?

3    A.   That is correct.

4    Q.   And you go on to say at the bottom of this paragraph, we

5    can go to the bottom of the -- let me make sure I have the

6    right place.  Yes, right up here, we can get the last few

7    sentences.

8             And, you point out that you specifically want Albert

9    to speak about how he and Keith Wellner are going to take

10   action on behalf of Arius Libra to protect those assets, right?

11   A.   Yes.  That's what I say in this e-mail.

12   Q.   And, by the way, you also say right above that you want to,

13   in essence, address the conflict of interest issue to the

14   degree that Mr. Bergstein could have a conflict between his

15   role for Swartz IP and his role with Arius Libra, right?

16   A.   Yes.

17   Q.   Now, on the topic of conflict of interest there are

18   settings in these investment situations where there can be a

19   conflict of interest as long as it's disclosed and addressed,

20   right?

21            MR. KOBRE:  Objection.

22            THE COURT:  Basis?

23            MR. KOBRE:  He is not testifying as an expert, he is

24   being asked --

25            THE COURT:  Sustained.

I2L5ber6                          Porter - cross

1    BY MR. BIENERT:

2    Q.  Well, if we look at, you were shown Government Exhibit A4,

3    we can pull that up-first of all, let me make sure I have the

4    right exhibit.  If we can bring up Exhibit 612 -- if we can

5    pull up Exhibit A4 which is one in the same as admitted in

6    evidence Government Exhibit 612?

7           Sir, do you remember on direct you were shown a copy

8    of this Exhibit 612, which is basically the WFF offering

9    documents?

10   A.  Yes.

11   Q.  And if we can go to page 22 of Exhibit A4, there is a

12   section in the WFF offering documents that addresses conflict

13   of interest.  Had you seen that before, sir?

14   A.  Yes, sir.

15   Q.  And it says that there can be various conflicts of interest

16   that may arise in connection with the operation of the funds

17   and that the directors of the funds will endeavor to resolve

18   all conflicts fairly and equitably.

19           Do you see that?

20   A.  Yes.

21   Q.  So, what the offering memo indicates is that there could be

22   a conflict but it just needs to be addressed and addressed in a

23   way that is fair and equitable, right?

24   A.  Well, you have to go -- you would have to be a little more

25   specific.  Among the conflicts which may arise are the

1    following, and then there is an iteration of potential

2    conflicts and how they may be addressed.

3    Q.  And so, is it fair to say that your understanding was that

4    if there was a conflict, the main thing is that it be made

5    known and that it can be addressed in a way that would be

6    deemed fair and equitable?

7              MR. KOBRE:  Objection.  Calls for legal conclusion.

8              THE COURT:  No.  Overruled.

9    A.  So, just disclosure doesn't resolve conflict of interest

10   issues, it depends on the facts and circumstances.  In many

11   cases, if there are conflicts of interest that are

12   unresolvable, then a party has to recuse themself from one side

13   or the other of a transaction.  That's quite normal.

14   Q.  Okay.  So, let's take that, sir.  Based on your meeting

15   with Mr. Bergstein, you were made aware of a conflict of

16   interest by him between his role at Swartz IP and his role at

17   Arius Libra, right?

18   A.  Yes.

19   Q.  And, based on him disclosing that to you, it gave you the

20   opportunity to talk directly to the people who ran, at least

21   the WFF fund that you were involved in, Messrs. Hallac and

22   Wellner, right?

23   A.  I'm sorry.  I don't understand that question.

24   Q.  The disclosure flagged this issue and allowed you to then

25   address it with the fund managers for your WFF fund Messrs.

I2L5ber6                        Porter - cross

1    Hallac and Wellner, right?

2    A.  Yes.

3    Q.  And, in terms of taking action that could be fair or

4    equitable -- I think you used a different term a moment ago so

5    I don't want to -- let me back up.

6          Would one way to address a potential conflict of

7    interest be, for example, an agreement if Mr. Bergstein is on

8    the board of Arius Libra, that he would recuse himself from any

9    voting or decision making at Arius Libra that might also impact

10   Swartz IP?

11         MR. KOBRE:  Objection.

12         THE COURT:  You are asking this as a hypothetical

13   question?

14         MR. BIENERT:  Yes, your Honor.  Or based on the facts,

15   but yes.

16         MR. KOBRE:  Objection.

17         THE COURT:  Sustained.

18   BY MR. BIENERT:

19   Q.  The bottom line is you knew about the issue from

20   Mr. Bergstein, you flagged it for Messrs. Hallac and Wellner,

21   and you specifically teed it up as one of the topics to discuss

22   with them the next day or two, right?

23         MR. KOBRE:  Objection.  What issue?

24         THE COURT:  Rephrase the question.

25   BY MR. BIENERT:

I2L5ber6                              Porter - cross

1    Q.  You knew about the issue from Mr. Bergstein --

2              THE COURT:  What issue?

3              MR. BIENERT:  I will try to define that.  My

4    apologies.

5    Q.  You knew about the issue that Mr. Bergstein was involved

6    with Swartz IP on the one hand which it made a loan to

7    Arius Libra, a company that he sat on the board of, right?

8    A.  That is correct.

9    Q.  And so, as to that issue, you knew about it from your

10   meeting with Mr. Bergstein and that allowed you to tee it up

11   for something that you wanted to address with Messrs. Hallac

12   and Wellner, right?

13   A.  Yes.

14   Q.  Now, let's go back in time a little bit because you talked

15   a little about the unwind that you were told about in December.

16   Prior to the unwind occurring, what was your understanding of

17   the value of the WFF investors' investment when its hedge fund

18   securities were at Gerova?

19   A.  I had --

20             MR. KOBRE:  Objection, your Honor, to relevance and

21   the scope of the question.

22             MR. BIENERT:  He testified as to the unwind, your

23   Honor.

24             THE COURT:  Let me see.

25             Sustained.

1   BY MR. BIENERT:

2   Q.  Well, let's go to December when you had the meeting in

3   December and you were told about the unwind and the actions

4   taken.  Did you have an understanding that prior to the unwind

5   that the stock, which WFF held of Gerova, was not able to be

6   traded?

7            MR. KOBRE:  Objection, your Honor.  I don't think

8   there was any testimony on direct about this.

9            MR. BIENERT:  There was just general testimony on the

10  unwind and why it was done.

11           THE COURT:  I will allow it.

12  BY MR. BIENERT:

13  Q.  Do you have the question?

14  A.  I understood that the Gerova stock was not trading.

15  Q.  So, prior to Mr. Bergstein and the folks at Wellner and

16  others doing the unwind, the position that the WFF investors

17  were at at that time was that they were not able to get any

18  value out of their investment.  Is that true?

19  A.  No, that's not true.

20  Q.  Okay.  Were they able to redeem the money and get it back

21  if they wanted it at that time?

22  A.  We were led to believe by Mr. Wellner going back to 2011 --

23  early 2011 that the transfer of the subfund assets into Gerova

24  had not been perfected and that he believed that an unwind was

25  possible.

I2L5ber6                         Porter - cross

1   Q.  So this is --

2   A.  In fact, we had many discussions with him and Albert about

3   that issue throughout late 2010 and into and through 2011

4   leading up to the meeting in December of 2011.

5   Q.  Was it your understanding that Mr. Hallac or Wellner or

6   just Weston had provided information to the WFF investors about

7   the deal where WFF hedge fund securities went to Gerova in

8   exchange for stock prior to that deal?

9   A.  I'm sorry.  What date?

10  Q.  Just prior to the stock going to Gerova did you have an

11  understanding that Hallac and Wellner provided relevant

12  information about the deal they were about to do with Gerova to

13  the WFF investors?

14  A.  Again, I don't -- I don't mean to be picking on words but

15  you said stock going to Gerova.  Could you rephrase the

16  question.

17  Q.  Prior to the transaction where the WFF hedge fund

18  securities went to Gerova in exchange for stock, was it your

19  understanding that Weston gave disclosure of the relevant terms

20  of that deal to the WFF investors?

21  A.  I did not feel like we got all the relevant disclosures.

22  Q.  And that episode happened well before you had ever heard of

23  Mr. Bergstein or had an understanding that he was involved in

24  the unwind in 2011, right?

25  A.  That?

I2L5ber6                          Porter - redirect

1   Q.  That meaning the deal with Gerova where the hedge fund

2   assets went to it and the stock came out.

3   A.  Yes.

4           MR. BIENERT:  That's all I have.  Thank you, sir.

5           THE COURT:  Any redirect?

6           MR. KOBRE:  Just briefly, your Honor.

7   REDIRECT EXAMINATION

8   BY MR. KOBRE:

9   Q.  You were asked some questions, Mr. Porter, on

10  cross-examination, about the conflict of interest that was

11  reflected in the e-mail that you were referring to that

12  Mr. Bergstein had.  Do you recall that?

13  A.  Yes, sir.

14  Q.  Did the fact that you came to know Mr. Bergstein's

15  involvement in Swartz IP, or that he told you about that, did

16  that resolve the conflict of interest?

17  A.  No.

18  Q.  Why?  Explain.

19  A.  Well, first of all, he didn't identify the fact that he had

20  a conflict, he just disclosed that he was in control over the

21  decisions that would be made by the lender Swartz IP and was

22  also in the same breath speaking about his determination to

23  have Arius Libra sell the subfund assets that were held by

24  Arius Libra.  So, he was, at the same time that he was

25  communicating he had control over the lender also indicating

I2L5ber6                              Porter - redirect

1   his desire to force the sale of the assets of Arius Libra.

2   Essentially, he didn't identify the conflict, I identified the

3   conflict.

4   Q.  And what was Mr. Bergstein proposing at that meeting with

5   respect to the sale of WFF assets?  What effect would that have

6   had?

7             MR. BIENERT:  Speculative, your Honor.

8   Q.  What effect did you understand that it would have?

9   A.  Well, if he forced a foreclosure of the loan, he would take

10  the assets and extinguish the loan, and if the value of those

11  subfunds were in excess of $8 million, then whatever was left

12  of the value of those assets would be taken by the lender and

13  that was my fear, is that he was going to force the

14  foreclosure.

15  Q.  During the meeting, that May 1st, 2012 meeting, did anyone

16  talk about a loan having been extended to Arius Libra by a

17  Weston fund?

18  A.  No.

19  Q.  Is that something that you, as a representative of the

20  Glenn family investors, would have wanted to know?

21  A.  Yes.

22  Q.  Why?

23  A.  Because it would implied there was another series of

24  conflicts of interest that we would certainly like to

25  understand in terms of how Arius Libra was being managed.

1   Q.  You were asked some questions on cross-examination about

2   individuals named DeFrank and Silverman.  Do you recall that?

3   A.  Yes, sir.

4   Q.  You testified that there was the possibility of a meeting

5   with those individuals?

6   A.  Yes, sir.

7   Q.  Did that ever occur?

8   A.  No.

9   Q.  Did you ever meet them?

10  A.  No.

11  Q.  You were asked some questions about what the -- you

12  testified on cross-examination about having been told by Keith

13  Wellner that the Gerova transaction had not been perfected,

14  that the transfer of the WFF asset had not been perfected.  Can

15  you explain that and how it relates to whether there were other

16  options aside from the proposal that Mr. Bergstein made at the

17  December meeting?

18  A.  Well, the context of the conversations that I had and that

19  we, the investor representatives had with Keith, going back to

20  early 2011 or perhaps even earlier than that in late 2010 but

21  certainly by February of 2011, was that Keith was and Keith and

22  Albert were focused on finding a way to unwind the transaction

23  and reverse the original capital contribution of our subfunds

24  into Gerova, in essence reobtaining absolute ownership of the

25  subfunds and giving up of the stock that had purportedly been

I2L5ber6                        Porter - redirect

1    issued to the WFF, the stock in Gerova that had been issued to

2    WFF.  So, they were talking about an unwind in early 2011.

3    Q.  So they were actually talking about an unwind transaction

4    well before the December meeting?

5    A.  Yes.

6    Q.  And when they were talking about an unwind, did it have

7    anything to do with a company called Arius Libra?

8    A.  No.  The idea that was floated by Mr. Wellner and

9    Mr. Hallac was that the unwind would put -- essentially put

10   humpty dumpty back together again, the Wimbledon Financing Fund

11   would own the subfunds and would seek liquidity of the

12   liquidation of those funds over time and the investors would

13   get their -- would get whatever value was remaining in those

14   subfunds, which we were led to understand was between

15   $12 million and $18 million.

16   Q.  And, were those discussions based on what you mentioned

17   earlier, that the transfer, that initial Gerova transaction had

18   not been fully consummated?

19   A.  Yes.  That's right.

20           MR. KOBRE:  Nothing further.

21           THE COURT:  All right.  You may step down.  Sir.

22   Thank you.

23           THE WITNESS:  Thank you.

24           (Witness steps down)

25           THE COURT:  Call your next witness.

I2L5ber6                          Vogt - direct

1            MR. IMPERATORE:  The government calls Christopher

2    Vogt.

3     CHRISTOPHER VOGT,

4          called as a witness by the Government,

5          having been duly sworn, testified as follows:

6            MR. IMPERATORE:  May I proceed, your Honor?

7            THE COURT:  You may inquire.

8    DIRECT EXAMINATION

9    BY MR. IMPERATORE:

10   Q.  Good afternoon.

11           Sir, what do you currently do for a living?

12   A.  I'm the Director of Equity Strategies at Margaret A.

13   Cargill Foundation.

14   Q.  What is that?

15   A.  That's a large charitable organization.  It is a charity.

16   Q.  In what state?

17   A.  In the state of Minnesota.

18   Q.  And what does it mean to be Director of Equity Strategies?

19   A.  It means that I manage the equity investments for the

20   foundation.

21   Q.  How far did you go in school?

22   A.  I have a bachelors of art from the University of Illinois

23   Urbana Champaign, and I have a masters in business

24   administration from the University of Chicago, Booth School of

25   Business.

I2L5ber6                                    Vogt - direct

1    Q.   How long have you worked in the investment industry?

2    A.   I have been working in the industry since 1994.

3    Q.   Doing what types of things, generally?

4    A.   Several different jobs.  I have traded options.  I have

5    also done investment management for the past 15 or 20 years.

6    Q.   Now let me direct your attention to roughly 2006.  Did you

7    begin new employment at that time?

8    A.   I did.

9    Q.   Where?

10   A.   At Allstate Investments, which is the investment arm of the

11   insurance company Allstate.

12   Q.   Is Allstate Insurance Company a public company?

13   A.   It is.  It is publicly traded on New York Stock Exchange.

14   Q.   And so, who owns Allstate?

15   A.   The public does.

16   Q.   What kind of business is Allstate in?

17   A.   It is a multi-line insurance company, which means it sells

18   life insurance to the general public -- life insurance, auto

19   insurance, home insurance.

20   Q.   And I believe you said you worked in the investment arm of

21   Allstate?

22   A.   I did.

23   Q.   Would you explain what you mean by that?

24   A.   Sure.

25        Allstate is a large insurance company and has a very

1    large pool of capital or portfolio and I helped manage those

2    portfolios.

3    Q.   What was your title at Allstate?

4    A.   I was the Portfolio Manager and Global Head of Hedge Fund

5    Investing.

6    Q.   Generally speaking, what does it mean to be a portfolio

7    manager?

8    A.   A portfolio manager manages a portfolio or a group of

9    investments.

10   Q.   During what period of time, approximately, did you work at

11   Allstate?

12   A.   I worked there from 2006 until midway through 2012.

13   Q.   And when, roughly, in 2012 did you leave?

14   A.   I think I left in early July, maybe mid-July.

15   Q.   At Allstate were you responsible for managing or making

16   certain types of investments?

17   A.   I was.

18   Q.   What types?

19   A.   Hedge fund investments.

20   Q.   What are hedge fund investments?

21   A.   Hedge funds are private, somewhat complex investment

22   strategies.

23   Q.   And while you were at Allstate, were you familiar with

24   something called Weston Capital Asset Management?

25   A.   I was.

I2L5ber6                          Vogt - direct

1   Q.   I am just going to refer to that as Weston for short.

2        How were you familiar with Weston?

3   A.   As part of my job there I managed two of the investments

4   that had been made.

5   Q.   What do you mean by that?

6   A.   There were two investments made into Weston into two

7   different funds.  They were made prior to my arrival at

8   Allstate but I was primarily responsible to oversee those

9   investments or to monitor those investments.

10  Q.   And, what was your understanding of what Weston did?

11  A.   Weston was a fund of funds manager, which means it invests,

12  it creates funds that invest in hedge funds.

13  Q.   And, which Weston funds was Allstate invested in while you

14  were employed at Allstate?

15  A.   They were invested in Weston Atlas as well as Weston

16  Partners II.

17  Q.   And, are you familiar with those investments?

18  A.   Yes, I am.

19  Q.   How?

20  A.   I had oversight of those two investments.

21  Q.   Now, through your work at Allstate, did you become familiar

22  with the Partners II fund at Weston?

23  A.   I was familiar with that.

24  Q.   Generally speaking, what was the Partners II fund?

25  A.   It was a fund of funds that invested in startup hedge funds

I2L5ber6                              Vogt - direct

1   so those were new hedge funds, they were very small hedge

2   funds, or ones that hadn't been around a long time.

3   Q.  Now, how much money, approximately, did Allstate invest in

4   the Partners II fund?

5   A.  I don't know the exact amount but I would say it was

6   between $15 million and $30 million.

7   Q.  And who were the specific Allstate investors who invested

8   in the Partners II fund?

9   A.  Sure.  There were three investors.  Kennet Capital which is

10  a noninsurance subsidiary; and there was two other investors,

11  there was the Allstate Pension Plan and the Allstate -- I think

12  it is called -- Retirement Plan.  These were two pension plans,

13  one for agents, the people that sell the policies to the

14  public, and the other one for the employees of Allstate at the

15  corporate headquarters.

16  Q.  What is a pension plan?

17          MR. BISCONTI:  Objection, your Honor.  Relevance.

18          THE COURT:  I will allow it.

19          Briefly.

20          THE WITNESS:  A pension plan is a pool of capital --

21          THE COURT:  Actually, it is cumulative because we had

22  this from another witness.  The jury heard what a pension plan

23  is, so I'm going to sustain on the basis of cumulativeness.

24  BY MR. IMPERATORE:

25  Q.  Now, in connection with Allstate's investment in

I2L5ber6                          Vogt - direct

1    Partners II, did you review any investment documentation?

2    A.   I did.

3    Q.   What type?

4    A.   The offering memorandum.

5    Q.   Ms. Sheinwald, would you please publish Government Exhibit

6    607 in evidence?

7         Do you recognize what this is?

8    A.   I do.

9    Q.   What is it?

10   A.   It is the offering memorandum.

11   Q.   For?

12   A.   For Weston Capital Partners II fund.

13   Q.   And how do you recognize it?

14   A.   I recognize it because I have read through it in the past.

15   It's the kind of main governing document of the fund.

16   Q.   Did you review Government Exhibit 607 while you were a

17   portfolio manager at Allstate?

18   A.   I did.

19   Q.   Why did you review it?

20   A.   It would be normal for someone to, in my position, to look

21   at this.  Again, it is sort of the owners' manual of what that

22   investment is going to do.

23   Q.   Was it important to you in overseeing the investment in

24   Partners II?

25   A.   Absolutely it was important.

I2L5ber6                          Vogt - direct

1    Q.  Let's turn to the next page, please.  There is a section

2    here, if you can blow it up at the top, please, it is labeled

3    investment objective.  What is the investment objective

4    section, what is the purpose of it?

5    A.  The investment objective, the purpose of it is to state

6    what the fund is going to do, basically what they're going to

7    invest in.

8    Q.  We won't read this into the record but would you just

9    explain, in layman's terms, what the investment objective was

10   of the Partners II fund as you understood it?

11   A.  Sure.

12           The objective of the fund was to invest in startup or

13   emerging hedge funds, these are hedge funds that are new or

14   were newly formed that were small.

15   Q.  Now, was this investment objective important to you?

16   A.  Yes, it was.

17   Q.  Why?

18   A.  Because it defines exactly what the fund is going do and

19   what we expect them to do.

20   Q.  Now, from your perspective in managing an investment on

21   behalf of Allstate and the Partners II fund, would the

22   Partners II fund have been permitted to invest in ways that

23   were inconsistent with the investment objective that is stated

24   here?

25           MR. BISCONTI:  Objection, your Honor.  Calls for legal

I2L5ber6                              Vogt - direct

1   conclusion is.

2              THE COURT:  Overruled.

3   A.  No.  They would have had to invest exactly what they said

4   they were going to invest in, which is in the objective.

5   Q.  And what was Allstate's objective in investing in

6   Partners II?

7   A.  We wanted to invest into emerging hedge funds.  These funds

8   typically provided a high-level of return.

9   Q.  Now, would using Partners II's money to make a loan to

10  another Weston fund have been permissible under the terms of

11  this offering memorandum, as you understood it?

12  A.  No.

13             MR. BISCONTI:  Objection, your Honor.  Relevance.

14             THE COURT:  Overruled.

15  A.  No.  They were not allowed to make loans based on this

16  objective.

17  Q.  Why not?

18  A.  Because it is not in the objective and because we were

19  seeking exposure to hedge funds, not to make loans.

20  Q.  Do you believe that such a loan would have been in the best

21  interest of the Partners II fund?

22  A.  No.

23  Q.  Would any loan made by Partners II have been consistent

24  with this investment objective?

25  A.  No.  This fund was to make equity investments, not loans.

I2L5ber6                          Vogt - direct

1    Q.   Now, focusing on the years 2011 until you left Allstate in

2    the summer of 2012, were you involved in monitoring Allstate's

3    investment in Partners II?

4    A.   Yes, I was.

5    Q.   And before the spring of 2012, did anyone at Weston or

6    Partners II advise you about a loan that Partners II had made

7    for the benefit of another Weston?

8    A.   No.

9    Q.   Is that something that you would have wanted to know?

10   A.   Absolutely.

11   Q.   Why?

12   A.   Because it transgresses the investment objective in the

13   offering memorandum.

14   Q.   And what issues would that have created when one fund,

15   Partners II, is making a loan for benefit of another?

16   A.   That would have created a conflict of interest.

17   Q.   What is that?

18   A.   Conflict of interest is a situation where a person or a

19   party can derive a benefit from their decisions, often those

20   decisions could be corrupt motivation or discuss-making.

21   Q.   And if Partners II had made a loan of about a few million

22   dollars, is that something you would have wanted to know?

23   A.   Yes.

24   Q.   Now, let me direct your attention to roughly June of 2012.

25   What, if anything, did you hear from Weston or Partners II at

I2L5ber6                        Vogt - direct

1    that time?

2    A.   We were told in June of 2012 that they had made a loan.

3    Q.   Who told you that?

4    A.   Albert Hallac.

5    Q.   How did that come about?

6    A.   We had asked for our capital back.

7              Asking for your capital back in an investment like

8    this is called a redemption.  So, we asked for a redemption and

9    they had told us that they would redeem us meaning they would

10   give us our capital back.  They told us this for a long period

11   of time and they didn't return our capital, so we asked for a

12   phone call with them, and they told us the reason they don't

13   give us our capital back is because they had made a loan.

14   Q.   And, according to Weston, had this loan already been made?

15   A.   Yes.

16   Q.   What was your reaction to hearing that?

17   A.   We were shocked.

18   Q.   Why?

19   A.   Because it's completely against the investment objective of

20   this fund.  It wasn't an equity investment made in a startup or

21   emerging hedge fund.

22             MR. IMPERATORE:  May I have a moment?

23             (Counsel conferring)

24             MR. IMPERATORE:  No further questions.

25             THE COURT:  You may cross-examine.

I2L5ber6                          Vogt - cross

1    CROSS EXAMINATION

2    BY MR. BISCONTI:

3    Q.  Good afternoon.  My name is Tony Bisconti, I represent

4    Mr. Bergstein.

5             Sir, have you ever met David Bergstein?

6    A.  I have not.

7    Q.  Have you ever spoken to Mr. Bergstein on the telephone?

8    A.  No.

9    Q.  Have you ever discussed your investment -- Allstate's

10   investment in the P2 fund with Mr. Bergstein?

11   A.  Not that I'm aware of.

12   Q.  Do you recall when the last point in time that Allstate

13   made an investment into the P2 fund was?

14   A.  It was -- I don't remember exactly, but I think it was in

15   2005.

16   Q.  So, there were no fresh money in from Allstate from around

17   2005?

18   A.  I believe that's correct.

19   Q.  Sir, were you ever notified that the P2 fund was going to

20   wind down?

21   A.  I don't believe so.

22   Q.  Other than the June 2012 conversation you mentioned with

23   Mr. Hallac I believe it was, did you have any other discussions

24   with Albert Hallac or Mr. Keith Wellner, say, from the period

25   of July 2011 up until that point in June 2012?

I2L5ber6                          Vogt - cross

1   A.  I believe so.  I know Albert Hallac was on the phone, I

2   think there were other people on that phone call as well.  It

3   was a teleconference so there could have been other people from

4   Weston.

5   Q.  So, are you specifically referencing the June 2012

6   conversation?

7   A.  On that, yes, I am.

8   Q.  So, my question is, between, say, July of 2011, up until

9   that phone call, were there any other discussions with

10  Mr. Hallac or Keith Wellner?

11  A.  I believe there were.

12  Q.  And what was the topic of those discussions?

13  A.  The schedule at which they were going to return our

14  capital.

15  Q.  So, these conversations would have occurred subsequent to

16  you making the redemption request you referred to?

17  A.  Yes.

18  Q.  Other than conversations regarding the redemption request

19  that was made, were there any other conversations in that time

20  period regarding Allstate's investment in the P2 fund?

21  A.  Not that I recall.

22  Q.  Sir, you were shown the offering memorandum for Partners II

23  a few moments ago on direct with the government.  What was your

24  understanding as to what the entity was that was in control of

25  the investment decisions and actions of the P2 fund in the

1   context of the offering memorandum?

2   A.  I don't remember specifically, but it would have been a

3   fund that was -- that Weston controlled.

4   Q.  Meaning the P2 fund was a fund that Weston controlled?

5   A.  That's right.

6   Q.  So, was it your understanding that decisions of what the P2

7   fund would invest in, subject to the offering memorandum, would

8   be made by Weston?

9   A.  Yes.

10  Q.  And what was your understanding as to who was in control of

11  Weston?

12  A.  There were several people that were in control of the

13  investment that was -- I believe they are listed in the

14  offering memorandum.

15  Q.  Would Albert Hallac be one of them?

16  A.  Yes.

17  Q.  Keith Wellner?

18  A.  I believe so, although I don't recall who he is.

19  Q.  So, is it true that most of your communications regarding

20  Allstate's investment with P2 fund was with Albert Hallac?

21  A.  I believe so.

22  Q.  Sir, when the loan that was discussed on your direct

23  questioning by the government, when that was disclosed to you

24  in June of 2012, what were you told about the loan?

25  A.  We were told that it was a loan that was -- I believe it

I2L5ber6                          Vogt - cross

1    was made to another Weston entity.  I don't recall any other

2    details well about that other than it was a loan that was made

3    and it was made to another Weston entity.

4    Q.  Were you told the amount of the loan?

5    A.  I don't recall.

6    Q.  Were you told whether or not the loan was secure?

7    A.  I don't recall.

8    Q.  Sir, are you aware of whether or not the loan was

9    subsequently repaid?

10              MR. IMPERATORE:  Objection.

11              THE COURT:  Sustained.

12   BY MR. BISCONTI:

13   Q.  Sir, are you aware of whether or not the P2 fund ever took

14   action to enforce its collateral in connection with the loan?

15              MR. IMPERATORE:  Same objection.

16              THE COURT:  Sustained.

17              MR. BISCONTI:  No further questions, your Honor.

18              THE COURT:  Any redirect?

19              MR. IMPERATORE:  No, your Honor.

20              THE COURT:  Call your next witness.

21              MR. KOBRE:  The government calls Eduardo Wienskoski.

22              THE COURT:  Thank you, sir.

23              (Witness steps down)

24    EDUARDO WIENSKOSKI,

25         called as a witness by the Government,

1    having been duly sworn, testified as follows:

2            THE COURT:  You may inquire.

3            MR. KOBRE:  Thank you.

4    DIRECT EXAMINATION

5    BY MR. KOBRE:

6    Q.  How old are you?

7    A.  29.

8    Q.  Where were you born?

9    A.  Brazil.

10   Q.  Are you a U.S. citizen?

11   A.  Yes.

12   Q.  Where do you currently live?

13   A.  Los Angeles.

14   Q.  Are you familiar with an entity named K-Jam Media?

15   A.  Yes.

16   Q.  How are you familiar with K-Jam Media?

17   A.  I worked there from approximately January 2011 to October

18   2015.

19   Q.  Who owns or operates K-Jam Media?

20   A.  Kia Jam.

21   Q.  You mentioned that you worked at K-Jam Media for several

22   years.  What was your position at K-Jam Media?

23   A.  I was Kia Jam's assistant.

24   Q.  What kind of business is K-Jam Media?

25   A.  It is a film production company.

I2L5ber6                          Wienskoski - direct

1    Q.  Film production?

2    A.  Yes.

3    Q.  To your knowledge, is K-Jam Media in the business of

4    medical billing?

5    A.  No.

6    Q.  Let me back up a little bit and ask about your background.

7    Just tell us a little bit about your education.

8    A.  I went to Florida State.  I graduated in 2010 with a degree

9    in film production.

10   Q.  And then following your graduation, did you move to

11   California?

12   A.  Yes.

13   Q.  What was your first job after you graduated?

14   A.  It was working as an intern at K-Jam Media.

15   Q.  And how did you get that job?  The internship.  I'm sorry.

16   A.  It was an internship, yes.

17          There was a film production company that I liked a lot

18   called -- excuse me, a film distribution company called

19   ThinkFilm.  I looked online, found their website, they had a

20   phone number.  I called that phone number and the person that

21   answered was Kia Jam's assistant at the time Josh Geller.  I

22   told him I was looking for an internship and he asked me to

23   come in and come in for an interview.

24   Q.  In the context of your coming in for an interview and your

25   reaching out in the instance to K-Jam Media, did the name

1    Pangea Media come up?

2    A.  Yes.

3         So, when I sent my resume to Josh, his e-mail was

4    JoshGeller@PangeaMediaGroup.com.  And the company was referred

5    to as Pangea Media Group.

6         THE COURT:  And you said Pangea; is that correct?

7         THE WITNESS:  Yes.

8         THE COURT:  Thank you.

9    BY MR. KOBRE:

10   Q.  When you first started as an intern with K-Jam Media, where

11   was the company located?

12   A.  It was in a building in Westwood, California; Glendon,

13   Street.

14   Q.  And what kind of duties or responsibilities did you have as

15   an intern?

16   A.  I would read scripts and would I provide analysis, I would

17   provide a synopsis and then provide analysis if it was suitable

18   for going into production or not.

19   Q.  At some point did you -- did your position with K-Jam Media

20   change from an intern?

21   A.  Yes.  Around summer of 2011 his previous assistant Josh

22   left the job, and Kia promoted me as his assistant, in a paid

23   position.

24   Q.  And you said when did that happen, that promotion?

25   A.  Approximately summer 2011.

I2L5ber6                        Wienskoski - direct

1    Q.  And what were your responsibilities as Kia Jam's assistant?

2    A.  They were similar to my responsibilities as an intern;

3    reading scripts, but I also had the added responsibilities of

4    coordinating his schedule, booking travel, administrative

5    duties.

6    Q.  And, who was your direct supervisor?

7    A.  It was Kia Jam.

8    Q.  Who are some of the other people that you saw in the K-Jam

9    Media office when you were working there?

10   A.  I saw Steve Piskula and Frymi Bidak.

11   Q.  And who was Frymi Bidak?  What was her position there?

12   A.  David Bergstein's assistant.

13   Q.  And Steve Piskula?

14   A.  He was office manager.

15   Q.  For K-Jam Media?

16   A.  Yes, for the whole office.

17   Q.  And you mentioned that Frymi Bidak was David Bergstein's

18   assistant.  Was David Bergstein located at that office as well

19   in K-Jam Media?

20   A.  Yes.  He had a private office inside our office but he was

21   there sporadically.

22   Q.  Did you see him from time to time?

23   A.  Yes.

24   Q.  Do you see him in the courtroom here today?

25   A.  I do.

I2L5ber6                          Wienskoski - direct

1  Q.  Can you just point to him and identify an item of clothing

2  that he is wearing?

3         THE COURT:  You may stand up, if you like.

4  A.  He is wearing a sweater with a zipper in the second row.

5         THE COURT:  Identification noted.

6         With that, ladies and gentlemen, we are going to

7  adjourn for the evening.  Have a pleasant one.  I hope you get

8  to relax.  I hope you don't have to work too hard, that you can

9  have the night off.  We will see you bright and early tomorrow

10 morning for a fresh start at 10:00.

11        Please do not discuss the case, keep an open mind.

12        (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

I2L5ber6

1                 (Jury not present)

2            THE COURT:  You may step down.

3                 (Witness excused)

4            THE COURT:  If you can have a seat for a moment, I

5    want to thank somebody, I think from the defense team, for

6    providing me with what appears to be certain transcript pages

7    from the March 27, 2014 meeting.  I would just ask defense

8    counsel to please orient me as to what they want to do, why

9    they want to do it, and what the basis for doing it is.  I

10   assume this has been furnished to the government?

11           MR. BIENERT:  Yes.  When I came in this morning, your

12   Honor, I had a copy of the blurb for lack of a term for your

13   Honor and for the government, and obviously they have the tape

14   and the overall transcript of the recording.

15           THE COURT:  So, let me ask a very simple question and

16   maybe this was something I didn't understand before.  There is

17   a portion on page 46 that's marked in red.  I'm going to take a

18   wild guess that there is some significance to that.  There are

19   also, on 45 and 46, a lot of text marked in yellow.

20           MR. BIENERT:  Correct.

21           THE COURT:  So, for starters, just tell me what the

22   difference is between the red and the yellow.

23           MR. BIENERT:  I guess, for lack of the better term,

24   the red is the sweet spot quote, the yellow is what we believe

25   in looking at it gives at least some context to what the quote

I2L5ber6

1   being said is.

2           THE COURT:  So, just again, before we apply any legal

3   analysis, what you are telling me is the government is planning

4   on offering the red marked portion.

5           MR. BIENERT:  My apologies.

6           THE COURT:  Okay.

7           MR. BIENERT:  I believe the government opposes this

8   coming in entirely.

9           THE COURT:  Okay.

10          MR. BIENERT:  In yellow is the snippet that we would

11  tender that we would want to be able to play in court.  The red

12  was the part I just thought it was easier when we talked to say

13  that's really the main quote, but the other yellow we thought

14  was appropriate for just context.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I2LPBER7

1          THE COURT:  Oh, now, tell me, just in terms of the law

2     of evidence, this is some sort of a recording that Parmar made;

3     is that right?

4          MR. BIENERT:  Yes, this is the same -- this snippet is

5     in the same recording where we had the reference earlier today

6     and yesterday with Mr. Hallac to the "serve up Bergstein."

7          THE COURT:  Right.

8          MR. BIENERT:  So basically, this is a short snippet

9     from a body wire that Mr. Parmar wore in, I believe, March of

10    2014 when meeting with Mr. Hallac and his attorney.

11         THE COURT:  All right.  And it sounds, on its face, to

12    be an out-of-court statement possibly offered for the truth of

13    its content.  Tell me how you think it gets in.

14         MR. BIENERT:  Well, first of all, I believe it is

15    non-hearsay because I think it's a statement against

16    Mr. Parmar's, frankly, criminal or civil interest at the time

17    it was made.  Although, we have a different view of his

18    criminal issues now, because this is him basically conceding

19    that had he kept to the course of the agreement, the Arius

20    Libra agreement with the medical assets.

21         As he says in the red part:  "I did take it elsewhere

22    and I turned 15 million," which was the investment they

23    originally anticipated, "into 100 million."  So it is that

24    conversation that we believe comes in as it relates to

25    Mr. Hallac, who was the person who he was talking to, to come

I2LPBER7

1      to motive and plan, No. 1.

2              But, secondly, it ties in to the bigger issue of what

3      happened to the assets.  I mean, let me say this, to make it

4      easier on your Honor.  I think you have inferentially denied my

5      request in your other rulings, but I certainly wanted to tell

6      you why we provided it, and that's the reason.

7              THE COURT:  I appreciate your candor because it does

8      strike me that there is a threshold relevance issue.

9              Let me hear from the government on the relevance

10     issue.

11             MR. ALLEN:  Your Honor, this is just a statement.  I

12     mean, there are a ton of problems with it, obviously, most

13     clearly that it's hearsay.  It's made in 2014.  It's not even

14     talking about the same medical billing business as

15     Mr. Bergstein was trying to create.  It's a business that would

16     have changed in the several years afterwards.

17             But the larger problem is the appreciation of the

18     assets is irrelevant to the question of whether Mr. Bergstein

19     had criminal mens rea at the time he's alleged to have

20     committed the charges of the offenses in question.  It could be

21     the case that they strike it lucky and the assets are worth a

22     lot of money.  That doesn't excuse what he did.  I mean, you

23     can't pick someone's pocket because you have a sincere belief

24     that you're going to go buy a lottery ticket and win.  It

25     doesn't work that way.

I2LPBER7

| | |
|---|---|
| 1 | THE COURT:  Right.  As I've come to learn, there is |
| 2 | this feeling, I assume for the sake of argument, well-based in |
| 3 | fact, that Parmar did somebody dirty by not transferring assets |
| 4 | to Pineboard or Arius Libra, and had he done so, those assets |
| 5 | would have been valuable and things would have turned out |
| 6 | differently. |
| 7 | I'm going to sustain the objection, but for the sake |
| 8 | of good order, I'm going to invite you to assign an exhibit |
| 9 | number to this so it can be preserved for review. |
| 10 | MR. BIENERT:  Will do, your Honor. |
| 11 | THE COURT:  All right.  Oh, I might as well ask the |
| 12 | question that was on my mind, at least 9:30 Tuesday morning.  I |
| 13 | was expecting to see the smiling face of Paul Parmar to welcome |
| 14 | me back.  Although, I was in on Monday, as was my law clerk.  I |
| 15 | didn't see a smiling face.  Anybody know why that might be? |
| 16 | MR. BIENERT:  No, and that was on my list to ask you. |
| 17 | I didn't know if there was some order from your Honor that I |
| 18 | wasn't aware of, but he was, obviously, ordered to be here.  He |
| 19 | isn't or wasn't and still isn't.  So it certainly struck me as |
| 20 | pretty obvious on the other day, when everybody was here two |
| 21 | weeks ago, that it was pretty clear you expected him here at |
| 22 | that time. |
| 23 | THE COURT:  All right.  Does the government have any |
| 24 | information as to his whereabouts? |
| 25 | MR. ALLEN:  No, your Honor. |

I2LPBER7

1              THE COURT:  Is he under a subpoena from one side or

2      the other?

3              MR. BIENERT:  Yes, our subpoena.

4              THE COURT:  All right.

5              MR. BIENERT:  And just to reorient your Honor, so at

6      least to remind us of where we were, the issue was were we

7      going to call him, he was invoking the Fifth.  We did briefing,

8      which I think you have, on the issue.

9              THE COURT:  I have it on my bench here.

10             MR. BIENERT:  And you ordered him back here for a

11     hearing, to address further briefing, or I guess just status on

12     that issue, and it looks like he sort of blew that off or

13     failed to show up, at least from our perspective.

14             THE COURT:  All right.  Well, we'll see what sort of

15     application is made, and with that, we're adjourned.

16             MR. FISH:  Your Honor, I wanted to ask you something.

17             THE COURT:  Yes?

18             MR. FISH:  With respect to the government's summary

19     witness, last night at 10:20 p.m. we received what has now been

20     represented to be the final summary witness exhibits.  I

21     reviewed them very briefly, and they seem to include between

22     five and ten -- I don't want to give an exact number -- slides

23     that are not new versions of old drafts, but seem to be

24     completely new information.

25             And, frankly, given when they came in and some ethical

I2LPBER7

1    issues because apparently you can't view them without a flash

2    installed in your computer, I didn't have time to really review

3    them very well, but we just got them last night.  I mean, the

4    government is very quick to jump up when they get new things;

5    so I just wanted to let you know.

6          And my understanding from the government is that this

7    witness might be testifying tomorrow about these things, and we

8    haven't even had time to assess what's in these new materials.

9          THE COURT:  Okay.  Well, I guess I'll hear more from

10   you.  This is something that I've heard about frequently

11   pointed at the defense, and now, the defense points it back at

12   the government as to five or ten pages.  Why don't you take a

13   look at this tonight, and then you'll let me know what you

14   think.  All right?

15         Yes, sir?

16         MR. BIENERT:  Just on scheduling, your Honor, I just

17   want to say on the record if there's any further guidance from

18   the government, now that we're here and talking, about when

19   they may rest.  And to the degree that we call witnesses, and I

20   can tell you, I think our first witness would be Sean Edrington

21   from Deutsche Bank, but we need to coordinate that.

22         I think the government, and I want to make sure they

23   correct me if I'm wrong, are saying that they think they'll

24   probably rest sometime Monday but that they might finish up on

25   Friday.  But I just want to know if we need to have

I2LPBER7

```
 1    Mr. Edrington fly out from California for Friday, or whether we
 2    just tell him to come out over the weekend.  Obviously, if the
 3    government is going into Monday, I'd tell him to come in over
 4    the weekend.
 5              THE COURT:  I don't want to inconvenience anybody, but
 6    I expect as between inconveniencing a government witness or a
 7    defendant's witness, and inconveniencing my 14 jurors, that's
 8    an easy call.  I'm not inconveniencing my jurors; so...
 9              MR. BIENERT:  I get it.  My point, and maybe I was
10    inartful, just if we can get the government to tell us whether
11    they think --
12              THE COURT:  Why don't you ask them.
13              MR. BIENERT:  -- it was going into Monday or not.
14              THE COURT:  If you act in a reciprocal behavior with
15    them, I assume they'd want to act in a reciprocal behavior with
16    you.
17              MR. BIENERT:  I believe so.
18              MR. IMPERATORE:  Your Honor, as we stated previously,
19    we believe we are likely to rest before the end of the week.
20    Obviously, that is subject to the length of cross-examination
21    and other time factors, but that is our hope and expectation.
22              THE COURT:  Okay.  Listen, folks sometimes reorder
23    their witnesses, but we're not going to have dead air space.
24    If they rest tomorrow, we're still not going to have dead air
25    space; so you'll have to figure it out because the jury comes
```

I2LPBER7

```
 1   first, which as I think maybe some of the younger lawyers don't

 2   remember, but I remember that that may not always have been the

 3   philosophy in every courtroom I've ever been in.  But I think

 4   the world has changed, and I don't think I'm unique in this

 5   regard.  The jury comes first.

 6               See you tomorrow morning.

 7               (Adjourned to February 22, 2018, at 10:00 a.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                           Page

 3   ALBERT HALLAC

 4   Cross (Resumed) By Mr. Bienert . . . . . . . .1625

 5   Redirect By Mr. Allen  . . . . . . . . . . .1730

 6   WILLIAM PORTER

 7   Direct By Mr. Kobre  . . . . . . . . . . . .1758

 8   Cross By Mr. Bienert . . . . . . . . . . . .1800

 9   Redirect By Mr. Kobre  . . . . . . . . . . .1818

10   CHRISTOPHER VOGT

11   Direct By Mr. Imperatore . . . . . . . . . 1822.

12   Cross By Mr. Bisconti  . . . . . . . . . . .1832

13   EDUARDO WIENSKOSKI

14   Direct By Mr. Kobre  . . . . . . . . . . . .1836

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         GOVERNMENT EXHIBITS

 2    Exhibit No.                                    Received

 3     213    . . . . . . . . . . . . . . . . .1755

 4     616    . . . . . . . . . . . . . . . . .1772

 5     617    . . . . . . . . . . . . . . . . .1781

 6     620    . . . . . . . . . . . . . . . . .1789

 7     618    . . . . . . . . . . . . . . . . .1793

 8                          DEFENDANT EXHIBITS

 9    Exhibit No.                                    Received

10     Z147   . . . . . . . . . . . . . . . . .1648

11     Z165   . . . . . . . . . . . . . . . . .1702

12     Z166   . . . . . . . . . . . . . . . . .1704

13

14

15

16

17

18

19

20

21

22

23

24

25
```