UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,

                                16-cr-746 (PKC)

        -against-                        MEMORANDUM
                                                        AND ORDER

DAVID BERGSTEIN,

                         Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        On March 1, 2018, a jury found defendant David Bergstein guilty of all seven counts of the indictment, charging him with investment adviser fraud, securities fraud, wire fraud, and conspiracy to commit all three. (Dkt. 1). At trial, the government relied in part on the testimony of cooperating witnesses, investors in the Weston Capital Asset Management ("Weston") funds at issue or their representatives, and individuals who previously invested with Bergstein. Bergstein put on a defense consisting in part of his own testimony and that of business associates.

        At the close of the government's case, Bergstein orally moved for a judgment of acquittal as to all counts and renewed the motion after the close of all evidence. (Tr. at 2227–30, 3009). The Court reserved decision on both occasions. (Id. at 2229, 3010). Both sides submitted letter briefs on the motion. (Dkts. 299, 304). The Court granted Bergstein's motion to extend the time for filing post-trial motions for a judgment of acquittal or a new trial. (Dkt. 315). Bergstein made no new motion. The oral trial motion on which the Court reserved decision remains pending. For the reasons to be explained, the Court denies the motion for a judgment of acquittal.

DISCUSSION.

I.  Legal Standard.

Rule 29 requires a court, "on the defendant's motion," to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Rule 29(a), Fed. R. Crim. P.  When a court reserves its decision until after the jury returns a verdict of guilty, "it must decide the motion on the basis of the evidence at the time the ruling was reserved."  Rule 29(b), Fed. R. Crim. P.

On such a motion, a court "must view the evidence 'in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government.'"  United States v. Anderson, 747 F.3d 51, 60 (2d Cir. 2014) (quoting United States v. Persico, 645 F.3d 85, 104 (2d Cir. 2011)).  A court further "defer[s] to the jury's evaluation of the credibility of the witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence."  United States v. Jones, 482 F.3d 60, 68 (2d Cir. 2006).  If "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the court must deny the motion.  United States v. Aguilar, 585 F.3d 652, 656 (2d Cir. 2009) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)) (emphasis in original).  But if "'the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'"  United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting United States v. Glenn, 312 F.3d 58, 70 (2d Cir. 2002)).  This strong "deference . . . to a jury verdict is 'especially important when reviewing a conviction of conspiracy'" because conspiracies are inherently secretive and rarely "'laid bare in court'" in all respects.  Anderson, 747 F.3d at 72–73 (quoting United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir. 1992)).

II.    Discussion.

    a.    Investment Adviser Fraud Charges.

        Counts Two and Three of the indictment charge Bergstein with aiding and

abetting investment adviser fraud.  15 U.S.C. §§ 80b–6, 80b–17; 18 U.S.C. § 2.  Count One

charges a conspiracy to commit investment adviser fraud, among other criminal objects.  18

U.S.C. § 371.  In relevant part, section 80b–6(1) prohibits an investment adviser from

"employ[ing] any device, scheme, or artifice to defraud any client or prospective client," while

section 80b–6(2) prohibits an investment adviser from "engag[ing] in any transaction, practice,

or course of business which operates as a fraud or deceit upon any client or prospective client."

The Investment Advisers Act of 1940 "defines investment adviser in a functional way."  United

States v. Onsa, 523 F. App'x 63, 65 (2d Cir. 2013) (summary order).  It reaches

            any person who, for compensation, engages in the business of
            advising others, either directly or through publications or writings,
            as to the value of securities or as to the advisability of investing in,
            purchasing, or selling securities, or who, for compensation and as
            part of a regular business, issues or promulgates analyses or reports
            concerning securities,

subject to limited exemptions.  15 U.S.C. § 80b–2(a)(11); see also Abrahamson v. Fleschner, 568

F.2d 862, 871 (2d Cir. 1977) ("Congress intended [the Investment Advisers Act of 1940] to

reach persons who receive compensation for investing funds of their clients."), overruled in part

on other grounds by Transam. Mortg. Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11 (1979).

        There is no challenge to the sufficiency of the evidence showing that Hallac was

an investment adviser to the Weston funds at issue—known as the P2 Fund, the TT Portfolio,

and WFF—as "clients" within the meaning of section 80b–6.  Bergstein instead argues that the

evidence was insufficient to show that Hallac was an investment adviser to *investors* in those

funds.  At the January 25, 2018 Final Pretrial Conference, the Court held that "a fair-minded

reading . . . of the indictment . . . charges a fraud on the funds." (Conference Tr. at 8). The Court maintains that holding.[1] Neither party asserted that a statutory exemption to the definition of investment adviser applies to Hallac. At trial, Hallac testified that he acted as "the head of" Weston and all its funds, managing "other people's monies" in exchange for "a share of the profits." (Tr. at 1358, 1360, 1396–97). He also testified regarding his obligations to keep Weston's "clients . . . informed of everything that's going on, and to make them aware if something new has happened," including by providing investment advice to investors as requested. (Id. at 1396–97). As the Court will later discuss, Hallac's advisory functions related to "securities." A rational jury could thus conclude beyond a reasonable doubt that Hallac served as an investment adviser to Weston's funds.

Section 80b–6(4), in relevant part, prohibits an investment adviser from "engag[ing] in any act, practice, or course of business which is fraudulent, deceptive, or manipulative," without any requirement of a client relationship. Bergstein challenges the legal sufficiency of any investment advisory fraud conviction on the basis that the indictment omits reference to the rules promulgated under section 80b–6(4), which define the conduct prohibited by section 80b–6(4). An indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged," including the "official or customary citation of the statute, rule, regulation, or other provision of law" allegedly violated. Rule 7(c)(1), Fed. R. Crim. P. Unless there is a showing of prejudice, an indictment is sufficient when it "state[s] the elements of the offense and provide[s] even minimal protection against double jeopardy." United States v. Stringer, 730 F.3d 120, 124–25 (2d Cir. 2013). "The fact that the wrong section of the statute was cited does not invalidate either the charge or the convictions

---

[1] For other counts, Bergstein challenges the sufficiency of the evidence showing a fraud on the investors, without a challenge as to the funds. (E.g., Dkt. 299 at 2). For substantially the same reasons, the Court rejects such arguments.

if . . . no prejudice is shown to derive from the miscitation." <u>United States v. Calabro</u>, 467 F.2d 973, 981 (2d Cir. 1972)); <u>see</u> Rule 7(c)(2), Fed. R. Crim. P.

The indictment properly cites section 80b–6. Bergstein offers no evidence or argument that the lack of citation to rules promulgated under section 80b–6(4) mislead or prejudiced him. To the contrary, a statute its by nature directs attention to the rules promulgated under it, and this Circuit denies reversals of convictions for the more severe error of incorrectly citing the applicable statute absent a showing of prejudice. <u>See, e.g.</u>, <u>Calabro</u>, 467 F.2d at 981. The lack of a regulatory citation cannot serve as a basis for granting a judgment of acquittal on any count.

> **b.** <u>Securities Fraud Charges.</u>

Counts Four and Five charge Bergstein with securities fraud under 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b–5, and with aiding and abetting the same under 18 U.S.C. § 2. Count One charges Bergstein with a conspiracy to commit securities fraud, among other criminal objects. 18 U.S.C. § 371. In relevant part, section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . [,] any manipulative or deceptive device or contrivance" in contravention of Securities and Exchange Commission ("SEC") rule or regulation. 15 U.S.C. § 78j(b). SEC Rule 10b–5, in relevant part, makes it unlawful to

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

### i. "Security."

The 1934 Act and the Securities Act of 1933 (the "1933 Act") (together, the "Securities Acts") define "security" to include "note[s]" and "investment contract[s]." 15 U.S.C. §§ 77b(a)(1), 78c(a)(10). In this case, the predicate securities included: (i) for Count Four, the note between Arius Libra Inc. ("Arius Libra") and the P2 Fund (the "P2 Note"), and (ii) for Count Five, the Swartz IP Services Group Inc. ("Swartz IP") note purchase agreement with the TT Portfolio and any notes issued in accordance with it (the "TT Note"). (Dkt. 114).

### 1. "Note."

Whether a note is a security is decided in light of the purpose of the Securities Acts to "regulate *investments*," regardless of their form or name. Reves v. Ernst & Young, 494 U.S. 56, 61 (1990) (emphasis in original). Courts begin with the presumption that notes with terms exceeding nine months are securities. Id. at 65 n.3, 70–71. The presumption that a note is a security, however, is rebuttable. Id. at 65. Courts compare the note at issue to categories of notes excluded from the definition of security, including:

> the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a character loan to a bank customer, short-term notes secured by an assignment of accounts receivable, . . . a note which simply formalizes an open-account debt incurred in the ordinary course of business . . . [and] notes evidencing loans by commercial banks for current operations.

Pollack v. Laidlaw Holdings, Inc., 27 F.3d 808, 812 n.4 (2d Cir. 1994) (quoting id. at 65) (alterations and omissions in original). The factors driving such comparison include: (1) "the motivations that would prompt a reasonable seller and buyer to enter into it;" (2) "the 'plan of distribution' of the instrument;" (3) "the reasonable expectations of the investing public;" and (4)

"whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." Reves, 494 U.S. at 66–67. "If an instrument is not sufficiently similar" to an excluded category, the same factors drive "whether another category should be added." Id. at 67.

The P2 Note and TT Note are presumptively securities; the evidence showed that the TT Note had five-year term, while the P2 Note had a roughly five-month term that was extended beyond nine months by later draws on the note.[2] (Exs. 106, 160; Tr. at 1446–47, 1451–52). The Court begins with the first Reves factor, which examines the motivations that would prompt reasonable parties to enter into the transaction. 494 U.S. at 66. Investment motives suggest a note is a security, while commercial or consumer motives suggest that a note is not a security. Id.; Pollack, 27 F.3d at 812. "If the seller's purpose is to raise money for the general use of a business enterprise . . . and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" Reves, 494 U.S. at 66; see also Pollack, 27 F.3d at 812–13 (stating that an instrument's fixed rate of interest does not cut against investment motive). Regarding the P2 Note, Weston sought to recoup value from losses previously incurred by WFF and Bergstein sought to raise money for his enterprises. (Tr. at 134, 2634). Regarding TT Note, Swartz IP would receive a loan and the TT Portfolio would receive an interest rate equal to the returns of the Tewksbury fund plus one percent annually. (Id. at 874, 2820–21). In light of the expected profit for the funds and the enterprise financing for Bergstein's entities, this factor supports a finding that the P2 Note and TT Note were securities.

The second Reves factor focuses on the plan of distribution for the investment and whether the note is an instrument in which there is "common trading for speculation or

---

[2] Even if the P2 Note did not warrant the presumption, the evidence nevertheless was sufficient for a reasonable jury to find beyond a reasonable doubt that the P2 Note was a security for the reasons to be explained.

investment." 494 U.S. at 66.  The evidence showed that the scheme did not involve solicitations of the investing public.  This factor weighs against a finding of securities.

The third Reves factor examines "the reasonable expectations of the investing public."  Id.  Courts consider whether actual purchasers reasonably believed the Securities Acts protected them.  See Pollack, 27 F.3d at 814; accord Stoiber v. S.E.C., 161 F.3d 745, 751 (D.C. Cir. 1998).  Weston was a SEC-regulated registered investment adviser that managed investor moneys in accordance with each fund's offering memorandum or its equivalent.  (Tr. at 101–104).  Typical investors in Weston funds included "high net worth individuals, insurance companies, wealthy families, [and] some pension funds."  (Id. at 116).  The P2 Note and the TT Note each state that it is unregistered under the 1933 Act and subject to the 1933 Act's restrictions on transfer.  (Exs. 106, 160).  On balance, this factor favors a finding of securities.

The final Reves factor centers on whether another applicable risk-reducing factor renders the application of the Securities Acts unnecessary.  494 U.S. at 67.  The Second Circuit has held that the Investment Advisers Act of 1940 does not present another applicable risk-reducing regime because it is a "complement, rather than [a] substitute for" the Securities Acts. Pollack, 27 F.3d at 815.  There is no evidence or argument that any other regime or factor applies.  This factor again favors a finding that the P2 Note and TT Note are securities.

Considering the Reves factors together, the evidence was sufficient to support a finding beyond a reasonable doubt that the P2 Note and TT Note were securities.  The same factors do not counsel a different categorization for these instruments.

## 2.  "Investment Contract."

"[A]n investment contract . . . means a contract, transaction[,] or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits solely

from the efforts of the promoter or a third party." S.E.C. v. W.J. Howey Co., 328 U.S. 293, 298–99 (1946). To qualify as a "security," an investment contract must satisfy all of the Howey elements. See Revak v. SEC Realty Corp., 18 F.3d 81, 87 (2d Cir. 1994).

The second element of a "common enterprise" may be established by showing "horizontal commonality," or the "tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." Id. The third element—the expectation of profits "solely" from the efforts of a third party—means that "'under all the circumstances, the scheme was being promoted primarily as . . . a means whereby participants could pool their own activities, their money[,] and the promoter's contribution in a meaningful way.'" United States v. Leonard, 529 F.3d 83, 88 (2d Cir. 2008) (quoting S. E. C. v. Aqua-Sonic Prod. Corp., 687 F.2d 577, 582 (2d Cir. 1982)).

For the P2 Note, the evidence showed that the P2 Fund (1) invested approximately $8.75 million in Arius Libra as part of (2) a common enterprise that pooled P2 Fund moneys with those of other Arius Libra investors, and that the P2 Fund (3) expected profits from pooling their funds with Bergstein's contributions. (Tr. at 142, 156–58). For the TT Note, the evidence showed that the TT Portfolio (1) invested $17.7 million in Swartz IP as part of (2) a common enterprise that pooled TT Portfolio moneys with those of other Swartz IP investors, and that the TT Portfolio (3) expected profits from pooling their funds with Bergstein's contributions. (Id. at 220–21, 245). A reasonable jury could find beyond a reasonable doubt that the P2 Note and TT Note were investment contracts and thus "securities."

ii.   "In Connection with."

Section 10(b) and Rule 10b–5 further require a nexus between the security and the fraudulent conduct. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. The phrase "in connection

with" is interpreted broadly and satisfied when the "fraud 'coincide[s]' with the purchase or sale of securities." United States v. Nouri, 711 F.3d 129, 143–44 (2d Cir. 2013) (quoting Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85 (2006)) (alteration in original).

The evidence at trial showed that Bergstein made material misrepresentations to Hallac and Wellner to induce Weston to enter into the P2 Note and TT Note. For the P2 Note, such evidence included Hallac and Wellner's testimony that Bergstein represented that disbursements under the P2 Note would be solely used for the unwind transaction and the medical billing business. (Tr. at 173, 1416). Wellner testified that Weston "wouldn't have advanced the funds" without those limitations. (Id. at 173). Bergstein testified that his draws on the P2 Note for other uses were justified because his "entities were advancing money at a much faster rate than [he was] requesting it." (Id. at 2810). The evidence, however, was limited with respect to amounts Bergstein advanced towards medical billing. (E.g., id. at 2713–15).

For the TT Note, such evidence included Bergstein's representations to Hallac and Wellner about the involvement and investment of Jerry Swartz in Swartz IP. (Id. at 1477). Hallac testified that Bergstein provided him with an unsigned, unaudited balance sheet of Swartz IP, which he requested in advance of agreeing to extend the $17.7 million. (Id. at 1480–86). Hallac testified that "it would have been insane" to enter into the TT Note if Swartz IP was not capitalized to the extent Bergstein represented, considering, for example, the TT Portfolio's need to meet redemption requests. (Id. at 1483). Swartz and his colleague James King each testified that he was not aware of any investment by Swartz into Swartz IP. (Id. at 929, 1270–74).

The evidence was thus sufficient for a reasonable jury to find beyond a reasonable doubt that Bergstein made material misrepresentations "in connection with" securities.

iii.  Liability Absent a Duty.

Taken together, section 10(b) and Rule 10b–5 "do not create an affirmative duty to disclose any and all material information."  Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011).  When an individual does not have an independent duty to disclose, "[d]isclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'"  Id. (quoting 17 C.F.R. § 240.10b–5(b)) (omission in original).  In other words, "[t]he lack of an independent duty is not . . . a defense to Rule 10b–5 liability" when an individual makes a material misstatement "because upon choosing to speak, one must speak truthfully about material issues."  Caiola v. Citibank, N.A., New York, 295 F.3d 312, 331 (2d Cir. 2002).

On the other hand, when an individual has a preexisting duty to speak, a material omission can form a basis for liability.  See Chiarella v. United States, 445 U.S. 222, 228 (1980). In the criminal context, an individual without a preexisting duty can aid and abet a fiduciary's material omission by associating with the venture, participating it as something one "wishe[d] to bring about," and seeking by one's own action to make it succeed.  See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 190 (1994) (citing 18 U.S.C. § 2 and Nye & Nissen v. United States, 336 U.S. 613, 619 (1949) (alteration in original)).

As detailed above, the evidence showed that Bergstein made affirmative material misstatements to Hallac and Wellner to induce Weston to enter into the P2 Note and TT Note. The evidence also showed that Bergstein knowingly engaged in conduct that aided or abetted Hallac and Wellner's fraud upon Weston's funds in violation of their fiduciary duties.  Hallac and Wellner testified that they advised Bergstein of the importance of concealing from investors the conflicts created by the P2 Note and TT Note, and that Bergstein acknowledged such plans.

(Tr. 203–04, 324, 1440–42). Regarding the P2 Note, Bergstein contributed to a presentation that Hallac and Wellner delivered to WFF investors, which advised investors that Owari, a Bergstein entity, "arranged" for the P2 Fund's loan to Arius Libra, without disclosing that the P2 Fund was the lender. (Id. at 204–07). Tim Wray, an investor representative, testified that he had no understanding of who the actual lender was and, if he had known, the conflict of interest would have caused concern and required disclosure to his clients. (Id. at 1333–36). Regarding the TT Note, Bill Porter, also an investor representative, testified that Bergstein told Porter at a meeting with Hallac and Wellner that Arius Libra held only one approximately $8 million debt to Swartz IP. (Id. at 1790–92). As noted, other evidence at trial showed that there was only one approximately $8 million loan by Arius Libra in favor of the P2 Fund. (E.g., id. at 1463). The record contained Porter's emails to Hallac and Wellner expressing his concerns regarding the transaction as described to him. (Id. at 1794–97).

The evidence was sufficient for a reasonable jury to conclude beyond a reasonable doubt that Bergstein made material misstatements to Hallac and Wellner to induce the Weston funds to enter into P2 Note and TT Note. It was further sufficient to conclude on the same basis that Bergstein knowingly aided and abetted Hallac and Wellner's fraud on the P2 Fund, WFF, and the TT Portfolio, which included concealing conflicted transactions from investors.

In view of the foregoing, the Court need not reach the question of whether the remaining predicate securities named in the bill of particulars—the assets liquidated to fund the P2 Note and TT Note—provide additional alternative factual bases for sustaining the jury's findings regarding the securities fraud counts. See United States v. Rutkoske, 506 F.3d 170, 176 (2d Cir. 2007); United States v. Jordan, 591 F. Supp. 2d 686, 705 (S.D.N.Y. 2008) (Cote, J.).

c. Wire Fraud Charges.

Count Six charges Bergstein with conspiring to commit wire fraud. 18 U.S.C. §§ 1343, 1349. Count Seven charges him with the substantive crime of wire fraud, and aiding and abetting the same. 18 U.S.C. §§ 2, 1343. Bergstein challenges Count Six based on the sufficiency of the evidence showing that Bergstein engaged in a conspiracy, arguing that the evidence showed that Bergstein conspired against Hallac and Wellner, rather than with Hallac, Wellner, or any others. As reviewed above, the evidence at trial supported a finding that Bergstein made materially misleading statements to Hallac and Wellner in order to induce Weston to enter into the P2 Note and TT Note. These misrepresentations furthered an overall scheme to defraud the P2 Fund, WFF, and the TT Portfolio. At the same time, Bergstein, Hallac, and Wellner worked in concert to conceal the scheme from investors in those funds and protect the scheme. This scheme involved interstate emails and wire transfers of P2 Fund and TT Portfolio money to entities through which Bergstein and others directed money to themselves. (Tr. at 169–70, 1523–25). On the trial record, a reasonable jury could conclude that Bergstein participated in a single conspiracy to commit wire fraud.

d. Venue.

A defendant's trial must occur where the crime was "committed," unless otherwise permitted by statute or the Federal Rules of Criminal Procedure. U.S. Const. art. III, § 2, cl. 3; amend. VI; Rule 18, Fed. R. Crim. P. When a statute does not specify the location of commission, courts determine the *locus delicti* by "'initially identify[ing] the conduct constituting the offense,' and then 'discern[ing] the location of the commission of the criminal acts.'" United States v. Ramirez, 420 F.3d 134, 138 (2d Cir. 2005) (quoting United States v. Rodriguez-Moreno, 526 U.S. 275, 279 (1999)). "[P]reparatory acts" are not "acts 'constituting'

the violation," and thus they do not give rise to venue. United States v. Tzolov, 642 F.3d 314, 319 (2d Cir. 2011). A defendant does not need the "knowledge or intent to cause an act in furtherance of the crime to occur in the district of venue" so long as the act occurring there is "foreseeable" to the defendant. United States v. Lange, 834 F.3d 58, 69 (2d Cir. 2016), cert. denied sub nom. Russell v. United States, 137 S. Ct. 677 (2017), and cert. denied, 137 S. Ct. 685 (2017).

"For an offense deemed to be 'continuing,' venue may be proper in more than one location." United States v. Rutigliano, 790 F.3d 389, 395 (2d Cir. 2015). When a defendant aids and abets a crime, venue is "proper where the defendant's accessorial acts were committed *or* where the underlying crime occurred." Lange, 834 F.3d at 69. For each count, the government bears the burden of proving venue by a preponderance of the evidence. Tzolov, 642 F.3d at 318.

"[A] substantial contacts rule" safeguards out-of-district defendants with minimal contacts to the district of venue by "tak[ing] into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding." United States v. Reed, 773 F.2d 477, 481 (2d Cir. 1985); see United States v. Kirk Tang Yuk, 885 F.3d 57, 70 (2d Cir. 2018) (recounting safeguard rationale).

    i.   Aiding and Abetting Investment Adviser Fraud (Counts Two and Three) and Securities Fraud (Counts Four and Five).

Under the relevant venue statutes for investment adviser fraud and securities fraud, venue is proper "in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. §§ 78aa(a), 80b–14. A preponderance of the evidence supported a finding that Hallac committed acts constituting investment adviser fraud against WFF, the P2 Fund, and TT Portfolio in this District. The evidence showed that Hallac had meetings in Weston's New

York office with WFF investors and TT Portfolio investors wherein Hallac concealed the scheme on the funds. (Tr. at 1528–30, 1797–99). As to Bergstein, venue was thus proper in this District based on aiding and abetting liability as charged and shown at trial. See Lange, 834 F.3d at 69.

A preponderance of the evidence also supported the conclusion that Bergstein furthered the securities fraud scheme against the P2 Fund and TT Portfolio, and so committed securities fraud, in this District. For example, Wellner testified that he had telephone conversations in which Bergstein mislead him on how P2 Fund moneys would be used (Tr. at 135, 145–46) and email communications in which Bergstein misrepresented Swartz's involvement in Swartz IP (e.g., Ex. 142). California-based Bergstein testified that he "underst[ood] Weston was located in Palm Beach," but he further testified that he "kn[ew] it had an office in New York." (Tr. at 2763, 2783). By virtue of this knowledge, and through his regular contact with Wellner, who was based in this District (id. at 97), it was foreseeable to Bergstein that acts constituting securities fraud would occur in this District. Venue additionally was proper in this District based on aiding and abetting liability. See Lange, 834 F.3d at 69.

A reasonable jury could thus find that venue for aiding and abetting investment adviser fraud and securities fraud properly lay in this District.

ii. Conspiracy to Commit Securities Fraud and Investment Adviser Fraud (Count One), Conspiracy to Commit Wire Fraud (Count Six), and Wire Fraud (Count Seven).

Both wire fraud and conspiracy are continuing offenses. Rutigliano, 790 F.3d at 395–96. Venue for wire fraud offenses is "proper in any district in which the offense began, continued, or concluded." United States v. Kim, 246 F.3d 186, 191 (2d Cir. 2001) (citing 18 U.S.C. § 3237(a)). On the other hand, "[v]enue is proper for conspiracy charges 'in any district in which an overt act in furtherance of the conspiracy was committed.'" Lange, 834 F.3d at 70.

"An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy." Tzolov, 642 F.3d at 320. "[A] defendant need not . . . have ever been physically present in a district for a conspiracy charge against him to be venued there." United States v. Rommy, 506 F.3d 108, 120 (2d Cir. 2007).

A reasonable jury could find that proper venue lay in this District for wire fraud, conspiracy to commit wire fraud, and conspiracy to commit investment adviser and securities fraud. Venue was proper for the substantive wire fraud charge because P2 Fund moneys used in the scheme came from the P2 Fund's bank account at a branch in the District (Ex. 700 at 3; Tr. 1978–79), in addition to the previously-reviewed interstate telephone calls and emails to Wellner in this District inducing the transactions. It was further proper for the wire fraud conspiracy charge because Wellner worked in this District to set up Purplebox, an entity through which Bergstein sent TT Fund moneys to Wellner, Hallac, and others for their personal use. (Tr. at 1523). Finally, venue was proper for the conspiracy to commit securities fraud and investment adviser fraud charge because the evidence showed that Wellner, in this District, uploaded to an electronic investor portal misleading documents designed to conceal the conflicted transactions from investors. (Exs. 604, 605; Tr. at 325).

iii.  Substantial Contacts.

For each of Counts One through Seven, Bergstein had substantial contacts with this District sufficient to make venue proper. The record reflected that Weston's headquarters were in Manhattan. (Tr. at 97). While the scheme, by its nature, had broad effects, Weston's Manhattan office served as the locus of the criminal conduct. (E.g., id. at 1040–41, 1341). There is no evidence or argument that this District was not suitable for accurate factfinding. Bergstein's primary location outside the District does not alter the result.

e. Time Bar.

Lastly, Bergstein challenges the timeliness of prosecution of the P2 Fund-related substantive offenses. The statute of limitations for the relevant securities fraud and investment adviser fraud provisions is six years. 18 U.S.C. § 3301(a)(2), (a)(4). For the continuing offense of wire fraud, the limitations period is five years. 18 U.S.C. § 3282(a); United States v. Rutigliano, 790 F.3d 389, 395, 400 n.5 (2d Cir. 2015).

The grand jury returned the indictment on November 7, 2016. (Dkt. 1). The evidence at trial showed that the P2 Note was effective August 3, 2011, and the TT Note was effective November 14, 2011. (Exs. 106, 160). It further showed that disbursements in connection with the overall scheme involving both the P2 Note and TT Note continued until May 17, 2012 and August 24, 2012, respectively. (Exs. 58, 727; Tr. at 1451–52). The limitations period thus did not run on any substantive offenses.

CONCLUSION.

The Court therefore DENIES Bergstein's motion for a judgment of acquittal.


SO ORDERED.


P. Kevin Castel
United States District Judge


Dated:   New York, New York
          May 29, 2018