**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>    – vs – <br><br>**DAVID BERGSTEIN,**<br><br>     **Defendant.** | Case No. 16-cr-746-PKC |

## DEFENDANT DAVID BERGSTEIN'S SENTENCING MEMORANDUM

Thomas H. Bienert, Jr.
Anthony R. Bisconti
BIENERT, MILLER & KATZMAN, PLC
903 Calle Amanecer, Ste. 350
San Clemente, CA 92673
(949) 369-3700
E-mail: tbienert@bmkattorneys.com
      tbisconti@bmkattorneys.com

Andrew L. Fish
SATERLEE STEPHENS LLP
230 Park Avenue, 11th Floor
New York, NY 10169
(212) 404-8761
E-mail: afish@ssbb.com

William F. Johnson
Brian R. Michael
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
(212) 556-2100
E-mail: wjohnson@kslaw.com
      bmichael@kslaw.com

*Counsel to David Bergstein*

Dated: June 13, 2018

## Table of Contents

I. INTRODUCTION ...................................................................................1

II. SENTENCING STANDARDS ...............................................................1

III. MR. BERGSTEIN'S HISTORY AND CHARACTER WARRANT A MODEST SENTENCE ............................................................................2

    A.    Mr. Bergstein's Social History. ...............................................2

    B.    Mr. Bergstein Is A Devoted Family Man Whose Wife And Young Sons Suffer Without Him. ................................................10

    C.    Mr. Bergstein Has A Long History Of Helping Others. ...........11

    D.    Mr. Bergstein Has Helped Those Struggling With Personal Challenges. .12

    E.    Mr. Bergstein Has Helped His Religious Community. ...............14

    F.    Mr. Bergstein Has Many Relationships with Law Enforcement And Earned The Respect Of Law Enforcement Leaders..................15

    G.    Mr. Bergstein Has Shown A Particular Affinity For Helping Children. ...16

    H.    Mr. Bergstein Has Helped Many Business People Fulfill Professional Goals Often Without Any Economic Incentive. .........................17

IV. THE NATURE AND CIRCUMSTANCES OF THIS CASE INVOLVE SEVERAL MITIGATING FACTORS.................................................19

    A.    Mr. Bergstein Intended A Successful Deal.................................19

    B.    Mr. Bergstein's Many Good Qualities Throughout His Life Demonstrate That The Acts Involved In This Case Are Aberrant Behavior. ................22

    C.    Mr. Bergstein's Protracted Litigation Related To The Issues In This Case Has Already Provided Some Measure Of Punishment. .............................25

V. SENTENCING GUIDELINE CALCULATION ...................................28

    A.    Mr. Bergstein Did Not Intend For the Funds To Lose Any Money, and Fund Manager Hallac Received Ample Assets to Repay the Loans Resulting in No Actual Loss....................................................29

    B.    Hallac's Ownership Value in P2 and TT is an Offset Against Loss Amount. ...................................................................................35

    C.    With Three Victims, There Is No Enhancement for Number of Victims. .36

    D.    The Crime Does Not Involve Sophisticated Means....................37

    E.    The Offense Did Not Involve Bankruptcy Proceedings .............38

| | F. | Mr. Bergstein Did Not Manage Anyone In Criminal Activity. ................40 |
|---|---|---|
| | G. | Mr. Bergstein Did Not Obstruct Justice Regarding The Warshawsky-Produced Documents. ...........................................................................41 |
| | H. | Mr. Bergstein Did Not Obstruct Justice By Testifying At Trial................43 |
| | I. | Mr. Bergstein Did Not Obstruct Justice By "Lying To The SEC."...........43 |
| VI. | | APPLICATION OF THE GOVERNMENT'S PROPOSED FRAUD GUIDELINES LEADS TO A DISPARITY IN SENTENCING .........................44 |
| VII. | | APPLYING SECTION 3553 FACTORS TO THE FACTS AND CIRCUMSTANCES OF THIS MATTER WEIGHS IN FAVOR OF A SENTENCE BELOW MR. BERGSTEIN'S CALCULATED GUIDELINES RANGE......................................................................................................47 |
| | A. | Seriousness Of The Offense And History And Characteristics of the Defendant.........................................................................................47 |
| | | 1.   Mr. Bergstein's Reduced Likelihood Of Recidivism.........................48 |
| | B. | Deterrence From Criminal Conduct..............................................................49 |
| | C. | Protection of the Public from Further Crimes of the Defendant................51 |
| | D. | Avoidance Of Unwarranted Sentence Disparities. .....................................51 |
| | E. | Restitution To Victims Of The Offense And Financial Considerations. ....55 |
| | | 1.   Restitution Should Be Reduced By Loan Repayments and Settlements. ......................................................................................56 |
| | | 2.   Restitution Should Be Reduced By Amounts Paid to Persons Under the Government's Control..................................................................56 |
| VIII. | | THE GOVERNMENT'S FORFEITURE APPLICATION IS NOT SUPPORTED BY THE EVIDENCE AND IS INCONSISTENT WITH PREVAILING FORFEITURE LAW ................................................................................60 |
| IX. | | REQUESTS FOR BUREAU OF PRISON RECOMMENDATIONS .................61 |
| X. | | CONCLUSION...............................................................................................61 |

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 4 of 67

## Table of Authorities

Cases

*Bergstein v. Tregub*,
  2017 WL 1709620 (Cal. May 2, 2017)................................................................. 24
*Gall v. United States*,
  128 S. Ct. 586 (2007)................................................................. 48
*United States v. Adelson*,
  441 F. Supp.2d 506 (S.D.N.Y. 2006)................................................. 44, 45, 49, 50, 54
*United States v. Banks*,
  62 F. Supp. 3d 125 (D.D.C. 2014)................................................................. 35
*United States v. Blount*,
  291 F.3d 201 (2d Cir. 2002)................................................................. 41
*United States v. Boccagna*,
  450 F.3d 107 (2d Cir.2006)................................................................. 56
*United States v. Booker*,
  543 U.S. 220 (2005)................................................................. 28
*United States v. Boyle*,
  2018 WL 834081 (3rd Cir. 2018)................................................................. 40
*United States v. Burgos*,
  324 F.3d 88 (2d. 2003)................................................................. 41
*United States v. Catoggio*,
  326 F.3d 323 (2d Cir. 2003)................................................................. 57
*United States v. Confredo*,
  528 F.3d 143 (2d Cir. 2008)................................................................. 30
*United States v. Courtney*,
  816 F.3d 681 (8th Cir. 2016)................................................................. 35
*United States v. Cummings*,
  189 F.Supp.2d 67 (S.D.N.Y. 2002)................................................................. 56
*United States v. Dharia*,
  284 F.Supp.3d 262 (E.D.N.Y. 2018)................................................................. 56
*United States v. Drayer*,
  364 Fed.Appx. 716 (2d Cir. 2010)................................................................. 56
*United States v. Faibish*,
  2017 WL 3634599 (E.D.N.Y. Aug. 22, 2017)................................................................. 56
*United States v. Fiumano*,
  2018 WL 507171 ................................................................. 57
*United States v. Foley*,
  738 F.3d 7 (1st Cir. 2015)................................................................. 57
*United States v. Gonzalez*,
  647 F.3d 41 (2d Cir. 2011)................................................................. 36
*United States v. Greenfield*,
  44 F.3d 1141 (2d Cir. 1995)................................................................. 41
*United States v. Gupta*,
  904 F. Supp. 2d 349 ................................................................. 44, 49
*United States v. Hodges*,
  2009 WL 36231 (E.D.N.Y. Feb. 12, 2009)................................................................. 48
*United States v. Lacey*,
  699 F.3d 710 (2d Cir. 2012)................................................................. 30
*United States v. McGinn*,
  787 F.3d 116 (2d. Cir. 2015)................................................................. 56
*United States v. Nascembeni*,

586 Fed. Appx. 144 (4th Cir. 2014)...................................................................... 40
*United States v. Parris,*
573 F. Supp. 2d 744 (E.D.N.Y. 2008) ................................................................ 45
*United States v. Reifler,*
446 F.3d 65 (2d Cir. 2005)...................................................................................... 59
*United States v. Sanchez,*
No. 99 Cr. 338, 2007 WL 60517 (S.D.N.Y. Jan. 8, 2007)................................ 48
*United States v. Sklena,*
692 F.3d 725 (7th Cir. 2012) ............................................................................... 49
*United States v. Smathers,*
879 F.3d 453 (2d. Cir. 2018)................................................................................. 59
*United States v. Tanke,*
743 F.3d 1296 (9th Cir. 2014) ............................................................................. 40
*United States v. Zakhary,*
357 F.3d 186 (2d Cir. 2004).................................................................................. 57

Statutes

11 U.S.C. § 101(2) ...................................................................................................... 39, 40
18 U.S.C. § 3553.................................................................................. 2, 47, 49, 51
18 U.S.C. § 3661 ............................................................................................................. 2
18 U.S.C. § 3664.................................................................................................... 56, 59

Rules

U.S.S.G. § 1B1.3............................................................................................................ 40
U.S.S.G. § 2B1.1............................................................................................................ 31

Other Authorities

*Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for*
*Further Reform,*
102 IOWA LAW REVIEW 939 ............................................................................... 46
*A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment*
*Purposes),*
58 Stan. L. Rev. 67, 80 (Oct. 2005)................................................................... 50
U.S. Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the
Federal Sentencing Guidelines, A Component of the Fifteen Year Report on the U.S.
Sentencing Commission's Legislative Mandate (May 2004)............................ 48, 49
United States Sentencing Commission, Fifteen Years of Guidelines Sentencing (2004) ............ 50

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 6 of 67

## I.   INTRODUCTION

Defendant David Bergstein respectfully submits this Sentencing Memorandum in aid of his sentencing scheduled for June 27, 2018.  We respectfully submit that when both his life's history and some of the unusual features of this case are viewed in full perspective, Mr. Bergstein is deserving of a minimal prison sentence, one far below the range calculated by the Government and the Probation Office under the U.S. Sentencing Guidelines ("Guidelines").

Mr. Bergstein has done much to help others.  From counseling those facing personal challenges, to giving his time and money to charitable and religious institutions, to funding law enforcement and children's needs, his record of assistance is extraordinary.  His unusually high commitment to service warrants leniency at sentencing.

This fraud case is also unusual, at least as to Mr. Bergstein's participation in the events and transactions that gave rise to the charges.  Unlike the other three participants,[1] Mr. Bergstein put up his own assets as part of the business deal at the center of the case, continually pushed to consummate the deal when others failed to deliver, lost his own money on the deal, and repaid millions to the victim hedge funds.  The finances of this case make it different than most fraud cases and, we respectfully submit, should mitigate Mr. Bergstein's sentence.

Sentencing focuses on more than simply guilt or innocence.  It must include an assessment of Mr. Bergstein's true character and, specifically in a fraud case, the particulars of the finances. Consideration of these significant factors, as well as other required sentencing factors, overwhelmingly supports imposition of a minimal period of incarceration as "sufficient but not greater than necessary" to effectuate the goals of sentencing.

## II.   SENTENCING STANDARDS

Title 18, Section 3553 of the United States Code ("The Sentencing Reform Act") requires sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with

---

[1] The other primary participants are Government cooperators Albert Hallac and Keith Wellner, and Government informant Paul Parmar.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 7 of 67

the purposes set forth in paragraph 2." Those purposes are the following:

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)     to afford adequate deterrence to criminal conduct;
> (C)     to protect the public from further crimes of the defendant; and
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

The Court must consider several factors in determining the appropriate sentence. These factors include, among others: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to advance the purposes of sentencing set forth above; (3) the kinds of sentences available; (4) the sentencing guidelines; (5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (6) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

"[N]o limitation shall be placed on the information concerning the background, character, and conduct of [Mr. Bergstein] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

## III.   MR. BERGSTEIN'S HISTORY AND CHARACTER WARRANT A MODEST SENTENCE

### A.     Mr. Bergstein's Social History.

David Bergstein was born a middle child into an Orthodox Jewish family. His father Leonard barely survived the Holocaust, and as a child fled with his family from Poland to a refugee camp in Uzbekistan (former U.S.S.R.). There, Leonard lost his father to starvation and lost an arm to a train on the tracks on which he slept to escape the cold. After the Allies prevailed, Leonard's family was allowed entrance to the U.S. but he was not, because at the time our country did not admit disabled immigrants. Leonard spent his adolescence in refugee camps, orphanages and foster care, eventually putting himself through University and earned an engineering degree. He later was allowed admission to the U.S. and reunited with his family in Brooklyn.

Case 1:16-cr-00746-PKC    Document 402    Filed 06/13/18    Page 8 of 67

Mr. Bergstein's mother, Sarah, also came from a family that was victimized by the carnage of World War II and the pogroms against the Jewish people. Originally from Morocco, her family fled to what is now Israel as part of a mass exodus in the early 1940s as the slaughtering of Jews became horrifyingly normal. Because of their dark complexion and native origin, Sarah and her family, who are Sephardic Jews, faced discrimination from other Jewish communities. Leonard was able travel to Israel and arrange a marriage with Sarah's family. Speaking little English at the time, Sarah married Leonard and immigrated to Brooklyn, where they began their family together.

Mr. Bergstein, along with his older brother Shalom and his younger sister Ethel, was born and raised in Brooklyn. His family lived in a public housing project. Mr. Bergstein recalls their building being locked at night with an extra steel door, and high fences surrounding the perimeter; gangs hung around outside and fought over turf. Mr. Bergstein attended elementary school at PS20 and was one of only a handful of Caucasian students in the entire school. Corporal punishment in the school was common and often sanctioned by the principal. Racially and culturally, Mr. Bergstein and his siblings were quite isolated in school and the community. However, his family lived within walking distance to the Temple and, seeking acceptance, they often attended services.

Mr. Bergstein's childhood was far from perfect. His mother stayed home during the day. His father initially worked as an electro-optical engineer and inventor, working on what would become his most well-known invention, for which he still holds a patent—the camera Zoom Lens. Leonard created his many inventions while employed for others, so they did not generate meaningful income for his family. Whenever Leonard was home, he was extremely controlling towards his wife and family. Leonard was a frugal man and kept Sarah on a modest budget and strict allowance, and no one could do anything without his approval. Mr. Bergstein describes his father as "a good and honest man to a fault, but extremely frugal and extremely hard on mom. He yelled a lot, called her names, would not let her see her family or drive a car." Mr. Bergstein recalls his father suffering from what today would be diagnosed as severe Post-Traumatic Stress Disorder, and generally having no inclination of how he was actually treating his wife and family.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 9 of 67

Mr. Bergstein states, "I knew he loved us, but he could never figure out how to show or use emotion." As Mr. Bergstein grew older, he would take on small jobs without his father's knowledge, and secretly give his paycheck to his mother.

Eventually the long hours and little compensation disillusioned his father, so Leonard left the corporate world and accepted a position as a professor at the Polytechnic Institute of Brooklyn (now part of New York University), Columbia University, and as a visiting Professor at George Washington University. Every seven years Leonard would take the family on sabbatical to teach for a year in Israel at its top university. Mr. Bergstein recalls spending one year of his childhood in Israel during the Six-Day War and how frightening it was. His family would barricade themselves in shelter in fear that they would fall victim to the war.

In Mr. Bergstein's adolescence, his family moved out of public housing and into a suburban home in Teaneck, New Jersey. Mr. Bergstein considers this move one of the best and exciting things to happen in his entire life. He remembers how his brother and sister were in shock that the neighborhood kids would leave their bikes and baseball bats in their yards, and that houses had lawn furniture that remained outside. Mr. Bergstein's family came from a part of the city where if anything was left out, it was stolen in minutes.

Like his father, Mr. Bergstein is very intelligent and hard working. This became clear in high school when his father insisted that he be enrolled in college before he finished the 10th grade. Only 15 years old, Mr. Bergstein started college courses at the Polytechnic Institute of Brooklyn where he studied Premedicine and Mathematics. On the weekends Mr. Bergstein would work with a moving company that specialized in large hard-to-move items such as pianos and refrigerators into buildings with no elevators. During the summers, Mr. Bergstein worked additional labor jobs, including construction. In 1982, at only age 19, Mr. Bergstein graduated early with a Bachelor of Science degree.

Leonard was still the main influence over Mr. Bergstein and his family and insisted that Mr. Bergstein continue his education either in medical or law school. Mr. Bergstein did as his father wished and enrolled into the Cardozo School of Law at Yeshiva University. Mr. Bergstein

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 10 of 67

was always focused on school, but also on staying employed. It meant a great deal to Mr. Bergstein that he would not have to rely on his father for money. During the day, he would go to school and study; from midnight until 4:00 a.m., he would work for a little over $10 an hour at the docks unloading freight for UPS. "I remember being so excited about the pay, it was more money than I had ever made. I was tired, but it was worth it," Mr. Bergstein recalls.

As Mr. Bergstein continued to work his way through undergraduate and law school, he networked around the city and made his way to Wall Street. He started a job with Bear Sterns as a ticket runner, running stock orders between parties. At synagogue in Teaneck, New Jersey, he met the man who would become his mentor and whom he credits for giving him his start in to the world of finance and investing. Joseph Stechler was an executive and stock analyst for Salomon Brothers, then one of the top firms on Wall Street. Stechler took a deep interest in Mr. Bergstein and considered him to have extreme promise and potential. Stechler offered Mr. Bergstein a position at the firm and took him under his wing. Blind to it at the time, Mr. Bergstein received from Stechler the tools and knowledge he would use to find great success later in his life. Stechler taught Mr. Bergstein the importance of, and how to find and manage, an "undervalued situation."

While things were going well for Mr. Bergstein on Wall Street, he was still attending law school but enjoying it less. He realized that he no longer wanted to pursue the law; it was not what he envisioned for himself and he was only enrolled because of his father's insistence. While attending a friend's wedding out of town at this time, Mr. Bergstein was introduced to a man who owned a successful business in California. After striking up a conversation, this older gentleman quickly saw the potential in Mr. Bergstein. After a few additional conversations, Mr. Bergstein was offered a job and convinced to move away from his family and join him in California. With about $1,000 to his name, Mr. Bergstein moved to California in approximately 1983, where he rented a single room in a widow's house for $150 a month.

Mr. Bergstein went from making $150 per week on Wall Street to making $250,000 per year in California. After a year, he became self-employed. By 1985, at the age of 23, Mr. Bergstein had closed his first million-dollar deal. The first thing Mr. Bergstein did was buy a car for both of

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 11 of 67

his parents to replace the single, run-down car they owned.

Through the 1980s Mr. Bergstein worked tirelessly seven-days a week, continuing to develop, buy, and sell real estate. After branching out and trying to make it on his own in the real estate world, Mr. Bergstein realized that while he enjoyed the "art of the deal," he admittedly was not great at the operations side of the business. Mr. Bergstein described it "like attending soccer school and studying and learning all the rules of the game, but never playing it on the field." He started to sustain huge losses. He was defaulting on bank loans, and interest rates were at an all-time high of nearly 20%. He recalls paying six million dollars in one year to the banks just in interest. He was able to sell off some of his assets and pay the banks back in full, but he realized his time in the real estate industry was coming to an end.

Mr. Bergstein soon recognized that his expertise was really in finding value, fixing problems, restructuring, and strategy. Mr. Bergstein accordingly gained a reputation of being someone who could manage distressed situations that were in litigation. It started when he received a phone call from a friend who told him about a contact in the garment industry whose business began to lose money and wanted to get out of the business. This person could no longer pay their bills and had angry vendors. Mr. Bergstein knew that he had found his own success and figured he would give it a try for someone else. After taking over the company and convincing the vendors not to force the company into bankruptcy, he was able to turn the business around within one year, and it started making a profit.

This started Mr. Bergstein's new career in "distressed counseling." Word about Mr. Bergstein's success spread, and he started taking on multiple projects, from grocery stores, to mom and pop shops, restaurants, magazine vendors, import and exporting companies, and so on. Mr. Bergstein worked through the next decade saving company after company, evolving his strategies to include expansions, roll ups, startups and growth companies.

For example, Mr. Bergstein realized a significant success with a project that began in 1998 with a comic magazine called Game Fan. The company was rapidly losing money, so it offered Mr. Bergstein part ownership in return for him helping turn things around. He decided to create

an Internet site around it, which would sell video games and other physical products that the magazine would offer. Within several months Mr. Bergstein was able to find investors to put in millions of dollars of expansion funds, which soon thereafter attracted a $25 million investment from notable investor Ron Burkle. The company later entered into a $250 million transaction, which greatly benefited investors. Steven Antebi, an investor in that deal (and now close personal friend of Mr. Bergstein) reflects in his letter to the Court: "[T]hrough [Mr. Bergstein's] efforts, the money was returned to the investor with a substantial profit . . . We all profited from David's efforts."[2]

The projects Mr. Bergstein had worked on were in many different fields. After meeting California construction tycoon Ron Tutor around the year 2000 and conducting some business transactions with him, the two created their own entertainment industry company in 2003 that they named R2D2—Mr. Bergstein's first venture into that industry. The company primarily focused on purchasing film rights, ultimately building a library that would consist of over 1500 films.

On the personal front, Mr. Bergstein met Sara Beaulieu in 2002 at a dinner party in Los Angeles. Sara, who was born in Maine and had just moved to Los Angeles, remembers: "We fell in love almost instantly. We went on our first date the day after we had met, and have been together every day since." Mr. Bergstein proposed, but his father insisted that Sara convert to Orthodox Judaism before a wedding occur. Per Mr. Bergstein's father's persistence, Sara agreed; the two were wed in 2005.

Mr. Bergstein had waited to raise a family until he was not only with the right partner but was in the position to devote significant time to his family. By 2007, he was in that position. Mr. Bergstein and his wife Sara, both first time parents, had their first child, Z.B. (now 11); their second son, L.B. (now 9) followed soon thereafter. Once their first child was born, Mr. Bergstein moved an office to his home, and set up an arts and crafts station into his office so he could work and spend time with his children at the same time.

---

[2] All of the letters to the Court are attached hereto as Exhibit A.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 13 of 67

Sara states, "[t]he only thing we ever fought about was his inability to say 'no'. We would have people contacting us all day and every day seeking David's help and advice. Strangers who we had never met would knock on our door and plead for David to help solve their problems, and he would always say yes. He was always trying to do everything." In her letter to the Court, Mr. Bergstein's mother concurs with Sara's assessment: "David was always a giving person. He would help anyone that asked for help." Recipients of Mr. Bergstein's help appreciate that he was able to find time for them notwithstanding his busy schedule. Mr. Brackenhoff—a career military man with nearly 30 years of service—reflects: "There is no doubt that he was setting aside important matters in order to make time for me - something I always appreciated."

Mr. Bergstein's life was better than he could have ever imagined. He was happily married with two children whom he adored, he was able to spend a lot of time with them, he was making money and able to support his family, and his businesses were finding success. Things seemed too good to be true, until 2008.

That year, the stock market had crashed, and DB Zwirn ("DBZ"), a hedge fund that had provided debt financing to Mr. Bergstein and Mr. Tutor, announced in February 2008 that it was going into liquidation. Most of the DBZ staff was quickly laid off. DBZ soon announced to R2D2—which at that time had a staff of over 150 people located in four different offices (Los Angeles, London, New York and Toronto)—that it put R2D2 into default and would be taking it over. While R2D2 had significant equity, it's liens with DBZ liens were complex. R2D2 had six movies under production with combined production costs of over $80 million that would ordinarily be financed. DBZ was left with no person of authority that could permit third-party financing to allow completion of the projects. Mr. Bergstein was forced to immediately shut three of the productions down and financed the other three from his own pocket in hopes to make some sort of return. Two-thirds of R2D2's 150-member staff left the company almost immediately, including all of the management. The New York and Toronto offices had to be shut down, and London soon followed. R2D2 was left with a staff of 20 employees in the one remaining office, in Los Angeles. Due to these departures, Mr. Bergstein—previously not part of daily management—had to assume

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 14 of 67

day-to-day control of the company.

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████

    Mr. Bergstein was left to handle all his father's finances and estate, which consisted of thousands of documents that Leonard had saved over the years in random boxes. Within months of his father's passing, Mr. Bergstein's mother Sarah fell asleep while driving, and crashed into a tree, nearly killing her. ███████████████████████████████████████████

█████████████████████████████ While she was in recovery, Mr. Bergstein had to address his mother's home, which was in complete disrepair and unsafe for her return upon discharge from the hospital. He quickly found himself responsible for repairing the house, replacing both the plumbing and electricity throughout the house, installing a new roof and flooring, and repairing many other problems in the house that had accumulated over nearly forty years.

    During this same time in 2008, Mr. Bergstein's first son was only one year old, and his wife was pregnant with their second son, L.B., who would be born that fall.

    While Mr. Bergstein was focusing on his immediate family and mother, he was also trying to address his businesses which were impacted by the economic crisis and quickly started to crumble. Banks were not loaning money, and capital for distressed companies was not readily available for companies such as R2D2. R2D2 had reduced in value by nearly $60 million and was hemorrhaging over $10 million per year. Mr. Bergstein put himself in what he refers to as "value preservation mode," and sold off assets and borrowed money to keep R2D2 alive. This period of

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 15 of 67

his life was filled with unexpected distractions, strain and enormous stress, leading into the events that ultimately resulted in federal criminal charges being brought.

**B.   Mr. Bergstein Is A Devoted Family Man Whose Wife And Young Sons Suffer Without Him.**

Several people who have taken the time to write the Court regarding Mr. Bergstein note how close he is with his wife and sons. David Weinberg, a ten-year family friend, writes: "I have known him to be a devout family man. He has been close to his wife and two sons and their bond is truly special." Fred Wilson, who worked with Mr. Bergstein at the Los Angeles Youth Foundation, LA Matters and Los Angeles Police Activity League, adds:

> With his children always the top priority in his life, David is not one to ever miss a game or a school event. David's commitment to his family is undeniable. This is as devoted a father and husband as one could ever hope to meet.

As to his two sons, obviously young boys (and society in general) benefit when they grow up with a present and involved father. This is particularly true in the Bergsteins' situation, as Mr. Bergstein is extremely involved with his 11- and 9-year-old sons. George Cardenas, a business associate of Mr. Bergstein's, writes in his letter to the Court:

> I'm sure I'm not the only one to tell you about his relationship with his children. No matter how involved David was in anything he did, his door was always open and his boys often came in either a loan *[sic]*, together or with their friends. Whatever David was doing would stop and they would get his full attention. As they got older, David would use their visits to slide in words and ideas to shape them.

Gary Leifer has taken family trips with the Bergsteins and "witnessed first-hand his interactions with his family. David is always engaged in conversation with his children, and exercises patience even when energies are high having a good time playing around." Brent Polacheck, a longtime family friend, observes that Mr. Bergstein would "go to the end of the Earth" for his boys.

Mr. Bergstein's incarceration these past three-and-a-half months has been extremely hard on his two young boys. His wife, Sara tells of their children: "They don't understand what's going on. When I came back home without Daddy, they just are not able to comprehend it..." The

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 16 of 67

children have been seeing a therapist at school, and as their handwritten letters to the Court make clear, are not handling their father's incarceration well. Their youngest, L.B., has been acting out in class, while his older brother Z.B., who prior to the trial would ace every test, has now lost focus and is starting to fail his classes. ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████  Dikla Krems notes the "huge void and profound sadness" resulting from his absence.

Sara's mother, Ann Miller, has been staying with Sara and the children to help Sara because she is so distraught without her husband of 13 years. Sara's strong connection to Mr. Bergstein was even noted by the Probation Officer, who wrote that after describing what a "caring, loving and giving person" Mr. Bergstein is, Sara was so emotional she could not continue the conversation. PSR at 124. Sara's mother also tells how Mr. Bergstein remains so positive and does everything he can to keep her and the kids in a good mood. Even from a jail cell he refuses to let them down and insists that everything will be okay.

Mr. Bergstein's dependable, caring nature to his family goes beyond his wife and children. Indeed, Mr. Bergstein has assumed the role of Bergstein family patriarch. In addition to offering his kidney when his brother was ill with kidney cancer, Mr. Bergstein took care of his elderly mother in his house for two years after she was injured in a car wreck in New Jersey. PSR at para 121. Mr. Bergstein has since relocated his mother to California, and then temporarily to Israel so that she could be close to her dying sister. Ever since her accident, he has handled all of her legal and financial affairs.

C.     **Mr. Bergstein Has A Long History Of Helping Others.**

Mr. Bergstein's difficult family background caused him to always work hard, never take things for granted, always focus on family, and have an abiding desire to help others facing difficulties. Throughout his adult life, Mr. Bergstein has helped an extraordinary number of people in many ways. Attached to this memorandum are nearly 100 letters from persons moved enough

by Mr. Bergstein's actions to write the Court. The letters come from a broad cross section of society, including working class members, high profile and established business associates, law enforcement personnel, employees, religious figures, young adults positively impacted by Mr. Bergstein as children, and social acquaintances. The letters demonstrate Mr. Bergstein's lifetime of assistance to others is genuine and heartfelt, done for the sake of truly helping people and not for reciprocal gain to himself. He "knew that many of the people he helped would never be able to reciprocate, but that never influenced or stopped him," writes longtime assistant Frymi Biedak.

For some, Mr. Bergstein's assistance literally saved their lives. For example, Ivan Pinto, who owns his own driving service, met Mr. Bergstein in 2005 and thereafter would drive Mr. Bergstein to and from meetings and to the airport when he was traveling. █████████████ ████████████████████████████████████████████████ "I told him that I didn't have extra money to spend on doctor's visits nor did I have insurance. David told me he would pay for all of my doctor's visits because he was very concerned about my health and could see I was having trouble turning my neck," says Pinto. ██████████████ ████████████

Mr. Bergstein's housekeeper Rosa Leonez has a similar story. ███████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████ Once again, Mr. Bergstein found the best surgeon and insisted on paying for the surgery.

### D.      Mr. Bergstein Has Helped Those Struggling With Personal Challenges.

Anne Miller, Mr. Bergstein's mother in law, writes that she has "witnessed David helping countless people by offering them employment opportunities, places to live, help with medical

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 18 of 67

situations etc." One such person is Abba Briski, a young man and son of Mr. Bergstein's rabbi who faced substance abuse and other challenges. He relates that Mr. Bergstein would take "time out of his hectic schedule to pick up the phone to check in on me, to talk to me, guide me, encourage me, and do everything he could to try and help me." He is thankful for the "huge impact" Mr. Bergstein has had on him, explaining:

> David has been there for me throughout all my struggles. He taught me what living life in sobriety is all about and that there is purpose in everything. He taught me what it means to face hardship and overcome obstacles.

Another is Michael Aframian, who was a troubled youth who was fortunate enough to know Mr. Bergstein:

> David Bergstein has helped me when I was in trouble – using drugs and doing nothing with my life. He found me a job and introduced me to Beit T'Shuvah, an organization which helps a lot of young people regardless of race, religion, or gender. Beit T'Shuvah helped me become clean and now I have a very good job working in the Soho House and have put my life together.

Ohad Bitton writes that Mr. Bergstein helped mentor him from a ten-year-old boy into manhood, and continued to be there for Ohad even as an adult:

> I was a 1st Sergeant in the Special Forces . . . . When I returned from War and had to make the difficult transition back into civilian life, he was there encouraging and helping me pursue my goals. And finally, when my father died from a long fight with cancer he was there. David would accompany my sister and me to Doctor's appointments; he literally fought for my Dad's survival.

Peggy Devine went through the horror of losing her husband after he was in a motorcycle accident. Mr. Bergstein was there to help:

> He was there when the doctor uttered the heart-wrenching words 'he passed away' and literally carried my children and I for the weeks following as we held funeral services on both coasts and tried to put our lives back together.

████████ writes that Mr. Bergstein paid her rent and helped her get back on her feet when she was having difficulties. This same sentiment is echoed by Jason Kitchen who says that he worked with Mr. Bergstein, who helped him get on his feet when he became quite sick.

Hilla Bitton has known Mr. Bergstein for 30 years and explains that he helped her and her

family adjust to life in the U.S. when they moved here.  Moreover, she recounts how Mr. Bergstein helped her while her father was dying of cancer, and even arranged for her father to be buried in Israel.  She notes that Mr. Bergstein "visited my father constantly and sat by his hospital bed until his last breath."

Trevor Miller—an English author, screenwriter, and filmmaker who has known Mr. Bergstein for 25 years—describes how Mr. Bergstein has always been there for him:

> He gave me opportunities when most wouldn't. He was kind when it counted. And when most people turned their backs, David Bergstein often bailed-me-out. When I was flat-broke, David paid for my wife's Birthday Party. When my brother was ill - David bought me plane tickets to fly home. When my mother had open-heart surgery, David gave me money to go and take care of my elderly parents.

Mr. Bergstein's assistance to those in need extended beyond those whom he knew personally.  Debbie Edelman recounts his "considerate, sensitive, thoughtful and gentle" nature to all:

> I once saw David pass by a homeless person on the floor by a Starbucks in LA. David went over to him so kindly, kneeled down to him and so personably filled him with encouraging words and gave him money. This is just one story that exemplifies David amongst many others stories which speak volumes of the type of person that he is. That's who he is. He loves helping people in need.

### E.    Mr. Bergstein Has Helped His Religious Community.

Mr. Bergstein has steadfastly and devoutly supported his religious community, as reflected in the letter of Rabbis Moshy Bryski, Chain Sanowicz, and Shmuel Naparstek.

Rabbi Naparstek notes that he has learned over the years that "David was always the first to give back the community. Whether it was contributing during the Jewish High Holidays, assisting non-profit institutions to further their educational or social services goals, or by simply helping out an individual or family in their time of need, David's motto has always been to take responsibility for those less fortunate."

Rabbi Sanowicz echoes similar sentiments.  He spent significant time with Mr. Bergstein in study sessions and sees Mr. Bergstein as a "deep-thinking man motivated by a genuine desire

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 20 of 67

to learn and to grow." He notes that Mr. Bergstein's appreciation of the spiritual is rivaled only by his "performance of practical deeds of kindness and generosity – for which he sought no acclaim or acknowledgment whatsoever."   Rabbi Sanowize cites several examples, including Mr. Bergstein's generous contributions to the Yeshiva where the Rabbi teaches to provide dorm facilities for out of town students, most of whom are impoverished and required financial assistance.  When the rabbi offered to have a plaque affixed noting Mr. Bergstein's contribution or offered a meeting with the Dean to thank him, Mr. Bergstein declined, preferring to keep his donation anonymous.

Mr. Bergstein's actions have also touched leaders in other faiths.  Paul Leon has been serving as Mayor of Ontario, California since 2005 and is currently in his third term.  Mayor Leon also serves as the Senior Pastor of Hope Chapel Foursquare Church in Ontario, and has written to the Court on Mr. Bergstein's behalf.  So too has Edwin Martinez, an ordained minister.  Martinez writes: "I have a deep and profound relief in redemption.  David Bergstein is a good man.  He is not a perfect man.  But then no one among is."

### F.   Mr. Bergstein Has Many Relationships with Law Enforcement And Earned The Respect Of Law Enforcement Leaders.

Mr. Bergstein has also assisted law enforcement.  For example, Police Chief Anthony Vasquez writes that for several years, he funded the Manzanita Police Department, providing financial donations used by the tribal police department for necessary equipment and training of its officers.  Fred Wilson writes that Mr. Bergstein also assisted in launching and supporting LA Lives Matter, a non-profit organization that supports law enforcement officers and their families.

Mr. Bergstein has established relationships with senior law enforcement personnel, many whom have penned letters to the Court attesting to Mr. Bergstein's character.  Two such authors include Steve Cooley and Adam Torres.  Steve Cooley was a three-term Los Angeles County District Attorney (serving from 2000 to 2012) and a candidate for California Attorney General. Adam Torres spent over two decades in federal law enforcement with the Internal Revenue Service and U.S. Marshals Service.  After serving as a special agent for the IRS, Torres was appointed by

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 21 of 67

President George W. Bush as U.S. Marshal for the Central District of California. In his letter to the Court, Torres references Mr. Bergstein's "honorable and forthright" nature."

### G.   Mr. Bergstein Has Shown A Particular Affinity For Helping Children.

Mr. Bergstein has had involvement in organizations and causes that help children. *See, e.g.*, Letter of Edmond A. DeFrank. Rabbi Moshe Bryski, who has known Mr. Bergstein for years, also writes that over time he has seen Mr. Bergstein "go out of his way to help the needy, strengthen educational programs and provide support for troubled youth throughout Los Angeles County caught in the scourges of drug addiction and other destructive behaviors."

Karen Beacheim writes:

> If you look at his character over the years, and how he gives back by serving on boards to help displaced kids (the Sheriff's Youth Foundation) or on the board of the Grossman Burn Foundation, a nonprofit organization supporting burn survivors and their families, it's evidence he is not a heartless, greedy person only out for himself.

Another example has been Mr. Bergstein's role as a significant benefactor of Native American children of the Manzanita Band of the Kumeyaa Nation. He has provided those children school supplies and backpacks; one year he even provided winter coats to all 52 children of the tribe, as described in the letter of Police Chief Anthony Vazquez. Chief Vazquez notes that Mr. Bergstein's efforts have helped preserve the integrity and traditions of the tribe's practices, cultural ceremonies and ceremonial funerals.

Fred Wilson, who has served in law enforcement for many years, introduced Mr. Bergstein to the Los Angeles Police Activity League, and recounts how "[h]ere as well he continued to be of immeasurable service to underprivileged/at risk children."

Sam Solakyan served with Mr. Bergstein on the Sheriff's Youth Foundation and recalls speaking with Mr. Bergstein about why he spent so much time on an organization focusing on youth, instead of one that would benefit his business as well:

> David noted that he was very fortunate compared to his own father and the many other children he saw growing up in a blighted neighborhood, living in poverty or being raised without supervision. [M]any children ... helped by the various youth

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 22 of 67

organizations in the Los Angeles area live in very different circumstances, they are uncared for and are often alone until evening or later. They are easy prey for gangs and predators. David felt that these local organizations impacted the most amount of lives at early stages as compared to other charities he's evaluated. David's view was that it's much easier to fix an adult while they are still children and he wanted to make a difference.

Aaron A. Grunfeld notes in his letter to the Court how Mr. Bergstein never sought recognition for this and other work:

> [W]hen the Los Angeles County Sheriff needed funds to help under privileged students with afternoon school programs, David arranged to help obtain the funds without fanfare or any publicity or even public recognition. The Sheriff, whom I know, explained to me that David was really one of the most extraordinary people in that regard. There was no ulterior motive or hope for payback.

### H. Mr. Bergstein Has Helped Many Business People Fulfill Professional Goals Often Without Any Economic Incentive.

Edwin Martinez, the aforementioned ordained minister who is also a business associate and friend of Mr. Bergstein since the 1990s writes that the David Bergstein he has observed is a "conscientious businessman, a caring member of the community, a friend, a Dad, a Husband, a generous employer, and a mentor who always made time for people."

Mr. Bergstein has provided not only funds, but also guidance and friendship to a number of individuals trying to get on their feet by starting their own small businesses. Jennifer Wilson writes in her letter to the Court that she was a recovering alcoholic who wanted to improve her situation in life by opening her own small business. Wilson had created a business plan and had a potential investor lined up for startup capital. Mr. Bergstein spent time reviewing the investor's proposal and found it to be disadvantageous to Wilson in a number of ways. She writes how Mr. Bergstein helped her set up her business on her own terms and loaned her the money interest free. She summarizes the effect of Mr. Bergstein's assistance: "The business changed my life . . . I remain sober and grateful to this day."

Edith Colin has been the Bergstein's housekeeper for more than a decade. Her letter to the Court makes evident that whenever she identified small business ideas, Mr. Bergstein was there

for her, with advice and funds. In Colin's own words: "David always supported me and wanted to help me grow and learn more."

Mr. Bergstein has also mentored and trained many young people, including the children of character witnesses David Weinberg, Ivan Pinto, ███████, as well as character witness Samantha Ratiner.

Richard Fischler, who worked with Mr. Bergstein in relation to Creative Concepts Holdings ("CCH") and runs Biozone, knows him to be a "kind, generous, honest and brilliant business advisor." Entrepreneur and professional sports team owner Kevin Nagle concurs in his letter to the Court: "David has a brilliant mind for finding solutions in a warm and unselfish manner few can lay claim to. I believe I can speak to this with some degree of authority as a businessman myself who founded and operated a 5 billion dollar business for many years."

Sisters Jacqueline and Louise Wilke are entrepreneurs who own a water company named BLK. They write:

> If we hadn't met David our outcome would have been very different for he actively mentored us throughout this process. He helped us put our company infrastructure in place with a view to full accountability and transparency as we continued to operate the day to day business. Not only did David take a personal interest in our company but with his guidance, and support we were able to turn our company around in just over a year.

Scores of character letters have been submitted to Mr. Bergstein's counsel on a daily basis. According to his wife Sara: "Every single day, the phone is ringing off the hook from people who have heard what has happened to David. All of these people have been helped by David in some way over the years, and they are willing to help him in any way that they can."

As these letters and words demonstrate, there is much more to Mr. Bergstein than one might think based solely on hearing the trial evidence in this case. We submit that Mr. Bergstein's extraordinary character as demonstrated by his many good acts, and the adverse impact of incarceration on his family and those who rely on him, are significant mitigating factors in determining the appropriate punishment in this case.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 24 of 67

## IV.   THE NATURE AND CIRCUMSTANCES OF THIS CASE INVOLVE SEVERAL MITIGATING FACTORS

Mr. Bergstein has been convicted of defrauding two hedge funds by illegally using their funds for the benefit of Mr. Bergstein and others, resulting in losses to the hedge funds.  The circumstances of this case indicate that Mr. Bergstein's role and actions involve several mitigating features separating it from the typical fraud case.

### A.   Mr. Bergstein Intended A Successful Deal.

This case involved a genuine business deal, where all the participants—including Hallac, Wellner and Mr. Bergstein—intended the deal to make money for all involved, including the hedge funds that loaned money to the deal.  This separates the fraud from many cases that involve ruses to steal money with no intention of ever conducting the represented business deal or repaying anything.

The convictions in this case stem from failures to advise two hedge funds that their assets were being used to loan money to certain business ventures, and the conflicts that existed among the funds.  Mr. Bergstein had no duties nor affirmative obligations to make the disclosures at the heart of the case.  Those obligations belonged to Government cooperators Hallac and Wellner, the investment advisers to the funds.  Mr. Bergstein's actions, or inaction, were derivative of Hallac's and Wellner's obligations.

Mr. Bergstein is the only one of the four key participants who put his own assets at risk in the deal.  Hallac, Wellner and Government informant Parmar did not.[3]  Mr. Bergstein was owed millions by Gerova, and was continuing to carry Gerova on an ongoing basis with capital, time, attorneys, and other resources.  He agreed to compromise his position and work with Gerova to cause the hedge fund securities ("Hedge Fund Securities" or "HF Securities"), which belonged to Gerova (previously belonging to the Wimbledon Financing Master  Fund ("WFF")) to be contributed a venture that would provide upside to WFF vis-a-vis their majority interest.  Mr. Bergstein also paid millions towards the Arius Libra/Pineboard deal, including creating and

---

[3] In fact, Hallac and Wellner pulled out many millions in one year without putting in any money. And Parmar, for his part, received at least $7 million and never provided the assets.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 25 of 67

funding Sovrin to run the medical record keeping and billing companies and for attorneys' fees to save assets like interests in the Aramid Entertainment Fund, Ltd. ("Aramid").

Before Mr. Bergstein ever entered the scene, WFF was worthless because Hallac and Wellner had previously swapped all of its valuable hedge fund securities for what turned out to be worthless Gerova stock. And Hallac, Wellner and Parmar did not put any personal assets or funds into the Arius Libra deal. Instead, they only took out millions from the deal. Conversely, Mr. Bergstein lost personal money he advanced when the deal did not come to fruition.

Critically, Mr. Bergstein's situation is also unusual because he caused the deal to be collateralized in a way that eliminated the lenders' downside risk. Even though the lenders were made whole, the ongoing business failed because of the acts of others:

1) Parmar refused to provide the medical record and billing assets at the heart of the deal, after being paid millions pursuant to the Purchase Agreement for his medical assets; a deal based on acquiring and running medical companies cannot succeed if the medical companies are never acquired; and

2) Hallac and Wellner failed to raise capital as agreed. Weston's role in the deal was to provide the funding for the deal. It entered several Placement Agreements for that express purpose, and also agreed it would seek bank financing. Yet it did neither.

Unlike Hallac, Wellner, and Parmar, Mr. Bergstein fought hard and spent millions of dollars to try to enforce the terms of the deal, repeatedly pushing and cajoling Parmar to honor the commitment to provide the medical companies, setting up a replacement medical company named Sovrin when Parmar was foot dragging, and bringing legal claims against Parmar when he refused. Indeed, out of hundreds of hours of surreptitious recordings that informant Parmar made of Mr. Bergstein, the Government played only one – and that recording showed how committed Mr. Bergstein was to consummating the deal. In it, Mr. Bergstein is virtually begging Parmar to honor the deal he entered to provide the medical record and billing companies, so the deal could proceed as planned. Mr. Bergstein's continued attempts to make the deal work so that all, including the victim hedge funds, could receive returns, is a significant mitigating factor.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 26 of 67

Another unusual aspect of this case is that, despite all the allegations of wrongdoing by Hallac, Wellner, and Mr. Bergstein, the deal would have succeeded had Parmar provided the promised assets, or distributions from those assets, and the hedge funds would have been fully paid back on their respective loans on time instead of having to resort to the collateral. Parmar admitted in 2014 that as of that date, had the deal gone forward, he would have turned Weston's $15 million into $100 million. *See* Ex. 1 (3/27/14 Tr. of Body Wire Recording). Mr. Bergstein was correct in his view that the deal could have paid fully paid back the hedge funds' respective loans, and the ability to pay back the loans was at all time in the control of Parmar, a Government informant who the Government could have required to pay the hedge funds. In fact, another group of sophisticated investors also saw the deal as having significant value, paying even more. Parmar swindled them out of $11 million for the very same assets at issue in this case, unbeknownst to Mr. Bergstein.[4]

With respect to Mr. Bergstein's intent, this case is unique in that there are hundreds of hours of recordings of Mr. Bergstein prepared by Government cooperators Paul Parmar and Jason Galanis, made concurrent with the transactions that were indicted and unbeknownst to Mr. Bergstein at the time. Those contemporaneous recordings are the best evidence of Mr. Bergstein's intent with respect to the indicted transactions. Of the hundreds of hours of recordings of Mr. Bergstein, the Government cannot point to any that show Mr. Bergstein intended to defraud the hedge funds at issue or cause any loss.[5]

Additionally, Mr. Bergstein offered to pay the victims back their money and did, in fact, do so. In the summer of 2012, Mr. Bergstein offered to repay in full the TT Loan less any monies paid to Weston. Hallac refused. As explained below in detail, Mr. Bergstein did, in fact, pay back the money as offered.

The fact that the acts leading to conviction occurred seven years ago, by itself, is reason

---

[4] *See* Dkt. 72, Ex. 30.

[5] The Government has quoted from a handful of recordings prepared by Galanis, and introduced one recording by Parmar at trial. However, the Government's claims as to the meaning of these recordings is unsupported by the words themselves; ultimately the quoted passages are ambiguous and do not they show any ill intent on behalf of Mr. Bergstein.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 27 of 67

warranting a lesser sentence. With the passage of so many years since the acts in question, the ability to address the goals of sentencing for those crimes are significantly diminished.

In short, the offense conduct in this case involved numerous unusual factors that warrant a lower than usual sentence than a "typical" fraud case involving funds obtained through material omissions.

### B.   Mr. Bergstein's Many Good Qualities Throughout His Life Demonstrate That The Acts Involved In This Case Are Aberrant Behavior.

Mr. Bergstein has a two decades-long track record demonstrative of who he really is. Mr. Bergstein has closed hundreds of deals during this time, ranging in size from startups to multi-billion dollar transactions. He has also dealt with hundreds of investors, ranging from individuals to large institutions. Finally, having specialized in distressed companies—which have a high failure rate—Mr. Bergstein has had remarkable success and virtually no issues in this area. Notwithstanding his conduct at issue in this case, that track record reflects a caring person and devoted family man who has helped countless people.

In letters to the Court, many of Mr. Bergstein's business associates attest to his character and integrity in their interactions, before, during, and after the time period of the offense conduct. Successful internet entrepreneur Adam Kasower and manufacturing magnate Leslie Edelman both describe how their respective lawyer's diligence on Mr. Bergstein and his work only affirmed what they already knew about him—that he was an honest businessman.

Jeff and Ron Harris—multi-millionaire businessmen thanks at least in part to Mr. Bergstein's strategic counseling—both note how they felt comfortable making numerous unsecured loans to Mr. Bergstein and his businesses exceeding $10 million (each of which was repaid with interest). David Weinberg, the co-founder and Chief Financial Officer of Sketchers USA, a publicly traded footwear company, writes that while he has "overall lost money investing with David," he nevertheless "look[s] forward to working with him again, once he has served his sentence."

The observations of Rabbi Sanowicz are also illustrative on the aberrational nature of Mr.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 28 of 67

Bergstein's acts involved in this case:

> [F]rom my more than 40 years of serving as a teacher and rabbi, I am quite aware of the fact that human beings are fallible creatures capable of straying from their core values. And while I am completely unaware of the facts relating to the case you presided over relating to Mr. David Bergstein, I feel I must go on record to vouch for this man's exemplary character as I've seen it repeatedly displayed over the course of more than two decades.

> Considering the quests for knowledge and enlightenment; the aspirations to do what is good and right; and the humility, honesty and dignity I've seen David Bergstein demonstrate time and time again, I strongly believe that <u>any deviations from such behaviors would be the anomalies</u>, and not the accurate representation of who this man truly is. (emphasis in original)

The business deal for which Mr. Bergstein was convicted occurred in 2011 and 2012. This was a particularly difficult time for Mr. Bergstein both personally and professionally. In addition to the difficult issues occurring at this time referenced in his Social History—his brother's cancer, father's death, mother's serious injury, one-year old son and pregnant wife, and R2D2 financial issues upon 2008 collapse of lenders—Mr. Bergstein became embroiled at that time in protracted, ugly litigation. In 2007 and 2008, Aramid, an off-shore hedge fund,[6] lent certain of Mr. Bergstein's entertainment industry related businesses money. Aramid was controlled by a man named David Molner ("Molner"). Mr. Bergstein was represented in those lending transactions by his long-time in-house attorney, Susan Tregub ("Tregub").

In late 2008-2010, Aramid investors were concerned about Molner's management of Aramid and began asserting that he was breaching his duties to the fund and was looting it. At that same time, Molner began asserting that Mr. Bergstein and his companies were in default on loans and owed Aramid in excess of $40 million. Molner was eventually forced out of Aramid and replaced by joint voluntary liquidators, who sued Molner for $20 million, claiming among other things that "[w]ith liability mounting and [Aramid's] investor base heightening its concerns,

---

[6] Aramid is one of the Hedge Fund Securities that Hallac and Wellner gave to Gerova in exchange for what became worthless Gerova stock, and that Mr. Bergstein caused to be rescued as part of the unwind agreement so they could be collateral to Arius Libra on the deal at issue in this case.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 29 of 67

Molner set upon identifying a scapegoat to whom he could pass blame for the precarious position of [Aramid] . . . [and] Molner instituted and directed a scorched-earth litigation campaign against . . . David Bergstein." *See* Ex. 2 (Aramid Compl. Against Molner), at 6-7.

Unfortunately, by the time Molner was removed from control of Aramid, the damage was done to Mr. Bergstein. In early 2010, Aramid filed involuntary bankruptcy proceedings against five of Mr. Bergstein's film-industry businesses.  Shockingly, it was uncovered that Molner had recruited Tregub to help orchestrate and file the bankruptcy proceedings, while both Molner and one of his attorneys were having an ongoing sexual relationship with Tregub—all the while she continued to represent Mr. Bergstein and his businesses in various matters. *See* Ex. 2 at ¶¶ 15, 61, 162, & 170. When Mr. Bergstein learned of Tregub's betrayal, he sued her and eventually obtained a unanimous jury verdict of more than $50 million.[7]

Before Tregub's malfeasance was uncovered, Aramid moved and obtained appointment of a trustee in the bankruptcy cases, removing Mr. Bergstein from control of his businesses. Thereafter, the trustee published a more than 300-page report containing various allegations of wrongdoing by Mr. Bergstein (several of which the Government has regurgitated in this case). Mr. Bergstein was then forced to defend against more than 100 lawsuits relating to those allegations.

As a result of the bankruptcies, Mr. Bergstein's staff was drastically diminished, and he was forced to pay tens of millions of dollars in legal fees defending against the proceedings. Ultimately, the bankruptcy trustee acknowledged that none of the allegations against Mr. Bergstein in his "report" were ever proven (and in fact were contradicted by substantial evidence), and Mr. Bergstein obtained dismissal of the more than 100 lawsuits all at the pleading stage. *See* Dkt. 95 (Decl. of Thomas H. Bienert, Jr.), at Ex. 48.  Moreover, Aramid settled with Mr. Bergstein, agreeing to pay him $ 6 million. *See* Ex. 3 (August 2014 Settlement Agreement). Additionally, Stroock & Stroock & Lavan—one of Molner's law firms—also agreed to a $17.5 million

---

[7] The damages award against Tregub was eventually reversed on appeal, on the basis that the bankruptcy trustee and his acts, discussed below, were the intervening cause of the damage sustained by Mr. Bergstein and his businesses. *See Bergstein v. Tregub*, 2017 WL 1709620 (Cal. May 2, 2017).

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 30 of 67

settlement for its role in the baseless litigation against Mr. Bergstein. *See* Ex. 4 (August 2015 Settlement). And the bankruptcy court, upon granting Mr. Bergstein's motion to dismiss the bankruptcy cases, harshly criticized the bankruptcy trustee and his counsel, finding that they engaged in: (i) "gross mismanagement"; (ii) "blatant abuse of the legal system"; (iii) "neglect of [their] duty to properly administer the estates"; (iv) "blatant forum shopping"; (v) "unwillingness to accept responsibility for their lack of due diligence in attending to the administration of [the involuntary bankruptcy cases]"; (vi) making "blatantly false statement[s]"; (vii) persistence in continuing to make a "false argument, which seriously put[] into question both the credibility and judgment of both [the trustee and his counsel]"; and (viii) taking "action in blatant disregard of their duties, as officers of the court . . . ." Dkt. 95, Ex. 49 thereto (Findings of Fact and Conclusions of Law), at 3-7 & 13.

Despite ultimately prevailing in the bankruptcy cases, it took several years of extensive, hard fought litigation to get there. The deals at issue in this case, in 2011 and 2012, transpired while Mr. Bergstein was in the early stages of dealing with that litigation, with a staff of two, limited resources for mounting legal bills, and dealing with the many personal issues referred to above. In short, the offense conduct occurred during a time when Mr. Bergstein's primary attention was elsewhere. When reviewed against the background of his many good deeds, laudatory acts, and legitimate business deals, the instant case involves aberrant behavior that occurred under the most extreme circumstances.

### C. Mr. Bergstein's Protracted Litigation Related To The Issues In This Case Has Already Provided Some Measure Of Punishment.

This case is not the sole form of punishment Mr. Bergstein has faced resulting from the two loans that were the focus of the trial. Before the return of the indictment, the alleged victims in this case—Weston Capital Partners Master Fund II, Ltd. (the "P2 Fund"), WFF, and the Wimbledon Fund, SPC (Class TT) (the "TT Fund"), each commenced civil lawsuits against Mr. Bergstein and various entities and individuals associated with him. The years-long litigation, and payments and judgments of several millions of dollars resulting from the same, have served as

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 31 of 67

punishment separate and apart from the sentence that will be imposed against him by the Court in this case.

For example, in September 2015, the TT Fund sued Mr. Bergstein and Graybox, among others, seeking to recover millions of dollars of alleged fraudulent transfers made in connection with the TT Loan. The litigation was hotly contested, with the TT Fund obtaining a preliminary injunction freezing millions of dollars in settlement funds to be received by Graybox from an unrelated settlement. Ultimately, Mr. Bergstein settled with the TT Fund, which resulted in the TT Fund being paid a total of $7,412,000, with an additional $2 million payment scheduled in the future. *See* Ex. 5 (TT Fund Settlement Agreement). Additionally, Mr. Bergstein agreed to assist and provide the TT Fund with information to help it pursue further recoveries against third parties, including but not limited to Parmar. That assistance has already led to the TT Fund filing suit and pursuing more than $3 million from Parmar for moneys received by him from the TT Loan as part of the acquisition of medical billing and electronic record management assets from Parmar.[8] *See* Ex. 6 (TT Fund Complaint against Parmar).

Separately, Mr. Bergstein has also been the embroiled in contentious litigation with the P2 Fund/WFF since 2015 as well. In that litigation, WFF has filed multiple lawsuits against Mr. Bergstein and related entities (among others) related to the loan from the P2 Fund to Arius Libra (the "P2 Loan").[9] Indeed in one of those actions—which sought turnover of amounts received from the P2 Loan—the New York state court entered judgment for approximately $8.5 million against Mr. Bergstein and others, finding Mr. Bergstein liable for the entire amount. *See* Ex. 7 (Judgment). Notably, when considering it is undisputed that the P2 Fund already received $3.5 million, this is far in excess of the actual amount of the P2 Loan. And in that action, the New York state court granted WFF an attachment of $3.3 million in settlement proceeds Mr. Bergstein was

---

[8] These amounts are in addition to the undisclosed payment that the TT Fund has already received from Hallac/Wellner/Weston, which the TT Fund's counsel has acknowledged was made but the details of which he refuses to disclose.

[9] Pursuant to an undisclosed Pooling & Cooperation Agreement, pursuant to which the P2 Fund and WFF have agreed to cooperate with one another, WFF is the purported assignee of claims that the P2 Fund could assert, including those related to the P2 Loan.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 32 of 67

to receive from yet another unrelated settlement. *See* Ex. 8 (Aramid Plan Confirmation), at 41-42. Despite these rulings, WFF continues to prosecute separate proceedings against Mr. Bergstein for ostensibly the same alleged conduct and funds.

In addition to the foregoing, the Securities and Exchange Commission has commenced an enforcement action against Mr. Bergstein, mirroring the indictment in this case. The SEC action was stayed pending conclusion of this case, but the stay was lifted on May 10. *See SEC v. Bergstein*, No. 16-cv-8701 (AJN). However, in light of the jury's verdict, Mr. Bergstein is facing additional punishment in the form of the relief sought by the SEC, which seeks disgorgement and civil penalties, among other relief.

And of course, Mr. Bergstein's many millions expended as deal costs and lost in this case are an additional form of punishment. Over the course of the deal, he paid millions in expenses for Sovrin, to Parmar, and to many independent contractors working on different aspects of the deal, among other expenses. Additionally, Mr. Bergstein spent many millions more on legal fees on aspects of the deal with Weston, including contracts, seeking to enforce aspects of the contracts, and supporting hedge funds like Aramid. For example, Mr. Bergstein paid *at least* $1,378,758.31 in legal fees on behalf of Gerova. *See* Ex. 23. This was for the benefit of Weston, the P2 Fund, WFF, and the TT Fund because it prevented litigation claims against Gerova from pushing it into bankruptcy. Had Gerova gone into bankruptcy, the entire transaction through which the Hedge Fund Securities were rescued from Gerova—and hence the collateral for the loans—could have been reversed and avoided. Similarly, Mr. Bergstein paid *at least* $871,889 in legal fees for Pineboard Holdings (*see* Ex. 24); these legal fees were almost entirely incurred in pursuing Parmar to force him to provide the assets he was supposed to provide pursuant to asset purchase agreement, and which were to provide value to the alleged victims both in terms of their equity in the venture and by providing revenue producing assets that could be used to pay down the loans at issue. Similarly, Mr. Bergstein paid a total of $250,000 for legal representation of WFF in its litigation with Aramid. In total, Mr. Bergstein paid *at least* $2,500,647.31 in legal bills for the deal, which should be viewed as a form of punishment.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 33 of 67

## V.     SENTENCING GUIDELINE CALCULATION

In this fraud case, whether or not Mr. Bergstein intended that the victim hedge funds lose money, and whether or not the deal actually provided sufficient funds for to repay the P2 and TT Funds, are significant factors at sentencing. Indeed, the vast majority of the point calculation in the PSR comes from the presumptive "loss amount" in this case. Thus, analysis of the "intended loss" and the "actual loss" are significant in assessing the sentence.

A review of the features of the deal at issue demonstrates that Mr. Bergstein did not intend the P2 and TT Funds to lose any money. Additionally, a review of the demonstrable evidence regarding loss makes clear that the hedge funds did not suffer an actual loss in this case. Accordingly, the sentencing guideline calculation results in a minimal sentence.

As set forth below, the appropriate guideline calculation will be offense level 7 and criminal history I, resulting in a sentencing range of zero to 6 months in prison.

In making the guideline calculation in this case, the Court should use the November 2016 version, since no amendments to the guidelines have been made since that time. While the Court must consider the guidelines, they are purely advisory and not mandatory. *United States v. Booker*, 543 U.S. 220, 260-61 (2005).

Mr. Bergstein has no criminal history points under the Sentencing Guidelines, so he will be in Category I.

Mr. Bergstein's advisory offense level is calculated as follows:

| | | |
|---|---|---|
| Fraud base offense level: | 7 | USSG, Section 2B1.1(a)(1) |
| Loss between zero and $6500 | + 0 | USSG, Section 2B1.1(b)(1)(J) |
| Total offense level: | 7 | |
| Advisory Sentencing Range: | Zero to 6 Months | |

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 34 of 67

A.    **Mr. Bergstein Did Not Intend For the Funds To Lose Any Money, and Fund Manager Hallac Received Ample Assets to Repay the Loans Resulting in No Actual Loss**

The deal in this case was structured to provide repayment to the P2 and TT Funds for the $9.4 million and $17.7 million loans, respectively, that they made to Arius Libra and Swartz IP Services Group, Inc. ("Swartz IP") in this case. Arius Libra had several sources available to it to repay the P2 and TT loans, including the following:

- Income generated by the operations of the medical billing and record keeping companies purchased from Parmar. *See* Ex. 9 (Purchase Agreement Pursuant to Which Arius Libra Subsidiary Pineboard Holdings Acquires Companies from Parmar).

- Distributions paid by the Hedge Fund Securities. *See* Ex. 10 (Arius Libra Acquires Hedge Fund Securities).

- Liquidation or other use of the Hedge Funds Securities. *See* Ex. 11 (Hedge Fund Securities are Collateral for Loan).

The evidence conclusively demonstrates that each of these sources was a legitimate source of funds:

- Parmar's medical companies were generating revenue after being purchased by Arius Libra. *See, e.g.*, Ex. 12 (email showing money generated); *see also* Ex. 13 (Tr. of Recorded Meeting Between Hallac and Wellner), at 4-6 (Wellner confronting Parmar about lying about funds).

- In just one quarter, for instance, Q4 2010, the HF Securities paid, after expense, $4,056,741. Of that money, $2.368 million was paid to Gerova, the owner of the Hedge Fund Securities and $1.688 million to the Weston, the manager of the Hedge Fund Securities, . *See* Ex. 14 at 2. As of the end of June 2011, the Hedge Funds securities owed $526,000 in management fees for the first quarter of the year, and were projected by Keith Wellner to owe an additional $457,500 for the second quarter of the year. *Id.* These distributions were ongoing and would have continually provided income to Arius

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 35 of 67

Libra. *See, e.g.*, Ex. 11 (Contribution Agreement providing that "[WFF] agrees to and shall take all necessary steps to contribute and cause to be transferred to Arius (the 'Contribution') the [Hedge Fund Securities]" but that if the Hedge Fund Securities could not be transferred to Arius in name, they "shall be held by [WFF] in trust for Arius . . . .").

■ The Hedge Fund Securities were worth roughly $80 million as of July, 2011, according to Wellner. *See* Ex. 15 (August 3, 2011 Email with "WFF and REFF Values."). This is an amount far more than necessary to payback the P2 and TT Funds for their loans. The Pledge Agreement required the Hedge Fund Securities to immediately be turned over to P2 in the event of a default. *See* Ex. 10 (Pledge Agreement). Thus, the Hedge Fund Securities were expressly to be used of necessary to pay the loans back.

The availability of these sources to provide funds to Arius Libra to ensure repayment of the P2 and TT loans were part of the business deal Mr. Bergstein entered with Hallac and Wellner. He reasonably believed that all of these sources would be used by Arius Libra to repay the loans. Because the amount of these payments and the assets pledged as collateral far exceeded the payments necessary to make P2 and TT Funds whole, he did not intend there to be any loss to the two hedge funds.[10]

Since the "intended loss" was zero in this case, the court is to look at the "actual loss" in calculating the guidelines. *See United States v. Lacey*, 699 F.3d 710, 718 (2d Cir. 2012) (court applies the greater of the actual or intended loss amount). In assessing actual loss, Mr. Bergstein must be given the opportunity at sentencing to show that past repayments and assets pledged to secure the loan alter the intended loss calculation). *See United States v. Confredo*, 528 F.3d 143,

---

[10] Additionally, with respect to the TT Loan, the side letter accompanying that agreement provided parameters for the loan. *See* Ex. 16. Among other things, this side letter required SIP to pay $3,025,675 to the P2 Fund, which it did. *See* Ex. 17. Mr. Bergstein kept SIP in compliance with the side letter, but Hallac and Wellner requested that he make numerous disbursements and diverted money that should have gone to reduce the amount owing on the P2 Loan, even as Mr. Bergstein warned them against the advisability of doing so. *See* Ex. 18. This is further evidence of Mr. Bergstein's intent to cause no loss.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 36 of 67

151 (2d Cir. 2008); U.S.S.G. § 2B1.1 cmt., application n. 3(E)(ii) ("In a case involving collateral pledged or otherwise provided by the defendant, [loss shall be reduced by] the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.")

Based on the actual numbers reflected above and the ongoing nature of the payments and ability to use the collateral, Mr. Bergstein does not believe there were losses to the P2 and TT Funds. Weston, through Hallac and Wellner, managed and controlled Arius Libra: Wellner was President of Arius; Hallac, Wellner, and Jeffrey Hallac constituted three of Arius Libra's five board seats; Hallac was the Chairman of the Board; Weston (through WFF) controlled the majority of Arius Libra's shares; and Hallac was the sole signatory on Arius Libra's bank account, which shared the same address as Weston. Thus, on behalf of Weston, they would have received the monthly management fees for the Hedge Fund Securities, which totaled millions a year, and would have been able to sell any or all of the Hedge Fund Securities to pay the P2 and TT Funds. Since Hallac and Wellner were fiduciaries required to look out for Arius Libra, as well as the managers of both the P2 and TT Funds and required to look out for them, Mr. Bergstein assumes that they did, in fact, direct these payments to the P2 and TT Fund. But because Mr. Bergstein has no visibility into those entities, he does not know what exact payments Hallac and Wellner received and paid to the P2 and TT Funds over the almost seven years that the Hedge Fund Securities would have been providing all that value to Arius Libra, the P2 Fund, and/or the TT Fund. Nor, for that matter, does he know if Hallac and Wellner ignored their duties to pay the P2 and TT Funds and, instead, misdirected the funds for their own or others' purposes. If they did the latter, those losses are not attributable to Mr. Bergstein, as they would be directly opposite the business deal he entered with them and not reasonably foreseeable.

While there is much that Mr. Bergstein does not know about the handling by Hallac and Wellner of the millions of dollars of value that Mr. Bergstein's deal brought Arius Libra, there

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 37 of 67

nonetheless is ample evidence demonstrating that the losses to the P2 and TT Funds should be $0.[11]

P2 Fund Payments

With respect to the total $9,410,572 the P2 Fund loaned to Arius Libra, the following are known amounts paid to or for the benefit of the P2 Fund:

(i)  $3,525,675 paid by Swartz IP to the P2 Fund to pay down the P2 Loan (*see* Ex. 17);

(ii)  $2,097,000 paid by Arius Libra to the P2 Fund to pay down the P2 Loan (*see* Dkt. 377 at Ex. 1);

(iii)  $990,110.02 generated by certain of the Hedge Fund Securities (CAM and Quantek) between August 5, 2011 (after the P2 Loan was entered) and May 24, 2012 (*see* Ex. 19 (May 30, 2012 Email Accounting for Hedge Fund Securities)).

(iv)  $250,000 paid by Jeffrey Hallac in connection with the P2 Loan (*see* Ex. 20);

(v)  $1,200,000 paid by Aramid (which was one of the Hedge Fund Securities serving as collateral for the P2 Loan) (*see* Ex. 21, at 7).

These payments alone reduce the P2 loan amount owed by $8,062,785.02, bringing the total outstanding $1,347,787.[12]

There are other known payments that further reduce the outstanding amount owed to the P2 Fund. The record at trial was clear that at all times, Mr. Bergstein dealt solely with Weston through Hallac and Wellner. They held themselves out as the decision makers and control parties for both the P2 Fund and the TT Fund, the lenders on both loans at issue. With respect to the P2 Loan, it is undisputed that Hallac and Wellner directed all distributions from the P2 Fund made pursuant to that loan. Accordingly, when Hallac and Wellner caused the P2 Fund to use proceeds

---

[11] While the figures supporting this contention are discussed in narrative form in the ensuing paragraphs, a chart is also included for the Court's ease of reference *infra* p. 35.

[12] Additionally, in connection with the P2 Loan, WFF is scheduled to receive $3,300,000 that was to go to Mr. Bergstein in the Aramid bankruptcy case. *See* Ex. 8.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 38 of 67

of the P2 Loan for Weston's or their own benefit, those amounts should not be counted against Mr. Bergstein for purposes of establishing his attributable loss at sentencing. For example, Hallac and Wellner caused the P2 Fund to pay the following amounts for their own or Weston's benefit: $700,000 to The Wimbledon Fund, Class C; $900,000 to Weston; and $300,000 to O'Melveny & Meyers (a law firm representing WFF in litigation). *See* Ex. 22. This additional $1,900,000 of the P2 Loan proceeds that Hallac and Wellner disbursed for their own benefit should not be attributed to Mr. Bergstein for loss purposes at sentencing, leaving less than $450,000 outstanding.

TT Loan Payments

With respect to the $17,700,000 the TT Fund loaned to Swartz IP, repayments of the following are known to have been made:

(i)   $1 million redemption from Swartz IP to the TT Fund. *See* Ex. 17.

(ii)  $7,412,000 paid to the TT Fund as part of Mr. Bergstein's settlement of its civil lawsuit against him prior to trial in this case. *See* Ex. 5.

These payments alone reduce the TT loan by $8,412,000, leaving $9,288,000.

Additionally, when Hallac and Wellner asked Mr. Bergstein to make certain payments, he did so with the understanding that the request was on behalf of and for the benefit of the lender. So, for example, when Hallac and/or Wellner directed Mr. Bergstein to pay, from the proceeds of the TT Loan, the following: $750,000 to Weston Financial Services, $750,000 to Purple Box, $750,000 to Fund.com, and $500,000 to Weston Capital Management, *see* Ex. 17, he did so with the understanding that those were funds being directed by the lender. To the extent Hallac and Wellner were misappropriating these proceeds from the TT Fund, that fact should not prejudice Mr. Bergstein at sentencing; instead, these amounts (totaling an additional $2,750,000) should be reduced from any loss attributable to Mr. Bergstein.

These figures, however, are before even factoring in the value of the Hedge Fund Securities, which were expressly intended as collateral to ensure the loans were paid. Even assuming a "fire sale" value of the Hedge Fund Securities of only 20% of their $78 million value represented by Wellner, which would be $15,600,000, selling the Hedge Fund Securities as

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 39 of 67

envisioned to pay P2 and TT would result in a net gain to the funds of about $9.3 million. Analysis of the finances of this matter demonstrate that there should be no losses to the P2 and TT Funds.

The following chart summarizes the known loss amount calculation based on the items set forth above:

| Amount | Explanation | Subtotal |
|---|---|---|
| $9,410,572 | Total P2 Loan proceeds disbursed | $9,410,572 |
| $17,700,000 | Total TT Loan proceeds disbursed | $27,110,572 |
| ($3,525,675) | Amount paid by Swartz IP to the P2 Fund to pay down the P2 Loan. | $23,584,897 |
| ($2,097,000) | Amount Arius Libra paid to the P2 Fund to pay down the P2 Loan | $21,487,897 |
| ($990,110.02) | Amount generated by Hedge Fund Securities CAM and Quantek between August 5, 2011 and May 29, 2012. | $20,497,787 |
| ($250,000) | Amount paid by Jeffrey Hallac in connection with the P2 Loan. | $20,247,787 |
| ($1,200,000) | Amount paid by Aramid to WFF. | $19,047,786.98 |
| ($1,000,000) | Redemption paid by Swartz IP to TT Fund | $18,047,786.98 |
| ($7,412,000) | Amount paid to the TT Fund in connection with Mr. Bergstein's settlement with the fund. | $10,635,786.98 |
| ($750,000) | TT Loan proceeds paid to Weston Financial Services by Swartz IP | $9,885,787 |
| ($750,000) | TT Loan proceeds paid to Purple Box by Swartz IP | $9,135,787 |
| ($750,000) | TT Loan proceeds paid to Fund.com by Swartz IP | $8,385,787 |
| ($500,000) | TT Loan proceeds paid to Weston Capital Management by Swartz IP | $7,885,787 |
| ($700,000) | P2 Loan proceeds paid to The Wimbledon Fund, Class C | $7,185,787 |
| ($900,000) | P2 Loan proceeds paid to Weston | $6,285,787 |
| ($15,600,000) | Low End Liquidation Value of Hedge Fund Securities | **Surplus: ($9,314,213)** |

In the event that the court does not find that the above payments result in a no loss situation, there are substantial additional financial factors that must be accounted for before a finding of actual loss could be made. *See, e.g.,* Ex. 14, at 2. Mr. Bergstein knows that even more has been repaid to the P2 Fund and TT Funds, in amounts that are unknown. For example, the calculation above does not include any of the ongoing distributions made by the Hedge Fund Securities for

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 40 of 67

management fees or other periodic distributions. While those amounts are unknown to Mr. Bergstein, they clearly occurred and they should total millions of dollars a year.

Additionally, in 2012 the TT Fund filed an action against Hallac and others titled *Chamonix Investment Corporation, et al v. Weston Capital Asset Management LLC, et al*, Index No. 654310/2012, previously pending in the Supreme Court for the State of New York. That case ultimately settled. On April 6, 2018, counsel for the TT Fund confirmed to Mr. Bergstein's counsel that the TT Fund received payment in connection with the TT Fund's loan to Swartz IP, but refused to provide any further information, claiming that such disclosure was protected absent court order. *See* Ex. 25 (April 6, 2018 Email). The amount of this settlement should be offset against the loss, restitution, and the forfeiture attributable to Mr. Bergstein. *See United States v. Banks*, 62 F. Supp. 3d 125, 132-33 (D.D.C. 2014) (acknowledging that a defendant who settled with a victim prior to sentencing and raised this settlement at sentencing could have this amount credited to him as an offset to the restitution amount); *United States v. Courtney*, 816 F.3d 681, 686 (8th Cir. 2016) (remanding to the district court for determination on the appropriate deduction from the forfeiture amount by the amount the lenders received from the properties through mortgage payments and the sale of the properties). Mr. Bergstein sought authority from the Court to subpoena this information, which the court denied, in part because the Court believed that Mr. Bergstein had "not adequately demonstrated that he cannot properly prepare for [sentencing] without such production and inspection in advance of [sentencing] . . . ." *See* Dkt. 371 at 2. Mr. Bergstein has no access to financial information regarding P2 and TT, and despite requests from P2 and TT for such information, they will not provide it.

**B.    Hallac's Ownership Value in P2 and TT is an Offset Against Loss Amount.**

Not only are there undeniably additional payments that the Government has failed to account for, but the starting point for how much should be due and owing is less than the face value of the loans to P2 and TT. There is no dispute that the amount lent by P2 and TT totals $27,110,572. Mr. Bergstein believes Hallac was a significant investor in various Weston funds.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 41 of 67

*See* Letter of David Zinberg (stating, "Mr. Hallac explained to me that he had a large fund that had $100 million, which had investor funds and his family's money. My understanding from the meeting was that the majority of the money in the fund was his own."). As a co-conspirator, he cannot benefit from his own crime. The value of any ownership by Hallac or his affiliates (and similarly Wellner and his affiliates) should be reduced from the starting point for the loss amount. Mr. Bergstein does not know what the value of his (or Wellner's) ownership in the P2 and TT Funds was, but clearly the starting point for the loss analysis is less than the $27,110,572 total of the loans.

The Government should be required to produce the financial information referenced above that is known to exist, but that is unknown to Mr. Bergstein. The Government controls cooperators Hallac and Weston, who as managers of Arius Libra, the P2 Fund, and the TT Fund—as well as WFF and the Hedge Fund Securities—should have the information. Yet despite defense requests, the Government has not provided that information. The loss determination should be based on full disclosure by the Government of all funds available to Arius, P2 and TT, as well as the value of any ownership by Hallac, Wellner or their affiliates. The Government should not be allowed to "hide the ball" to potentially cause an inaccurate and inflated loss amount.

In short, the intended loss was zero and even with what is already known, the actual loss is zero. As a result, there are no loss amount enhancements to the 7-point base offense level under the section 2B1.1.

### C.     With Three Victims, There Is No Enhancement for Number of Victims.

The Government incorrectly contends that a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(B)(2)(A) applies because the offense involved ten or more victims. The Government does not explicitly articulate how it arrives at a total of ten or more, but rather states this in conclusory fashion after detailing several transactions in a purported attempt to show that investors in WFF, the P2 Fund, and the TT Fund were all defrauded. The Government's apparent aggregation of these entities' individual investors in calculating the number of victims is improper. *See United States v. Gonzalez*, 647 F.3d 41, 64 (2d Cir. 2011) (stating, "Ordinarily" it is the organization, and

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 42 of 67

not the individuals who funded the organization, that is treated as the victim of "any theft from the organization's coffers."). There should be no departure from the "ordinary" practice in the Second Circuit of treating the collective entities—the losses of which are the basis for determining the loss amount—as the "victims" within the meaning of § 2B1.1(B)(2). Here, there are at most two victims—the P2 Fund and the TT Fund. WFF is not a third victim because—as explained in more detail above—it was worthless before Mr. Bergstein came into the picture as the result of acts of Hallac and Wellner arising from the Gerova-WFF asset swap. Moreover, arguably the TT Fund was not a victim either, because the TT Loan was disclosed to and approved by the TT Fund Directors. Even if the TT Fund and WFF are included, the total number of victims is three.

### D.     The Crime Does Not Involve Sophisticated Means.

The Government incorrectly contends that a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C) applies because the offense involved sophisticated means. The Government took the position before and during trial that the charged crimes were completed once the P2 Loan and TT Loans were entered into, because they were conflicted transactions that Hallac and Wellner did not disclose to the funds. Accordingly, the offense involved a simple non-disclosure related to two business loans. That crime does not involve sophisticated means.

The Government wrongly claims that the conduct involved "shell companies" to divert funds. It did not. All of the entities involved in the case were real companies and fully disclosed in the contracts setting forth the transactions. The Government bases its position on Guideline Commentary referencing hiding assets or transactions through "fictitious entities, corporate shells or offshore financial accounts." This case does not involve such circumstances. Rather, the Government has repeatedly invoked the term "shell companies" throughout this case, as if the use of a corporate entity structure as a means of doing business was inherently bad. This premise is incorrect. Much of business is conducted in corporate name, and many businesses use numerous different such structures to do so. That fact alone does not suffice for a sophisticated means enhancement. After all, the Guideline requires that the "offense" involved sophisticated means, not just business transactions. The Government has failed to establish that the "offense" here

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 43 of 67

consisted of transactions involving corporate structures that themselves were sophisticated beyond the normal business environment. The fact that a business entity that had a name different than one of the principals involved in the deal does not transform a legitimate corporate structure into a "shell" company within the meaning of the Sentencing Guidelines. In any event, all of the conduct the Government claims gives rise to a sophisticated means enhancement—i.e., the purported use of corporate entities to divert proceeds—occurs after the fact of the loans being made. And the Government has failed to show how any alleged victims of the loan fraud were deceived by the fact that corporate entities were used for the loan transactions themselves. They knew who they were dealing with: David Bergstein. The names of the entities had no bearing on that.

**E.     The Offense Did Not Involve Bankruptcy Proceedings**

A 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(9)(B) should not be applied here because the "offense here" had nothing to do with any bankruptcy proceeding. The Indictment did not charge any bankruptcy related counts or conduct. The transactions at issue had nothing to do with bankruptcy proceedings. The Government never presented any evidence of bankruptcy issues that were part of the charged conduct. None of the individuals or entities involved in the indicted transactions—specifically, Mr. Bergstein, Hallac, Wellner, Weston, WFF, the P2 Fund, or the TT Fund—were involved in any bankruptcy proceedings, and the P2 Loan and the TT Loan did not involve any bankruptcy proceeding.

The Government seeks the enhancement based on a claim that Mr. Bergstein acquired a bankruptcy claim through an entity named CAC Group for a 2008 debt to an Arkansas company named Stephens. Neither CAC Group, nor Stephens were part of the charged conduct or the facts of fraud on the P2 and TT Funds at issue in this case, and the debt purchased was from years before the indicted conduct. Thus, the mere fact that CAC Group purchased a claim from Stephens is an insufficient nexus to apply U.S.S.G. §2B1.1(b)(9)(B), even if the purchase involved a misrepresentation, for which there is insufficient proof.

The Government's contention that Mr. Bergstein misrepresented his or Wellner's

relationship with CAC Group is illusory. For example, Mr. Bergstein advised that Wellner was the CFO of Weston, which would fund the acquisition of the debt, which would be owned by a special purpose vehicle over which Weston had a control position. *See* Ex. 26. This was accurate—Wellner's position with Weston was correct, the source of funds was accurate (even under the Government's theory, the funds came from the TT Fund through Swartz IP, as agreed by Weston, and Weston previously used CAC Group to acquire a claim that Marshall Manley held against Gerova, in order to protect WFF's recovery of the Hedge Fund Securities). Accordingly, there was an established association between Weston and CAC Group. *See* Exs. 27 & 28.

Further, the only representation contained in the "Agreement of Sale" filed in the referenced bankruptcy cases was that CAC Group was not an "affiliate" of Mr. Bergstein, Pangea Media Group LLC, R2D2 LLC, or CT-1 Holdings. *See* Exs. 29 & 30. Under Title 11, United States Code (the "Bankruptcy Code"), the term 'affiliate' has a very specific definition. *See* 11 U.S.C. § 101(2). Specifically,

> The term "affiliate" means –
>
> (A) Entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—
>> (i)   in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
>> (ii)  solely to secure a debt, if such entity has not in fact exercised such power to vote;
> (B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—
>> (i)   in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
>> (ii)  solely to secure a debt, if such entity has not in fact exercised such power to vote;
> (C) person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or
> (D) entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 45 of 67

11 U.S.C. § 101(2). The Government has not established, nor can it, that CAC Group satisfies any of these definitions of "affiliate" with respect to Mr. Bergstein, Pangea, R2D2, or CT-1 Holdings. Accordingly, there is no evidence supporting the Government's claim that the "offense" here involved a misrepresentation during the course of bankruptcy proceedings. In any event, the mere fact that CAC Group purchased a claim from Stephens is an insufficient nexus to apply U.S.S.G. §2B1.1(b)(9)(B), even if the purchase involved a misrepresentation (which it did not). Instead, the Government must show that the acts in the bankruptcy proceeding were committed "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. §1B1.3(a)(1)(B); *United States v. Tanke*, 743 F.3d 1296 (9th Cir. 2014) (applying standard in U.S.S.G. §1B1.3(a)(1)(B) to define relevant conduct under U.S.S.G. §2B1.1(b)(9)(B)). This enhancement cannot be imposed where, as is the case here, Mr. Bergstein was entirely removed from the bankruptcy proceeding and any alleged misrepresentations had nothing to do with avoiding detection or responsibility for the charged crimes. *See Tanke*, 743 F.3d 1296 (finding that defendant's false testimony's during bankruptcy proceeding, despite the fraudulent scheme was completed four years earlier, occurred "in the course of attempting to avoid detection or responsibility for that offense."); *United States v. Nascembeni*, 586 Fed. Appx. 144 (4th Cir. 2014) (finding that defendant's filing of bankruptcy petition using the alias created to fraudulently receive supplemental Social Security benefits – the charged conduct – was "part and parcel of the same fraudulent behavior."); *United States v. Boyle*, 2018 WL 834081, at *2-3 (3rd Cir. 2018) (finding that defendant's misrepresentations in bankruptcy court were an attempt to evade detection of his fraudulent scheme).

### F.    Mr. Bergstein Did Not Manage Anyone In Criminal Activity.

A 2-level enhancement pursuant to U.S.S.G. § 3B1.1(b) is not appropriate because Mr. Bergstein was not a manager of the criminal activity of others. The Government did not establish that Kia Jam was a criminal conspirator, much less that Mr. Bergstein managed Kia Jam in any unlawful activity.

The imposition of this enhancement centers on whether the defendant "exercised some

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 46 of 67

control over others involved in the commission of the offense" or "played a significant role in the decision to recruit or to supervise lower-level participants." *United States v. Blount*, 291 F.3d 201, 217 (2d Cir. 2002); *United States v. Greenfield*, 44 F.3d 1141, 1146 (2d Cir. 1995) (internal quotations omitted). There is insufficient evidence to establish that Mr. Bergstein managed Kia Jam in any unlawful activity. First, the involvement of Kia Jam in the business transactions at issue in this case cannot fairly be described as subservient to Mr. Bergstein. Rather, if anything, Jam and Mr. Bergstein functioned at the same, not different, levels. There are several emails in evidence showing Jam asking Mr. Bergstein for funds to cover various expenses, with Mr. Bergstein often providing payments. The relationship between Mr. Bergstein and Jam was that of equal partners, engaged in a legitimate business relationship, and this enhancement does not apply in such cases. *United States v. Burgos,* 324 F.3d 88, 93 (2d. 2003) (finding that enhancement was not warranted when relationship between defendant and a participant in alleged fraudulent scheme was mutually beneficial and defendant considered the participant his "right hand man," and further, that any direction from defendant occurred in the course of "legitimate employment," not in directing criminal activity). As previously discussed, any requests from Mr. Bergstein to Jam to wire money were made in the normal course of their legitimate business relationship. Further, the Government alleges that Mr. Bergstein and Jam discussed how Jam should disburse the loan proceeds; a true manager of criminal activity would have simply directed Jam on such actions. Discussion is, again, a sign of a partnership, and not proof of any subservient or manager-type relationship. *Greenfield*, 44 F.3d at 1146 (enhancement does not apply to equal partners). At most, the Government's evidence shows that Jam was a "beneficiary" of Mr. Bergstein's conduct, but not someone who was managed. The Government has not introduced evidence demonstrating that Jam was knowingly involved in the indicted scheme, or any other scheme for that matter.

G.   **Mr. Bergstein Did Not Obstruct Justice Regarding The Warshawsky-Produced Documents.**

Based on previous hearings and submissions in this matter, Mr. Bergstein anticipates that the Government will contend that he obstructed justice in this case by purportedly arranging with

41

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 47 of 67

witness Evan Warshawsky to produce allegedly fabricated invoices.   The Government's conclusion is erroneous and without sufficient evidence.

The Government has not established that documents produced by Evan Warshawsky for trial are not authentic.   For that reason, a 2-level enhancement under U.S.S.G. § 3C1.1 is inappropriate here because Mr. Bergstein did not obstruct justice.

Indeed, the payment to Warshawsky was a legitimate payment for financial and accounting consulting work performed last year.   He performed work for the company CCH, which in 2017 acquired various assets and a company named Biozone from a company named Flavor Producers, Inc ("FPI").   Warshawsky was retained in the summer of 2017 to look at the inventory of assets CCH was acquiring and provide financial consulting and an audit related to that acquisition. Richard Fischler headed CCH at the time, agreed to the retention of Warshawsky and authorized the payment of a $25,000 flat fee to Warshawsky for the services.   Warshawsky in fact performed the work and was owed payment.   Payment was made later in the year, in December, because it took several months for CCH's financial condition to get to the point where it had the funds to pay Warshawsky for the work he had previously performed.   CCH issued a 1099 to Warshawsky for the work he performed.   At the time Fischler authorized CCH's payment, he was not aware that Warshawsky had anything to do with Mr. Bergstein's criminal trial, and the payment was not pursuant to any financial arrangement between Mr. Bergstein and Warshawsky.   *See* attached Decls. of Richard Fischler and Juan Estevez.

When asked about payments during questioning at trial, Mr. Warshawsky accurately testified that he had been paid $25,000 in December 2017 but did not recall which of several Bergstein related work-projects that payment was far.   *See* attached Declaration of Evan Warshawsky.   Warshawsky worked on several work projects in 2016 and 2017 for people introduced to him through Mr. Bergstein.   In addition to his work for CCH, he performed independent contractor financial and accounting work for Saleen Automotive, which paid him approximately $101,000 for work in 2016 and 2017, and for Flavor Producers, Inc., which paid him $30,000 in 2016 and factored into the work he did for CCH.   *See id.; see also* attached Decls.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 48 of 67

of Joe Bianco, Daniel Lutz, and Richard Fischler. All this work was legitimate work for which Warshawsky was paid money due to him. None of it had anything to do with Warshawsky locating invoices and documents for Mr. Bergstein from his work several years before. In the then-and-there of his trial testimony, and without having given any thought to such payments because they were not related to his location of documents for Mr. Bergstein, Warshawsky simply could not recall which work matter the recently received $25,000 payment was for. Significantly, neither the $25,000 payment, nor any of the other payments he received in 2017 for work he received through Bergstein introductions, had anything to do with paying him for old invoices, much less fabricated or fake invoices.

Additionally, contrary to the Government's assertion otherwise, Mr. Bergstein never intended to use many, or any, of the allegedly "fake" documents at trial. Rather, Mr. Bergstein produced potentially relevant documents to the Government after being directed by the Court to produce to the government materials "forthwith, under pain of not being able to offer the testimony" of the witnesses to which the documents related. *See* Tr. at 234. When many of these "questioned" documents were produced to the Government, the defense expressly advised the defense had not yet determined whether it intended to use the documents at trial, but instead were producing them now out of an abundance of caution in light of the Court's directive.

### H.   Mr. Bergstein Did Not Obstruct Justice By Testifying At Trial.

The fact that Mr. Bergstein testified on his own behalf and was convicted falls far short of establishing that he perjured himself. The indictment in this case is very broad, and the Government did not seek any specific findings on its verdict form. Accordingly, there is no basis to conclude that Mr. Bergstein perjured himself or that the jury concluded that Mr. Bergstein was untruthful in his testimony.

### I.   Mr. Bergstein Did Not Obstruct Justice By "Lying To The SEC."

The Government bases this allegation on questions in deposition about a handful of particular usages of funds. The proceeds referenced were reimbursements for funds Mr. Bergstein advanced to the transaction at issue in the case. Since the funds were reimbursement for payments

43

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 49 of 67

he had already made, he was free to use the funds as he wished upon being reimbursed.

## VI.   APPLICATION OF THE GOVERNMENT'S PROPOSED FRAUD GUIDELINES LEADS TO A DISPARITY IN SENTENCING

While Mr. Bergstein submits the evidence makes clear that the loss in this case is zero and that fraud guideline sentencing enhancements do not apply at all, the Government takes an extreme view of fraud loss and sentencing enhancements that result in a recommended sentence in excess of 20 years.   Any findings that adopt the Government's proposed guideline application demonstrate that following the current Sentencing Guidelines for economic offenses can often result in a sentence that is disparate and patently unfair.   This is because of the Guidelines' over-emphasis on loss amount and "doubling-up" on additional point enhancements for offense characteristics.   As such, the fraud Guidelines have faced criticism by courts in this district and beyond.   As Judge Rakoff stated in *United States v. Adelson*, 441 F. Supp.2d 506 (S.D.N.Y. 2006):

> To put this matter in broad perspective, it is obvious that sentencing is the most sensitive, and difficult, task that any judge is called upon to undertake. Where the Sentencing Guidelines provide reasonable guidance, they are of considerable help to any judge in fashioning a sentence that is fair, just and reasonable. But where, as here, the calculations under the guidelines have run so amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences.

*Id.* at 515 (emphasis added).   In *Adelson*, Judge Rakoff imposed a sentence of 42 months after calculating an advisory Guideline range of life imprisonment. *Id.* at 509, 514; *see also United States v. Gupta*, 904 F. Supp. 2d 349 ("This Court has already had occasion to comment on the unreasonableness of this approach in *United States v. Adelson*, 441 F. Supp.2d 506, (S.D.N.Y. 2006), and hereby adopts by reference the observations made there.").   In *Gupta*, Judge Rakoff imposed a sentence of 24 months after calculating an advisory Guideline range of 78 to 97 months' imprisonment. *Id.* at 353, 355.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 50 of 67

In *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), Judge Block, after conducting an in-depth analysis of sentences in securities fraud cases nationwide, noted his disagreement with the advisory guidelines:

> While I acknowledge that the Guidelines 'reflect Congress' judgment as to the appropriate national policy for such crimes,' *id.*, this does not mean that the Sentencing Guidelines for white collar crimes should be a black stain on common sense. Fortunately, thanks to the Supreme Court, district courts are now 'allowed to impose a sentence that varies from the Guidelines based solely on…disagreements with the Guidelines,' as long as they "state the basis for [their] disagreement along with 'sufficient justifications' for 'the extent of any departure.'" *Cutler*, 520 F.3d at 163 (quoting *Gall*, 128 S. Ct. at 594).

*Id.* at 754-755. In *Parris*, Judge Block imposed "a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life." *Id.* at 745.

Here, applying the fraud guidelines as recommended by the Government in their March 16, 2018 letter to the Probation Department results in a total offense level of 39. Thirty-two of those points are enhancements based on specific offense characteristics and role in the offense: 22 points for the loss amount, 2 points for involving 10 or more victims, 2 points for sophisticated means, 2 points for the offense involving a misrepresentation in the course of a bankruptcy proceeding, 2 points for the defendant being a manager of criminal activity and 2 points for obstruction of justice.

> While one might theorize as to why the Sentencing Commission promulgated each of these additions, 'the [Sentencing] Commission has never explained the rationale underlying *any* of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, of the weights it has chosen to assign to each identified characteristic.' Stith & Carbanes, *supra*, at 69. Here, their combined effect—an added 20 points under the Government's approach—ill-fits the situation of someone like Adelson. It represents, instead, the kind of 'piling-on' of points for which the guidelines have frequently been criticized.

*Adelson* at 510 (emphasis added). This "piling-on" of points repeatedly punishes Mr. Bergstein for aspects of the case effectively incorporated into the loss enhancement but also added on as

specific offense characteristics.  Although he bears the full brunt of the entire loss amount for encompassing a "leadership role" over his co-conspirator, Kia Jam, he still receives 2 additional points for being a manager of criminal activity under the Government's theory.

As the following chart indicates, in 2016, over 40% of fraud and money laundering sentences in the Second Circuit were below Guidelines sentences.



SOURCE: This was produced using the U.S. Sentencing Commission's Interactive Sourcebook (isb.ussc.gov) using the commission's fiscal year 2006-2016 Datafiles, USSCFY2006-USSCFY2016.

As represented in the above chart, since *Adelson* was decided, the trend in the Second Circuit has been to impose below the Guideline sentences in fraud and money laundering cases. "As our independent review of sentencing statistics and the results of our empirical study show, federal district judges usually choose not to follow the advisory fraud guideline, particularly in the context of mid-high monetary damage cases."  Mark W. Bennett, Justin D. Levinson & Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 IOWA LAW REVIEW 939, 981.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 52 of 67

VII.   **APPLYING SECTION 3553 FACTORS TO THE FACTS AND CIRCUMSTANCES OF THIS MATTER WEIGHS IN FAVOR OF A SENTENCE BELOW MR. BERGSTEIN'S CALCULATED GUIDELINES RANGE**

We respectfully submit that a minimal sentence is appropriate in this case because a review of the factors the Court must consider pursuant to Title 18 U.S.C. § 3553(a)(1) – (7) weighs in favor of such a disposition.[13]   Certain of these factors are referenced above in discussing Mr. Bergstein's character and conduct, but are directly applied here.

Pursuant to 18 U.S.C. § 3553, the Court should impose "a sentence sufficient but not greater than necessary" to provide just punishment for the defendant, and consider "the nature and circumstances of the offense and history and characteristics of the defendant."  In doing so, the Court must also consider the need for the sentence it imposes "to reflect the seriousness of the offense, [and] to promote respect for the law."  18 U.S.C. § 3553(a)(l) and (2)(A).  These sections of the Code direct the Court to consider the defendant, his life, and his actions holistically, and to "provide just punishment for the offense" in light of all the facts known to the Court.  Such consideration here results in a sentence between zero to 6 months.

A.   **Seriousness Of The Offense And History And Characteristics of the Defendant.**

Although Mr. Bergstein's offense is serious, we respectfully submit that a minimal sentence will still promote respect for the law and provide just punishment, particularly given the distinct mitigating circumstances present here.  The four corners of the charging documents in this case and the PSR do not define Mr. Bergstein; rather, they only reveal a fraction of the man, and during an aberrational, and highly stressful, period of his life.  But the Court must sentence the whole person—here, that necessitates consideration of Mr. Bergstein's criminal conduct in the context of his whole life.  As set forth in more detail in Section II above, Mr. Bergstein has been a constant and positive presence in the lives of others.  And as set forth more fully in Section V above, this case is unique in that Mr. Bergstein's conduct and motivations are generally unlike those of the defendants in securities fraud cases tried in this Circuit, as this case involves a real

---

[13] This argument applies even should the Court determine that a different Sentencing Guidelines range is applicable to Mr. Bergstein.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 53 of 67

business transaction that Mr. Bergstein worked tirelessly to bring to successful conclusion (and would have but for the actions of others), as opposed to an empty scheme devoid of value or likelihood of success.

### 1.    Mr. Bergstein's Reduced Likelihood Of Recidivism.

Mr. Bergstein is 55 years old. Under the advisory guidelines, age is "ordinarily" not relevant pursuant to U.S.S.G. §5H1.1, but may be so in unusual cases or in combination with other factors, or may be considered as a §3553(a) factor to vary from the guidelines. Post-*Booker* and Rita, a sentencing court may consider the defendant's age under § 3553(a). *See, Gall v. United States*, 128 S. Ct. 586, 593, 599 (2007) (affirming sentence of probation, in part, for defendant's age at the time of the offense conduct) and *United States v. Hodges*, No. 07 Cr. 706, 2009 WL 36231, at *8 (E.D.N.Y. Feb. 12, 2009) (noting that "post-*Booker*, courts have observed that recidivism is markedly lower for older defendants" and collecting cases); *United States v. Sanchez*, No. 99 Cr. 338, 2007 WL 60517, at *4 (S.D.N.Y. Jan. 8, 2007) (citations omitted) ("With regard to the necessity to   protect society from future crimes of the defendant, this Court and others have previously declined to impose lengthy Guidelines sentences on older defendants in light of the Sentencing Commission's conclusion that '[r]ecidivism rates decline relatively consistently as age increases.'"). The Sentencing Commission has found "recidivism rates decline relatively consistently as age increases." *See* U.S. Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate (May 2004), p. 12, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (last visited on December 21, 2017). "Generally, the younger the offender, the more likely the offender recidivates." *Id.* at p.12. In addition, this study found that "[r]ecidivism risk increases with each CHC: guideline offenders in higher CHCs are more likely to re-offend within two years of release from prison or upon entering probation status. *Id.* at 8.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 54 of 67

Under the primary recidivism measure, offenders in CHC I [Mr. Bergstein's category] have a substantially lower risk of recidivating within two years (~12%) than do offenders in CHC VI (~55%)." *Id.* at p.6 (alterations added). When one analyzes the risk of recidivism for an offender such as Mr. Bergstein, who is over the age of 50 and is in CHC I, the U.S. Sentencing Commission study found that such risk is 6.2 percent. *Id.* at 28.

As for general deterrence, in the case of economic offenses, "common sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not." *United States. v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y 2012). "[T]here is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 741 F. Supp. 2d at 514. In addition to the terms of forfeiture and restitution that may be imposed in this matter, a sentence of zero to 6 months sends a strong message to individuals who may be inclined to commit a similar fraud in the future.

**B.    Deterrence From Criminal Conduct.**

The second factor listed in 18 U.S.C. § 3553(a)(2) is to "afford adequate deterrence from criminal conduct." 18 U.S.C. § 3553(a)(2)(B). This factor focuses on general deterrence of the public from committing criminal conduct of the type the defendant has engaged in.

Mr. Bergstein submits that a minimal sentence, when considered together with the collateral consequences of this case—an SEC enforcement action seeking disgorgement and civil penalties, as well as multiple civil lawsuits—will provide adequate general deterrence to the criminal conduct of others similarly situated to him. *See United States v. Sklena*, 692 F.3d 725, 732 (7th Cir. 2012) (recognizing that a large civil penalty can have a "deterrent effect . . . similar to that of a criminal sentence"). Moreover, Mr. Bergstein's remand into custody following his conviction (more than three months ago) and inevitable additional obligations constitute serious punishments that will discourage others from doing as he did. Finally, the public humiliation and barriers to re-employment that result from his felony conviction (and the extensive media coverage of the same) are heavy burdens for Mr. Bergstein that would tend to discourage others from committing the same crimes. *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 55 of 67

2006) (noting the ruined reputation of the defendant following his conviction as a deterrent); *see also* Letter of Cary Epstein[14] ("[Mr.] Bergstein has worked for years arranging financing for transactions, advising on transactions, structuring transactions and pursuing distressed company transactional opportunities. Mr. Bergstein has been convicted of securities fraud. Those two sentences are wildly incompatible. Based on my professional experience and having worked with Mr. Bergstein, I believe **Mr. Bergstein's professional career is over."**) (emphasis in original).

Further, recent studies have also indicated that general deterrence is better realized through the probability of punishment, rather than its length or severity in any one particular case. *See, e.g.*, Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes)*, 58 Stan. L. Rev. 67, 80 (Oct. 2005) ("Research has found that offenders are more sensitive to the probability of punishment than to its severity . . . White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty."); *Adelson*, 441 F. Supp. 2d at 514 ("there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."); United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* (2004) (noting that the Sentencing Guidelines were written, in part, to "ensure a short but definite period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence.").

Properly understood in context, Mr. Bergstein's conduct is undeserving of a lengthy prison sentence (and unmistakably undeserving of the range calculated by Probation in the PSR[15]). As such, a minimal custodial sentence will not impair the deterrent effect Mr. Bergstein's sentence will have on others because it will be seen as a proper deviation due to the different circumstances

---

[14] Mr. Epstein is a transactional attorney who has worked with Mr. Bergstein for a number of years on a variety of matters.

[15] In the Final PSR (Dkt. 401), Probation adopted the Government's view wholesale. Mr. Bergstein objected at length to the virtually paragraphs of the draft PSR, and incorporates those objections by reference here and attaches same as Ex. 33.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 56 of 67

of the underlying behavior, the collateral consequences of that behavior, and the significant additional burdens Mr. Bergstein will be required to carry for the rest of his life as a result of his crime.

### C.     Protection of the Public from Further Crimes of the Defendant.

The third factor listed in 18 U.S.C. § 3553(a)(2)(C) requires to the Court to consider the need "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C).

Throughout his professional life, Mr. Bergstein has conducted countless complex business transactions without engaging in the one-time unlawful and aberrational conduct that brought him before this Court. At the time of the relevant transaction, Mr. Bergstein was in the midst of contentious and consuming litigation brought by a business adversary that had upended his professional and personal life.

Against that backdrop, it is without question that the time he has already spent remanded in custody, _plus_ inevitable additional obligations, _plus_ a pending SEC enforcement action, _plus_ civil lawsuits and judgments, _plus_ the mere possibility of a Guidelines sentence behind bars away from his family, equate to a more than sufficient amount of specific deterrence to prevent Mr. Bergstein from further unlawful conduct. Indeed, the Court's immediate remand of Mr. Bergstein has already achieved that result. Epstein notes the significant impact custody has already had on Mr. Bergstein after seeing him in MCC recently:

> "[H]e exhaled and said under his breath with resignation '_I'm done fighting._' . . . I confess that these are words I never, ever expected to come out of Mr. Bergstein's mouth. . . . He was beaten down and far more humble than I have ever seen him."

Given Mr. Bergstein's track record in business and the significant consequences he has already faced and is facing, there is negligible risk that Mr. Bergstein will become a recidivist.

### D.     Avoidance Of Unwarranted Sentence Disparities.

Title 18 U.S.C. § 3553(a)(6) also requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." A comparison of the circumstances and sentences in other, relatively

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 57 of 67

recent cases involving securities fraud illustrates both that: (1) others have engaged in objectively more egregious conduct and received relatively short sentences; and (2) to the extent higher sentences were imposed in other cases, the mitigating factors that are present for Mr. Bergstein did not exist in those cases. Even if the Court were to find that some of the Government's sentencing enhancers apply, a sentence below Mr. Bergstein's calculated Guidelines range would, nonetheless, be appropriate and certainly consistent with the below-Guidelines punishments imposed on other defendants who had higher gains, direct fiduciary duties, or a higher number of victims.

Gary Hirst, the former president and chairman of the board of Gerova, exhibited conduct objectively more egregious than Mr. Bergstein, and received a sentence of 78 months—an amount appropriately above what we are seeking yet still significantly below Probation's calculation. Hirst defrauded his shareholders by secretly giving away nearly $72 million of company stock to himself and his co-conspirators for no legitimate business purpose. As a result of this scheme, Hirst and others reaped nearly $20 million in profits ($2.6 million that benefitted Hirst directly). *See United States v. Hirst*, 15 CR 643 (PKC), Complaint (Dkt. No. 2) (S.D.N.Y. September 21, 2015). Hirst's sentence of 78 months in prison was significantly below the calculated guidelines ranged of 168 to 210 months for his offense level of 35. *See Hirst*, 15 CR 643 (PKC), Judgment (Dkt. No. 437) (S.D.N.Y. August 3, 2017). It is worth pointing out two factors present in Hirst's case that are not present here. First, Hirst, unlike Mr. Bergstein, owed fiduciary duties of trust and loyalty to his shareholders and the investing public as an officer and director of a public company. He abused his position to enrich himself by manipulating that company's stock. Mr. Bergstein was at most— and unintentionally—an aider and abettor to Hallac and Wellner's primary violation through their breaches of their fiduciary duties to their investors. Second, Hirst's scheme was entirely illegitimate; here, Mr. Bergstein intended the deal to make money for all involved, including the hedge funds that loaned money to the deal. Despite this egregious conduct, this Court departed from the Guidelines to sentence Hirst to 78 months. The Court should similarly depart from the Guidelines range here to impose a sentence between zero to 6 months.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 58 of 67

Darcy Wedd, a former mobile phone industry CEO, was sentenced to 10 years in prison for a scheme that stands in stark contrast to the offense conduct at issue here. Specifically, Wedd participated in a fraudulent scheme to charge mobile phone customers millions of dollars in monthly fees for unsolicited, recurring text messages without the customers' knowledge or consent – a practice known as auto-subscribing. *United States v. Wedd*, 15-00616 (KBF), Judgment (S.D.N.Y. May 3, 2018). The fraud committed by Wedd and his co-conspirators resulted in the theft of over $150 million from consumers. Wedd was convicted by a jury on December 15, 2017, following a two-week trial.

In Wedd's case, the applicable sentencing range pursuant to the Guidelines was 120 years' imprisonment. The Probation Office recommended a below-Guidelines sentence of 180 months' imprisonment. The Government requested a sentence at least in accordance with Probation's recommendation; Wedd requested a sentence of 84 months' imprisonment. *United States v. Wedd*, 15-00616 (KBF), Government Sentencing Mem. (S.D.N.Y. March 26, 2018). Wedd ultimately received 10 years.

Whereas Wedd's fraud focused on consumers and was predatory in nature, Mr. Bergstein's offense conduct related to a soured business deal among sophisticated parties. Whereas Wedd and his co-conspirators stole over $150 million from consumers, Mr. Bergstein intended zero loss and the actual loss can only be said to be zero. Wedd's conduct (which, according to the Guidelines, warranted 120 years behind bars) was deserving of a 10-year sentence; Mr. Bergstein's is not.

The case of Mehmet Hakan Atilla is also illustrative on this point. Atilla, a banker and deputy general manager at a Turkish bank, was convicted by a jury earlier this year on four counts of conspiracy and one count of bank fraud based on charges that he helped Iran undermine U.S. sanctions and launder $1 billion in oil revenue through the U.S. financial system. In May 2018, he was sentenced to 32 months in prison, a non-Guidelines sentence substantially below Probation's recommendation of life and the government's argument for 15 years. *United States v. Atilla*, 15 CR 867 (RMB), Sentencing Tr. (S.D.N.Y. May 16, 2018). Judge Berman calculated a Guidelines range of 97 to 121, and imposed a sentence below even that. Moreover, Atilla received

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 59 of 67

credit for the 14 months he has already spent in jail following his arrest (meaning he will only serve 18 additional months), was not criminally fined, and will not face any restitution obligations. *Id.*

In sentencing Atilla, Judge Berman pointed to the Second Circuit's 2007 decision to affirm the non-Guidelines sentence (42 months as opposed to life) imposed by Judge Rakoff on former drug company President Richard P. Adelson—despite Adelson's massive fraud—to convey that Guideline ranges for white collar crimes can often yield unfair results.[16] Judge Berman also referenced the more than one hundred letters he received from Atilla's family and friends in acknowledging Atilla had lived an exemplary life in Turkey. It is worth noting that this 32-month sentence was notwithstanding the fact Judge Berman found that Atilla testified falsely at trial. *Atilla*, 15 CR 867 (RMB), Sentencing Tr. (S.D.N.Y. May 16, 2018). Given Atilla's character and aberrational conduct, Judge Berman used his discretion to impose a just sentence where following the Guidelines or the recommendations of Probation and the government would have resulted otherwise. The same is true in this case.

Finally, the case of Kansas businessman and race car driver Scott Tucker further demands that the Guidelines range in Probation's Presentence Report not be applied to Mr. Bergstein's case. Tucker was sentenced to 200 months in prison by this Court earlier this year, after being found guilty by a jury of fourteen counts of, *inter alia*, violating federal truth in lending and racketeering laws. *United States v. Tucker*, 16 CR. 91 (PKC), Judgment (Dkt. No. 322) (S.D.N.Y. January 5, 2018). Specifically, Tucker and his lawyer orchestrated a $2 billion payday loan scheme and then entered into sham deals with tribes in an attempt to shield their involvement from law enforcement. Probation's Presentence Reports calculated an applicable Guidelines range of life imprisonment (and recommended a total sentence of 28 years imprisonment), and the Court adopted the guideline

---

[16] *See United States v. Adelson*, 441 F. Supp. 2d 506, 506 (S.D.N.Y. July 20, 2006), *aff'd*, 301 Fed. Appx. 93 (2008) (in imposing the 42 month sentence, Judge Rakoff had stated, "this is one of those cases in which calculations under the sentencing guidelines lead to a result so patently unreasonable as to require the court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law.").

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 60 of 67

calculates set forth by Probation. *See Tucker*, 16 CR. 91 (PKC) (Dkt. No. 331) Judgment Tr. (S.D.N.Y. January 31, 2018).

The 200-month sentence handed down by this Court (again, an amount similar to that in the Presentence Report here) should be reserved for defendants like Tucker whose cases do not involve the special and mitigating circumstances present in the instant case. Indeed, the length of Tucker's scheme (roughly 15 years), number of victims (millions) and net payments ($1.3 billion) exponentially exceed the corresponding figures here. Moreover, unlike Mr. Bergstein, Tucker had a prior criminal history rooted in fraud, having been previously incarcerated in federal prison for making a false statement to obtain a bank loan and of running a fraudulent financial services business. *Id.* Even with these exacerbating factors, Tucker's sentence was still below the relevant Guidelines range.

Mr. Bergstein's circumstances compare favorably with the foregoing defendants, and indicate that the requested sentence is appropriate to avoid unwarranted disparities with their sentences. Moreover, as previously argued in his bail reconsideration motion (Dkt. 352), Mr. Bergstein's remand into custody was atypical of cases involving similarly situated defendants. We respectfully submit that this entirely unexpected three-month period at the Metropolitan Correctional Center in New York—three thousand miles away from his wife and children—has served as its own form of additional punishment.

**E.      Restitution To Victims Of The Offense And Financial Considerations.**

Finally, 18 U.S.C. § 3553(a)(7) requires the Court to consider "the need to provide restitution to any victims of the offense." The Government's restitution calculation is erroneous because it merely recites the Government's inflated loss calculation of $22,584,897. The Government's calculation fails to (1) account for the actual loss in this case based on payments to the P2 and TT Funds, and (2) the extent to which most of the alleged victim money from the P2 and TT Funds went to people under the Government's control. For the reasons noted above in the section regarding loss amount, Mr. Bergstein believes the P2 and TT Funds were or should have been made whole and that no restitution is warranted.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 61 of 67

1.      **Restitution Should Be Reduced By Loan Repayments and Settlements.**

The overarching principle of restitution is that a victim is not entitled to recovery beyond its actual loss. *United States v. Dharia*, 284 F.Supp.3d 262 (E.D.N.Y. 2018) ("The case law can be restated in a simple principle: 'restitution may not result in double recovery.') (citing *United States v. Cummings*, 189 F.Supp.2d 67, 79 (S.D.N.Y. 2002)); *United States v. Boccagna*, 450 F.3d 107, 115, 119 (2d Cir.2006) (restitution is only concerned with the victim's actual loss because "the purpose of restitution is essentially compensatory."). The MVRA explicitly provides that "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in  - (A) any Federal civil proceeding; and (B) any State civil proceeding, to the extent provided by the law of the State." 18 U.S.C. § 3664(j)(2).

Therefore, the order of restitution necessarily must account for any civil litigation recoveries to the P2 and TT Funds, and any disgorgement paid to the Government. *See, e.g., United States v. Drayer*, 364 Fed.Appx. 716, 722 (2d Cir. 2010) ("Here, the government concedes that remand is necessary in order for the District Court to clarify whether Drayer is entitled to a further reduction in the restitution ordered because of any amounts the 20 additional victim-banks received from the BONY settlement. Accordingly, we vacate the judgment with respect to Drayer's restitution order and remand solely for findings in that respect."); *United States v. McGinn*, 787 F.3d 116 (2d. Cir. 2015) (holding that, to the extent monies were actually distributed to victims by Receiver in related SEC action, the amount of distribution should offset Mr. Bergstein's restitution obligations). In addition, any value that the victim received in connection with the alleged scheme must be taken into account when crafting the restitution application. *United States v. Faibish*, 2017 WL 3634599, *2 (E.D.N.Y. Aug. 22, 2017) (requiring government to revise restitution claim to take in account the amount the alleged victim received in exchange for a fraudulently-induced payment, including dividends and interest payments on a loan). In this case, this would include income or distributions from collateral for the loan, such as the Hedge Fund Securities, as well as from Parmar's medical companies that were purchased in

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 62 of 67

the transaction at issue, and from the sale of any of the hedge fund securities or Parmar's medical companies. Finally, principal repayments by third parties against a loan amount should be offset for purposes of calculating restitution. *See, e.g., United States v. Foley*, 738 F.3d 7, 27 (1st Cir. 2015) (finding that the district court erred in failing to offset the original loan amounts by principal repayments made by some of the borrowers and remanding for the district court to recalculate the lenders' loss on this basis).

Significantly, restitution orders may not be entered without identifying the victims and their actual losses. *United States v. Fiumano*, 2018 WL 507171, at *5 (citing *United States v. Zakhary*, 357 F.3d 186, 190 (2d Cir. 2004) ("A lump sum restitution order entered without any identification of victims and their actual losses is not permissible."); *United States v. Catoggio*, 326 F.3d 323, 328 (2d Cir. 2003) (holding "that restitution can only be imposed to the extent that the victims of a crime are actually identified")). Moreover, the restitution calculation must take into account the loss attributable to the defendant. *Zakhary*, 357 F.3d at 190-91 (vacating the judgment of conviction ordering restitution because the victims of the defendant's fraudulent conduct were not identified nor was the amount of their individual losses determined). In a case like this one, where multiple parties have Mr. Bergstein in state court and in many instances have received substantial settlements,[17] yet also purport to be victims in this criminal case, this Court should require the Government to submit an accounting that identifies all purported victims and the amount of their losses.[18]   The requirement for such an accounting is made even more

---

[17] Any suggestion by the Government that Mr. Bergstein should be required to pay the legal and other expenses of these civil plaintiffs as part of his restitution obligation should be rejected. On May 30, 2018, the Supreme Court in *Lagos v. United States*, No. 16-1519, held that the MVRA does not allow a victim to recover expenses incurred in connection with its private investigation, civil litigation, or bankruptcy proceedings to recover losses from a defendant. (Opinion at 3). The Supreme Court held that the MVRA only entitles victims to recovery of those expenses incurred during participation in "*government* investigations and *criminal* proceedings," such as lost income, childcare expenses, or transportation expenses. *Id.* (emphasis added). Accordingly, the Supreme Court reversed a restitution award for legal, accounting, and consulting fees incurred by a lender seeking recovery of losses that were caused by the defendant's fraud. *Id.* at 8.

[18] The losses here are to the hedge funds, but to the degree the Government has tried to argue that individual hedge fund investors are the victims, the Government must be required to identify each with specificity. Here, it is worth noting that any such individual investors in the funds were sophisticated and high net worth.

Case 1:16-cr-00746-PKC  Document 402  Filed 06/13/18  Page 63 of 67

compelling by the fact that Hallac, a coconspirator in the case, as an owner in the P2 and TT Funds is an alleged Government victim; certainly Mr. Bergstein should not have to pay Hallac for his alleged losses.

### 2. Restitution Should Be Reduced By Amounts Paid to Persons Under the Government's Control.

Government informant Parmar received over $7 million of the funds, money paid pursuant to the agreements at issue in the instant case in exchange for medical companies that he never delivered. After receiving those millions in investor money, he reneged on providing the medical companies to Arius Libra and instead formed another company, by his own admission turning the investment into $100 million that could have been available to investors in the instance case. *See* Ex. 1. The Government has taken no action at all against its long-time informant Parmar for his theft from all the players in this case, including Mr. Bergstein. Instead, it has allowed him to steal that investor money, as well as the benefit of the medical billing and recordkeeping companies that Arius Libra was entitled to.[19]

Separate from the millions that went to Parmar, Government cooperators Hallac and Wellner received millions of the investors' money. At a million, Hallac and Wellner received millions from proceeds of the loans at issue. Yet the Government has done nothing thus far to collect anything from them, other than a portion of the $750,000 "Purplebox" money they received.

The Government controls each of informant Parmar, cooperator Hallac and cooperator Wellner. The Government has not accounted for the funds they controlled. The Government

---

[19] Parmar was recently indicted, not by the S.D.N.Y., but the D.N.J., and not for his fraud in the instant case, but for defrauding more recent investors in a fraud scheme very much like the one he committed against Mr. Bergstein, Arius Libra and the other in the instant case. *See* Ex. 31 (Parmar Criminal Complaint). Given that his indictment occurred shortly after the instant trial, the Government undoubtedly was investigating him for a fraud paralleling ours at the very same time Mr. Bergstein was seeking discovery regarding Parmar, which the Government continually refused to provide throughout this case. Indeed, since the Indictment of Parmar became public, defendant again sought relevant discovery regarding Parmar, (*see* Ex. 31 (T. Bisconti Email to Gov't Dated May 22, 2018), and the Government, once again, refused to provide such discovery, arguing Parmar's misconduct occurred after the offense conduct here and stating: "And as has been litigated, misconduct by Mr. Parmar would not excuse your client's lies to Weston and its investors." *See* Ex. 32 (Gov't Email Dated May 23, 2018). The Government has repeatedly violated its discovery obligations regarding informant Parmar in this matter.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 64 of 67

cannot properly foist all restitution obligations on Mr. Bergstein, while ignoring obligations of its cooperators Hallac and Wellner to avoid paying the funds they received.

Under the Mandatory Victims Restitution Act (MVRA), "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e); see also *United States v. Smathers*, 879 F.3d 453, 460-61 (2d. Cir. 2018) (applying same burden). "[T]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e); see also *United States v. Reifler*, 446 F.3d 65, 122 (2d Cir. 2005) (applying same burden). The Government is required to demonstrate the victim's loss amount with specificity. *Reifler*, 446 F.3d at 122, 133 (vacating restitution orders where the government failed to properly identify victims and quantify their losses). "[T]o the extent practicable" victims shall be notified of the opportunity to file "a separate affidavit relating to the amount of the victim's losses subject to restitution." 18 U.S.C. § 3664(d)(2)(A).

While normally the burden is on the defendant to show credits against restitution obligations, e.g., *United States v. Smathers*, 879 F.3d 453, 460-61 (2d. Cir. 2018), that burden should not apply in the instant case. The rational for the burden is that the defendant typically is best situated to provide evidence that recoveries from other sources were for the same loss that he caused and that the alleged victim has been compensated in full for the loss he caused. *Id.* at 461. This is not the present in the instant case. To the contrary, the Government's cooperators, Hallac, Wellner and Parmar, are in the position to know what additional funds were received by Arius Libra and or the medical record and billing companies, and what funds were or should have been paid to the victim hedge funds, as Hallac and Wellner managed and controlled WFF, the P2 Fund, the TT Fund, and Arius Libra, and Parmar controlled the medical companies. Mr. Bergstein controlled none of them. They know the specifics while Mr. Bergstein does not. Based on what is known, it appears highly likely that Hallac and Wellner received far more than necessary to repay P2 and TT in full.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 65 of 67

## VIII. THE GOVERNMENT'S FORFEITURE APPLICATION IS NOT SUPPORTED BY THE EVIDENCE AND IS INCONSISTENT WITH PREVAILING FORFEITURE LAW

Immediately following Mr. Bergstein's conviction, the Government proposed a preliminary order of forfeiture in the amount of $22,584,897, which is based on an inflated loss calculation that Mr. Bergstein has challenged above, and will further challenge at the June 25, 2018 Fatico hearing. The Government summarily argued that because in its view, Mr. Bergstein was the mastermind behind the fraudulent scheme, the entire amount of the fraud (but for approximately $4,525,675 that it has conceded is not forfeitable (Dkt. 368)) is properly forfeitable from Mr. Bergstein, notwithstanding the full participation of co-conspirators Wellner and Hallac, without whom the fraud could not have been carried out. Mr. Bergstein opposed the Government's proposed preliminary order of forfeiture in a letter dated April 11, 2018 (Dkt. 375), and fully incorporates herein the arguments in that submission.[20]

As explained in Part V above, the hedge funds did not suffer an actual loss in this case. The $22,584,897 loss amount reflected in the PSR does not account for the extent to which Hallac and Wellner misappropriated funds, the $7 million in payments to Parmar, or for various repayments of the loan amount by Mr. Bergstein. In any event, those amounts should be deducted from any forfeiture judgment. As Mr. Bergstein's explained in detail in his April 11, 2018 forfeiture submission, after the Supreme Court's decision in *Honeycutt* last year, the Government cannot seek forfeiture based on joint and several liability. Any forfeiture judgment imposed on Mr. Bergstein must be limited to funds that he personally obtained. In addition, repayments of the loans and payments to victims, should be credited against any forfeiture amount. There were also disbursements that went to third parties that were not owned or controlled by Mr. Bergstein.

---

[20] Mr. Bergstein submitted a letters contesting the Government's position on the forfeiture amount (Dkt. 359 and Dkt. 375). With his April 11, 2018 letter (Dkt. 375), Mr. Bergstein submitted a summary chart outlining (1) repayments of the P2 and TT loans; (2) amounts obtained by Hallac, Wellner, or entities they controlled; and (3) disbursements to other third parties not owned or controlled by Mr. Bergstein, and made for the benefit of the investors, as well as other exhibits containing correspondence that provides factual support for certain repayments. Mr. Bergstein will present and elicit additional evidence at the *Fatico* hearing, of amounts that cannot be included in any forfeiture judgment.

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 66 of 67

For these reasons, which are fully briefed in Mr. Bergstein's April 11, 2018 forfeiture submission, the Court should decline to impose forfeiture in this case.

## IX.   REQUESTS FOR BUREAU OF PRISON RECOMMENDATIONS

Mr. Bergstein has a history of resorting to alcohol and drugs during periods of extreme stress, such as the death of his father and diagnosis of his brother with cancer. While he otherwise had no criminal history, he had two instances of driving under the influence years ago. *See* PSR at para 128.   Accordingly, Mr. Bergstein requests that, should the Court sentence him to more than a minimal custodial term, the Court recommend to the BOP that he receive the Residential Drug Abuse Program while in custody.

In addition, because Mr. Bergstein's wife and young children live in the Los Angeles area, where he has lived for over thirty years, he requests that the Court recommend to the BOP that he serve any custodial sentence in a suitable facility as close to the Los Angeles area as possible.

## X.   CONCLUSION

As set forth in detail above, an appropriate assessment of the sentencing guidelines calls for a minimal custodial period of between zero and six months, which properly achieves the goals of sentencing set forth in Section 3553(a).

The interpretation of the sentencing guidelines urged by the Government is draconian in view of the circumstances of the case and the life of Mr. Bergstein. The facts and circumstance of the case are unusual. The crime happened over six years ago, and involves one where Mr. Bergstein intended a successful business deal and worked hard for its success before it failed, largely through the failure of others to do their part in the deal. There has been more than enough money paid and available for the fund managers to have made the victim funds whole. Independent of the crimes of conviction, Mr. Bergstein's lifetime of success and good deeds, as well as his family situation, fairly call for significant mitigation of a sentence that might otherwise apply. Mr. Bergstein respectfully requests this Court impose a minimal custodial sentence with whatever additional conditions the Court deems appropriate. Such a sentence is sufficient to achieve the mandates of Section 3553(a), while, among other things, still allowing Mr. Bergstein

Case 1:16-cr-00746-PKC   Document 402   Filed 06/13/18   Page 67 of 67

a chance to return to his boys' lives while they are still in their formative years.

Dated: June 13, 2018

**BIENERT, MILLER & KATZMAN, PLC**

By:   /s/ Thomas H. Bienert, Jr.
      *Counsel to David Bergstein*

**KING & SPALDING LLP**

By:   /s/ William F. Johnson
      *Counsel to David Bergstein*

**SATTERLEE STEPHENS LLP**

By:   /s/ Andrew L. Fish
      *Counsel to David Bergstein*